IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **EXIDE TECHNOLOGIES, et al.**[1] | ) | **Case No. 02-11125 (KJC)** |
| | ) | (Jointly Administered) |
| Debtors | ) | |

## MEMORANDUM[2]

BY:   **KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the "Motion of Pacific Dunlop Holdings Entities for Reconsideration of Order Denying their Motion to Remand or for Abstention and Stay Relief, and Dismissing their Causes of Action against the Non-Debtor, Foreign Exide Entities" (docket no. 3385)(the "Reconsideration Motion"), in which the Pacific Dunlop Holdings Entities[3] request that I reconsider this Court's Order dated December 11, 2003 that denied the PDH Entities' motion for remand, abstention, and relief from the automatic stay to continue a civil action in the Circuit Court of Cook County, Illinois (the "Illinois State Court). For the reasons set forth below, the Reconsideration Motion is denied.

---

[1] The reorganized debtors in these proceedings are: Exide Technologies, f/k/a Exide Corporation; Exide Delaware, L.L.C.; Exide Illinois, Inc.; RBD Liquidation, L.L.C.; Dixie Metals Company; and Refined Metals Corporation (For ease of reference, the reorganized debtors shall be referred to herein as the "Debtor").

[2] This Memorandum constitutes the findings of fact and conclusions of law required by Fed.R.Bankr.P 7052. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding pursuant to 28 U.S.C. 157(b)(1) and (b)(2)(A), (G) and (O).

[3] The Reconsideration Motion was filed by Pacific Dunlop Holdings (USA), Inc. (referred to herein individually as "PDH (USA)"), Pacific Dunlop Holdings (Europe) Limited, P.D. International Pty Limited, Pacific Dunlop Holdings (Hong Kong) Limited, and Pacific Dunlop Holdings (Singapore) PTE. Ltd. (collectively referred to herein as the "PDH Entities").

## BACKGROUND

The PDH Entities were the owners of the GNB Companies, a global automotive and industrial battery business. In May and June of 2000, the PDH Entities entered into separate stock and/or asset sale agreements (the "Sales Agreements") with the Debtor and three non-debtor foreign subsidiaries: (i) Exide Holding Europe, a French company, (ii) Exide Holding Asia Pte. Limited, a Singapore corporation, and (iii) Exide Singapore Pte. Limited, a Singapore corporation (collectively, the "Non-Debtor Exide Entities"). Under the Sale Agreements, specific PDH Entities sold different corporate subsidiaries or assets to specific Exide entities.

On or about May 9, 2000, PDH (USA) and the Debtor[4] entered into a Coordinating Agreement which governed the transactions contemplated in the Sales Agreements. (See Ex. "A" to the Debtors' opposition to the PDH Entities' remand and abstention motion (Docket no. 2942)). The Coordinating Agreement included, among other things, provisions addressing venue, submission to jurisdiction and governing law (Section 5.2)[5] and indemnification (Article 4).[6]

On July 17, 2001, the PDH Entities filed a complaint in the Illinois State Court against the Debtor and the Non-Debtor Exide Entities asserting claims for breach of contract, unjust

---

[4] The Coordinating Agreement was signed by Exide Corporation.

[5] Section 5.2 of the Coordinating Agreement requires, *inter alia*, that all disputes, legal actions, etc. must be brought "solely in a state or federal court located in the County of Cook, State of Illinois" and agrees that the Coordinating Agreement and Sales Agreements "shall be governed by and construed in accordance with the internal laws of the State of Illinois."

[6] Section 4.1 contains provisions regarding an indemnification by the Seller (i.e., PDH (USA)) and Section 4.2 contains provisions regarding an indemnification by the Buyer (i.e., Exide Corporation). The parties' main dispute is whether the language in the Buyer's indemnification of Section 4.2 is ambiguous. For the reasons set forth on the record at a November 19, 2003 hearing and as set forth herein, I have determined that this language is not ambiguous.

enrichment, and conversion relating to funds in the approximate amount of $16.6 million dollars that the PDH Entities allege have been retained wrongfully by the Debtor and the Non-Debtor Exide Entities following the sale of the GNB Companies. In December 2001, PDH (USA) filed a second complaint solely against the Debtor, alleging a breach of contract claim with respect to certain letters of credit and seeking relief in the amount of approximately $3.14 million dollars. Both complaints were consolidated into Case No. 01 L 08460 in the Illinois State Court (the "State Court Actions").

