UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

IN RE:                          .    Chapter 11
                                .
Exide Technologies, et al.,     .
                                .
        Debtor(s).              .    Bankruptcy #02-11125 (KJC)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

                        Philadelphia, PA
                        November 19, 2003
                          10:19 a.m.

                TRANSCRIPT OF MOTIONS HEARING
        BEFORE THE HONORABLE KEVIN J.CAREY
            UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtor(s):              James O'Neill, Esq.
                            Pachulski, Stang, Ziehl,
                            Young, Jones & Weintraub
                            919 North Market Street
                            Wilmington, DE 19801

                            Benjamin G. Chew, Esq.
                            Patton Boggs, LLP
                            Ste. 500
                            2550 M. Street, N.W.
                            Washington, DC 20037

                            Andrew Zimmitti, Esq.
                            Patton Boggs, LLP
                            Ste. 500
                            2550 M. Street, N.W.
                            Washington, DC 20037

                            Kenneth E. Kraus, Esq.
                            Schopf & Weiss
                            312 W. Randolph St.-Ste. 300
                            Chicago, IL 60606

2

```
 1    For Pacific Dunlap Entities:   Douglas N. Candeub, Esq.
                                     Morris James Hitchens
 2                                   & Williams, LLP
                                     PNC Bank Center
 3                                   222 Delaware Ave.-10th Fl.
                                     Wilmington, DE 19899
 4
      For                           Christina Houston, Esq.
 5                                   Richards Layton & Finger
                                     One Rodney Square
 6                                   Wilmington, DE 19899
 7    Audio Operator:               Chris Caruso
 8    Transcribing Firm:            Writer's Cramp, Inc.
                                     6 Norton Rd.
 9                                   Monmouth Jct., NJ 08852
                                     732-329-0191
10
    Proceedings recorded by electronic sound recording, transcript
11  produced by transcription service.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

```
                              Index
 1
                                                    Further
 2               Direct  Cross  Redirect  Recross  Redirect

