# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) | Bk. Case No. 02-11125 (KJC) |
| EXIDE TECHNOLOGIES, INC., *et al.*,[1] | ) |  |
|  | ) |  |
| Debtors. | ) |  |
|  | ) | C.A. No. 05-561- SLR |
|  | ) |  |
| PACIFIC DUNLOP HOLDINGS | ) |  |
| (EUROPE) LTD, *et al.*, | ) | Bankr. Adv. Pro. No. 04-51299-KJC; |
| Appellants, | ) |  |
| v. | ) | Removed From Circuit Court of Cook |
|  | ) | County, Ill. Civ. Action No.: 01L |
| EXIDE HOLDING EUROPE, *et al.* | ) |  |
| 008460 | ) |  |

## APPENDIX TO APPELLANTS' BRIEF
## VOLUME I

MORRIS, JAMES, HITCHENS & WILLIAMS LLP
Brett D. Fallon (ID No. 2480)
Douglas N. Candeub (ID No. 4211)
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, Delaware 19899
Telephone: (302) 888-6800
Facsimile: (302) 571-1750

-and-

GOODELL, DEVRIES, LEECH & DANN, LLP
Linda Woolf, Esquire
Paula Krahn Merkle, Esquire
One South Street, 20th Floor
Baltimore, Maryland 21202
Telephone: (410) 783-4000
Facsimile: (410) 783-4040

Dated: February 13, 2006

Attorneys for the Appellants, Pacific Dunlop Holdings (USA), Inc., Pacific Dunlop Holdings (Europe) Limited, P.D. International Pty Limited, Pacific Dunlop Holdings (Hong Kong) Limited, and Pacific Dunlop Holdings (Singapore) PTE. Ltd.

---

[1]    Apart from the lead debtor, Exide Technologies, Inc., f/k/a Exide Corporation, the debtors in these proceedings were Exide Delaware, L.L.C.; Exide Illinois, Inc.; RBD Liquidation, L.L.C.; Dixie Metals Company; and Refined Metals Corporation.  The cases of these subsidiary debtors were closed by order entered June 18, 2004 (Bankr. docket No. 4599).

# APPENDIX
## Table of Contents

Tab 1.    Order Denying Motion of Pacific Dunlop Holdings (USA), Inc., Pacific Dunlop
Holdings (Europe) Limited, P.D. International Pty Limited, Pacific Dunlop Holdings
(Hong Kong) Limited and Pacific Dunlop Holdings (Singapore) PTE. Ltd. for Remand
of State Law Action or, in the Alternative, for Abstention and for an Order Granting
Relief from the Automatic Stay to Proceed to Liquidate Claim in State Court (D.I.
3325) (the "2003 Order")

Tab 2.    The Bankruptcy Court's Order Denying the Motion of Pacific Dunlop Holdings
Entities for Reconsideration of Order Denying Their Motion to Remand or for
Abstention and Stay Relief, and Dismissing Their Causes of Action Against the Non-
Debtor, Foreign Exide Entities (D.I. 5104) (the "2005 Order")

Tab 3.    Memorandum Denying the Motion of Pacific Dunlop Holdings Entities for
Reconsideration of Order Denying Their Motion to Remand or for Abstention and Stay
Relief, and Dismissing Their Causes of Action Against the Non-Debtor, Foreign Exide
Entities (D.I. 5103) (the "2005 Memorandum")

Tab 4.    Motion of the Pacific Dunlop Holdings Entities for Reconsideration of Order Denying
Their Motion to Remand or for Abstention and Stay Relief, and Dismissing Their
Causes of Action Against the Non-Debtor, Foreign Exide Entities (D.I. 3385) (the
"Motion for Reconsideration")

       Exhibit A.    Order Denying Motion of Pacific Dunlop Holdings (USA), Inc., Pacific
                     Dunlop Holdings (Europe) Limited, P.D. International Pty Limited, Pacific
                     Dunlop Holdings (Hong Kong) Limited and Pacific Dunlop Holdings
                     (Singapore) PTE. Ltd. for Remand of State Law Action or, in the Alternative,
                     for Abstention and for an Order Granting Relief from the Automatic Stay to
                     Proceed to Liquidate Claim in State Court

       Exhibit B.    Coordinating Agreement

       Exhibit C.    Affidavit of James D. McDonough

       Exhibit D.    Declaration of Martin Hudson

Tab 5.    Substituted Declaration of Martin Hudson Re: D.I. 3385 (D.I. 3417)

Tab 6.    Motion of Pacific Dunlop Holdings (USA), Inc., Pacific Dunlop Holdings (Europe)
Limited, P.D. International Pty Limited, Pacific Dunlop Holdings (Hong Kong)
Limited and Pacific Dunlop Holdings (Singapore) PTE. Ltd. for Remand of State Law
Action or, in the Alternative, for Abstention and for an Order Granting Relief from the
Automatic Stay to Proceed to Liquidate Claim in State Court (D.I. 2507) (the "Remand
Motion")

       Exhibit A.    First Complaint (PDH Entities v. Exide Entities)

       Exhibit B.    Second Complaint (PDH USA v. Exide)

i

Exhibit C.   Order, Cook County (Ill.) Circuit Court, lifting stay of discovery against defendants other than debtor (July 19, 2002)

Exhibit D.   Memorandum in Opposition to Defendants' Motion to Transfer, in Bankruptcy Court, Northern District of Illinois

Exhibit E.   Motion to Remand or, in the Alternative, to Abstain, in Bankruptcy Court, Northern District of Illinois

Exhibit F.   Memorandum Opinion Transferring Adversary from Another District

Exhibit G.   *RCG Int'l Investors, LDC v. ARI Network Servs., Inc.*, 2003 WL 21843637 (D. Del.).

Exhibit H.   *OMNA Med. Partners, Inc. v. Carus Healthcare, P.A.*, 2000 WL 33712302 (Bankr. D. Del.).

Exhibit I.   *Carol L. Lux v. D'Angeli Bldg. & Constr. Co.*, 1994 Bankr. LEXIS 341 (Bankr. E.D. Pa.).

Exhibit J.   *Nemsa Establishment, S.A. v. Viral Testing Sys.*, 1995 U.S. Dist. 11650 (S.D.N.Y.).

Exhibit K.   *Port Auth. of N.Y. & N.J. v. CCI-Bowers Co.*, 1992 U.S. Dist. LEXIS 6206 (D.N.J.).

Exhibit L.   *In re Federated Dep't Stores, Inc.*, 1990 Bankr. LEXIS 1118 (Bankr. S.D. Ohio).

Tab 7.   Court Docket for Adv. Pro. No. 04-51299 (KJC)

Tab 8.   Transcript of Hearing before Cook County Circuit Court Judge Sheldon Gardner, Cook County Circuit Court, July 8, 2002

Tab 9.   Order and Memorandum Transferring Adversary from another District (Bankr. N.D. Ill. Feb. 4, 2003) (Sonderby, B.J.)

Tab 10.   Amended Joint Plan of Reorganization of the Official Committee of Unsecured Creditors and the Debtors (D.I. 3918)

Exhibit A.   Amended Prepetition Foreign Credit Agreement Term Sheet

Exhibit B.   New Exide Warrant Term Sheet

Exhibit C.   Personal Injury Tort and Wrongful Death Claims Resolution and Distribution Procedures

Tab 11.   Disclosure Statement for Joint Plan of Reorganization of the Official Committee of Unsecured Creditors and the Debtors (D.I. 3919) (exhibits not included in this appendix)

Tab 12.   Order Confirming Joint Plan of Reorganization of the Official Committee of Unsecured Creditors and the Debtors (D.I. 4341)

Tab 13.   Findings of Fact, Conclusions of Law and Memorandum Order Relating to Confirmation of the Joint Plan of Reorganization of the Official Committee of Unsecured Creditors and the Debtors (D.I. 4340)

Tab 14.   Amended Notice of Appeal (D.I. 5125)

Tab 15.   Coordinating Agreement

Tab 16.   Stock Purchase Agreement with Respect to Pacific Dunlop GNB Corporation, Between Pacific Dunlop Holdings (USA) Inc., as Seller, and Exide Corporation, as Buyer (the "US Agreement")

Tab 17.   Stock Purchase Agreement with Respect to Pacific Dunlop GNB Technologies Limited, Between Pacific Dunlop Holdings (Europe) Ltd, as Seller, and Exide Holdings Europe, as Buyer (the "UK Agreement")

Tab 18.   Stock Purchase Agreement with Respect to Pacific Dunlop GNB Technologies NV, Between P D International Pty Limited and Pacific Dunlop Holdings (Europe) Ltd., as Sellers, and Exide Holding Europe, as Buyer (the "European Agreement")

Tab 19.   Stock Purchase Agreement with Respect to Pacific Dunlop GNB Technologies (China) Limited, Among Pacific Dunlop Holdings (Hong Kong) Limited, as Seller, and Exide Holding Asia Pte Limited, as Buyer (the "Hong Kong/PRC Agreement")

Tab 20.   Stock Purchase Agreement with Respect to Pacific Dunlop GNB Technologies (India) Private Limited, Among Pacific Dunlop Holdings (Singapore) Pte Ltd, as Seller, and Exide Holding Asia Pte Limited, as Buyer (the "India Agreement")

Tab 21.   Asset Purchase Agreement, Between Pacific Dunlop Holdings (Singapore) Pte Ltd., as Seller, and Bluewall Pte Ltd to be renamed Exide Singapore Pte Limited, as Buyer (the "Singapore Agreement")

Tab 22.   Proofs of Claim for: Pacific Dunlop Holdings (Europe) Limited; Pacific Dunlop Holdings (Hong Kong) Limited; and Pacific Dunlop Holdings (Singapore) Pte Ltd. (without their accompanying attachments)

Tab 23.   Order consolidating Case Nos. 01-L-15589 and 01-L-08460.

Tab 24.   Excerpt from Transcript of Hearing before Bankruptcy Judge Kevin J. Carey, January 22, 2004 at 2:15 p.m.

# TAB 1

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EXIDE TECHNOLOGIES, INC., *et al.*,[1] | ) | Case No. 02-11125 (KJC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |

## ORDER DENYING MOTION OF PACIFIC DUNLOP HOLDINGS (USA), INC., PACIFIC DUNLOP HOLDINGS (EUROPE) LIMITED, P.D. INTERNATIONAL PTY LIMITED, PACIFIC DUNLOP HOLDINGS (HONG KONG) LIMITED AND PACIFIC DUNLOP HOLDINGS (SINGAPORE) PTE. LTD FOR REMAND OF STATE LAW ACTION OR, IN THE ALTERNATIVE, FOR ABSTENTION AND FOR AN ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY TO PROCEED TO LIQUIDATE CLAIM IN STATE COURT

Upon consideration of the Motion of Pacific Dunlop Holdings (USA), Inc., Pacific Dunlop Holdings (Europe) Limited, P.D. International Pty Limited, Pacific Dunlop Holdings (Hong Kong) Limited and Pacific Dunlop Holdings (Singapore) PTE. Ltd. (collectively, the "Plaintiffs") for Remand of State Law Action or, in the Alternative, for Abstention And for an Order Granting Relief from the Automatic Stay to Proceed to Liquidate Claim in State Court ("Plaintiffs' Motion"), Debtor Exide Technologies, Inc., f/k/a Exide Corporation's ("Exide") Opposition thereto, arguments of counsel on the record at the hearing of Plaintiffs' Motion on November 19, 2003, and being fully advised,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

For the reasons articulated on the record on November 19, 2003, Plaintiffs' Motion is DENIED. The Court finds that Section 4.2(a) of the Coordinating Agreement as modified by Amendment No. 1 of the Coordinating Agreement is unambiguous, that Debtor Exide is the sole

---

[1] The Debtors in these proceedings are: Exide Technologies, Inc., f/k/a Exide Corporation; Exide Delaware, L.L.C.; Exide Illinois, Inc.; RBD Liquidation, L.L.C.; Dixie Metals Company; and Refined Metals Corporation.

indemnitor thereunder, and that consequently the foreign Pacific Dunlop entities have no right of recovery against the non-debtor Exide entities. The Court also finds that all the claims asserted by the Plaintiffs, including those of the foreign Pacific Dunlop entities, are core proceedings to which the automatic stay applies, that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b)(2)(B) and (C), that mandatory abstention pursuant to 28 U.S.C. § 1334(c)(2) is inapplicable, and that neither remand pursuant to 28 U.S.C. § 1452(b) nor discretionary abstention pursuant to 28 U.S.C. § 1334(c)(1) is warranted.

SO ORDERED this 11th day of ~~November~~ Dec. 2003.

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

# TAB 2

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                    )        Chapter 11
                                          )
EXIDE TECHNOLOGIES, et al.[12]            )        Case No. 02-11125 (KJC)
                                          )        (Jointly Administered)
                Debtors                   )

## ORDER

AND NOW, this 16th day of June, 2005, upon consideration of the Motion of Pacific

Dunlop Holdings Entities for Reconsideration of Order Denying their Motion to Remand or for[1]

Abstention and Stay Relief, and Dismissing their Causes of Action against the Non-Debtor,

Foreign Exide Entities (docket no. 3385)(the "Reconsideration Motion"), and the Debtor's

opposition thereto, and for the reasons given in the accompanying Memorandum, it is hereby

**ORDERED AND DECREED** that the Reconsideration Motion is **DENIED.**

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

---

[12]The reorganized debtors in these proceedings are: Exide Technologies, f/k/a Exide Corporation; Exide Delaware, L.L.C.; Exide Illinois, Inc.; RBD Liquidation, L.L.C.; Dixie Metals Company; and Refined Metals Corporation.

Copies to:

Benjamin G. Chew, Esquire
Patton Boggs, LLP
2550 M Street, N.W.
Washington, D.C. 20037

James E. O'Neill, Esquire
Pachulski, Stang, Ziehl, Young, Jones & Weintraub, P.C.
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705

Brett Fallon, Esquire
Douglas N. Candeub, Esquire
Morris, James, Hitchens & Williams, LLP
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, DE 19899

Paula Krahn Merkle, Esquire
Goodell, DeVries, Leech & Dann, LLP
One South Street, 10th Floor
Baltimore, MD 21202

Matthew N. Kleinman, Esquire
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

# TAB 3

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **EXIDE TECHNOLOGIES, et al.[1]** | ) | **Case No. 02-11125 (KJC)** |
| | ) | (Jointly Administered) |
| Debtors | ) | |

## MEMORANDUM[2]

### BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

Before the Court is the "Motion of Pacific Dunlop Holdings Entities for Reconsideration of Order Denying their Motion to Remand or for Abstention and Stay Relief, and Dismissing their Causes of Action against the Non-Debtor, Foreign Exide Entities" (docket no. 3385)(the "Reconsideration Motion"), in which the Pacific Dunlop Holdings Entities[3] request that I reconsider this Court's Order dated December 11, 2003 that denied the PDH Entities' motion for remand, abstention, and relief from the automatic stay to continue a civil action in the Circuit Court of Cook County, Illinois (the "Illinois State Court). For the reasons set forth below, the Reconsideration Motion is denied.

