**TAB 5**

12/29/2003 17:35 FAX 302 571 1750    MORRIS JAMES    ⊠002

# DECLARATION OF MARTIN HUDSON

My name is Martin Hudson. I am over 18 years of age and competent to testify as to the matters set forth in this Declaration, made pursuant to 28 U.S.C. § 1746.

1.    I am a solicitor licensed to practice in Victoria & New South Wales, Australia. At all times relevant to the facts set forth herein, I was a Legal Consultant to Pacific Dunlop Limited Group providing General Counsel services to, among others, Pacific Dunlop Holdings (USA), Inc. ("PDH USA") and its affiliates.

2.    In my capacity as Legal Consultant, I participated in the negotiation of the agreement by which PDH USA and certain of its affiliates conveyed the GNB businesses, comprised of certain assets and subsidiaries, to Exide Corporation (now known as Exide Technologies) and certain of its affiliates. I was the corporate attorney who took the lead role in negotiations on behalf of the PDH entities.

3.    On or about May 9, 2000, PDH USA entered into a sale agreement ("U.S. Sale Agreement") pursuant to which it agreed to convey certain stock and assets relating to the United States GNB businesses to Exide Corporation (n/k/a Exide Technologies). At the same time, PDH USA and Exide Corporation also entered into a Coordinating Agreement. In the Coordinating Agreement, PDH USA (referred to therein as the "Seller") and Exide Corporation (referred to therein as the "Buyer") agreed that certain of PDH USA's international affiliates (the "International Sellers") would enter into separate sale agreements, referred to therein as "ROW Agreements," to effect the transfer of certain global GNB assets and subsidiaries to certain of Exide's international affiliates (the "International Buyers"). Id., Section 5.5(e) at 21. The

International Sellers and International Buyers entered the ROW Agreements on or about June 28, 2000.

4.    The Coordinating Agreement was intended to have an over-arching effect on each of the transactions by which the GNB businesses were sold.  The parties covenanted that the International Sellers and International Buyers would become signatories to the Coordinating Agreement and subject to the obligations imposed on them by that agreement.  Coordinating Agreement, Section 5.5(e) at 21.  Consistently, each of the ROW Agreements provides that the Coordinating Agreement and the U.S. Sale Agreement is part of the entire agreement of the parties to that ROW Agreement.  See e.g., Stock Purchase Agreement With Respect To GNB Technologies Limited, (Exhibit A hereto) Section 11.4 at p. 33.  Each of the ROW Agreements also included provisions which stipulated that the International Buyers and International Sellers' "sole and exclusive" indemnification obligations under the ROW Agreements were those set forth in the Coordinating Agreement.  See e.g., Id. Article 10, at p. 30-31.

5.    The indemnification obligations under the Coordinating Agreement are set forth in Article IV thereof.  In subsection 4.2(a), the Buyer agrees to indemnify and hold Seller and the International Sellers harmless from any and all Losses and Expenses arising from any breach by Buyer of any of its covenants or agreements in the Sale Agreements or in the Coordinating Agreement, or any breach of representation or warranty in the Sale Agreement.  Coordinating Agreement, Section 4.2, at p. 16.  For the purpose of this and other Articles in the Coordinating Agreement, the term "Buyer" is defined to include any International Buyer, as the context may require.  Id. Section 1.1, at 3.

6.    On or about June 19, 2000, the parties executed Amendment No. 1 to the Coordinating Agreement.  That Amendment states that the Coordinating Agreement remained in

- 2 -

A-0104

12/29/2003 17:37 FAX 302 571 1750          MORRIS JAMES                                    ☑004

full force and effect except as expressly amended therein. Section 4.2(a)(i) was amended to insert the words "or, for sake of clarification, any International Buyer" after the word "Buyer" in the first line of that section.

7.    The primary purpose of this Amendment was to assure that the agreements could be enforced in the United States in the forum selected by the parties – state or federal court in Cook County, Illinois. There was no request by, or discussion or negotiation with, Exide concerning limiting the rights of the Seller, or any International Sellers, to seek recourse against the International Buyers for breaches by them of their covenants or agreements under their respective ROW Agreements or the Coordinating Agreement. There was no intent on the part of the Sellers or the International Sellers to limit recourse against the International Buyers for such breaches.

    **I declare** under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 26, 2003.

Martin Hudson

525174

- 3 -

# TAB 6

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EXIDE TECHNOLOGIES, INC., et al., | ) | Case No. 02-11125 (KJC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | Objections Due: 10/14/03 @ 4:00 p.m. |
| | ) | Hearing Date: 10/21/03 @ 10:00 a.m. |

**MOTION OF PACIFIC DUNLOP HOLDINGS (USA) INC.,
PACIFIC DUNLOP HOLDINGS (EUROPE) LIMITED,
P.D. INTERNATIONAL PTY LIMITED, PACIFIC DUNLOP
HOLDINGS (HONG KONG) LIMITED AND PACIFIC DUNLOP
HOLDINGS (SINGAPORE) PTE. LTD FOR REMAND OF STATE LAW
ACTION OR, IN THE ALTERNATIVE, FOR ABSTENTION AND FOR AN
ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY TO PROCEED
TO LIQUIDATE CLAIM IN STATE COURT**

Pacific Dunlop Holdings (USA), Inc. ("PDH (USA)"), and Pacific Dunlop

Holdings (Europe) Limited, P.D. International Pty Limited, Pacific Dunlop Holdings

(Hong Kong) Limited, and Pacific Dunlop Holdings (Singapore) Pte. Ltd. (collectively,

excluding PDH (USA), the "PDH Foreign Entities"), by their undersigned counsel,

hereby move this Court for an order, pursuant to 28 U.S.C. §§ 1452(b) and 1334(c) and

Rule 9027 of the Federal Rules of Bankruptcy Procedure, remanding certain litigation

pending between the movants, debtor Exide Technologies, Inc., f/k/a Exide Corporation

(the "Debtor") and certain non-debtor affiliates to the Circuit Court of Cook County,

Illinois, County Department, Law Division (the "Illinois State Court"). In the alternative,

as to movant PDH (USA) only, the movants request this Court to abstain from

adjudicating PDH (USA)'s claims against the Debtor and to enter an order modifying the

automatic stay to the extent necessary to permit PDH (USA) to liquidate its claim against

the Debtor in Illinois State Court. In support of the requested relief, PDH (USA) and the

PDH Foreign Entities (collectively the "Pacific Dunlop Entities") respectfully state as follows:

<u>**BACKGROUND**</u>

A.    *Relationship between Plaintiffs and Defendants*

1.    In or about May and June of 2000, the Pacific Dunlop Entities entered into separate stock and/or asset sale agreements (the "Sales Agreements") with the Debtor and with the three non-Debtor affiliates: Exide Holding Europe, a French company, Exide Holding Asia Pte. Limited, a Singapore corporation and Exide Singapore Pte. Limited (formerly Bluewall Pte. Ltd), a Singapore corporation (collectively, the "Non-Debtor Defendants").[1]

2.    In or about May and June of 2000, PDH (USA) and the Debtor entered into a Coordinating Agreement containing certain provisions intended to govern the transactions contemplated by the Sales Agreements. The indemnification obligations in the Coordinating Agreement are cross-referenced and incorporated into the respective Sales Agreements.[2]

3.    The parties to the Coordinating Agreement expressly included a forum selection provision in that agreement pursuant to which all claims, including the claims at issue here, are to be brought in a state or federal court located in Cook County, Illinois.

---

[1]    Specifically, PDH (USA) entered into a Sales Agreement with the Debtor, Exide Technologies; Pacific Dunlop Holdings (Europe) Ltd. and P.D. International Pty. Ltd. both entered into Sales Agreements with Exide Holding Europe; Pacific Dunlop Holdings (Hong Kong) Ltd. entered into a Sales Agreement with Exide Holding Asia Pte. Ltd.; and Pacific Dunlop Holdings (Singapore) Pte. Ltd. entered into two Sales Agreements, one with Exide Holding Asia Pte. Ltd. and the other with Exide Holding Singapore Pte. Ltd.

