# **<u>EXHIBIT B</u>**

A-0150

IN THE CIRCUIT COURT OF COOK COUNTY ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

|  |  |  |
|---|---|---|
| PACIFIC DUNLOP HOLDINGS<br>(USA) INC., | )<br>)<br>) |  |
| Plaintiff, | )<br>) | 01L5589 |
| v. | )<br>) | Civil Action No.: |
| EXIDE CORPORATION,<br>d/b/a EXIDE TECHNOLOGIES, | )<br>)<br>) | JURY DEMANDED ON ALL ISSUES<br>SO TRIABLE |
| Defendant. | )<br>) |  |

## COMPLAINT

Plaintiff, Pacific Dunlop Holdings (USA) Inc. for its complaint against Defendant, Exide

Corporation, d/b/a Exide Technologies ("Exide") states:

### NATURE OF THE CASE

1.      During May and June of 2000, Pacific Dunlop Holdings (USA) Inc. ("PDH") and

various related entities (hereinafter collectively referred to as the "PDH Sellers") and Exide

entered into a series of agreements (the "Sale Agreements") whereby the PDH Sellers sold

and/or transferred to Exide various subsidiary entities or assets of subsidiary entities and assets

comprising the GNB world-wide automotive and industrial battery business (the "GNB Sale").

This transaction has already given rise to one lawsuit presently before this Court – Case No. 01 L

008460, pending before the Honorable Sheldon Gardner.[1]

2.      PDH and Exide entered into a separate agreement (the "Coordinating

Agreement"),  which contained certain provisions that had an overarching effect on the

---

[1]      Because of their voluminous nature, and because their terms and provisions are not at issue in this case, the
Sales Agreements have not been attached.  They have been previously filed in this Court in Case 01 L 008460
and are available to the Court should the Court wish to review them.
F:\DATA\DOCS\2942\001\LOC Complaint -- lsw version.doc



transactions contemplated in the Sale Agreements. *See* Coordinating Agreement, attached hereto as Exhibit A. In each of the Sale Agreements and in the Coordinating Agreement, the parties agreed to venue any disputes arising out of the Sale Agreements and/or the Coordinating Agreement in Cook County, Illinois, and agreed to submit to the jurisdiction of the courts of this State. Ex. A, § 5.2.

3.    Pursuant to the terms of an amendment to the Coordinating Agreement executed by the parties on September 29, 2000 - the closing date of the transaction ("Closing") PDH agreed that, for a transitional period after the Closing, it would maintain certain letters of credit issued by third parties to secure certain obligations of GNB. In return, Exide agreed that it would use all commercially reasonable efforts to replace these letters of credit within 180 days of the Closing Date. *See* Amendment No. 3 to Coordinating Agreement, Sec. 7.8 and Schedule 7.8 attached thereto, attached as Exhibit B hereto.

4.    Exide failed to obtain replacement letters of credit or other financial assurances acceptable to the beneficiaries of the letters of credit by the end of the 180 day transitional period agreed to by the parties - April 1, 2001. Exide's failure to do so was a breach of its obligations under Section 7.8 to the Coordinating Agreement. As a result of this breach, PDH was compelled to maintain numerous letters of credit securing the obligations of its former GNB subsidiaries after April 1, 2001, at significant cost to PDH.

5.    In an attempt to resolve its potential claim against Exide arising from this breach and certain other financial issues arising from the GNB Sale, PDH and Exide entered into an Interim Settlement Agreement in July, 2001. *See* July, 2001 Interim Settlement Agreement, attached hereto as Exhibit C. Under that Agreement, Exide agreed, *inter alia*, that it would diligently and without delay complete negotiations with the Zurich Insurance Company to

F:\DATA\DOCS\2942\001\LOC Complaint – lsw version.doc  2

replace letters of credit that secured GNB's obligations arising from future workers compensation claims against policies issued by Zurich or its subsidiaries and affiliates. *See* Exhibit C, at p. 2. Exide further agreed that, if it failed to reach an agreement with Zurich by October 1, 2001, it would pay to PDH an amount equal to the then-remaining value of the letter(s) of credit held by Zurich. *Id.*, pp. 2-3. Exide has breached these contractual obligations.

6.    Under the terms of the Interim Settlement Agreement, Exide also agreed to pay PDH for the actual costs incurred in maintaining the letters of credit identified on Exhibit A to that Agreement from April 1, 2001 until the sooner of: (1) the expiration date of the individual letters of credit; or (2) the date that the individual letters of credit are released by the beneficiary. *See* Exhibit C, at p. 3. Exide has breached this contractual obligation.

7.    On September 8, 2001, Ari Levine, Exide's Deputy General Counsel, wrote to Ian Taylor, a representative of PDH, acknowledging Exide's obligations under the Interim Settlement Agreement, and specifically acknowledging that, if Exide was unable to reach an agreement with Zurich by October 1, 2001, Exide was required to pay PDH the cash value of the security held by Zurich for the workers compensation policies. *See* September 8, 2001 Levine e-mail, attached as Exhibit D, at p. 2, Section 2.

8.    Exide failed to reach an agreement regarding replacement of the GNB letters of credit with Zurich by October 1, 2001. Notwithstanding its explicit agreement in the Interim Settlement Agreement, Exide has failed to pay the face value the letter(s) of credit held by Zurich's security to the PDH Sellers.

9.    The face value of Zurich's security is presently calculated to be $2,972,504.

10.    Exide has failed to reimburse PDH for the costs PDH has incurred in maintaining the letters of credit listed on Exhibit A of the Interim Settlement Agreement since April 1, 2001.

F:\DATA\DOCS\2942\001\LOC Complaint – lsw version.doc  3



As of this date, PDH has incurred costs of maintaining the letters of credit in the amount of $171,914.24.[2]

## COUNT I
### (Breach of Contract)

11.    PDH hereby incorporates by reference the allegations of paragraphs 1-10 as if set forth in full herein.

12.    Exide breached its obligations under Section 7.8 of Amendment No. 3 to the Coordinating Agreement by failing to obtain replacement security for letters of credit maintained by PDH for the former GNB within 180 days of the Closing.

13.    In an effort to resolve PDH's claim arising from this breach, PDH and Exide entered into the Interim Settlement Agreement, pursuant to which Exide agreed to replace the Zurich letters of credit no later than October 1, 2001 or to pay PDH the face value of the letter(s) of credit.

14.    Exide's failure to pay PDH the face value of the Zurich letter(s) of credit and the costs of maintaining the letters of credit identified on Exhibit A to the Interim Settlement Agreement is a breach of Exide's explicit obligations under the Interim Settlement Agreement.

15.    As a direct and proximate result of Exide's breach of its obligations under the Interim Settlement Agreement, PDH has incurred damages in the amount of $3,144,418.24[3], in addition to the loss of the use of that amount and continuing costs to maintain letters of credit. Additionally, PDH has incurred significant expenses in connection with bringing this claim,

---

2    The $171,914.24 figure reflects the costs incurred by PDH in maintaining the letters of credit listed on Exhibit A of the Agreement as of the end of the quarter ending September 2001. The amount of costs incurred by PDH will continue to increase until this matter is resolved.
3    Calculated as the sum of the present face value of Zurich's security ($2,972,504) and the current aggregate cost of maintaining the letters of credit ($171,914.24).
F:\DATA\DOCS\2942\001\LOC Complaint – lsw version.doc  4



## COORDINATING AGREEMENT

This COORDINATING AGREEMENT dated May 9, 2000 (the "Agreement") is executed by and between Exide Corporation, a Delaware corporation ("Buyer") and Pacific Dunlop Holdings (USA) Inc., a Delaware corporation ("Seller").

### RECITALS

A.    The parties hereto have agreed that Buyer and certain subsidiaries of Buyer (the "International Buyers") will purchase from the Seller and certain Affiliates of Seller (the "International Sellers") the businesses more particularly described in and conveyed under the Sale Agreements as defined below (collectively, the "Business").

B.    To effect the foregoing, following the execution of this Agreement, Buyer and the International Buyers, on the one hand, and, Seller or the International Sellers, on the other hand, will execute individual asset or share purchase agreements, which are described on Exhibit A hereto, including the U.S. Agreement (as defined herein) which is being executed by Buyer and Seller simultaneously herewith (collectively, the "Sale Agreements"), pursuant to which the Seller or one or more of the International Sellers will agree to sell, and the Buyer or one or more of the International Buyers will agree to purchase, the assets or capital shares owned by the Seller or the International Sellers (the "Purchased Assets"), that, together with certain liabilities that Buyer or the International Buyers will agree to assume (the "Assumed Liabilities"), in the aggregate constitute the Business, on the terms and conditions set forth in the Sale Agreements.

C.    Pursuant to this Agreement and in connection with the Buyer's acquisition of the Business, the Seller is delivering to Buyer certain financial statements of the Business.

