IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Bk. Case No. 02-11125 (KJC) |
| EXIDE TECHNOLOGIES, INC., *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| ——————————————— | ) | C.A. No.  05-561- SLR |
| | ) | |
| PACIFIC DUNLOP HOLDINGS | ) | |
| (EUROPE) LTD, *et al.*, | ) | |
| Appellants, | ) | Bankr. Adv. Pro. No. 04-51299-KJC; |
| v. | ) | |
| | ) | Removed From Circuit Court of Cook |
| EXIDE HOLDING EUROPE, *et al.* | ) | County, Ill. Civ. Action No.: 01L |
| 008460 | ) | |

## APPENDIX TO APPELLANTS' BRIEF
## VOLUME II

MORRIS, JAMES, HITCHENS & WILLIAMS LLP
Brett D. Fallon (ID No. 2480)
Douglas N. Candeub (ID No. 4211)
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, Delaware 19899
Telephone: (302) 888-6800
Facsimile: (302) 571-1750

-and-

GOODELL, DEVRIES, LEECH & DANN, LLP
Linda Woolf, Esquire
Paula Krahn Merkle, Esquire
One South Street, 20th Floor
Baltimore, Maryland 21202
Telephone: (410) 783-4000
Facsimile: (410) 783-4040

Dated: February 13, 2006

Attorneys for the Appellants, Pacific Dunlop Holdings
(USA), Inc., Pacific Dunlop Holdings (Europe)
Limited, P.D. International Pty Limited, Pacific
Dunlop Holdings (Hong Kong) Limited, and Pacific
Dunlop Holdings (Singapore) PTE. Ltd.

---

[1]     Apart from the lead debtor, Exide Technologies, Inc., f/k/a Exide Corporation, the
debtors in these proceedings were Exide Delaware, L.L.C.; Exide Illinois, Inc.; RBD Liquidation,
L.L.C.; Dixie Metals Company; and Refined Metals Corporation.  The cases of these subsidiary
debtors were closed by order entered June 18, 2004 (Bankr. docket No. 4599).

# APPENDIX
Table of Contents

Tab 1.   Order Denying Motion of Pacific Dunlop Holdings (USA), Inc., Pacific Dunlop
Holdings (Europe) Limited, P.D. International Pty Limited, Pacific Dunlop Holdings
(Hong Kong) Limited and Pacific Dunlop Holdings (Singapore) PTE. Ltd. for Remand
of State Law Action or, in the Alternative, for Abstention and for an Order Granting
Relief from the Automatic Stay to Proceed to Liquidate Claim in State Court (D.I.
3325) (the "2003 Order")

Tab 2.   The Bankruptcy Court's Order Denying the Motion of Pacific Dunlop Holdings
Entities for Reconsideration of Order Denying Their Motion to Remand or for
Abstention and Stay Relief, and Dismissing Their Causes of Action Against the Non-
Debtor, Foreign Exide Entities (D.I. 5104) (the "2005 Order")

Tab 3.   Memorandum Denying the Motion of Pacific Dunlop Holdings Entities for
Reconsideration of Order Denying Their Motion to Remand or for Abstention and Stay
Relief, and Dismissing Their Causes of Action Against the Non-Debtor, Foreign Exide
Entities (D.I. 5103) (the "2005 Memorandum")

Tab 4.   Motion of the Pacific Dunlop Holdings Entities for Reconsideration of Order Denying
Their Motion to Remand or for Abstention and Stay Relief, and Dismissing Their
Causes of Action Against the Non-Debtor, Foreign Exide Entities (D.I. 3385) (the
"Motion for Reconsideration")

     Exhibit A.   Order Denying Motion of Pacific Dunlop Holdings (USA), Inc., Pacific
                  Dunlop Holdings (Europe) Limited, P.D. International Pty Limited, Pacific
                  Dunlop Holdings (Hong Kong) Limited and Pacific Dunlop Holdings
                  (Singapore) PTE. Ltd. for Remand of State Law Action or, in the Alternative,
                  for Abstention and for an Order Granting Relief from the Automatic Stay to
                  Proceed to Liquidate Claim in State Court

     Exhibit B.   Coordinating Agreement

     Exhibit C.   Affidavit of James D. McDonough

     Exhibit D.   Declaration of Martin Hudson

Tab 5.   Substituted Declaration of Martin Hudson Re: D.I. 3385 (D.I. 3417)

Tab 6.   Motion of Pacific Dunlop Holdings (USA), Inc., Pacific Dunlop Holdings (Europe)
Limited, P.D. International Pty Limited, Pacific Dunlop Holdings (Hong Kong)
Limited and Pacific Dunlop Holdings (Singapore) PTE. Ltd. for Remand of State Law
Action or, in the Alternative, for Abstention and for an Order Granting Relief from the
Automatic Stay to Proceed to Liquidate Claim in State Court (D.I. 2507) (the "Remand
Motion")

     Exhibit A.   First Complaint (PDH Entities v. Exide Entities)

     Exhibit B.   Second Complaint (PDH USA v. Exide)

Exhibit C.   Order, Cook County (Ill.) Circuit Court, lifting stay of discovery against defendants other than debtor (July 19, 2002)

Exhibit D.   Memorandum in Opposition to Defendants' Motion to Transfer, in Bankruptcy Court, Northern District of Illinois

Exhibit E.   Motion to Remand or, in the Alternative, to Abstain, in Bankruptcy Court, Northern District of Illinois

Exhibit F.   Memorandum Opinion Transferring Adversary from Another District

Exhibit G.   *RCG Int'l Investors, LDC v. ARI Network Servs., Inc.*, 2003 WL 21843637 (D. Del.).

Exhibit H.   *OMNA Med. Partners, Inc. v. Carus Healthcare, P.A.*, 2000 WL 33712302 (Bankr. D. Del.).

Exhibit I.   *Carol L. Lux v. D'Angeli Bldg. & Constr. Co.*, 1994 Bankr. LEXIS 341 (Bankr. E.D. Pa.).

Exhibit J.   *Nemsa Establishment, S.A. v. Viral Testing Sys.*, 1995 U.S. Dist. 11650 (S.D.N.Y.).

Exhibit K.   *Port Auth. of N.Y. & N.J. v. CCI-Bowers Co.*, 1992 U.S. Dist. LEXIS 6206 (D.N.J.).

Exhibit L.   *In re Federated Dep't Stores, Inc.*, 1990 Bankr. LEXIS 1118 (Bankr. S.D. Ohio).

Tab 7.   Court Docket for Adv. Pro. No. 04-51299 (KJC)

Tab 8.   Transcript of Hearing before Cook County Circuit Court Judge Sheldon Gardner, Cook County Circuit Court, July 8, 2002

Tab 9.   Order and Memorandum Transferring Adversary from another District (Bankr. N.D. Ill. Feb. 4, 2003) (Sonderby, B.J.)

Tab 10.   Amended Joint Plan of Reorganization of the Official Committee of Unsecured Creditors and the Debtors (D.I. 3918)

Exhibit A.   Amended Prepetition Foreign Credit Agreement Term Sheet

Exhibit B.   New Exide Warrant Term Sheet

Exhibit C.   Personal Injury Tort and Wrongful Death Claims Resolution and Distribution Procedures

Tab 11.   Disclosure Statement for Joint Plan of Reorganization of the Official Committee of Unsecured Creditors and the Debtors (D.I. 3919) (exhibits not included in this appendix)

Tab 12.    Order Confirming Joint Plan of Reorganization of the Official Committee of Unsecured
           Creditors and the Debtors (D.I. 4341)

Tab 13.    Findings of Fact, Conclusions of Law and Memorandum Order Relating to
           Confirmation of the Joint Plan of Reorganization of the Official Committee of
           Unsecured Creditors and the Debtors (D.I. 4340)

Tab 14.    Amended Notice of Appeal (D.I. 5125)

Tab 15.    Coordinating Agreement

Tab 16.    Stock Purchase Agreement with Respect to Pacific Dunlop GNB Corporation,
           Between Pacific Dunlop Holdings (USA) Inc., as Seller, and Exide Corporation, as
           Buyer (the "US Agreement")

Tab 17.    Stock Purchase Agreement with Respect to Pacific Dunlop GNB Technologies
           Limited, Between Pacific Dunlop Holdings (Europe) Ltd, as Seller, and Exide Holdings
           Europe, as Buyer (the "UK Agreement")

Tab 18.    Stock Purchase Agreement with Respect to Pacific Dunlop GNB Technologies NV,
           Between P D International Pty Limited and Pacific Dunlop Holdings (Europe) Ltd., as
           Sellers, and Exide Holding Europe, as Buyer (the "European Agreement")

Tab 19.    Stock Purchase Agreement with Respect to Pacific Dunlop GNB Technologies (China)
           Limited, Among Pacific Dunlop Holdings (Hong Kong) Limited, as Seller, and Exide
           Holding Asia Pte Limited, as Buyer (the "Hong Kong/PRC Agreement")

Tab 20.    Stock Purchase Agreement with Respect to Pacific Dunlop GNB Technologies (India)
           Private Limited, Among Pacific Dunlop Holdings (Singapore) Pte Ltd, as Seller, and
           Exide Holding Asia Pte Limited, as Buyer (the "India Agreement")

Tab 21.    Asset Purchase Agreement, Between Pacific Dunlop Holdings (Singapore) Pte Ltd., as
           Seller, and Bluewall Pte Ltd to be renamed Exide Singapore Pte Limited, as Buyer (the
           "Singapore Agreement")

Tab 22.    Proofs of Claim for: Pacific Dunlop Holdings (Europe) Limited; Pacific Dunlop
           Holdings (Hong Kong) Limited; and Pacific Dunlop Holdings (Singapore) Pte Ltd.
           (without their accompanying attachments)

Tab 23.    Order consolidating Case Nos. 01-L-15589 and 01-L-08460.

Tab 24.    Excerpt from Transcript of Hearing before Bankruptcy Judge Kevin J. Carey,
           January 22, 2004 at 2:15 p.m.

# TAB 9

24

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FEB 0 4 2003

|  |  |
|---|---|
| PACIFIC DUNLOP HOLDINGS<br>(EUROPE) LTD., et al. | )<br>)<br>) | Avd. No. 02 A 01106 |
|     Plaintiffs | )<br>) | (Removed from Circuit Court of<br>Cook County, Civil Action No.<br>01 L 008460) |
| v. | )<br>)<br>) |  |
| EXIDE HOLDING EUROPE, et al., | )<br>) | Hon. Susan Pierson Sonderby |
|     Defendants. | ) |  |

ORDER

For the reasons stated in its memorandum opinion entered on this date, the Court hereby

transfers this adversary proceeding, including plaintiffs' pending Motion to Remand or, in the

Alternative, to Abstain, to the United States Bankruptcy Court for the District of Delaware.

ENTERED:

_SUSAN PIERSON SONDERBY_

FEB 0 4 2003

By _____

24

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED FEB 0 4 2003

|  |  |  |
|---|---|---|
| PACIFIC DUNLOP HOLDINGS | ) | Adv. No. 02 A 01106 |
| (EUROPE) LTD., et al. | ) |  |
|  | ) | (Removed from Circuit Court of |
| Plaintiffs | ) | Cook County, Civil Action No. |
| v. | ) | 01 L 008460) |
|  | ) |  |
| EXIDE HOLDING EUROPE, et al., | ) | Hon. Susan Pierson Sonderby |
|  | ) |  |
| Defendants. | ) |  |

## MEMORANDUM OPINION

This matter is before the Court on a motion filed by Exide Corporation ("Exide" or the "Debtor") and certain of its subsidiaries, including Exide Holding Europe, Exide Holding Asia Pte. Ltd., and Exide Singapore Pte. Ltd. (the "Non-Debtor Entities"), to transfer the venue of this removed action to the District of Delaware, and on the motion to remand or, alternatively, to abstain, filed by Pacific Dunlop Holdings (USA) Inc. ("PDH") and certain of its affiliated corporations, including Pacific Dunlop Holdings (Europe) Ltd., P.D. International Pty. Ltd., Pacific Dunlop Holdings (Hong Kong) Ltd., and Pacific Dunlop Holdings (Singapore) Pte. Ltd. (collectively with PDH, the "PDH Sellers"). The facts relevant to the Court's disposition of the matter are not in dispute.

## BACKGROUND

PDH owned GNB Corporation ("GNB"), a global automotive and industrial battery business. During May and June of 2000, the PDH Sellers sold GNB, together with stock and the assets of

24

certain corporate subsidiaries, to Exide and the Non-Debtor Entities pursuant to a series of sales and other agreements. Each Non-Debtor Entity entered into a separate agreement with one or more of the PDH Sellers, pursuant to which specific PDH entities sold different corporate subsidiaries or assets to specific Exide entities (the "Sale Agreements"). PDH and Exide then entered into a separate agreement (the "Coordinating Agreement") that governed the transactions contemplated in the Sale Agreements, the transition of ownership of GNB, and the method for resolving disputes arising from the transactions.