On April 15, 2002, the Debtor filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Case"). After the bankruptcy filing, the Debtor requested that the Illinois State Court stay the State Court Actions as to all defendants, including the Non-Debtor Exide Entities. By Order dated July 19, 2002, the Illinois State Court denied the request to stay proceedings against the Non-Debtor Exide Entities.

On August 21, 2002, the Debtor removed the State Court Actions to the United States Bankruptcy Court for the Northern District of Illinois (the "Illinois Bankruptcy Court"). Thereafter, both the Debtor and Non-Debtor Exide Entities moved to transfer the removed action to this Court. On August 28, 2002, the PDH Entities filed a motion for remand or, in the alternative, abstention in the Illinois Bankruptcy Court. On February 4, 2003, the Illinois Bankruptcy Court issued a Memorandum Opinion granting the transfer motion and ordering that the removed action, including the PDH Entities' pending motion for remand or abstention, be transferred to this Court.

On October 3, 2003, the PDH Entities filed in this Court a renewed motion for remand of the State Court Actions or, in the alternative, for abstention and relief from the automatic stay to

proceed to liquidate the claims in state court (docket no. 2507)(the "Remand and Relief from Stay Motion"). The Debtor opposed the relief requested in the Remand and Relief from Stay Motion and a hearing was held on November 19, 2003. On December 11, 2003, this Court entered an order which stated, in relevant part, that:

> For the reasons articulated on the record on November 19, 2003, Plaintiffs' Motion [the Remand and Relief from Stay Motion] is DENIED. The Court finds that Section 4.2(a) of the Coordinating Agreement as modified by Amendment No. 1 of the Coordinating Agreement is unambiguous, the Debtor Exide is the sole indemnitor thereunder, and consequently the foreign Pacific Dunlop entities have no right of recovery against the non-debtor Exide entities. The Court also finds that all the claims asserted by the Plaintiffs, including those of the foreign Pacific Dunlop entities, are core proceedings to which the automatic stay applies, that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157(b)(2)(B) and (C), that mandatory abstention pursuant to 28 U.S.C. §1334(c)(2) is inapplicable, and that neither remand pursuant to 28 U.S.C. §1452(b) nor discretionary abstention pursuant to 28 U.S.C. §1334(c)(1) is warranted.

Order dated December 11, 2003 (docket no. 3325). On December 26, 2003, the PDH Entities filed the Reconsideration Motion. The Debtor opposed the Reconsideration Motion and a hearing to consider that motion was held February 26, 2004.

## STANDARD - MOTION FOR RECONSIDERATION

The PDII Entities bring the Reconsideration Motion pursuant to Fed.R.Bankr.P. 9023 (to alter or amend judgment), Fed.R.Bankr.P. 7052 (to amend findings of fact and judgment) and Fed.R.Bankr.P. 3008 (reconsideration of claims).

Requests for relief under Fed.R.Bankr.P. 7052, which incorporates Fed.R.Civ.P. 52(b), and Fed.R.Bankr.P. 9023, which incorporates Fed.R.Civ.P. 59(e), are substantially similar. *Gutierrez v. Ashcroft*, 289 F.Supp.2d 555, 561 (D.N.J. 2003). The purpose of these rules is to correct manifest errors of law or fact, but they are not intended to allow a party to relitigate old issues, to advance new theories, or to secure a rehearing on the merits of a case. *Id., Guerin v.*

*United States,* 1999 WL 213372, *1 (E.D.Pa. April 12, 1999).

A motion to alter or amend a judgment under Rule 59(e) must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice. *North River Ins. Co. v. Cigna Reinsurance Co.,* 52 F.3d 1194,1218 (3rd Cir. 1995); *Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3rd Cir. 1985).[7]

Here, the PDH Entities do not argue that there has been an intervening change in controlling law and have not presented any new evidence in support of their arguments. Instead, they claim that the Court misinterpreted Illinois law regarding consideration of extrinsic evidence to construe the parties' intent with respect to the indemnification provision of the Coordinating Agreement and its amendments.