 3   Witnesses For Pacific
       Dunlap:
 4

 5

 6   Witnesses For The
       Debtor:
 7

 8

 9

10   MOTIONS:

11

12
     EXHIBITS:                            Marked    Received
13

14

15

16

17   SUMMATION BY:

18

19

20

21   THE COURT: Finding      64

22

23

24

25
```

1    THE CLERK:  All rise.  Please be seated.  The Court is

2  now in session.

3    THE COURT:  Good morning all.

4    ALL:  Good morning, Your Honor.

5    MR. O'NEILL:  Good morning, Your Honor --

6    THE COURT:  Good morning.

7    MR. O'NEILL:  -- James O'Neill here on behalf of the

8  Debtors.  First, just as a preliminary matter, I wanted to

9  advise the Court regarding the matter scheduled for tomorrow.

10  The copy of the agenda which was filed indicated that it was

11  going to be over two days, but we realize that it's not going

12  to be over two days --

13    THE COURT:  I know an insidiously wrong statement,

14  Mr. O'Neill.

15    MR. O'NEILL:  I'm very -- I do apologize to the

16  Court.  I think that it was a carry over from when we were

17  actually gonna have the trial which was going to be a two day,

18  but Your Honor has been exceedingly generous with your time,

19  and although I would like to get more, that's not the way that

20  I intend to do it.  So I do apologize for any confusion.

21    THE COURT:  No problem.

22    MR. O'NEILL:  We will only be with you for one day

23  tomorrow, so I just wanted to state that right off.

24    THE COURT:  Very well.

25    MR. O'NEILL:  I also wanted to introduce to the Court

1    today some other attorneys on the Exide team, Ben Chew and

2    Andrew Zimmitti --

3              THE COURT:  Okay.

4              MR. O'NEILL:  -- both from the firm of Patton, Boggs,

5    and they're going to be representing Exide today with me in

6    connection with this matter.  Both of these gentlemen have

7    already been admitted pro hac.  The Court has entered orders

8    for their admission.  Also, with us today in the Courtroom is

9    Ken Kraus from the firm of Schopf & Weiss, he's going to be

10   assisting today as well --

11             THE COURT:  Good morning.

12             MR. O'NEILL:  -- however, we don't need to have him

13   admitted, and with that I'm going to turn the podium over to

14   Mr. Candeub.

15             THE COURT:  Okay.

16             MR. O'NEILL:  Thank you.

17             MR. CANDEUB:  Good morning, Your Honor --

18             THE COURT:  Morning.

19             MR. CANDEUB:  -- Doug Candeub for the Pacific Dunlap

20   Entities including what I'll refer to as principally Pacific

21   Dunlap, USA or PDH, USA, and the various other entities Pacific

22   Dunlap, PDH of Singapore and Asia and Europe, and internet PDH

23   International, which is based in Australia, and collectively

24   refer to those as the PDH foreign entities.

25             THE COURT:  Very well.

1      MR. CANDEUB:  Your Honor, we're here on a Motion for
2  Remand and/or Relief from Stay --
3      THE COURT:  Mr. Candeub, before you go on I just
4  wanted to point out to the parties that I have yet to receive
5  from Delaware the most recent binder, but what I did was I went
6  back on my shelf, I'd actually saved the binders from the
7  times, several times, that this hearing was scheduled
8  previously.  To the extent that anything was added that's in
9  the most recent binder that wasn't in the prior ones, let me
10  know, otherwise, I think I've seen all the papers.
11      MR. O'NEILL:  I think there were no additions
12  actually, Your Honor.  We submitted the original binder for our
13  hearing which I think was going to be on 10/31 --
14      THE COURT:  Yes.
15      MR. O'NEILL:  -- and I don't believe that there have
16  been any changes since that time.
17      THE COURT:  All right.  Those I do have.
18      MR. CANDEUB:  Your Honor, yes, rather than do a
19  written reply I had intended to use argument time to rebut
20  arguments made in the -- to the responding brief.  Your Honor,
21  for purposes of just going through the background facts, what I
22  was intending to do is to go through a witness, Linda Wolf,
23  who's the attorney who was one of the principal attorneys
24  representing Pacific Dunlap Entities in the litigation in
25  Illinois in Chicago to go through the background of the

1   contracts and the relationship between the parties and the

2   litigation, so if I may I'd like to call her as a witness --

3           THE COURT:  Well, let me ask this --

4           MR. CANDEUB:  -- to walk through the background.

5           THE COURT:  -- except for a dispute about how certain

6   language in the coordinating agreement should be viewed, is

7   there dispute about any of the material facts concerning these

8   circumstances?

9           MR. CANDEUB:  Your Honor --

10          THE COURT:  I don't gather from reading the papers

11  that there are.

12          MR. CANDEUB:  Your Honor, there's some misstatements

13  of fact, there's some things which have been stated in briefs

14  -- in the briefs by the Debtors which we believe are contrary

15  to the facts, and for that purpose, although --

16          THE COURT:  And which would be material to the legal

17  determination --

18          MR. CANDEUB:  Yes, Your Honor.

19          THE COURT:  -- that I've got to make.

20          MR. CANDEUB:  And for that purpose I submit that it

21  would be helpful to have someone walk through the background,

22  because it's complicated and it is very much relevant to a

23  decision here.

24          MR. CHEW:  Excuse me, Your Honor, I do not want to

25  interrupt Plaintiff's presentation, but we did want to be heard

1  as a preliminary matter on whether a witness is necessary.

2  Now, Plaintiff's timely notified us that they intended to put

3  Ms. Wolf on, but our reaction was, I don't want to presume to

4  say similar to the Court's, but we do not believe that live

5  testimony is necessary on the issue what I understand Ms.

6  Wolf's proffer to be, which is the status how far along the

7  Chicago litigation has proceeded.  We already have a Memorandum

8  Opinion from Judge Sonderby in the Illinois Bankruptcy Court

9  transferring the case to this Court in which in ruling on the

10  Motion to Transfer and granting such motion she examined

11  virtually the identical criteria for voluntary abstention, one

12  of which was how far along the Chicago litigation was, and she

13  specifically found that that litigation in Cook County was

14  {quote}, "Not in an advanced stage in any event," {unquote} and

15  this Your Honor -- Judge Sonderby's Memorandum and Opinion and

16  Order is attached to the Exhibit-F --

17          THE COURT:  I've read it.

18          MR. CHEW:  -- to Plaintiff's brief, so, Your Honor,

19  we have Mr. Kraus available as a rebuttal witness, which we

20  also notified Plaintiffs, but our position is this is old

21  ground, Judge Sonderby's Opinion speaks to this, makes specific

22  findings of fact and conclusions of law which were not

23  challenged by Plaintiffs.  There was no Motion to Reconsider,

24  there was no appeal, so I respectfully submit that this

25  testimony would be duplicative of that.  If we understand the

1  proffer correctly.

2          THE COURT:  Mr. Candeub?

3          MR. CANDEUB:  Your Honor, I was not jumping into the

4  argument on the motion and to a large degree what we just heard

5  is an argument on the motion itself, and there's a great deal

6  of material concerning not just what the facts are but the

7  emphasis on them, the relevance of what happened before Judge

8  Gardner in the State Court proceeding, what happened with Judge

9  Sonderby, and although -- well, to some degree Ms. Wolf can

10 testify about what the position of the parties is on their --

11 specifically our side in particular on the interpretation of

12 these agreements.  The issue before this Court, we submit

13 largely, is not other than to the extent necessary for purposes

14 beside whether to keep this or send it out, does not involve a

15 substantive ruling on, for example, whether or not there are

16 rights against the non-Debtor entities and so forth.  Indeed,

17 Judge Sonderby specifically said that she found it ambiguous.

18 She found that there was ambiguity in the contract, and

19 nevertheless transferred it here thinking that the issue of

20 remand would be dealt with elsewhere.

21         THE COURT:  I guess I could go back and re-read it,

22 but I don't think she actually drew a conclusion.  What she did

23 was set forth the parties respective arguments without

24 concluding that the contract was ambiguous.

25         MR. CANDEUB:  Your Honor, with all due respect, I'm

10

1  reading from the Opinion on page 6, "It appears from a review

2  of the agreements and the parties' contentions that there may

3  be an ambiguity on the indemnification issue."

4          THE COURT:  I don't view that as a conclusion.   When

5  she says, "It appears," and she says, "there may be" --

6          MR. CANDEUB:  And then she says we may not resolve

7  that issue --

8          THE COURT:  Yes, so --

9          MR. CANDEUB:  -- but she acknowledges that there may

10  be ambiguity.

11          THE COURT:  -- and says that she didn't resolve it,

12  so there was no finding on it, although I can understand why,

13  again, and I said that when I first came out, I know there's a

14  disagreement between the parties about how those provisions are

15  to be read.  Okay --

16          MR. CANDEUB:  Your Honor, you know, the alternative

17  would be for me to go through the facts, and if you'll bear

18  with me I'd be happy to do that.  It would take, I think it

19  would be smoother to do that through a witness, but otherwise I

20  would use some substantial period of my argument time to go

21  through the background.

22          THE COURT:  Well, let's --

23          MR. CANDEUB:  I think it just would be easier with a

24  witness.

25          THE COURT:  Generally, Mr. Candeub, what I like do is

11

1   let parties, especially the moving parties, try their own

2   cases.  But in fairness, I think I have to tell you at the

3   outset that it's clear to me that by virtue of the filing of

4   the Proofs of Claim that in large measure the matters before me

5   are core, and as a consequence, and as some of the cases also

6   discuss, any right to jury trial has been waived.  Now, to the

7   extent you wish to make a factual record through a witness on

8   issues that deal with other things, you're free to do that, but

9   let me -- let's just talk a little bit about what those

10  conclusions that I've reached, after review of the papers and

11  reading of many of the cases that the parties have cited,

12  leaves us.  Pacific Dunlap is looking for remand, for equitable

13  remand, for a couple of reasons.  One, there are cases and they

14  arise really in non-Court cases, non-Court claims so far as I

15  can tell from reading the decisions that have been cited, that

16  this Court ought to give affect to the Forum Selection Clauses

17  chose by the -- drafted and agreed to by the parties, and that

18  if you look at the multifactor test on equitable remand and,

19  you know, there are different Courts add or subtract a couple

20  of factors, but they all center around the same kind of

21  notions, there ought to be equitable remand.  On mandatory

22  abstention, it doesn't apply because I've concluded, at least

23  in large part, these are Court proceedings now --

24          MR. CANDEUB:  Your Honor --

25          THE COURT:   -- Pacific Dunlap has also asked for me

1    to exercise discretionary abstention, in addition to which

2    you've asked for Relief from Stay against the non-Debtors.

3    Now, the Debtor's come back and said, "Well, that issue --

4    first of all, only Exide, meaning the parent, is responsible

5    under the agreements, but," says the Debtor, "even if that were

6    not true, the issue's so inextricably intertwined that I ought

7    to, under the 3rd Circuit's Unusual Circumstances Standard,

8    ought to extend the stay to proclude action against the

9    non-Debtors."  But it seems to me, assuming that's the universe

10   of legal issues, that the mandatory abstention part of the

11   motion is one I'm going to deny for the reason that these are,

12   at least in large measure, core, and secondly, by virtue of the

13   filing of the Proof of Claim you've -- the forum selection

14   issue falls away, because, as some of the cases say, once

15   you've done that you've chosen your forum.  Now, understanding

16   that the only party who's here voluntarily is the Debtor, but I

17   think the cases say pretty much say that as well.  What does

18   that leave?

19          MR. CANDEUB:  Your Honor, there's a key issue here

20   which was very much intentionally submerged by the Debtors in

21   their responding brief by blending everything together under

22   that Proof of Claim argument.  The Proofs of Claim are only

23   against Exide Corporation, the Debtor.

24          THE COURT:  That's only who they could be against.

25          MR. CANDEUB:  Of course, Your Honor.  And, of course,

13

1    their claims are -- Proofs of Claim are not Proofs of Claim

2    against the Exide foreign non-Debtor entities.  Your Honor, we

3    would concede that the claims of -- first of all, PDH, USA only

4    has claims against Exide Corp., the Debtor.  We would concede