---

[1] The reorganized debtors in these proceedings are: Exide Technologies, f/k/a Exide Corporation; Exide Delaware, L.L.C.; Exide Illinois, Inc.; RBD Liquidation, L.L.C.; Dixie Metals Company; and Refined Metals Corporation (For ease of reference, the reorganized debtors shall be referred to herein as the "Debtor").

[2] This Memorandum constitutes the findings of fact and conclusions of law required by Fed.R.Bankr.P 7052. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding pursuant to 28 U.S.C. 157(b)(1) and (b)(2)(A), (G) and (O).

[3] The Reconsideration Motion was filed by Pacific Dunlop Holdings (USA), Inc. (referred to herein individually as "PDH (USA)"), Pacific Dunlop Holdings (Europe) Limited, P.D. International Pty Limited, Pacific Dunlop Holdings (Hong Kong) Limited, and Pacific Dunlop Holdings (Singapore) PTE. Ltd. (collectively referred to herein as the "PDH Entities").

## BACKGROUND

The PDH Entities were the owners of the GNB Companies, a global automotive and industrial battery business. In May and June of 2000, the PDH Entities entered into separate stock and/or asset sale agreements (the "Sales Agreements") with the Debtor and three non-debtor foreign subsidiaries: (i) Exide Holding Europe, a French company, (ii) Exide Holding Asia Pte. Limited, a Singapore corporation, and (iii) Exide Singapore Pte. Limited, a Singapore corporation (collectively, the "Non-Debtor Exide Entities"). Under the Sale Agreements, specific PDH Entities sold different corporate subsidiaries or assets to specific Exide entities.

On or about May 9, 2000, PDH (USA) and the Debtor[4] entered into a Coordinating Agreement which governed the transactions contemplated in the Sales Agreements. (See Ex. "A" to the Debtors' opposition to the PDH Entities' remand and abstention motion (Docket no. 2942)). The Coordinating Agreement included, among other things, provisions addressing venue, submission to jurisdiction and governing law (Section 5.2)[5] and indemnification (Article 4).[6]

On July 17, 2001, the PDH Entities filed a complaint in the Illinois State Court against the Debtor and the Non-Debtor Exide Entities asserting claims for breach of contract, unjust

---

[4] The Coordinating Agreement was signed by Exide Corporation.

[5] Section 5.2 of the Coordinating Agreement requires, *inter alia*, that all disputes, legal actions, etc. must be brought "solely in a state or federal court located in the County of Cook, State of Illinois" and agrees that the Coordinating Agreement and Sales Agreements "shall be governed by and construed in accordance with the internal laws of the State of Illinois."

[6] Section 4.1 contains provisions regarding an indemnification by the Seller (i.e., PDH (USA)) and Section 4.2 contains provisions regarding an indemnification by the Buyer (i.e., Exide Corporation). The parties' main dispute is whether the language in the Buyer's indemnification of Section 4.2 is ambiguous. For the reasons set forth on the record at a November 19, 2003 hearing and as set forth herein, I have determined that this language is not ambiguous.

A-0006

enrichment, and conversion relating to funds in the approximate amount of $16.6 million dollars that the PDH Entities allege have been retained wrongfully by the Debtor and the Non-Debtor Exide Entities following the sale of the GNB Companies. In December 2001, PDH (USA) filed a second complaint solely against the Debtor, alleging a breach of contract claim with respect to certain letters of credit and seeking relief in the amount of approximately $3.14 million dollars. Both complaints were consolidated into Case No. 01 L 08460 in the Illinois State Court (the "State Court Actions").

On April 15, 2002, the Debtor filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Case"). After the bankruptcy filing, the Debtor requested that the Illinois State Court stay the State Court Actions as to all defendants, including the Non-Debtor Exide Entities. By Order dated July 19, 2002, the Illinois State Court denied the request to stay proceedings against the Non-Debtor Exide Entities.

On August 21, 2002, the Debtor removed the State Court Actions to the United States Bankruptcy Court for the Northern District of Illinois (the "Illinois Bankruptcy Court"). Thereafter, both the Debtor and Non-Debtor Exide Entities moved to transfer the removed action to this Court. On August 28, 2002, the PDH Entities filed a motion for remand or, in the alternative, abstention in the Illinois Bankruptcy Court. On February 4, 2003, the Illinois Bankruptcy Court issued a Memorandum Opinion granting the transfer motion and ordering that the removed action, including the PDH Entities' pending motion for remand or abstention, be transferred to this Court.

On October 3, 2003, the PDH Entities filed in this Court a renewed motion for remand of the State Court Actions or, in the alternative, for abstention and relief from the automatic stay to

3

proceed to liquidate the claims in state court (docket no. 2507)(the "Remand and Relief from

Stay Motion"). The Debtor opposed the relief requested in the Remand and Relief from Stay

Motion and a hearing was held on November 19, 2003. On December 11, 2003, this Court

entered an order which stated, in relevant part, that:

> For the reasons articulated on the record on November 19, 2003, Plaintiffs' Motion [the
> Remand and Relief from Stay Motion] is DENIED. The Court finds that Section 4.2(a)
> of the Coordinating Agreement as modified by Amendment No. 1 of the Coordinating
> Agreement is unambiguous, the Debtor Exide is the sole indemnitor thereunder, and
> consequently the foreign Pacific Dunlop entities have no right of recovery against the
> non-debtor Exide entities. The Court also finds that all the claims asserted by the
> Plaintiffs, including those of the foreign Pacific Dunlop entities, are core proceedings to
> which the automatic stay applies, that the Court has jurisdiction over this matter pursuant
> to 28 U.S.C. §§157(b)(2)(B) and (C), that mandatory abstention pursuant to 28 U.S.C.
> §1334(c)(2) is inapplicable, and that neither remand pursuant to 28 U.S.C. §1452(b) nor
> discretionary abstention pursuant to 28 U.S.C. §1334(c)(1) is warranted.

Order dated December 11, 2003 (docket no. 3325). On December 26, 2003, the PDH Entities

filed the Reconsideration Motion. The Debtor opposed the Reconsideration Motion and a

hearing to consider that motion was held February 26, 2004.

### STANDARD - MOTION FOR RECONSIDERATION

The PDH Entities bring the Reconsideration Motion pursuant to Fed.R.Bankr.P. 9023 (to

alter or amend judgment), Fed.R.Bankr.P. 7052 (to amend findings of fact and judgment) and

Fed.R.Bankr.P. 3008 (reconsideration of claims).

Requests for relief under Fed.R.Bankr.P. 7052, which incorporates Fed.R.Civ.P. 52(b),

and Fed.R.Bankr.P. 9023, which incorporates Fed.R.Civ.P. 59(e), are substantially similar.

*Gutierrez v. Ashcroft,* 289 F.Supp.2d 555, 561 (D.N.J. 2003). The purpose of these rules is to

correct manifest errors of law or fact, but they are not intended to allow a party to relitigate old

issues, to advance new theories, or to secure a rehearing on the merits of a case. *Id., Guerin v.*

4

*United States,* 1999 WL 213372, *1 (E.D.Pa. April 12, 1999).

A motion to alter or amend a judgment under Rule 59(e) must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice. *North River Ins. Co. v. Cigna Reinsurance Co.,* 52 F.3d 1194,1218 (3rd Cir. 1995); *Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3rd Cir. 1985).[7]

Here, the PDH Entities do not argue that there has been an intervening change in controlling law and have not presented any new evidence in support of their arguments. Instead, they claim that the Court misinterpreted Illinois law regarding consideration of extrinsic evidence to construe the parties' intent with respect to the indemnification provision of the Coordinating Agreement and its amendments.

The PDH Entities also seek reconsideration under Fed.R.Bankr.P. 3008, which provides, in relevant part, that "[a] party in interest may move for reconsideration of an order allowing or disallowing a claim against the estate." The PDH Entities argue that the December 11, 2003 Order essentially treated their claims against the Non-Debtor Exide Entities "as if they were claims [against] the estate, and accordingly, reconsideration is sought." *See* Reconsideration Motion, ¶23. However, the December 11, 2003 Order did not make any determination regarding the allowance or disallowance of a claim against the Debtor's estate; instead, it denied the

---

[7]The PDH Entities assert that a motion for reconsideration should be granted if the court is convinced that (1) the court made an error of law or mistake of fact, and (2) if aware of the error or mistake, the court would have reached a different result. *In re Bill's Dollar Stores, Inc.,* 200 B.R. 18, 19 (Bankr.D.Del. 1994), *Quire v. Castle,* 768 F.Supp. 1087, 1090 (D.Del. 1991). However, these cases were decided prior to the Third Circuit Court of Appeals' decision in *North River, supra.,* and, to the extent these decisions may suggest a more relaxed standard, they are no longer good law. *Chama, Inc. v. First Northern Bank and Trust (In re Chama, Inc.),* 265 B.R. 662, 670 (Bankr.D.Del. 2000).

A-0009

Remand and Relief from Stay Motion because the Coordinating Agreement unambiguously provides that the PDH Entities' only recourse is against the Debtor. Therefore, I conclude that Rule 3008 is not applicable to this matter.

<u>DISCUSSION</u>

The crux of the dispute concerns the meaning of the term "Buyer" as set forth in the indemnification provision of the Coordinating Agreement. Section 4.2(a) of the Coordinating Agreement (pre-amendment) provided as follows:

Section 4.2    <u>Indemnification of Buyer.</u>

(a)    Subject to <u>Sections 4.2(b), 4.2(c),</u> and <u>4.2(d),</u> Buyer agrees to indemnify and hold Seller and the International Sellers and their Affiliates harmless from and against any and all Losses and Expenses incurred by Seller or the International Sellers and their Affiliates in connection with or arising from:

(i)    any breach by Buyer of any of its covenants or agreements in the Sale Agreements or in this Agreement;

(ii)    any breach of any warranty or the inaccuracy of any representation of Buyer contained in the Sale Agreements, in each case without regard to the "materiality" of Material Adverse Effect; or

(iii)    any breach by Buyer of any covenant contained in <u>Section 11.1</u> or <u>Section 12.2</u> of the U.S. Agreement or the corresponding provisions in other Sale Agreements.[8]

---

[8]The remainder of Section 4.2 provides as follows:

(b)    Notwithstanding anything to the contrary contained herein:

(i)    Buyer shall be required to indemnify and hold Seller and the International Sellers and their Affiliates harmless for any claims asserted under clause (ii) of <u>Section 4.2(a)</u> with respect to any Losses and Expenses incurred by Seller or the International Sellers only with respect to Qualifying Claims and then only to the extent that such Qualifying Claims, individually or in the aggregate with other Qualifying Claims, exceeds Five Million Five Hundred Thousand United States Dollars (US $5,500,000); and

(ii)    the aggregate amount required to be paid by the Buyer pursuant to <u>Section 4.2(a)</u> shall not exceed the Purchase Price;

(iii)    the limitations in (i) and (ii) shall not apply to breaches of <u>Sections 6.1, 6.2,</u> or

6

A-0010

The definition of the term "Buyer" in Article 1 of the Coordinating Agreement provides as follows:

"Buyer" has the meaning specified on the first page of this Agreement. As used in Articles 1 and 3 to 7, inclusive, Buyer shall be deemed to mean Buyer and/or (as the context may require) any International Buyer.

The first page of the Coordinating Agreement defined "Buyer" as only Exide Corporation. On June 19, 2000, the parties entered into the first of three amendments to the Coordinating Agreement. Amendment No. 1 to the Coordinating Agreement specifically modified Section 4.2(a)(i) "to insert the words 'or, for the sake of clarification, any International Buyer' after the word "Buyer" in the first line of such section." The PDH Entities argue that the term "Buyer," as used in the first sentence of Section 4.2(a), should be read broadly, and, in this

---

6.7 of the U.S. Agreement and the corresponding provisions of the other Sale Agreements.

(c)    The indemnification provided for in this Section 4.2 shall terminate two (2) years after the Closing Date (and no claims shall be made by Seller or the International Sellers thereafter), except that:

(i)    the indemnification by Buyer shall continue as to the idemnity provided pursuant to clauses (i) and (iii) of Section 4.2(a) indefinitely; and

(ii)   the indemnification by Buyer as to any event, fact or circumstance of which Seller or the International Sellers have notified Buyer in accordance with the requirements of Section 4.3 on or prior to the date such indemnification would otherwise terminate in accordance with this Section 4.2 shall continue until the liability of Buyer shall have been determined pursuant to this Article 4 and Buyer shall have reimbursed Seller and the International Sellers for the full amount of all Losses and Expenses in accordance with this Article 4.

(d)    Notwithstanding anything to the contrary contained herein, in any Sale Agreement, or in any other document, Seller and the International Sellers shall not be entitled to indemnification under Section 4.2(a) with respect to a breach of covenant or agreement or breach or inaccuracy of any representation or warranty of Buyer in the Sale Agreements to the extent that Seller or the International Sellers (which shall include Seller's and the International Sellers' officers, employees, counsel, and authorized representatives) had knowledge of such breach as of the Closing Date. It is understood that for purposes of this Section 4.2(d), Seller shall be deemed to have knowledge of any information contained in written due diligence material provided by Buyer to Seller.

7

context, really means the "Buyer and/or any International Buyer."

In the December 11, 2003 Order, I concluded that Section 4.2 of the Coordinating Agreement, as amended, was not ambiguous and, therefore, did not allow the PDH Entities to introduce extrinsic evidence to "clarify" its meaning. The PDH Entities assert that this Court, in reaching its conclusions in the December 11, 2003 Order, either failed to apply the correct Illinois rule of law regarding contract interpretation or failed to apply that rule properly to the facts of this case.

The Supreme Court of Illinois determined that Illinois courts traditionally have applied the following principle of contract interpretation, which is sometimes called the "four corners" rule:

> an agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence.

*Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill.2d 457, 462, 706 N.E.2d 882, 884 (Ill. 1999) *quoting Western Illinois Oil Co. v. Thompson*, 26 Ill.2d 287, 291, 186 N.E.2d 285 (Ill. 1962).

The *Air Safety* Court continued:

> If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence. If, however, the trial court finds that the language of the contract is susceptible to more than one meaning, then an ambiguity is present. Only then may parol evidence be admitted to aid the trier of fact in resolving the ambiguity.

*Air Safety*, 185 Ill.2d at 462-63 (citations omitted). In construing contracts, Illinois courts have also relied upon the parol evidence rule, which has been explained as follows:

> [The parol evidence rule generally precludes evidence of understandings, not reflected in a writing, reached before or at the time of its execution which would vary or modify its terms. Under the parol evidence rule, extrinsic or parol evidence concerning a prior or

8

contemporaneous agreement is not admissible to vary or contradict a fully integrated writing.