[2]    Each relevant provision of the respective Sales Agreements provides that "the [Non-Debtor Defendant's] sole and exclusive indemnification obligations under this Agreement are set forth in the Coordinating Agreement . . . . [W]ith respect to any breach by either party of its representations, warranties, covenants or agreements in this Agreement . . . the sole and exclusive remedy of the other party (in contract, tort, for contribution, under Requirements of Law or otherwise) shall be the indemnification provided in the Coordinating Agreement."

2

CMM/106873-0001/905599/3

Specifically, Section 5.2 of the Coordinating Agreement provides in pertinent part that: "each of the parties hereto (for themselves and for their Affiliates) agrees that any and all disputes, legal actions, suits, or proceedings arising out of or relating to claims arising under this Agreement, the Sale Agreements, or the transactions contemplated hereby and thereby, whether legal or equitable in nature or arising out of contract, tort, Requirements of Law, for contribution or otherwise, shall be brought solely in a state or federal court in the County of Cook, State of Illinois."

4.    The parties further agreed that Illinois state law would govern any dispute between them arising from the transactions.

B.    *State Court Causes of Action*

5.    On July 17, 2001, the Pacific Dunlop Entities filed a complaint (the "Complaint") in the Illinois State Court which asserts claims under Illinois state law individually against the Debtor and the Non-Debtor Defendants alleging that, at the time of closing on the Sale Agreements, the Debtor and the Non-Debtor Defendants each wrongfully converted substantial funds belonging to the Pacific Dunlop Entities and retained those funds instead of paying them as part of the purchase price in the sales. Additionally and alternatively, the Pacific Dunlop Entities alleged that the Debtor and the Non-Debtor Defendants are liable for breach of their Sales Agreements by wrongfully retaining funds to which the Pacific Dunlop Entities are entitled and/or are liable for unjust enrichment from wrongfully and unlawfully retaining such funds. Each of the

CMM/106873-0001/905599/3

A-0108

Pacific Dunlop Entities has demanded a jury trial. A copy of the Complaint is attached hereto as **Exhibit A**.[3]

6.    PDH (USA) filed a second complaint (the "Second Complaint") in the Illinois State Court in December, 2001 against the Debtor alleging that the Debtor owes PDH (USA) sums of money relating to letters of credit which the Debtor extended to support the obligations of GNB, the subsidiary purchased from PDH (USA). PDH (USA) has demanded a jury trial. A copy of the Second Complaint is attached hereto as **Exhibit B**.

7.    The Complaint and Second Complaint (collectively, the "State Court Actions") were consolidated into Case No. 01 L 08460 in the Illinois State Court.

8.    PDH (USA) is the sole party among the Pacific Dunlop Entities alleging claims against the Debtor. The claims asserted by PDH (USA) against the Debtor total approximately $12,000,000.00, plus allowable interest, expenses and costs.

9.    On April 15, 2002 (the "Petition Date"), the Debtor filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware.

10.    Following the Petition Date, the Debtor requested that the Illinois State Court stay the State Court Actions as to <u>all</u> defendants, including the Non-Debtor Defendants, pursuant to 11 U.S.C. §§ 362(a) and 105. The Pacific Dunlop Entities acknowledged application of the automatic stay as to the Debtor, but denied that it stayed the continued prosecution of their separate claims against each of the Non-Debtor Defendants for their independent breaches of their respective Sales Agreements (to which the Debtor is not a

---

[3] Due to the volume of the exhibits and attachments referenced in certain of the pleadings and documents attached as Exhibits to this Motion, such exhibits and attachments have not been included with the service copies of the Motion but will be made available upon request.

CMM/106873-0001/905599/3

party), their independent conversion of assets belonging to the Pacific Dunlop Entities and their unjust enrichment.

11.    On July 19, 2002, after three separate hearings, the Illinois State Court issued a ruling refusing to stay the actions against the Non-Debtor Defendants, whether for reasons of the automatic stay or otherwise.  A copy of the July 19, 2002 Order of the Illinois State Court declining to stay the State Court Actions as to the Non-Debtor Defendants is attached hereto as **Exhibit C**.

C.    *Removal and Transfer of the State Court Actions*

12.    On July 30, 2002, then presiding Bankruptcy Judge John C. Akard entered an order in these bankruptcy proceedings extending the deadline by which Debtor had to remove actions through and including December 31, 2002.

13.    On August 21, 2002, one day before a scheduled hearing on the defendants' motion in the State Court Actions to find that the Debtor was a necessary party to the actions, the Debtor removed the State Court Actions to the United States Bankruptcy Court for the Northern District of Illinois (the "Illinois Bankruptcy Court").

14.    On August 22, 2002, the Debtor and Non-Debtor Defendants filed their Motion to Transfer to the United States District Court for the District of Delaware (the "Transfer Motion").  The Transfer Motion sought transfer of the entire State Court Actions, not just the claims against the Debtor, from the Illinois Bankruptcy Court to this Court pursuant to 28 U.S.C. § 1412 or, alternatively, 28 U.S.C. § 1404 because, in the eyes of the Debtor and the Non-Debtor Defendants, it was more convenient and expeditious for this Court to adjudicate the claims raised in the State Court Actions given the pending bankruptcy proceedings of the Debtor.

CMM/106873-0001/905599/3

15.   The Debtor also justified transfer of the State Court Actions to this Court on a misinterpretation of the provisions of the Coordinating Agreement. Under the Debtor's interpretation of the Coordinating Agreement, any breach of an individual Sales Agreement by a Non-Debtor Defendant that results in a judgment against that Non-Debtor Defendant somehow becomes the sole liability of the Debtor.

16.   The Pacific Dunlop Entities filed their response in opposition to the Transfer Motion on September 19, 2002.  A copy of the response is attached hereto as **Exhibit D**. Among other things, the response of the Pacific Dunlop Entities to the Transfer Motion explains the issue of liability under the Coordinating Agreement. The provisions of the Coordinating Agreement leave intact a direct liability upon the individual breaching Non-Debtor Defendants under any Sale Agreement, but creates a secondary liability on the Debtor if, and only if, the Non-Debtor Defendant fails to satisfy its liability to the applicable Pacific Dunlop Entity.

17.   Moreover, with respect to the claims for conversion, as a matter of law the Non-Debtor Defendants cannot rely upon an indemnification provision in the Coordinating Agreement to absolve themselves of responsibility.

18.   On August 28, 2002, the Pacific Dunlop Entities filed their Motion to Remand or, in the Alternative, to Abstain (the "Remand Motion") in the Illinois Bankruptcy Court.  A copy of the Remand Motion is attached hereto as **Exhibit E**.  The Remand Motion seeks remand of the State Court Actions to the Illinois State Court because 28 U.S.C. § 1334 does not provide the Illinois Bankruptcy Court (or, any other bankruptcy court) with any jurisdiction to adjudicate claims against the Non-Debtor Defendants. The claims filed by the PDH Foreign Entities against the Non-Debtor Defendants do not

6

"arise under" or "arise in" a case filed under the Bankruptcy Code, nor are they "related to" the Debtor's bankruptcy case.    In any event, the Remand Motion requests abstention by the Illinois Bankruptcy Court pursuant to 28 U.S.C. § 1334(c)(1) and (c)(2).

19.    On February 4, 2003, the Illinois Bankruptcy Court issued its Memorandum Opinion granting the relief requested in the Transfer Motion.    A copy of the Memorandum Opinion is attached hereto as **Exhibit F**.  The Illinois Bankruptcy Court acknowledged the parties dispute over the proper interpretation of the language of the Coordinating Agreement and recognized that an ambiguity in the Coordinating Agreement may exist.  The Illinois Bankruptcy Court did not, however, make any ruling as to the proper interpretation of the Coordinating Agreement.

20.    As a result of the Memorandum Opinion, the State Court Actions, including the pending Remand Motion, were transferred to this Court.

21.    As of the date of this Motion, the State Court Actions, although transferred by the Illinois Bankruptcy Court, have not been processed and/or docketed in this Court.[4]

22.    PDH (USA) has filed a proof of claim against Exide in this bankruptcy case.  In addition, the PDH Foreign Entities filed purely protective proofs of claim against Exide, to preserve their position in the event that they are not able to go forward with their claims against the Non-Debtor Defendants, and were submitted without waiver of their principal claims directed against those non-debtor entities.