D.    In order effectively and efficiently to coordinate the acquisition of the Business by means of the multiple Sale Agreements, the parties hereto desire to provide in a single document certain provisions that have overarching effect on the transactions contemplated by the Sale Agreements, such as (i) the adjustment of the purchase price paid pursuant to the Sale Agreements under the circumstances described in this Agreement, (ii) the Seller's representation and warranty regarding the financial statements referred to in Recital C, and (iii) the resolution of any unintended inconsistencies or conflicts between or among the terms of the Sale Agreements.

E.    The parties hereto further desire to provide for a single avenue of recourse for indemnification claims arising under the Sale Agreements and have therefore agreed that all claims for indemnity against losses or claims resulting from breaches of obligations, representations or warranties under the Sale Agreements or this Agreement will be addressed exclusively under this Agreement.

**A-0160**

NOW THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, and in exchange for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1.

## DEFINITIONS

Section 1.1    Definitions. In this Agreement, the terms set forth below have the meanings specified or referred to in this Section 1.1 and shall be equally applicable to both the singular and plural forms. Unless otherwise defined herein, all capitalized terms used in this Agreement shall have the meanings ascribed to them in the U.S. Agreement.

"Accounting Report" has the meaning specified in Section 2.l(b)(ii) of this Agreement.

"Action" means any lawsuit, arbitration, regulatory, governmental or other proceeding or investigation, whether at law or in equity.

"Additional Accounting Firm" has the meaning specified in Section 2.1(d) of this Agreement.

"Additional Accounting Firm Adjustments" has the meaning specified in Section 2.1(d)(ii) of this Agreement.

"Affiliate" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person, including, but not limited to, those affiliates that have executed this Agreement.

"Agreed Accounting Principles" has the meaning specified in Section 2.1(a) of this Agreement.

"Agreed Adjustments" has the meaning specified in Section 2.1(d) of this Agreement.

"Agreed Rate" means the prime rate published by The Wall Street Journal, as that rate may vary from time to time, or if that rate is no longer published, a comparable rate.

"Agreement" has the meaning specified on the first page of this Agreement.

"Assumed Liabilities" has the meaning specified on the first page of this Agreement.

-2-

"Audited Closing Date Balance Sheet" has the meaning specified in Section 2.1(b) of this Agreement.

"Business" has the meaning specified on the first page of this Agreement.

"Business Day" means a day other than Saturday, Sunday or a day on which United States national banks are closed.

"Buyer" has the meaning specified on the first page of this Agreement. As used in Articles 1 and 3 to 7, inclusive, Buyer shall be deemed to mean Buyer and/or (as the context may require) any International Buyer.

"Claim Notice" has the meaning specified in Section 4.3(a) of this Agreement.

"Customer Information" has the meaning specified in Section 6.3 of this Agreement.

"Data Room" means the information compiled by Seller and made available to Buyer at the offices of Seller's counsel in Chicago, Illinois for due diligence purposes in connection with the transactions contemplated by the Sale Agreements, which documents are more particularly described in the "GNB Technologies Due Diligence Master Index" dated April 17, 2000, as amended from time to time.

"Employee Leave Benefits" means the aggregate amount of all vacation pay, long service leave, holiday pay or similar employee entitlement to which Transferring Employees would legally have been entitled had each such employee resigned from employment in the Business at the Closing Date.

"Expenses" means any and all reasonable expenses incurred in connection with investigating, defending or asserting any Action or overtly threatened Action (including court filing fees, court costs, arbitration fees or costs, witness fees, and reasonable fees and disbursements of legal counsel, investigators, expert witnesses, accountants and other professionals).

"Final Closing Date Balance Sheet" has the meaning specified in Section 2.1(c) of this Agreement.

"Financial Statements" has the meaning specified in Section 3.1 of this Agreement.

"GNB Companies" means any company, all the stock or the business of which is acquired pursuant to one or more of the Sale Agreements by the Buyer.

"Governmental Body" means any Australian, European, New Zealand, United States, or other national, state, or local governmental authority, agency, or regulatory body.

-3-



"Indemnified Party" has the meaning specified in Section 4.3(a) of this Agreement.

"Indemnitor" has the meaning specified in Section 4.3(a) of this Agreement.

"International Buyers" has the meaning specified on the first page of this Agreement.

"International Sellers" has the meaning specified on the first page of this Agreement.

"June 30, 1999 Balance Sheet" has the meaning specified in Section 3.1 of this Agreement.

"KPMG" has the meaning specified in Section 2.1(a) of this Agreement.

"Losses" means losses, liabilities, settlement payments. awards. judgments. fines, assessments. penalties, and damages.

"March 31, 2000 Balance Sheet" has the meaning specified in Section 3.1 of this Agreement.

"Negative Purchase Price Adjustment" has the meaning specified in Section 2.2(a) of this Agreement.

"Non-Compete Period" has the meaning specified in Section 6.1 of this Agreement.

"Objection Period" has the meaning specified in Section 2.1(c) of this Agreement.

"Person" means any individual. corporation. partnership, limited liability company or corporation, joint venture, association, joint-stock company, trust, unincorporated organization or Governmental Body.

"Positive Purchase Price Adjustment" has the meaning specified in Section 2.2(a) of this Agreement.

"Preliminary Closing Date Balance Sheet" has the meaning specified in Section 2.1(a) of this Agreement.

"Price Adjustment Statement" has the meaning specified in Section 2.1(b)(i) of this Agreement.

-4-

A-0163



"**Purchase Price**" means the aggregate of the cash purchase prices paid pursuant to the Sale Agreements, being Three Hundred and Thirty-Three Million United States Dollars (US $333,000,000).

"**Purchase Price Adjustment Due Date**" has the meaning specified in Section 2.2(b) of this Agreement.

"**Purchased Assets**" has the meaning specified on the first page of this Agreement.

"**Qualifying Claim**" has the meaning specified in Section 4.1(b)(i) of this Agreement.

"**Real Property**" has the meaning specified in each of the Sale Agreements.

"**Requirements of Law**" means any foreign, federal, state or local law, statute, regulation, code or ordinance of any Governmental Body currently in effect.

"**Resolution Period**" has the meaning specified in Section 2.1(d) of this Agreement.

"**Review Commencement Date**" has the meaning specified in Section 2.1(e)(i) of this Agreement.

"**Sale Agreements**" has the meaning specified on the first page of this Agreement.

"**Seller Entities**" has the meaning specified in Section 5.5 of this Agreement.

"**Tax**" (and, with correlative meaning, "**Taxes**" and "**Taxable**") means any federal, state, county, local or foreign income, alternative or add-on minimum, gross income, gross receipts, capital gains, capital, property, sales, use, transfer, license, excise, premium, lease, estimated, environmental, registration, value added, stamp, real property, franchise, employment, payroll, wage, withholding or minimum tax, ad valorem, stamp duty, customs duty, any other similar taxes or governmental charges, fees, levies, assessments or liabilities of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, and includes any interest, penalty or fine, or addition to tax imposed by any Governmental Body.

"**Transferring Employees**" means all employees of the Business who accept employment with the Buyer or one of its Affiliates, or who are employed by one of the GNB Companies purchased by the Buyer or one of its Affiliates.

"**U.S. Agreement**" means the Stock Purchase Agreement by and between Buyer and Seller concerning the purchase and sale of Seller's United States business and operations.

A-0164

ARTICLE 2.

PURCHASE PRICE ADJUSTMENT

Section 2.1    Determination of Final Closing Date Balance Sheet.

(a)    As soon as possible following the Closing Date (but not later than sixty (60) days after the Closing Date), Buyer shall cause to be prepared a balance sheet as of the Closing Date setting forth in reasonable detail the total assets and total liabilities of the Business (the "Preliminary Closing Date Balance Sheet") and deliver same to Seller and to KPMG Peat Marwick LLP or its successor ("KPMG"). The Preliminary Closing Date Balance Sheet shall be prepared in accordance with generally accepted accounting principles consistent with those employed in the preparation of the June 30, 1999 Balance Sheet and the March 31, 2000 Balance Sheet ("Agreed Accounting Principles"). Notwithstanding the foregoing, the parties agree that:

(i)    the Preliminary Closing Date Balance Sheet and the March 31, 2000 Balance Sheet shall not reflect (and/or no consideration will be given to) an accrual or provision for "Closure, restructuring and other reserves" which was presented as $9,571,000 on the March 31, 2000 Balance Sheet;

(ii)    the fixed assets of the Business will be valued on the Preliminary Closing Balance Sheet in the amounts set forth in the March 31, 2000 Balance Sheet subject only to ordinary depreciation, plus any capital expenditures (less disposals) after March 31, 2000; and

(iii)    the inventory of the Business shall be determined using the results of a physical inventory of the Business near the Closing Date as agreed to by the parties.

KPMG and Seller and Buyer and its auditors shall have the opportunity to observe the taking of physical inventories.