On July 17, 2001, the PDH Sellers filed a complaint in the Circuit Court of Cook County, Illinois (the "State Court") against Exide and the Non-Debtor Entities, alleging that they had breached the Sale Agreements and the Coordinating Agreement by wrongfully retaining funds to which one or more of the PDH Sellers were entitled. The PDH Sellers also claimed that Exide and the Non-Debtor Entities were liable for conversion and unjust enrichment under Illinois common law. The action was assigned to Judge Sheldon Gardner as Case No. 01 L 08460. On December 4, 2001, PDH filed a second suit in the State Court, naming only Exide as defendant and alleging that it owed certain sums to the PDH Sellers relating to letters of credit that Exide had extended to support the obligations of GNB. The second suit was assigned to Judge Lee Preston, as Case No. 01 L 15589. On March 26, 2002, the two actions were consolidated into Case No. 01 L 08460, before Judge Gardner.

On April 15, 2002, Exide filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"), as Case No. 02-11125. As a result of the bankruptcy filing, Judge Gardner temporarily stayed the State Court action, including discovery, by order dated April 30, 2002.

-2-

However, he subsequently lifted the previous stay of discovery as to all parties except Exide, denied the defendants' request for a temporary stay of the litigation as against the Non-Debtor Entities, and set the matter for further status on August 22, 2002. The Non-Debtor Entities then filed a formal motion to dismiss the plaintiffs' claims for lack of a necessary party, i.e., Exide.

On July 30, 2002, Bankruptcy Judge John C. Akard, sitting by designation on the Delaware Bankruptcy Court, granted Exide's motion to extend to December 31, 2002 the deadline for removing actions pending in other courts. On August 21, 2002, one day before the scheduled status hearing in State Court, Exide removed the consolidated State Court action to this Court pursuant to 28 U.S.C. §1452, asserting that this Court has jurisdiction under 28 U.S.C. §1334. The Notice of Removal was filed in the Bankruptcy Court for this district and division as required by 28 U.S.C. § 1452 and Local Bankruptcy Rule 420.

None of the defendants have objected to the removal. The plaintiffs, however, contend that removal was improper, because this Court lacks subject matter jurisdiction over the action. According to the plaintiffs, the claims they assert against the Non-Debtor Entities in the removed action do not "arise under" or "arise in" Exide's bankruptcy case and are not "related to" it within the meaning of §1334.[1]

The defendants counter that subject matter jurisdiction exists, because the claims against the Non-Debtor Entities are, at a minimum, "related to" Exide's bankruptcy case. They further contend that this Court should transfer the case to the Delaware Bankruptcy Court, where Exide's bankruptcy

---

[1]     28 U.S.C. § 1334 provides:
    (a) Except as provided in subsection (b) of this section, the district court shall have original and exclusive jurisdiction of all cases under title 11.
    (b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

-3-

case is pending, before considering the plaintiffs' Motion to Remand or Abstain.

Exide's contention that this Court has subject matter jurisdiction over the removed action is predicated on provisions in the Coordinating Agreement. According to Exide, the indemnification provisions in that agreement fix liability on Exide for any breaches of the Sale Agreements by the Non-Debtor Entities.

Section 1 of the Coordinating Agreement provides that "... all claims resulting from breaches of obligations, representations or warranties under the Sale Agreements or this [Coordinating] Agreement will be addressed exclusively under this Agreement." Section 4.5 of the Coordinating Agreement is entitled "Exclusivity of Remedy" and further provides that "the sole and exclusive remedy" for "any breach by any party" is "the indemnification provided in this Article 4."[2]

Section 4.2 of the Coordinating Agreement, as amended (entitled "Indemnification by Buyer") provides in pertinent part:

> Buyer agrees to indemnify and hold Seller and the International Sellers and their Affiliates harmless from and against any and all Losses and Expenses incurred by Seller or the International Sellers and their Affiliates in connection with or arising from:
>
> (i) any breach by Buyer *or, for sake of clarification, any International Buyer* of any of its covenants or agreements in the Sale Agreements or in this Agreement[.]

(amendment in italics.) According to Exide, the term "Buyer" in the above-quoted provision refers to Exide, and does not include the International Buyers (e.g., the Non-Debtor Entities). Exide points out that the Coordinating Agreement, on page three, states, *inter alia*, that the term "Buyer" shall have the meaning specified on the first page of the Agreement, *viz.*, "Exide Corporation, a Delaware

---

[2]    The parties agree that the Coordinating Agreement contains their exclusive remedy. (See Complaint, par. 4) ("exclusive remedy would be the indemnification provided for in the Coordinating Agreement")

-4-

Corporation ("Buyer")." The term "Buyer," as so defined, would not encompass the Non-Debtor Entities. Accordingly, Exide contends that under §4.2, which as quoted above states that "Buyer agrees to indemnify ...," Exide is the only party responsible for breaches by the Non-Debtor Entities of their obligations under the Sale Agreements.

In further support of its contention, Exide notes that when §4.2 was amended, the parties added, after the term "Buyer" in clause (i) quoted above, the language "or, for sake of clarification, any International Buyer." Comparable language was not, however, added to the preceding phrase, identifying the indemnitor (the parties retaining the language "Buyer agrees to indemnify ... ."). Exide therefore contends that this amendment is further confirmation that Exide is solely responsible for breaches under the agreements; i.e., while the parties clarified that indemnification would cover breaches by the Non-Debtor Entities, they chose not to expand the named indemnitors.

Finally, Exide notes that in Count I of the State Court complaint, sounding in contract, plaintiffs seek "judgment against Exide." The prayer for relief docs not name the Non-Debtor Entities. Accordingly, Exide contends that plaintiffs themselves implicitly recognize that Exide is the sole indemnitor for all breaches of the parties' agreements.

Plaintiffs, on the other hand, interpret the indemnification and related provisions as providing them with a remedy against the Non-Debtor Entities. Plaintiffs note that although the definition of "Buyer" in the Coordinating Agreement states that the term "has the meaning specified on the first page of [the] Agreement" (i.e., Exide), the definition goes on to state that in certain portions of the agreement (including the indemnification provisions), "Buyer shall be deemed to mean Buyer and/or (as the context may require) any International Buyer." Plaintiffs contend that for purposes of the indemnification provisions, the context requires that the term "Buyer" include the Non-Debtor

A-0366

Entities, particularly in light of the fact that the Sale Agreements state that the Non-Debtor Entities' indemnification obligations "are set forth in the Coordinating Agreement."

It appears, from a review of the agreements and the parties' contentions, that there may be an ambiguity on the indemnification issue. As discussed below, however, the Court need not resolve that issue in order to determine whether the removal of this action was proper.

## DISCUSSION

1. **The Propriety of the Removal**

Prior to consideration of the remaining issues raised in the parties' motions, the Court must first determine whether it has subject matter jurisdiction over the action. *In re Canion*, 196 F.3d 579, 584 (5th Cir. 1999) ("[f]ederal courts must be assured of their subject matter jurisdiction at all times"); *Rumore v. Wamstad*, No. Civ.A. 01-2997, 2001 WL 1426680, *1 (E.D.La., Nov. 13, 2001).

District courts have bankruptcy jurisdiction over four types of matters: (1) cases under title 11; (2) proceedings "arising under" title 11; (3) proceedings "arising in" cases under title 11; and (4) proceedings "related to" cases under title 11. *See* 28 U.S.C. § 1334. The first category refers to the bankruptcy case itself, which is not before this Court. As to the remaining three categories, it is unnecessary to distinguish among them so long as the matter is at least "related to" the bankruptcy case; "these three 'references operate conjunctively to define the scope of jurisdiction.'" *Rumore v. Wamstad*, 2001 WL 1426680, at *1 (*quoting In re Wood*, 825 F.2d 90, 93 (5th Cir. 1987)).

The Seventh Circuit has held that a proceeding is related to a bankruptcy case when the dispute affects the amount of property for distribution or the allocation of property among creditors. *In re Fedpak Systems, Inc.*, 80 F.3d 207, 213-14 (7th Cir. 1995). Under this test, the Court has at

-6-

least "related to" jurisdiction over the instant action.

As discussed above, issues were raised in the State Court action as to whether Exide is liable to the plaintiffs as the sole indemnitor for breaches by the Non-Debtor Entities of their obligations under the Sale Agreements. At the time of removal, these issues were pending before the State Court. Indeed, the Non-Debtor Entities' motion to dismiss for lack of a necessary party (i.e., Exide) had not been ruled on. The motion was based in large part on the contention that Exide was the sole indemnitor under the indemnification provisions of the Coordinating Agreement. Disposition of that motion may result in a finding that Exide is in fact the party liable for all breaches. Clearly, a finding of liability on the part of the Debtor will have an impact on the estate. At a minimum, the plaintiffs will seek to utilize such a finding to bolster proofs of claim against the Exide estate for the Non-Debtor Entities' obligations under the Sale Agreements. The finding would thereby affect the estate's claims base and the allocation of property among its creditors. Under these circumstances, this Court has at least "related to" jurisdiction over the removed action.


**2.    The Motion to Transfer**

Having concluded that removal was proper, the Court will consider the defendants' motion to transfer this action to the Delaware Bankruptcy Court. The majority of courts considering the order in which to consider transfer or remand motions have overwhelmingly decided to hear transfer motions first. These courts have reasoned that when the transferee court is the court in which the bankruptcy case is pending, such courts are most familiar with the debtor's reorganization and therefore best equipped to consider the issues of remand and abstention. *See Consolidated Lewis*

-7-

*Investment Corp. v. First National Bank of Jefferson Parish* 74 B.R. 648 (E.D. La. 1987); *In re Allegheny Health, Education and Research Foundation*, 1999 WL 1033566, *1 (Bankr. E.D. Pa., Nov. 10, 1999); *In re Aztec Industries, Inc.* 84 B.R. 464, 467 (Bankr. N.D. Ohio 1987); *In re Convent Guardian Corp.*, 75 B.R. 346 (Bankr. E.D.Pa. 1987); *Colarusso v. Burger King Corp.*, 35 B.R. 365 (Bankr. E.D.Pa. 1984).

The defendants predicate their motion to transfer on the change of venue provision set forth in 28 U.S.C. § 1412. That section provides: "A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties." As the language of the statute contains no explicit reference to "related" proceedings, many courts have found that motions to transfer such actions should be governed by § 1404, the general venue provision. *See e.g., Rumore v. Wamstad*, 2001 WL 1426680, *2; *Tultex Corp. v. Freeze Kids, L.L.C.*, 252 B.R. 32 (S.D.N.Y. 2000); *Goldberg Holding Corp. v. NEP Productions, Inc.*, 93 B.R. 33 (Bankr. S.D.N.Y. 1988). That section provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404. The issue is largely academic, however, inasmuch as the factors to be considered under either statute are the same. *Jackson v. Venture Department Stores, Inc.*, No. 98 C 6216, 1998 WL 778057, *2 (N.D.Ill., Nov. 3, 1998); *see also In re Emerson Radio Corp.*, 52 F.3d 50, 56 (3rd Cir. 1995). The only significant difference between the two provisions is that § 1404 contains the additional limitation that transfer be to a district where the action might have been brought in the first instance. *See Emerson Radio*, 52 F.3d at 56. Accordingly, under § 1404, transfer is appropriate when (1) venue is proper in both the transferor and transferee courts; (2) transfer is for the convenience of the parties and witnesses; and (3) transfer is

-8-

in the interest of justice. *Coffey v. Van Dorn Iron Works*, 796 F.2d 217 (7th Cir. 1986). In ruling on a motion for transfer, the judge must consider the statutory factors in light of all the circumstances of the case. *Id.* at 219. The movant has the burden of establishing, by reference to particular circumstances, that transfer is appropriate. *See, e.g., Id.; Illinois Tool Works, Inc. v. Sweetheart Plastics, Inc.*, 436 F.2d 1180, 1187-88 (7th Cir. 1971).

As to the first element, venue is proper in both the transferor and transferee courts. Venue is proper in the Northern District of Illinois because this case was removed pursuant to 28 U.S.C. § 1452, which states: "A party may remove any claim or cause of action in a civil action ... to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title."

Venue is also proper in the District of Delaware pursuant to § 1409. Under § 1409, a proceeding arising under Title 11 or arising in or related to a case under Title 11 may be commenced in the district court in which such case is pending. Exide's bankruptcy case was filed in the District of Delaware, and for that reason, venue is also proper in the Delaware Bankruptcy Court. *See Calumet National Bank v. Levine*, 179 B.R. 117, 120 (N.D.Ind. 1995).

As for the second element, neither the plaintiffs nor the witnesses will be seriously inconvenienced by transferring this case to the Delaware Bankruptcy Court. Only twenty-nine of the forty-nine witnesses identified by the parties in answers to interrogatories are actually closer to one district than the other. Nineteen of those twenty-nine witnesses are closer to Wilmington than Chicago, including eighteen witnesses who are located less than 150 miles from the Delaware court. Only eleven of the twenty-nine witnesses are closer to Chicago. This includes nine witnesses located less than 150 miles from the Illinois court and two witnesses in Stillwater, Oklahoma, and Reno,

-9-

A-0370

Nevada, respectively.

According to defendants, the location of the other nineteen witnesses has no meaningful effect on the convenience of the two venues. Two witnesses are located in Singapore, and seven witnesses are located in Australia. Others are located in the United Kingdom, Belgium, and Germany. Travel from these international locations is not materially affected by the choice of venue. Seven witnesses are in the Atlanta, Georgia area, which is equidistant from Wilmington and Chicago. (See Chart of Witness Locations, as Exhibit D to Defendants' Motion).