The PDH Entities also seek reconsideration under Fed.R.Bankr.P. 3008, which provides, in relevant part, that "[a] party in interest may move for reconsideration of an order allowing or disallowing a claim against the estate." The PDH Entities argue that the December 11, 2003 Order essentially treated their claims against the Non-Debtor Exide Entities "as if they were claims [against] the estate, and accordingly, reconsideration is sought." *See* Reconsideration Motion, ¶23. However, the December 11, 2003 Order did not make any determination regarding the allowance or disallowance of a claim against the Debtor's estate; instead, it denied the

---

[7]The PDH Entities assert that a motion for reconsideration should be granted if the court is convinced that (1) the court made an error of law or mistake of fact, and (2) if aware of the error or mistake, the court would have reached a different result. *In re Bill's Dollar Stores, Inc.,* 200 B.R. 18, 19 (Bankr.D.Del. 1994), *Quire v. Castle,* 768 F.Supp. 1087, 1090 (D.Del. 1991). However, these cases were decided prior to the Third Circuit Court of Appeals' decision in *North River, supra.,* and, to the extent these decisions may suggest a more relaxed standard, they are no longer good law. *Chama, Inc. v. First Northern Bank and Trust (In re Chama, Inc.),* 265 B.R. 662, 670 (Bankr.D.Del. 2000).

Remand and Relief from Stay Motion because the Coordinating Agreement unambiguously provides that the PDH Entities' only recourse is against the Debtor. Therefore, I conclude that Rule 3008 is not applicable to this matter.

## DISCUSSION

The crux of the dispute concerns the meaning of the term "Buyer" as set forth in the indemnification provision of the Coordinating Agreement. Section 4.2(a) of the Coordinating Agreement (pre-amendment) provided as follows:

Section 4.2   Indemnification of Buyer.

(a)   Subject to Sections 4.2(b), 4.2(c), and 4.2(d), Buyer agrees to indemnify and hold Seller and the International Sellers and their Affiliates harmless from and against any and all Losses and Expenses incurred by Seller or the International Sellers and their Affiliates in connection with or arising from:

   (i)   any breach by Buyer of any of its covenants or agreements in the Sale Agreements or in this Agreement;

   (ii)   any breach of any warranty or the inaccuracy of any representation of Buyer contained in the Sale Agreements, in each case without regard to the "materiality" of Material Adverse Effect; or

   (iii)   any breach by Buyer of any covenant contained in Section 11.1 or Section 12.2 of the U.S. Agreement or the corresponding provisions in other Sale Agreements.[8]

---

[8]The remainder of Section 4.2 provides as follows:
(b)   Notwithstanding anything to the contrary contained herein:
   (i)   Buyer shall be required to indemnify and hold Seller and the International Sellers and their Affiliates harmless for any claims asserted under clause (ii) of Section 4.2(a) with respect to any Losses and Expenses incurred by Seller or the International Sellers only with respect to Qualifying Claims and then only to the extent that such Qualifying Claims, individually or in the aggregate with other Qualifying Claims, exceeds Five Million Five Hundred Thousand United States Dollars (US $5,500,000); and
   (ii)   the aggregate amount required to be paid by the Buyer pursuant to Section 4.2(a) shall not exceed the Purchase Price;
   (iii)   the limitations in (i) and (ii) shall not apply to breaches of Sections 6.1, 6.2, or

6

The definition of the term "Buyer" in Article 1 of the Coordinating Agreement provides as follows:

> **"Buyer"** has the meaning specified on the first page of this Agreement. As used in Articles 1 and 3 to 7, inclusive, Buyer shall be deemed to mean Buyer and/or (as the context may require) any International Buyer.

The first page of the Coordinating Agreement defined "Buyer" as only Exide Corporation. On June 19, 2000, the parties entered into the first of three amendments to the Coordinating Agreement. Amendment No. 1 to the Coordinating Agreement specifically modified Section 4.2(a)(i) "to insert the words 'or, for the sake of clarification, any International Buyer' after the word "Buyer" in the first line of such section." The PDH Entities argue that the term "Buyer," as used in the first sentence of Section 4.2(a), should be read broadly, and, in this

---

|     |       |
| --- | ----- |
|     | 6.7 of the U.S. Agreement and the corresponding provisions of the other Sale Agreements. |
| (c) | The indemnification provided for in this Section 4.2 shall terminate two (2) years after the Closing Date (and no claims shall be made by Seller or the International Sellers thereafter), except that: |
|     | (i)    the indemnification by Buyer shall continue as to the idemnity provided pursuant to clauses (i) and (iii) of Section 4.2(a) indefinitely; and |
|     | (ii)   the indemnification by Buyer as to any event, fact or circumstance of which Seller or the International Sellers have notified Buyer in accordance with the requirements of Section 4.3 on or prior to the date such indemnification would otherwise terminate in accordance with this Section 4.2 shall continue until the liability of Buyer shall have been determined pursuant to this Article 4 and Buyer shall have reimbursed Seller and the International Sellers for the full amount of all Losses and Expenses in accordance with this Article 4. |
| (d) | Notwithstanding anything to the contrary contained herein, in any Sale Agreement, or in any other document, Seller and the International Sellers shall not be entitled to indemnification under Section 4.2(a) with respect to a breach of covenant or agreement or breach or inaccuracy of any representation or warranty of Buyer in the Sale Agreements to the extent that Seller or the International Sellers (which shall include Seller's and the International Sellers' officers, employees, counsel, and authorized representatives) had knowledge of such breach as of the Closing Date. It is understood that for purposes of this Section 4.2(d), Seller shall be deemed to have knowledge of any information contained in written due diligence material provided by Buyer to Seller. |