5    that those are core claims.

6            THE COURT:  And what's the magnitude of those claims?

7    The Debtor says, I think, they're 16 million.

8            MR. CANDEUB:  Yes, Your Honor.

9            THE COURT:  Okay.

10           MR. CANDEUB:  But the --

11           THE COURT:  Out of the 20 million or so --

12           MR. CANDEUB:  The dollar amount, Your Honor, doesn't

13   matter.  Your Honor, the focus for our purposes today --

14           THE COURT:  Well, maybe not for purposes of Plan

15   distribution, but it may matter.

16           MR. CANDEUB:  Well, yes, for purposes of the Plan.

17   Your Honor, the Plan makes -- is independent of this outcome,

18   very clearly, that there's not gonna be any change in the

19   outcome of whether the Plan is confirmed or not confirmed.

20   There's been no testimony in many days of testimony on the Plan

21   as to the importance of this date, this litigation staying here

22   versus going there, you've heard not a word about that.

23   Obviously, it's not essential to the Plan.  Our focus today, my

24   focus, my argument and focus is on the claims by the Exide --

25   by the PDH foreign entities against the Exide non-Debtor

1   entities.

2          THE COURT:  And I will tell you that's the one I

3   think that's closest, at least in my mind, on which I'm still

4   open.

5          MR. CANDEUB:  And Your Honor, we would concede that

6   the PDH, USA claims against Exide are core and that the only

7   ground therefore for whether -- the only real ground for

8   whether it should stay or go would be to the extent that

9   there's a concern about judicial economy as to the other ones,

10  but otherwise I want to just focus on the claims of the PDH

11  foreign entities against the Exide non-Debtor entities.  As to

12  the Proofs of Claim, those Proofs of Claim were very

13  exclusively protective because of the arguments made by Exide,

14  and, but in any event, they only provide -- and they're

15  protective in so far as they say basically, it's contingent if

16  we can't go against -- if we can't reclaim against the Exide

17  non-Debtors as we've asserted all along, then we want to be

18  protected to be able to go against the Debtors here.

19         THE COURT:  But I agree with those decisions, some of

20  which have been cited by the parties that say, you can put

21  whatever protective so-called language in the Proof that you

22  want but it's of no affect.

23         MR. CANDEUB:  I understand, Your Honor.

24         THE COURT:  Okay.

25         MR. CANDEUB:  But in any case, that's of no affect as

1  against the Debtor.

2          THE COURT:   Correct.

3          MR. CANDEUB:   It has no bearing, contrary to what the

4  Debtors try to argue, it has no bearing on the claims against

5  the non-Debtors.   The fact that we filed -- that the PDH

6  foreign entities filed Proofs of claim against the Debtor does

7  not make the claims against the non-Debtors core, so, in fact,

8  those necessarily have to be noncore at best.

9          THE COURT:   Unless Exide is correct in its

10  interpretation of the coordinating agreement provisions.

11          MR. CANDEUB:   That would be -- yes, that's right,

12  Your Honor.   And for that purpose we need -- to that extent

13  only we need to focus on either alternatively what that

14  language says or alternatively whether that is an issue that

15  should be decided elsewhere, because considering it's an issue

16  between the non-Debtors against non-Debtors there's no obvious

17  reason why this Court needs to decide that.

18          THE COURT:   Well, let's talk about that for a minute,

19  and you talk about judicial economy and efficiency, which I

20  think is an appropriate issue to be raised.   As I understand

21  it, the magnitude of the dispute, at least without

22  consideration of any counterclaim which the Debtors say they

23  will bring in connection with their expected objection to the

24  Proofs of Claim, and I don't know whether they've been filed

25  yet or not, but I'm just going on what the papers said, the

16

1  scope of the -- the magnitude of the dispute is about $20

2  million, 16 million of which is acknowledged to be sought

3  against Exide alone.  Doesn't that make the dispute as between

4  non-Debtor entities the tail of the dog?

5          MR. CANDEUB:  Your Honor, I don't think that's

6  actually accurate about the 16 million against the Debtor

7  alone, and if I may, I'd like to check with Ms. Wolf --

8          THE COURT:  Go ahead.

9          MR. CANDEUB:  -- who's here on that, but the fact is

10  that the first -- there are two complaints.  The first

11  complaint brought but all of the PDH entities collectively was

12  for about 16 million, and the second one brought only by PDH,

13  USA was for about 2.3 million, and that one clearly the 2.3 is

14  only the one, but as to the 16 million I'm not so sure.  If

15  you'll bear for a moment --

16      (Pause in proceedings)

17          MR. CANDEUB:  All right, so, Your Honor, I'm told,

18  and this can be confirmed on testimony if necessary, that about

19  11 million out of the claim in the first complaint is actually

20  against non-Debtor entities, so --

21          MR. CHEW:  Excuse me, Your Honor, I didn't want to

22  interrupt again, but there is an answer to this, it's 12

23  million, and this is from Plaintiff's brief.  Of the 20.1

24  million total at issue 12 million, about 60% is directed solely

25  at the Debtor Exide, and the quote is PDH's motion at page 4,

1  paragraph 8 {quote}, "The claims asserted by PDH, USA against

2  the Debtor total approximately $12 million plus allowable

3  interest expenses and costs.  I apologize --

4          THE COURT:  Okay, so the parties agreed.

5          MR. CANDEUB:  No, they don't, I think, because --

6          THE COURT:  I'm sorry, I thought you just said 12

7  million of the --

8          MR. CANDEUB:  -- you just said it's only for PDH, USA

9  only.

10          MR. CHEW:  Twelve million against the Debtor

11  exclusively, and this is from their brief, and we don't

12  disagree.

13          THE COURT:  And I think that's what Mr. Candeub just

14  said.

15          MR. CHEW:  No, he said 11 million against the

16  non-Debtor entities.

17          THE COURT:  All right.

18          MR. CHEW:  So, it's actually pretty near the reverse.

19          THE COURT:  I'm sorry, it's reverse.  Okay.

20          MR. CANDEUB:  And I can put on Ms. Wolf --

21          THE COURT:  All right.

22          MR. CANDEUB:  -- to deal with that issue if that's a

23  factual concern for Your Honor in determining this.  But, yes,

24  from our standpoint the majority is actually against the

25  non-Debtor entities involving the cash accounts.  That first

18

1  complaint involves sweeping moneys out of cash accounts and not

2  having been actually swept as it was supposed to have been done

3  at the time of the closing.  So, I'm sorry Your Honor, you had

4  asked me a question, I guess, about that, but so, in terms of

5  the claims of the PDH foreign entities against the Exide

6  non-Debtor foreign entities, we submit that that has to be

7  non-core because it was a State Court action preceded the

8  filing of the bankruptcy, that it's obviously not something

9  that could only be brought in Bankruptcy Court, which is part

10 of the definition of what a core thing is, and doesn't involve

11 Debtors, so it can only be related to, and in fact, Judge

12 Sonderby found that it was related to jurisdiction, not

13 otherwise.  And so, we submit that given that the claims

14 against the non-Debtor entities are clearly non-core, then we

15 go back to the question about remand under 1452 and mandatory

16 and/or discretionary abstention as to those, and also the State

17 cases, the automatic stay extension to non-Debtors under

18 unusual circumstances cases, and in that regard I want to alert

19 the Court of one thing in particular that one of the cases that

20 was relied upon by the Debtors was a Bankruptcy Court decision

21 in -- coming out of the Southern -- I'm sorry, District Court

22 decision from the Southern District of Texas from March 2003,

23 Reliant Energy Services vs. Enron Canada Corp., we spent some

24 time talking about that case where there was an extension of

25 the stay to non-Debtors about 5 days before the -- I'm sorry,

19

1   about a couple of days -- 5 days after the Debtors filed their

2   motion, their responding brief, so they wouldn't have had this

3   in front of them, but the Court should be aware of it, that

4   case was vacated, reversed, and remanded by the 5th Circuit.   I

5   only have a Westlaw cite, 2003 Westlaw, 22439846.

6           THE COURT:   Thank you.

7           MR. CANDEUB:   And the Court found that there was

8   ambiguity in the contract, and that was at issue involving --

9   there was a netting agreement issue in that one between

10  multiple parties, and that the extension of the automatic stay

11  to the affiliates was premised on a certain reading of the

12  Agreement which needed to then be revisited on a remand.   There

13  are a couple of cases that the -- the extension of the

14  automatic stay is limited -- the Courts refer to unusual

15  circumstances and in those cases they also say things like

16  there needs to be a showing that it would be essential to the

17  Debtors' reorganization to keep the claim in the Bankruptcy

18  Court forum, and as I've submitted, Your Honor, the Plan stands

19  independent of whatever happens to this claim.   We filed a --

20  after we objected to the Plan there was a stipulation filed

21  with the Debtors which said, among other things, that the

22  claims against the non-Debtors would be unaffected, in other

23  words, there was general language about free and clear of

24  liens, and we made it clear that that's when they agreed, it

25  doesn't affect our claims against the non-Debtors.   They didn't

1  concede that we could go elsewhere, we didn't concede that we

2  could stay here, but the fact remains that there is an

3  understanding that from the Debtors' standpoint that it could

4  go one way, it could go the other way, and the Plan leaves

5  intact certain treatment for Unsecured Creditors either way not

6  affected by how this comes out.  There's no indication that

7  anybody is relying on the Debtors as parents of these -- or the

8  Debtor as a parent of these non-Debtors subsidiaries is relying

9  in some degree on these funds for the feasibility of the Plan

10  or the effectiveness of the Plan.  And furthermore, the Exide

11  non-Debtor entities did not file Proofs of Claim, to the best

12  of my knowledge, and so that to the extent that they argue,

13  they've argued in the past, they argued in Chicago that the

14  language in the Agreement is an Indemnification Agreement which

15  essentially says that it doesn't necessarily preclude a suit

16  against the non-Debtor entities, that there was never a Motion

17  to Dismiss because we couldn't sue them, and the coordinating

18  Agreement expressly provides Forum Selection Clause, it applies

19  to everybody, it's understood that that -- that given that

20  Exide Corporation was already in Chicago there was the point of

21  that all the other parties signing onto that was that all the

22  other foreign entities could be sued in Cook County, Illinois.

23  So, there was never a dispute about the ability to sue them

24  there, the right of suing them, it was a question of

25  indemnification, of whether they would have a right to go

21

1    against or collect back from Exide, and the Exide non-Debtor

2    entities did not file Proofs of Claim against Exide, so to the

3    extent that we do prevail against the non-Debtor entities that

4    -- and they then seek to get indemnified by Exide, they don't

5    have a basis for doing that, because they haven't filed a Proof

6    of Claim timely.  So, it's another reason why the Debtor

7    wouldn't be affected by the Indemnification Clause in the

8    Agreement.  Your Honor, the -- I guess I should like to just

9    step back for a moment from my argument and say, given what

10   you've heard so far, would it be helpful to have Ms. Wolf as a

11   witness?

12          THE COURT:  Well, let me ask this question.  Does any

13   part of her proposed testimony involve testimony concerning

14   what the parties meant by the language in their various

15   Agreements, particularly the Coordinating Agreement concerning

16   who was included in or out of the indemnification provisions

17   and the exclusive remedy provisions?

18          MR. CANDEUB:  Yes, Your Honor.

19          THE COURT:  Okay.  Then tell me under Illinois law

20   how and when that testimony is appropriate.  Many jurisdictions

21   have a rule that says unless the Court makes the legal

22   determination that that language is ambiguous that there would

23   be no extrinsic evidence otherwise presented.  What's the rule

24   of law in this case?  And I assume, because the parties have

25   chosen Illinois law, that that would be the governing law, but

1  tell me if you disagree.

2       MR. CANDEUB:  Your Honor, I'm not sure whether -- I

3  don't know whether that's contemporaneous finding or not,

4  whether you need to first find the ambiguity before the

5  testimony can be presented.

6       THE COURT:  All right.  Does the Debtor have a

7  position on that?