*Eichengreen v. Rollins, Inc.*, 325 Ill.App.3d 517, 521, 757 N.E.2d 952, 956 (Ill. 2001).

The PDH Entities argue that the Court erred in concluding that the term "Buyer," as used in Section 4.2, was unambiguous. They assert that the Court should consider the indemnification provision and its amendment within the context of the multiple agreements signed by the parties. When considered this way, the PDH Entities assert that the indemnification provision and its amendment are ambiguous and, therefore, extrinsic evidence is needed to interpret the terms and determine accurately the parties' intent at the time they entered into the agreements. The PDH Entities' argument urges, in essence, use of what has been called the "provisional admission" approach to contract interpretation:

> Under the provisional admission approach, although the language of a contract is facially unambiguous, a party may still proffer parol evidence to the trial judge for the purpose of showing that an ambiguity exists which can be found only by looking beyond the clear language of the contract. Under this method, an extrinsic ambiguity exists 'when someone who knows the context of the contract would know if the contract actually means something other than what it seems to mean." Consequently, if after "provisionally" reviewing the parol evidence, the trial judge finds that an "extrinsic ambiguity" is present, then the parol evidence is admitted to aid the trier of fact in resolving the ambiguity."

*Air Safety*, 185 Ill.2d at 463, 706 N.E.2d at 885 (citations omitted). In the *Air Safety* case, the Illinois Supreme Court refused to adopt the provisional admission approach over the four corners rule in cases involving a contract that is facially unambiguous and contains an express integration clause. *Air Safety*, 185 Ill.2d at 464, 706 N.E.2d at 885. *See also Eichengreen*, 325 Ill.App.3d at 522, 757 N.E.2d at 956-57.

In the case at bar, the use of the term "Buyer" in Section 4.2(a) of the Coordinating

9

Agreement is not ambiguous. "A contract term is ambiguous when it may reasonably be interpreted in more than one way." *Dean Management, Inc. v. TBS Construction, Inc.*, 339 Ill.App.3d 263, 269, 790 N.E.2d 934, 939 (Ill. 2003). If Section 4.2(a) *may* have been ambiguous as to whether, in its various clauses, the context supported a broad definition of "Buyer" to include the Non-Debtor Exide Entities, any uncertainty was resolved by Amendment No. 1 to the Coordinating Agreement. By virtue of Amendment No. 1, the parties specifically and deliberately carved out only one clause of Section 4.2(a) to "clarify." The other parts of Section 4.2(a) remained unchanged. Therefore, the only reasonable inference that arises from Amendment No. 1, is that the parties intended that the term "Buyer," as used in the remainder of Section 4.2(a), means only Exide Corporation.

Section 7.3 of the Coordinating Agreement contains an express integration clause[9] and a provision that "[i]n the event of a dispute or inconsistency between any of the Sales Agreements and this Agreement, the terms of this Agreement shall prevail." The *Air Safety* Court noted the effect of integration clauses, writing:

> The integration clause makes clear that the negotiations leading to the written contract *are not* the agreement. Accordingly, considering extrinsic evidence of prior negotiations to create an "extrinsic ambiguity" where *both* parties *explicitly* agree that such evidence will *not* be considered ignores the express intentions of the parties and renders integration clauses null.

---

[9] Section 7.3 provides:

> Entire Agreement; Amendments. This Agreement, the Sale Agreements and the other agreements and documents to be delivered pursuant to the Sale Agreements contain the entire understanding of the parties hereto with regard to the subject matter contained herein, and supersede all prior written or oral agreements, understandings or letters of intent between the parties hereto, with respect to the subject matter hereof. The Sale Agreements and all Schedules and Exhibits thereto are incorporated herein by this reference. This Agreement shall not be amended, modified or supplemented except by a written instrument signed by an authorized representative of each of the parties hereto. In the event of a dispute or inconsistency between any of the Sale Agreements and this Agreement, the terms of this Agreement shall prevail.

10

> An integration clause ... is a clear indication that the parties desire the contract be interpreted solely according to the language used in the final agreement. Consequently, we will not write the integration clause out of the contract for policy reasons.

*Air Safety,* 185 Ill.2d at 464-65, 706 N.E.2d at 885-86 (emphasis in original).[10]

Because the Coordinating Agreement is unambiguous and includes an integration clause, the "four corners" rule applies to this case and extrinsic evidence is not admissible to alter or vary its terms.[11]

Finally, the PDH Entities also argue that the Court should consider extrinsic evidence regarding the meaning of the term "Buyer" in Section 4.2(a) based on the "mutual mistake" exception to the parol evidence rule. *See Johnson v. Johnson,* 237 Ill.App.3d 381, 391, 604 N.E.2d 378, 385-86 (Ill.App. 1992). The PDH Entities, however, did not raise the doctrine of mutual mistake at the hearing on November 19, 2003. A motion for reconsideration is not an opportunity to assert new legal theories that could have been raised previously. *In re United Merchants and Mfr., Inc.,* 1992 WL 37498, *1 (Bankr.D.Del. Feb. 18, 1992). *See also Fogel v. Zell (In re Madison Mgmt. Group, Inc.),* 2000 WL 288515, *3 (N.D.Ill. Feb. 23, 2000).

---

[10]The PDH Entities, relying on the decision in *Hessler v. Crystal Lake Chrysler-Plymouth, Inc.,* 338 Ill.App.3d 1010, 788 N.E.2d 405 (Ill. 2003), argue that the Court can consider extrinsic evidence to determine whether a contract is integrated, even if it contains an integration clause. However, *Hessler* involved a sale of goods and was governed by the Uniform Commercial Code - Sales (810 ILCS 5/2-101 *et seq.* (West 2000). *Hessler,* 338 Ill.App.3d at 1017. The Illinois Supreme Court has held that "[t]he rule in cases *not* governed by the Uniform Commercial Code (UCC) is that only the subject writing may be considered to determine the integration question." *J&B Steel Contractors,* 162 Ill.2d 265, 271, 642 N.E.2d 1215, 1218 (Ill. 1994).

[11]Recital "E"at the beginning of the Coordinating Agreement provides that "The parties hereto further desire to provide for a single avenue of recourse for indemnification claims arising under the Sale Agreements and have therefore agreed that all claims for indemnity against losses or claims resulting from breaches of obligations, representations or warranties under the Sale Agreements or this Agreement will be addressed exclusively under this Agreement." This further signifies the parties' intent that the indemnification provision is addressed in this document without resort to the other agreements to vary or modify its provisions.

11

# TAB 4

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EXIDE TECHNOLOGIES, INC., *et al.*,[1] | ) | Case No. 02-11125 (KJC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |

**MOTION OF THE PACIFIC DUNLOP HOLDINGS ENTITIES FOR
RECONSIDERATION OF ORDER DENYING THEIR MOTION TO
REMAND OR FOR ABSTENTION AND STAY RELIEF, AND
DISMISSING THEIR CAUSES OF ACTION AGAINST THE
NON-DEBTOR, FOREIGN EXIDE ENTITIES**

The Pacific Dunlop Holdings (USA), Inc., Pacific Dunlop Holdings (Europe) Limited,

P.D. International Pty Limited, Pacific Dunlop Holdings (Hong Kong) Limited and Pacific

Dunlop Holdings (Singapore) PTE. Ltd. (collectively, the "Plaintiffs" or the "PDH Entities"), by

their counsel, hereby move this Court for reconsideration of that certain Order denominated

"Order Denying Motion Of Pacific Dunlop Holdings (USA), Inc., Pacific Dunlop Holdings

(Europe) Limited, P.D. International Pty Limited, Pacific Dunlop Holdings (Hong Kong)

Limited and Pacific Dunlop Holdings (Singapore) Pte. Ltd For Remand Of State Law Action Or,

In the Alternative, For Abstention and For an Order Granting Relief From the Automatic Stay To

Proceed To Liquidate Claim In State Court" (hereafter, the "Order"), which was entered on the

docket on December 15, 2003.[2]

The PDH Entities make this Motion pursuant to Fed. R. Bankr. P. 9023 (to alter or

---

[1] The Debtors in these proceedings are: Exide Technologies, Inc., f/k/a Exide Corporation; Exide Delaware, L.L.C.; Exide Illinois, Inc.; RBD Liquidation, L.L.C.; Dixie Metals Company; and Refined Metals Corporation.

[2] A true and correct copy of the Order is attached hereto as Exhibit "A".

DNC/106873-0001/924354/1

amend judgment), Fed. R. Bankr. P. 7052 (for amendment of judgment and findings), and Fed. R. Bankr. P. 3008 (reconsideration of claims). The PDH Entities urge the Court to reconsider its decision not to consider any extrinsic evidence, its apparent decision that there was not even a latent ambiguity in the agreements at issue between the parties, and its narrow interpretation of a portion of Amendment No. 1 to the Coordinating Agreement, without due regard to the agreements between the parties as a whole.

The PDH Entities do not seek reconsideration of this Court's ruling insofar as it pertains to Pacific Dunlop Holdings (USA), Inc. ("PDH USA"), but rather *only* seek reconsideration as to the Court's ruling upon the claims of the PDH Entities *other than* PDH USA (collectively, the PDH Foreign Entities"), which claims are directed against three non-Debtor affiliates: Exide Holding Europe, a French company; Exide Holding Asia Pte. Limited, a Singapore corporation; and Exide Singapore Pte. Limited (formerly Bluewall Pte. Ltd), a Singapore corporation (collectively, the "Non-Debtor Defendants" or the "Exide Foreign Entities"). In support of this Motion, the PDH Entities present the Declarations of James D. McDonough and Martin Hudson, attached hereto, and state as follows:

## BACKGROUND

A.    _The Sale of the GNB Business_

1.    In May and June of 2000, the PDH Entities, the Debtor, and the three Non-Debtor Defendants entered into separate stock and/or asset sale agreements (the "Sales Agreements"), for the sale of the global GNB battery business.[3] The Sale Agreement between PDH (USA) and

---

[3]    Specifically, PDH (USA) entered into a Sales Agreement with the Debtor, Exide Technologies; Pacific Dunlop Holdings (Europe) Ltd. and P.D. International Pty. Ltd. both entered into Sales Agreements with Exide Holding Europe; Pacific Dunlop Holdings (Hong Kong) Ltd. entered into a Sales Agreement with Exide Holding Asia Pte. Ltd.; and Pacific Dunlop Holdings (Singapore) Pte.

the Debtor was entered into on or about May 9, 2000. The other Sale Agreements were all entered into on or about June 28, 2000.

2.    On May 9, 2000, PDH (USA) and the Debtor also entered into a Coordinating Agreement containing certain provisions intended to govern the transactions contemplated by the Sales Agreements.[4] The indemnification obligations in the Coordinating Agreement are cross-referenced and incorporated into the respective Sales Agreements. The Coordinating Agreement was thereafter amended by the parties three times.

3.    Although the Coordinating Agreement was entered into between PDH (USA) and the Debtor, it was adopted by reference into all the Sales Agreements. The Coordinating Agreement itself provided, at Section 5.5(e), that the parties to the Sales Agreements would also sign on to the Coordinating Agreement.   Each of the respective Sales Agreements provides that "the [Non-Debtor Defendant's] sole and exclusive indemnification obligations under this Agreement are set forth in the Coordinating Agreement . . . . [W]ith respect to any breach by either party of its representations, warranties, covenants or agreements in this Agreement . . . the sole and exclusive remedy of the other party (in contract, tort, for contribution, under Requirements of Law or otherwise) shall be the indemnification provided in the Coordinating Agreement." *See* Exhibits to the Proofs of Claim of the PDH Entities (attached as exhibits to the Debtor's Responding Brief).

4.    Although the Coordinating Agreement was entered into between PDH (USA) and the Debtor, in accordance with its adoption by reference in all the Sales Agreements, the

---

Ltd. entered into two Sales Agreements, one with Exide Holding Asia Pte. Ltd. and the other with Exide Holding Singapore Pte. Ltd.

[4]    Pertinent excerpts from the Coordinating Agreement are collected in the <u>Exhibit "B"</u> attached hereto.

3

A-0019

27.    At the hearing on November 19, 2003, the Court rejected the contentions of the PDH Entities that there was no intent by the parties to limit the recourse of the PDH Foreign Entities against the Exide Foreign Entities; that there are many clauses in the agreements, viewed as a whole, which are simply inconsistent with an interpretation of precluding such recourse; and that, should the Court find plausible the Debtor's interpretation of the relevant clause in Amendment No. 1 the Coordinating Agreement, then it should at least find that the clause was ambiguous, as Bankruptcy Judge Sonderby had suggested, and consider extrinsic evidence.

28.    However, the Court concluded that the language was not ambiguous, and therefore declined to consider extrinsic evidence, proffered by the PDH Entities, and to have been presented through witness Linda Woolf, regarding the context of the Sales Agreements, the Coordinating Agreement, and the amendments thereto.

29.    As discussed below, the PDH Entities urge this Court to reconsider that conclusion. Furthermore, to prevent manifest injustice against the PDH Foreign Entities in maintaining their claims against the non-debtor Exide Foreign Entities, the PDH Entities urge this Court to consider in the alternative that there was a mutual mistake in the drafting of the Amendment No. 1 the Coordinating Agreement, so that extrinsic evidence may be considered to determine the true intent of the parties.

**II.    *Illinois Law on Contract Construction Supports Consideration of Extrinsic Evidence in Circumstances Such as Those Presented by the PDH Entities Here.***

30.    The principal objective in construing an agreement is to give effect to the intent the parties possessed at the time they entered into that agreement. See *Pennsylvania Life Insurance Co. v. Pavlick*, 265 Ill.App.3d 526, 529, 637 N.E.2d 1160, 1162 (1994); accord *USG Corp. v. Sterling Plumbing Group, Inc.*, 247 Ill.App.3d 316, 318, 617 N.E.2d 69, 70 (1993).

A-0025

31.    Ordinarily, the language the parties use is the best indication of their intent. *In re Marriage of Frain*, 258 Ill.App.3d 475, 478 630 N.E.2d 523 (1994). The court must place the meanings of words in the contract within the context of the contract as a whole. *Dean Management, Inc. v. TBS Const., Inc.*, 339 Ill.App.3d 263, 790 N.E.2d 934 (Ill.App. 2 Dist. 2003).    The agreement is to be construed as a whole, giving meaning and effect to every provision when possible. See *Coles-Moultrie Elec. Co-op. v. City of Sullivan*, 304 Ill.App.3d 153, 159, 709 N.E.2d 249, 253 (Ill. App. 4 Dist. 1999).

32.    To determine the parties' intent, a court must analyze "the specific words used in conjunction with the circumstances under which they were drafted." *Warren-Boynton State Bank v. Wallbaum*, 123 Ill.2d 429, 436, 123 Ill.Dec. 936, 528 N.E.2d 640 (1988). Consistent with the principle that the relevant circumstances under which a grant was made must be considered, the Illinois courts apply the principle of contractual interpretation that parol evidence is admissible "to determine if a latent ambiguity exists." *Diaz v. Home Federal Sav. and Loan Ass'n of Elgin*, 337 Ill.App.3d 722, 727, 786 N.E.2d 1033, 1039-40 (Ill. App. 2 Dist. 2002).