---

[4] Counsel for the Pacific Dunlop Entities has alerted this Court's courtroom deputy regarding the fact that the transferred consolidated State Court Action appears not to have been docketed in this Court.  Therefore, the Pacific Dunlop Entities request that this Court treat the filing as both a filing in the main case and as if it had been filed in the adversary proceeding that should be pending.

7

## SUMMARY OF ARGUMENTS

- Enforcement of the parties' forum selection clause adopted in their Agreements requires this Court to remand the matter to the Illinois courts.

- The State Court Actions should be remanded to the Illinois State Court because this Court lacks subject matter jurisdiction over this matter under 28 U.S.C. § 1334. The claims of the four PDH Foreign Entities against the three Non-Debtor Defendants do not "arise under" or "arise in" a case filed under the Bankruptcy Code.

- While the claims of PDH (USA) against the Debtor may be "related to" the Debtor's bankruptcy case, stay relief as to PDH (USA) should be granted so that it may have its claims against the Debtor adjudicated in the Illinois State Court.

- The interests of equity compel this Court to remand this matter to the Illinois State Court pursuant to 11 U.S.C. § 1452(b).

- This Court should in any event abstain from hearing this matter pursuant to 28 U.S.C. § 1334(c)(2).

## RELIEF REQUESTED

23.    District courts and bankruptcy courts possess broad powers to return state law claims to the state courts from which they were removed when a bankruptcy court lacks jurisdiction or is otherwise an inappropriate or inefficient forum for adjudication. In re Micro Design, Inc., 120 B.R. 363, 366 (E.D. Pa. 1990). So strong is Congressional intent that the federal courts not usurp traditional state court jurisdiction in the name of bankruptcy convenience that Congress has provided courts three alternate grounds on which a federal court may or must refrain from considering a cause properly adjudicated by the state court in which it originated. See Lone Star Indus., Inc. v. Liberty Mut. Ins., 131 B.R. 269, 275 (D. Del. 1991); Balcor/Morristown Ltd. Partnership v. Vector Whippany Assocs., 181 B.R. 781, 791 (D.N.J. 1995); Drexel Burnham Lambert Group, Inc. v. Vigilant Ins. Co., 130 B.R. 405, 409 (S.D.N.Y. 1991).

8

    a.   Section 1452(b) grants the district and bankruptcy courts the authority to remand cases removed under Sections 1452(a) and 1334(b) for "<u>any</u> equitable ground," (emphasis added);

    b.   Section 1334(c)(2) <u>requires</u> the court to abstain from hearing any case if, among other things, it is based on state law, is related to a title 11 case, but does not arise under title 11, and could not have been commenced in federal court, absent jurisdiction under Section 1334.

    c.   Section 1334(c)(1) provides that, even if not all of the mandatory abstention factors are present, a court may abstain from hearing a case in the interest of justice or comity with state courts or state law. Where most of the elements of mandatory abstention are present, strong consideration should be given to discretionary abstention. <u>Balcor/Morristown Ltd.</u>, 181 B.R. at 788, 794.

24.   Moreover, as discussed *infra*, the Courts recognize a strong policy in favor of enforcing forum selection clauses in contracts, irrespective of whether one party to the contract may be in bankruptcy.

I.     **THE STATE COURT ACTIONS SHOULD BE REMANDED TO ILLINOIS STATE COURT BECAUSE THE FORUM SELECTION <u>CLAUSE OF THE CONTRACTING PARTIES SHOULD BE ENFORCED</u>**

25.   The Sales Agreements each contain forum selection clauses wherein the parties, including the Debtor and Non-Debtor Defendants, agreed that any disputes arising out the Sales Agreements or the Coordinating Agreement would be determined by Illinois state law in a state or federal court in Cook County, Illinois.

9

A-0114

26.   The State Court Actions, as against the Non-Debtor Defendants, cannot be tried in a state or federal court outside of Cook County, Illinois. If this Court fails to remand the State Court Actions to the Illinois State Court, the PDH Foreign Entities will be denied the benefit of their bargain, namely the choice of forum.

27.   The United States Supreme Court, in M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972), announced a general rule that forum selection clauses are "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." Id. at 10.

28.   The Third Circuit Court of Appeals has interpreted Bremen to mean that a forum selection clause is presumptively valid and will be enforced by the forum unless the party objecting to its enforcement establishes (1) that it is the result of fraud or overreaching, (2) that enforcement would violate a strong public policy of the forum, or (3) that enforcement would in particular circumstances of the case result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable. Coastal Steel Corp. v. Tilghman Wheelabrator Ltd., 709 F.2d 190, 202 (3d Cir.1983), overruled on other grounds by Lauro Lines v. Chasser, 490 U.S. 495 (1989). See also RGC International Investors, LDC v. ARI Network Services, Inc., 2003 WL 21843637 (D.Del., Jul 31, 2003) (Exhibit G hereto); In re OMNA Medical Partners, Inc., 2000 WL 33712302 at *4 (Bankr. D.Del., Jun 12, 2000) ("Forum selection clauses are presumptively valid and enforceable, absent compelling public policy considerations or serious inconvenience to the parties.") (Exhibit H hereto).

29.   The Third Circuit Court of Appeals has enforced forum selection clauses against Chapter 11 bankruptcy debtors.   In re Diaz Contracting, Inc., 817 F.2d 1047 (3d

10

Cir. 1987). The court ruled that debtors in bankruptcy are not entitled to more lenient application of the law regarding enforcement of forum selection clauses, simply by virtue of being in bankruptcy. 817 F.2d at 1053.

30. In rejecting the debtor's arguments for non-enforcement of the forum selection clause in that case, the Diaz Contracting court stated: "Although Diaz arguably demonstrated some inconvenience in litigating in the contractual forum, its assertions are insufficient to meet its heavy burden of proving unreasonableness and injustice. 'Mere inconvenience or additional expense is not the test of unreasonableness, since it may be assumed that the plaintiff received under the contract consideration for these things.'" 817 F.2d at 1052-53 (citations omitted).

31. While public policy may favor centralization of bankruptcy proceedings in the bankruptcy court where a case is pending, " this policy is not so strong as to mandate that forum selection clauses be abandoned where the dispute is non-core." In re N. Parent, Inc., 221 B.R. 609, 620 (Bankr. D. Mass. 1998). See also Envirolite Enterprises, Inc., v. Glastechnische Industrie Peter Lisec Gesellschaft M.B.H., 53 B.R. 1007 (S.D.N.Y. 1985) (public policy did not preclude enforcement against Chapter 11 debtor of forum selection clause of contract which required litigation in Austria; In re Kamine/Besicorp Allegany, L.P., 214 B.R. 953 (Bankr. D.N.J. 1997) (forum-selection clause had to be enforced in favor of plaintiff/creditor and against debtor as to complaint's non-core claims).

32. Notably, in the Kamine case, the plaintiff/creditor had filed a timely proof of claim albeit stating that it was being submitted subject to its objections regarding the court's jurisdiction, and the court nonetheless enforced the forum selection clause. 214 B.R. at 975.

CMM/106873-0001/905599/3

A-0116

33.    Since the disputes between the Pacific Dunlop Entities and the Exide entities all are non-core disputes that revolve around contracts with forum selection clauses, those clauses should be enforced, and the State Court Actions remanded to Illinois.

II.    THE STATE COURT ACTIONS SHOULD BE REMANDED TO ILLINOIS STATE COURT BECAUSE THE VARIOUS FACTORS TO BE CONSIDERED FAVOR REMAND

34.    Courts consider a number of well-established factors in deciding to remand a case to state court, pursuant to Section 1452(b).  These same factors apply to a motion for discretionary abstention pursuant to Section 1334(c)(1).  Balcor/Morristown Ltd., 181 B.R. at 788; In re Riverside Nursing Home, 144 B.R. 951, 957 (S.D.N.Y. 1992); Gorse v. Long Neck, Ltd., 107 B.R. 479, 482 (D. Del. 1989).  They include:

(1)    the economical or duplicative use of judicial resources;

(2)    the presence of non-debtor parties;

(3)    the remand lessens the possibility of inconsistent results;

(4)    the existence of the right to a jury trial;

(5)    comity considerations;

(6)    prejudice to involuntarily removed parties;

(7)    plaintiff's choice of forum as between state and federal courts;

(8)    nature of the claim or claims, that is, whether purely state law matters which could be better addressed by the state court are predominant;

(9)    alternate jurisdictional bases;

(10)    the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; and

(11)    the effect a remand decision would have on the efficient and economic administration of the estate.