(b)    Promptly following delivery of the Preliminary Closing Date Balance Sheet to Seller, Seller shall cause KPMG to conduct a special audit of the Preliminary Closing Date Balance Sheet, which special audit shall be completed not later than sixty (60) days after delivery of the Preliminary Closing Date Balance Sheet to Seller. Upon completion of the special audit, Seller shall cause KPMG to deliver to each of Seller and Buyer:

(i)    a "Price Adjustment Statement" of the Business which will reflect changes in inventories, prepaid expenses, trade receivables net of allowance, trade accounts payable, accrued salaries, wages and other compensation, warranty reserves and other accrued expenses (as such

-6-

accounts are defined in the June 30, 1999 Balance Sheet and the March 31, 2000 Balance Sheet), in each case since March 31, 2000, plus an amount equal to any capital expenditures: (A) made after March 31, 2000 that are permitted by Section 5.7 and Section 7.3(b) and that are described in Schedule 7.3(B) to the U.S. Agreement, (or the corresponding schedules of the other Sale Agreements) plus (B) any other capital expenditures made in the ordinary course of business since March 31, 2000, minus ordinary depreciation and disposals of such capital assets and casualty losses (net of expected insurance proceeds) of such capital assets plus an amount equal to the amount of tax benefit, but in no event more than One Million United States Dollars (US $1,000,000), on the Employee Leave Benefits and future retiree medical benefits accrued (on a country-by-country basis) with respect to all Transferring Employees as at the Closing Date (collectively, the "Adjustable Accounts"); and

(ii)  an audit report stating (without qualification) that, in KPMG's opinion, the Preliminary Closing Date Balance Sheet, including the financial information in the Price Adjustment Statement referred to in Section 2.1 (b)(i), as audited by such firm, has been prepared in accordance with the Agreed Accounting Principles except as provided in Section 2.1 (a)(i) and (ii) (such summary, Price Adjustment Statement and audit report are herein referred to as the "Accounting Report").

The Preliminary Closing Date Balance Sheet, as so determined, is herein referred to as the "Audited Closing Date Balance Sheet." The parties shall make available to KPMG all books, records and other information that KPMG may request to issue its Accounting Report. The fees and expenses of KPMG related to the special audit of the Preliminary Closing Date Balance Sheet hereunder shall be paid by Seller.

(c)  Promptly following the delivery of the Accounting Report to Buyer, Buyer and its auditors and advisors may review the same and, within thirty (30) days after such delivery (the "Objection Period"), Buyer may deliver to Seller a certificate (signed by an officer of Buyer) setting forth its objections, if any, only to the values shown for the Adjustable Accounts on the Audited Closing Date Balance Sheet, together with a summary of the reasons therefor and calculations which, in Buyer's view, are necessary to eliminate such objections. In the event Buyer does not so object within the Objection Period, the Audited Closing Date Balance Sheet shall be final and binding as the "Final Closing Date Balance Sheet".

(d)  In the event Buyer objects within the Objection Period, then within thirty (30) days following Buyer's delivery to Seller of the certificate referenced in Section 2.1(c), (the "Resolution Period"), the Buyer and Seller shall use their reasonable efforts to resolve by written

-7-

A-0166

amount equal to the actual increase or decrease occurring with respect to that particular category of Purchased Asset or Assumed Liability. Any difference between the total amount of the adjustment to the Purchase Price and the amount of such adjustment due to changes in value of the tangible Purchased Assets or Assumed Liabilities as to which the Purchase Price has been otherwise allocated, shall be allocated to or deducted from intangible assets.

## ARTICLE 3.

## FINANCIAL STATEMENTS

Section 3.1   Financial Statements.  Attached to this Agreement as Exhibit B is a copy of the audited combined statements of assets, liabilities and shareholders' equity and audited combined statements of operations of the Business at and for the years ended June 30, 1998 and 1999, together with the notes thereto and the independent auditors' reports thereon, including the audited balance sheet of the Business as at June 30, 1999 together with the notes thereto (the "June 30, 1999 Balance Sheet").  Seller will deliver by May 19, 2000, a copy of the unaudited combined statements of assets, liabilities and shareholders' equity and combined statements of operations of the Business at and for the nine months ended March 31, 2000, including the unaudited balance sheet of the Business as at March 31, 2000 together with the notes thereto (the "March 31, 2000 Balance Sheet").  The financial statements attached hereto as Exhibit B and to be delivered by Seller pursuant to this Section 3.1 are referred to collectively as the "Financial Statements".

Section 3.2     Representation and Warranty.  Seller hereby represents and warrants to Buyer that the Financial Statements have been prepared from the books and records of the Business and have been restated as described in the notes thereto.  Subject to the matters described in the last sentence of this Section 3.2 and the qualifications set forth in the applicable auditors' reports and notes to the Financial Statements, the Financial Statements fairly present, in all material respects, and on a consistent basis (except as described in the applicable notes) the financial position and results of operations of the Business at the dates and for the periods covered (in conformity with U.S. generally accepted accounting principles).

-11-

A-0170



the amount of payment is after taxes. The payor shall have the sole right to control the Tax audit referenced in this Section 4.6 with respect to such payment.

## ARTICLE 5.

### COORDINATING MATTERS

Section 5.1     Taxes. On a world-wide basis, all Taxes, recording fees, personal property taxes, title application fees, patent and trademark assignment registration fees, and such other transfer taxes and fees arising by virtue of the transfer of the Purchased Assets from Seller or the International Sellers, as the case may be, to Buyer pursuant to the Sale Agreements (other than Taxes based upon the net income or capital gain of Seller or their Affiliates arising out of the transactions contemplated thereby) shall be paid as follows:  (i) Buyer shall pay the first Two Million United States Dollars (US $2,000,000) of such Taxes plus any transfer taxes resulting from the making of a Section 338(h)(10) Election and (ii) Seller shall pay the amount of such Taxes in excess of the amounts to be paid by Buyer pursuant to Section 5.1(i).

Section 5.2     Venue; Submission to Jurisdiction; Governing Law. For purposes of this Agreement, the Sale Agreements, and the transactions contemplated hereby and thereby (but not for the purposes of enforcing any guaranty of the indemnity obligations of the Seller pursuant to Article 4 of this Agreement (a "Guaranty Agreement")), each of the parties hereto (for themselves and for their Affiliates) agrees that any and all disputes, legal actions, suits, or proceedings arising out of or relating to claims arising under this Agreement, the Sale Agreements, or the transactions contemplated hereby and thereby, whether legal or equitable in nature, or arising out of contract, tort, Requirements of Law, for contribution or otherwise, shall be brought solely in a state or federal court located in the County of Cook, State of Illinois.  By their signature to this Agreement, the parties, regardless of their residence, each irrevocably submits to the jurisdiction of the courts located in the County of Cook, State of Illinois, in any dispute, legal action, suit or proceeding arising out of or relating to this Agreement, the Sale Agreements, or the transactions contemplated hereby or thereby other than any Guaranty Agreement. Each of the parties acknowledges that it has freely agreed to so submit to jurisdiction and venue, and that without such agreement the courts located in the County of Cook, State of Illinois might not otherwise have jurisdiction over each of such parties.  This Agreement and the Sale Agreements shall be governed by and construed in accordance with the internal laws of the State of Illinois, without giving effect to any choice of law provisions which may direct the application of the laws of another jurisdiction. The initiation or maintenance of any Action by any Affiliate of Buyer or Seller in contravention of this Section 5.2 will constitute a breach by the Buyer or the Seller, as the case may be, of their covenant hereunder.

Section 5.3     Waiver. For purposes of this Agreement, the Sale Agreements, and the transactions contemplated hereby and thereby other than any Guaranty Agreement, each of the parties hereby irrevocably waives all claims of immunity from jurisdiction, attachment and execution to which it might otherwise be entitled in any legal action or proceeding brought in any state or

-19-

A-0177



materials and appropriate officers and employees for participation in discussions in connection therewith.

(c)    The Seller Entities shall not (and shall not permit any of their representatives or advisors to) (i) solicit, initiate, or encourage the submission of any proposal or offer from any Person relating to the acquisition of any stock or assets constituting part of the Business (including any acquisition structured as a merger, consolidation, or share exchange) or (ii) participate in any discussions or negotiations regarding, furnish any information with respect to, assist or participate in, or facilitate in any other manner any effort or attempt by any Person to do or seek any of the foregoing. No Seller Entity shall vote any shares of capital stock, including, but not limited to, the Shares, in favor of any such acquisition structured as a merger, consolidation, or share exchange. Seller shall immediately notify Buyer if any Person makes any proposal, offer, inquiry, or contact with respect to any of the foregoing.

(d)    Buyer shall not (and shall not permit any of its representatives or advisors to) solicit, initiate or encourage the submission of any proposal or offer from any Person relating to the acquisition of more than 40% of the voting securities of, or all or substantially all of the assets of, Buyer (including any acquisitions structured as a merger, consolidation or share exchange). Buyer shall immediately notify Seller if any Person makes any proposal, offer, inquiry or contact with respect to any of the foregoing.