The "interest of justice" is a component to be analyzed separately and may be determinative in a particular case, even if the convenience of the parties and witnesses might call for a different result. *See, e.g., Coffey v. Van Dorn Iron Works*, 796 F.2d 217 (7th Cir. 1986); *Lemke v. St. Margaret Hospital*, 594 F. Supp. 25 (N.D. Ill. 1983). Factors considered generally relate to the efficient administration of the court system. For example, the interest of justice may be served by a transfer to a district where the litigants are more likely to receive a speedy trial. *Coffey v. Van Dorn Iron Works*, 796 F.2d 217 (7th Cir. 1986). In the same vein, related litigation should be transferred to a forum where consolidation is feasible. *See Id.* at 217; *FTC v. MacArthur*, 532 F. 2d. 1135, 1143 (7th Cir. 1976). In making this determination, the court considers traditional notions of judicial economy rather than the private interests of the litigants and their witnesses. *TIG Ins., Co. v. Brightly Galvanized Prods., Inc.*, 911 F.Supp. 344, 346 (N.D. Ill.1996). Considerations also include the relationship of the community to the issues, the respective courts' familiarity with the applicable law, and the likelihood of a speedy trial. *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 220-21 (7th Cir.1986).

The Delaware Bankruptcy Court is obviously more familiar with the pending bankruptcy case

-10-

and the time and resources required for its effective administration. It is more efficient and more consistent with the goals of the Bankruptcy Code if one court, familiar with the estate and the bankruptcy process, hears the action. The action itself is not in an advanced stage in any event. The parties have taken one deposition, and there has been one discovery dispute regarding the timing of third-party discovery. The defendants point out that any discovery that has been taken can be used in the Delaware court. The State Court has made only one substantive ruling regarding a motion to dismiss for failure to state a claim (and that without prejudice) and ruled on one discovery dispute involving the timing of third-party subpoenas.

Plaintiffs suggest that the private interests of the parties favor retention of this matter in Illinois because of a forum selection clause in the Coordinating Agreement, designating Illinois as the proper venue. However, as discussed above, the proceeding — though properly brought in an Illinois court — was then properly removed to federal court. The forum selection clause does not preclude the requested transfer, but may be appropriately considered in connection with the plaintiffs' motion to remand or abstain. *See, e.g., In re AG Industries, Inc.*, 279 B.R. 534, 540 (Bankr. S.D.Oh. 2002) With respect to the private interests of the litigants, the Court further notes that none of the parties reside in Illinois and none of the bank accounts at issue are located in Illinois — two important criteria, which the Seventh Circuit considers in deciding these motions. *See Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 220-21 (7th Cir.1986) (considerations include the relation of the community to the issues). The outcome of this action also does not affect the Illinois state government or its citizens.

In sum, balancing all the relevant factors, the Court concludes that the defendants have met their burden of establishing that it is in the interest of justice and for the convenience of the parties

-11-

that this suit be transferred to the District of Delaware.

## CONCLUSION

For the reasons stated above, an order will be entered transferring this adversary proceeding, including plaintiffs' pending motion to remand or abstain, to the Delaware Bankruptcy Court.

ENTERED:

SUSAN PIERSON SONDERBY
**United States Bankruptcy Judge**

FEB 0 4 2003

-12-

A-0373

Page 1 of 3  1106

# U.S. Bankruptcy Court
## Northern District of Illinois (Chicago)
### Adversary Proceeding #: 02-01106
#### Internal Use Only

Assigned to:
Related BK Case:
Related BK Title:                                    Date Filed: 08/21/02
Demand:
Nature of Suit:


**Plaintiff**

------------------------

**Pacific Dunlop Holdings**              represented by **Pacific Dunlop Holdings**
                                                         PRO SE


**V.**

**Defendant**

------------------------

**Exde Corporation**                     represented by **William G Schopf**
                                                         Schopf & Weiss
                                                         304 West Randolph Street
                                                         Chicago, IL 60606
                                                         312-701-9300

| Filing Date | # | Docket Text |
|---|---|---|
| 08/21/2002 | 1 | ADVERSARY Complaint [KAG] (Entered: 08/21/2002) |
| 08/21/2002 | 2 | COVER Sheet [KAG] (Entered: 08/21/2002) |
| 08/21/2002 | 3 | APPEARANCE by Kenneth E Kraus and Eric F Rinehart for Exide Corporation [DO] (Entered: 08/22/2002) |
| 08/21/2002 | 4 | LOCAL RULE 3.2 Notificatin As To Affiliates [DO] (Entered: 08/22/2002) |
| 08/22/2002 | 5 | NOTICE of Motion [DO] (Entered: 08/23/2002) |
| 08/22/2002 | 6 | MOTION to Transfer To The United States District Court For The District Of Delaware by Defendants Exide Technologies hearing on 09/05/2002 at 10:00 a.m. at 219 South Dearborn, Courtroom 642, |

A-0374

| | | |
|---|---|---|
| | | Chicago, IL 60604 [DO] (Entered: 08/23/2002) |
| 09/04/2002 | 7 | HEARING Continued hearing on 10/09/2002 at 10:30 a.m.RE: Item# 6 [MI] Original NIBS Entry Number: 6A (Entered: 09/04/2002) |
| 08/28/2002 | 8 | NOTICE of Motion [DO] Original NIBS Entry Number: 7 (Entered: 08/29/2002) |
| 08/28/2002 | 9 | MOTION To Remand Or In The Alternative To Abstain by Pacific Dunlop Holdings (Europe)Ltd, (Plaintiffs) hearing on 09/04/2002 at 10:00 a.m. at 219 South Dearborn, Courtroom 642, Chicago, IL 60604 [DO] Original NIBS Entry Number: 8 (Entered: 08/29/2002) |
| 09/04/2002 | 10 | HEARING Continued hearing on 10/09/2002 at 10:30 a.m.RE: Item# 9 [MI] Original NIBS Entry Number: 8A (Entered: 09/04/2002) |
| 08/28/2002 | 11 | APPEARANCE by Thomas John Verticchio for Pacific Dunlop Holdings (Europe) Ltd. [DO] Original NIBS Entry Number: 9 (Entered: 08/29/2002) |
| 08/28/2002 | 12 | NOTICE of Filing [DO] Original NIBS Entry Number: 10 (Entered: 08/29/2002) |
| 08/28/2002 | 13 | STATEMENT Pursuant To Rule 9027 (e)(3) Of The Rules Of Bankruptcy Procedure by Plaintiffs [DO] Original NIBS Entry Number: 11 (Entered: 08/29/2002) |
| 08/28/2002 | 14 | RULE 3.2 Notification Of Affiliates by Plaintiffs [DO] Original NIBS Entry Number: 12 (Entered: 08/29/2002) |
| 08/28/2002 | 15 | MEMORANDUM In Support Of Motion To Remand Or In The Alternative To Abstain by Plaintiff [DO] Original NIBS Entry Number: 13 (Entered: 08/29/2002) |
| 08/29/2002 | 16 | APPEARANCE by Mathew N Kleiman, Esq. for Defendants [DO] Original NIBS Entry Number: 14 (Entered: 08/30/2002) |
| 08/30/2002 | 17 | RENOTICE of Motion hearing on 09/04/2002 at 10:00 a.m. at 219 South Dearborn, Courtroom 642, Chicago, IL 60604RE: Item# 6 [SE] Original NIBS Entry Number: 15 (Entered: 09/03/2002) |
| 09/18/2002 | 18 | NOTICE of Filing [GR] Original NIBS Entry Number: 16 (Entered: 09/19/2002) |
| 09/18/2002 | 19 | Opposition to Plaintiffs Motion to Remand by Defendant, Exide Entities. [GR] Original NIBS Entry Number: 17 (Entered: |

A-0375

| | | 09/19/2002) |
|---|---|---|
| 09/19/2002 | 20 | NOTICE of Filing [HP] Original NIBS Entry Number: 18 (Entered: 09/20/2002) |
| 09/19/2002 | 21 | MEMORANDUM In Opposition to Defendants Motion to Transfer by Plaintiff [HP] Original NIBS Entry Number: 19 (Entered: 09/20/2002) |
| 09/26/2002 | 22 | NOTICE of Filing [DO] Original NIBS Entry Number: 20 (Entered: 09/27/2002) |
| 09/26/2002 | 23 | REPLY To Defendants' Opposition To Plaintiffs' Motion To Remand RE: Item# 19 [DO] Original NIBS Entry Number: 21 (Entered: 09/27/2002) |
| 09/26/2002 | 24 | NOTICE of Filing [DO] Original NIBS Entry Number: 22 (Entered: 09/27/2002) |
| 09/26/2002 | 25 | REPLY In Support of Its Motion To Transfer To The United States District Court For The District Of Delaware by Defendant RE: Item# 6 [DO] Original NIBS Entry Number: 23 (Entered: 09/27/2002) |
| 02/04/2003 | 26 | MEMORANDUM Opinion and Order transferring this adversary proceeding, including plaintiffs pending Motion to Remand or, in the Alternative, to Abstain, to the United States Bankruptcy Court for the District of Delaware at □□ at RE: Item# 6 [SE] Original NIBS Entry Number: 24 (Entered: 02/04/2003) |
| 02/04/2003 | 27 | CERTIFICATE of Service RE: Item# 26 [SE] Original NIBS Entry Number: 25 (Entered: 02/04/2003) |

A-0376

# TAB 10

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| EXIDE TECHNOLOGIES, et al.,[1] | ) | |
| | ) | |
| Debtors. | ) | Case No. 02-11125 (KJC) |
| | ) | (Jointly Administered) |

---

# JOINT PLAN OF REORGANIZATION
## OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
## AND THE DEBTORS

---

Matthew N. Kleiman
Jason D. Horwitz
Ross M. Kwasteniet
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

Counsel for the Debtors and
Debtors in Possession

Laura Davis Jones
James E. O'Neill
Kathleen Marshall DePhillips
PACHULSKI, STANG, ZIEHL,
YOUNG, JONES & WEINTRAUB
919 North Market Street
P.O. Box 8705
Wilmington, DE 19899
(302) 652-4100

Counsel for the Debtors and
Debtors in Possession

Fred S. Hodara
Mary Reidy Masella
AKIN GUMP STRAUSS HAUER
& FELD LLP
590 Madison Avenue
New York, New York 10022
(212) 872-1000

Counsel for the Official Committee of
Unsecured Creditors

David B. Stratton
David M. Fournier
PEPPER HAMILTON LLP
1313 Market Street
Suite 5100
Wilmington, DE 19899-1709
(302) 777-1709

Counsel for the Official Committee of
Unsecured Creditors

Dated: March 11, 2004

---

[1] The Debtors in these proceedings are: Exide Technologies f/k/a Exide Corporation; Exide Delaware, L.L.C.; Exide Illinois, Inc., RBD Liquidation, L.L.C., Dixie Metals Company and Refined Metals Corporation.

6·15·04
#3918

## TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND
    GOVERNING LAW ................................................................................................................... 1
    A.    Rules of Interpretation, Computation of Time and Governing Law ....................... 1
    B.    Defined Terms ........................................................................................................... 1

ARTICLE II. ADMINISTRATIVE AND PRIORITY TAX CLAIMS .......................................... 11
    A.    Administrative Claims ............................................................................................ 11
    B.    DIP Facility Claims ................................................................................................ 12
    C.    Priority Tax Claims ................................................................................................ 12

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY
    INTERESTS .............................................................................................................................. 12
    A.    Summary ................................................................................................................ 12
    B.    Classification and Treatment of Claims and Equity Interests: Exide .................... 13
    C.    Classification and Treatment of Claims and Equity Interests: Subsidiary Debtors ......................... 16
    D.    Special Provision Governing Unimpaired Claims ................................................ 18

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE JOINT PLAN ................................. 18
    A.    Voting Classes ....................................................................................................... 18
    B.    Acceptance by Impaired Classes ........................................................................... 18
    C.    Presumed Acceptance of Joint Plan ...................................................................... 18
    D.    Presumed Rejection of Joint Plan ......................................................................... 18
    E.    Non-Consensual Confirmation .............................................................................. 18

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE JOINT PLAN ............................... 19
    A.    Restructuring .......................................................................................................... 19
    B.    Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors ... 19
    C.    Cancellation of Old Notes and Equity Interests .................................................... 19
    D.    Issuance of New Securities; Execution of Related Documents .............................. 20
    E.    Issuance of Stock or Limited Liability Company Interests of Reorganized Subsidiary
        Debtors to Reorganized Exide ............................................................................... 20
    F.    Corporate Governance, Directors and Officers, and Corporate Action ................ 20
    G.    Dismissal of Creditors Committee Adversary Proceeding, Smith Adversary Proceeding
        and other Settlements .............................................................................................. 21
    H.    Noteholder Distribution Settlement ....................................................................... 22
    I.    Sources of Cash for Distribution under Joint Plan ................................................ 22
    J.    Public Company Status and Listing on National Exchange ................................... 22
    K.    Payment of Fees and Expenses for the Agent, the Steering Committee and the
        Postconfirmation Creditors Committee ................................................................. 22
    L.    Indenture Trustee and other Professional Fees and Expenses ............................... 22
    M.    Adoption of Company Incentive Plan .................................................................... 23