context, really means the "Buyer and/or any International Buyer."

In the December 11, 2003 Order, I concluded that Section 4.2 of the Coordinating Agreement, as amended, was not ambiguous and, therefore, did not allow the PDH Entities to introduce extrinsic evidence to "clarify" its meaning. The PDH Entities assert that this Court, in reaching its conclusions in the December 11, 2003 Order, either failed to apply the correct Illinois rule of law regarding contract interpretation or failed to apply that rule properly to the facts of this case.

The Supreme Court of Illinois determined that Illinois courts traditionally have applied the following principle of contract interpretation, which is sometimes called the "four corners" rule:

> an agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence.

*Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill.2d 457, 462, 706 N.E.2d 882, 884 (Ill. 1999) quoting *Western Illinois Oil Co. v. Thompson*, 26 Ill.2d 287, 291, 186 N.E.2d 285 (Ill. 1962).

The *Air Safety* Court continued:

> If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence. If, however, the trial court finds that the language of the contract is susceptible to more than one meaning, then an ambiguity is present. Only then may parol evidence be admitted to aid the trier of fact in resolving the ambiguity.

*Air Safety*, 185 Ill.2d at 462-63 (citations omitted). In construing contracts, Illinois courts have also relied upon the parol evidence rule, which has been explained as follows:

> [The parol evidence rule generally precludes evidence of understandings, not reflected in a writing, reached before or at the time of its execution which would vary or modify its terms. Under the parol evidence rule, extrinsic or parol evidence concerning a prior or

contemporaneous agreement is not admissible to vary or contradict a fully integrated writing.

*Eichengreen v. Rollins, Inc.*, 325 Ill.App.3d 517, 521, 757 N.E.2d 952, 956 (Ill. 2001).

The PDH Entities argue that the Court erred in concluding that the term "Buyer," as used in Section 4.2, was unambiguous. They assert that the Court should consider the indemnification provision and its amendment within the context of the multiple agreements signed by the parties. When considered this way, the PDH Entities assert that the indemnification provision and its amendment are ambiguous and, therefore, extrinsic evidence is needed to interpret the terms and determine accurately the parties' intent at the time they entered into the agreements. The PDH Entities' argument urges, in essence, use of what has been called the "provisional admission" approach to contract interpretation:

> Under the provisional admission approach, although the language of a contract is facially unambiguous, a party may still proffer parol evidence to the trial judge for the purpose of showing that an ambiguity exists which can be found only by looking beyond the clear language of the contract. Under this method, an extrinsic ambiguity exists 'when someone who knows the context of the contract would know if the contract actually means something other than what it seems to mean." Consequently, if after "provisionally" reviewing the parol evidence, the trial judge finds that an "extrinsic ambiguity" is present, then the parol evidence is admitted to aid the trier of fact in resolving the ambiguity."

*Air Safety*, 185 Ill.2d at 463, 706 N.E.2d at 885 (citations omitted). In the *Air Safety* case, the Illinois Supreme Court refused to adopt the provisional admission approach over the four corners rule in cases involving a contract that is facially unambiguous and contains an express integration clause. *Air Safety*, 185 Ill.2d at 464, 706 N.E.2d at 885. *See also Eichengreen*, 325 Ill.App.3d at 522, 757 N.E.2d at 956-57.

In the case at bar, the use of the term "Buyer" in Section 4.2(a) of the Coordinating

9

Agreement is not ambiguous. "A contract term is ambiguous when it may reasonably be interpreted in more than one way." *Dean Management, Inc. v. TBS Construction, Inc.*, 339 Ill.App.3d 263, 269, 790 N.E.2d 934, 939 (Ill. 2003). If Section 4.2(a) *may* have been ambiguous as to whether, in its various clauses, the context supported a broad definition of "Buyer" to include the Non-Debtor Exide Entities, any uncertainty was resolved by Amendment No. 1 to the Coordinating Agreement. By virtue of Amendment No. 1, the parties specifically and deliberately carved out only one clause of Section 4.2(a) to "clarify." The other parts of Section 4.2(a) remained unchanged. Therefore, the only reasonable inference that arises from Amendment No. 1, is that the parties intended that the term "Buyer," as used in the remainder of Section 4.2(a), means only Exide Corporation.