8       MR. CHEW:  Yes, Your Honor, the Debtor does.  The

9  Debtor has three objections.  One, the Parol Evidence Rule

10 should apply.  Debtor has argued the language is unambiguous,

11 clear and susceptible to resolution by the Court and that's why

12 we briefed it.  In fact, we were surprised the other side

13 basically allided over that central point.  So, number one, we

14 don't think any threshold showing has been made requiring parol

15 evidence.  Number two, our understanding is that Ms. Wolf was

16 not part of the drafting process, and we find it very unusual

17 to trial counsel who is coming in after the fact would opine as

18 to what her clients intended years before, and I would think

19 that would raise myriad issues of attorney-client

20 communication, attorney work product unless she's willing to

21 waive all of that.  I think there's a problem there.  We'd like

22 to opportunity to voir dire her at a very minimum to the extent

23 the Court is willing to find right now that it's ambiguous,

24 which as the Court pointed out, Judge Sonderby did not find,

25 she did not reach that, she said it may be it may not be, it's

23

1    for you to say --

2        THE COURT:  Well, first, would you agree or disagree

3    that it's Illinois law in that respect I should be applying?

4        MR. CHEW:  Yes, Your Honor, we would --

5        THE COURT:  Okay.  And what does Illinois law say on

6    that issue?

7        MR. CHEW:  We don't know, Your Honor.  We didn't

8    research it because, again, it's our position that it's

9    ambiguous and that Illinois --

10        THE COURT:  It's not ambiguous.

11        MR. CHEW:  I'm sorry, that it is not ambiguous.

12    Moreover, Your Honor that's not consistent with the proffer the

13    Plaintiffs provided.  Plaintiffs provided a very specific

14    proffer of what Ms. Wolf would be saying today, and that is

15    that she would be testifying as to the status of the Cook

16    County litigation and how far it proceeded.  We had no idea,

17    and we have this in writing, by the way, our understanding of

18    the proffer that she would be opining, or presuming to opine,

19    about the meaning of Section 4.2, the Coordinating Agreement

20    and that would be unfair surprise at a very minimum, Your

21    Honor.  We didn't understand that it was to be an evidentiary

22    hearing on the issue of the meaning of 4.2.  We've argued it's

23    unambiguous to the extent the Court disagrees we believe that

24    the next appropriate step would be to set up a discovery period

25    here in this Court and then an evidentiary hearing on Section

24

1    4.2.   But I don't think, with all due respect, it's for the

2    Court to decide we're there yet.   We think we have a very

3    strong argument.   The plain language of 4.2 says that the

4    non-Debtor entities would be held harmless, Your Honor, and

5    we're prepared to make that argument as a matter of law, but

6    not as a matter of fact.

7          MR. CANDEUB:   Your Honor, again -- well, first after

8    all, as to the writing that Mr. Chew was referring to, that was

9    a letter from him which was what I would describe as a

10   self-serving letter because it doesn't necessarily -- it

11   doesn't parallel what our phone conversation was.   I said I'd

12   be going through the contracts as well, and he sent a letter

13   that only limited it to certain parts of what we discussed in

14   our telephone conversation.   Your Honor, again I suggest that

15   for purposes of going through the contracts it may be helpful

16   to have a witness just to go through them.   Whether Your Honor

17   concludes they're ambiguous or not, you can determine that

18   yourself after just getting an explanation about what the

19   contract does, but if you prefer I can do that by way of

20   argument.

21          THE COURT:   In terms of what the contracts say and

22   what the dispute is about I don't think there's disagreement

23   among the parties.

24          MR. CANDEUB:   Your Honor, it's not necessarily

25   disagreement.   It's a question of understanding how it works,

25

1   because it's not obvious.    There's a lot of -- if I may then,

2   if Your Honor prefer not to have a witness, I'd like --

3          THE COURT:    Well, Mr. Candeub, as I said at the

4   outset, you know, I'm content to let the parties, particularly

5   the moving party, try its case the way it wants to, but I'm not

6   interested in getting into testimony which deals extensively

7   with background because I don't think that there's any material

8   disagreement, again, between the parties on those issues, and I

9   don't know what I need amplified other than what's set forth in

10  the papers by way of background.    I don't think we need to

11  tread through that.

12         MR. CANDEUB:    Your Honor, if I may, I'd like to go

13  through the agreements then.

14         THE COURT:    Go ahead.

15         MR. CANDEUB:    Okay.    First, Your Honor, there's the

16  -- I'll start with the Coordinating Agreement, which is in a

17  lot of places in these documents.    It's an agreement dated May

18  9th, 2000, between Exide Corporation, defined in that first

19  line as Buyer, and Pacific Dunlap Holdings, USA, Inc., as

20  Seller.    One thing that's perhaps might have been drafted

21  better, Your Honor, but in any case, I just want to alert you,

22  on page 3 of the Agreement --

23         THE COURT:    Yes.

24         MR. CANDEUB:    -- there's a definition of Buyer which

25  is different from the one on that first line.    It says, Buyer

26

1   has the meaning specified on the first page of this Agreement

2   as used in Articles 1 and 3 to 7 inclusive, Buyer shall be

3   deemed to mean Buyer and/or as the context may require any

4   international Buyer.  So, we already have two different

5   definitions of Buyer within the same agreement.  Now, I want to

6   point out also, Your Honor, the Coordinating Agreement has 7

7   Articles, so what this essentially says is that Buyer means

8   Buyer and/or international Buyer everywhere except Article 2.

9   Going back to the first page in the recitals, paragraph B,

10  explains that, "To effect the execution of this Agreement Buyer

11  and the international Buyers on the one hand and Seller or the

12  international Sellers on the other hand will execute individual

13  asset or share purchase agreements which are described on

14  Exhibit-A hereto, including the U.S. Agreement as defined

15  herein which is being executed by Buyer and Seller

16  simultaneously."  So, in other words, the PDH, USA Agreement

17  with Exide Corp. was entered into at the same time as this one,

18  May 9th.  And as collectively -- and then the Exhibit-A, which

19  is right after the signature pages lists a variety of these

20  other agreements, including the various Sale Agreements that

21  came to pass on June 28th.  They're all dated June 28th.  And

22  then the -- then I would turn your attention to -- just a

23  second -- I'm gonna skip ahead to page 21.  It says, "Buyer and

24  Seller covenant and agree that not later than June 19th," --

25  this was later changed to June 28th --  "June 19th the

1  international Buyers and the international Sellers will enter

2  into Sale Agreements to affect the transfer of businesses

3  affiliated with the subsidiaries that are operated in these

4  various locations and transfer certain trademarks.  These

5  Agreements are referred to herein as to R-O-W Agreements."

6  That Your Honor, as Ms. Wolf would explain, refers to the rest

7  of the world, that's R-O-W.  "Buyer and Seller further covenant

8  agreed that the R-O-W Agreements will provide for closing of

9  the transactions contemplated thereby simultaneously with the

10 closing and the substantive provisions of the R-O-W Agreements"

11 -- that's the other Sales agreements --  "will parallel the

12 substantive provisions of this Agreement modified only for

13 compliance with local law."  So -- all right, and then move

14 down to the bottom two sentences of that paragraph, "Upon

15 execution of the R-O-W Agreements Buyer shall cause the

16 international Buyers, and Seller shall cause the international

17 Sellers to become parties to this Agreement by executing and

18 delivering signature pages to this Agreement.  Upon such

19 execution and delivery the international Buyers and

20 international Sellers will be subject to the obligations

21 imposed on them and entitled to the benefits afforded to them

22 by this Agreement."  So, by way of explanation, Your Honor,

23 this is part of the reading of why one of the many elements for

24 why it was understood when the Coordinating Agreement was

25 entered into that the Buyer and international Buyers would all

1 become within, among other things, the remedy clauses provided

2 in this --

3       THE COURT:  I don't think there's any dispute about

4 that.

5       MR. CANDEUB:  Okay, Your Honor.

6       THE COURT:  I mean, the Debtor can correct me when

7 it's in its turn if I'm wrong, but I don't think there's any

8 dispute about that.

9       MR. CANDEUB:  But insofar as they're gonna

10 parallel the substantive provisions that also suggests that I

11 think where we say Buyer in the provision that they dispute

12 means Buyer and/or any international Buyer that that -- and

13 they say just no, no, it just -- Exide just means Buyer, that

14 this supports the understanding the reading that it was

15 intended to be, Buyer and/or international Buyer.  Your Honor,

16 I'll go back to page 19 at this point, the venue provision and

17 the waiver provision, Sections 5.2 and 5.3, provides that, "For

18 purposes of this Agreement, the Sale Agreements and the

19 transactions contemplated hereby and thereby" -- and then some

20 language that's not material -- "shall be brought solely in a

21 State or Federal Court located in the County of Cook, the State

22 of Illinois.  By their signature to this Agreement the parties,

23 and regardless of their residence, each irrevocably submits to

24 the jurisdiction of the Courts located in the County of Cook,

25 State of Illinois in any dispute legal action proceeding

1  arising relating to this Agreement the Sale Agreements or the

2  transactions contemplated hereby thereby other than the

3  Guarantee Agreement" -- that doesn't apply to us the Guarantee

4  Agreement --  "each of the parties acknowledge that it is

5  freely agreed to submit to the jurisdiction of venue and

6  without such Agreement the County located in the County of Cook

7  might not otherwise have jurisdiction over each such parties."

8  So, given that Exide was in Chicago this again would only have

9  any bearing if as to the non-Debtor Exide entities it would

10  only mean that there was an understanding that they could be

11  sued in Cook County, Illinois, and given that that had to be

12  the direction of this clause.  Then at 5.3, "For purposes of

13  this Agreement the Sale Agreements and the transactions

14  contemplated hereby and thereby other than the Guarantee

15  Agreement each of the parties hereby irrevocably waives all

16  claims of immunity from jurisdiction attachment and execution

17  which it might otherwise be entitled to in any legal action or

18  proceeding brought in any State or Federal Court located in the

19  County of Cook, State of Illinois."  So, again, this was

20  incorporated into the other Agreements, the other parties

21  understood this meant all these folks could be sued.

22      THE COURT:  The bankruptcy changes at least some of

23  that and may change all of it, and the cases talk about that.

24  The bankruptcy overlay, and I --

25      MR. CANDEUB:  The point -- the reason I'm raising

1  this here is not for purposes of whether or not the Unusual

2  Circumstances Clause exception to the automatic stay is clear.

3  The automatic stay only applies to Debtors not to non-Debtors,

4  but for purposes of explaining the context of the Agreement

5  wherein it was understood that these parties -- the non-Debtor

6  Exide entities could be -- might be or anticipated and might be

7  sued in Court.

8      THE COURT:  But I think that's clear, the language is

9  unambiguous.

10     MR. CANDEUB:  And if you're suing somebody in Court

11  you're not suing them other than for to get some remedy, and

12  so, it was understood, we submit Your Honor, that the prospect

13  or possibility of suing the non-Debtor entities in Court

14  existed, was understood, and that's in part reflected in this

15  language.  The Article 4 has the indemnification provisions.

16  Article 4.1 is indemnification by Seller, that would be the PDH

17  folks, it doesn't apply to us in our scenario, and then 4.2 is

18  indemnification by Buyer, that starts at the very bottom of

19  page 15 and then mostly on 16.  It says," Subject to Sections

20  4.2(b), (c), and (d), Buyer agrees to indemnify and hold Seller

21  and international Sellers and their affiliates harmless from

22  and against any and all losses and expenses incurred by Seller

23  or the international Sellers in connection or arising from."

24  And here this is where we have the different opinions about

25  that first clause there in 4.2(a) we submit that the language

31

1  from the definition of Buyer is, "Buyer and/or any

2  international Buyer" should apply there, Debtors disagree with

3  that, and that, "Therefore Buyer and/or any international Buyer