33.    When contract terminology is unambiguous, it must be given its plain and ordinary meaning, but where the language is ambiguous, the trial court may receive parol evidence to decide what the parties intended. *Pepper Construction Co. v. Transcontinental Insurance Co.*, 285 Ill.App.3d 573, 576, 673 N.E.2d 1128 (1996). A contract term is "ambiguous" when it may reasonably be interpreted in more than one way. *Dean Management, Inc. v. TBS Const., Inc.*, 339 Ill.App.3d 263, 269, 790 N.E.2d 934, 939 (Ill.App. 2 Dist. 2003).

34.    A contract is integrated if the parties intended it to be a final and complete expression of their agreement. *J & B Steel Contractors, Inc. v. C. Iber & Sons, Inc.*, 246 Ill.App.3d 523, 528, 617 N.E.2d 405 (1993), *aff'd*, 162 Ill.2d 265, 642 N.E.2d 1215 (1994); *Hessler v. Crystal*

DNC/106873-0001/924354/1

A-0026

¹IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EXIDE TECHNOLOGIES, INC., et al., | ) | Case No. 02-11125 (KJC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | | Objections Due: 1/15/04 @ 4:00 p.m. |
| | | Hearing Date: 1/22/04 @ 2:00 p.m. |

**NOTICE OF MOTION OF PACIFIC DUNLOP HOLDINGS ENTITIES FOR
RECONSIDERATION OF ORDER DENYING THEIR MOTION TO
REMAND OR FOR ABSTENTION AND STAY RELIEF, AND
DISMISSING THEIR CAUSES OF ACTION AGAINST THE
NON-DEBTOR, FOREIGN EXIDE ENTITIES**

TO:    SEE ATTACHED SERVICE [1]

Pacific Dunlop Holdings (USA), Inc., Pacific Dunlop Holdings (Europe) Limited, P.D. International PTY Limited, Pacific Dunlop Holdings (Hong Kong) Limited and Pacific Dunlop Holdings (Singapore) PTE. Ltd. (the "Movants") have filed their Motion for Reconsideration of Order Denying Their Motion to Remand or For Abstention and Stay Relief, and Dismissing Their Causes of Action Against the Non-Debtor, Foreign Exide Entities (the "Motion").

HEARING ON THE MOTION WILL BE HELD ON <u>January 22, 2004 at 2:00 p.m.</u> before the Honorable Kevin J. Carey, United States Bankruptcy Judge at the Robert N.C. Nix Federal Building, 900 Market Street, Courtroom No. 1, 2ⁿᵈ Floor, Philadelphia, Pennsylvania 19107.

You are required to file a response (and the supporting documentation required by Local Rule 4001-(d)) to the attached motion on or before <u>January 15, 2004 at 4:00 p.m.</u>

At the same time, you must also serve a copy of the response upon Movants' attorneys:

| | |
|---|---|
| Brett D. Fallon, Esquire | Paula Krahn Merkle, Esquire |
| Douglas N. Candeub, Esquire | Goodell, DeVries, Leech & Dann, LLP |
| 222 Delaware Avenue, 10ᵗʰ Floor | One South Street, 10ᵗʰ Floor |
| P.O. Box 2306 | Baltimore, Maryland 21202 |
| Wilmington, Delaware 19899 | Telephone: (410) 783-4016 |
| Telephone: (302) 888-6800 | Facsimile: (410) 783-4040 |
| Facsimile: (302) 571-1750 | |

---

[1] Due to volume, copies of the exhibits have been provided only to counsel to the Debtor, counsel to the Committee and the United States Trustee. Any other party wishing to obtain a copy of the exhibits to the Motion may do so by contacting undersigned counsel.

# EXHIBIT A

A-0033

indemnitor thereunder, and that consequently the foreign Pacific Dunlop entities have no right of recovery against the non-debtor Exide entities. The Court also finds that all the claims asserted by the Plaintiffs, including those of the foreign Pacific Dunlop entities, are core proceedings to which the automatic stay applies, that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b)(2)(B) and (C), that mandatory abstention pursuant to 28 U.S.C. § 1334(c)(2) is inapplicable, and that neither remand pursuant to 28 U.S.C. § 1452(b) nor discretionary abstention pursuant to 28 U.S.C. § 1334(c)(1) is warranted.

SO ORDERED this 11th day of ~~November~~ Dec. 2003.

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

## COORDINATING AGREEMENT

This COORDINATING AGREEMENT dated May 9, 2000 (the "Agreement") is executed by and between Exide Corporation, a Delaware corporation ("Buyer") and Pacific Dunlop Holdings (USA) Inc., a Delaware corporation ("Seller").

## RECITALS

A.    The parties hereto have agreed that Buyer and certain subsidiaries of Buyer (the "International Buyers") will purchase from the Seller and certain Affiliates of Seller (the "International Sellers") the businesses more particularly described in and conveyed under the Sale Agreements as defined below (collectively, the "Business").

*    *    *

E.    The parties hereto further desire to provide for a single avenue of recourse for indemnification claims arising under the Sale Agreements and have therefore agreed that all claims for indemnity against losses or claims resulting from breaches of obligations, representations or warranties under the Sale Agreements or this Agreement will be addressed exclusively under this Agreement.

*    *    *

## ARTICLE 1.

## DEFINITIONS

Section 1.1    Definitions. In this Agreement, the terms set forth below have the meanings specified or referred to in this Section 1.1 and shall be equally applicable to both the singular and plural forms. Unless otherwise defined herein, all capitalized terms used in this Agreement shall have the meanings ascribed to them in the U.S. Agreement.

*    *    *

"Buyer" has the meaning specified on the first page of this Agreement. As used in Articles 1 and 3 to 7, inclusive, Buyer shall be deemed to mean Buyer and/or (as the context may require) any International Buyer.

*    *    *

A-0037

Section 4.2    <u>Indemnification by Buyer</u>.

(a)    Subject to <u>Sections 4.2(b)</u>, <u>4.2(c)</u>, and <u>4.2(d)</u>, Buyer agrees to indemnify and hold Seller and the International Sellers and their Affiliates harmless from and against any and all Losses and Expenses incurred by Seller or the International Sellers and their Affiliates in connection with or arising from:

(i)    any breach by Buyer of any of its covenants or agreements in the Sale Agreements or in this Agreement;

(ii)    any breach of any warranty or the inaccuracy of any representation of Buyer contained in the Sale Agreements, in each case without regard to "materiality" or Material Adverse Effect; or

(iii)    any breach by Buyer of any covenant contained in <u>Section 11.1</u> or <u>Section 12.2</u> of the U.S. Agreement or the corresponding provisions in the other Sale Agreements.

(b)    Notwithstanding anything to the contrary contained herein:

(i)    Buyer shall be required to indemnify and hold Seller and the International Sellers and their Affiliates harmless for any claims asserted under clause (ii) of <u>Section 4.2(a)</u> with respect to any Losses and Expenses incurred by Seller or the International Sellers only with respect to Qualifying Claims and then only to the extent that such Qualifying Claims, individually or in the aggregate with other Qualifying Claims, exceeds Five Million Five Hundred Thousand United States Dollars (US $5,500,000); and

(ii)    the aggregate amount required to be paid by Buyer pursuant to <u>Section 4.2(a)</u> shall not exceed the Purchase Price;

(iii)    the limitations in (i) and (ii) shall not apply to breaches of <u>Sections 6.1</u>, <u>6.2</u> or <u>6.7</u> of the U.S. Agreement and the corresponding provisions of the other Sale Agreements.

(c)    The indemnification provided for in this <u>Section 4.2</u> shall terminate two (2) years after the Closing Date (and no claims shall be made by Seller or the International Sellers thereafter), except that:

(i)    the indemnification by Buyer shall continue as to the indemnity provided pursuant to clauses (i) and (iii) of <u>Section 4.2(a)</u> indefinitely; and

A-0038

(ii)     the indemnification by Buyer as to any event, fact or circumstance of which Seller or the International Sellers have notified Buyer in accordance with the requirements of Section 4.3 on or prior to the date such indemnification would otherwise terminate in accordance with this Section 4.2 shall continue until the liability of Buyer shall have been determined pursuant to this Article 4 and Buyer shall have reimbursed Seller and the International Sellers for the full amount of all Losses and Expenses in accordance with this Article 4.

(d)     Notwithstanding anything to the contrary contained herein, in any Sale Agreement, or in any other document, Seller and the International Sellers shall not be entitled to indemnification under Section 4.2(a) with respect to a breach of covenant or agreement or breach or inaccuracy of any representation or warranty of Buyer in the Sale Agreements to the extent that Seller or the International Sellers (which shall include Seller's and the International Sellers' officers, employees, counsel, and authorized representatives) had knowledge of such breach as of the Closing Date. It is understood that for purposes of this Section 4.2(d), Seller shall be deemed to have knowledge of any information contained in written due diligence material provided by Buyer to Seller.



Section 4.5     **Exclusivity of Remedy**.  Except as set forth in Section 9.3 of the U.S. Agreement and the corresponding provisions of the other Sale Agreements, with respect to any breach by any party of its representations, warranties, covenants, or agreements in this Agreement, the Sale Agreements and the agreements, instruments, and documents being or to be executed and delivered hereunder or thereunder, the sole and exclusive remedy of the other party and its Affiliates (in law, equity, contract, tort, for contribution, under Requirements of Law, or otherwise) shall be the indemnification provided in this Article 4.  In view of this exclusivity of remedy provision, Buyer and Seller covenant and agree for themselves and their respective Affiliates that they will not bring, maintain, join, or prosecute any Action or other proceeding against the other or its Affiliates for breach of the Sale Agreements or indemnity therefor except as provided in this Agreement. The initiation or maintenance of any Action by any Affiliate of Buyer or Seller in contravention of this Section 4.5 will constitute a breach by the Buyer or the Seller, as the case may be, of their covenant hereunder.

## ARTICLE 5.

## COORDINATING MATTERS

Section 5.2    Venue; Submission to Jurisdiction; Governing Law.  For purposes of this Agreement, the Sale Agreements, and the transactions contemplated hereby and thereby (but not for the purposes of enforcing any guaranty of the indemnity obligations of the Seller pursuant to Article 4 of this Agreement (a "Guaranty Agreement")), each of the parties hereto (for themselves and for their Affiliates) agrees that any and all disputes, legal actions, suits, or proceedings arising out of or relating to claims arising under this Agreement, the Sale Agreements, or the transactions contemplated hereby and thereby, whether legal or equitable in nature, or arising out of contract, tort, Requirements of Law, for contribution or otherwise, shall be brought solely in a state or federal court located in the County of Cook, State of Illinois.  By their signature to this Agreement, the parties, regardless of their residence, each irrevocably submits to the jurisdiction of the courts located in the County of Cook, State of Illinois, in any dispute, legal action, suit or proceeding arising out of or relating to this Agreement, the Sale Agreements, or the transactions contemplated hereby or thereby other than any Guaranty Agreement.  Each of the parties acknowledges that it has freely agreed to so submit to jurisdiction and venue, and that without such agreement the courts located in the County of Cook, State of Illinois might not otherwise have jurisdiction over each of such parties.  This Agreement and the Sale Agreements shall be governed by and construed in accordance with the internal laws of the State of Illinois, without giving effect to any choice of law provisions which may direct the application of the laws of another jurisdiction. The initiation or maintenance of any Action by any Affiliate of Buyer or Seller in contravention of this Section 5.2 will constitute a breach by the Buyer or the Seller, as the case may be, of their covenant hereunder.

Section 5.3    Waiver.  For purposes of this Agreement, the Sale Agreements, and the transactions contemplated hereby and thereby other than any Guaranty Agreement, each of the parties hereby irrevocably waives all claims of immunity from jurisdiction, attachment and execution to which it might otherwise be entitled in any legal action or proceeding brought in any state or federal court located in the County of Cook, State of Illinois, and further irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to any dispute, legal action, suit or proceeding arising out of or relating to this Agreement, the Sale Agreements, or the transactions contemplated hereby and thereby being brought in any federal or state court located in the County of Cook, State of Illinois, and hereby further irrevocably waives any claim that any such dispute, legal action, suit, or proceeding brought in any such court has been brought in an inconvenient forum.

Section 5.5    <u>Actions Prior to the Closing Date.</u>

(e)    Buyer and Seller covenant and agree that not later than June 19, 2000, the International Buyers and the International Sellers will enter into Sale Agreements to effect (i) the transfer of businesses affiliated with the Subsidiaries that are operated in Australia, New Zealand, U.K., Europe, the People's Republic of China, Hong Kong, Singapore, and India as further described in the chart dated April 24, 2000 and titled "Structure of GNB Worldwide" provided by Seller to Buyer and (ii) the transfer of certain trademarks.  These agreements are referred to herein as the "ROW Agreements."  Buyer and Seller further covenant and agree that: (i) the ROW Agreements will provide for closing of the transactions contemplated thereby simultaneously with the Closing, and (ii) the substantive provisions of the ROW Agreements will <u>parallel</u> the substantive provisions of this Agreement, modified only for compliance with local law.  The ROW Agreement covering the sale of that portion of the business located in Australia shall contain a covenant not to compete from the sellers thereunder, which covenant not to compete shall be on generally the same terms and conditions as the covenant not to compete contained in <u>Section 6</u> of this Agreement, including, without limitation, with respect to the global scope and five-year duration of such covenant not to compete. Upon execution of the ROW Agreements, Buyer shall cause the International Buyers and Seller shall cause the International Sellers to become parties to <u>this</u> Agreement by executing and delivering signature pages to this Agreement.  Upon such execution and delivery, the International Buyers and the International Sellers will be subject to the obligations imposed on them and entitled to the benefits afforded to them by this Agreement.

## AMENDMENT NO. 1 TO
## COORDINATING AGREEMENT

This AMENDMENT NO. 1, dated June 19, 2000, is to that certain Coordinating Agreement dated as of May 9, 2000 (the "Agreement"), which was executed by and between Exide Corporation, a Delaware corporation ("Buyer"), and Pacific Dunlop Holdings (USA) Inc., a Delaware corporation ("Seller").

The parties have now determined that they desire to amend the Agreement as set forth herein. Therefore, the parties hereby agree as follows:

1.    Except as expressly amended hereby, the Agreement remains in full force and effect. Unless otherwise defined herein, capitalized terms used in this Amendment No. 1 shall have the meanings assigned to them in the Agreement.

2.    Exhibit A to the Agreement is hereby deleted and replaced in its entirety with Exhibit A attached to this Amendment.

3.    Section 4.2(a)(i) is hereby amended to insert the words "or, for sake of clarification, any International Buyer" after the word "Buyer" in the first line of such section.