12

A-0117

Gorse, 107 B.R. at 482; Drexel Burnham, 130 B.R. at 407; In re Southern Technical

College, Inc., 144 B.R. 421, 422 (Bankr. E.D. Ark. 1992).

35.  In considering these factors, the court must resolve all doubts in favor of

remand.  In re Selig, No. 91-13358DAS, 1994 Bankr. LEXIS 341, at *3 (Bankr. E.D. Pa.

Mar. 15, 1994) (attached hereto as **Exhibit I**) (quoting Boyer v. Snap-on Tools Corp.,

913 F.2d 108, 111 (3d Cir. 1990)).  Moreover, keeping in mind that remand may be

granted on "any equitable ground," this list is merely illustrative.  Lone Star Indus., 131

B.R. at 275.

36.  Even cursory examination of these factors compels the conclusion that the

State Court Actions should be remanded for adjudication in the Illinois State Court in

which they originated.  Standing alone, PDH (USA)'s claims against the Debtor are state

law claims that will not interfere with reorganization of the estate.  For this reason, they

should be remanded.

37.  Analyzed together with the claims of the PDH Foreign Entities against the

Non-Debtor Defendants -- as they should be -- all of the Pacific Dunlop Entities' causes

of action should be remanded for a more efficient adjudication in light of the fact that the

bankruptcy court lacks authority to consider the claims against the Non-Debtor

Defendants or, at the very least, cannot conduct a jury trial on them.

38.  Additionally, the Illinois State Court is already familiar with the State Court

Actions and, in terms of efficiency, is better suited to adjudicate these claims.

    A.    Remand Of All Claims Will Insure The Most Efficient Resolution
               Of All Claims By A Jury And Avoid The Risk Of Inconsistent Results

39.  PDH (USA)'s claims against the Debtor should be tried with the claims of the

PDH Foreign Entities against the Non-Debtor Defendants. A centralized proceeding will

13

be the most efficient, the least taxing on judicial resources and the most likely to avoid inconsistent results. As previously discussed, this Court lacks jurisdiction over the claims of the PDH Foreign Entities against the Non-Debtor Defendants and is unable to conduct a jury trial on such causes. For this reason, the entire case should be remanded and the claims tried together before a jury. Conversely, if the Debtor is not present as a party while the State Court Actions proceed to judgment between the PDH Foreign Entities and the Non-Debtor Defendants, there will be a risk of duplicative litigation, when, at a later date, PDH (USA)'s claims against Debtor are tried within the pending chapter 11 case.[5] Thus, remand will reduce judicial burden and avoid duplicative and potentially inconsistent litigation.

40.  The same issues were confronted by the District Court for the Southern District of New York in the context of a motion to withdraw the reference. In re Green, 200 B.R. at 299. Finding that the debtor's third-party action in an adversary proceeding was non-core, the court withdrew the reference as to the entire adversary proceeding, since to bifurcate core and non-core claims would "result in duplicative presentations on substantially overlapping factual matters. . . . Such a process would cause unnecessary delay and deplete both judicial resources and the assets of the bankruptcy estate." Id. For similar reasons, remand here is appropriate, since it will reduce the burden on these proceedings, avoids duplicative litigation and avoids the risk of inconsistent results as might occur between the state court litigation and bankruptcy adjudication.

B.    The Illinois Court Is The Only Forum In Which
       All Causes Of Action May Be Tried By A Jury

---

[5] The presence of Debtor in the State Court Actions as between the PDH Foreign Entities and the Non-Debtor Defendants is not, however, necessary in order for the State Court Actions to proceed to judgment.

14

41.  The Pacific Dunlop Entities have demanded that their claims be tried by a jury.  If the action is not remanded to Illinois State Court, the right of the Pacific Dunlop Entities to a jury trial will be compromised.  The PDH Foreign Entities' claims against the Non-Debtor Defendants are indisputably not core proceedings.  The Court is without jurisdiction to conduct a jury trial on non-core, "related" claims (assuming, arguendo, that the PDH Foreign Entities' claims against the Non-Debtor Defendants are even "related" to the bankruptcy case).  The PDH Foreign Entities are unwilling to waive their right to a jury trial on their causes of action.  Moreover, because the PDH Foreign Entities are unwilling to consent to entry of a final judgment by the bankruptcy court, even if a jury trial were conducted here, the jury findings would be subject to de novo review by the district court.  "Such review of matters determined by a jury would violate the Seventh Amendment."  In re Green, 200 B.R. at 299 (withdrawing reference); In re Orion Pictures Corp., 4 F.3d at 1102; Beard v. Braunstein, 914 F.2d 434, 442-43 (3d Cir. 1990) ("a bankruptcy court cannot conduct a jury trial in a non-core proceeding").

42.  Several courts have held that a jury demand in non-core proceedings is "sufficient ground" for equitable remand pursuant to Section 1452(b).  Nemsa Establishment, S.A. v. Viral Testing Sys. Corp., No. 95 Civ. 0277 (LAP), 1995 U.S. Dist. LEXIS 11650, at *24 (S.D.N.Y. Aug. 14, 1995) (attached hereto as Exhibit J); Port Authority v. CCI-Bowers Co., Civ. No. 91-5681 (CSF), 1992 U.S. Dist. LEXIS 9206, at *12 (D.N.J. June 17, 1992) (attached hereto as Exhibit K); Drexel Burnham, 130 B.R. at 408; Zweygardt v. Colorado Nat'l Bank, 52 B.R. 229, 234-35 (Bankr. D. Colo. 1985); In re Southern Technical, 144 B.R. at 422.

A-0120

43.    Because the causes of action by the PDH Foreign Entities against the Non-Debtor Defendants cannot be tried by a bankruptcy court, Illinois State Court is the only forum that can try all claims as against all parties and the entire action should be remanded for adjudication in a single proceeding.  See In re Green, 200 B.R. at 299 (withdrawing reference as to entire action to protect jury right and avoid waste of judicial resources).

### C.    Considerations Of Comity Require Remand To The State Court

44.    Congressional intent is clear:  "Absent countervailing circumstance[s], the trial of state law created issues and rights should be allowed to proceed in state court." Hatcher v. Lloyd's of London, 204 B.R. 227, 232. (M.D. Ala. 1997).  No such countervailing circumstances exist in this case.  The estate lacks any sufficient cause or interest to justify divesting the Illinois State Court of its jurisdiction, particularly when the "only relation to the Title 11 proceeding is that the debtor, quite apart from the bankruptcy proceeding, may be a responsible party . . . according to state law." Statement of Sen. Orrin G. Hatch, Senate Comm. on the Judiciary, reprinted in 1984 U.S. Code Cong. & Admin. News 576, 602.  Here, the Debtor may only be adjudged a responsible party as to the causes of action between the PDH Foreign Entities and the Non-Debtor Defendants if, under Illinois state law, the Illinois State Court determines that the Debtor's interpretation of the Coordinating Agreement is correct.

45.    Before removal, the Illinois State Court declined to extend application of the automatic stay to the Non-Debtor Defendants or to otherwise stay the State Court Actions as to the Non-Debtor Defendants.[6]  The Illinois State Court ordered that the claims of the

---

[6] The Debtor did not petition this Court for injunctive or other relief under 11 U.S.C. § 105(a) to stay the State Court Actions against the Non-Debtor Defendants.

16

PDH Foreign Entities move forward against the Non-Debtor Defendants. "Principles of comity militate against this Court's assertion of bankruptcy removal jurisdiction above the plenary jurisdiction of the [Illinois State Court]." Port Authority, 1992 U.S. Dist. LEXIS 9206, at *12 (Ex. K) (quoting Drexel Burnham, 130 B.R. at 408).