(e)    Buyer and Seller covenant and agree that not later than June 19, 2000, the International Buyers and the International Sellers will enter into Sale Agreements to effect (i) the transfer of businesses affiliated with the Subsidiaries that are operated in Australia, New Zealand, U.K., Europe, the People's Republic of China, Hong Kong, Singapore, and India as further described in the chart dated April 24, 2000 and titled "Structure of GNB Worldwide" provided by Seller to Buyer and (ii) the transfer of certain trademarks. These agreements are referred to herein as the "ROW Agreements." Buyer and Seller further covenant and agree that: (i) the ROW Agreements will provide for closing of the transactions contemplated thereby simultaneously with the Closing, and (ii) the substantive provisions of the ROW Agreements will parallel the substantive provisions of this Agreement, modified only for compliance with local law. The ROW Agreement covering the sale of that portion of the business located in Australia shall contain a covenant not to compete from the sellers thereunder, which covenant not to compete shall be on generally the same terms and conditions as the covenant not to compete contained in Section 6 of this Agreement, including, without limitation, with respect to the global scope and five-year duration of such covenant not to compete. Upon execution of the ROW Agreements, Buyer shall cause the International Buyers and Seller shall cause the International Sellers to become parties to this Agreement by executing and delivering signature pages to this Agreement. Upon such execution and delivery, the International Buyers and the International Sellers will be subject to the obligations imposed on them and entitled to the benefits afforded to them by this Agreement.

(f)    Buyer and Seller covenant and agree that not later than June 12, 2000:

-21-

A-0179



      (i)      Seller shall deliver final Disclosure Sched·..es to the U.S. Agreement and to this Agreement as contemplated by <u>Section 5.7</u> hereof;

      (ii)     Buyer and Seller shall agree on the ROW Business Allocation as set forth in the U.S. Agreement; and

      (iii)    Buyer shall have determined whether or not it will make the 338(h)(10) Election.

Section 5.6   <u>Buyer's Conditions to Closing</u>.  Notwithstanding any provision to the contrary herein or in any Sale Agreement, the obligations of Buyer and the International Buyers under this Agreement and each Sale Agreement shall be subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions:

      (a)     Buyer shall have obtained the financing necessary to consummate the transactions contemplated hereby and such financing shall not have been terminated or withdrawn and all of the conditions precedent to Buyer's receipt of such financing shall be satisfied or waived in writing, including, without limitation, that there shall have been a roadshow completed by Buyer and its financing sources (with the assistance of Seller) with respect to the sale by Buyer of senior subordinated notes (or other securities) to fund a portion of the Purchase Price.

      (b)     Prior to the Closing Date, all of the obligations reflected in the item "Closure, restructuring and other reserves" in the March 31, 2000 Balance Sheet shall have been fully performed by Seller and the International Sellers.

Section 5.7.   <u>Due Diligence Termination Right</u>.

      (a)     Notwithstanding any provision to the contrary herein or in any Sale Agreement, at any time on or prior to June 19, 2000, Buyer may terminate this Agreement and the Sale Agreements if Buyer and its financing sources, in their sole judgment, are not satisfied in all respects with the results of their due diligence review of all or any part of the Business, including, without limitation, their review of business, financial, legal, environmental and accounting matters relating to the Business. It is expressly understood by the parties hereto: (i) that, as of the date of this Agreement, Buyer has not reviewed the Disclosure Schedules to the U.S. Agreement and to this Agreement provided by Seller and therefore Buyer's rights under this paragraph shall not be limited in any manner by any disclosure in such Disclosure Schedules as they existed on the date hereof or as modified pursuant to (ii) below; (ii) that at any time on or prior to June 12, 2000 , Seller shall be entitled to provide to Buyer modified Disclosure Schedules to the U.S. Agreement and to this Agreement which Disclosure Schedules, as modified, will constitute the final Disclosure Schedules to the U.S. Agreement (except for <u>Schedule 5.19(J)</u> to the U.S. Agreement, which may be updated through the Closing) and to this Agreement; and (iii) that Buyer's right to terminate this Agreement pursuant to this <u>Section 5.7</u> shall include the right to terminate if Buyer is not satisfied, in its sole

-22-

discretion, with the Disclosure Schedules to the U.S. Agreement and to this Agreement as they exist on the date hereof or as they may be modified pursuant to (ii) of this Section 5.7.

(b)    Notwithstanding any provision to the contrary herein or in any Sale Agreement, at any time on or prior to June 19, 2000, Seller may terminate this Agreement and the Sale Agreements if Seller, in its reasonable judgment, determines during its due diligence review of all or any part of the Buyer's business, including without limitation, its review of business, financial, legal, environmental and accounting matters relating to the Buyer's business, that any of the matters disclosed during such review would have an adverse effect on the value of the Buyer Shares.

## ARTICLE 6.

## COVENANT NOT TO COMPETE

Section 6.1    Non-Competition.  Seller hereby agrees, for itself and its Affiliates that neither it nor any of its Affiliates shall, directly or indirectly during the period of time commencing on the date hereof and continuing until five (5) years from the Closing Date (the "Non-Compete Period"), whether alone or together in association with others. and whether as a principal, agent, owner, shareholder, officer, director, partner, member. manager. operator. employee, proprietor. investor, independent contractor, licensor, licensee. co-venturer, consultant, or in any other capacity whatsoever, engage in the Business or invest in, or have a financial interest in, or be in any way affiliated with, any Person engaged in the Business, anywhere in the world.  Seller agrees with Buyer that the geographic scope of this covenant not to compete is the result of arm's length bargaining and is fair and reasonable in light of the nature of the operations of the Business and the fact that some or all facets of the Business have competed with competitors throughout the world.  The parties intend that the covenant contained in this Article 6 shall be construed as a covenant not to compete that is enforceable under applicable law.  If in any judicial proceeding a court of competent jurisdiction shall refuse to enforce the foregoing covenant not to compete according to its terms, the parties shall negotiate in good faith to modify or limit the scope of this covenant in a manner they believe, after consultation with their respective counsel. will result in the covenant being enforced in the pending judicial proceeding, it being the intent of this provision that Buyer shall at all times have the benefit of the foregoing covenant not to compete. except to the extent as may be required to be limited or modified by applicable law or a judgment of a court or competent jurisdiction.

Section 6.2    Intellectual Property.  Commencing on the Closing Date and continuing in perpetuity, Seller shall not use, and shall cause its Affiliates not to use, any Intellectual Property, except to the extent that such Intellectual Property: (i) must be disclosed to comply with applicable laws and regulations, (ii) becomes known to the public, before or after disclosure to Buyer, other than by act or omission of Seller or its Affiliates, (iii) is lawfully disclosed to Seller by a Person having the right to disclose it to Seller, or (iv) is otherwise in the public domain.

Section 6.3    Customer Information.  Seller acknowledges and agrees that all customer information (including but not limited to lists or billing information) of PDGNB and the Subsidiaries

-23-

A-0181



(the "<u>Customer Information</u>") is confidential and proprietary to such entity. Following the Closing, Seller agrees to refrain from and to cause each of its Affiliates to refrain from, utilizing any and all Customer Information for any purpose involving competition with Buyer, including without limitation marketing or selling such information.

Section 6.4    <u>Remedy</u>.  The parties hereto acknowledge and agree that the covenants contained in this <u>Article 6</u> are reasonable and necessary for the protection and continued viability of the Business and that a breach of such covenants would cause Buyer serious loss and damage.  The parties agree that in the event of an actual or threatened breach of such covenants, Buyer shall be entitled to obtain an injunction restraining Seller or any of its Affiliates from violating or continuing to violate such covenants. Nothing herein shall be construed from prohibiting Buyer from pursuing such other remedies as may be available to it for such breach, including the recovery of damages.

ARTICLE 7.

MISCELLANEOUS

Section 7.1    <u>Notice</u>.  Any notice, request, instruction or other document to be given hereunder shall be in writing and: (a) delivered personally; (b) sent by Federal Express or other similarly reputable overnight courier; or (c) transmitted by facsimile, according to the instructions set forth below.  Such notices shall be sent to the following addresses and/or facsimile numbers and shall be deemed given: (x) if delivered personally, at the time delivered; (y) if sent by Federal Express or other similarly reputable overnight courier, at the time delivered to such courier, or (z) if transmitted by facsimile, at the time when receipt is confirmed by the sending facsimile machine.

If to Seller or any of the International Sellers, to:

Pacific Dunlop Holdings (USA) Inc.
6121 Lakeside Drive, Suite 200
Reno, Nevada 89511
United States of America
Attention:    President
Facsimile:    702-824-4626

with a copy to:

Gardner, Carton & Douglas
321 N. Clark Street
Suite 3400
Chicago, Illinois 60610
United States of America
Attention:    Mr. Robert J. Wilczek
Facsimile:    312-644-3381

-24-

A-0182



If to Buyer, to:

Exide Corporation
2901 Hubbard Road
Ann Arbor, MI 48105
United States of America
Attention:    General Counsel
Facsimile:    734-877-2575

with a copy to:

Kirkland & Ellis
200 E. Randolph Drive
Chicago, Illinois 60601
Attention:    Mr. Carter W. Emerson. P.C.
Facsimile:    312-861-2200

or to such other address as such party may indicate by a notice delivered to the other parties hereto in accordance with the provisions of this Section 7.1.

Section 7.2    Successors and Assigns.

(a)    Except as permitted by this Section 7.2. the rights of Buyer. Seller and the International Sellers pursuant to this Agreement or any of the Sale Agreements shall not be assignable by such party without the prior written consent of the other parties; provided, however, that no such assignment shall relieve the assigning party from any of its duties or obligations under this Agreement or any of the Sale Agreements.