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........ 23
    A.    Assumption of Executory Contracts and Unexpired Leases .................................. 23
    B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases ............. 24
    C.    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed ......... 25
    D.    Indemnification of Directors, Officers and Employees ......................................... 25
    E.    Compensation and Benefit Programs ..................................................................... 25
    F.    Rejection of Rights Agreement and Registration Agreements ............................... 25

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS ............................................ 25

A.    Distributions for Claims Allowed as of the Effective Date ................................... 25
B.    Delivery and Distributions and Undeliverable or Unclaimed Distributions ..................... 26
C.    Timing and Calculation of Amounts to be Distributed ........................................ 26
D.    Minimum Distribution ...................................................................... 27
E.    Setoffs .................................................................................. 27
F.    Surrender of Canceled Instruments or Securities ............................................ 27
G.    Restriction on Distribution of New Exide Common Stock and New Exide Warrants ............... 27

ARTICLE VIII. PROCEDURES FOR RESOLUTION OF DISPUTED, CONTINGENT AND
     UNLIQUIDATED CLAIMS OR EQUITY INTERESTS ......................................... 28
A.    Resolution of Disputed Claims .............................................................. 28
B.    Allowance of Claims ....................................................................... 30
C.    Controversy Concerning Impairment ......................................................... 30

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE
     JOINT PLAN ....................................................................... 30
A.    Condition Precedent to Confirmation ....................................................... 30
B.    Conditions Precedent to Consummation ...................................................... 31
C.    Waiver of Conditions ...................................................................... 31
D.    Effect of Non-occurrence of Conditions to Consummation .................................... 31

ARTICLE X. RELEASE, INJUNCTIVE AND RELATED PROVISIONS ......................................... 32
A.    Subordination ............................................................................. 32
B.    Releases by the Debtors ................................................................... 32
C.    Releases by Holders of Claims ............................................................. 32
D.    Release of Foreign Subsidiary Borrowers and the Domestic Non-Debtor ....................... 33
E.    Exculpation ............................................................................... 33
F.    Injunction ................................................................................ 33
G.    Preservation of Rights of Action .......................................................... 33
H.    Discharge of Claims and Termination of Equity Interests ................................... 35

ARTICLE XI. RETENTION OF JURISDICTION ......................................................... 35

ARTICLE XII. MISCELLANEOUS PROVISIONS ......................................................... 36
A.    Effectuating Documents, Further Transactions and Corporation Action ....................... 36
B.    Dissolution of Committees ................................................................. 36
C.    Payment of Statutory Fees ................................................................. 36
D.    Letters of Credit ......................................................................... 36
E.    Modification of Joint Plan ................................................................ 37
F.    Revocation of Joint Plan .................................................................. 37
G.    Successors and Assigns .................................................................... 37
H.    Reservation of Rights ..................................................................... 37
I.    Section 1146 Exemption .................................................................... 37
J.    Further Assurances ........................................................................ 37
K.    Service of Documents ...................................................................... 37
L.    Filing of Additional Documents ............................................................ 39

JOINT PLAN OF REORGANIZATION
OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
AND THE DEBTORS

Pursuant to Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, the Official Committee of Unsecured Creditors and the Debtors and Debtors-in-Possession in the above-captioned and numbered cases, hereby respectfully propose the following Joint Plan of Reorganization:

### ARTICLE I.

### DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

A.    *Rules of Interpretation, Computation of Time and Governing Law*

1.    For purposes herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference herein to an existing document or exhibit Filed, or to be Filed, shall mean such document or exhibit, as it may have been or may be amended, modified or supplemented; (d) unless otherwise specified, all references herein to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits hereof or hereto; (e) the words "herein," "hereof" and "hereto" refer to the Joint Plan in its entirety rather than to a particular portion of this Joint Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

2.    In computing any period of time prescribed or allowed hereby, the provisions of Bankruptcy Rule 9006(a) shall apply.

3.    Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

B.    *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "10% Senior Notes" means the 10% senior notes due April 15, 2005, issued pursuant to the 10% Senior Note Indenture.

2.    "10% Senior Note Claims" means all Claims derived from or based upon the 10% Senior Notes.

3.    "10% Senior Note Indenture" means that certain indenture dated April 28, 1995, as amended from time to time, as between Exide and The Bank of New York, as trustee, pursuant to which the 10% Senior Notes were issued.

4.    "10% Senior Note Indenture Trustee" means The Bank of New York, as trustee under the 10% Senior Note Indenture.

5.    "2.9% Convertible Notes" means the 2.9% senior convertible subordinated notes due December 15, 2005, issued pursuant to the 2.9% Convertible Note Indenture.

6.    "2.9% Convertible Note Claims" means all Claims derived from or based upon the 2.9% Convertible Notes.

7.    "2.9% Convertible Note Indenture" means that certain indenture dated December 15, 1995, as amended from time to time, as between Exide, as issuer, and The Bank of New York, as trustee, pursuant to which the 2.9% Convertible Notes were issued.

8.    "2.9% Convertible Note Indenture Trustee" means HSBC Bank USA, successor indenture trustee for the 2.9% convertible senior subordinated notes due 2005.

9.    "2.9% Note Settlement and Reallocation Payment" means 13.33% of the Aggregate Noteholder Distribution.

10.    "2.9% Note Subordination Payment" means the Pro Rata portion of the Class P4 Distribution based on the Allowed amount of the 2.9% Convertible Note Claims.

11.    "Adequate Protection Superpriority Claims" has the meaning set forth in the Final DIP Order.

12.    "Administrative Claim" means a Claim for costs and expenses of administration under section 503(b), 507(a)(1), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, but not limited to: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the businesses of Debtors (such as wages, salaries or commissions for services and payments for goods and other services and lease obligations); (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under sections 328, 330(a) or 331 of the Bankruptcy Code or otherwise; (c) all fees and charges assessed against the Estates under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911-1930; and (d) any Claim afforded priority status under section 503(b), 507(a)(1), 507(b), or 1114(e)(2) of the Bankruptcy Code pursuant to Final Order of the Bankruptcy Court.

13.    "Affiliate" means any Entity that is an affiliate of the Debtors or Reorganized Debtors within the meaning of section 101(2) of the Bankruptcy Code.

14.    "Agent" means Credit Suisse First Boston in its capacity as administrative agent under the Prepetition Credit Facility.

15.    "Agent Expenses" means the reasonable fees and expenses incurred after the Petition Date by the legal, accounting, financial, and other advisors to the Agent and/or the Syndication Agent under the Prepetition Credit Facility, including Alvarez & Marsal LLC, Shearman & Sterling LLP, Richards Layton & Finger, P.A., Standard & Poor's (in an amount not to exceed $1.4 million), and other foreign counsel and advisors to the Agent.

16.    "Aggregate Noteholder Distribution" means the Class P4 Distribution allocable to the 10% Senior Note Claims and the 2.9% Convertible Note Claims, based on the aggregate Allowed amount of the 10% Senior Note Claims and the 2.9% Convertible Note Claims.

17.    "Allowed" means, with respect to any Claim or Equity Interest, except as otherwise provided herein: (a) a Claim or Equity Interest that has been scheduled by Debtors in their schedules of liabilities as other than disputed, contingent or unliquidated and as to which Debtors or other party in interest has not Filed an objection by the Claims Objection Bar Date; (b) a Claim or Equity Interest that either is not a Disputed Claim or Equity Interest or has been allowed by a Final Order; (c) a Claim or Equity Interest that is allowed: (i) in any stipulation of amount and nature of Claim executed prior to the Confirmation Date and approved by the Bankruptcy Court; (ii) in any stipulation with Debtors of amount and nature of Claim or Equity Interest executed on or after the Confirmation Date; or (iii) in or pursuant to this Joint Plan, any contract, instrument, indenture or other agreement entered into or assumed in connection herewith; (d) a Claim or Equity Interest relating to a rejected executory

-2-

contract or unexpired lease that either (i) is not a Disputed Claim or Equity Interest or (ii) has been allowed by a Final Order, in either case only if a proof of Claim or Equity Interest has been Filed by the Claims Objection Bar Date or has otherwise been deemed timely Filed under applicable law; or (e) a Claim or Equity Interest that is allowed pursuant to the terms hereof.

18.    "Allowed … Claim" means an Allowed Claim in the particular Class described.

19.    "Allowed Equity Interest" means an Allowed Equity Interest in the particular Class described.

20.    "Amended and Restated Intercreditor and Subordination Agreement" means that certain intercreditor and subordination agreement dated as of April 15, 2002, and amended and restated as of February 13, 2004, among Deutsche Bank AG New York Branch, as agent for the Replacement DIP Credit Facility, Credit Suisse First Boston, as agent for the Prepetition Credit Facility, Citicorp USA, Inc., as escrow agent, certain affiliates of Exide and certain other signatories thereto.

21.    "Amended Prepetition Foreign Credit Agreement" means that certain credit agreement which shall govern the Prepetition Foreign Secured Claims of Option B Electors (if any), effective as of the Effective Date, substantially in the form contained in the Plan Supplement, and containing terms materially consistent with the Amended Prepetition Foreign Credit Agreement Term Sheet.

22.    "Amended Prepetition Foreign Credit Agreement Term Sheet" means that certain term sheet attached hereto as Exhibit A.

23.    "Ballots" mean the ballots accompanying the Disclosure Statement upon which Holders of Impaired Claims entitled to vote shall indicate their acceptance or rejection of the Joint Plan in accordance with the Joint Plan and the Voting Instructions.

24.    "Bankruptcy Code" means Title I of the Bankruptcy Reform Act of 1978, as amended from time to time, as set forth in sections 101 et seq. of Title 11 of the United States Code, and applicable portions of Titles 18 and 28 of the United States Code.

25.    "Bankruptcy Court" means the United States District Court for the District of Delaware, having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made pursuant to section 157 of Title 28 of the United States Code and/or the General Order of such District Court pursuant to section 151 of title 28 of the United States Code, the bankruptcy unit of such District Court.

26.    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Cases, promulgated under 28 U.S.C. § 2075 and the General, Local and Chambers Rules of the Bankruptcy Court.

27.    "Beneficial Holder" means the Person or Entity holding the beneficial interest in a Claim or Equity Interest.

28.    "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

29.    "Cash" means legal tender of the United States of America or the equivalent thereof, including bank deposits, checks and Cash Equivalents.

30.    "Cash Equivalents" means equivalents of Cash in the form of readily marketable securities or instruments issued by a Person, including, without limitation, readily marketable direct obligations of, or obligations guaranteed by, the United States of America, commercial paper of domestic corporations carrying a Moody's rating of "A" or better, or equivalent rating of any other nationally recognized rating service, or interest bearing certificates of deposit or other similar obligations of domestic banks or other financial institutions having a shareholders' equity or capital of not less than one hundred million dollars ($100,000,000) having maturities of not more than one (1) year, at the then best generally available rates of interest for like amounts and like periods.

- 3 -

A-0382

31.    "Causes of Action" mean all Claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, third-party claims, counterclaims, and crossclaims (including, but not limited to, all claims and any avoidance, recovery, subordination or other actions against insiders and/or any other entities under the Bankruptcy Code, including sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or otherwise) of the Debtors, the Debtors in Possession, and/or the Estates (including, but not limited to, those actions listed in the Plan Supplement) that are or may be pending on the Effective Date or instituted by the Reorganized Debtors after the Effective Date against any entity, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order.

32.    "Chapter 11 Cases" means the above-captioned chapter 11 proceedings filed by the Debtors with case numbers 02-11125 through 02-11128, 02-13449 and 02-13450, and jointly administered under case number 02-11125.

33.    "Claim" means a claim (as defined in section 101(a)(5) of the Bankruptcy Code) against a Debtor, including, but not limited to: (a) any right to payment from a Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) any right to an equitable remedy for breach of performance if such performance gives rise to a right of payment from a Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

34.    "Claim Holder" or "Claimant" means the Holder of a Claim.

35.    "Claims Objection Bar Date" means the deadline for the Debtors, Reorganized Debtors or any other Person or Entity to file an objection to the allowance of any Claim, which shall be 120 days after the Effective Date, unless extended by the Bankruptcy Court.

36.    "Claim Settlement Notice Parties" means the Postconfirmation Creditors Committee, United States Trustee and any other party who specifically requests notice of the settlement of Disputed Claims pursuant to Article VIII.A hereof.

37.    "Class" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof.

38.    "Class P3 Distribution" means 90% of the Effective Date New Exide Common Stock.

39.    "Class P4 Distribution" means (a) 10% of the Effective Date New Exide Common Stock, and (b) the New Exide Warrants.

40.    "Class P4-B Distribution" means 86.67% of the Aggregate Noteholder Distribution.

41.    "Class P4-C Distribution" means 13.33% of the Aggregate Noteholder Distribution.

42.    "Class P3 Option B Distribution" means New Exide Common Stock from the Class P3 Distribution having a value equal to the Prepetition Domestic Secured Claims Liquidation Value plus $1.00.

43.    "Committee/$R^2$ Motion" means that certain motion filed December 1, 2003, docket number 3261, whereby the Creditors Committee sought leave to commence an adversary proceeding against $R^2$ Investments LDC and $R^2$ Top Hat, Ltd.