Section 7.3 of the Coordinating Agreement contains an express integration clause[9] and a provision that "[i]n the event of a dispute or inconsistency between any of the Sales Agreements and this Agreement, the terms of this Agreement shall prevail." The *Air Safety* Court noted the effect of integration clauses, writing:

> The integration clause makes clear that the negotiations leading to the written contract *are not* the agreement. Accordingly, considering extrinsic evidence of prior negotiations to create an "extrinsic ambiguity" where *both* parties *explicitly* agree that such evidence will *not* be considered ignores the express intentions of the parties and renders integration clauses null.

---

[9]Section 7.3 provides:
   Entire Agreement; Amendments. This Agreement, the Sale Agreements and the other agreements and documents to be delivered pursuant to the Sale Agreements contain the entire understanding of the parties hereto with regard to the subject matter contained herein, and supersede all prior written or oral agreements, understandings or letters of intent between the parties hereto, with respect to the subject matter hereof. The Sale Agreements and all Schedules and Exhibits thereto are incorporated herein by this reference. This Agreement shall not be amended, modified or supplemented except by a written instrument signed by an authorized representative of each of the parties hereto. In the event of a dispute or inconsistency between any of the Sale Agreements and this Agreement, the terms of this Agreement shall prevail.

> An integration clause ... is a clear indication that the parties desire the contract be interpreted solely according to the language used in the final agreement. Consequently, we will not write the integration clause out of the contract for policy reasons.

*Air Safety*, 185 Ill.2d at 464-65, 706 N.E.2d at 885-86 (emphasis in original).[10]

Because the Coordinating Agreement is unambiguous and includes an integration clause, the "four corners" rule applies to this case and extrinsic evidence is not admissible to alter or vary its terms.[11]

Finally, the PDH Entities also argue that the Court should consider extrinsic evidence regarding the meaning of the term "Buyer" in Section 4.2(a) based on the "mutual mistake" exception to the parol evidence rule. *See Johnson v. Johnson*, 237 Ill.App.3d 381, 391, 604 N.E.2d 378, 385-86 (Ill.App. 1992). The PDH Entities, however, did not raise the doctrine of mutual mistake at the hearing on November 19, 2003. A motion for reconsideration is not an opportunity to assert new legal theories that could have been raised previously. *In re United Merchants and Mfr., Inc.*, 1992 WL 37498, *1 (Bankr.D.Del. Feb. 18, 1992). *See also Fogel v. Zell (In re Madison Mgmt. Group, Inc.)*, 2000 WL 288515, *3 (N.D.Ill. Feb. 23, 2000).

---

[10] The PDH Entities, relying on the decision in *Hessler v. Crystal Lake Chrysler-Plymouth, Inc.*, 338 Ill.App.3d 1010, 788 N.E.2d 405 (Ill. 2003), argue that the Court can consider extrinsic evidence to determine whether a contract is integrated, even if it contains an integration clause. However, *Hessler* involved a sale of goods and was governed by the Uniform Commercial Code - Sales (810 ILCS 5/2-101 *et seq.* (West 2000). *Hessler*, 338 Ill.App.3d at 1017. The Illinois Supreme Court has held that "[t]he rule in cases *not* governed by the Uniform Commercial Code (UCC) is that only the subject writing may be considered to determine the integration question." *J&B Steel Contractors*, 162 Ill.2d 265, 271, 642 N.E.2d 1215, 1218 (Ill. 1994).

[11] Recital "E" at the beginning of the Coordinating Agreement provides that "The parties hereto further desire to provide for a single avenue of recourse for indemnification claims arising under the Sale Agreements and have therefore agreed that all claims for indemnity against losses or claims resulting from breaches of obligations, representations or warranties under the Sale Agreements or this Agreement will be addressed exclusively under this Agreement." This further signifies the parties' intent that the indemnification provision is addressed in this document without resort to the other agreements to vary or modify its provisions.

Accordingly, the doctrine of mutual mistake will not be considered in the Reconsideration Motion.

For all of the foregoing reasons, the PDH Entities' Reconsideration Motion will be denied. An appropriate Order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: June 16, 2005