4  agrees to indemnify and hold Seller" -- et cetera -- "harmless

5  from and against," and given that at this point in time, May

6  9th, there was only -- the only Buyer was the one entity but at

7  later point the other Sellers were gonna be involved -- or the

8  other Buyers were gonna be involved, it was -- they incorporate

9  by reference to the Coordinating Agreement.  It's set forth

10 that they were gonna have substantive provisions paralleling

11 this Agreement, that it was understood by the parties based on

12 the language here that Buyer would have to include Buyer and/or

13 any international Buyer, and then it goes on to say, you know,

14 (a)(1), they agree to indemnify in connection with (a)(1), "Any

15 breach by Buyer of any of its covenants or agreements in the

16 Sale Agreements or in this Agreement to any breach of any

17 warranty or the inaccuracy of any representation of Buyer

18 contained in the Sale Agreements without regard to materiality

19 or material adverse affect, or 3, any breach by Buyer of any

20 covenant contained in Section 11(1) or 12(2) of the U.S.

21 Agreement."

22        THE COURT:  Mr. Candeub, was Exide the page 1 Buyer,

23 a party to all of the Sale Agreements?

24        MR. CANDEUB:  No, Your Honor.

25        THE COURT:  Okay.

32

1     MR. CANDEUB:  Absolutely not.  It was only party to

2  the one between Exide and PDH, USA.

3     THE COURT:  So, in order to -- it strikes me that in

4  order to -- what the Debtor's arguing is that in 4.2(a) I have

5  to read the definition of the Buyer in the introductory

6  language as being only Exide, but it seems to me that I have to

7  read, if I were to buy the Debtor's argument, that I have to

8  read Buyer in the three subparts of A to mean Buyer or any

9  international Buyer, is that correct?

10     MR. CANDEUB:  I guess that's right, Your Honor.  Now

11  -- to even -- fairness, just to move ahead to the -- what I'm

12  sure the Debtor's counsel is jumping in their seat about is,

13  there was an amendment -- there were three amendments to the

14  Coordinating Agreement.  The first one is the one of issue.

15  That's just following Exhibit-A, listing the sale agreements.

16  That's -- and if I can turn your attention to that, if you have

17  that there.  Amendment Number 1 to the Coordinating Agreement's

18  dated June 19 and it does --

19     THE COURT:  I don't have that in front of me.  You

20  need to get me to a tab or --

21     MR. CANDEUB:  It's -- it would be, let's see now,

22  page -- after 26 there are two pages of signatures and then one

23  page, Exhibit-A, and then the next page would be the

24  Coordinating Agreement, Amendment Number 1.

25     THE COURT:  I have it.  Thank you.

1    MR. CANDEUB:  In that it says -- let's see, "accept as

2    otherwise expressly amended hereby, the agreement remains in

3    full force.  Unless otherwise defined, capitalized terms used

4    have the same as the other one to Exhibit-A is hereby deleted

5    and replaced with a different Exhibit-A and number 3, 4.2(a)(1)

6    is hereby amended to insert the words 'or for sake of

7    clarification and the international buyer' after the word buyer

8    in the first line of such section."  So then we go back to that

9    4.2(a) and here's where we have a -- what would be another

10   source for at least ambiguity.  The -- we now have an explicit

11   understanding that international buyer is covered within

12   (a)(1), it's not -- it's still not expressly referred to in

13   (a)(2) or (a)(3), even though, as you suggested, that that

14   would be the apparent intent from the Agreement originally.

15   And --

16       THE COURT:  So, I guess my reaction to that is rather

17   than create an ambiguity, doesn't it actually eliminate any

18   possible ambiguity?

19       MR. CANDEUB:  No, Your Honor, because it doesn't

20   address -- well, it's not even clear if it's 4.2(a)(1) does

21   that mean it says the first line, but the first line of 4.2(a)

22   says "buyer also" does that mean --

23       THE COURT:  See, and that's --

24       MR. CANDEUB:  -- (a) and (a)(1)?

25       THE COURT:  That's my point.  It seems to me that --

1  well, okay.  You answered my question.

2          MR. CANDEUB:  And even then, it doesn't eliminate the

3  language of the definition of buyer in the first place.  So,

4  Your Honor, we're not going to hear today evidence from the

5  drafters as to what they had in mind when they made that

6  change.  That would be a matter of speculation.  But we submit

7  that the language -- the understanding all along was buyer

8  and/or international -- any international buyer in 4.2(a) and

9  that that continues to apply.  And to the extent that there was

10  any question about the application to the sale agreements

11  because it says buyer of its covenants in the sale agreements,

12  they just perhaps, for grammatical purposes if nothing else,

13  thought it would be, considering the buyer doesn't sign the

14  buyer, Exide, doesn't sign all the sale agreements.  So it's

15  buyer or international buyers.  It had to be because multiple

16  sale agreements with multiple entities.  But buyer still is

17  defined as and/or any international buyer.  And given the other

18  language in the agreements -- the sales agreements for example

19  say consistently in section 10.2 of the various sales

20  agreements the buyers sole and exclusive indemnification

21  obligations under this agreement, the buyer being in any given

22  sale agreement whatever foreign entity, are set forth in the

23  Coordinating Agreement which is incorporated.  So it doesn't

24  say -- they could have said the buyer here has no

25  indemnification obligations, there are none.  It doesn't say

1  that. It says, we have incorporated by reference to this other

2  document so your remedies are as provided here in this other

3  document. They could have done any number of things to make it

4  clear if they intended that there be no remedy against any of

5  those other entities to say that. It doesn't say that. It

6  says buyer and/or international buyer in the definition

7  section. They are incorporated by reference. It's intended

8  that the agreements are going to parallel substantively. So on

9  those -- principally on those grounds, Your Honor, we've

10  maintained all along -- and furthermore -- it's clear that the

11  remedies exist.

12      Now furthermore, in terms of acknowledgement from the

13  Debtors of that -- I should point out that there was in the

14  State Court in the first complaint an answer filed by the Exide

15  entities collectively. And in the answer, which I have and can

16  submit also -- and I don't think there would any dispute about

17  that, it's a document -- there's no defense asserted. You

18  can't sue us, the foreign entities; it's not in there. They

19  didn't raise that. They didn't raise that for a good long

20  time, as Ms. Wolfe could also explain, in the litigation in

21  Illinois. Why not? Because they understood that there was a

22  right to sue them there. So that's another factor by way of

23  the behavior of the parties to show the understanding and their

24  intent.

25      There is -- the -- substantively, of course, the issue

36

1  involved the sweeping of accounts and that's what was -- there

2  was accounts for multiple entities.  There certainly is nothing

3  in the sale agreements to say we, you know -- by the seller

4  saying we understand we don't have a right to go against you

5  because the funds were all in the hands of the various

6  entities; they're separate distinct entities.  They have

7  separate cash accounts.  They were all separately supposed to

8  be swept.  The claims that there were separate sale agreements

9  between for example PDH Europe to Exide Europe, so there's

10  no -- nothing in the agreements that says, "and if we don't pay

11  you everything you're owed, you can't go against us, too bad."

12  And again, that's something that if that was the case, you'd

13  expect that to be spelled out pretty clearly.  And it doesn't

14  say that.  So -- and, Your Honor, the closing date, by the way,

15  was in September so it wasn't -- it was a couple of months

16  after these agreements were entered into.  Ms. Wolfe could

17  testify to that also.

18        Your Honor, we, as a legal matter, if given authority

19  to dismiss without prejudice the claims of the PDH foreign

20  entities against the Exide foreign entities as they exist in

21  the transferred action here, statute of limitations hasn't run.

22  We could dismiss them without prejudice and file a brand new

23  lawsuit just on behalf of the PDH entities against the Exide

24  foreign entities.  And it may be helpful to think about it that

25  way in terms of what would happen or what should happened here.

37

1  At that point, the Debtors would need to file their Motion for

2  a Stay of such a proceeding.  And again, it's only against non-

3  Debtors so the stay doesn't automatically apply, only in

4  unusual circumstances.  And then they would have to say it's

5  something about essential for the reorganization or an identity

6  of -- that the parties are essentially identical

7         THE COURT:  Mr. Candeub, sometimes -- and I think

8  generally as a way of approaching matters -- and I think many

9  Judges are of this view, but not all -- is that you only

10  decide -- I only try to decide those things which I have to

11  decide and not be overreaching in it.  On the other hand, while

12  your suggestion is that the Debtors -- the Plaintiff or

13  Plaintiffs could chose to file suits against the non-Debtors

14  and that issue would eventually, I guess, percolate back to me

15  again.  It seems to me that out a sense of judicial economy and

16  the fact that, you know, you've already gone from State Court

17  to Federal Court in Illinois, from Federal Court in Delaware,

18  that to render a decision today that causes that process in

19  part to be started all over again seems inefficient when in

20  fact the Debtor has by virtue of having made its extension of

21  the stay request, it seems to me teed that up for decision

22  today.

23         MR. CANDEUB:  Your Honor, by way of information also,

24  and I think this is in our papers, the argument for extension

25  of the stay was made to Judge Gardner in State Court, and he

38

1   denied that and there's an order.  If you haven't seen it I

2   can --

3          THE COURT:  But that State Court --

4          MR. CANDEUB:  -- submit that.  So that actually

5   already has been --

6          THE COURT:  -- Judge and I, it seems to me, work under

7   entirely different circumstances and principles on that issue.

8   Wouldn't you agree?

9          MR. CANDEUB:  I don't know what the Judge -- Judge

10  Gardner considered.  I would assume that he is not very

11  familiar with -- as familiar -- nearly as familiar as Your

12  Honor with the issues of 362(a).

13         THE COURT:  Well, and it wouldn't be his

14  responsibility necessarily to have that focus either.  Okay.

15         MR. CANDEUB:  But it was presented at some length

16  after multiple arguments in, I think, three separate hearings

17  before the Judge decided that he would not stay that as to the

18  non-Debtors.  And it was only after that that the removal was

19  filed of course.

20        Your Honor, this Court -- by contrast, if the lawsuit

21  didn't already exist, it Pacific Dunlap entities -- foreign

22  entities wanted to sue the -- today the Exide foreign entities

23  and there wasn't already this lawsuit, they could not come to

24  this Court and file a complaint against the non-Debtors because

25  we submit that that's not -- it would not be within this

1   Court's jurisdiction.  It would get booted right away.  So

2   given that this is a -- has to be a non-core proceeding as to

3   the non-Debtors, at best, as Judge Sonderby suggested, at best

4   related to jurisdiction, this is something where -- and given

5   that there's a jury trial demand as made by both sides and a

6   counter claim for that matter from Exide so that -- from the

7   Exide entities.  So that there are claims on both sides from

8   the non-Debtors against the foreign Plaintiffs, a jury trial

9   demand on both sides, that this is not a case which can be

10  heard in this Court, given the State Law issues, the jury trial

11  demands, the non-core claims as against the non-Debtor

12  entities.  And given that it started in State Court, given that

13  there is a foreign selection clause which the Courts do enforce

14  in non-core matters, and this is, again, not withstanding any

15  of the arguments about the Proofs of Claim, non-core as to the

16  non-Debtor entities.  That this is a situation where there

17  already was a State Court action going and can go back there.

18  Once again there isn't any -- in terms of judicial economy, if

19  anything there's some familiarity by the Court up there

20  already.  There was discovery that was taken, there was

21  substantial document exchange, there was written discovery,

22  there was one deposition.  There were many noticed, only one

23  taken.  So in terms of judicial economy this Court couldn't

24  hear the jury trial case as it related to matter it could only

25  do Findings of Fact and Conclusions of Law anyway or as a non-

40

1  core matter.  And the trial couldn't be here.  And -- so that