4.    The following provision is added to the Agreement:

Section 5.8.    Representation regarding Trademarks.

Seller hereby represents and warrants that the Sale Agreements will convey to the Buyer or International Buyers all of the trademarks employed by Seller or its Affiliates in the Business immediately prior to the Closing.

5.    Sections 5.7(a) and (b) are hereby amended to replace the references to "June 19, 2000" therein to "June 28, 2000."

C1081/12081776.4

# EXHIBIT C

## AFFIDAVIT OF JAMES D. MCDONOUGH

STATE OF ILLINOIS      )
                       )
COUNTY OF COOK         )

My name is James D. McDonough. I am over 18 years of age and competent to testify as to the matters set forth in this Affidavit.

1.      I am an attorney licensed to practice in the State of Illinois. At all times relevant to the facts set forth herein, I was a partner at the law firm of Gardner, Carton & Douglas located in Chicago, Illinois.

2.      Gardner, Carton & Douglas represented Pacific Dunlop Holdings (USA), Inc. ("PDH USA") and certain of its affiliates in connection with the sale of the GNB businesses, comprised of certain subsidiaries and assets of other subsidiaries to Exide Corporation (now known as Exide Technologies) and certain of its affiliates and subsidiaries. I was one of the Gardner, Carton & Douglas attorneys who took a lead role in the negotiation of the agreements pursuant to which the GNB businesses were conveyed to Exide.

3.      On or about May 9, 2000, PDH USA and its affiliates entered into a Sale Agreement pursuant to which it agreed to convey certain stock and assets comprising the worldwide GNB business to Exide Corporation (n/k/a Exide Technologies). At the same time, PDH USA and Exide Corporation also entered into a Coordinating Agreement, a copy of which is attached hereto as Exhibit ___. In the Coordinating Agreement, PDH USA (referred to therein as the "Seller") and Exide Corporation (referred to therein as the "Buyer") agreed, among other things, that their international subsidiaries would enter into separate sale agreements, referred to therein as "ROW Agreements" to effect the transfer of the international GNB affiliates and subsidiaries (the "International Sellers") to Exide's international subsidiaries and affiliates (the

"International Buyers"). Id., Section 5.5(e) at 21. The Coordinating Agreement was intended to have an over-arching effect on the separate sales transactions. The parties covenanted that the International Sellers and Buyers would become signatories to the Coordinating Agreement and subject to the obligations imposed on them by that agreement. Id.

4.    A provision was included in each of the separate Sale Agreements which provided that the signatories' sole and exclusive remedy for breach of the Sale Agreements was the indemnification provided in the Coordinating Agreement. The indemnification obligations of the parties are set forth in Article IV of the Coordinating Agreement. In subsection 4.2(a)(i), the Buyer agrees to indemnify and hold Seller and the International Sellers harmless from any and all Losses and Expenses arising from any breach by Buyer of any of its covenants or agreements in the Sale Agreements or in this Agreement. Id. at 16. For the purpose of this and other Sections of the Coordinating Agreement, the term "Buyer" is defined to include any International Buyer, as the context may require.

5.    On or about June 19, 2000, the parties executed Amendment No. 1 to the Coordinating Agreement. That Amendment states that the Coordinating Agreement remained in full force and effect except as expressly amended therein. Section 4.2(a)(i) was amended to insert the words "or, for sake of clarification, any International Buyer" after the word "Buyer" in the first line of that Section. At the time Amendment No. 1 was executed, it was not my understanding that the parties thereby intended to limit the rights of the Seller or International Sellers to seek recourse against the International Buyers for breaches by them under their respective Sale Agreements.

- 2 -

# EXHIBIT D

A-0047

| | | |
|---|---|---|
| Section 5 21 | Environmental Matters | 20 |
| Section 5 22 | Bank Accounts, Guarantees and Powers | 21 |
| Section 5 23 | Accounts and Records | 22 |
| Section 5 24 | Insurance | 22 |
| Section 5 25 | Product Warranties | 22 |
| Section 5 26 | No Misrepresentation | 23 |
| Section 5 27 | Sufficiency of Assets | 23 |
| Section 5 28 | Powers of Attorney | 23 |
| ARTICLE 6 | REPRESENTATIONS AND WARRANTIES REGARDING THE BUYER | 23 |
| Section 6 1 | Organisation | 23 |
| Section 6 2 | Power and Authority | 23 |
| Section 6 3 | Agreement Binding | 23 |
| Section 6 4 | Absence of Conflicts | 23 |
| Section 6 5 | No Litigation | 24 |
| Section 6 6 | Investment Representation | 24 |
| Section 6 7 | No Advisor | 24 |
| Section 6 8 | No Misrepresentation | 24 |
| ARTICLE 7 | ACTION PRIOR TO THE CLOSING DATE | 25 |
| Section 7 1 | Preserve Accuracy of Representations and Warranties | 25 |
| Section 7 2 | Notification of Changes | 25 |
| Section 7 3 | Governmental Approvals | 25 |
| Section 7 4 | Operations Prior to the Closing Date | 25 |
| Section 7 5 | Intercompany Agreements | 26 |
| Section 7 6 | General | 26 |
| Section 7 7 | Preservation of Business | 26 |
| ARTICLE 8 | CONDITIONS TO CLOSING | 26 |
| Section 8 1 | Buyer | 26 |
| Section 8 2 | Seller | 27 |
| ARTICLE 9 | TERMINATION | 29 |
| Section 9 1 | Termination | 29 |
| Section 9 2 | Effect of Termination | 29 |
| Section 9 3 | Notice of Termination | 29 |
| ARTICLE 10 | EXCLUSIVITY OF REMEDY | 30 |
| Section 10 1 | Indemnification by the Seller | 30 |
| Section 10 2 | Indemnification by the Buyer | 30 |
| Section 10 3 | Exclusivity of Remedy | 30 |
| ARTICLE 11 | GENERAL PROVISIONS | 30 |
| Section 11 1 | Notices | 30 |
| Section 11 2 | Confidential Information | 32 |
| Section 11 3 | No Public Announcement | 33 |
| Section 11 4 | Entire Agreement, Amendments | 33 |
| Section 11 5 | Successors and Assigns | 33 |
| Section 11 6 | Interpretation | 33 |
| Section 11 7 | Waivers | 34 |

ii

| Section 11 8 | Expenses | 34 |
| Section 11 9 | Partial Invalidity | 34 |
| Section 11 10 | Execution in Counterparts | 34 |
| Section 11 11 | Governing Law | 35 |
| Section 11 12 | Further Assurances and Cooperation | 35 |
| Section 11 13 | No Reliance | 35 |
| Section 11 14 | Insurance Matters | 35 |
| Section 11 15 | Disclosure Letter | 36 |

iii

A-0054

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT dated as of 28 June 2000 (the "Agreement") is executed by and among PACIFIC DUNLOP HOLDINGS (EUROPE) LIMITED, a company incorporated in England and Wales under company number 1458684 (the "Seller"), whose registered office is at Ansell House, 119 Ewell Road, Surbiton, Surrey, KT6 6AL, and Exide Holding Europe, a company incorporated in France (the "Buyer")

### WHEREAS

A    The Seller owns the entire issued share capital of GNB (as defined in this Agreement)

B    The Buyer desires to purchase from the Seller, and the Seller desires to sell to the Buyer, the entire issued share capital of GNB on the terms and subject to the conditions in this Agreement

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the Seller and the Buyer agree as follows

### ARTICLE 1

### DEFINITIONS

Section 1 1    Definitions  In this Agreement, unless the context otherwise requires, the following terms have the meanings specified or referred to in this Section 1 1 and shall be equally applicable to both the singular and plural forms  Any agreement referred to below shall mean such agreement as amended, supplemented and modified from time to time to the extent permitted by the applicable provisions thereof and by this Agreement

"Action" means any lawsuit, arbitration, or regulatory, governmental or other proceeding or investigation whether at law or in equity

"Adjoining Properties" shall mean all sites or locations other than the Real Property or the PRP Sites to which Contaminants have migrated from the Real Property through air, soil, surface water or groundwater

"Affiliate" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person

"Agreement" has the meaning specified in the first paragraph of this Agreement

1

"Business" means (i) the marketing of starting-lighting-ignition automotive and specialty batteries and supplying original equipment manufacturers and replacement market customers with batteries for passenger cars, light and heavy-duty trucks, golf carts, motorcycles, garden tractors and marine use and related activities, and (ii) the marketing of batteries and allied products, parts and service for industrial applications, in each case, as conducted by GNB at the Real Property immediately prior to the Closing Date

"Business Day" means a day other than Saturday, Sunday or a day on which United States national banks are closed

"the Buyer" has the meaning specified in the first paragraph of this Agreement

"the Buyer Ancillary Agreements" means all agreements, instruments and documents being or to be executed and delivered by the Buyer under this Agreement

"Closing" has the meaning specified in Section 3 1

"Closing Date" has the meaning specified in Section 3 1

"Companies Act" means the Companies Act 1985 of the United Kingdom, as amended as of the Closing Date

"Confidential Information" has the meaning specified in Section 11 2

"Coordinating Agreement" means that certain coordinating agreement dated 9 May 2000 between Exide Corporation, a Delaware corporation, and Pacific Dunlop Holdings (USA) Inc , a Delaware corporation, as amended and supplemented from time to time

"Court Order" means any judgement, order, award or decree of any foreign, federal, state, or local court or tribunal or governmental agency and any award in any arbitration proceeding in any jurisdiction

"Disclosure Letter" means the letter dated 12 June 2000 the Buyer, as modified pursuant to Section 5 7 of the Coordinating Agreement

"Employees" has the meaning specified in Section 5 18(a)

"Employee Plan" has the meaning specified in the Principal US Agreement

"Encumbrance" means any lien, charge, security interest, mortgage, pledge, power of sale, easement, encroachment, covenant, restriction on transfer or other restriction on or defect in title or other encumbrances

"Environmental Laws" means all applicable statutory, international, treaty, conventions and local laws, regulations, codes of practice, circulars and guidance notes relating to pollution or human health or the environment (as defined in Section 1(2) of the Environmental Protection Act 1990 of the United Kingdom) (including ambient air, surface water, ground water, tidal water and the foreshore between high and low tide, land surface or sub-surface strata), including,

2

"Intellectual Property" has the meaning specified in Section 5 13(a)

"Intercompany Agreements" means agreements between GNB or a Subsidiary and an Affiliate of GNB other than GNB and any Subsidiary

"June 30, 1999 Balance Sheet" has the meaning specified in the Coordinating Agreement, including the notes to such balance sheet

"KPMG" means KPMG LLP or its successor

"Knowledge of the Seller" or similar phrases means matters actually known to Thomas Miltner, Thomas Smith, Thomas O'Hare, Mitchell Bregman, Barbara Hatcher, Rolf Fehndrich, Bart de Keyser or Jeff Kostos

"Knowledge of the Seller Regarding Environmental Matters" or similar phrases means matters actually known to Rolf Fehndrich or Barbara Hatcher

"Licences" has the meaning specified in Section 5 12

"Losses" means all losses, obligations, liabilities, settlement payments, awards, judgements, fines, assessments, penalties, and damages

"March 31, 2000 Balance Sheet" has the meaning specified in the Coordinating Agreement, including the notes to such balance sheet

"Material Adverse Effect" means any event, occurrence or condition (other than as a result of general economic conditions or events or conditions affecting the automotive and industrial battery industry as a whole) which has, or could reasonably be expected to have, a material adverse effect on the financial condition, assets, results of operations, Business, or operations of GNB, taken as a whole

"Person" means any individual, corporation, partnership, limited liability company or corporation, joint venture, association, trust, unincorporated organisation, or Governmental Body

"Principal US Agreement" means the Stock Purchase Agreement With Respect To Pacific Dunlop GNB Corporation dated May 9, 2000 between Pacific Dunlop Holdings (USA) Inc , as Seller, and Exide Corporation, as Buyer, as amended and supplemented from time to time

"PRP Sites" shall mean all sites (other than the Real Property and the Adjoining Properties) with respect to which GNB, a Subsidiary, or any of their successors or assignees have or may have liability under any Environmental Law

"Purchase Price" has the meaning specified in Section 2 2

4

A-0058

"Real Property" means leasehold property held by GNB, brief details of which are set out in Schedule 2

"Release" includes any and all spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaking, dumping, disposing, and any other means by which a substance may be introduced into or travel through the environment

"Remedial Action" shall include all actions required by a Court Order or otherwise by a Governmental Body to (i) clean up, remove, remediate, contain, treat, monitor, assess, evaluate or in any other way address Hazardous Materials, (ii) prevent the Release or threatened Release of Hazardous Materials, or (iii) investigate and determine if a remedial response is needed and to design such a response and post-remedial investigation, monitoring, operation and maintenance

"Requirements of Law" means any applicable law, regulation, bylaw, code or ordinance of any Governmental Body currently in effect

"ROW Agreements" has the meaning specified in Section 5 5(e) of the Coordinating Agreement

"Schemes" has the meaning specified in Section 5 18(a)

"The Seller" has the meaning specified in the first paragraph of this Agreement

"The Seller Ancillary Agreements" means all agreements, instruments and documents being or to be executed and delivered by the Seller under this Agreement

"Shares" means the 239,644 fully paid issued ordinary shares of £1 each in the share capital of GNB constituting its entire issued share capital

"SSAP" means a Statement of standard accounting practice adopted by the Accounting Standards Board

"Subsidiary" shall have the meaning ascribed to it in sections 736 and 736A of the Companies Act

"Tax Authority" means any governmental, federal, state, provincial, local governmental or other, fiscal, tax, revenue, customs duties or excise authority body or official whether of the United Kingdom or elsewhere in the world

"Tax" means any and all forms of taxes, levies, imposts, contributions, duties and charges and all withholdings or deductions in respect thereof, in the nature of and corresponding to Tax imposed by any Tax Authority acting as such whether directly or primarily chargeable against, recoverable from or attributable to GNB or any other person, and all fines, penalties, charges, costs and interest relating thereto and "Taxation" shall be construed accordingly

"Tax Return" means any return, report notice, computation, or similar statement required to be filed with respect to any Tax (including any attached schedules), including,

5

without limitation, any information return, claim for refund, amended return and declaration of estimated Tax

## ARTICLE 2

### SALE AND PURCHASE

Section 2 1    Sale and Purchase of the Shares

(a)    On the terms and subject to the conditions of this Agreement, on the Closing Date, the Seller shall sell, transfer, assign, convey and deliver to the Buyer, and the Buyer shall purchase from the Seller, the Shares free and clear from all Encumbrances together with all rights and benefits attaching or accruing to such Shares at Closing

(b)    Title to beneficial ownership of, and any risk attaching to the Shares shall pass on the Closing and the Buyer shall, from the Closing Date, be entitled to exercise all rights attached or accrued to the Shares including, without limitation, the right to receive all dividends, distributions or any return of capital made or paid by GNB on or after the Closing Date