        D.     The Pacific Dunlop Entities Chose A Court Of Competent Jurisdiction Which Should Not Be Ousted Of That Jurisdiction

      46.   The Pacific Dunlop Entities commenced the State Court Actions in the Circuit Court of Cook County, Illinois, County Department, Law Division.  If the cause is not remanded, the Pacific Dunlop Entities will be denied its choice of forum. Port Authority, 1992 U.S. Dist. LEXIS 9206, at *15-16 (Ex. K).  The Pacific Dunlop Entities have participated in the bankruptcy case only to the extent necessary to protect their interests in their property interests and the State Court Actions.

      47.   Additionally, as discussed *supra*, each of the parties, including the Debtor and Non-Debtor Defendants, contractually *agreed* to a forum selection clause whereby any cause of action arising out of the Sales Agreements would be brought and adjudicated in a court in Cook County, Illinois, as well as further agreeing to a choice of law clause whereby any dispute among them would be governed by Illinois state law.

      48.   Failing to remand the State Court Actions to Illinois State Court would deny the Pacific Dunlop Entities the benefit of a contractual right.

      49.   The State Court Actions were pending in Illinois State Court for almost one year prior to the filing of the Debtor's bankruptcy petition and, as a result, the Illinois State Court has invested substantial judicial resources in these cases. As of the date of Debtor's notice of removal, the Illinois State Court had heard oral argument on nine (9) separate occasions (not including appearances to present motions), issued eleven (11)

17

orders relating to the case, and discovery was in an advanced stage. Interrogatories, requests for admission and requests for production of documents had been propounded and answered, nine deposition notices have been served and one witness has been deposed. Divesting the Illinois State Court of its jurisdiction at this point would be an inefficient use of judicial resources and waste the time and effort expended to date by the Illinois State Court in resolving the State Court Actions.

50. Failure to remand this action to Illinois State Court will only serve to further delay adjudication, especially of the claims against the Non-Debtor Defendants, and, as a result, will create a hardship to the Pacific Dunlop Entities. Courts consistently attach "great weight to the hardship suffered by a plaintiff in being denied the opportunity to conduct discovery and litigate issues of liability through an extended period while the automatic stay remains in force." In re Federated Dep't Stores, Inc., No. 1-90-00130, 1990 Bankr. LEXIS 1118, at *3 (Bankr. S.D. Ohio May 30, 1990) (attached hereto as **Exhibit L**).

51. The Pacific Dunlop Entities have been delayed from prosecuting the State Court Actions long enough. The State Court Actions were initially stayed following the filing of the Debtor's petition so that the Illinois State Court could entertain Debtor's argument that 11 U.S.C. § 362 applied to the Non-Debtor Defendants as well as the Debtor. After the Illinois State Court denied the Debtor and Non-Debtor Defendants' motion to stay the proceedings as to all defendants, the Debtor removed the State Court Actions to the Illinois Bankruptcy Court on the eve of the scheduled hearing in Illinois State Court. on the defendants' motion arguing that the Debtor was a necessary party. The result of the removal to federal court and transfer to this Court has been the *de facto*

CMM/106873-0001/905599/3

application of the automatic stay as to the Non-Debtor Defendants, because the Illinois Bankruptcy Court did not have jurisdiction to adjudicate the claims between the Pacific Dunlop Entities and the Non-Debtor Defendants. The Pacific Dunlop Entities have been forced to defend against the Transfer Motion and to brief their own Remand Motion and have not been enabled to make any progress toward adjudicating the merits of the State Court Actions as against the Non-Debtor Defendants.

       E.     The Bankruptcy Court Lacks Subject Matter Jurisdiction over the
            PDH Foreign Entities' Claims Against the Non-Debtor Defendants

52.   The subject matter jurisdiction of the bankruptcy court is limited to its statutory authority under 28 U.S.C. § 157. Pursuant to Section 157(b)(1), bankruptcy judges may determine only title 11 cases and "core proceedings" arising under title 11 or arising in a title 11 case.  An action that does not rely on "the bankruptcy laws for existence and which could proceed in a court that lacks federal bankruptcy jurisdiction is non-core."  In re Guild and Gallery Plus, Inc., 72 F.3d 1171, 1178 (3d Cir. 1996); In re Green, 200 B.R. 296, 298 (S.D.N.Y. 1996). The bankruptcy court may hear, though it may not determine (without consent of all parties), a non-core proceeding that is "related to" a Title 11 case.[7]  28 U.S.C. § 157(c).

53.   Claims by non-debtors against other non-debtors, such as the PDH Foreign Entities' causes of action against the Non-Debtor Defendants, are not "related to" the Debtor's bankruptcy case.  Although the Debtor alleges that the Coordinating Agreement gives rise to direct payment obligations by the Debtor on account of the Non-Debtor Defendants' liability, this is not enough to subject the PDH Foreign Entities' causes of

---

[7]      In this instance, the court must make proposed findings of fact and law to the district court for *de novo* review and, if appropriate, entry of a final order.  The PDH Foreign Entities will not consent to entry of any final order or judgment by the bankruptcy court.

19

has been timely requested in these proceedings. Thus, the test set forth by Section 1334(c)(2) has been satisfied and the PDH Foreign Entities' causes of action as against the Non-Debtor Defendants must be remanded.

64.   In the alternative, if the Court finds that one of the mandatory abstention factors is lacking, for the reasons stated above, discretionary abstention remains the appropriate grounds for relief. Balcor/Morristown Ltd., 181 B.R. at 788, 794.

IV.   PDH (USA) IS ENTITLED TO RELIEF FROM THE AUTOMATIC STAY TO LIQUIDATE ITS CLAIM AGAINST DEBTOR IN ILLINOIS STATE COURT

65.   It is well established that the automatic stay applies to the debtor and not to third parties, even if the third parties are co-defendants with the debtor in a lawsuit. See, e.g., Sav-a-Trip v. Belfort, 164 F.3d 1137 (8th Cir. 1999); Maritime Elec. Co. v. United Jersey Bank, 959 F.2d 1194, 1205 (3d Cir. 1991); Guiterrez & Sachs, Chartered v. Havens, 245 B.R. 180 (D.D.C. 2000). The automatic stay is not available to non-bankrupt co-defendants of a debtor even if they are in a similar legal or factual nexus with the debtor. Maritime Elec., 959 F.2d at 1205. For this reason, the automatic stay does neither applies nor extends to the Non-Debtor Defendants.

66.   The automatic stay, as it applies to the Debtor, should be terminated as requested by PDH (USA) herein pursuant to Section 362(d)(1) of the Bankruptcy Code because "cause" exists to allow the stay to be lifted so that the State Court Actions may proceed to trial and liquidation in Illinois State Court as to the Debtor.

67.   Although the automatic stay is a fundamental protection granted to a debtor under the Bankruptcy Code, Midlantic Nat'l Bank v. New Jersey Dpt. of Envtl. Protection, 474 U.S. 494, 503 (1986), the stay is not meant to be indefinite or absolute,

24

A-0129

and relief may be granted in appropriate circumstances.  Wedgewood Inv. Fund, Ltd. v.

Wedgewood Realty Group, Ltd. (In re Wedgewood), 878 F.2d 693, 697 (3d Cir. 1989).

68.    Section 362(d) provides:

> (d)  On request of a party in interest and after notice and a
> hearing, the court shall grant relief from the stay provided
> under subsection (a) of this section, such as by terminating,
> annulling, modifying or conditioning such stay-

> (1) for cause...

11 U.S.C. §  362(d)(1).

69.    "Cause" is not defined by the Bankruptcy Code. Consequently, a Bankruptcy

Court must decide what constitutes "cause" to lift the automatic stay on a case by case

basis.  In re Rexene Products Company, 141 B.R. 574, 576 (Bankr. D. Del. 1992), citing

In re Fernstrom Storage and Van Co., 938 F.2d 731, 735 (7th Cir. 1991).  The legislative

history of Section 362 states that cause may be established by a single factor such as

"lack of any connection with or interference with the pending bankruptcy case."  Rexene,

141 B.R. at 576, citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess., 343-344 (1977).

70.    In appropriate circumstances, the automatic stay should be terminated to allow

non-bankruptcy litigation to proceed in the non-bankruptcy forum. The legislative history

to Section 362 is clear on this point:

> [I]t will often be more appropriate to permit
> proceedings to continue in their place of
> origin, where no great prejudice to the
> bankruptcy estate would result, in order to
> leave the parties in their chosen forum and
> to relieve the bankruptcy court from any
> duties that may be handled elsewhere.