(b)    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns. Nothing in this Agreement, express or implied, is intended or shall be construed to confer upon any Person other than the parties and successors and assigns permitted by this Section 7.2 any right, remedy, benefit or claim under or by reason of this Agreement.

Section 7.3    Entire Agreement; Amendments.  This Agreement, the Sale Agreements and the other agreements and documents to be delivered pursuant to the Sale Agreements contain the entire understanding of the parties hereto with regard to the subject matter contained herein, and supersede all prior written or oral agreements, understandings or letters of intent between the parties hereto, with respect to the subject matter hereof.  The Sale Agreements and all Schedules and Exhibits thereto are incorporated herein by this reference.  This Agreement shall not be amended, modified or supplemented except by a written instrument signed by an authorized representative of each of the parties hereto.  In the event of a dispute or inconsistency between any of the Sale Agreements and this Agreement, the terms of this Agreement shall prevail.

-25-

A-0183

Section 7.4   **Interpretation**. Section headings are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

Section 7.5   **Waivers**. Any term or provision of this Agreement may be waived, or the time for its performance may be extended, pursuant to a written action by the party entitled to the benefit thereof. The failure of either party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of such party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

Section 7.6   **Partial Invalidity**. Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

Section 7.7   **Execution in Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement, and shall become binding when one or more counterparts have been signed by each of the parties hereto and delivered to each of Seller and Buyer.

* * * * * *

-26-

A-0184

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

SELLER:

PACIFIC DUNLOP HOLDINGS (USA) INC.

By: _Stephen C Newling_
Name: _Stephen C Geeling_
Title: _Vice President Finance_

BUYER:

EXIDE CORPORATION

By: _____
Name: _____
Title: _____

*SIGNATURE PAGE TO COORDINATING AGREEMENT*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

SELLER:

PACIFIC DUNLOP HOLDINGS (USA) INC.

By: _____

Name: _____

Title: _____

BUYER:

EXIDE CORPORATION

By: _____

Name: ROBERT A. LUTZ

Title: CHAIRMAN, PRESIDENT + CEO

*SIGNATURE PAGE TO COORDINATING AGREEMENT*

A-0186



**Exhibit A**

**Sale Agreements**

Stock Purchase Agreement With Respect To Pacific Dunlop GNB Corporation dated as of even date herewith between Buyer and Seller.

Asset Purchase Agreement among Pacific Dunlop Holdings (N.Z.) Limited, _____ and Buyer.

Asset Purchase Agreement among GNB Battery Technologies Ltd., Australian Battery Company (Aust.) Pty Ltd., Pacific Dunlop Limited, _____ and Buyer.

Agreement for the Sale and Purchase of the Entire Issued Share Capital of GNB Technologies NV among P.D. International Pty. Limited, Pacific Dunlop Holdings (Europe) Ltd., _____ and Buyer.

Agreement for the Sale and Purchase of the Entire Issued Share Capital of GNB Technologies Limited among Pacific Dunlop Holdings (Europe) Ltd., _____ and Buyer.

Stock Purchase Agreement with respect to GNB (China) Limited among [____] and Buyer.

Asset Purchase Agreement among Pacific Dunlop Holdings (China) Co., Ltd., _____ and Buyer.

Asset Purchase Agreement among Pacific Dunlop Holdings (Singapore) Pte Ltd, _____ and Buyer.

Stock Purchase Agreement with respect to GNB Technologies (India) Private Limited among Pacific Dunlop Holdings (Singapore) Pte Ltd, _____ and Buyer.

Purchase Agreement among PD Licensing Pty Ltd, _____, and Buyer.

**EXHIBIT B**

A-0188

**Exhibit B**

**Financial Statements**

A-0189

GARDNER CARTON DOUGLAS-CHICAGO  1 312 644 3381;    10/13/00  2:26PM;*JetFax* #204;Page 2

1 312 644 335:

(d)

# AMENDMENT NO. 3 TO
## COORDINATING AGREEMENT

This AMENDMENT NO. 3, dated September 29, 2000, is to that certain Coordinating Agreement dated as of May 9, 2000 (the "Coordinating Agreement"), which was executed by and between Exide Corporation, a Delaware corporation ("Buyer"), and Pacific Dunlop Holdings (USA) Inc., a Delaware corporation ("Seller"), as amended by Amendment No. 1 dated June 19, 2000 and Amendment No. 2 dated June 28, 2000, is executed by and between Buyer and Seller.

The parties desire to supplement and amend the Coordinating Agreement to provide for a procedure intended to permit an efficient and expeditious closing of the transactions contemplated by the Stock Purchase Agreement upon the satisfaction of the conditions thereto.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Except as expressly amended hereby, the Agreement, as previously amended on June 19, 2000 and June 28, 2000, remains in full force and effect.  Unless otherwise defined herein, capitalized terms used in this Amendment No. 3 shall have the meanings assigned to them in the Agreement.

2.      Section 1.1 is hereby amended to delete the existing definition of "Price Adjustment Statement" and to add the following definitions:

"Preliminary Price Adjustment Statement" has the meaning specified in Section 2.1(b)(i) of this Agreement.

"Price Adjustment Statement" means the Preliminary Price Adjustment Statement after giving effect to the Agreed Adjustments and the Additional Accounting Firm Adjustments, if any.

3.      Section 2.1(a) is hereby amended to delete the words "the Closing Date" where appearing as the last three words of the second line thereof, and replacing them with "September 30, 2000". It is the intention of the parties that no adjustment of the purchase price will result from events that occur after the close of business on the Closing Date, except for events occurring in the ordinary course of business.  Section 2.1(a) is further hereby amended to add the following language thereto as a new subsection (iv):

(iv)    reserves, in the following amounts, shall be created by Seller prior to Closing:

| | |
|---|---|
| Environmental | US$19,000,000 |
| Warranty reserves | 5,600,000 |
| Quicksmart (A/P and Accruals) | 800,000 |
| Medical Benefits (Accrued Exp) | 900,000 |

A:\Amendment No 3 to Coordinating Agt.DOC

SENT BY: GARDNER CARTON DOUGLAS-CHICAGO  1 312 644 3381;    10/13/00  2:26PM; JetFax #204; Page 3
1 312 644 3381

| Inventory Obsolescence | 1,000,000 |
| FIFO Variances (Inventory) | 3,800,000 |

**TOTAL**                      US$31,100,000

4.     Section 2.1(b) is hereby amended to change each reference to the "Price Adjustment Statement" to "Preliminary Price Adjustment Statement." Section 2.1(b) is further amended to add the following sentence to the end of such section: "The Parties expressly agree that the calculations set forth in the Preliminary Price Adjustment Statement will not give effect to any change in the price resulting from or relating to the reserves contemplated by Section 2.1(a)(iv) hereof."

5.     Section 2.1(c) is hereby amended to add the following language at the end of the last sentence thereof: ", and the Preliminary Price Adjustment Statement shall be final and binding as the Price Adjustment Statement."

6.     Section 2.1(d) is hereby deleted in its entirety and replaced with the following:

(d).     In the event Buyer objects within the Objection Period, then within thirty (30) days following Buyer's delivery to Seller of the certificate referenced in Section 2.1(c), (the "Resolution Period"), the Buyer and Seller shall use their reasonable efforts to resolve by written agreement (the "Agreed Adjustments") Buyer's objections to the Audited Closing Date Balance Sheet or the Preliminary Price Adjustment Statement. In the event that Seller and Buyer so resolve any such objections, the Audited Closing Date Balance Sheet and/or the Preliminary Price Adjustment Statement shall be adjusted by the Agreed Adjustments and, if all such objections have been resolved by Agreed Adjustments, the Audited Closing Date Balance Sheet and the Preliminary Price Adjustment Statement, as adjusted by the Agreed Adjustments, shall be final and binding as the Final Closing Date Balance Sheet and the Price Adjustment Statement. In the event any objections raised by Buyer are not resolved by Agreed Adjustments during the Resolution Period, then within ten (10) days following the end of the Resolution Period, the Seller and Buyer shall jointly select a national accounting firm acceptable to both Seller and Buyer (or if they cannot agree on such selection, a national accounting firm will be selected by lot after eliminating any accounting firm or firms that has or have acted as auditors, tax advisors, or consultants to Seller or Buyer or their respective Affiliates) (the "Additional Accounting Firm"). For purposes of the preceding sentence, only the following accounting firms shall be considered national accounting firms: Ernst & Young LLP and Deloitte & Touche LLP. The terms of the engagement of the Additional Accounting Firm shall be the terms set forth in Section 2.1(e). The Additional Accounting Firm shall review and resolve any remaining objections as to which Buyer and Seller have not reached Agreed Adjustments and deliver, in no event later than sixty-five (65) days following the Review Commencement Date (as defined in Section 2.1(e)(i)) (time being of the essence), written notice to each of Buyer and Seller setting forth:

CARTER DOUGLAS-CHICAGO  1 312 644 3381;    10/13/00  2:26PM;JetFax #204;Page 4
1 312 644 3381

(i)    its determination of such remaining objections; and

(ii)    the adjustments, if any, to the Audited Closing Date Balance Sheet and/or the Preliminary Price Adjustment Statement (the "Additional Accounting Firm Adjustments").