44.    "Committees" means, collectively, the Creditors Committee and the Equity Committee.

45.    "Company Incentive Plan" means the post-Effective Date incentive compensation plan to be adopted by the compensation committee of the New Exide Board of Directors and by the New Exide Board of Directors as soon as reasonably practicable after the Effective Date, as such plan may be modified or supplemented in accordance with its terms.

A-0383

46. "Confirmation" means the entry of the Confirmation Order, subject to all conditions specified in Article IX.A hereof having been (a) satisfied or (b) waived pursuant to Article IX.C hereof.

47. "Confirmation Hearing" means the hearing at which the Confirmation Order is considered by the Bankruptcy Court.

48. "Confirmation Date" means the date upon which the Confirmation Order is entered by the Bankruptcy Court in its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

49. "Confirmation Order" means the order of the Bankruptcy Court confirming the Joint Plan pursuant to section 1129 of the Bankruptcy Code.

50. "Consummation" means the occurrence of the Effective Date.

51. "Creditor" means any Holder of a Claim.

52. "Creditors Committee" means the official committee of unsecured creditors appointed in these Chapter 11 Cases, currently consisting of the Pension Benefit Guaranty Corporation, HSBC Bank USA, The Bank of New York, Smith Management LLC, Turnberry Capital Management L.P., Tulip Corporation, Transervice Logistics Inc., Carroll Todd Lollis (as guardian ad litem for Logan T. Lollis), and Aaron Wann.

53. "Creditors Committee Adversary Proceeding" means that certain adversary proceeding filed in the Bankruptcy Court by the Creditors Committee and R² Investments, LDC against Credit Suisse First Boston and Salomon Smith Barney, Inc., designated as Adversary Proceeding Number 03-50134 (KJC).

54. "Debtor" means one of the Debtors, in its individual capacity, as a debtor in these Chapter 11 Cases.

55. "Debtor in Possession" means one of the Debtors in Possession, in its individual capacity, as debtor in possession in these Chapter 11 Cases.

56. "Debtors" means, collectively, the Initial Debtors and the Subsequent Debtors.

57. "Debtors in Possession" means the Debtors, as debtors in possession in these Chapter 11 Cases.

58. "Deutsche Exide" means Deutsche Exide GMBH.

59. "DIP Facility" means that $500 million secured super priority debtor in possession credit agreement dated as of April 15, 2002, and amended and restated as of February 13, 2004, as amended from time to time, among (a) Exide and those subsidiaries of Exide listed on the signature pages thereof as debtors and debtors in possession, as borrowers, (b) the subsidiaries of Exide listed on the signature pages thereof as guarantors, and any subsidiary that becomes guarantor thereunder pursuant to section 10.9 of such agreement, (c) Deutsche Bank AG New York Branch, as administrative agent and collateral monitoring agent, (d) Citicorp USA, Inc., as collateral agent and escrow agent, and (e) the lenders and issuers from time to time party thereto.

60. "DIP Facility Claims" means Claims derived from or based upon the DIP Facility.

61. "Disclosure Statement" means the Disclosure Statement for the Joint Plan of Reorganization of the Official Committee of Unsecured Creditors and the Debtors, together with all exhibits, schedules and supplements thereto, as amended, supplemented, or modified from time to time, describing the Joint Plan, that is prepared and distributed in accordance with sections 1125, 1126(b) and/or 1145 of the Bankruptcy Code and Bankruptcy Rule 3018 and/or other applicable law.

62. "Disputed" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not an Allowed Claim or Equity Interest: (a) that is listed on the Schedules as unliquidated, disputed or contingent; (b) as to which a Debtor or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules or (c) that is otherwise disputed by a

A-0384

Debtor in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order.

63.   "Distribution Record Date" means the date for determining which Holders of Claims are eligible to receive distributions hereunder, and shall be the Confirmation Date.

64.   "Dixie Metals" means Dixie Metals Company, a Delaware corporation.

65.   "Domestic Non-Debtor" means GNB Battery Technologies Japan, Inc., a Delaware corporation.

66.   "Effective Date" means the date selected by the Creditors Committee, the Agent and the Debtors which is a Business Day after the Confirmation Date on which:  (a) no stay of the Confirmation Order is in effect, and (b) all conditions specified in Article IV hereof have been (i) satisfied or (ii) waived pursuant to Article IX.C. hereof.

67.   "Effective Date New Exide Common Stock" means 25 million shares of New Exide Common Stock, provided, however, that the overall equity position represented by these shares will be subject to dilution by the exercise, if any, of the New Exide Warrants, by operation of the Company Incentive Plan and by any duly authorized issuance of Reorganized Exide capital stock after the Effective Date.

68.   "Entity" means an entity as defined in section 101(15) of the Bankruptcy Code.

69.   "Equity Committee" means the official committee of equity security holders appointed in these Chapter 11 Cases.

70.   "Equity Interest" means any equity interest in a Debtor, including, but not limited to, all issued, unissued, authorized or outstanding shares or stock, together with any warrants, options or contract rights to purchase or acquire such interests at any time.

71.   "Estate" means the estate of a Debtor created by section 541 of the Bankruptcy Code upon the commencement of its respective Chapter 11 Case.

72.   "Exide" means Exide Technologies, f/k/a Exide Corporation, a Delaware corporation.

73.   "Exide BV" has the meaning set forth in Article V.A. hereof.

74.   "Exide CV" has the meaning set forth in Article V.A. hereof.

75.   "Exide Delaware" means Exide Delaware, L.L.C., a Delaware limited liability company.

76.   "Exide Holding Asia" has the meaning set forth in Article V.A hereof.

77.   "Exide Holding Europe" has the meaning set forth in Article V.A hereof.

78.   "Exide Illinois" means Exide Illinois, Inc., a Pennsylvania corporation.

79.   "Exit Facility" means a post-Consummation credit facility, substantially in the form contained in the Plan Supplement, in an amount sufficient to (a) fund the Debtors' Cash payment obligations under the Joint Plan and (b) provide for the Debtors' projected minimum Cash reserve requirements on and after the Effective Date.

80.   "Fee Notice Parties" means (a) the Debtors, (b) the Creditors Committee, (c) the Agent, (d) the Office of the United States Trustee (if the Office of the United States Trustee requests to receive copies of the fee and expense statements of the Fee Submission Parties), (e) the 2.9% Convertible Note Indenture Trustee, (f) the 10% Senior Note Indenture Trustee, (g) R2 Investments LDC and R2 Top Hat, Ltd., and (h) Smith Management LLC.

81.   "Fee Submission Parties" means the following entities, which shall be authorized to submit time descriptions and expense statements pursuant to Article V.L hereof, for all fees and expenses (including, but not

- 6 -

A-0385

limited to legal fees and expenses) actually and reasonably incurred and related to these Chapter 11 Cases: (A) the 10% Senior Note Indenture Trustee and its counsel, (the applicable application period for the foregoing being prior to the Effective Date); (B) the 2.9% Convertible Note Indenture Trustee and its counsel, R2 Investments LDC and R2 Top Hat, Ltd., (limited to actual and necessary out-of-pocket expenses), and the following counsel to R2 Investments LDC and R2 Top Hat, Ltd.: (i) Brown Rudnick Berlack & Israels, (ii) Fox, Rothschild, Obrien & Frankel, (iii) Ashby & Geddes, (iv) Debevoise & Plimpton, (v) Fish & Richardson, (vi) Gibson, Dunn & Crutcher, (vii) Kelly, Hart & Hallman, (viii) Mayer, Brown, Rowe & Maw, (ix) Paul, Weiss, Rifkind, Wharton & Garrison, (x) Sidley, Austin, Brown & Wood, (xi) Sonnenschein, Nath & Rosenthal, and (xii) Wilmer, Cutler & Pickering, (the applicable application period for the foregoing being January 1, 2002 through the Effective Date); and (C) the Bayard Firm, as litigation counsel to the Creditors Committee, Sonnenschein Nath & Rosenthal LLP, as litigation counsel to the Creditors Committee, and Arent Fox Kintner Plotkin & Kahn PLLC and Duane Morris LLP, counsel to Smith Management LLC, (the applicable application period for the foregoing being the Petition Date through the Effective Date).

82.    "File" or "Filed" means file or filed with the Bankruptcy Court in the Chapter 11 Cases.

83.    "Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

84.    "Final DIP Order" means the "Final Order Authorizing the Debtors In Possession to Enter into Post-Petition Credit Agreement and Obtain Post-Petition Financing Pursuant to Section 363 and 364 of the Bankruptcy Code, Providing Adequate Protection, and Granting Liens, Security Interests and Super-Priority Claims" entered by the Bankruptcy Court on May 10, 2002, as amended or modified pursuant to the Interim and Final Orders approving the amendments to the DIP Facility.

85.    "Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

86.    "Foreign Asset Sales" has the meaning set forth in the Amended and Restated Intercreditor and Subordination Agreement.

87.    "Foreign Subsidiary Borrowers" means Exide Holding Europe S.A., Compagnie Européenne D'Accumulateurs S.A., Euro Exide Corporation Limited, Sociedad Española del Acumulador Tudor S.A., Tudor A.B., CMP Batterijen B.V., CMP Batteries Limited, Deutsche Exide Standby GMBH, Deutsche Exide GMBH and Mercolec Tudor B.V., Exide Italia S.R.L., Industria Composizioni Stampate, SpA, Fulmen Ibérica S.L., CMP Batterijen N.V., Exide Automotive Batterie GMBH, Hagen Batterie AG, Hagen Batterijen B.V., Electro Mercantil Industrial S.L., Exide (Dagenham) Limited, Exide France S.A.S., Fulmen UK Limited, Exide Automotive S.A., Sociedade Portuguesa do Acumulador Tudor S.A., Exide Danmark A/S, Exide Batterier AB, Centra S.A., Exide Sønnak A/S, Exide Automotive B.V., Exide Batteries Limited, B.I.G. Batteries Limited, Exide Lending Limited, Exide Holdings Limited, Exide Technologies Holding BV, Exide Holding Asia PTE Limited, GNB Technologies (China) Limited, Exide Singapore PTE Limited, Exide Australia PTY Limited, Exide Technologies Limited, Exide Canada Inc., and 1036058 Ontario Inc.

88.    "General Unsecured Claim" means any Claim against a Debtor that is not an Administrative Claim, DIP Facility Claim, Priority Tax Claim, Other Priority Claim, Other Secured Claim, or Prepetition Credit Facility Claim.

89.    "Holder" and collectively, "Holders" mean a Person or Entity holding an Equity Interest or Claim, including a holder.

90.    "Impaired" means with respect to any Class of Claims or Equity Interests, which Claims or Equity Interests will not be paid in full upon the effectiveness of this Joint Plan or will be changed by the reorganization effectuated hereby.

91.    "Impaired Claim" means a Claim classified in an Impaired Class.

- 7 -

92. "Impaired Class" means each of Classes P3, P4, P5, S3, S4 and S5 as set forth in Article III hereof.

93. "Initial Debtors" means, collectively, Exide; Exide Delaware; Exide Illinois, and RBD Liquidation, having Filed voluntary chapter 11 petitions on the Initial Petition Date.

94. "Initial Petition Date" means April 15, 2002.

95. "Joint Plan" means this Joint Plan of Reorganization of the Creditors Committee and the Debtors.

96. "Letter of Credit" means a letter of credit issued pursuant to the Prepetition Credit Facility.

97. "Master Ballots" mean the master ballots accompanying the Disclosure Statement upon which Holders of Impaired Claims or Impaired Equity Interests shall indicate their acceptance or rejection of the Joint Plan in accordance with the Voting Instructions.

98. "New Exide Board of Directors" means the board of directors of Reorganized Exide, on and after the Effective Date.

99. "New Exide By-laws" means the by-laws of Reorganized Exide, substantially in the form contained in the Plan Supplement.

100. "New Exide Certificate of Incorporation" means the certificate of incorporation of Reorganized Exide, substantially in the form contained in the Plan Supplement.

101. "New Exide Common Stock" means the shares of Reorganized Exide's common stock, par value $.01 per share, to be authorized pursuant to the New Exide Certificate of Incorporation.

102. "New Exide Warrant Agreement" means that certain warrant agreement governing the New Exide Warrants, substantially in the form contained in the Plan Supplement, containing terms materially consistent with the New Exide Warrant Term Sheet.

103. "New Exide Warrant Term Sheet" means that certain term sheet describing the terms of the New Exide Warrants, attached hereto as Exhibit B.

104. "New Exide Warrants" means warrants to purchase 6.25 million shares of New Exide Common Stock (assuming 25 million shares to be issued under the Joint Plan), as governed by the terms set forth in the New Exide Warrant Agreement (including the anti-dilution provisions therein), it being understood that the overall equity position represented by any shares obtained through the exercise of the New Exide Warrants will be subject to dilution by the Company Incentive Plan.

105. "New Organizational Documents" means (a) those certificates of incorporation to be filed with the Secretary of State for the State of Delaware by Reorganized Exide, Reorganized Dixie Metals, and Reorganized Refined Metals, (b) the certificate of incorporation to be filed with the Secretary of State for the State of Pennsylvania by Reorganized Exide Illinois, and (c) the certificates of formation to be filed with the Secretary of State for the State of Delaware by Exide Delaware and RBD Liquidation, along with the operating agreements or limited liability company agreements for Exide Delaware and RBD Liquidation, whether or not filed.