2  the claims by -- and there's substantial claims by the non-

3  Debtor -- against the non-Debtor entities -- that that case

4  ought to be heard elsewhere than this Court.

5      For purposes of dealing with the issues by PDH, USA

6  against Exide, the Debtor, I would note in their Courts --

7  there are a couple of cases, like there was a recent <u>KMart</u> case

8  where this happened, the -- we would be willing to waive any

9  collateral estoppel issues that might be raised as a concern by

10  the Debtors.  They may say, "Oh gee whiz, we might, you know,

11  if we keep the one thing here."  If that's what they prefer,

12  judicial economy might say send it out.  You might say okay,

13  it's a Court matter it should stay here.  If that should arise,

14  we would waive, for the convenience of the parties in the

15  Court, collateral estoppel as to any resolution of the State

16  Court of the claims in another venue --

17      THE COURT:  Then in fact you're promoting that which

18  your papers say you seek to avoid and that is trial in two

19  different forums of virtually the same issues.

20      MR. CANDEUB:  Well, Your Honor, they're not

21  necessarily the same issues because --

22      THE COURT:  Then let's say they're related.

23      MR. CANDEUB:  They're related.  And we would prefer

24  that they all be out in State Court, but given that we have

25  jury trial rights, given that they're non-core, that there is a

1  case that was already begun, it clearly fits in with the --

2  within at least the discretionary, if not mandatory -- the

3  requirements that if the Debtors prefer to have the case

4  against Exide stay here, notwithstanding the judicial economy

5  factor, that -- we would accommodate that and accommodate the

6  Court.  And that's what happened, as I said, in the KMart

7  decision, which was 285 BR 679, from November 2002.  And

8  actually that happened in the Alden Industries case before

9  Judge Sigmund as well; Weslaw 357719.

10      There are a number of cases that the Debtors cite and rely

11  on and I want to just alert Your Honor of just some

12  distinctions between them in our case.  In particular the

13  McCartney case from the 3rd Circuit 1997, McCartney vs.

14  Integra, which is one of the cases they're relying on in

15  connection --

16          THE COURT:  The unusual circumstances case.

17          MR. CANDEUB:  Yes, Your Honor, exactly.  That was one

18  where -- that arose under the Deficiency Judgment Act and it

19  was very specific to that Act as being a factor in the

20  determination where the Court found -- this was a situation

21  where the Debtor was an individual who owned a company.  And

22  the company had some real estate and there was a foreclosure

23  against the real estate.  And the Court found that the

24  mortgagee, the -- Integra could not have proceeded against the

25  -- Le Mars, the company, to obtain a deficiency judgment

42

1   because it would have been required under that Deficiency

2   Judgment Act to name McCartney individually as a respondent to

3   the petition and thereby violate the automatic stay.  And this,

4   by the way, was the case where the Debtor was -- this was a

5   case where there -- 6 months had already past and then the

6   Debtor was saying, "They blew it.  The bank blew it because

7   they should have brought this action within 6 months and they

8   didn't."  And the Court agreed and said that whereas the bank

9   defended on the grounds that they stay applied, the Court said

10  it didn't.  So it wasn't exactly an unusual circumstance in

11  this case at all because it wasn't where somebody came into the

12  Court and said, "Your Honor, we're seeking to proceed against a

13  non-Debtor or we're seeking to prevent somebody from going

14  against a non-Debtor."  It was all after the fact and then it

15  was all based on the fact that the DJA, the Deficiency Judgment

16  Act, required that the individual be names as a respondent and

17  as the ground for why it should apply at all.

18      And we have, independent of that, Your Honor, a situation

19  where they are just, we submit, straight claims, non-Debtors

20  against non-Debtors.  And they'll argue that Exide should be

21  named.  I suppose they would argue that, but we submit it's not

22  necessary.  That the -- there are a number of cases they refer

23  to, by the way, in the context of the Proof of Claim situation.

24  And the reason that I've discussed -- they're really not

25  pertinent here because we don't have any Proofs of Claim

43

1    against the non-Debtors necessarily.  And a lot of those cases

2    are two-party cases; that is to say, cases between a Debtor and

3    a non-Debtor and not between non-Debtor against non-Debtor.

4        In the case of <u>Queenie vs. Gardner</u> where there was -- a

5    2nd Circuit case that they also rely on involving an extension

6    to a non-Debtor defendant.  That was also an unusual case, very

7    unusual case because it was not opposed.  There was no

8    opposition, oddly enough, to the extension to the non-Debtors

9    by the non-Debtors.  And also the Court found that there would

10   be an immediate adverse economic impact on the Debtor, and

11   there's no grounds for finding there would be an immediate

12   adverse impact on this Debtor.

13       THE COURT:  Of course that decision also -- and

14   relying on <u>McCartney</u> for that proposition --

15       MR. CANDEUB:  Relied on what?

16       THE COURT:  <u>McCartney</u>, relied on the <u>McCartney</u> case.

17   So <u>McCartney</u> I don't view as being limited to the specific

18   circumstances that were involved there.  And secondly, it also

19   goes on to talk about cases where such actions are stayed when

20   there's such an identity between the Debtor and the third party

21   defendant, that the Debtor may be said to be the real party

22   defendant, which is one of the things the Debtor's arguing

23   here.  Okay.

24       MR. CANDEUB:  But not every -- but on the other hand,

25   there's no case law out there that says just because you're a

44

1   subsidiary you're identical to the Debtor, to the parent.

2          THE COURT:  No everything is, I think, factually

3   oriented.

4          MR. CANDEUB:  And there's no support here for showing

5   that the identity of the -- if any -- if there were an identity

6   that it would be -- create an adverse effect of the Debtor,

7   which I think you absolutely need to show to come within

8   362(a).  And otherwise, it's, you know -- in any event, it's

9   still part of 105.  It isn't 362(a) by itself.  It's a matter

10  of some extension by the case law, I believe, Your Honor.

11         THE COURT:  Well, it's funny.  The cases talk about --

12  and they come up -- some of the cases talk about a 105(a)

13  injunction being applied under what really is a modified

14  injunction standard, and some cases talk about extension of the

15  362(a) stay.  They both end up with the same results,

16  approaching it in somewhat different ways.  But the

17  considerations, I think, are largely the same.  Anything

18  further, Mr. Candeub?

19         MR. CANDEUB:  Yes, also, Your Honor, they refer to the

20  Isuza case, which was one of those two-party cases, but in any

21  event, there were two different Isuza cases.  They refer to one

22  where there was a Proof of Claim and then the other one that

23  preceded it from 264 BR was one where the Court found that

24  allowing the State Court action to proceed was appropriate.  So

25  with that, Your Honor, I'd like to just reserve some

1  opportunity to respond to Debtor's counsel.

2         THE COURT:  Yes, and I'd like to hear Debtor's

3  argument for -- again assuming that your still pressing for

4  this whether I hear your witness at all.  But let me hear

5  argument from the Debtor first.

6         MR. CANDEUB:  Thank you.

7         THE COURT:  All right, thank you.

8         MR. CHEW:  Good morning again, Your Honor, may it

9  please the Court, Ben Chew for the Debtor.

10        THE COURT:  Before you begin, I have two questions I'd

11 like to ask.

12        MR. CHEW:  Yes, Your Honor.

13        THE COURT:  The first is if I were to -- if I agree

14 with Exide's argument that I should read the Coordinating

15 Agreement provisions in such a way that only Exide would be

16 liable for any breaches of the agreements under the

17 indemnification provision of the buyer or the international

18 buyers, I guess what I'd have to -- what I'm looking for is a

19 principled or rational basis upon which Exide would have made

20 such a decision.  Why would they have wanted that?  Why would

21 they have wanted to restrict liability to Exide alone?

22        MR. CHEW:  I would be speculating, Your Honor.  They

23 are a wholly owned subsidiaries and it could be that they

24 assume the liability was coming that way anyway.  It may have

25 been a negotiated point between the parties.  I don't know.

46

But what I do believe, and I believe the Court has hit on the very core issue, that the language is clear and unambiguous. And if we could approach to set -- well, you had another question --

THE COURT:  I have another question.

MR. CHEW:  I apologize, Your Honor.

THE COURT:  And then you'll be free to make your argument.  If I should happen not to agree with Exide's interpretation of the various Coordinating Agreement provisions and were instead to agree with Pacific Dunlap here in its reading, I want to address the alternative relief that the Debtor has sought, and that is I enter an order extending the stay preventing action against the non-Debtors.  What happens, okay, if I do that, if I grant that alternative relief to the Debtor?  I hear the claims objections here and then whatever counter-claims the Debtor brings, doesn't the liability of the non-Debtors have to be determined at some point anyway, and doesn't that get determined in a forum other than this one?

MR. CHEW:  No, Your Honor, we respectfully disagree. And we've been batting this around for several days now.  And Plaintiffs take a stab at it in paragraph 77 of their opening brief.  "Don't worry, Your Honor, this isn't going to have an effect on the estate.  We're not going to prosecute, we're not going to enforce against certain assets."  The truth is, Your Honor, it would be a mess.  And it really all boils down to our

1  inextricably linked argument pursuant to the RSVGC case.

2      THE COURT:  But, but -- and I don't necessarily

3  disagree with that.  But if I don't read the agreement Exide's

4  way, it necessarily leaves for determination later in another

5  forum the liability of the non-Debtor entities, doesn't it?

6      MR. CHEW:  Well, Your Honor, again, our position is

7  that this Court is the proper forum to make that decision as

8  well.  Of course, as the Court understands, our threshold

9  position is that Exide is the sole indemnitor, which means

10  there's nothing left to remand all the claims the $20.1 million

11  --

12      THE COURT:  And I'm asking you to suppose I don't make

13  that conclusion.  And if I don't make that conclusion, what, in

14  the Debtor's view, ultimately happens with the claims against

15  the non-Debtors, whether they're -- whether I do a partial

16  remand, which I've done before, or whether I simply say to make

17  it clean to Pacific Dunlap, "Go file a separate lawsuit?"

18      MR. CHEW:  Again, Your Honor, I'm not trying to be

19  obtuse.  The problem with the partial remand is -- and again, I

20  wanted to clarify this 'cause there's been some bandying about

21  about the amounts and who's liable for what.  According to

22  Plaintiff's own papers, which are reflected in their Proofs of

23  Claim, the Proofs of Claim are an amount of 20.1 million, which

24  is exactly equal to the amount that they're claiming in the

25  sweep in LOC cases, 20.1 million.  Of that $20.1 million total,

48

1   12 million, about 60%, is directed solely at the Debtor, Exide.

2   They also state in their brief at page 7, paragraph 22, that

3   they are looking to Debtor Exide for the remaining $8.1 million

4   of alleged liability.  In other words, if you look at their

5   Proofs of Claim, they state very clearly, "Yes we're looking at

6   Exide.  We maybe looking at the non-Debtor entities as well."

7   It is -- all of this comes down -- it really begs the question

8   that the Court raised to Mr. Candeub at some point, some Court

9   is going to have to grasp the nettle and interpret section 4.2

10  of the Coordinating Agreement.  Judge Sonderby thought that

11  this Court, which has been plagued with the underlying case for

12  many, many, many hours, for which the client is very

13  appreciative.  But ultimately, that decision should be made

14  because otherwise I think it's absolutely unmanageable

15  because --

16          THE COURT:  But I could make it, and I could make it

17  adversely to Exide.

18          MR. CHEW:  Understood, Your Honor.

19          THE COURT:  Let me ask the question another way.  Not

20  to be obtuse myself, but what Pacific Dunlap is arguing is

21  that, again, assuming that I agree with its reading of the

22  agreement is that I don't even have related-to jurisdiction in

23  connection with the claims by a non-Debtor entity -- well by

24  the claims of Pacific Dunlap against non-Debtor entities.  It

25  may be that Exide is responsible for the whole amount, but if I

49