(c)    The Buyer shall not be obliged to complete the purchase of any of the Shares unless the purchase of all the Shares is completed simultaneously

Section 2 2    Purchase Price

The purchase price (the "Purchase Price") shall be equal to One Million Seven Hundred Seventy Nine Thousand United States Dollars (US$1,779,000)    At the Closing, the Buyer shall pay the Purchase Price to the Seller by wire transfer of immediately available funds to such bank account as the Seller shall direct in writing    After Closing, the Purchase Price shall be adjusted pursuant to Article 2 of the Coordinating Agreement

## ARTICLE 3

### CLOSING

Section 3 1    Closing  time and location

Completion of the sale and purchase of the Shares (the "Closing") shall take place at 10 00 a m  Chicago time on the last Business Day of the month in which the last of the conditions specified in Article 8 is satisfied or waived at the offices of at Gardner, Carton & Douglas at 321 North Clark Street, Chicago, Illinois, or at such other time or place as shall be agreed upon by the Seller and the Buyer  Notwithstanding the foregoing, if the date upon which the last of the conditions specified in Article 8 is satisfied or waived is five (5) or fewer Business Days before the last day of the month, then the Closing shall be consummated on the fifth (5th) Business Day following the date upon which the last of such conditions was satisfied or waived, or such other date as may be agreed upon by Buyer and Seller  The time and date on which the

6

Closing is completed is referred to herein as the "Closing Date"  The Closing shall be effective as of close of business on the Closing Date

Section 3 2   Documents to be Delivered to the Buyer at Closing

At Closing, the Seller shall deliver to the Buyer or as the Buyer may direct

(a)    a duly executed and completed transfer of the Shares in favour of the Buyer or as the Buyer may direct together with the relative share certificates (or an indemnity in a form reasonably satisfactory to the Buyer in respect of any share certificates which are missing) and any power of attorney under which such transfer has been executed,

(b)    duly executed transfers of any of the Shares held by nominees in favour of the Buyer or as the Buyer may direct,

(c)    duly executed counterparts of the Seller Ancillary Agreements,

(d)    a closing certificate of the Seller in a form reasonably satisfactory to the Buyer certifying as to the accuracy of the Seller's representations and warranties at and as of the Closing and that the Seller has performed and complied with all of the terms, provisions and conditions to be performed and complied with by the Seller at or before the Closing,

(e)    a certificate of the Company Secretary or an Assistant Company Secretary of the Seller in a form reasonably satisfactory to the Buyer dated the Closing Date, certifying as to  (i) the Seller's articles of association, (ii) the passing of resolutions of the Seller's board of directors, authorising the execution and performance of this Agreement, the Seller Ancillary Agreements, and the transactions contemplated hereby, and (iii) evidence of due appointment and signatures of its officers executing this Agreement and any Seller Ancillary Agreement,

(f)    the written resignations of their respective offices executed as a deed by each of the directors and the company secretary as may be required to resign by the Buyer effective as of the Closing Date,

(g)    the certificate of incorporation and any certificates of incorporation on change of name, the share register, share certificate books (with any unissued share certificates), all minute books and other statutory books (which shall be written up to but not including the Closing Date), and the common seal of GNB,

(h)    the resignation of the auditors of GNB in accordance with section 392 of the Companies Act confirming that they have no outstanding claims of any kind against GNB and containing a statement complying with section 394(1) of the Companies Act, and

(i)    such other certificates and documents as the Buyer or its Counsel may reasonably request

7

A-0061

Section 3 3    Seller Obligations Closing

At the Closing, the Seller shall be obligated to

(a)    cause those persons nominated by the Buyer who have duly consented to act as Directors of GNB, to be validly appointed as additional directors and the person nominated by the Buyer who has duly consented to act as secretary of GNB to be validly appointed as company secretary of GNB, and

(b)    on such appointments referred to in section 3 3(a) being made, cause the persons referred to in section 3 2(f) to cease to be directors and the company secretary of GNB

Section 3 4    Buyer's Obligations at Closing

Upon completion of all the matters referred to in Section 3 2 (and only upon such completion) the Buyer shall be obliged to deliver to the Seller

(a)    duly executed counterparts of the Buyer Ancillary Agreements,

(b)    a closing certificate of the Buyer in a form reasonably satisfactory to the Seller certifying as to the accuracy of the Buyer's representations and warranties at and as of the Closing and that Buyer has performed and complied with all of the terms, provisions and conditions to be performed and complied with by the Buyer at or before the Closing,

(c)    a certificate of the Company Secretary or an Assistant Company Secretary of the Buyer in a form reasonably satisfactory to the Seller, dated the Closing Date, certifying as to (i) the Buyer's articles of association (or other like constitutional document), (ii) the passing of resolutions of the Buyer's board of directors, authorising the execution and performance of this Agreement, the Buyer Ancillary Agreements, and the transactions contemplated hereby, and (iii) evidence of due appointment and signatures of its officers executing this Agreement and any Buyer Ancillary Agreement,

(d)    the written consent of each of the persons named in Section 3 3(a) to serve as director or company secretary, as the case may be, and

(e)    such other certificates and documents as the Seller or its Counsel may reasonably request

Section 3 5    Form of Documents

The documents and instruments referred to in Sections 3 2 and 3 4 shall be satisfactory as to form to counsel for the party to whom they are delivered

Section 3 6    Post-Closing Matters

(a)    The Seller hereby declares that for so long as it remains the registered holder of any of the Shares after Closing it will

8

(i)    hold the Shares and the dividends and other distributions of profits or surplus or other assets declared, paid or made in respect of them after Closing and all rights arising out of or in connection with them in trust for the Buyer and its successors in title, and

(ii)    deal with and dispose of the Shares and all such dividends, distributions and rights as are described in Section 3 6(a)(i) as the Buyer or any such successor may direct

(b)

(i)    The Seller hereby appoints the Buyer as its lawful attorney for the purpose of receiving notices of and attending and voting at all meetings of the members of GNB from Closing to the date on which the Buyer or its nominee is entered in the register of members of GNB as the holder of the Shares

(ii)    For such purpose the Seller hereby authorises

(A)    GNB to send any notices in respect of its holding of Shares to the Buyer, and

(B)    the Buyer to complete in such manner as it thinks fit and to return proxy cards, consents to short notice and any other document required to be signed by it in its capacity as a member

## ARTICLE 4

### REPRESENTATIONS AND WARRANTIES REGARDING THE SELLER

The Seller represents and warrants to the Buyer as follows

Section 4 1    **Organisation**

The Seller has been duly incorporated and validly exists under the laws of England

Section 4 2    **Power and Authority**

The Seller has the full corporate power and authority to execute and deliver this Agreement and the Seller Ancillary Agreements and to perform its obligations hereunder and thereunder The Seller's execution, delivery and performance of this Agreement and each of the Seller Ancillary Agreements has been duly authorised and approved by all necessary corporate action

9

A-0063

Section 4 3   Agreement Binding

This Agreement and each of the Seller Ancillary Agreements has been duly executed and delivered by the Seller and, assuming due authorisation, execution and delivery by the Buyer, is the legal, valid and binding obligation of the Seller enforceable against the Seller in accordance with their respective terms, subject to general principles of equity and except as enforceability may be limited by applicable bankruptcy, insolvency, fraudulent transfer, reorganisation, moratorium or other similar laws of general application relating to creditors' rights generally

Section 4 4   Absence of Conflicts

The execution, delivery and performance of this Agreement and the Seller Ancillary Agreements and the performance of the Seller's obligations hereunder and thereunder will not

(a)    conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation, or result in the termination or result in the creation, imposition or crystallisation of any Encumbrance upon the Shares or any assets of GNB under

(i)    any term or provision of the memorandum or articles of association of the Seller, or

(ii)    any note, instrument, contract, agreement, mortgage, indenture, lease, license or franchise to which the Seller or any Affiliate of Seller is a party or by which it or any of its assets is bound, or

(iii)    any Court Order, or

(iv)    any Requirements of Law,

except for any of the foregoing which, individually or in the aggregate is or are not likely to have a Material Adverse Effect or hinder or impair the completion of the transactions contemplated hereby, or

(b)    require the approval, consent, authorisation or act of, or the making by the Seller or any Affiliate of Seller of any declaration, notification, filing or registration with any Person, except for any of the foregoing which, individually or in the aggregate, if not taken, is or are not likely to have a Material Adverse Effect, or materially hinder or impair the consummation of the transactions contemplated hereby

Section 4 5   No Litigation

There is no Action pending or, to the Knowledge of the Seller, threatened, which challenges the legality or propriety of the transactions contemplated by this Agreement or the Seller Ancillary Agreements or which impairs the completion of the transactions contemplated hereby or thereby

10

A-0064

Section 4 6     <u>Title to Shares</u>

The Seller is the sole legal and beneficial owner of the Shares and such Shares are free and clear of all Encumbrances, and the Seller has full right and power to vote and dispose of such Shares as contemplated herein  The Seller is not a party to any option, warrant, purchase right, or other contract or commitment that could require the Seller to sell, transfer, or otherwise dispose of any of the Shares (other than this Agreement)  The Seller is not a party to any voting trust, proxy, or other agreement or understanding with respect to the voting of any of the Shares

Section 4 7     <u>No Advisor</u>

Neither the Seller nor any Affiliate of Seller nor any Person acting on its or their behalf, has retained any advisor, broker, investment banker or financial advisor in connection with this Agreement or any transaction contemplated hereby for which the Buyer or GNB may be liable

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES REGARDING GNB

The Seller represents and warrants to the Buyer as follows

Section 5 1     <u>Organisation</u>

(a)      GNB is a private company limited by shares and has been duly incorporated and validly exists under the laws of England and Wales  The Seller has delivered to the Buyer complete and correct copies of GNB's certificate of incorporation and  certificate(s) of incorporation on change of name and a copy of its memorandum and articles of association as currently in force  GNB is not in violation of any provision of its memorandum or articles of association and GNB has all requisite corporate power and authority to hold its property under lease, to own or lease its assets and to carry on its business as currently conducted and to operate the property and assets now being operated by it  The particulars of GNB are set forth in Schedule 1

(b)      All filings required by law to be made by GNB have been properly made and all registers and minute books required by law to be kept by GNB have been properly written up and such registers and minute books contain an accurate and complete record of the matters which should be dealt with therein and GNB has not received any application or request for rectification of its statutory registers or any notice or allegation that any of them is incorrect

Section 5 2     <u>Share Capital</u>

The authorised share capital of GNB consists of 250,000 ordinary shares of £1 each of which 239,644 have been issued  All the Shares are legally and beneficially owned by the Seller  The Shares comprise the whole of the issued and allotted share capital of GNB and have been properly and validly issued, are fully paid or credited as fully paid and have not been issued in violation of any pre-emptive or other rights arising under statute, contract or otherwise ·  GNB has no outstanding subscriptions, options  warrants, rights, agreements or other commitments

11

A-0065

granting to any Person any interest in or right to acquire any of their its securities, including, without limitation, the Shares, or any interest therein. GNB has not issued any instrument or security convertible into, or exchangeable for, the Shares or other shares, and there is no agreement or understanding to which GNB or the Seller is a party or by which either of them is bound with respect to the voting of the Shares. GNB is under no obligation, whether contingent or otherwise, to issue or repurchase any of its Shares or to make any dividend or distribution payments based on its revenues, profits or net income.

Section 5.3    Subsidiaries and Investments

GNB has no Subsidiaries. GNB does not own, directly or indirectly, any stocks, shares, bonds or securities or any equity or other proprietary interest in any Person.

Section 5.4    Absence of Conflicts

The execution and completion of this Agreement and the Seller Ancillary Agreements, and the transactions contemplated or provided for in any of them, will not

(a)    conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation, or result in the termination of, or result in the creation, imposition or crystallisation of any Encumbrance upon the Shares or any assets of GNB under

(i)    any term or provision of the memorandum or articles of association of GNB, or

(ii)    any note, instrument, contract, agreement, mortgage, indenture, lease, licence or franchise to which GNB is a party or by which it or any of its assets is bound,

(iii)    any Court Order, or

(iv)    any Requirements of Law,

except for any of the foregoing which, individually or in the aggregate, is or are not likely to have a Material Adverse Effect or will not or is not likely to hinder or impair the exchange and completion of this Agreement or any of the transactions contemplated or provided for hereby and thereby, or

(b)    require the approval, consent, authorisation or act of, or the making by GNB of, any declaration, notification, filing or registration with any Person, except for any of the foregoing which, individually or in the aggregate, is or are not likely to have a Material Adverse Effect or materially hinder or impair the consummation of the transactions contemplated hereby and thereby

12

A-0066

Section 5 5    No Violation or Litigation

(a)    GNB has complied and is in compliance with all Court Orders and Requirements of Law which are applicable to GNB and its business, except for such Requirements of Law as to which noncompliance is not likely to have a Material Adverse Effect, and

(b)    there is no Action pending or, to the Knowledge of the Seller, threatened, against GNB or any of its assets and there has not been, to the Knowledge of the Seller, any claim asserted by any Person that could lead to an Action and neither GNB nor any of its assets is subject to any currently pending Court Order  To the Knowledge of the Seller, there is no Action pending or threatened against any officer or director of GNB arising out of his or her service as an officer or director of GNB

Section 5 6    Operations Since June 30, 1999

Except as reflected in the March 31, 2000 Balance Sheet, since June 30, 1999

(a)    there has been no material adverse change in the business, operations, assets, or financial condition of GNB taken as a whole  The termination of any Intercompany Agreement not listed in Schedule 5 will not have a Material Adverse Effect,

(b)    Except as reflected in the March 31, 2000 Balance Sheet, GNB has conducted its business in the ordinary course and has not

(i)    made any material change in operations,

(ii)    made any capital expenditure or entered into any contract or commitment in excess of the capital expenditures disclosed in the "Fiscal Year 2000 Open Sanction Summary" attached to Schedule 5 7(B) of the Principal US Agreement,

(iii)    sold, leased (as lessor), assigned, transferred or otherwise disposed of, or imposed or suffered to be imposed any Encumbrance on, any of the assets, except for inventory and other personal or real property sold, leased or otherwise disposed of for fair value in the ordinary course of business consistent with past practice and except for Permitted Encumbrances (as defined in the Principal US Agreement),

(iv)    cancelled any debts owed to or claims held (including the settlement of any Action) other than in the ordinary course of business consistent with past practice,

(v)    created, incurred or assumed, or agreed to create, incur or assume, any indebtedness for borrowed money or entered into, as lessee, any lease obligations which are subject to SSAP 21 or FRS 5 or guaranteed any such indebtedness or leases of others or made any loans other than in the ordinary course of business consistent with past practice,

(vi)    written off as uncollectible or accelerated or delayed collection of notes or amounts receivable in advance of or beyond their regular due dates or the dates when the

13

A-0067

same would have been collected other than in the ordinary course of business consistent with past practice,