CMM/106873-0001/905599/3

A-0130

H.R. Rep. No. 595, 95th Cong., 1st Sess., 341 (1977). See also Fernstrom, 938 F.2d at 735; In re Peterson, 116 B.R. 247, 249 (D. Colo. 1990); In re Murray Indus., Inc., 121 B.R. 635, 637 (Bankr. M.D. Fla. 1990).

71.    The legislative history of Section 362 states that cause may be established by a single factor such as "a desire to permit an action to proceed ... in another tribunal," or "lack of any connection with or interference with the pending bankruptcy case." Rexene, 141 B.R. at 576, citing H.R.Rep. No. 95-595, 95th Cong, 1st Sess., 343-44 (1977). Bankruptcy courts routinely grant creditors relief from the automatic stay to proceed with pending state court actions against the debtor for purposes of liquidating claims. See e.g., In re Rabin, 53 B.R. 529, 531 (Bankr. D. N.J. 1985) (lifting the automatic stay to allow continuation of two state court actions pending against Chapter 11 debtor); Brodsky v. Philadelphia Athletic Club, Inc., 9 B.R. 280, 283 (Bankr. E.D. Pa. 1981) (modifying automatic stay to permit plaintiff to continue with state court action against the debtor, where the action could be decided by state judge as expertly as it could by bankruptcy court).

72.    This Court has stated that relief from stay should be granted upon a showing that:

a.      the debtor or the debtor's estate will not be greatly prejudiced;

b.      the hardship to the movant by maintenance of the automatic stay considerably outweighs the hardship to the debtor; and

c.      the movant has a reasonable chance of prevailing on the merits.

See Rexene, 141 B.R. at 576.

73.    All three factors weigh heavily in favor of modifying the automatic stay to permit PDH (USA) to prosecute its State Court Actions against the Debtor.

26

CMM/106873-0001/905599/3

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EXIDE TECHNOLOGIES, INC., et al., | ) | Case No. 02-11125 (KJC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | | Objections Due: 10/14/03 @ 4:00 p.m. |
| | | Hearing Date: 10/21/03 @ 10:00 a.m. |

**NOTICE OF MOTION OF PACIFIC DUNLOP HOLDINGS (USA) INC.,
PACIFIC DUNLOP HOLDINGS (EUROPE) LIMITED, P.D. INTERNATIONAL PTY
LIMITED, PACIFIC DUNLOP HOLDINGS (HONG KONG) LIMITED AND PACIFIC
DUNLOP HOLDINGS (SINGAPORE) PTE. LTD FOR REMAND OF STATE LAW
ACTIONS OR, IN THE ALTERNATIVE, FOR ABSTENTION AND FOR AN ORDER
GRANTING RELIEF FROM THE AUTOMATIC STAY TO PROCEED TO
LIQUIDATE CLAIM IN STATE COURT**

TO:     SEE ATTACHED SERVICE LIST[1]

        Pacific Dunlop Holdings (USA), Inc., Pacific Dunlop Holdings (Europe) Limited, P.D. International PTY Limited, Pacific Dunlop Holdings (Hong Kong) Limited and Pacific Dunlop Holdings (Singapore) PTE. Ltd. (the "Movants") have filed their Motion for Remand of State Law Actions or, in the Alternative, for Abstention and for an Order Granting Relief from the Automatic Stay to Proceed to Liquidate Claim in State Court (the "Motion")

        HEARING ON THE MOTION WILL BE HELD ON October 21, 2003 at 10:00 a.m. before the Honorable Kevin J. Carey in the United States District Court for the District of Delaware, Courtroom 2B, 844 N. King Street, Wilmington, Delaware 19801.

        You are required to file a response (and the supporting documentation required by Local Rule 4001-(d)) to the attached motion on or before October 14, 2003 at 4:00 p.m.

        At the same time, you must also serve a copy of the response upon Movants' attorneys:

Brett D. Fallon, Esquire
Douglas N. Candeub, Esquire
Christina M. Thompson, Esquire
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, Delaware 19899
Telephone: (302) 888-6800
Facsimile: (302) 571-1750

Paula Krahn Merkle, Esquire
Goodell, DeVries, Leech & Dann, LLP
One South Street, 10th Floor
Baltimore, Maryland 21202
Telephone: (410) 783-4016
Facsimile: (410) 783-4040

---

[1] Due to volume, copies of the exhibits have been provided only to counsel to the Debtor, counsel to the Committee and the United States Trustee. Any other party wishing to obtain a copy of the exhibits to the Motion may do so by contacting undersigned counsel.

The hearing date specified above may be a preliminary hearing or may be consolidated with the final hearing, as determined by the Court.

The attorneys for the parties shall confer with respect to the issues raised by the motion in advance for the purpose of determining whether a consent judgment may be entered and/or for the purpose of stipulating to relevant facts such as value of the property, and the extent and validity of any security instrument.

Dated: October 3, 2003        MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Brett D. Fallon (ID No. 2480)
Douglas N. Candeub (ID No. 4211)
Christina M. Thompson (ID No. 3976)
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, Delaware 19899
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
Email: bfallon@morrisjames.com
Email: dcandeub@morrisjames.com
Email: cthompson@morrisjames.com

-and-

Paula Krahn Merkle, Esquire
Goodell, DeVries, Leech & Dann, LLP
One South Street, 10th Floor
Baltimore, Maryland 21202
Telephone: (410) 783-4016
Facsimile: (410) 783-4040
Email: pkm@gdldlaw.com

CMM/106873-0001/906627/1

A-0136

# **<u>EXHIBIT A</u>**

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

PACIFIC DUNLOP HOLDINGS
(USA) INC.,

PACIFIC DUNLOP HOLDINGS
(EUROPE) LIMITED
an English company

P.D. INTERNATIONAL
PTY LIMITED
an Australian company

PACIFIC DUNLOP HOLDINGS
(HONG KONG) LIMITED
a Hong Kong corporation

PACIFIC DUNLOP HOLDINGS
(SINGAPORE) PTE. LTD.
a Singapore corporation

                              Plaintiffs,

        v.

EXIDE CORPORATION,

EXIDE HOLDING EUROPE
a French Company

EXIDE HOLDING ASIA
PTE. LIMITED
a Singapore corporation

EXIDE SINGAPORE PTE. LIMITED

FORMERLY
BLUEWALL PTE. LTD
a Singapore Corporation
                              Defendants.

Civil Action No.:

JURY DEMANDED ON ALL ISSUES
SO TRIABLE

01L 008460
CALENDAR N
BREACH OF CONTRACT



## COMPLAINT

Plaintiffs, Pacific Dunlop Holdings (USA) Inc. ("PDH"), Pacific Dunlop Holdings (Europe) Limited, P.D. International PTY Limited, Pacific Dunlop Holdings (Hong Kong) Limited, and Pacific Dunlop Holdings (Singapore) Pte. Limited, (collectively, unless otherwise specified, and including PDH hereinafter called the "PDH Sellers"), for their complaint against Defendants, Exide Corporation ("Exide"), Exide Holding Europe, Exide Holding Asia Pte. Limited, and Exide Singapore Pte. Limited (formerly Bluewall Pte. Limited)(collectively, unless otherwise specified, and including Exide hereinafter called the "Exide Buyers") state:

## NATURE OF THE CASE

1.     As a term of the PDH Sellers' sale of their interests in the world-wide GNB automotive and industrial battery business to the Exide Buyers, the parties agreed that the PDH Sellers had the right to remove and retain all cash held by the companies sold as part of the business and, where assets – and not stock in subsidiaries – were sold, to retain the cash assets. At the sale's closing, the cash intended by the parties to be removed and/or retained by the PDH Sellers totalled approximately $16.6 million. The PDH Sellers have requested that this cash be released to them, in accordance with the parties' agreements and intent, but the Exide Buyers have refused this request. The Exide Buyers continue to unjustly and wrongfully retain approximately $16.6 million cash to which the PDH Sellers are entitled, and have breached their agreement with the PDH Sellers by so doing.