The Audited Closing Date Balance Sheet as so determined but after giving effect to the Agreed Adjustments and to the Additional Accounting Firm Adjustments shall constitute the Final Closing Date Balance Sheet.  The Preliminary Price Adjustment Statement as so determined but after giving effect to the Agreed Adjustments and to the Additional Accounting Firm Adjustments shall constitute the Price Adjustment Statement.

7.    Section 5.1 is hereby amended to insert the following sentence to the end thereof: "Notwithstanding the foregoing, Seller shall not be responsible for paying Taxes in an amount equal to the excess (if any) of (i) the Taxes actually incurred in respect of the purchase in Australia by Buyer or one of Buyer's Affiliates of the Receivables, as defined in the agreement listed third on Exhibit A attached to this Agreement, pursuant to such agreement as amended by Amendment No. 1 thereto over (ii) the amount of Taxes that would have been incurred with respect to such Receivables had Section 2.9 of such agreement prior to Amendment No. 1 hereto been performed, and any such excess shall not be included in the calculation of the first US$2,000,000 of such Taxes for purposes of the immediately preceding sentence.

8.    Section 5.6(b) is hereby deleted in its entirety.

9.    The following provisions are hereby added to the Agreement:

Section 7.8.    Replacement of Financial Assurances and Maintenance of Related Insurance and Letters of Credit.  The Parties acknowledge and agree that, prior to the Closing Date, Seller or one of its Affiliates has arranged for the issuance by a third party of certain letters of credit securing obligations of GNB, which letters of credit are listed on Schedule 7.8 attached hereto (the "Letters of Credit").  Seller hereby agrees that the Letters of Credit will remain in place for a transitional period after the Closing, provided that: (i) from and after the Closing Date, the Buyer agrees to use commercially reasonable efforts to obtain the consent of the beneficiaries of each of the Letters of Credit to surrender such Letter of Credit and to accept replacement financial assurances from the Buyer as soon as possible after the Closing and in any event prior to the date falling one hundred eighty (180) days after the Closing Date; and (ii) until such time as the last of the Letters of Credit has been surrendered to Seller by the beneficiary thereof or canceled according to its terms, Buyer shall maintain one or more Replacement Insurance Policy(ies) (as defined below) or a R placement LC (as defined below) with respect to each of the Letters of Credit.  As used herein, the term "Replacement Insurance Policy(ies)" means one or more policies of insurance with one or more insurance companies reasonably acceptable to Seller

A \Amendment No 3 to Coordinating Agt.DOC

SENT BY: GARDNER CARTON DOUGLAS-CHICAGO  1 312 644 3381;      10/13/00  2:27PM; JetFax #204;Page 5

1 312 644 3381

(it being understood that Indian Harbor Insurance Company, an affiliate of XL, is an insurance company that is acceptable to Seller), which policies provide for, among other things, indemnification of the Seller or any of its Affiliates against any and all loss, cost or expense incurred or suffered by Seller or its Affiliate as a result of or associated with any draws on or payments under the Letters of Credit from and after the Closing Date, and which policies are otherwise reasonably acceptable in form and substance to the Seller (it being understood that Policy No. PEC 0006165 issued by Indian Harbor Insurance Company is acceptable to Seller). As used herein, the term "Replacement LC" means an irrevocable standby letter of credit issued by Fleet Boston Financial or an affiliate thereof for the benefit of Seller or its designated Affiliate, which letter of credit shall permit the beneficiary to draw thereon in the amount of any and all loss, cost or expense incurred or suffered by Seller or its Affiliate as a result of or associated with any draws on or payments under the Letters of Credit from and after the Closing Date. Buyer agrees that it will not cancel the Replacement Insurance Policy or Replacement LC or allow any such policy or letter of credit to lapse while any of the Letters of Credit remain outstanding and that, in the event the Replacement Insurance Policy or Replacement LC lapses or is otherwise rendered ineffective during such period, Buyer will promptly deliver to Seller a replacement insurance policy, letter of credit or similar instrument reasonably acceptable to Seller, which policy, letter of credit or other instrument will provide indemnification or draw rights to Seller on substantially the same terms as the canceled or lapsed policy or letter of credit (as the case may be). It is the intention of the parties that each Letter of Credit will be the subject of Seller's or its Affiliate's rights under one, but not both, of the Replacement Insurance Policy or the Replacement LC. Seller shall have no obligation to renew or extend the term of any Letter of Credit, it being the intention of the parties that the Letters of Credit will expire pursuant to their terms if not previously surrendered by the beneficiary thereof. The Seller covenants and agrees that it shall not and shall cause the beneficiary under the Replacement LC to not draw on the Replacement LC (or any replacement thereof) except with respect to a Letter of Credit listed on Schedule 7.8 attached hereto.

Section 7.9    Shreveport Lease.

(a)    Seller and Buyer acknowledge:

(i)    United of Omaha Life Insurance Company (the "Lessor"), the Lessor of 6901 Westport Avenue, Shreveport, Louisiana 71129 (the "Shreveport Property"), has advised GNB that it does not intend to renew GNB's current Lease of the Shreveport Property (the "Current Lease") and is actively seeking a ＿urchaser of that property;

(ii)    Sections 27(b)(ii) and 27(c) of the Current Lease permit the then Lessee of the Shreveport Property to purchase the entire subject property for the price and in the manner there specified (the "Lease Option").

A-0193

(b)    Seller intends to use its reasonable commercial efforts from Closing, at its sole cost, to locate a third party buyer acceptable to the Lessor to acquire the Shreveport Property and to lease the same to Buyer upon the terms and conditions of the Lease forming Exhibit C hereto (the "New Lease").

(c)    As a condition precedent to the obligations of Seller more particularly set out in Sections 7.9(e) and 7.9(f) hereof, Buyer agrees with Seller that:

(i)    Buyer shall on or before Closing deliver to the Lessor (with a copy to Seller) the "acknowledged instrument in recordable form" referred to in the second sentence of Section 24 of the Current Lease pursuant to the terms of Section 19 of the Current Lease;

(ii)    Buyer shall after Closing, upon reasonable request from the Seller, make the Shreveport Property available for inspection by Seller and/or any prospective third party buyer located by Seller; and

(iii)    Buyer shall, upon demand from Seller, execute a lease in the form of the New Lease with any person who acquires the Shreveport Property from Lessor (whether as a result of the efforts of the Seller pursuant to Section 7.9(b), or as a result of the operation of either Section 7.9(e) or Section 7.9(f).

(d)    If by 9 November, 2000 Buyer shall not have been notified in writing that the Lessor has sold the Shreveport Property to a third party subject to the New Lease with Buyer then, on or prior to 5 p.m. Central Time on 10 November, 2000, Buyer may, by delivery to Seller of a notice in writing and a form of the New Lease duly executed by Buyer:

(i)    if, in Buyer's good faith judgment, it is lawfully able to do so, assign to Seller all of Buyer's rights with respect to the Lease Option; or

(ii)    if, in Buyer's good faith judgment, it is not lawfully able so to do, or if Lessor asserts that Buyer may not so assign the Lease Option, notify Seller that Buyer intends to exercise the Lease Option.

(e)    In the event of an assignment in accordance with Section 7.9(d)(i), Seller hereby undertakes to Buyer that Seller will:

(i)     timely and properly exercise the Lease Option and close the acquisition of the entire Shreveport Property from the Lessor as contemplated by Sections 27(c) and (b)(ii) of the Current Lease; and

(ii)    execute and deliver a counterpart of the New Lease delivered by Buyer to Seller pursuant to Section 7.9(d).

(f)     In the event of a notice in accordance with Section 7.9(d)(ii):

(i)     upon Buyer exercising the Lease Option, Buyer shall execute and deliver to Seller a special warranty deed and other documents (which shall convey to Seller rights equivalent to but not greater than those conveyed to Buyer by Lessor) to convey the Shreveport Property from Buyer to Seller on the closing date contemplated by Section 27 of the Current Lease (the "Option Closing Date"), for a consideration equal to the amount determined to be payable by the Buyer upon exercise of the Lease Option;

(ii)    on the Option Closing Date, Seller shall pay the consideration due from it to Buyer either to Buyer (and Buyer shall thereupon pay such consideration to Lessor), or if Buyer shall so direct, to Lessor on Buyer's behalf, in either event, as contemplated by the Current Lease; and

(iii)   Seller shall execute and deliver a counterpart of the New Lease delivered by Buyer to Seller pursuant to Section 7.9(d).

(g)     For the purposes of Sections 7.9(e) and 7.9(f), Buyer and Seller further agree that:

(i)     save as provided in Section 7.9(g)(ii) all fees and expenses required to be paid under Section 27(c)(iii) and the final sentence of Section 27(c)(iv) will be borne by Seller;

(ii)    the Seller may, at any time before the date of exercise of the Lease Option, cause an Affiliate to act in its stead pursuant to either Section 7.9(e) or Section 7.9(f), provided that Seller shall cause such Affiliate to perform all of Seller's obligations set forth herein.