106. "Nominee" means any Beneficial Holder whose securities were registered or held of record in the name of his broker, dealer, commercial bank, trust company, savings and loan or other nominee.

107. "Non-Noteholder General Unsecured Claims" means all General Unsecured Claims that are not 10% Senior Note Claims or 2.9% Convertible Note Claims.

108. "Old Notes" means, collectively, the 10% Senior Notes and the 2.9% Convertible Notes.

109. "Option A Electors" means those Holders of Prepetition Credit Facility Claims, if any, who chose the Class P3 Option A, pursuant to Article III.B.3 hereof.

- 8 -

A-0387

110.   "Option B Electors" means those Holders of Prepetition Credit Facility Claims, if any, who chose the Class P3 Option B, pursuant to Article III.B.3 hereof.

111.   "Other Priority Claims" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

112.   "Other Secured Claims" means any and all Secured Claims against the Debtors not specifically described herein.

113.   "Person" means a person as defined in section 101(41) of the Bankruptcy Code.

114.   "PITWD Claims" means those Claims against the Debtors based on or derived from allegations of personal injury tort or wrongful death, within the meaning of 28 U.S.C. 157(b)(5).

115.   "Plan Supplement" means the compilation of documents and forms of documents, schedules and exhibits previously filed and subsequently identified as an exhibit to this Joint Plan or to be filed not less than 10 days prior to the hearing on the Confirmation Hearing, as it may be altered, amended, modified or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules.

116.   "Postconfirmation Creditors Committee" means a committee to be formed on the Effective Date, comprised of those members of the Creditors Committee willing to serve in such capacity.

117.   "Prepetition Credit Facility" means that certain amended and restated credit and guarantee agreement dated September 29, 2000, as amended from time to time, among Exide and certain borrowing subsidiaries and certain guarantors and the Agent and certain other parties thereto.

118.   "Prepetition Credit Facility Claims" means all Claims of any Person (a) derived from or based upon the Prepetition Credit Facility and all documents relating thereto, including the Prepetition Domestic Secured Claims, Prepetition Foreign Secured Claims and the Prepetition Credit Facility Swap Claim, (b) derived from or based upon any guaranty of the obligations under the Prepetition Credit Facility and all documents relating thereto and (c) arising under or in connection with the Final DIP Order and derived from or based upon the Prepetition Credit Facility and all documents relating thereto, including the Adequate Protection Superpriority Claims, if any.

119.   "Prepetition Credit Facility Swap Claim" means the Claim based upon the $60,000,000 two-year interest rate swap with Exide dated as of October 20, 2000.

120.   "Prepetition Domestic Secured Claims" means all Prepetition Credit Facility Claims that are not Prepetition Foreign Secured Claims.

121.   "Prepetition Domestic Secured Claims Liquidation Value" means the value available for distribution to Holders of Prepetition Domestic Secured Claims as of the Effective Date if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, as set forth in the section of the Disclosure Statement entitled "LIQUIDATION ANALYSIS" and within the meaning of section 1129(a)(7)(A)(ii) of the Bankruptcy Code.

122.   "Prepetition Foreign Secured Claims" means all Prepetition Credit Facility Claims as to which any of the Foreign Subsidiary Borrowers are obligors.

123.   "Prepetition Lenders" means those Persons party to the Prepetition Credit Facility as lenders thereunder.

124.   "Priority Tax Claim" means a Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

125.   "Professional," or collectively "Professionals" means a Person or Entity (a) employed pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b)

A-0388

for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

126.    "Pro Rata" means the proportion that an Allowed Claim or an Allowed Equity Interest bears to the aggregate amount of Allowed Claims or the aggregate amount of Allowed Equity Interests in such Class or subclass, as applicable.

127.    "Purported Lease" means one of the contracts at issue in the Recharacterization Adversary Proceeding.

128.    "Purported Lessor" means the defendants in the Recharacterization Adversary Proceeding.

129.    "RBD Liquidation" means RBD Liquidation L.L.C., a Delaware limited liability company.

130.    "Recharacterization Adversary Proceeding" means that certain adversary proceeding filed by the Debtors in the Bankruptcy Court on March 24, 2003, docketed as adversary proceeding number 03-51952 (KJC).

131.    "Registration Agreements" means, collectively, (a) that certain registration rights agreement dated as of September 29, 2000, by and among the Debtors and certain lenders under the Prepetition Credit Agreement, (b) that certain registration rights and standstill agreement dated as of September 29, 2000, by and between the Debtors and Pacific Dunlop Holdings (USA) Inc., and (c) that certain registration rights agreement dated from October, 1993, by and among the Debtors, Wilmington Securities, Inc., and certain holders of Equity Interests in the Debtors, as amended.

132.    "Releasees" means the Debtors and their Affiliates, the Reorganized Debtors and each of their Affiliates, the Creditors Committee, the Equity Committee, the Agent, the Syndication Agent, the Agents and Lenders under (and as defined in) the DIP Facility, the Option A Electors, the 10% Senior Note Indenture Trustee, the 2.9% Convertible Note Indenture Trustee, Smith Management LLC, $R^2$ Investments, LDC, $R^2$ Top Hat, Ltd., and all officers, directors, members, employees, attorneys, financial advisors, accountants, investment bankers, agents and representatives of each of the foregoing, whether current or former, in each case in their capacity as such, and only if serving in such capacity on the Initial Petition Date or thereafter.

133.    "Reorganized Debtor" means any Debtor and Debtor in Possession, or any successor thereto, by merger, consolidation, or otherwise, on and after the Effective Date.

134.    "Reorganized Debtors" means the Debtors and Debtors in Possession, or any successors thereto, by merger, consolidation, or otherwise, on and after the Effective Date.

135.    "Reorganized Exide" means Exide or any successors thereto, by merger, consolidation, or otherwise, on and after the Effective Date.

136.    "Reorganized Subsidiary Debtors" means the Subsidiary Debtors, or any successors thereto, by merger, consolidation, or otherwise, on and after the Effective Date.

137.    "Refined Metals" means Refined Metals Corporation, a Delaware corporation.

138.    "Rights Agreement" means that certain rights agreement dated September 18, 1998, as amended, between Exide and American Stock Transfer and Trust Company, as rights agent, authorizing the issuance of rights to purchase or acquire shares of preferred stock under certain circumstances.

139.    "Schedules" mean the schedules of assets and liabilities, schedules of executory contracts, and the statement of financial affairs as the Bankruptcy Court requires the Debtors to File pursuant to section 521 of the Bankruptcy Code, the Official Bankruptcy Forms and the Bankruptcy Rules, as they may be amended and supplemented from time to time.

140.    "Secured Claim" means (a) a Claim that is secured by a lien on property in which the Estate has an interest, which lien is valid, perfected and enforceable under applicable law or by reason of a Final Order, or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest

A-0389

in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code, or (b) a Claim Allowed under this Joint Plan as a Secured Claim.

141. "Securities Exchange Act" means the Securities Exchange Act of 1934, as amended.

142. "Smith Adversary Proceeding" means that certain adversary proceeding filed in the Bankruptcy Court by Smith Management LLC against Credit Suisse First Boston, Salomon Smith Barney, Inc., n/k/a Citigroup Global Markets, Inc., AG Capital Funding Partners L.P., $R^2$ Top Hat Ltd., Black Diamond 1998-1 LTD., Black Diamond CLO 2000-1 LTD., Black Diamond International Funding, LTD., Citadel Trading LTD., and Citadel Equity Fund, LTD., designated as adversary proceeding 03-56894 (KJC).

143. "Solicitation Order" means an order of the Bankruptcy Court (a) approving the adequacy of the Disclosure Statement and (b) establishing certain solicitation and voting procedures, dates and deadlines.

144. "Standstill Agreement" means that certain Standstill Agreement and Fifth Amendment to the Credit Agreement dated as of April 15, 2002, as amended, among Exide and certain borrowing subsidiaries and certain guarantors and the Agent and certain other parties thereto.

145. "Steering Committee Expenses" means the reasonable and actual expenses of the members of the Steering Committee, including the reasonable and actual fees and expenses incurred after the Petition Date by the legal, accounting and financial advisors to the members of the steering committee of prepetition lenders, in the aggregate not to exceed $850,000.

146. "Subsequent Debtors" means Dixie Metals and Refined Metals, having Filed voluntary chapter 11 petitions on the Subsequent Petition Date.

147. "Subsequent Petition Date" means November 21, 2002.

148. "Subsidiary Debtors" means Exide Delaware; Exide Illinois, RBD Liquidation, Dixie Metals and Refined Metals.

149. "Syndication Agent" means Citigroup Global Markets, Inc., formerly known as Salomon Smith Barney, Inc., in its capacity as syndication agent under the Prepetition Credit Facility.

150. "Unimpaired Claims" means Claims in an Unimpaired Class.

151. "Unimpaired Class" means an unimpaired Class within the meaning of section 1124 of the Bankruptcy Code.

152. "Unknown Causes of Action" has the meaning set forth in Article X.F.1 below.

153. "Voting Deadline" means the date stated in the Voting Instructions by which all Ballots must be received.

154. "Voting Instructions" mean the instructions for voting on the Joint Plan contained in the Solicitation Order, in the section of the Disclosure Statement entitled "SOLICITATION; VOTING PROCEDURES" and in the Ballots and the Master Ballots.

ARTICLE II.

ADMINISTRATIVE AND PRIORITY TAX CLAIMS

A.    *Administrative Claims*

Subject to the provisions of section 330(a) and 331 of the Bankruptcy Code, each Holder of an Allowed Administrative Claim will be paid the full unpaid amount of such Allowed Administrative Claim in Cash (i) on the Effective Date, (ii) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed, or (iii) upon such other terms as may be agreed upon by such Holder and Reorganized Debtor or otherwise upon an order of

- 11 -

the Bankruptcy Court; *provided that* Allowed Administrative Claims representing obligations incurred in the ordinary course of business or otherwise assumed by a Debtor pursuant hereto will be assumed on the Effective Date and paid or performed by such Reorganized Debtor when due in accordance with the terms and conditions of the particular agreements governing such obligations. The Holders of Allowed Adequate Protection Superpriority Claims, if any, will receive on account of such Claims the treatment set forth for Class P3 in Article III.B.3 below.

B.    *DIP Facility Claims*

Subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, Allowed DIP Facility Claims will be paid in full in Cash on the earlier of (i) the Effective Date or (ii) the termination of the DIP Facility according to its terms.

C.    *Priority Tax Claims*

On the Effective Date or as soon as practicable thereafter, each Holder of a Priority Tax Claim due and payable on or prior to the Effective Date shall be paid, at the option of the respective Reorganized Debtor, (a) Cash in an amount equal to the amount of such Allowed Claim, or (b) Cash over a six-year period from the date of assessment as provided in section 1129(a)(9)(C) of the Bankruptcy Code, with interest payable at a fixed rate determined as of the Confirmation Date by the formula provided in section 6621(a)(2) of the Internal Revenue Code and compounded daily (as provided in section 6622 of the Internal Revenue Code), provided, however, that tax obligations owed to the Missouri Department of Revenue shall be paid at a rate of 5% annual interest. Any deferred payments made pursuant to section 1129(a)(9)(C) of the Bankruptcy Code shall be by equal quarterly Cash payments beginning on the first day of the calendar month following the Effective Date, and following on the first day of each third calendar month thereafter, as necessary. The amount of any Priority Tax Claim that is not an Allowed Claim or that is not otherwise due and payable on or prior to the Effective Date, and the rights of the Holder of such Claim, if any, to payment in respect thereof shall (x) be determined in the manner in which the amount of such Claim and the rights of the Holder of such Claim would have been resolved or adjudicated if the Chapter 11 Cases had not been commenced, (y) survive the Effective Date and Consummation of the Joint Plan as if the Chapter 11 Cases had not been commenced, and (z) not be discharged pursuant to section 1141 of the Bankruptcy Code. In accordance with section 1124 of the Bankruptcy Code, and notwithstanding any other provision of the Joint Plan to the contrary, the Joint Plan shall leave unaltered the legal, equitable, and contractual rights of each Holder of a Priority Tax Claim. If the Reorganized Debtors substantially default on the payments of a tax due to a local, state or federal taxing authority under this Joint Plan, then the total amount still owed to such local, state or federal taxing authority under this Joint Plan shall become due and payable, and such local, state or federal taxing authority may collect such amount as otherwise permitted under nonbankruptcy law. In this context, "substantial default" shall mean that the Reorganized Debtors have defaulted on two consecutive Joint Plan payments owing to a given local, state or federal taxing authority, and, after receiving written notice of such default from the local, state or federal taxing authority, have not, within sixty days, cured the default.

ARTICLE III.