```
 1   read the Coordinating Agreement the way Pacific Dunlap would

 2   like me to, it means there might be liability in non-Debtor

 3   entities as well.  Do I even have related-to jurisdiction to

 4   consider those claims?

 5              MR. CHEW:  We believe so, Your Honor.

 6              THE COURT:  Okay.

 7              MR. CHEW:  And we believe --

 8              THE COURT:  Tell me how and why.

 9              MR. CHEW:  Thank you, Your Honor.  I guess, again, we

10   would point first to the RSVGC case, which we regard as

11   strikingly similar to this case, because that was the case in

12   which there were State Court proceedings based on State Law --

13              THE COURT:  I'm well familiar with it because I was on

14   the losing end of that argument.

15              MR. CHEW:  Oh.  Well, in that case I don't need to

16   explain it.  We believe that it's similar to this case in which

17   the Court -- as the Court is far more aware than I -- found

18   that the claims against the non-Debtor entities and the Debtor

19   were so inextricably intertwined that it was impossible as a

20   practical matter to disentangle them.  And we believe this is

21   precisely the case here.  And we believe that that's reflected

22   in the agreements and that's reflected in the conduct of the

23   parties.  And the Plaintiffs to the -- if you're talking about

24   the conduct of the parties, I mean, Plaintiffs in the sweep

25   action, which is an action for $16.6 million in their
```

1  (indiscern.) clause, it's against Exide only.  And I think

2  that's consistent with the parties' understanding.  That's

3  parole and we would submit inadmissible.  The parties

4  understood that Exide was going to be the sole indemnitor.  And

5  I believe, Your Honor, if I may get to the argument on 4.2 --

6  THE COURT:  Yes, I'll let you start where you'd like

7  and move from there.  Thank you --

8  MR. CHEW:  Well, thank you, Your Honor.  If --

9  THE COURT:  -- for answering my question.

10  MR. CHEW:  If I might approach.  This is a

11  demonstrative exhibit only.  It was prepared by Mr. Krauss, and

12  rather than thumbing through the different pages of the

13  Coordinating Agreement, I've given it to Mr. Candeub, who will

14  rebut it if he thinks the cites are wrong.  But these are just,

15  in 3 or 4 pages, what we believe to be the operative pages of

16  the Coordinating Agreement.

17  MR. CANDEUB:  Your Honor, I would object to the use of

18  this rather than with the documents themselves.  There all --

19  all of the documents are before Your Honor.  I don't think that

20  this is helpful because it omits information from various

21  clauses.  And to that degree, just as I did, Your Honor, Mr.

22  Chew can just draw your attention to those clauses.

23  THE COURT:  Well, in fact that was going to be my

24  point.  It's just as you did only it's in writing.  And I don't

25  accord it any more weight because it's in writing as opposed to

1    oral.  I'll allow it.

2        MR. CHEW:  Understood, Your Honor.  And I -- we were

3    just trying to be helpful.  The analysis begins, as the Court

4    pointed out, with section 4.2, indemnification by buyer, Exide.

5    And the Court has already read that language.  It's very clear

6    on its face that it's the buyer which agrees to indemnify and

7    hold seller and the international sellers and their affiliates

8    harmless from any and all losses.  But in defense of

9    Plaintiffs, that doesn't really end the inquiry.  Certainly on

10   it's face it says that Exide is the sole indemnitor.  But you

11   really have to look up on the page of the demonstrative

12   exhibit.  It's set forth at page 3 of the Coordinating

13   Agreement, which is Exhibit-A to Debtor's opposition.  This is

14   a relevant clause.  "Buyer has the meaning specified on the

15   first page of this agreement."  And as you know, on the first

16   page there's a distinction between buyer and international

17   buyer.  But here is an operative clause.  "As used in articles

18   1 and 3 to 7 inclusive, buyer shall be deemed to mean buyer

19   and/or as the context may require, international buyer."  So

20   you go back to 4.2 and you look at the language and see does

21   the context require the international buyer to be included.

22   Now on its face, it certainly appears that the context does not

23   require international buyer because they are making

24   distinctions here between international sellers and sellers,

25   buy specifically saying only the buyer is the indemnitor.  But

1    to the extent there's any doubt whatsoever about the party's

2    intent, it is resolved by the second page of the demonstrative

3    exhibit, as Mr. Candeub pointed it out, Amendment Number 1 to

4    the Coordinating Agreement, number 3, sub-paragraph 3.  Section

5    4.2(a)(1) is hereby amended to insert the words "or for the

6    sake of clarification any international buyer after the word

7    buyer in the first line of such section."  Let's look at that.

8    That means any breach by buyer or any international buyer of

9    the covenants or agreements in the sale agreements or in this

10   agreement.  So clearly what the parties were agreeing to do in

11   the amendment was, "Exide, you're not only on the hook for

12   whatever breaches that you commit, you're also on the hook for

13   the breaches of the international buyers of the non-Debtor

14   entities."  If they had wanted to include or clarify the

15   preceding paragraph, 4.2(a), they would darn well have included

16   that in the amendment.  So not only on the face of the

17   agreement do we know that Exide's the sole indemnitor, but when

18   they went back to look at it and said, "Gee, maybe that page 3,

19   as the context may require, may create some ambiguity as to

20   whether Exide is on the hook for the breaches by the non-Debtor

21   entities."  They said, "We better fix that up."  So they say

22   for the sake of clarification, "any international buyer."  So

23   what they clearly did was mean that Exide will remain the sole

24   Indemnitor, but it won't be the sole Indemnitor only of its own

25   breaches, it's going to be on, it's going to be liable and

1   responsible for any breaches by the non-debtor entities and

2   Your Honor, we respectfully submit that that is clear as a

3   bell, and that, respectfully submit, would require the Court to

4   deny the motion that -- because there's nothing left to remand

5   and have the consolidated adversary proceeding precede here in

6   this Court.  And Your Honor, I'm prepared to address any other

7   issues that the Court may have, but we respectfully submit that

8   that ends the inquiry.  And if it doesn't, and the Court

9   doesn't agree with that, we can certainly go into the other

10  argument, but we respectfully submit that, that that's it.

11          THE COURT:  Why don't you continue.

12          MR. CHEW:  Thank you, Your Honor.

13      (Pause in proceedings)

14          MR. CHEW:  And I just I apologize for the delay.  I

15  just don't want to --

16          THE COURT:  That's okay.

17          MR. CHEW:  -- repeat something that the Court already

18  appears to have ruled on.  With respect with the forum

19  selection clause, the bankruptcy Court, as this Court is well

20  aware, have held that where is here a proceeding is core,

21  otherwise valid forum selection clauses should not be enforced.

22  As the Court held in Parit, cited in page 16 of our brief,

23  {quote} "retaining core proceedings in this Court, in spite of

24  a valid forum selection clause, promotes the well-defined

25  policy goals of the bankruptcy, of bankruptcy Courts."  And

54

1  this is echoed, Your Honor, as the Court is aware, in Judge
2  Sonderby's opinion and order of February 4, 2003 transferring
3  the adversary proceeding from Illinois to this Court in which
4  she states {quote} "the Delaware Bankruptcy Court is obviously
5  more familiar with the pending bankruptcy case and the time and
6  resources required for its effective administration.  It is
7  more efficient and more consistent with the goals of the
8  Bankruptcy Code if one Court familiar with the estate and the
9  bankruptcy process hears the action."  That's Judge Sonderby's
10 opinion which is Exhibit F, to Plaintiff's opening brief at
11 page 11.  Your Honor, I understand that the Court has, at least
12 as a preliminary matter, has ruled that mandatory abstension
13 for remand would not be applicable in these circumstances.
14      THE COURT:  At least with respect to the issues raised
15 in the Proofs of Claim.  Now, as may be if I determined, by
16 making a determination, and I think I probably have to,  with
17 respect to what the 4.2 language means, it may be that all of
18 the disputes are core.  If I would find that Exide is the
19 exclusive party, against whom liability could be imposed.
20      MR. CHEW:  Well, thank you, Your Honor, and we
21 certainly submit that all the claims are core, even as to the
22 non-Debtor entities.  But perhaps, very briefly, to run through
23 the factors for discretionary abstension for remand.  As a
24 threshold matter, Your Honor, Judge Sonderby's opinion
25 eviscerates any notion of abstension or remand here.  The very

1    fact of her Order of Transfer to this Court that we would

2    submit establishes factor one, that is the Court's duty to

3    decide matters properly before it.  And ultimately decide

4    either as a matter of law on the language of 4.21 and Amendment

5    number 1, paragraph 3 that it's a matter of law the non-Debtor

6    entities cannot be liable and Exide is the sole Indemnitor or

7    to the extent there's an ambiguity to set up some type of

8    discovery schedule and ultimately have an evidentiary hearing

9    on the issue of 4.2.  But in any event, Your Honor, that we

10   would respectfully need to happen before any decision as far as

11   remanding the non-Debtor entities, because as the Court pointed

12   out, it's really putting the cart before the horse.  If we're

13   right on that, either as a matter of law or as subsequently

14   determined by Your Honor after an evidentiary hearing, it's

15   pointless to send it back to Judge Gardner in, in any form,

16   even in a truncated form.  Your Honor, Judge Sonderby's

17   previously sighted conclusions as to the potential adverse

18   impact on remand as to Cook County on the efficient

19   administration of the estate, as well as her findings as to the

20   close relationship of the consolidated adversary proceedings to

21   the main bankruptcy case show that factors three, which is the

22   effect on the efficient administration of the estate, and six,

23   that it the degree of relatedness of the proceeding to the main

24   bankruptcy case, strongly militate against abstention of remand

25   here.  Similarly, Judge Sonderby concluded that factors two,

1   which is the economical and/or duplicative use of judicial

2   resources, and five, which are comity considerations, also

3   weigh against abstention of remand.  As the Court concluded at

4   page 11, again this is Exhibit F, of Plaintiff's opening brief,

5   {quote} "the State Court action itself is not in an advanced

6   stage in any event.  The parties have taken one deposition, and

7   there has been one discovery dispute regarding the timing of

8   third party discovery.  The Defendants point out that any

9   discovery that has been taken can be cited in the Delaware

10  Court."  And we would certainly stand up for that.  I mean

11  that's part of the record.  "The State Court has made only one

12  substantive ruling regarding the Motion to Dismiss for failure

13  to state a claim."  Significantly, Your Honor, page seven of

14  her memorandum opinion, Judge Sonderby notes that the State

15  Court judge never reached the core issue in this case, which

16  has been argued here before the Court, i.e., whether Exide is

17  the sole Indemnitor under the agreement.  Plaintiffs admit as

18  much in their brief at page 20 paragraph 54.  {Quote} "At this

19  stage of this State Court actions, no determination has been

20  made as to the Debtors' liability, if any, on the breach of the

21  sales agreements by the non-Debtor entities."  And they also

22  admit that in their Proofs of Claim, which are set forth as

23  Exhibit C to our opposition brief, and I'll just read from the

24  second one.  The second page of the second Proof of Claim,

25  which is attached as Exhibit C.  {Quote} "As set forth in the

1    memorandum opinion the parties disagree regarding the inability
2    of the" -- strike that -- "regarding the liability of the
3    Debtor for any breaches of the sale agreements.  It is PDH
4    Europe's division that Exide Holding Europe is primarily liable
5    for its breaches and that the Debtor is secondarily liable to
6    the extent that Exide Holding Europe is unable to satisfy PDH
7    Europe.  The Debtor contends that it is the sole Indemnitor for
8    breaches by it or its subsidiaries under the related sales
9    agreements.  Accordingly, if the appropriate Court determines
10   that the Debtor is the sole Indemnitor, PDH Europe has a direct
11   claim against the Debtor for any breaches.  Conversely, if the
12   appropriate Court determines that Exide Holding Europe is
13   primarily liable for its breaches, PDH Europe has a contingent
14   claim against the Debtor, which is dependent on Exide Holding
15   Europe's ability to satisfy PDH Europe's claim."  This we
16   respectfully submit establishes two points.  One, nothing of
17   great significance has happened in the Illinois Court and
18   number two, it all begs the ultimate question on 4.2.  And as
19   to the former point, Your Honor, if anyone would have been
20   expected to defend sovereignty or the comity, rather, of her
21   own State Courts, it would have been Judge Sonderby, but of
22   course she noted that none of the parties resides in Illinois,
23   and none of the bank accounts of issue in the sweeps case is
24   located in Illinois, which factors are relevant to her decision
25   under 7 Circuit Law as she concludes "the outcome of this

1  action does not effect the Illinois State Government or its

2  citizens" and we believe that's a significant factor in the

3  Court's consideration whether to remand the non-Debtor

4  entities. Illinois has no interest. By contrast, as has been

5  stated, I won't repeat it, Judge Sonderby found that, that

6  transfer to this Court was very necessary to the efficient

7  administration of the estate. Nor, Your Honor, does factor

8  four, afford Plaintiff's any support because they do not even

9  allege, much less establish, that there is any difficulty or

10  unsettled nature of the relevant Illinois law. Indeed, the

11  adversary proceeding involved straightforward issues of

12  contract interpretation and, as the Court pointed out, parol

13  evidence. But these are straightforward issues of law.

14  There's nothing unique here. Similarly, as Judge Sonderby

15  concluded "the final three of the nine enumerated factors weigh

16  against remander or abstention because Plaintiffs would not be

17  prejudiced" and if anything, Delaware is the most convenient