(vii)   delayed or accelerated payment of any accounts payable or other liabilities beyond or in advance of their due date or the date when such liabilities would have been paid other than in the ordinary course of business consistent with past practice,

(viii)   made any distribution of assets (including payments of cash) to any of its Affiliates (not including the Seller or any of its Subsidiaries) other than pursuant to agreements entered into in the ordinary course of business consistent with past practice or declared or paid any distributions (provided that Seller shall have the right to remove and retain all cash held by GNB) or redeemed, reclassified or purchased or otherwise acquired any shares of its capital stock or authorised or issued any shares of its capital stock or any option, warrant or other right to purchase or acquire any such shares, or

(ix)   entered into, or amended, any employment, severance or similar agreement or arrangement or made any increases in the wages, bonuses, and benefits of its employees (other than any increases made in the ordinary course of business consistent with past practice),

(x)   waived any rights or settled any claims, except for such waivers or settlements granted or entered into in the ordinary course of business,

(xi)   made any change to its method of accounting,

(xii)   suffered or incurred any damage, destruction, fire, explosion, accident, flood or other casualty loss or act of God (whether or not covered by insurance) to any material operating asset or group of operating assets,

(xiii)   entered into or amended any purchase and sale contract outside the ordinary course of business,

(xiv)   suffered any amendments, termination, suspension or revocation of, any Governmental Permit,

(xv)   adopted an Employee Plan or amended or modified any already existing Employee Plan,

(xvi)   amended its articles of association,

(xvii)   manufactured inventory in excess of its expected needs, or

(xviii)   where applicable, agreed to do any of the foregoing

14

A-0068

Section 5 7    Returns, Elections and Appeals

(a)    GNB has properly and within the requisite periods made all proper returns which at any time it has been liable to make or provide for any purposes of Tax

(b)    GNB has duly and within the requisite periods made or given all elections, claims, notices and which are assumed to have been made or given in computing the charge or provision for GNB (if any) for Tax in, or in preparing the Financial Statements

(c)    GNB has duly and within the requisite periods accounted for or paid all Tax which it is liable to account for or pay

(d)    No appeal is currently outstanding against any assessment or other demand in respect of any Tax

(e)    PAYE and National Insurance    GNB has properly operated the PAYE and National Insurance contributions systems by making such deductions as are required by law from all payments made or deemed to be or treated as made by it or on its behalf, and by duly accounting to the United Kingdom Inland Revenue for all sums so deducted and for all other amounts for which it is required to account under the PAYE and National Insurance contributions systems

(f)    Valued Added Tax Act of 1994 ("VATA 1994")    The Company is registered for the purposes of the VATA 1994 and has made, given, obtained and kept full, complete and up to date records, invoices and other documents appropriate or required for those purposes and is not in arrears with any payments or returns due and has not been required by the Commission of Customs & Excise to give security under Paragraph 4 of Schedule 1 VATA 1994

(g)    All Taxes payable upon the importation of goods and all excise duties payable to HM Customs & Excise payable in respect of any assets (including trading stock) imported, owned or used by GNB have been paid in full

(h)    Except as set forth in the Disclosure Letter, no deficiency or proposed adjustment (which has not settled or otherwise resolved) for any amount of Tax has been proposed, asserted or assessed by any taxing authority against GNB or its Subsidiaries

(i)    Except as set forth in the Disclosure Letter, there is no action, suit, taxing authority proceeding or audit now in progress, pending or, to the Knowledge of Seller, threatened against or with respect to GNB or its Subsidiaries

(j)    Except as set forth in the Disclosure Letter, no claim has ever been made by a taxing authority in a jurisdiction where GNB or its Subsidiaries, respectively, do not file Tax Returns that such entity is or may be subject to Taxes assessed by such jurisdiction

(k)    Except as set forth in the Disclosure Letter, GNB and its Subsidiaries will not be required (A) as a result of a change in method of accounting for a taxable period ending on or prior to the Closing Date, to include any adjustment in taxable income for any taxable period (or

15

portion thereof) ending after the Closing Date, (B) as a result of any Requirement of Law relating to taxation matters to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date, (C) as a result of any Requirement Law relating to taxation matters, to include any item of income in taxable income for any taxable period (or portion thereof) ending after the Closing Date or (D) any installment sale made or prepaid income attributable to a taxable period ending on or prior to the Closing Date

     (l)   Except as set forth in the Disclosure Letter, GNB and its Subsidiaries have no obligation or liability for the payment of Taxes of any other Person, including, but not limited to the following, a liability of GNB or its Subsidiaries for the payment of any Tax arising (A) as a result of being (or ceasing to be) a member of any Affiliated Group (or being included (or required to be included) in any Tax Return relating thereto), (B) as a result from any expressed or implied obligation to indemnify another person, and (C) as a result from GNB or its Subsidiaries succeeding to the Tax liability of any other person as a successor, transferee or otherwise

### Section 5 8    Title to Assets

GNB is the exclusive and absolute owner of and has good title to, or a valid leasehold interest to, all of the personal property in the United Kingdom reflected in the June 30, 1999 Balance Sheet (other than the property in the United Kingdom disposed of since the date of the June 30, 1999 Balance Sheet in the ordinary course of business for fair value) in the amounts and categories reflected therein, and all personal property in India acquired after the date of the June 30, 1999 Balance Sheet, free and clear of all Encumbrances, except for (a) Permitted Encumbrances, (b) the lien of current taxes not yet due and payable and (c) other exceptions disclosed in Schedule 5 8  Except as disclosed in Schedule 5 8, the personal property of GNB that is utilized in the operation of GNB's business is usable in the ordinary course of GNB's business and conforms to all applicable statutes, ordinances and regulations relating to its construction, use and operation, except where such nonconformity is not likely to have a Material Adverse Effect

### Section 5 9    Real Property

     (a)   the Real Property shown in Schedule 2 comprise all the premises and land owned, leased, occupied or used by GNB,

     (b)   Part II of Schedule 2 contains details of the material terms of each material lease, sublease or similar agreement under which GNB is lessee or sublessee of, or holds or occupies, the Real Property,

     (c)   there is no other Person in possession or occupation of the Real Property without GNB's, or other proper authority,

     (d)   to the Knowledge of the Seller there is no material subsisting breach nor any material non-observance on the part of GNB of any covenant, condition or agreement contained in the lease under which GNB occupies the Real Property and no landlord has refused to accept rent or made any complaint or objection concerning the covenants

16

A-0070

Section 5 10    Assets

Schedule 3 contains a list of all machinery, equipment, and vehicles owned by GNB having an original cost of £67,000 or more (the "Principal Assets")

Section 5 11    Asset Leases

The Disclosure Letter contains a brief description of each lease or other agreement or arrangement, whether written or oral, (including in each case the annual rental, the expiration date thereof and a brief description of the property covered) under which GNB is lessee of, or holds or operates, any machinery, equipment, or vehicle owned by a third party, except those which are terminable by GNB without cost or penalty on 30 days' or less notice or which provide for annual rentals of less than £67,060

Section 5 12    Licences

All material licences, consents, authorisations, permits, orders, warrants, confirmations, permissions, certificates, approvals and authorities ("Licences") necessary for the carrying on of the Business and operations of GNB have been obtained and are being complied with except to the extent that non-compliance is not likely to have a Material Adverse Effect  No written notice of the suspension, cancellation, refusal, modification or revocation of any such Licence has been received by GNB and, to the Knowledge of Seller, there is no basis for the issuance of such notice except as a result of the consummation of the transactions contemplated hereby or except as is not likely to have a Material Adverse Effect   Notwithstanding the foregoing, Licenses required under the Environmental Laws are addressed solely in Section 5 21(b)

Section 5 13    Intellectual Property

(a)    Except as set out in Schedule 4 there are no material patents, patent applications, trade marks or trade mark registrations, service marks or service mark registrations, trade names, Internet domain names, corporate names, or any applications to register any of the foregoing, copyrights, licences to or from any Person in relation thereto (the "Intellectual Property"), used by GNB or otherwise relating to the business of GNB as presently carried on,

(b)    each item constituting part of the Intellectual Property has been, to the extent indicated in Schedule 4, duly registered, filed or issued, as the case may be and such registrations, filings and issuances remain in full force and effect,

(c)    GNB owns and possesses all right, title and interest in and to the Intellectual Property, and GNB has not received written notice of any claim by any Person contesting the validity, enforceability, use, or ownership of any Intellectual Property, patent disclosures or inventions or asserting that GNB is infringing the intellectual property rights of others  Schedule 4 sets forth all technology (including Intellectual Property) owned by third parties and used by GNB  To the Knowledge of the Seller, no Person is infringing the rights of GNB with respect to any Intellectual Property  GNB uses all reasonable efforts to protect its trade secrets

17

A-0071

Section 5 14   Employees, etc

(a)   the Disclosure Letter contains details of

(i)   the aggregate number of employees employed by GNB,

(ii)   the name, date of commencement of service, temporary or permanent status, period of service, location, salary and benefits package, grade and age of each employee,

(iii)   the terms of the contract of employment of each employee earning more than £25,000 per annum, and

(iv)   the forms of all consultancy or similar arrangements involving payments in excess of £10,000 per annum,

(b)   there are no proposals to terminate the employment of any employees of GNB and there are no arrangements (whether contractual or otherwise) to vary or amend their terms of employment (whether to their detriment or benefit)

(c)   GNB has in relation to each of its employees (and, so far as relevant, to each of its former employees) complied with

(i)   obligations imposed on it by all statutes regulations and codes of conduct and practice relevant to the relations between it and its employees or any trade union or employee representatives and has maintained current adequate and suitable records regarding the service and terms and conditions of employment of each of its employees,

(ii)   all collective agreements recognition agreements and customs and practices for the time being dealing with such relations or the conditions of service of its employees, and

(iii)   all relevant orders and awards made under any relevant statute regulation or code of conduct and practice affecting the conditions of service of its employees

Section 5 15   Trade Disputes

No trade union or other body is recognised by GNB for collective bargaining as representing any of the employees   GNB is not involved in any industrial or trade dispute or any dispute or negotiation with any trade union or other body representing any of the employees

Section 5 16   Payments on Termination

(a)   no liability has been or may be incurred by GNB for breach of any contract of employment or consultancy with any employee or consultant including, without limitation, redundancy payments, protective awards, compensation for wrongful dismissal or unfair

18

A-0072

(h)     To the Knowledge of the Seller Regarding Environmental Matters, as of the Closing Date there is no condition existing on the premises constituting the Properties that will give rise to any liability of GNB under any Environmental Law

(i)     Seller has made available to Buyer true and correct copies of all material environmental audits and consultant's reports relating to the past and current operations, properties and facilities of GNB or any of their respective predecessors, which are in its possession or under its reasonable control

(j)     To the Knowledge of the Seller Regarding Environmental Matters, the sites identified in the Disclosure Letter constitute, and as the Disclosure Letter is updated by Seller from time to time in its sole discretion prior to the Closing Date, will constitute all PRP Sites as of the Closing Date

(k)     Notwithstanding any other provision of this Agreement, no representations and warranties are made or shall be deemed to apply to the PRP Sites

Section 5 22    Bank Accounts, Guarantees and Powers

The Disclosure Letter lists all accounts, directors' resolutions authorising borrowing or deposit boxes maintained by GNB at any bank or other financial institution and the names of the persons authorised to effect transactions in such accounts and pursuant to such resolutions and with access to such boxes

Section 5 23    Accounts and Records

All the accounts, books, ledgers and financial and other material records of the Business have been maintained accurately and in accordance with generally accepted accounting practices

Section 5 24    Insurance

The Seller has, and at all times has had, valid insurance coverage in respect of the Business against all risk normally insured against by persons in the same industry, underwritten by one or more well-established and reputable insurers or adequately capitalised Affiliates   The Disclosure Letter contains a list of all insurance policies maintained by or on behalf of GNB on the Properties, assets, business or personnel specifying

(i)     the insurer,

(ii)    the amount of the coverage,

(iii)   the type of insurance,

(iv)    the policy number, and

(v)     any currently pending claims thereunder

22

A-0076

GNB has not failed to give any notice or present any claim under any insurance policy in due and timely fashion. All premiums due under the policies listed in the Disclosure Letter have been paid or accrued for on the Financial Statements and all such policies are in full force and effect and no notice of disallowance of any claim under any insurance policy, whether or not currently in effect, has been received by GNB. Other than (i) claims properly made against GNB in the ordinary course of business pursuant to insurance programs written on a retrospective rating basis, (ii) claims made as a result of premium audits relating to expired insurance policies, (iii) deductible claims relating to losses that are incurred but not reported, or losses that are known but not finally resolved, GNB has no liability for or exposure to any premium expenses for expired policies and there are no current claims by GNB under any such policy as to which coverage has been questioned, denied or disputed by the underwriters of such policies.

Section 5 25    **Product Warranties**

(a)    Details of all of GNB's unexpired, express product warranties with respect to any product that it manufactures or sells or that it has heretofore manufactured or sold are set out in the Disclosure Letter. Except as disclosed, GNB has not received written notice of any claim, and to the Knowledge of the Seller there are no threatened claims against GNB based on any product warranty (except claims outstanding as of June 30, 1999, not exceeding the UK equivalent of US$200,000)

(b)    GNB has not received a prohibition notice, a notice to warn, or a suspension notice under the Consumer Protection Act of 1987 of the United Kingdom

Section 5 26    **No Misrepresentation**

To the Knowledge of the Seller, the representations and warranties of the Seller contained in this Agreement, the Disclosure Letter and the certificates and other instruments delivered by the Seller pursuant hereto, do not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained herein or therein not misleading

Section 5 27    **Sufficiency of Assets**    GNB owns or leases or has the right to use all Real Property, buildings, machinery, equipment, intellectual property and other assets necessary for the conduct of the Business

Section 5 28    **Powers of Attorney**    As of Closing, there will not be any outstanding powers of attorney executed on behalf of GNB other than with respect to the filing of taxes, customs and similar matters and intellectual property registrations

**ARTICLE 6**

**REPRESENTATIONS AND WARRANTIES REGARDING THE BUYER**

The Buyer represents and warrants to the Seller as follows

23

A-0077

Section 6 1    Organisation

The Buyer has been duly incorporated and validly exists under the laws of France

Section 6 2    Power and Authority

The Buyer has the legal right and full corporate power, authority and approval to execute and deliver this Agreement and the Buyer Ancillary Agreements and to perform its obligations hereunder and thereunder and to own and lease its property and conduct its operations as currently conducted   The Buyer's execution, delivery and performance of this Agreement has been duly authorised and approved by all necessary corporate action

Section 6 3    Agreement Binding

This Agreement and the Ancillary Agreements have been duly executed and delivered by the Buyer, and assuming due authorisation, execution and delivery by the Seller, are the legal, valid and binding obligations of the Buyer enforceable in accordance with their respective terms, subject to the general principle of equity and except as enforceability may be limited by applicable bankruptcy, insolvency, fraudulent transfer, reorganisation, moratorium or other similar laws of general application relating to creditors' rights generally

Section 6 4    Absence of Conflicts

The execution, delivery and performance of this Agreement and the Buyer Ancillary Agreements and the performance of the Buyer's obligations hereunder and thereunder will not

(a)        conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation, or result in termination of or result in the creation or imposition of any Encumbrance under

(i)        any term or provision of the memorandum or articles of association of the Buyer (or like constitutional documents),

(ii)       any note, instrument, contract, agreement, mortgage, indenture lease, license, franchise, permit or other commitment to which the Buyer is a party or by which it or any of its assets are bound,

(iii)      any Court Order,

(iv)      any Requirements of Law,

except in each case, for any of the foregoing which, individually or in the aggregate is or are not likely to have a material adverse effect on the Buyer or its business taken as a whole or hinder or impair the completion of the transactions contemplated hereby, or

(b)        require the approval, consent, authorisation or act of, or the making by the Buyer of any declaration, notification, filing or registration with, any Person, except, in each case, for

24

A-0078

any of the foregoing which, individually or in the aggregate, if not taken, is or are not likely to have a material adverse effect on the Buyer or its business taken as a whole or materially hinder or impair the consummation of the transactions contemplated hereby.