2

A-0139

## BACKGROUND

2.    During May and June 2000, the PDH Sellers and the Exide Buyers and certain of their respective affiliates entered into a series of agreements (the "Sale Agreements")[1] whereby the PDH Sellers and certain of their respective affiliates sold and/or transferred to the Exide Buyers and certain of their respective affiliates various subsidiary entities or assets of subsidiary entities and assets comprising the GNB world-wide automotive and industrial battery business (the "Businesses" or when referred to in the singular, the "Business").

3.    PDH and Exide entered into a separate agreement (the "Coordinating Agreement"),[2] on May 9, 2000 that provided, in a single document, certain provisions that had an overarching effect on the transactions contemplated in the Sale Agreements. In particular, section 4.2(a)(i) of the Coordinating Agreement provided that, subject to Sections 4.2(b), 4.2(c) and 4.2(d), "[Exide on its behalf and on the behalf of the Exide Buyers, as hereinafter defined] agrees to indemnify and hold [the PDH Sellers] harmless from and against any and all losses and expenses incurred by [each PDH Seller and its affiliates the PDH Sellers] in connection with or arising from any breach by each Exide Buyer of any of its covenants or agreements in the Sale Agreements or in [the Coordinating] Agreement". Ex. G, § 4.2(a)(i).

4.    Each of the Sales Agreements provided, in general, that each PDH Seller's and each Exide Buyer's sole and exclusive indemnification obligations were set forth in the Coordinating Agreement, and that, with respect to any breach by either party of its warranties, covenants or agreements in the Sales Agreements, each PDH Seller's exclusive remedy would be

---

[1]    The relevant Sales Agreements are attached hereto, and specifically incorporated herein, as Exhibit A-F. Because of their voluminous nature, the various schedules relating to the Sales Agreements have not been attached. These schedules are available to the Court and the parties upon request.
[2]    The Coordinating Agreement is attached, and specifically incorporated herein, as Exhibit G.

A-0140

the indemnification provided for in the Coordinating Agreement. Exs. A-E, §§ 10.1, 10.2, and

10.3, Ex. F, §§ 11.1, 11.2, and 11.3.

    5.    In each of the Sale Agreements and in the Coordinating Agreement the parties

agreed to venue any disputes arising out of the Sale Agreements and/or the Coordinating

Agreement in Cook County, Illinois, (Ex. G, § 5.2), and agreed to submit to the jurisdiction of

the courts of this State. Exs. A, E and F, § 12.11, Exs. B, C, and D, § 11.11.

**THE SALE**

    6.    The sale of the Businesses to the Exide Buyers was effected through a series of

sale transactions, including the following:

**Stock Purchase Agreements**

    a.    the sale by PDH of all outstanding shares of capital stock in Pacific Dunlop GNB Corporation to Exide Corporation (the "U.S.A. Agreement"). Pursuant to a Stock Purchase Agreement dated as of May 9, 2000, this sale included the sale of the following Pacific Dunlop GNB Corporation subsidiaries: GNB Technologies, Inc. (Delaware); GNB Industrial Battery Company (Delaware); and GNB Battery Technologies Japan Inc. (Delaware). Ex. A.

    b.    the sale by Pacific Dunlop Holdings (Europe) Limited of all outstanding shares of capital stock in GNB Technologies Limited to Exide Holding Europe pursuant to a Stock Purchase Agreement dated as of June 28, 2000 (the "UK Agreement"). Ex. B.

    c.    the sale by P.D. International PTY Limited; and Pacific Dunlop Holdings (Europe) Limited of all outstanding shares of capital stock in GNB Technologies NV to Exide Holdings Europe, pursuant to a Stock Purchase Agreement dated as of June 28, 2000 (the "European Agreement"). This sale included the sale of the following: GNB Technologies NV subsidiaries; GNB Technologies Oy (Finland); GNB Technologies S.A. (France); GNB Technologies GmbH (Germany); and GNB Technologies s.r.l. (Italy). Ex. C.

    d.    the sale by Pacific Dunlop Holdings (Hong Kong) Limited of all outstanding shares of capital stock in GNB Technologies (China) Ltd. to Exide Holding Asia Pte. Limited pursuant to a Stock

4

Purchase Agreement dated as of June 28, 2000 (the "Hong Kong/PRC Agreement"). This sale included the sale of a to be established subsidiary of GNB Technologies (China) Ltd., to be called GNB Technologies (Shenzen) Limited. Ex. D.

e.    the sale by Pacific Dunlop Holdings (Singapore) Pte. Limited of all outstanding shares of capital stock in GNB Technologies (India) Private Limited to Exide Holding Asia Pte. Limited pursuant to a Stock Purchase Agreement dated as of June 28, 2000 (the "India Agreement"). Ex. E.

<u>Singapore Asset Purchase Agreement</u>

f.    the sale by Pacific Dunlop Holdings (Singapore) Pte. Limited of all its rights, assets and property of every kind and description otherwise used in, consumed by or relating exclusively to the Business (subject to specifically excluding certain Assets, including specifically cash) to Exide Singapore Pte. Limited, formerly called Bluewall Pte. Ltd., pursuant to a Stock Purchase Agreement dated as of June 28, 2000 (the "Singapore Agreement"). Ex. F.

The transactions identified in sub-paragraphs a-e above are collectively referred to herein as the "Stock Purchase Agreements." The transactions identified in sub-paragraphs a-f above are those collectively defined herein as the "Sale Agreements". Each seller in the transactions identified in sub-paragraphs a-f above is a Seller or an "International Seller" for the purposes of the Coordinating Agreement and is defined herein as a "PDH Seller". Each buyer in the transactions identified in sub-paragraphs a-f above is a Buyer or an "International Buyer" for the purposes of the Coordinating Agreement and is defined herein as an "Exide Buyer".

7.    The PDH Sellers and the Exide Sellers all intended that the cash held by the Businesses was not to be conveyed to Exide as part of the Sale.

8.    In each of the Stock Purchase Agreements, each Exide Buyer agreed that each PDH Seller had the right to remove and retain all cash held by each company being sold and its subsidiaries. Exs. A, D and E, §5.7(b)(viii); Exs. B and C, § 5.6(b)(viii).

5

9.      In the Singapore Agreement, each Exide Buyer agreed with each PDH Seller that all cash held by the Businesses was specifically excluded from the assets being transferred to that Exide Buyer.  Ex. F, §2.2(a).

10.     The Sale closed on September 30, 2000.

11.     At the time of closing, cash was held in various bank accounts of companies and their subsidiaries sold pursuant to each Stock Purchase Agreement referred to in sub-paragraphs a-e inclusive of paragraph 6 above, as follows:

| Sale Agreement | Account/Company | Amount |
|---|---|---|
| USA Agreement | GNB Canada | 818,630 Canadian Dollars |
| | GNB USA Automotive | 1,330,800 USA Dollars |
| | FSO USA | 91,000 USA Dollars |
| | GNB USA Corporate | 3,843,501 USA Dollars |
| | GNB Japan | 949,516 USA Dollars |
| UK Agreement | GNB Technologies Ltd | 2,262,213 Pounds Sterling |
| European Agreement | GNB Technologies NV | 126,158,352 Belgium Francs |
| | GNB Technologies Oy | 294,693 FNN |
| | GNB Technologies SA | 13,409,947 French Francs |
| | GNB Technologies Gmbh | 186,060 German Marks |
| | GNB Technologies srl | 1,023,778,743 Italian Lire |
| Hong Kong/PRC Agreement | GNB Technologies (China) Ltd. | 791,524 USA Dollars |
| Indian Agreement | GNB Technologies (India) Private Limited | 396,817 USA Dollars |

12.     At the time of closing, cash of the Business sold under the Singapore Agreement was held by the PDH Sellers as follows:

| Sale Agreement | PDH Seller | Amount |
|---|---|---|
| Singapore Agreement | Pacific Dunlop Holdings (Singapore) Pte Ltd | 278,446 USA Dollars |

6

13.    The total of the amount described in paragraphs 11 and 12 above, converted to U.S.A. Dollars under the then prevailing rate of exchange, was approximately $16.6 million (the "Cash Amount").