A \\Amendment No 3 to Coordinating Agt.DOC

(h)    In the event that Seller shall become the owner of the Shreveport Property pursuant to the provisions of this Section 7.9 then Buyer and Seller agree that the provisions of Section 35 of the New Lease shall in no way affect the rights and obligations of the Buyer and Seller pursuant to Section 4.

Section 7.10    **Closure, restructuring and other reserves.**    The parties acknowledge that certain of the obligations of GNB reflected in the item "Closure, restructuring and other reserves" in the March 31, 2000 Balance Sheet will not have been fully paid or performed on or before the Closing Date by the Seller or the International Sellers. Seller hereby agrees that from and after the Closing Date, it will promptly pay costs properly included in such reserve that are incurred by or invoiced to Buyer after the Closing Date. Buyer agrees that it will submit any such invoices to or otherwise notify Seller in a prompt manner to permit timely payment of such amounts by Seller. For the avoidance of doubt, the parties also acknowledge that the term "other accrued expenses" as used in the fourth line of Section 2.1(b)(i) does not include items properly included in the item "Closure, restructuring and other reserves" in the March 31, 2000 Balance Sheet.

Section 7.11    **GNB Letters of Credit.** As of the Closing Date, none of the GNB Companies (which term is intended to include both GNB and its subsidiaries and all of the businesses being acquired by Exide by way of asset purchase) is an account party or otherwise liable with respect to any letters of credit, other than those set forth on Exhibit D attached hereto.

IN WITNESS WHEREOF, the parties have duly executed this Amendment No. 3 on the date first set forth above.

EXIDE CORPORATION

By: _____
Name: David H. Kell
Title: Vice President and Treasurer

PACIFIC DUNLOP HOLDINGS (USA) INC.

By: _____
Name: Martin Hudson
Title: Attorney-in-Fact

Schedule 7.8

## ANZ

| Yc No. | BENEFICIARY |
|---|---|
| 2977/8200 | Arabia Solar Energy |
| 1438/8200 | Zurich-American Insurance Company |
| ~~1445/8200~~ | |
| 1445/8200 | SMII Oak Creek LP |
| 2373/8200 | Robert N. Ivancel |
| LM 716020 | Korea Storage Battery |
| LM 716021 | Yacht Battery Co., Taipei |
| 5014/8200 | Yacht Battery Co., Taipei |
| 5041/8200 | Yacht Battery Co., Taipei |
| 5074/8200 | Korea Storage Battery |
| 5075/8200 | Yacht Battery Co., Taipei |
| 5099/8200 | Korea Storage Battery |
| 5100/8200 | Yacht Battery Co., Taipei |
| LM 716021 | Yacht Battery Co., Taipei |
| See Attachment 1 | |

GNB Pac Rim L/cs    -    See Attachment 2

A-0197

**EXHIBIT C**

A-0198

Oct-12-01 02:12P Pacific Dunlop        702 824 4628        P.05
11 JUL 2001 15:50 PM EMARTIN M HUDSON 613 96544184X NO. 7348272583    NO. 6963    P. 4 of
7348272583



John B. Van Zile
Executive V.P.,
General Counsel
and Secretary
Exide Technologies
3600 Green Court, Suite 7.
Ann Arbor, MI 48105

734.822.2553 tel
734.822.2575 fax
734.827.3286 voice box
jvanzile@exideworld.com
www.exideworld.com

July 10, 2001

Martin M Hudson Pty
Level 3
678 Victoria Street
RICHMOND VIC 3121
AUSTRALIA

RE: Coordinating Agreement/Interim Settlement

Dear Mr. Hudson:

This letter will confirm the terms of an interim settlement of claims arising under or related to the Coordinating Agreement, dated September 29, 2000 (the "Agreement"). Specifically, our respective clients, Exide Corporation d/b/a Exide Technologies ("Exide"), Pacific Dunlop Limited ("PDL") and Pacific Dunlop Holdings (US), Inc. ("PDH"), have agreed to resolve the following matters, each as set forth below: (a) the Purchase Price Adjustment, (b) workers compensation charges, (c) costs associated with the maintenance of certain letters of credit ("LC's") and (d) Pacific Dunlop's interest in Pacific Marine Batteries Pty Limited ("PMB"). All capitalized terms shall have the meaning ascribed to them in the Coordinating Agreement, unless otherwise provided for herein.

Until accepted by both parties, this letter shall be deemed part of the settlement negotiations between the parties, and may not be admitted into evidence in any future proceeding between the parties to the Coordinating Agreement. If executed by both parties, this letter-agreement may only be admitted into evidence in a proceeding by one party to enforce its rights as set forth herein against the other party. The parties shall treat this letter-agreement as a confidential document, except (and only) to the extent disclosure of this letter-agreement is required under the laws of the United States or of Australia.

With respect to the Purchase Price Adjustment, Buyer and Seller hereby agree that there is owning and due a Positive Purchase Price Adjustment in the amount of Twelve Million, Six Hundred, Eighty-Four Thousand, Five Hundred, Ninety-Four and 18/100 United States Dollars ($12,684,594.18). In consideration of the mutual obligations set forth in this letter, the parties agree as follows:

(a)    Sellers acknowledge that Buyer paid to Sellers an initial payment of Eleven Million United States Dollars ($11,000,000) on or about December 27,2000, which amount shall be credited against the Positive Purchase Price Adjustment.

(b)    On Friday, 13 July 2001, provided the parties have exchanged counter-signed copies of this letter-agreement by 9 am on Wednesday, 11 July 2001, Buyer shall pay Sellers by wire transfer the amount of Nine Hundred, Sixty-Four Thousand, Five Hundred, Ninety-Four and 18/100 United States Dollars ($964,594.18).

M Hudson PDL- Coordinating Agmt1.doc

Oct-12-01 02:12P Pacific Dunlop          702 824 4628          P.06
11. JUL. 2001 15:50 PM    MARTIN M HUDSON 613 96544184X NO. 7348272583    NO. 0903    P. 06
                                    7348272583

(c)     Buyer shall pay Sellers by wire transfer the amount of Seven Hundred, Twenty Thousand United States Dollars ($720,000) (the "PMB Reserve") on the earlier of (i) the resolution of the PMB issue, as described below or (ii) the Final Resolution Date (as defined below).

(d)     Neither party shall make any further claims with respect to the Purchase Price Adjustment.

With respect to the workers compensation costs arising from claims by persons who were employed by GNB Technologies, Inc. and its US subsidiaries on or prior to September 29, 2000 (the "Former GNB Employees"), the parties agree as follows:

(a)     Buyer acknowledges that Sellers provided workers insurance coverage for the Former GNB Employees through certain policies (the "Workers Compensation Policies") which one or more of Sellers purchased from Zurich-American Insurance Company ("Zurich").

(b)     Sellers acknowledge that Buyer has already made a payment to Zurich in the amount of Six Hundred, Seventy-Five Thousand United States Dollars ($675,000), which payment has been credited against premium and or loss payments due under the Workers Compensation Policies as the result of claims by the Former GNB Employees.

(c)     Buyer shall:

   (i)     within three (3) business days from the date that Sellers provide Buyer by fax with a counter-signed copy of this letter, pay Zurich by wire transfer the amount of One Hundred, Seventy-Eight Thousand, Six Hundred, Forty-Four Dollars ($178,644), in order to satisfy all premium and/or loss payments due to Zurich under the Workers Compensation Policies as the result of claims made on or prior to September 29, 2000 by the Former GNB Employees; and

   (ii)    on or before 3 August 2001, pay Zurich by wire transfer the amount agreed by Buyer and Zurich (provided that Sellers have no reasonable objection thereto) as being necessary to satisfy all premium and/or loss payments due to Zurich under the Workers Compensation Policies as a result of claims made after September 29, 2000 by the Former GNB Employees.

(d)     Sellers represent that there were no amounts owing and due under the Workers Compensation Policies for claims made as of September 29, 2000 by the Former GNB Employees except for the amounts listed in paragraphs (b) and (c)(i) of this Section.

(e)     Buyer shall be responsible for resolving the question of the amount and type of security required by Zurich in order to cover future claims by Former GNB Employees against the Workers Compensation Policies. Sellers agree that Buyer is free to negotiate directly with Zurich on this matter, without any participation by Sellers, their agents or representatives. Buyer agrees with Sellers that:

   (i)     Buyer will diligently and without delay complete the negotiations with Zurich on the above security matters;

   (ii)    Buyer will keep Sellers fully informed as to the progress and status of such negotiations at such reasonable intervals as Sellers shall request; and

                                    M Hudson PDL- Coordinating Agmt1.doc

Oct-12-01 02:13P Pacific Dunlop          702 824 4628          P.07
14. JUL. 2001 15:51    MARTIN M HUDSON 613 96544184X NO. 7348222583    NO. 8963  P. 003
JUL-10-01 TUE 03:00 PM EXIDE ~~~~~~~~~~~
                        7348222583

(iii)    This matter shall be resolved with Zurich by no later than October 1, 2001. If Buyer fails to resolve the matter with Zurich before the above date, then Buyer shall pay Sellers in cash the then-remaining face value of the security held by Zurich with respect to claims by Former GNB Employees against the Workers Compensation Policies.