CLASSIFICATION AND TREATMENT
OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

A.    *Summary*

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

THE ESTATES OF THE DEBTORS HAVE NOT BEEN CONSOLIDATED, SUBSTANTIVELY OR OTHERWISE. ANY CLAIMS HELD AGAINST ONE OF THE DEBTORS WILL BE SATISFIED

A-0391

SOLELY FROM THE CASH AND ASSETS OF SUCH DEBTOR. EXCEPT AS SPECIFICALLY SET FORTH HEREIN, NOTHING IN THIS JOINT PLAN OR THE DISCLOSURE STATEMENT SHALL CONSTITUTE OR BE DEEMED TO CONSTITUTE AN ADMISSION THAT ONE OF THE DEBTORS IS SUBJECT TO OR LIABLE FOR ANY CLAIM AGAINST THE OTHER DEBTORS. THE CLAIMS OF CREDITORS THAT HOLD CLAIMS AGAINST MULTIPLE DEBTORS WILL BE TREATED AS SEPARATE CLAIMS WITH RESPECT TO EACH DEBTOR'S ESTATE FOR ALL PURPOSES (INCLUDING, BUT NOT LIMITED TO, DISTRIBUTIONS AND VOTING), AND SUCH CLAIMS WILL BE ADMINISTERED AS PROVIDED IN THE JOINT PLAN.

Summary of Classification and Treatment of Claims and Equity Interests: Exide

| Class | Claim | Status | Voting Right |
|-------|-------|--------|--------------|
| P1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| P2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| P3 | Prepetition Credit Facility Claims | Impaired | Entitled to vote |
| P4 | General Unsecured Claims<br><br>• P4-A: Non-Noteholder General Unsecured Claims<br><br>• P4-B: 10% Senior Note Claims<br><br>• P4-C: 2.9% Convertible Note Claims | Impaired | Entitled to vote |
| P5 | Equity Interests | Impaired | Deemed to reject |

1.      Summary of Classification and Treatment of Claims and Equity Interests: Subsidiary Debtors

| Class | Claim | Status | Voting Right |
|-------|-------|--------|--------------|
| S1 | Other Priority Claims | Unimpaired | Deemed to accept |
| S2 | Other Secured Claims | Unimpaired | Deemed to accept |
| S3 | Prepetition Credit Facility Claims | Impaired | Entitled to vote |
| S4 | General Unsecured Claims | Impaired | Deemed to Reject |
| S5 | Equity Interests | Impaired | Deemed to Reject |

B.      *Classification and Treatment of Claims and Equity Interests: Exide*

1.      Class P1—Other Priority Claims

(a)      *Classification:* Class P1 consists of all Other Priority Claims against Exide.

(b)      *Treatment:* The legal, equitable and contractual rights of the Holders of Allowed Class P1 Claims are unaltered by the Joint Plan. Unless otherwise agreed to by the Holders of the Allowed Other Priority Claim and Exide, each Holder of an Allowed Class P1 Claim shall receive, in full and final satisfaction of such Allowed Class P1 Claim, one of the following treatments, in the sole discretion of Exide:

(i)      Reorganized Exide will pay the Allowed Class P1 Claim in full in Cash on the Effective Date or as soon thereafter as is practicable; *provided that,* Class P1 Claims representing obligations incurred in the ordinary course of business will be paid in full in Cash when such Class P1 Claims become due and owing in the ordinary course of business; or

(ii)      such Claim will be treated in any other manner so that such Claim shall otherwise be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

- 13 -

A-0392

(c)    *Voting:*  Class P1 is Unimpaired and the Holders of Class P1 Claims are conclusively deemed to have accepted the Joint Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Claims in Class P1 are not entitled to vote to accept or reject the Joint Plan.

2.    Class P2—Other Secured Claims

(a)    *Classification:*  Class P2 consists of all Other Secured Claims against Exide.

(b)    *Treatment:*  The legal, equitable and contractual rights of the Holders of Class P2 Claims are unaltered by the Joint Plan.  Unless otherwise agreed to by the Holder of the Allowed Class P2 Claim and Exide, each Holder of an Allowed Class P2 Claim shall receive, in full and final satisfaction of such Allowed Class P2 Claim, one of the following treatments, in the sole discretion of Exide:

(i)    the legal, equitable and contractual rights to which such Claim entitles the Holder thereof shall be unaltered by the Joint Plan;

(ii)    Reorganized Exide shall surrender all collateral securing such Claim to the Holder thereof, without representation or warranty by or further recourse against Exide or Reorganized Exide; or

(iii)    such Claim will be treated in any other manner so that such Claim shall otherwise be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

On the Effective Date or as soon as practicable thereafter, the Allowed Class P2 Claims of local, state and federal taxing authorities, if any, shall be paid, at the option of the respective Reorganized Debtor, (a) Cash in an amount equal to the amount of such Allowed Class P2 Claim, or (b) Cash over a six-year period from the date of assessment of the tax to which the claim relates, with interest payable at a fixed rate determined as of the Confirmation Date by the formula provided in section 6621(a)(2) of the Internal Revenue Code and compounded daily (as provided in section 6622 of the Internal Revenue Code), provided, however, that tax obligations owed to the Missouri Department of Revenue shall be paid at a rate of 5% annual interest.  Any deferred payments made pursuant to this provision of the Joint Plan shall be by equal quarterly Cash payments beginning on the first day of the calendar month following the Effective Date, and following on the first day of each third calendar month thereafter, as necessary.  Notwithstanding any other provision of the Joint Plan, all local, state and federal taxing authorities shall retain their applicable legal and equitable rights, if any, against non-Debtor obligors with respect to local, state and federal tax obligations owed by the Debtors.

Notwithstanding any other provision of this Joint Plan, any oversecured Allowed Class 2A Claim of a state or federal taxing authority shall be entitled to postpetition interest at the rate provided for in section 6621(a)(2) of the Internal Revenue Code up to the amount by which the value of the property securing the oversecured Allowed Class P2 Claim exceeds the value of such claim.

All local, state and federal taxing authorities shall retain the tax liens and rights to setoff securing their Allowed Class P2 Claims and, in the event the Reorganized Debtors substantially default on the payment of such claims (as provided for in this Joint Plan), then the total amount still owed to the applicable state or federal taxing authority under this Joint Plan shall become due and payable, and the local, state or federal taxing authority may collect such amount as otherwise permitted under nonbankruptcy law.  In this context, "substantial default" shall mean that the Reorganized Debtors have defaulted on two consecutive Joint Plan payments owing to a given local, state or federal taxing authority, and, after receiving written notice of such default from the local, state or federal taxing authority, have not, within sixty days, cured the default.

(c)    *Voting:*  Class P2 is Unimpaired and the Holders of Class P2 Claims are conclusively deemed to have accepted the Joint Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Claims in Class P2 are not entitled to vote to accept or reject the Joint Plan.

3.    *Class P3—Prepetition Credit Facility Claims*

(a)    *Classification:*  Class P3 consists of the Prepetition Credit Facility Claims against Exide.

- 14 -

(b)    *Treatment*:  Class P3 Claims shall be Allowed Claims in the aggregate amount of $802,700,000.  Holders of Allowed Class P3 and S3 Prepetition Credit Facility Claims may elect on their respective Ballots either (i) Class P3 Option A or (ii) Class P3 Option B, provided that Holders must elect the same treatment for both their Class P3 and S3 Claims.  Any Class P3 Holder that does not make an election on its Ballot is deemed to be an Option B Elector.  Any Class P3 Holder that does not make an election on its Ballot or chooses the Class P3 Option B, may, at any time prior to the Effective Date, choose the Class P3 Option A with respect to such Claim by providing notice of such choice to the Debtors in writing.  The Holder of the Prepetition Credit Facility Swap Claim is deemed to be an Option A Elector with respect to such Claim.

(i)    Class P3 Option A:  On or as soon as practicable after the Effective Date, Holders of Allowed Class P3 and S3 Prepetition Credit Facility Claims who choose the Class P3 Option A shall receive, in full and final satisfaction of their Prepetition Domestic Secured Claims and Prepetition Foreign Secured Claims, a Pro Rata share (based on the aggregate of such Holder's Prepetition Domestic Secured Claims and Prepetition Foreign Secured Claims) of 100% of the remaining Class P3 Distribution after distributions, if any, pursuant to the Class P3 Option B.  As a condition to the receipt of a Pro Rata share of the New Exide Common Stock, each Option A Elector shall execute the amendment to the Prepetition Credit Facility summarized in the Amended Prepetition Foreign Credit Agreement Term Sheet.

(ii)    Class P3 Option B:  On or as soon as practicable after the Effective Date, Holders of Allowed Class P3 and S3 Prepetition Credit Facility Claims who choose the Class P3 Option B shall receive, in full and final satisfaction of their Prepetition Domestic Secured Claims, a Pro Rata share (based on the aggregate of the Prepetition Domestic Secured Claims) of the Class P3 Option B Distribution.  On the Effective Date, the Prepetition Foreign Secured Claims of Option B Electors shall be governed by the Amended Prepetition Foreign Credit Agreement.

(c)    Voting:  Class P3 is Impaired and Holders of Class P3 Claims are entitled to vote to accept or reject the Joint Plan.

4.    *Class P4—General Unsecured Claims*

(a)    *Classification*:  Class P4 consists of all General Unsecured Claims against Exide.

(b)    *Treatment*:  Except as provided in Article VIII, on or as soon as practicable after the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Allowed Class P4 Claim, the following treatment:

(i)    Class P4-A:  Non-Noteholder General Unsecured Claims:  Holders of Class P4-A Non-Noteholder General Unsecured Claims shall receive a Pro Rata share of the Class P4 Distribution, based on the Allowed amount of their Claims.

(ii)    Class P4-B:  10% Senior Note Claims:  Pursuant to Article V.H hereof, Holders of Class P4-B 10% Senior Note Claims shall receive a Pro Rata share of the Class P4-B Distribution, based on the Allowed amount of their Claims.  As provided in Section V.C hereof, this distribution shall be made to the 10% Senior Note Indenture Trustee, who shall in turn make the distributions to or for the benefit of the beneficial holders of the 10% Senior Note Claims in accordance with the terms of the 10% Senior Note Indenture and herewith.  To the extent amounts are still owing to the 10% Senior Note Indenture Trustee under the 10% Senior Note Indenture, all distributions to Class P4-B shall be subject to the charging lien of the 10% Senior Note Indenture Trustee under the 10% Senior Note Indenture.

(iii)    Class P4-C:  2.9% Convertible Note Claims:  Pursuant to Article V.H hereof, Holders of Class P4-C 2.9% Convertible Note Claims shall receive a Pro Rata share of the Class P4-C Distribution, based on the Allowed amount of their Claims.  As provided in Section V.C hereof, this distribution shall be made to the 2.9% Convertible Note Indenture Trustee, who shall in turn make the distributions to or for the benefit of the beneficial holders of the 2.9%

- 15 -

Convertible Note Claims in accordance with the terms of the 2.9% Convertible Note Indenture and herewith. To the extent amounts are still owing to the 2.9% Convertible Note Indenture Trustee under the 2.9% Convertible Note Indenture, all distributions to Class P4-C shall be subject to the charging lien of the 2.9% Convertible Note Indenture Trustee under the 2.9% Convertible Note Indenture.

(c)    *Voting*:  Class P4 is Impaired and Holders of Class P4 Claims are entitled to vote to accept or reject the Joint Plan, with all such votes to be tabulated on the basis of one aggregate Class.

5.    *Class P5—Equity Interests*

(a)    *Classification:*  Class P5 consists of the Equity Interests in Exide.

(b)    *Treatment:*  On the Effective Date Class P5 Equity Interests will be cancelled and Holders thereof will not receive a distribution under the Joint Plan in respect of such Interests.

(c)    *Voting*:  Class P5 is Impaired and is conclusively deemed to reject the Joint Plan. Holders of Class P5 Equity Interests are not entitled to vote to accept or reject the Joint Plan.

C.    *Classification and Treatment of Claims and Equity Interests: Subsidiary Debtors*

1.    *Class S1—Other Priority Claims*

(a)    *Classification:*  Class S1 consists of all Other Priority Claims against the respective Subsidiary Debtors.

(b)    *Treatment:*  The legal, equitable and contractual rights of the Holders of Allowed Class S1 Claims are unaltered by the Joint Plan. Unless otherwise agreed to by the Holders of the Allowed Other Priority Claim and the respective Subsidiary Debtor, each Holder of an Allowed Class S1 Claim shall receive, in full and final satisfaction of such Allowed Class S1 Claim, one of the following treatments, in the sole discretion of the applicable Subsidiary Debtor:

(i)    The applicable Reorganized Debtor will pay the Allowed Class S1 Claim in full in Cash on the Effective Date or as soon thereafter as is practicable; *provided that,* Class S1 Claims representing obligations incurred in the ordinary course of business will be paid in full in Cash when such Class S1 Claims become due and owing in the ordinary course of business; or

(ii)    such Claim will be treated in any other manner so that such Claim shall otherwise be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(c)    *Voting:*  Class S1 is Unimpaired and the Holders of Class S1 Claims are conclusively deemed to have accepted the Joint Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Claims in Class S1 are not entitled to vote to accept or reject the Joint Plan.

2.    *Class S2—Other Secured Claims*

(a)    *Classification:*  Class S2 consists of all Other Secured Claims against the respective Subsidiary Debtors.