18  forum for all parties. Indeed, as Judge Sonderby concluded "19

19  of the 49 witnesses are actually closer to Wilmington then they

20  are to Chicago, including 18 witnesses who are located fewer

21  than 150 miles from the Delaware Court. Only 11 of the 49

22  witnesses are closer to Chicago, and this is Judge Sonderby's

23  memorandum opinion at nine: "None of the parties resides in

24  Illinois, and the Debtor Exide is headquartered in nearby

25  Princeton, New Jersey. Though counsel are the least relevant

1   consideration, lead counsel for Plaintiffs, Ms. Wolf and her

2   firm, are in nearby Baltimore, and Exide's counsel is in

3   Washington, D.C.  All of whom are a short ride on Amtrak's

4   Northeast Corridor.  Nor can Plaintiffs be heard to complain

5   about the lack of a jury trial when they themselves filed the

6   Proofs of Claim, invoking this Court's jurisdiction and clearly

7   contemplating thereby that there would be no jury trial."

8   Also, Your Honor, for the reasons set forth at pages 31 through

9   35 of Exide's opposition, "Exide respectfully submits that the

10  Court should deny Plaintiffs' request for relief for the

11  automatic stay, which as the Court is well aware, would be an

12  extraordinary relief, wholly unwarranted in this case.

13  Plaintiffs have not begun to satisfy their burden.  Indeed,

14  Plaintiffs have shown no cause as to why they should be allowed

15  to obtain a position superior to other Unsecured Creditors to

16  pursue their entire $20.1 million claim against the estate,

17  outside of the confines of this Bankruptcy Court.  The balance

18  of hardships clearly falls against granting relief from the

19  automatic stay.  Debtor Exide would be severely prejudice were

20  the adversary proceeding allowed to go forward in Cook County,

21  particularly given that Plaintiff's $20.1 million claim is a

22  core proceeding, tied and relevant to the reorganization as

23  Judge Sonderby determined litigating the adversary case, in

24  this, outside of this Court, would interfere with the efficient

25  administration, while keeping the adversary proceeding here

1  would impair no comity interest of Illinois which has no

2  interest here."  Finally, Your Honor, as argued at pages 35

3  through 40 of our opposition, to the extend that the Plaintiffs

4  have any claim against the non-Debtor entities which, as you

5  know, Exide submits they do not, "the automatic stay should

6  apply to these claims as well.  Ajudication of the non-Debtor

7  claims outside of this Court might have a profound and adverse

8  impact on the estate.  Given the amount of the contingent

9  claims, which we understand to be $8.1 million contingent

10  against the non-Debtor entities and/or against Exide and that

11  such entities are wholly owned by Exide."  Finally, Your Honor,

12  as discussed in the context of the RBGSC case, to the extent

13  that any claims can be stated against a non-Debtor entity there

14  is inextricably linked to the claims against the Debtor and

15  must remain and be adjudicated in this Court, especially,

16  unless and until the Court determines the proper interpretation

17  of section 4.2 of the coordinating agreement.  Thank you, Your

18  Honor.

19          THE COURT:  Mr. Candeub?

20          MR. CANDEUB:  Your Honor, a few points resulting from

21  Mr. Chew's argument.  First, I note that he doesn't, doesn't

22  disagree that, that Exide Entity's answer and counterclaim in

23  the -- which, again I can submit as -- to Your Honor, doesn't

24  raise an argument that the case against the non-Debtor Exide --

25  the Exide foriegn entities should be dismissed on the grounds

1   that have been asserted subsequently.  And it does assert a

2   counterclaim.  The argument was made that context requires

3   interpretation of the buyer in 4.2(a) as the Debtors have

4   argued.  I just want to remind, again, your Court that the

5   language, part of the language, Mr. Chew, did not remind the

6   Court about, is still, nonetheless, contained in his excerpt

7   and was also -- what was referred to earlier the article 10.2

8   of the various sale agreements.  Part of the context is that in

9   section 10.2 it clearly contemplates that there will be a

10  remedy against the buyer.  And otherwise it would say so.  It

11  says there's a remedy and it's exclusively in terms of the

12  coordinated agreement, which is incorporated by reference,

13  which allows for the definition of buyer to include

14  international buyer.  This wouldn't make any sense if there was

15  just to be no remedy against the buyer and the sale agreement.

16  The forum selection clauses that Mr. Chew referred -- cases

17  that he referred to again, focused only on the core scenario.

18  We're here focusing on the non-core claims of the Pacific

19  Dunlap for entities against the Exide non-Debtor entities and

20  Judge Sonderby did not, although it was, sounded like she was

21  suggesting it, did not make any finding on core/non-core the --

22  as far as what would happen procedurally, if this case were to

23  be -- the claims against the non-Debtor entities were to be

24  remanded to Illinois, in Illinois Court, and if it were there

25  then decided by that judge, the question about the meaning of

1    section 4.2 -- if that Court were then to decide that there was

2    -- that Exide, the Debtor, is the sole Indemnitor as the

3    Debtors argue, and the sole source for any recompense or

4    compensation, there's also -- sole source because they're --

5    part of the argument earlier on in Chicago by them was --

6    indemnification suggested that even if there was a remedy

7    against the non-Debtor entities that that -- that those

8    entities would in turn be indemnified by Exide and that's an

9    argument which they've abandoned but that's one interpretation

10   for the indemnification language.  In any case, if the Court

11   were to -- in, in another jurisdiction, in Illinois, were to

12   decide that there was no action against the foreign entities of

13   Exide then that -- it, and if this Court were to remand

14   partially just those claims, then those claims would be

15   dismissed.  The action would be dismissed, and we would be

16   simply before this Court on the Proofs of Claim against the

17   Debtor.  So there would be no big mess.  The Court would decide

18   -- could decide out there or it could have that evidentiary

19   hearing that Mr. Chew was referring to, if that were necessary.

20   But in any case, could decide okay, there are claims that exist

21   against the non-Debtors or there aren't.  And, and if there

22   aren't, then the claims could be dismissed and there'd be no

23   confusion.  And if they are, allowed to be maintained and

24   prosecuted, then they could be -- that could proceed in a forum

25   where, by agreement of all the parties, undisputed there's a

1  forum selection clause only action should be brought in

2  Illinois, regardless of where any of them are located.  And

3  this is not a 1404(a), or Motion to Transfer issues that was

4  decided by Judge Sonderby.  We're not here to talk about where

5  the witnesses are located.  That's not -- Judge Sonderby

6  specifically left for this Court the issue of remand.  That

7  Judge was not --

8            THE COURT:  However --

9            MR. CANDEUS:  -- deciding that.

10           THE COURT:  -- it did discuss many of the factors that

11 might be important to a decision on remander abstention.

12           MR. CANDEUB:  True enough.  But didn't -- but left

13 that open.  So, I'm gonna leave that for transferee Court.

14 And, so, to the extent that we've been hearing about that,

15 those aren't really a factor, that, in terms of the dollar

16 amount -- again, I'm not sure why this is pertinent but the

17 Proof of Claim from Pacific Dunlap USA spells out that there

18 was a -- under the -- basically in the claims asserted in the

19 first lawsuit, in the first complaint, that the total claims

20 under that lawsuit are $6,760,000 and some.  So that's out of

21 that, that -- that the total on that first lawsuit.  To the

22 extent that Mr. Chew was arguing that there should be an

23 evidentiary hearing, I suppose that that's, in some fashion, a

24 concession as to ambiguity.  And he argued that we're giving up

25 our jury trial rights by virtue of the Proofs of Claim but as I

1  argued before, that's absolutely not the case.  That's only as

2  the claims against the Debtor.  There's been no -- the Proof of

3  Claim has no impact on the claims against the non-Debtors and

4  that's absolutely been preserved in and its asserted and for

5  that matter, the Exide, as I said, the Exide entity has also

6  asserted jury trial right.  The RSBGC claim, I believe, was

7  principally a two-party claim, a two-party action, unless I'm

8  mistaken, Your Honor, so I'm not sure why that would be

9  pertinent here as far as being a significant issue, significant

10 answer on the related to jurisdiction, but for -- in any event,

11 for the collective reasons we've argued, the language of the

12 coordinated agreement and the sales agreements collectively

13 fully supports a remedy against the non-Debtor entities.  The

14 Court doesn't have -- either it has no jurisdiction or, at

15 best, related to jurisdiction the claims against the foreign

16 entities are non-core.  This is something which couldn't be

17 decided here and enforcement of the forum selection clause it

18 ought to be decided back in, back in Illinois.  If Your Honor

19 has any questions, I can answer them.

20        THE COURT:  I do not.  Both counsel has been very

21 responsive in answering the many that I have asked.  All right.

22 Anything further, counsel?

23        MR. CHEW:  No, Your Honor.

24        THE COURT:  All right.  It seems to that I do have to

25 first reach a decision about whether there is ambiguity in the

1  coordinating agreement.  And it seems to me that, while Judge

2  Sonderby points out that there may be ambiguity, I conclude as

3  a matter of law that there is none.  And that Exide is the sole

4  Indemnitor under Section 4.2 and I reach this conclusion,

5  largely as a result of Amendment number 1, where the parties

6  specifically chose to include language which addressed the very

7  issue of what the buyer should mean in that subsection, and it

8  strikes me that there's no other reasonable inference to be

9  drawn from the making of that amendment other than the parties

10  intended to make that clarification with respect to section

11  4.2(a) small Roman "i", small Roman numeral 1.  And

12  specifically chose not to make that {quote} "clarification"

13  with respect to any other part of section 4.2.  That's why I

14  make that conclusion.  This results in making Exide solely

15  liable for the asserted breaches, which are, in nature, whether

16  they come in through the adversary, or by the filing of Proofs

17  of Claim and counter claims thereto, clearly within the Court

18  jurisdiction of this Court under 28 USC, Section 157 (b)(2)(b)

19  and (b)(2)(c).  With that backdrop, I then look at the requests

20  for equitable remand or discretionary abstention and while I

21  have reviewed the pertinent cases that the parties have cited,

22  neither party cited my published decision in the Reliance Group

23  Holdings case, which is reported at 273 Bankruptcy Reporter

24  374.  And in that case, I set forth the standards that I employ

25  in considering mandatory abstention, discretionary abstention

66

1    and equitable remand.  And the standards are set forth
2    specifically at various parts of that opinion, although I will
3    say that the cases the parties have cited, and, and pretty
4    much all of the cases that talk about these various issues, all
5    say the same things.  Some may add some factors, some may have
6    fewer factors in the multi-factor list of what's to be
7    considered.  But they're all within the same realm.  And Judge
8    Sonderby in her February 4, 2003 decision discussed some of
9    them.  But after taking into consideration all of those
10   factors, I don't find that remand or abstention is warranted
11   here.  And primarily, the overriding consideration, in addition
12   to all of those others that the parties have argued and the
13   Debtor particularly has convincingly argued, is that the
14   bankruptcy system is set up so that the Bankruptcy Court is
15   supposed to be the primary, and sometimes exclusive, forum for
16   the resolution of what are core proceedings.  Which is why the
17   Court is given discretion in certain matters to decide whether
18   they should be heard here or not.  And in exercising that
19   discretion, it seems to me with Exide as the sole Indemnitor,
20   and with the nature of the claims that have been brought, that
21   this forum ought to be the one where the issues are decided.
22   Now -- and I will enter an order, which I'd like Debtors
23   counsel to draft, which embodies the Bench ruling.  And you
24   need not set forth specific factors, only the denial of the
25   motion in its various parts.  For the -- just simply say, for

1  the reasons I've articulated on the record today.  That having

2  been decided, I guess my question is, I'd like the parties'

3  views, if they've had a chance to consider this, where we go

4  next with the adversary, if anywhere, and/or whether these

5  matters are to be decided in the context of claims objection

6  hearings.  So, if counsel had some chance to think about that?

7  And if not, I'd happily give you time to think about it and

8  come back to me.

9          MR. O'NEILL:  Your Honor, I think that we would, just

10 speaking from the kind of Exide core team, I think we would

11 appreciate a little bit of time to figure out where this will

12 fit within the mix.  I'm not sure whether special counsel

13 thinks that that's -- but I think that we're all consistent in

14 that approach.  We would like to just -- a little bit of time

15 to figure that out.  And we could advise the Court through your

16 Courtroom Deputy or try to set up status conference or

17 something on the adversary if that's what you think is

18 appropriate.

19         THE COURT:  Well, I would say that let counsel consult

20 with their co-counsel and their clients and, to the extent that

21 they can agree about what, what happens next, you can submit a

22 Form of Order for my consideration to the extent counsel do not

23 agree on what's to happen next once you let me know, and you

24 can reach out by conference telephone and I'll address, at

25 least in a preliminary way, those issues then.  How's that?

1        ALL:  That's fine your honor.  Thank you, Your Honor.

2        THE COURT:  All right.  Are there any questions?

3        MR. CHEW:  No, Your Honor.

4        THE COURT:  All right, thank you.  That concludes this

5   hearing.  Court stands adjourned.

6        ALL:  Thank you, Your Honor.

7      (Court adjourned)

8

9                    CERTIFICATION
    I certify that the foregoing is a correct transcript from the
10  electronic sound recording of the proceedings in the above-
    entitled matter.

11

12  _____        _11-21-03_
    Signature of Transcriber              Date

13

14

15

16

17

18

19

20

21

22

23

24

25