Section 6 5    No Litigation

There is no Action pending or, to the knowledge of the Buyer, threatened, which questions the legality or propriety of the transactions contemplated by this Agreement the Buyer Ancillary Agreements or which would impair the contemplation of the transactions contemplated hereby, and there has not been, to the knowledge of the Buyer, any claim asserted by any Person that could lead to such an Action

Section 6 6    Investment Representation

The Buyer is acquiring the Shares for investment and not with a view to the distribution thereof or dividing all or any part of its interest therein with any other person

Section 6 7    No Advisor

Neither the Buyer nor any Person acting on its behalf has retained any advisor, broker, investment banker or financial advisor in connection with this Agreement or any transaction contemplated hereby for which the Seller may be liable

Section 6 8    No Misrepresentation    To the knowledge of Buyer, the representations and warranties of Buyer contained in this Agreement and the certificates and other instruments delivered by Buyer pursuant hereto do not include any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made not misleading

ARTICLE 7

ACTION PRIOR TO THE CLOSING DATE

The Buyer and the Seller covenant and agree to take the following actions between the date hereof and the Closing Date

Section 7 1    Preserve Accuracy of Representations and Warranties

The Buyer and the Seller shall, and the Seller shall procure that GNB shall, refrain from taking any action that would render any representation or warranty contained in this Agreement inaccurate as of the Closing Date    The Buyer and the Seller shall promptly notify the other of any Action, investigation, or other proceeding, that shall be instituted or threatened against such party or in the case of Seller, against GNB, to restrain, prohibit or otherwise challenge the legality of any transaction contemplated by this Agreement

25

## ARTICLE 8

### CONDITIONS TO CLOSING

Section 8 1    Buyer

The obligations of Buyer under this Agreement shall, at the election of the Buyer, be subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions

(a)    No Misrepresentation or Breach of Obligations or Agreements

Seller shall have complied in all material respects with its covenants and agreements herein and in the Coordinating Agreement

(b)    No Breach of Representation or Warranty

Each of the representations and warranties of the Seller contained in this Agreement and each of the Seller Ancillary Agreements shall be true and correct in all material respects on the Closing Date as though made on the Closing Date (except with respect to those representations and warranties that speak as to a particular date or time, which only need to be true and correct as of such date or time), except for changes therein specifically permitted by this Agreement or resulting from any transaction expressly consented to in writing by the Buyer, and there shall have been delivered to the Buyer a closing certificate in a form reasonably satisfactory to the Buyer to such effect, dated the Closing Date, signed by the Chairman or Managing Director of the Seller,

(c)    Closing Documents

The Buyer shall have received from the Seller the agreements and closing documents provided for in Section 3 2,

(d)    Necessary Approvals

The Seller and the Buyer shall have received all approvals and actions of or by all Governmental Bodies and any other Person which are necessary to complete the transactions contemplated hereby and by the ROW Agreements and preserve for the benefit of GNB its rights under the GNB Agreements which are material to the operation of the Business,

(e)    No Suit

No Action by any Governmental Body shall be pending or threatened questioning the legality of this Agreement or the consummation of the transactions contemplated hereby in whole or in part,

27

A-0081

Section 10 3   Exclusivity of Remedy

Except as provided in Section 9 2, with respect to any breach by either party of its representations, warranties, covenants, or agreements in this Agreement or the respective Buyer or Seller Ancillary Agreements, or the ROW Agreements and the transactions contemplated hereby and thereby, the sole and exclusive remedy of the other party (in contract, tort, for contribution, under Requirements of Law, or otherwise) shall be the indemnification provided in the Coordinating Agreement  In view of this exclusivity of remedy provision, the Buyer and the Seller covenant and agree for themselves and for their respective Affiliates that they will not bring, maintain, join or prosecute any Action or other proceeding against the other or its Affiliates for breach of this Agreement or indemnity therefor except as provided in the Coordinating Agreement

## ARTICLE 11

## GENERAL PROVISIONS

Section 11 1   Notices

Any notice, request, instruction or other document to be given hereunder shall be in writing and  (a) delivered personally, (b) sent by reputable overnight couriers, or (c) sent by facsimile, according to the instructions set forth below

Such notices shall be sent to the following addresses and/or facsimile numbers and shall be deemed given  (x) if delivered personally, at the time delivered, (y) if sent by reputable overnight courier, at the time sent, or (z) if transmitted by facsimile, at the time when receipt is confirmed by the sending facsimile machine

If to Seller, to

Pacific Dunlop Holdings (USA) Inc
6121 Lakeside Drive
Suite 200
Reno, Nevada  89511
U S A
Attention  President
Facsimile  702-824-4626

31

A-0085

supplemented except by a written instrument signed by an authorised representative of each of the parties hereto

Section 11 5   Successors and Assigns

(a)     The rights of each party under this Agreement and the Coordinating Agreement shall not be assignable without the written consent of the other party, provided, however, that no such assignment shall relieve the assigning party from any of its duties or obligations under this Agreement or the Coordinating Agreement, and provided further, however, that upon written notice to Seller, Buyer may assign this Agreement to an Affiliate of Buyer without the consent of Seller

(b)     This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns   Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any Person other than the parties and successors and assigns permitted by this Section 11 5 any right, remedy, benefit or claim under or by reason of this Agreement

Section 11 6   Interpretation

(a)     Article titles and headings to Sections herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement   The Schedules and Exhibits referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth herein

(b)     This Agreement, the Disclosure Letter and the Schedules and Exhibits hereto have been mutually prepared, negotiated and drafted by each of the parties hereto and thereto   The parties agree that the terms of this Agreement shall be construed and interpreted against each party in the same manner and that no such provisions shall be construed or interpreted more strictly against one party on the assumption that an instrument is to be construed more strictly against the party which drafted the agreement

(c)     All statutes referenced in this Agreement are statutes of the United Kingdom, unless otherwise indicated

Section 11 7   Waivers

Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the party or parties entitled to the benefit thereof   Any such waiver shall be validly and sufficiently authorised for purposes of this Agreement if, as to any party, it is authorised in writing by an authorised representative of such party   Subject to Sections 8 1 and 8 2, the failure of any party hereto to enforce at any time any term or provision of this Agreement shall not be construed to be a waiver of such term or provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any party thereafter to enforce each and every such term or provision   No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach

34

A-0088

IN WITNESS whereof the parties hereto have executed this Agreement the day and year first above written

SELLER

PACIFIC DUNLOP HOLDINGS (EUROPE) LIMITED
by its duly appointed attorney

Name   Martin M Hudson
Title    Attorney in Fact

BUYER

EXIDE HOLDING EUROPE
by its Director duly authorised

Name   Denis Porges
Title    Chairman

IN WITNESS whereof the parties hereto have executed this Agreement the day and year first above written

SELLER

PACIFIC DUNLOP HOLDINGS (EUROPE) LIMITED
by its duly appointed attorney

Name   Martin M  Hudson
Title    Attorney in Fact

BUYER

EXIDE HOLDING EUROPE
by its Director duly authorised

Name   Denis Porges
Title   Chairman

A-0093

SCHEDULE 1

Particulars of GNB

| | |
|---|---|
| Country of Incorporation | England and Wales |
| Date of Incorporation | 27 June 1997 |
| Registered Number | 3396707 |
| Registered Office | 51 Eastcheap, London EC3M1JP |
| Directors | Rolf Fehndrich<br>Thomas Minner<br>Thomas Smith |
| Secretary | Barbara Ann Hatcher |
| VAT Number | |
| Accounting Reference Date | 30 June |
| Auditors | KPMG, 2 Cornwall Street<br>Birmingham B32DL |
| Authorised Share Capital | 250,000 ordinary shares of £1 each |
| Issued Share Capital | 239,644 |
| Shareholder | Pacific Dunlop Holdings (Europe) Limited |

1

SCHEDULE 2

The Real Property

Part I

Premises at Apex 4/40 Halifax Road Cressex Industrial Estate, High Wycombe

Part II

| (1) | Date of Lease | | 5 May 1999 |
|-----|----|----|----|
| (2) | Parties | Landlord – | Skillbond Limited |
| | | Tenant – | GNB |
| | | Sureties – | GNB Technologies NV |
| | | – | GNB Technologies Inc |
| (3) | Term | | 15 years from 24 March 1999 |
| (4) | Rent | | £87,000 per annum |
| (5) | Rent Reviews | | As of 24 March in each 2004, 2009 and 2014 |

.2

A-0095

## HOTCHKIS AND WILEY FUNDS
### Mercury Rebranding Project – Document List

| Name of Document | GC&D Document No |
|---|---|
| Class A Shares Distribution Plan Sub-Agreement | 12083184 |
| Class A Distribution Plan of Merrill Lynch Low Duration Fund of Merrill Lynch Investment Managers Trust Pursuant to Rule 12b-1 | 12085624 |
| Class B Shares Distribution Plan Sub-Agreement | 12083189 |
| Class B Distribution Plan of Merrill Lynch Low Duration Fund of Merrill Lynch Investment Managers Trust Pursuant to Rule 12b-1 | 12085651 |
| Class C Shares Distribution Plan Sub-Agreement | 12083190 |
| Class C Distribution Plan of Merrill Lynch Low Duration Fund of Merrill Lynch Investment Managers Trust Pursuant to Rule 12b-1 | 12085645 |
| Class D Shares Distribution Plan Sub-Agreement | 12085620 |
| Class D Distribution Plan of Merrill Lynch Low Duration Fund of Merrill Lynch Investment Managers Trust Pursuant to Rule 12b-1 | 12083191 |
| Distribution Agreement | 12083187 |
| License Agreement Relating to Use of Name | 12083192 |
| Merrill Lynch Select Pricing System Plan Pursuant to Rule 18f-3 Under the Investment Company Act | 12083188 |

C:\TEMP\7718919.DOC

**HOTCHKIS AND WILEY FUNDS**
Mercury Rebranding Project — Document List

| Name of Document | GC&D Document No |
|---|---|
| Class A Shares Distribution Plan Sub-Agreement | 12083184 |
| Class A Distribution Plan of Merrill Lynch Low Duration Fund of Merrill Lynch Investment Managers Trust Pursuant to Rule 12b-1 | 12085624 |
| Class B Shares Distribution Plan Sub-Agreement | 12083189 |
| Class B Distribution Plan of Merrill Lynch Low Duration Fund of Merrill Lynch Investment Managers Trust Pursuant to Rule 12b-1 | 12085651 |
| Class C Shares Distribution Plan Sub-Agreement | 12083190 |
| Class C Distribution Plan of Merrill Lynch Low Duration Fund of Merrill Lynch Investment Managers Trust Pursuant to Rule 12b-1 | 12085645 |
| Class D Shares Distribution Plan Sub-Agreement | 12085620 |
| Class D Distribution Plan of Merrill Lynch Low Duration Fund of Merrill Lynch Investment Managers Trust Pursuant to Rule 12b-1 | 12083191 |
| Distribution Agreement | 12083187 |
| License Agreement Relating to Use of Name | 12083192 |
| Merrill Lynch Select Pricing System Plan Pursuant to Rule 18f-3 Under the Investment Company Act | 12083188 |

C:\TEMP\771.TMP.DOC

**SCHEDULE 3**

Principal Assets

Nothing to disclose

3

A-0098

SCHEDULE 4

Intellectual Property

GNB sells products manufactured by its U S affiliate GNB Industrial Battery Company  All trademarks, patent rights and other Intellectual Property necessary for GNB to acquire and sell these products are the subject of an implied license from GNB Industrial Battery Company, which is responsible for acquiring and maintaining appropriate registration with respect thereto

4

A-0099

## SCHEDULE 5

### Surviving Intercompany Agreements

1. Commissionaire Agreement between GNB and GNB Technologies S A dated February 26, 1998

2. Commissionaire Agreement between GNB and GNB Technologies NV dated February 26, 1998

CHI01/1 7040113 11

A-0100

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EXIDE TECHNOLOGIES, INC., *et al.,*[6] | ) | Case No. 02-11125 (KJC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |

## ORDER

Upon consideration of the Motion of the Pacific Dunlop Holdings Entities for

Reconsideration of Order Denying Their Motion to Remand or for Abstention and Stay Relief,

and Dismissing Their Causes of Action Against the Non-Debtor, Foreign Exide Entities (the

"Motion to Reconsider") and any response thereto, and after notice and a hearing, and upon

finding said Motion to be meritorious,

IT IS HEREBY ORDERED THAT this Court's Order entered on December 15, 2003

with respect the Motion of Pacific Dunlop Holdings (USA), Inc., Pacific Dunlop Holdings

(Europe) Limited, P.D. International Pty Limited, Pacific Dunlop Holdings (Hong Kong)

Limited and Pacific Dunlop Holdings (Singapore) PTE. Ltd. for Remand of State Law Action or,

in the Alternative, for Abstention And for an Order Granting Relief from the Automatic Stay to

Proceed to Liquidate Claim in State Court (the "Motion or for Abstention and Stay Relief") is

hereby AMENDED as follows:

Notwithstanding anything to the contrary in that Order, the foreign PDH Entities shall be

entitled, at a hearing to be scheduled hereafter, to present extrinsic evidence in support of their

---

[6] The Debtors in these proceedings are: Exide Technologies, Inc., f/k/a Exide Corporation; Exide Delaware, L.L.C.; Exide Illinois, Inc.; RBD Liquidation, L.L.C.; Dixie Metals Company; and Refined Metals Corporation.

DNC/106873-0001/924354/1

**A-0101**

contention that the Coordinating Agreement, as amended, continued to allow them to bring legal actions and pursue rights of recovery against the non-debtor Exide Foreign Entities.

SO ORDERED this ___ day of _____ 2003.


_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

A-0102