14.    The Stock Purchase Agreements do not specify a time within which each PDH Seller was required to remove, retain or otherwise obtain any cash held or retained by the company and/or the subsidiaries being sold thereunder.

15.    The cash specified in paragraph 11 was not removed from the accounts of the companies and/or subsidiaries sold pursuant to the Stock Purchase Agreements prior to the closing of the Sale.

16.    After the closing of the Singapore Agreement, employees of the Exide Buyer wrongfully removed cash from bank accounts in the name of the particular PDH Seller, even though cash was an asset specifically excluded from the assets transferred to that particular Exide Buyer.

17.    By the terms of the Sale Agreements, the fact that each PDH Seller did not remove, retain, or otherwise obtain that part of the Cash Amount to which it was entitled prior to the closing of the Sale did not mean that either it or PDH waived the right to obtain the Cash Amount in the future.

18.    By the terms of the Sale Agreements, each Exide Buyer is required to execute and deliver such instruments, documents or other writings as may be reasonably necessary or desirable to carry out and to effectuate fully the intent and purposes of the Sale Agreements.

19.    After the Sale's closing, PDH requested that Exide deliver to it the Cash Amount, consistent with the intent of the parties and the language and purposes of the Sale Agreements and the Coordinating Agreement.

7

20.    PDH's request that Exide deliver to it the Cash Amount acted as a request on behalf of each PDH Seller for each Exide Buyer to execute and deliver instruments, documents and/or other writings which were reasonably necessary to carry out and/or effectuate fully the intent of the parties and the purposes of the Sale Agreements and the Coordinating Agreement.

21.    Exide has refused to furnish PDH with the Cash Amount, in violation of the terms of the Sale Agreements and the Coordinating Agreement, and in violation of the intent of the parties.

22.    Exide's refusal to furnish PDH with the Cash Amount constitutes a refusal to execute and deliver the instruments, documents and/or other writings which were reasonably necessary to furnish PDH, or each PDH Buyer, with the Cash Amount, and which were therefore necessary to carry out and/or effectuate fully the intent and purposes of the Sale Agreements and the Coordinating Agreement.

## COUNT I
### (Breach of Contract)

23.    The PDH Sellers hereby incorporate by reference the allegations of paragraphs 1–22 as if set forth in full herein.

24.    Each Exide Buyer owed certain contractual covenants and obligations pursuant to the Sale Agreements.

25.    The unjustified refusal by or on behalf of each of the Exide Buyers collectively to furnish PDH and the PDH Sellers collectively with the Cash Amount is a breach of the covenants and/or obligations under each of the Sale Agreements.

26.    Each Exide Buyer's breach of its covenants and/or obligations under the Sale Agreements has caused PDH and the PDH  Sellers collectively to suffer a loss of the Cash Amount, in addition to the loss of use of the Cash Amount, and caused PDH Sellers to incur

8

A-0145

significant expenses incurred in connection with bringing this claim, including court filing fees, court costs, witness fees, and reasonable fees in disbursements to legal counsel, investigators, expert witnesses, accountants and other professionals.

27.     Each of the PDH Sellers has performed all of its obligations and satisfied all conditions under the Sale Agreements and the Coordinating Agreement.

28.     Exide and the Exide Buyers must, pursuant to Section 4.2(a)(i) of the Coordinating Agreement, indemnify and hold PDH and each of the PDH Sellers harmless from and against any and all losses and expenses incurred by them in connection with or arising from their breaches of the covenants or agreements described above.

WHEREFORE, PDH and the PDH Sellers respectfully request that the Court Order the following relief in their favor:

a.     judgment against Exide in the amount of $16.6 million, or such other amount to be proved in this matter

b.     pre and post trial interest;

c.     all reasonable expenses incurred in connection with bringing this claim, including court filing fees, court costs, witness fees, and reasonable fees in disbursements to legal counsel, investigators, expert witnesses, accountants and other professionals; and

d.     any other remedy this Court and/or the jury deems just and appropriate.

## COUNT II
### (Unjust Enrichment)

29.     The PDH Sellers hereby incorporates by reference the allegations of paragraphs 1-28 as if set forth in full herein.

30.     Neither the PDH Sellers nor the Exide Buyers intended for the Exide Buyers to retain the Cash Amount after the Sale closed.

9

31.    By the retention of the Cash Amount after the Sale closed the Exide Buyers have unjustly retained a benefit to the PDH Sellers' detriment and have been enriched in an amount equal to the Cash Amount, and pre and post trial interest in a way unanticipated and unintended by the parties and under the express written terms of the Sale Agreements and the Coordinating Agreement, and under the terms of the Sale Agreements, the PDH Sellers are entitled to recover these amounts from each Exide Buyer.

32.    Under the circumstances, and under fundamental principals of justice, equity and in good conscience, none of the Exide Buyers should be permitted to retain the Cash Amount and such other monies as any of them have retained, but should rather be required to furnish PDH and PDH Sellers with cash in the amount equal to the Cash Amount, in addition to all reasonable expenses incurred in connection with bringing this claim, including court filing fees, court costs, witness fees, and reasonable fees in disbursements to legal counsel, investigators, expert witnesses, accountants and other professionals, and pre and post trial interest.

WHEREFORE, PDH and the PDH Sellers respectfully request that the Court Order the following relief in their favor:

a.    judgment against Exide and the Exide Buyers in the amount of $16.6 million, or such other amount to be proved in this matter;

b.    pre and post trial interest;

c.    all reasonable expenses incurred in connection with bringing this claim, including court filing fees, court costs, witness fees, and reasonable fees in disbursements to legal counsel, investigators, expert witnesses, accountants and other professionals; and

d.    any other remedy this Court and/or the jury deems just and appropriate.

10

A-0147

**COUNT III**
**(Conversion)**

33.     The PDH Sellers hereby incorporate by reference the allegations paragraphs 1-32 as if set forth in full herein.

34.     By wrongfully removing the Cash Amount from the various accounts, being held pursuant to the parties' agreements as the property of the PDH Sellers, the Exide Buyers exercised an unauthorized and wrongful assumption of control, dominion, and ownership over a specific chattel of the PDH Sellers, readily identifiable as the Cash Amount.

35.     At all relevant times, the PDH Sellers had the right, and continue to have the right, to the readily identifiable Cash Amount.

36.     At all relevant times, the PDH Sellers had the absolute and unconditional right to immediate possession of the readily identifiable Cash Amount.

37.     Despite repeated demands made by the PDH Sellers upon the Exide Buyers for possession of the Cash Amount, the Exide Buyers continue to exercise unauthorized and wrongful assumption of control, dominion, or ownership of the Cash Amount, and have thereby wrongfully converted the Cash Amount.

WHEREFORE, PDH and the PDH Sellers respectfully request that the Court Order the following relief in their favor:

        a.    judgment against Exide and the Exide Buyers in the amount of $16.6 million, or such other amount to be proved in this matter;

        b.    pre and post trial interest;

11

A-0148

c.   all reasonable expenses incurred in connection with bringing this claim, including court filing fees, court costs, witness fees, and reasonable fees in disbursements to legal counsel, investigators, expert witnesses, accountants and other professionals; and

d.   any other remedy this Court and/or the jury deems just and appropriate.

Respectfully submitted,

**PLAINTIFFS**

Pacific Dunlop Holdings (USA) Inc., Pacific Dunlop Holdings (Europe) Limited, P.D. International PTY Limited, Pacific Dunlop Holdings (Hong Kong) Limited, and Pacific Dunlop Holdings (Singapore) Pte. Limited

By: _____
One of their attorneys

Thomas J. Verticchio, Esq.
Patrick G. Cooke, Esq.
PATZIK, FRANK & SAMOTNY LTD.
150 South Wacker Drive
Suite 900
Chicago IL 60606
(312) 551 8300
(312) 551 1101 (Facsimile)

Of Counsel:

Charles P. Goodell, Jr., Esquire
Linda S. Woolf, Esquire
Ian Gallacher, Esquire
GOODELL, DEVRIES, LEECH & DANN
One South Street, 20th Floor
Baltimore MD 21202
(410) 783-4000
(410) 783-4040 (Facsimile)

12