(f)    Sellers acknowledge that:

(i)    Zurich and Sellers' agreement to allow Buyer to address these security matters directly with Zurich is a material inducement for Buyer's agreements contained in paragraph (e) above;

(ii)    Specifically, Buyer's agreement to the ultimate outcome referred to in the second sentence in sub-paragraph (e)(iii) above, is conditional upon the subject matter of that sentence not being disclosed by Sellers, their agents or representatives, to Zurich, its agents or representatives, in any way, shape or form; and

(iii)    Buyer is (and has been since September 30, 2000) solely responsible for the management of all claims by the Former GNB Employees against the Workers Compensation Policies, to the absolute exclusion of the Sellers.

With respect to letters of credit which have not been released to Sellers since the Closing, Buyer and Sellers agree:

(a)    Nothing in this letter-agreement or in the other agreements between Sellers and Buyer shall oblige Sellers to maintain any LC after its stated expiration date;

(b)    Buyer and Sellers agree that the list of LC's set forth in Exhibit A, attached hereto, represents the complete list of all LC's which had not been released to Sellers as at April 1, 2001;

(c)    Buyer shall reimburse Sellers for their actual cost of maintaining the LC's listed on Exhibit A for the period between April 1, 2001 and the sooner of (i) the expiration date of the LC or (ii) the date on which the LC is released by the third party that holds it currently. Attached as Exhibit D is what the Sellers understand to be the current basis of charging for the LC's. It is acknowledged by the parties that this exhibit may be altered in the event that the relevant Bank is entitled to (and does) vary those charges;

(d)    Buyer shall have no obligation to reimburse Sellers for the carrying costs (as outlined above) if Sellers take any action to cause a LC to expire prior to its stated expiration date.

With respect to Pacific Dunlop Limited's ("PDL") interest in PMB, the parties agree as follows:

(a)    Subject always to any offer being made pursuant to paragraph (c) below, between now and the date 45 days from the date of this letter agreement ("the PMB Decision Date"), PDL and Buyer will work diligently together to explore ways that PDL may sell its interest in PMB to Buyer (or an Affiliate). In furtherance of this objective that parties shall instruct their respective Australian counsel to confer upon the matter and provide their joint recommendation to the parties within the next 30 days.

M Hudson PDL- Coordinating Agmt1.doc

12. OCT. 2001  9:37                                    NO. 1159——P. 22



"LEVINE, Ari (Princeton)" <ari.levine@exide.com> on 8 September, 2001
00:09:50

To:    Cheryle Allan/CORPHO/PACDUN@PACDUN
cc:    "VAN ZILE, John (Ann Arbor)" <jvanzile@exideworld.com>

Subject: RE: Exide / Pacific Dunlop Limited - Outstanding Issues

---

Mr. Taylor:

Congratulations on the new assignment. While Mr. Hudson and I have not
always been able to achieve the amicable resolution our clients desire, I
truly enjoyed working with him, and have no doubt that you and I will
equally enjoy the occasional fray. Please give me a call when you can, or
let me know when you might be available, so that we can talk through these
issues. In the meantime, let me give you a quick reply.

I am a bit surprised at your "demand," given that fact that neither your
subsidiary (Convass) nor your agents (Richard Oliver) are making any
headway
towards payment of a recognized and proper insurance claim relating to the
spring, 2000 fire at the Farmer's Branch, Texas plant. As you may know,
our
Alpharetta, Georgia office has provided your agent, Richard Oliver
Incorporated (ROI), with all of the information requested to file a proof
of
loss associated with the fire. That information shows (preliminarily) a
net
loss of approximately US$1,200,000. As I told Mr. Hudson, Exide will not
agree to any "setoff" against that amount. Instead, we demand full and
prompt payment of the claim. We would hope PDL will not prevent Convass
from acknowledging its obligation to pay a proper loss, or prevent ROI from
providing timely information to allow that payment to proceed, whether from
Convass or others. In fact, I would appreciate your confirming that, and
advising when we can expect payment.

That issue aside, please allow me to set forth below my understanding of
the
status of the various matters which Mr. Hudson and I discussed on 30
August.

1.    Home Insurance Demand

I advised Mr. Hudson that Marsh, our insurance brokers/advisors, had sent
ROI, your brokers/advisors, a list of information required to determine the
nature of the payments requested. Mr. Hudson indicated that he would
contact Kathy Brody at ROI to ensure that she had received the request from
Marsh. Indeed, Mr. Hudson sent an email your Thursday evening (30 August)
asking Ms. Brody if she had received the communication from Marsh, and
requesting that she contact me if she had not heard from Marsh. As I have
not heard from Ms. Brody on this issue (although she has communicated
briefly with me on the insurance claim), I assume that she did receive
Marsh's request for additional information. In fact, I know that Marsh has
been talking with Mr. Mark Morris about ROI, although I gather there have
been some communication problems there. Please let me know when Marsh can

A-0206

(18)

expect ROI's reply.

As an aside (and as I told Mr. Hudson), I have been advised by Marsh that the nature of the payments here in question is quite unusual, especially if one persists in describing these as "retroactive premiums." As a further aside, it appears from our document review that the Home policies were not disclosed by PDL during the due diligence process. We have not reached any conclusion on the matter from those observations, and indeed our investigation continues. However, I want you to be fully apprised of our thought process as we move toward some resolution on this matter.

2.    Zurich Security

As you may know, the Interim Settlement Agreement (ISA) provides Exide until
1 October to resolve this issue with Zurich. If Exide is not able to reach an agreement with Zurich before that date, Exide must pay PDL the cash value
of the security held by Zurich for those policies. During our 30 August telephone call, I asked Mr. Hudson to send me a spreadsheet showing a list of that security, which I believe totals approximately US$ 3 million. I have no doubt that Mr. Hudson asked someone to send me the list, but I have not received it. Could you please follow up on your end?

I might add that Mr. Hudson had agreed that your Zurich contact, Mr. Jeff Benzin, would stay out of Exide's discussions with Zurich. In fact, the ISA
expressly acknowledges the importance Exide places upon resolving this issue
through its contacts at Zurich without interference from PDL (or its agents). We are a bit perturbed that Mr. Benzin has so injected himself into this discussion, with the predictable outcome.

3.    LC Costs

We are open to several approaches on these, which you and I can discuss when
we talk.


As recent events have proved, both of our clients are quite capable of resorting to litigation if necessary. I respectfully suggest that further efforts to keep these matters from taking that course would be worth the investment of time on both our parts, especially if there is simply some miscommunication regarding one or another of these concerns. For that reason, I look forward to discussing these with you.

Regards,

Ari Levine
Deputy General Counsel
Exide Technologies
210 Carnegie Center, Suite 500
Princeton, NJ  08540
USA
(609) 627-7229    Direct Dial
(609) 627-7165  Fax

12. OCT. 2001   9:38                                    NO. 1159   P. 24

(19)

-----Original Message-----
From: callan@pacdun.com [mailto:callan@pacdun.com]
Sent: Friday, September 07, 2001 12:42 AM
To: alevine@exideworld.com; jvanzile@exideworld.com
Subject: Exide / Pacific Dunlop Limited - Outstanding Issues


Messrs Levine and Van Zile,

As you are aware from recent communications from Martin Hudson I have taken over
conduct of this matter within PDL.

It is a matter of very great concern to us that the outstanding issues have not
yet been resolved.  In this regard I refer to Martin's email of 23 August and
the proposed resolution set out therein.

By this message I advise that formal letters of demand are this day being faxed
to Mr Van Zile as we currently see no other way in which to proceed to a
satisfactory conclusion.

Yours faithfully,


Ian S Taylor
Corporate Counsel

ATZIK, FRANK, & SAMOTNY LTD.

CLERK   Clerk of Circuit Court                              CHECK NO:        017612

| R REF. NO. | YOUR INVOICE NUMBER | INVOICE DATE | INVOICE AMOUNT | AMOUNT PAID | DISCOUNT TAKEN |
|---|---|---|---|---|---|
| 903 | 120401B | 12/04/01 | 433.50 | 433.50 | .00 |
| | Ref: 002942-001 12/31/01 | | | | |

Check Total                                                    433.50

PATZIK, FRANK, & SAMOTNY LTD.

FOUR HUNDRED THIRTY THREE AND 50/100 DOLLARS

Clerk of Circuit Court

⑈017612⑈ ⑆071904779⑆ 760575100⑈

---

ATZIK, FRANK, & SAMOTNY LTD.                                   **17612**
                                                              017612

    CLERK   Clerk of Circuit Court

    16903 120401B        12/04/01      433.50        433.50           .00
       Ref: 002942-001 12/31/01

Check Total                                                    433.50

DELUXE BUSINESS FORMS  1-800-328-0304  www.deluxeforms.com

A-0209