(b)    *Treatment:*  The legal, equitable and contractual rights of the Holders of Class S2 Claims are unaltered by the Joint Plan. Unless otherwise agreed to by the Holder of the Allowed Class S2 Claim and the applicable Subsidiary Debtor, each Holder of an Allowed Class 2B Claim shall receive, in full and final satisfaction of such Allowed Class 2B Claim, one of the following treatments, in the sole discretion of the applicable Subsidiary Debtor:

(i)    the legal, equitable and contractual rights to which such Claim entitles the Holder thereof shall be unaltered by the Joint Plan;

- 16 -

A-0395

(ii)    the applicable Reorganized Debtor shall surrender all collateral securing such Claim to the Holder thereof, without representation or warranty by or further recourse against the applicable Debtor or Reorganized Debtor; or

(iii)    such Claim will be treated in any other manner so that such Claim shall otherwise be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

On the Effective Date or as soon as practicable thereafter, the Allowed Class S2 Claims of local, state and federal taxing authorities, if any, shall be paid, at the option of the respective Reorganized Debtor, (a) Cash in an amount equal to the amount of such Allowed Class S2 Claim, or (b) Cash over a six-year period from the date of assessment of the tax to which the claim relates, with interest payable at a fixed rate determined as of the Confirmation Date by the formula provided in section 6621(a)(2) of the Internal Revenue Code and compounded daily (as provided in section 6622 of the Internal Revenue Code), provided, however, that tax obligations owed to the Missouri Department of Revenue shall be paid at a rate of 5% annual interest. Any deferred payments made pursuant to this provision of the Joint Plan shall be by equal quarterly Cash payments beginning on the first day of the calendar month following the Effective Date, and following on the first day of each third calendar month thereafter, as necessary. Notwithstanding any other provision of the Joint Plan, all local, state and federal taxing authorities shall retain their applicable legal and equitable rights, if any, against non-Debtor obligors with respect to local, state and federal tax obligations owed by the Debtors.

Notwithstanding any other provision of this Joint Plan, any oversecured Allowed Class S2 Claim of a state or federal taxing authority shall be entitled to postpetition interest at the rate provided for in section 6621(a)(2) of the Internal Revenue Code up to the amount by which the value of the property securing the oversecured Allowed Class S2 Claim exceeds the value of such claim.

All local, state and federal taxing authorities shall retain the tax liens and rights to setoff securing their Allowed Class S2 Claims and, in the event the Reorganized Debtors substantially default on the payment of such claims (as provided for in this Joint Plan), then the total amount still owed to the applicable local, state or federal taxing authority under this Joint Plan shall become due and payable, and the local, state or federal taxing authority may collect such amount as otherwise permitted under nonbankruptcy law. In this context, "substantial default" shall mean that the Reorganized Debtors have defaulted on two consecutive Joint Plan payments owing to a given local, state or federal taxing authority, and, after receiving written notice of such default from the local, state or federal taxing authority, have not, within sixty days, cured the default.

(c)    Voting:  Class S2 is Unimpaired and the Holders of Class S2 Claims are conclusively deemed to have accepted the Joint Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Claims in Class S2 are not entitled to vote to accept or reject the Joint Plan.

3.    Class S3—Prepetition Credit Facility Claims

(a)    Classification:  Class S3 consists of all Prepetition Credit Facility Claims against the respective Subsidiary Debtors.

(b)    Treatment:  Class S3 Claims shall be Allowed Claims in the aggregate amount of $802,700,000. On account of their Class S3 Claims, the Holders thereof will receive the treatment set forth for Class P3 in Article III.B.3 above.

(c)    Voting:  Class S3 is Impaired and Holders of Class S3 Claims are entitled to vote to accept or reject the Joint Plan.

4.    Class S4—General Unsecured Claims

(a)    Classification:  Class S4 consists of all General Unsecured Claims against the respective Subsidiary Debtors.

- 17 -

(b)  *Treatment*:  On or as soon as practicable after the Effective Date, each Allowed Class S4 Claim will be cancelled and Holders of Allowed Class S4 Claims will receive no distribution on account thereof.

(c)  *Voting*:  Class S4 is Impaired and is conclusively deemed to reject the Joint Plan. Holders of Class S4 Claims are not entitled to vote to accept or reject the Joint Plan.

5.  *Class S5—Equity Interests*

(a)  *Classification*:  Class S5 consists of all Equity Interest in the respective Subsidiary Debtors.

(b)  *Treatment*:  On or as soon as practicable after the Effective Date, each Allowed Class S5 Equity Interest will be cancelled.

(c)  *Voting*:  Class S5 is Impaired and is conclusively deemed to reject the Joint Plan. Holders of Class S5 Interests are not entitled to vote to accept or reject the Joint Plan.

D.  *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Joint Plan, nothing under the Joint Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claims, including, but not limited to, all rights in respect of legal and equitable defenses to or setoffs or recoupments against such Unimpaired Claims.

## ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THE JOINT PLAN

A.  *Voting Classes*

Each Holder of an Allowed Claim in Classes P3, P4, and S3 shall be entitled to vote to accept or reject the Joint Plan.

B.  *Acceptance by Impaired Classes*

An Impaired Class of Claims shall have accepted the Joint Plan if (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Joint Plan and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Joint Plan.

C.  *Presumed Acceptance of Joint Plan*

Classes P1, P2, S1 and S2 are Unimpaired under the Joint Plan, and, therefore, are presumed to have accepted the Joint Plan pursuant to section 1126(f) of the Bankruptcy Code.

D.  *Presumed Rejection of Joint Plan*

Classes P5, S4 and S5 are impaired and shall receive no distributions, and, therefore, are presumed to have rejected the Joint Plan pursuant to section 1126(g) of the Bankruptcy Code.

E.  *Non-Consensual Confirmation*

The Creditors Committee and the Debtors reserve the right to seek Confirmation of the Joint Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, in view of the deemed rejection by Classes P5, S4 and S5. In the event that Class P3, P4, and/or S3 fails to accept the Joint Plan in accordance with section 1129(a)(8) of the Bankruptcy Code, the Creditors Committee and the Debtors reserve the right (a) to request that the

Bankruptcy Court confirm the Joint Plan in accordance with section 1129(b) of the Bankruptcy Code and/or (b) to modify the Joint Plan in accordance with Article XII.E hereof.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE JOINT PLAN

A.    *Restructuring*

Prior to the Confirmation Date, (i) Exide will form a new Dutch company ("Exide CV"), owned by Exide and a new wholly-owned domestic subsidiary of Exide, and (ii) Exide CV will form another new wholly owned Dutch company ("Exide BV"). After the Confirmation Date but on or before the Effective Date, (i) Exide will transfer the shares of two existing foreign subsidiaries, Exide Holding Asia PTE Limited ("Exide Holding Asia") and Exide Holding Europe S.A. ("Exide Holding Europe"), along with its interest in the Exide Holding Europe participating loan, to Exide CV in exchange for equity of Exide CV, (ii) Exide CV will transfer its newly-acquired shares of Exide Holding Asia and a portion of its newly acquired shares of Exide Holding Europe to Exide BV in exchange for equity of Exide BV, (iii) Exide Holding Europe will be converted from a French S.A. to a French S.A.S. or S.A.R.L, and (iv) Exide will enter into an assumption and indemnification agreement with Deutsche Exide regarding Deutsche Exide's obligations under the Prepetition Credit Facility.

B.    *Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors*

The Reorganized Debtors shall continue to exist after the Effective Date as separate legal entities, with all the powers of a corporation or limited liability company, as applicable, under the laws of their respective states of organization and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under such applicable state law. Except as otherwise provided in the Joint Plan, on and after the Effective Date, all property of the Debtors' Estates, and any property acquired by the Debtors or Reorganized Debtors under the Joint Plan, shall vest in the respective Reorganized Debtors, free and clear of all Claims, liens, charges, or other encumbrances. On and after the Effective Date, the Reorganized Debtors may operate their business and may use, acquire or dispose of property and compromise or settle any Claims or Equity Interests, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Joint Plan and the Confirmation Order. In consideration of the undertakings of Reorganized Exide under the Joint Plan, Reorganized Exide shall continue to own 100% of the Subsidiary Debtors as of the Effective Date.

C.    *Cancellation of Old Notes and Equity Interests*

On the Effective Date, except to the extent otherwise provided herein, all notes, instruments, certificates, and other documents evidencing (a) the Old Notes, (b) Equity Interests, and (c) any stock options, warrants or other rights to purchase Equity Interests shall be canceled and the obligations of the Debtors thereunder or in any way related thereto shall be discharged. On the Effective Date, except to the extent otherwise provided herein, any indenture relating to any of the foregoing shall be deemed to be canceled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtors thereunder shall be discharged.

On the Effective Date, except as otherwise provided for herein, the 10% Senior Notes and the 2.9% Convertible Notes shall be deemed extinguished, cancelled and of no further force or effect, and the obligations of the Debtors thereunder shall be discharged, in each case without any further act or action under any applicable agreement, law, regulation, order or rule and without any further action on the part of the Bankruptcy Court or any Person; *provided, however*, that the 10% Senior Note Indenture and the 2.9% Convertible Note Indenture shall continue in effect for the purposes of (i) allowing the 10% Senior Note Indenture Trustee and the 2.9% Convertible Note Indenture Trustee to receive and make the Distributions to be made to the holders of 10% Senior Note Claims and the 2.9% Convertible Note Claims, respectively, in accordance with Article III.B.4 hereof, and (ii) preserving any rights of the 10% Senior Note Indenture Trustee and the 2.9% Convertible Note Indenture Trustee, including indemnification rights, they may have with respect to the holders of the 10% Senior Notes or the 2.9% Convertible Notes under their respective indentures, and the charging liens in favor of the 10% Senior Note Indenture Trustee under the 10% Senior Note Indenture and the 2.9% Convertible Note Indenture Trustee under the 2.9% Convertible Note Indenture.

A-0398

Notwithstanding any provision herein to the contrary, the distribution provisions contained in the 10% Senior Note Indenture and the 2.9% Convertible Note Indenture shall continue in effect to the extent necessary to authorize the 10% Senior Note Indenture Trustee and the 2.9% Convertible Note Indenture Trustee to receive and distribute all distributions to be made pursuant to this Joint Plan to the holders of 10% Senior Note Claims and the 2.9% Convertible Note Claims, respectively. Such distribution provisions shall terminate in their entirety upon completion of all such distributions under the Joint Plan. The 10% Senior Note Indenture Trustee and the 2.9% Convertible Note Indenture Trustee shall not be required to give any bond or surety or other security for the performance of their duties.

D.    *Issuance of New Securities; Execution of Related Documents*

Reorganized Exide shall issue or authorize for future issuance all securities, notes, instruments, certificates, and other documents required to be issued pursuant hereto, including, without limitation, the New Exide Common Stock (shares of which will be reserved for issuance upon the exercise of the New Exide Warrants) and New Exide Warrants, each of which shall be distributed as provided herein. Reorganized Exide and its subsidiaries shall execute and deliver such other agreements, documents and instruments, including the Amended Prepetition Foreign Credit Agreement, as are required to be executed pursuant to the terms hereof.

E.    *Issuance of Stock or Limited Liability Company Interests of Reorganized Subsidiary Debtors to Reorganized Exide*

On or immediately after the Effective Date, the common stock or limited liability company interests, as applicable, of the Reorganized Subsidiary Debtors shall be issued to Reorganized Exide.

F.    *Corporate Governance, Directors and Officers, and Corporate Action*

1.    *New Certificate of Incorporation and By-laws*

On the Effective Date, the Reorganized Debtors will file the New Organizational Documents with the Secretary of State for the relevant state of incorporation or formation. The New Organizational Documents will prohibit the issuance of non-voting securities pursuant to section 1123(a)(6) of the Bankruptcy Code. The New Exide Certificate of Incorporation will, among other things, authorize the New Exide Common Stock, including those shares of New Exide Common Stock issuable upon the exercise of the New Exide Warrants.

2.    *Directors and Officers of Reorganized Exide*

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the officers of Exide immediately prior to the Effective Date will be the officers of Reorganized Exide. Pursuant to section 1129(a)(5), Exide will disclose, on or prior to the Confirmation Date, the identity and affiliations of any Person proposed to serve on the New Exide Board of Directors. To the extent any such Person is an "Insider" under the Bankruptcy Code, the nature of any compensation for such Person will also be disclosed. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Exide Certificate of Incorporation, the New Exide By-laws and the Delaware General Corporation Law.

The New Exide Board of Directors will be a newly-appointed seven person board of directors. One initial board member shall be appointed by the Creditors Committee, which member shall have a three year term and shall serve on the compensation committee of the New Exide Board of Directors. A second initial board member shall be appointed jointly by the Creditors Committee and the Prepetition Lenders. Additionally, Craig H. Muhlhauser, the Chief Executive Officer of Exide, shall be initially appointed to the New Exide Board of Directors. The four other members of the New Exide Board of Directors shall be appointed by the Prepetition Lenders.

3.    *Corporate Action*

On the Effective Date, the adoption and filing of the New Exide Certificate of Incorporation and New Organizational Documents, the approval of the New Exide By-laws, the appointment of directors and officers for Reorganized Exide, the restructuring transactions contemplated by Article V.A hereof, and all actions contemplated hereby shall be authorized and approved by the Bankruptcy Court in all respects (subject to the provisions hereof).

A-0399