# TAB 11

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EXIDE TECHNOLOGIES, et al.,[1] | ) | |
| | ) | Case No. 02-11125 (KJC) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

---

## DISCLOSURE STATEMENT FOR JOINT PLAN OF REORGANIZATION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND THE DEBTORS

### IMPORTANT DATES

- *Date by which Ballots must be received: April 9, 2004*
- *Date by which objections to Confirmation of the Joint Plan must be filed and served: April 9, 2004*
- *Hearing on Confirmation of the Joint Plan:    April 16, 2004*

Matthew N. Kleiman
Jason D. Horwitz
Ross M. Kwasteniet
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

Counsel for the Debtors and
Debtors in Possession

Fred S. Hodara
Mary Reidy Masella
AKIN GUMP STRAUSS HAUER
& FELD LLP
590 Madison Avenue
New York, New York 10022
(212) 872-1000

Counsel to the Official Committee of
Unsecured Creditors

Dated: March 11, 2004

Laura Davis Jones
James E. O'Neill
Kathleen Marshall DePhillips
PACHULSKI, STANG, ZIEHL,
YOUNG, JONES & WEINTRAUB
919 North Market Street
P.O. Box 8705
Wilmington, Delaware 19899
(302) 652-4100

Counsel for the Debtors and
Debtors in Possession

David B. Stratton
David M. Fournier
PEPPER HAMILTON LLP
Hercules Plaza
Suite 5100
1313 Market Street
Wilmington, Delaware 19801
(302) 777-1709

Counsel to the Official Committee of Unsecured
Creditors

---

[1] The Debtors in these proceedings are: Exide Technologies f/k/a Exide Corporation; Exide Delaware, L.L.C.; Exide Illinois, Inc.; RBD Liquidation, L.L.C.; Dixie Metals Company; and Refined Metals Corporation.

#3919

THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, GENERALLY IN RELIANCE ON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

FOR NON-U.S. HOLDERS ONLY: THE DISTRIBUTION OF THIS DISCLOSURE STATEMENT AND THE ISSUE OR TAKING UP OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT MAY BE RESTRICTED BY LAW IN CERTAIN JURISDICTIONS OUTSIDE THE UNITED STATES. IN AN EFFORT TO COMPLY WITH LOCAL JURISDICTIONAL REQUIREMENTS GOVERNING THE OFFER AND ISSUANCE OF SECURITIES, DEBTORS HAVE MADE REASONABLE EFFORTS TO ASCERTAIN THE JURISDICTIONS WHERE DEBTORS' SECURITIES AND OTHER CLAIMS ARE CURRENTLY HELD AND IN WHICH THE SECURITIES OF REORGANIZED DEBTORS WILL BE HELD AFTER THE EFFECTIVE DATE. NO ACTION HAS BEEN TAKEN BY DEBTORS THAT WOULD PERMIT AN OFFER OF ANY SECURITIES ISSUED UNDER THE JOINT PLAN OR POSSESSION OR DISTRIBUTION OF THIS DISCLOSURE STATEMENT IN ANY JURISDICTION WHERE ACTION FOR THAT PURPOSE IS REQUIRED. PERSONS INTO WHOSE POSSESSION THIS DISCLOSURE STATEMENT COMES ARE REQUIRED BY DEBTORS TO INFORM THEMSELVES ABOUT AND TO OBSERVE SUCH RESTRICTIONS. IN ADDITION, DEBTORS RECOMMEND THAT HOLDERS OR POTENTIAL HOLDERS OF SECURITIES UNDER THE JOINT PLAN CONSULT WITH THEIR OWN ADVISORS CONCERNING ANY LIMITATIONS ON THEIR RIGHT TO TRANSFER SUCH SECURITIES. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR ISSUE, OR THE SOLICITATION OF ANY OFFER TO BUY OR SUBSCRIBE FOR ANY SECURITIES BY ANY PERSON IN ANY CIRCUMSTANCES IN WHICH SUCH OFFER OR SOLICITATION IS UNLAWFUL. TO THE EXTENT THAT DEBTORS ARE REQUIRED TO COMPLY WITH CERTAIN REQUIREMENTS OF JURISDICTIONS IN WHICH HOLDERS OF SECURITIES OF DEBTORS RESIDE DUE TO THE PARTICIPATION OF HOLDERS IN SUCH JURISDICTIONS IN ANY VOTE OR ELECTION WITH RESPECT TO THE JOINT PLAN, DEBTORS SHALL NOT BE REQUIRED TO TAKE SUCH PARTICIPATION INTO ACCOUNT.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE JOINT PLAN AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS WHICH ARE ATTACHED HERETO ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THAT INFORMATION AND TO THOSE DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE JOINT PLAN, OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED HEREIN BY REFERENCE, THE JOINT PLAN SHALL GOVERN FOR ALL PURPOSES.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN UNLESS SO SPECIFIED. EACH HOLDER OF AN IMPAIRED CLAIM SHOULD CAREFULLY REVIEW THE JOINT PLAN, THIS DISCLOSURE STATEMENT AND THE EXHIBITS TO BOTH DOCUMENTS IN THEIR ENTIRETY BEFORE CASTING A BALLOT. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. ANY PERSONS DESIRING ANY SUCH ADVICE OR OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE JOINT PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. NO REPRESENTATIONS CONCERNING DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT OR, SUBSEQUENT TO A FILING BY DEBTORS UNDER THE BANKRUPTCY CODE, BY THE

BANKRUPTCY COURT. ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN YOUR ACCEPTANCE OF THE JOINT PLAN WHICH ARE OTHER THAN OR INCONSISTENT WITH THE INFORMATION CONTAINED HEREIN AND IN THE JOINT PLAN SHOULD NOT BE RELIED UPON BY YOU.

ALTHOUGH DEBTORS HAVE USED THEIR BEST EFFORTS TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, EXCEPT FOR THE FINANCIAL STATEMENTS INCLUDED IN THE COMPANY'S ANNUAL REPORT ON FORM 10-K INCLUDED AS EXHIBIT D HERETO.

THE PROJECTIONS PROVIDED IN THIS DISCLOSURE STATEMENT HAVE BEEN PREPARED BY DEBTORS' MANAGEMENT WITH THE ASSISTANCE OF THE BLACKSTONE GROUP, L.P. ("BLACKSTONE"), FINANCIAL ADVISORS TO THE DEBTORS, AND ALIXPARTNERS LLC ("ALIXPARTNERS"), TURNAROUND ADVISORS TO THE DEBTORS. THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND REORGANIZED DEBTORS' CONTROL. DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE PROJECTIONS OR TO REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE PROJECTIONS, THEREFORE, SHOULD NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

SEE ARTICLE V OF THIS DISCLOSURE STATEMENT, "RISK FACTORS," FOR A DISCUSSION OF CERTAIN RISK FACTORS WHICH SHOULD BE CONSIDERED IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE JOINT PLAN.

TABLE OF CONTENTS

Page

SUMMARY ................................................................................................................. 1

I. GENERAL INFORMATION ....................................................................................... 8

    A.    DESCRIPTION OF DEBTORS' BUSINESS ....................................................... 8
        1.    General Discussion of Business ............................................................ 8
        2.    Narrative Description of Business ......................................................... 8
    B.    SUMMARY OF CAPITAL STRUCTURE OF DEBTORS ................................ 13
        1.    Original DIP Credit Facility and Replacement DIP Credit Facility ............ 13
        2.    Prepetition Credit Facility ................................................................. 14
        3.    10% Senior Notes ............................................................................. 15
        4.    Convertible Notes ............................................................................. 15
        5.    Common Stock ................................................................................. 15
    C.    EVENTS LEADING TO THE CHAPTER 11 CASES ...................................... 15
    D.    PURPOSE OF THE JOINT PLAN ................................................................. 16
    E.    TERMS OF SECURITIES TO BE ISSUED AND CREDIT FACILITY TO BE
        MODIFIED PURSUANT TO THE JOINT PLAN ........................................... 16
        1.    New Exide Common Stock .................................................................. 16
        2.    New Exide Warrants .......................................................................... 17
        3.    Amended Prepetition Foreign Credit Agreement ................................... 17
    F.    NEW EXIDE BOARD OF DIRECTORS AND OFFICERS ............................. 17
    G.    LIQUIDATION ANALYSIS ........................................................................ 17
    H.    PROJECTIONS AND VALUATION ............................................................. 18
        1.    Projections ....................................................................................... 18
        2.    Valuation ......................................................................................... 22
    I.    REORGANIZED DEBTORS AND THE POST-CONFIRMATION ESTATE ...... 22

II. THE CHAPTER 11 CASES ...................................................................................... 22

    A.    DEBTOR-IN-POSSESSION FINANCING ...................................................... 22
    B.    APPOINTMENT OF THE OFFICIAL COMMITTEES .................................... 23
    C.    SUMMARY OF KEY MOTIONS ................................................................. 23
        1.    Motion to Obtain Postpetition Financing and Authorizing Debtors to
            Utilize Cash Collateral; Granting Adequate Protection to Prepetition
            Secured Lenders ............................................................................... 23
        2.    Motions for the Authority to Pay Prepetition Shipping Charges and Claims
            of Essential Trade Creditors .............................................................. 23
        3.    Applications for Retention of Debtors' Professionals ............................. 23
        4.    Motion for Expedited Procedures for the Rejection of Executory Contracts
            and Unexpired Leases ...................................................................... 24
        5.    Motion for Continued Use of Cash Management System ........................ 24
        6.    Motions to Pay Prepetition Wages, Salaries and other Compensation and
            Employee Medical, Pension and Similar Benefits ................................. 24
        7.    Motion for Expedited Procedures in the Sale or Abandonment of
            De Minimis Assets ........................................................................... 24
        8.    Motion to Implement a Key Employee Restructuring Milestone Incentive
            and Income Protection Program .......................................................... 24
        9.    Motion to Extend the Time to Assume or Reject Unexpired Leases of
            Nonresidential Real Property .............................................................. 24
        10.    Motion to Extend Time to File a Joint Plan and Solicit Acceptances .......... 24
        11.    Motion to Appoint an Equity Security Holders Committee ...................... 24

-i-

A-0445

|   |   | 12. | Motion Directing that Certain Orders in the Chapter 11 Cases of Exide Technologies, et al be Made Applicable to Dixie Metals Company and Refined Metals Corporation | 25 |
|---|---|---|---|---|
|   |   | 13. | Claim of Bernd Schulte-Ladbeck | 25 |
|   |   | 14. | Motion to Approve Stipulation and Agreed Order Authorizing Entry Into a Bonding Facility Agreement | 25 |
|   | D. | | ASSUMPTION/REJECTION OF CONTRACTS AND LEASES | 25 |
|   | E. | | BANKRUPTCY LITIGATION | 26 |
|   |   | 1. | Exide v. Keystone Leasing Service, et al. | 27 |
|   |   | 2. | Exide v. Arthur M. Hawkins, Douglas N. Pearson and Alan E. Gauthier | 27 |
|   |   | 3. | Creditors Committee and R$^2$ Investments v. Credit Suisse First Boston and Salomon Smith Barney, Inc. | 27 |
|   |   | 4. | Smith Management LLC vs. Credit Suisse First Boston, et al. | 27 |
|   |   | 5. | EnerSys Litigation | 28 |
|   |   | 6. | Pacific Dunlop Litigation | 28 |
|   |   | 7. | Confirmation Appeals | 29 |
|   | F. | | CLAIMS PROCESS AND CLAIMS BAR DATES | 29 |
|   |   | 1. | Filing of Schedules of Liabilities | 29 |
|   |   | 2. | Bar Dates | 29 |
|   |   | 3. | Claims Objection Process | 29 |
|   | G. | | EXCLUSIVE JOINT PLAN PROPOSAL AND ACCEPTANCE RIGHTS | 29 |
|   | H. | | EVENTS SINCE THE SECOND AMENDED DISCLOSURE STATEMENT | 30 |
| III. | | | SUMMARY OF THE JOINT PLAN OF REORGANIZATION | 30 |
|   | A. | | OVERVIEW OF CHAPTER 11 | 30 |
|   | B. | | SUBSTANTIVE CONSOLIDATION | 32 |
|   | C. | | ADMINISTRATIVE AND PRIORITY TAX CLAIMS | 32 |
|   |   | 1. | Administrative Claims | 32 |
|   |   | 2. | DIP Facility Claims | 32 |
|   |   | 3. | Priority Tax Claims | 32 |
|   | D. | | CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS | 33 |
|   |   | 1. | Summary | 33 |
|   |   | 2. | Summary of Classification and Treatment of Claims and Equity Interests: Exide | 33 |
|   |   | 3. | Summary of Classification and Treatment of Claims and Equity Interests: Subsidiary Debtors | 33 |
|   | E. | | CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS: EXIDE | 33 |
|   |   | 1. | Class P1—Other Priority Claims | 33 |
|   |   | 2. | Class P2—Other Secured Claims | 34 |
|   |   | 3. | Class P3—Prepetition Credit Facility Claims | 35 |
|   |   | 4. | Class P4—General Unsecured Claims | 35 |
|   |   | 5. | Class P5—Equity Interests | 36 |
|   | F. | | CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS: SUBSIDIARY DEBTORS | 37 |
|   |   | 1. | Class S1—Other Priority Claims | 37 |
|   |   | 2. | Class S2—Other Secured Claims | 37 |
|   |   | 3. | Class S3—Prepetition Credit Facility Claims | 38 |
|   |   | 4. | Class S4—General Unsecured Claims | 38 |
|   |   | 5. | Class S5—Equity Interests | 38 |
|   | G. | | SPECIAL PROVISION GOVERNING UNIMPAIRED CLAIMS | 39 |
|   | H. | | ACCEPTANCE OR REJECTION OF THE JOINT PLAN | 39 |

A-0446

|  | 1. | Voting Classes | 39 |
|  | 2. | Acceptance by Impaired Classes | 39 |
|  | 3. | Presumed Acceptance of Joint Plan | 39 |
|  | 4. | Presumed Rejection of Joint Plan | 39 |
|  | 5. | Non-Consensual Confirmation | 39 |
| I. | | MEANS FOR IMPLEMENTATION OF THE JOINT PLAN | 39 |
|  | 1. | Restructuring | 39 |
|  | 2. | Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors | 39 |
|  | 3. | Cancellation of Old Notes and Equity Interests | 40 |
|  | 4. | Issuance of New Securities; Execution of Related Documents | 40 |
|  | 5. | Issuance of Stock or Limited Liability Company Interests of Reorganized Subsidiary Debtors to Reorganized Exide | 42 |
|  | 6. | Corporate Governance, Directors and Officers, and Corporate Action | 42 |
|  | 7. | Dismissal of Creditors Committee Adversary Proceeding, Smith Adversary Proceeding and other Settlements | 43 |
|  | 8. | Noteholder Distribution Settlement | 44 |
|  | 9. | Sources of Cash for Distribution under Joint Plan | 44 |
|  | 10. | Public Company Status and Listing on National Exchange | 44 |
|  | 11. | Payment of Fees and Expenses for the Agent, the Steering Committee and the Postconfirmation Creditors Committee | 44 |
|  | 12. | Indenture Trustee and other Professional Fees and Expenses | 44 |
|  | 13. | Adoption of Company Incentive Plan | 46 |
| J. | | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 46 |
|  | 1. | Assumption of Executory Contracts and Unexpired Leases | 46 |
|  | 2. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 47 |
|  | 3. | Cure of Defaults for Executory Contracts and Unexpired Leases Assumed | 47 |
|  | 4. | Indemnification of Directors, Officers and Employees | 47 |
|  | 5. | Compensation and Benefit Programs | 47 |
|  | 6. | Rejection of Rights Agreement and Registration Agreements | 48 |
| K. | | PROVISIONS GOVERNING DISTRIBUTIONS | 48 |
|  | 1. | Distributions for Claims Allowed as of the Effective Date | 48 |
|  | 2. | Delivery and Distributions and Undeliverable or Unclaimed Distributions | 48 |
|  | 3. | Timing and Calculation of Amounts to be Distributed | 49 |
|  | 4. | Minimum Distribution | 49 |
|  | 5. | Setoffs | 49 |
|  | 6. | Surrender of Cancelled Instruments or Securities | 49 |
|  | 7. | Restriction on Distribution of New Exide Common Stock and New Exide Warrants | 50 |
| L. | | PROCEDURES FOR RESOLUTION OF DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS OR EQUITY INTERESTS | 50 |
|  | 1. | Resolution of Disputed Claims | 50 |
|  | 2. | Allowance of Claims | 52 |
|  | 3. | Controversy Concerning Impairment | 52 |
|  | 4. | Personal Injury Tort and Wrongful Death Claims | 52 |
| M. | | CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE JOINT PLAN | 53 |
|  | 1. | Condition Precedent to Confirmation | 53 |
|  | 2. | Conditions Precedent to Consummation | 53 |
|  | 3. | Waiver of Conditions | 54 |
|  | 4. | Effect of Non-occurrence of Conditions to Consummation | 54 |
| N. | | RELEASE, INJUNCTIVE AND RELATED PROVISIONS | 54 |
|  | 1. | Subordination | 54 |
|  | 2. | Releases by the Debtors | 54 |

-iii-

A-0447

|  | 3. | Releases by Holders of Claims | 55 |
|  | 4. | Release of Foreign Subsidiary Borrowers and the Domestic Non-Debtor | 55 |
|  | 5. | Exculpation | 56 |
|  | 6. | Injunction | 56 |
|  | 7. | Preservation of Rights of Action | 56 |
|  | 8. | Discharge of Claims and Termination of Equity Interests | 58 |
| O. | | RETENTION OF JURISDICTION | 58 |
| P. | | MISCELLANEOUS PROVISIONS | 59 |
|  | 1. | Effectuating Documents, Further Transactions and Corporation Action | 59 |
|  | 2. | Dissolution of Committees | 59 |
|  | 3. | Payment of Statutory Fees | 59 |
|  | 4. | Letters of Credit | 59 |
|  | 5. | Modification of Joint Plan | 60 |
|  | 6. | Revocation of Joint Plan | 60 |
|  | 7. | Successors and Assigns | 60 |
|  | 8. | Reservation of Rights | 60 |
|  | 9. | Section 1145 Exemption | 60 |
|  | 10. | Section 1146 Exemption | 61 |
|  | 11. | Further Assurances | 61 |
|  | 12. | Service of Documents | 61 |
|  | 13. | Filing of Additional Documents | 63 |
| IV. VOTING AND CONFIRMATION PROCEDURE | | | 63 |
| A. | | VOTING INSTRUCTIONS | 63 |
| B. | | VOTING TABULATION | 64 |
| C. | | THE CONFIRMATION HEARING | 67 |
| D. | | STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE JOINT PLAN | 67 |
|  | 1. | Acceptance | 67 |
|  | 2. | Fair and Equitable Test | 68 |
|  | 3. | Feasibility | 68 |
|  | 4. | "Best Interests" Test | 68 |
| V. RISK FACTORS | | | 70 |
| A. | | CERTAIN BANKRUPTCY CONSIDERATIONS | 70 |
| B. | | FACTORS AFFECTING THE VALUE OF THE SECURITIES TO BE ISSUED UNDER THE JOINT PLAN | 71 |
| C. | | RISKS RELATING TO THE OPERATIONS OF REORGANIZED DEBTORS | 73 |
| VI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES | | | 75 |
| A. | | CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE HOLDERS OF CLAIMS AND EQUITY INTERESTS | 75 |
|  | 1. | Consequences to Holders of Prepetition Credit Facility Claims | 75 |
|  | 2. | Consequences to Holders of General Unsecured Claims Against the Company | 78 |
|  | 3. | Consequences to Holders of General Unsecured Claims Against the Subsidiary Debtors | 79 |
|  | 4. | Consequences to Holders of Equity Interests | 79 |
|  | 5. | Accrued Interest, Market Discount and Original Issue Discount | 79 |
| B. | | CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO REORGANIZED DEBTORS | 80 |
|  | 1. | Cancellation of Indebtedness and Reduction of Tax Attributes | 80 |
|  | 2. | Limitation of Net Operating Loss Carryovers and Other Tax Attributes | 81 |
| C. | | BACKUP WITHHOLDING | 82 |
| VII. MISCELLANEOUS PROVISIONS | | | 83 |

-iv-

A.      PENDING LITIGATION .................................................................. 83
        1.      Private Party Lawsuits ..................................................... 83
        2.      Environmental Matters ..................................................... 85
        3.      Other ................................................................................ 88
B.      PENSION PLANS ........................................................................... 88
C.      SUCCESSORS AND ASSIGNS ...................................................... 89
D.      RESERVATION OF RIGHTS .......................................................... 89
E.      SERVICE OF DOCUMENTS .......................................................... 89

VIII. RECOMMENDATION .................................................................... 91

A-0449

EXHIBITS

Exhibit A  -  Joint Plan of Reorganization
Exhibit B  -  Liquidation Analysis
Exhibit C  -  Projections
Exhibit D  -  Annual Report on Form 10-K for the fiscal year ended March 31, 2003
Exhibit E  -  Schedule of Environmental Sites

A-0450

general corporate purposes. On February 13, 2004, the Company amended and restated the Original DIP Credit Facility to provide up to $500 million in financing (the "Replacement DIP Credit Facility") (1) to supplement cash flows from operations during the reorganization process, including the payment of post-petition ordinary course trade and other payables, the payment of certain permitted prepetition claims, working capital needs, letter of credit requirements and other general corporate purposes, (2) purchase the outstanding loans and commitments of the lenders under the European securitization facility, (3) to provide the Company with an additional $40 million in working capital financing and (4) to provide the Company with a $125 million stand-by commitment to pay the 9.125% Senior Notes (Deutsche mark denominated) at their April 15, 2004 maturity.

The purpose of the Joint Plan is to restructure Debtors' debt to provide Debtors with a capital structure that can be supported by the cash flow of their operations. Assuming that all Holders of Allowed Class P3 and S3 Prepetition Credit Facility Claims choose the Class P3 Option A, the Joint Plan will reduce Debtors' debt and accrued interest by approximately $1.4 billion and their future annual interest expense by approximately $55–60 million. Debtors believe that the reorganization contemplated by the Joint Plan is in the best interests of their creditors and interested constituencies. If the Joint Plan is not confirmed, Debtors believe that they will be forced to either file an alternate plan of reorganization or liquidate under Chapter 7 of the Bankruptcy Code ("Chapter 7"). In either event, Debtors believe that the Company's creditors would realize a less favorable distribution of value, or, in certain cases, none at all, for their Claims under an alternative plan or liquidation. The Debtors further believe that the Company's equity holders, who are not entitled to receive a distribution under the Joint Plan, would not receive a distribution under an alternative plan or liquidation. See the Liquidation Analysis set forth in *Exhibit B* attached hereto.

### Events Since the Second Amended Disclosure Statement

On October 25, 2003, and within the Debtors' exclusive period to file a plan of reorganization, the Debtors filed the Debtors' Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Fourth Amended Plan"). On December 30, 2003, the Bankruptcy Court issued an order denying confirmation of the Fourth Amended Plan. The Bankruptcy Court found the Debtors' enterprise value to be in the range of $1.4 billion to $1.6 billion. Given, in large part, its opinion on the value of the Debtors' estates, the Bankruptcy Court held that (1) although the Debtors are authorized to propose a settlement of the Creditors Committee Adversary Proceeding under section 1123(b)(3)(A) of the Bankruptcy Code, the proposed settlement in the Fourth Amended Plan was not fair and equitable because the $8.5 million settlement amount was below the lowest range of reasonableness; (2) the Fourth Amended Plan's release and injunction provisions were not approved because general unsecured creditors did not receive fair consideration from the parties proposed to be released in return for such releases; and (3) the Debtors' proposed distribution to certain general unsecured creditors is not a reallocation of the Prepetition Lenders' recovery because there may be sufficient value to pay the Prepetition Lenders in full. The Bankruptcy Court's order further urged the parties to continue discussing a consensual exit strategy in light of the above findings. In consideration of the Bankruptcy Court's order and its determination that the Debtors' enterprise value is in the range of $1.4 billion to $1.6 billion, the Creditors Committee, the Debtors, the Agent and their respective advisors negotiated for several weeks in an effort to reach a consensual plan of reorganization. On January 22, 2004, the parties reached an agreement in principle, which is the basis for this Disclosure Statement and the Joint Plan.

The Debtors' exclusive period to file a plan of reorganization and obtain acceptances to any such plan has expired with respect to the Agent and the Creditors Committee, but such period was extended to February 15, 2004 for all other parties. The Debtors have filed a motion to further extend their exclusive period to solicit acceptances of a plan of reorganization with respect to all parties except the Agent and the Creditors Committee to May 15, 2004.

### Treatment of Claims and Equity Interests

The table set forth below summarizes the Classes of Claims and Equity Interests under the Joint Plan, projected aggregate amount of such Classes, the treatment of such Classes, and the projected recoveries of such Classes both in connection with the Joint Plan and in a liquidation under Chapter 7 of the Bankruptcy Code. The projected recoveries (if the Joint Plan is approved) are based upon certain assumptions contained in the valuation analysis as set forth in Section I.H hereof and subject to dilution for the Company Incentive Plan.

(Dollars in Millions)

| Class/Type of Claim or Interest | Projected Claims/ Interests | Joint Plan Treatment of Class | Projected Recovery under Joint Plan | Projected Recovery Under Chapter 7 |
|---|---|---|---|---|
| Administrative Claims | $1.0 | Paid in full | $1.0 100% | $1.0 100% |

-2-

envelope will be included with your Ballot, if necessary. Beneficial Holders of Claims who receive a return envelope addressed to their bank, brokerage firm or other nominee, or any agent thereof (each, a "Nominee"), should allow sufficient time for the Nominee to receive their votes and process them on a Master Ballot before the Voting Deadline, as defined below.

The Debtors have engaged a solicitation agent to assist in the voting process. The solicitation agent will answer questions, provide additional copies of all materials and oversee the voting tabulation. The solicitation agent will also process and tabulate ballots for each Class entitled to vote to accept or reject the Joint Plan. The solicitation agent is Bankruptcy Management Corporation, 1330 E. Franklin Avenue, El Segundo, CA 90245, (888) 909-0100 (toll free) (the "Solicitation Agent").

TO BE COUNTED, THE SOLICITATION AGENT MUST RECEIVE YOUR BALLOT (OR MASTER BALLOT OF YOUR NOMINEE HOLDER) INDICATING ACCEPTANCE OR REJECTION OF THE JOINT PLAN <u>NO LATER THAN 5:00 p.m. PREVAILING EASTERN TIME, ON APRIL 9, 2004</u> (THE "VOTING DEADLINE"), UNLESS THE DEBTORS, THE CREDITORS COMMITTEE OR THE BANKRUPTCY COURT EXTENDS OR WAIVES THE PERIOD DURING WHICH VOTES WILL BE ACCEPTED BY THE DEBTORS AND THE CREDITORS COMMITTEE, IN WHICH CASE THE TERM "VOTING DEADLINE" FOR SUCH SOLICITATION SHALL MEAN THE LAST TIME AND DATE TO WHICH SUCH SOLICITATION IS EXTENDED. ANY EXECUTED BALLOT THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE JOINT PLAN OR THAT INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE JOINT PLAN SHALL NOT BE COUNTED ONLY FOR PURPOSES OF VOTING FOR OR AGAINST THE JOINT PLAN. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE MAY OR MAY NOT BE COUNTED, AT THE DISCRETION OF THE DEBTORS OR THE CREDITORS COMMITTEE.

THE DEBTORS AND THE CREDITORS COMMITTEE BELIEVE THAT THE JOINT PLAN IS IN THE BEST INTEREST OF ALL OF THE DEBTORS' CREDITORS AS A WHOLE. THE DEBTORS AND THE CREDITORS COMMITTEE THEREFORE RECOMMEND THAT ALL HOLDERS OF CLAIMS SUBMIT BALLOTS TO ACCEPT THE JOINT PLAN.

*Time and Place of the Confirmation Hearing.* The Confirmation Hearing, which is the hearing where the Bankruptcy Court will determine whether to confirm the Joint Plan, will commence on <u>April 16, 2004, at 10:00 a.m. Prevailing Eastern Time</u>, before the Honorable Kevin J. Carey, United States Bankruptcy Judge, at the Robert N.C. Nix Federal Courthouse, 900 Market Street, Philadelphia, PA 19107.

*Deadline for Voting For or Against the Joint Plan.* If you are entitled to vote, it is in your best interest to vote timely on the enclosed ballot (the "Ballot") and return the Ballot in the enclosed envelope to the balloting agent, who is Bankruptcy Management Corporation, at (i) if by courier/hand delivery, 1330 E. Franklin Avenue, El Segundo, California 90245, (888) 909-0100 (toll free), or (ii) if by U.S. Mail, P.O. Box 1063, El Segundo, California 90245-1063.

Your vote must be received prior to the Voting Deadline, which is <u>5:00 p.m. Prevailing Eastern Time on April 9, 2004</u>, or it will not be counted. At the Debtors' and the Creditors Committee's request, the Bankruptcy Court has established certain procedures for the solicitation and tabulation of votes on the Joint Plan. They are described in the Order entitled "Order (A) Approving The Disclosure Statement; (B) Scheduling A Hearing To Confirm The Joint Plan; (C) Establishing A Deadline For Objecting To The Joint Plan; (D) Approving Form Of Ballots, Voting Deadline And Solicitation Procedures; and (E) Approving Form And Manner Of Notices" (the "Solicitation Order") and the "Notice Of (I) Entry Of Order Approving Disclosure Statement; (II) Setting Hearing To Confirm Joint Plan Of Reorganization; And (III) Related Important Dates" (the "Confirmation Hearing Notice") that accompany this Disclosure Statement.

*Deadline for Objecting to the Confirmation of the Joint Plan.* Objections to Joint Plan confirmation must be filed with the Bankruptcy Court and served upon the following so that they are *actually received* on or before <u>5:00 p.m. Prevailing Eastern Time on April 9, 2004.</u>

| | |
|---|---|
| Counsel to the Debtors | Counsel to the Debtors |
| Kirkland & Ellis LLP | Pachulski Stang Ziehl Young & Jones PC |
| 200 East Randolph Drive | 919 N. Market Street |
| Chicago, IL 60601 | 16th Floor |
| 312-861-2000 | Wilmington, DE 19899 |
| Fax: 312-861-2200 | Attn: Laura Davis Jones |
| Attn: Matthew N. Kleiman | James E. O'Neill |
| Ross M. Kwasteniet | |

A-0456

Office of the United States Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19801
302-573-6491
Attn: Mark S. Kenney

Solicitation Agent
Bankruptcy Management Corporation
1330 E. Franklin Avenue
El Segundo, CA 90245
Attn: Exide Solicitation Agent
 (email service permitted at exide@bmccorp.net)

Counsel to the Creditors Committee
Akin Gump Strauss Hauer & Feld LLP
590 Madison Avenue
New York, NY 10022
Fax: 212-872-1002
Attn: Fred S. Hodara
    Mary Reidy Masella

Counsel to the Creditors Committee
Pepper Hamilton LLP
Hercules Plaza
Suite 5100
1313 Market Street
Wilmington, DE 19801
Attn: David B. Stratton
    David M. Fournier

Counsel to the Equity Committee
Reinhart Boerner Van Deuren S.C.
1000 North Water Street, Suite 2100
Milwaukee, WI 53202
414-298-8191
Attn: Mark L. Metz

Counsel to the Equity Committee
Potter Anderson & Corroon LLP
1313 N. Market Street
6th Floor
Hercules Plaza
Wilmington, DE 19899
Attn: William A. Hazeltine

Counsel to the Prepetition Lenders
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
Attn: Douglas P. Bartner
    Marc B. Hankin

Counsel to the Prepetition Lenders
Richards Layton & Finger, P.A.
One Rodney Square
Wilmington, DE 19899
302-651-7845
Fax: 302-651-7701
Attn: Mark D. Collins
    Etta R. Wolfe

Counsel to Smith Management LLC
Arent Fox Kintner Plotkin & Kahn, PLLC
1675 Broadway, 25th Floor
New York, NY 10019-5820
Attn: Andrew I. Silfen

### Consummation of the Joint Plan

Following Confirmation of the Joint Plan, the Joint Plan will be consummated on the date selected by the Debtors, the Creditors Committee and the Agent which will be a Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect, and (b) all conditions specified in Article IX.B of the Joint Plan have been (x) satisfied or (y) waived pursuant to Article IX.C therein. Distributions to be made under the Joint Plan will be made on or as soon after the Effective Date as practicable or as otherwise provided for herein.

### Risk Factors

Prior to deciding whether and how to vote on the Joint Plan, each Holder of Impaired Claims should consider carefully all of the information in this Disclosure Statement, especially the Risk Factors described in Section V hereof.

A-0457

| | | |
|---|---|---|
| • | *Champion®* | enhanced power cold cranking amps and a 72 month warranty |
| • | *Champion Trailblazer®* | targeted at light trucks and sport utility vehicles |

In Europe, Exide has five major Company-owned brands: Exide® and Tudor®, promoted as pan-European brands, and Deta®, Centra™ and Fulmen®, which have strong local awareness levels.  The Company generally offers transportation batteries in five basic categories:

| | | |
|---|---|---|
| • | *Basic Model* | marketed under private label brand names in France, Germany and Spain, under the Basic name in Italy and under various names in other markets |
| • | *Upgrade Model* | marketed under the Classic mark, which carries a 24 month warranty and marketed under the Equipe™ name in France, the Classic® name in Germany, the Leader™ name in Italy, the Tudor® name in Spain and under various other names in other markets |
| • | *Premium Model* | marketed under the Ultra™ brand in the United Kingdom, the Formula™ name in France, the Top Start Plus™ name in Germany, the Ultra™ name in Italy, the Millennium 3™ name in Spain and under various other names in other markets |
| • | *STR/STE™* | approved for use by BMW and was included in some models beginning with the 2000 model year |
| • | *Maxxima™* | the equivalent of the Exide Select Orbital® |

Batteries used for marine and recreational vehicles include the following:

| | | |
|---|---|---|
| • | *Stowaway Nautilus®* | employs technology to satisfy the power requirements of large engines, sophisticated electronics and on-board accessories |
| • | *Exide Select Orbital® Marine* | brings all the advantages of Exide's patented spiral wound technology to the marine market, and maintains nearly a full charge during the off-season, and can be quickly recharged.  This battery is also sealed, making it ideal for closed environments (such as inside a boat hull) |
| • | *Stowaway Powercycler®* | a completely sealed, VRLA battery with AGM technology and prismatic plates that offers features and benefits similar to the Exide Select Orbital®, and was the first sealed, AGM battery introduced in the marine battery market |
| • | *Nautilus® Gold Dual Purpose*<br>*Stowaway® Dual Purpose* | a combination battery, replacing separate starting and deep cycle batteries in two-battery marine and recreational vehicle systems |
| • | *Nautilus® Mega Cycle®*<br>*Stowaway® Deep Cycle* | a high performance, dual terminal battery |

A-0459

electric boats and non-military submersible vehicles. Exide also offers a complete range of battery chargers and associated equipment for the operation and maintenance of battery-powered vehicles.

Exide's motive power batteries are composed of two-volt cells assembled in numerous configurations and sizes to provide capacities ranging from 30 Ah to 1500 Ah. The Company also manufactures and markets a range of 6 and 12 volt monobloc batteries. Exide offers conventional vented lead acid technology utilizing tubular positive-plate and flat plate cell design. Exide also offers a range of lead acid battery technologies to meet a wide spectrum of customer application requirements.

In North America, motive power products are sold to independent lift truck dealers, lift truck OEMs and national accounts or end users. The motive power battery market in Europe is divided into the OEM market, comprised of the manufacturers of electric vehicles, and the replacement market, which includes large users of such electric vehicles as well as original equipment dealer networks.

Motive power products and services are distributed in North America by Company-owned sales and service locations which are augmented by a network of independent manufacturers' representatives who provide local service on their own behalf. In Europe, the Company distributes motive power products and services through Company-owned sales and service organizations in each country and utilizes distributors and agents for export of products from Europe to the rest of the world.

In North America, the Company's large customers include Nacco, Crown, Wal-Mart, Kroger and Target. In Europe, its major original equipment motive power customers include the Linde Group, Junghreinrich Group, Atlet and BT Toyota. Motive power products in Europe are also sold to a wide range of customers in the aftermarket, ranging from large industrial concerns and retail distributors to small warehouse and manufacturing operations.

The European and North American motive power markets are influenced by the demand for materials handling equipment. Customer demand for materials handling equipment has a strong historical correlation to general economic conditions. The general economic environment in fiscal 2003 has reduced the overall demand for materials handling equipment and replacement batteries.

*Network Power Segment.* Sales of network power batteries represented approximately 17% of the Company's net sales for fiscal 2003.

Network power (also known as standby or stationary) batteries are used for back-up power applications to ensure continuous power supply in case of main (primary) power failure or outage. Today's examples of where network power batteries are used to provide backup power include telecommunications, computers, hospitals, process control, air traffic control, security systems, utility, railway and military applications. Network power batteries also serve as uninterruptible power supplies ("UPS") used in computer installations for banks, airlines and back-up servers for the internet. Other telecommunications applications include central and local switching systems, satellite stations, optical fiber repeating boxes, cable TV transmission boxes and radio transmission stations. In these applications, the batteries are usually packaged with a 48V DC power system.

There are two primary network power lead acid battery technologies: valve-regulated (VRLA, or sealed) and vented (flooded). There are two types of VRLA technologies—GEL and AGM. These technologies are described as follows:

-11-

A-0461

- *VRLA: GEL:*                   This technology utilizes a gel electrolyte. VRLA batteries have replaced other types of network power batteries because they enhance safety, reduce maintenance and can be used in both vertical and horizontal positions. The Sonnenschein® gel technology offers the advantages of high reliability and long life. The gel product range offers a wide range of capabilities such as heat resistance, deep discharge resistance, long shelf life and high cyclic performance.

- *VRLA: AGM:*                   This technology utilizes an electrolyte immobilized in an absorbent glass mat separator. This technology is particularly well adapted to high rate applications and can offer up to a 20-year design life.

- *Vented (Flooded):*           This technology is used in applications requiring high reliability, but with the ability to allow for regular maintenance. The basic construction involves positive flat or tubular positive plates. Transparent containers and accessible internal construction are features of these batteries that allow end users to check the battery's physical condition.

Customers for network power batteries for telecommunications applications include manufacturers of switches and other equipment and the system operators. UPS battery customers consist of system manufacturers and end users. Performance in this market is impacted by the demand for computer systems. Other customers served by Exide include electrical generating companies, as well as government and military users.

The Company offers a global product line which is being marketed under the following five brands associated with product type and technology:

- Absolyte®:                    Large 2-volt cells, incorporating AGM technology, for long duration (e.g., telecommunications) and short duration applications

- Marathon®:                    Multi-cell AGM monobloc batteries for long duration applications

- Sprinter®:                    Multi-cell AGM monobloc batteries for short duration applications

- Sonnenschein®:                Multi-cell monoblocs and 2-volt cells, incorporating primarily Gel technology

- Classic®:                     Primarily 2-volt and some multi-cell vented (or flooded) products for a wide range of applications

Exide's major network power end user customers for telecommunications products and services include AT&T, China Unicom, Cingular, Nippon Telegraph and Telephone, Singapore Telecom, Telecom Italia, Telefonica of Spain and Verizon. Major telecommunications OEM customers include Alcatel, Ericsson, Marconi, Emerson, Nortel, Motorola and Nokia. UPS OEM customers include MGE and Siemens. Exide is also one of the leading suppliers of submarine batteries to the navies of Denmark, France, Germany, Italy, Norway, Singapore, Spain, Sweden and Turkey. Exide is the sole supplier to the U.S. Navy for submarine batteries for the nuclear-powered fleet.

Given the importance of service and technical assistance, the Company often ships network power batteries directly to system suppliers and UPS manufacturers who include the batteries in their original equipment and distribute products to end users. Batteries are also shipped directly to end users for both systems

-12-

A-0462

and replacement. The Company also promotes its products through technical seminars, trade shows and technical literature.

Demand for telecommunications batteries is driven by the growth in broadband and worldwide deployment of cellular and wireless mobile communication systems and the need for safe and reliable back-up power. The dramatic telecommunications industry downturn has resulted in weak demand for network power batteries since September 2001.

For further information about the Company's business operations, refer to the Company's Annual Report on Form 10-K for the fiscal year ended March 31, 2003 attached as *Exhibit D* hereto, as well as the Company's Quarterly Report on Form 10-Q for the quarter ended December 31, 2003, which is available on the Securities and Exchange Commission's internet website at http://www.sec.gov.

**B.     SUMMARY OF CAPITAL STRUCTURE OF DEBTORS**

**1.     <u>Original DIP Credit Facility and Replacement DIP Credit Facility</u>**

On May 10, 2002, the Company received final Bankruptcy Court approval of its prior $250 million Original DIP Credit Facility. The Original DIP Credit Facility was being used to supplement cash flows from operations during the reorganization process, including the payment of post-petition ordinary course trade and other payables, the payment of certain permitted prepetition claims, working capital needs, letter of credit requirements and other general corporate purposes.

The Original DIP Credit Facility was a secured revolving credit and term loan facility under which Exide Technologies was the borrower with certain U.S. subsidiaries acting as guarantors. The Original DIP Credit Facility was afforded super priority claim status in the Chapter 11 Cases and was collateralized by first liens on certain eligible U.S. assets of the Company, principally accounts receivable, inventory and property.

The revolving credit tranche of the Original DIP Credit Facility provided for borrowing up to $121 million, of which up to $65 million was available to Exide Technologies for on-lending to its foreign subsidiaries. An additional $50 million sub-facility was also available to the foreign subsidiaries based on certain collateral asset values in the United Kingdom and Canada. To the extent funds were borrowed under the Original DIP Credit Facility and on-lent to foreign subsidiaries, additional liens on certain assets of the borrowing foreign subsidiary and related guarantees were required. Up to $40 million of the revolving credit tranche was available for letters of credit.

Borrowings under the Original DIP Credit Facility bore interest at LIBOR plus 3.75% per annum. Borrowings were limited to eligible collateral under the Original DIP Credit Facility. Eligible collateral under the Original DIP Credit Facility included certain accounts receivable and inventory in the U.S. and certain property in the U.S. and Europe. Availability to the Company was impacted by changes in both the amounts of the collateral and qualitative factors (such as aging of accounts receivable and inventory reserves) as well as cash requirements of the business such as trade credit terms. The Original DIP Credit Facility contained certain financial covenants requiring the Company to maintain monthly specified levels of earnings before interest, taxes, depreciation, amortization, restructuring and certain other defined charges, as well as limits on capital expenditures and cash restructuring expenditures. The Original DIP Credit Facility also contained other customary covenants, including certain reporting requirements and covenants that restricted the Company's ability to incur indebtedness, create or incur liens or guarantees, enter into leases, sell or dispose of assets, change the nature of the Company's business or enter into related party transactions.

On February 13, 2004, the Company amended and restated the Original DIP Credit Facility to provide up to $500 million in financing (1) to supplement cash flows from operations during the reorganization process, including the payment of post-petition ordinary course trade and other payables, the payment of certain permitted prepetition claims, working capital needs, letter of credit requirements and other general corporate purposes, (2) purchase the outstanding loans and commitments of the lenders under the European securitization facility, (3) to provide the Company with additional $40 million in working capital financing and (4) to provide the Company with a $125 million stand-by commitment to pay the 9.125% Senior Notes (Deutsche mark denominated) at their April 15, 2004 maturity.

The terms and conditions of the Replacement DIP Credit Facility are substantially the same as the terms and conditions of the Original DIP Credit Facility. The Replacement DIP Credit Facility is a secured revolving

-13-

## SUMMARY

The following summary is qualified in its entirety by the more detailed information and financial statements contained elsewhere in this Disclosure Statement.

Exide Technologies (together with its subsidiaries unless the context requires otherwise, the "Company" or "Exide") is a Delaware corporation organized in 1966 to succeed to the business of a New Jersey corporation founded in 1888. The Company is one of the largest manufacturers of lead acid batteries in the world, with fiscal 2003 net sales of approximately $2.4 billion. The Company manufactures and supplies lead acid batteries for transportation and industrial applications worldwide.

On April 15, 2002 ("Petition Date"), Exide and three of its wholly-owned, U.S. subsidiaries (RBD Liquidation, LLC ("RBD"), Exide Delaware, LLC ("Exide Delaware") and Exide Illinois, Inc. ("Exide Illinois")) filed voluntary petitions for reorganization under Chapter 11 of the federal bankruptcy laws ("Bankruptcy Code" or "Chapter 11") in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court") under case numbers 02-11125 through 02-11128. On November 21, 2002, Refined Metals Corporation ("Refined") and Dixie Metals Corporation ("Dixie"), both wholly-owned, non-operating subsidiaries of Exide, filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court under case numbers 02-13449 and 02-13450. Refined and Dixie have no employees and negligible, if any, assets. RBD, Exide Delaware, Exide Illinois, Dixie and Refined, together with Exide are hereinafter referred to as the "Debtors." All of the foregoing cases are being jointly administered for procedural purposes before the Bankruptcy Court under case number 02-11125.

As debtors-in-possession under Chapter 11, the Debtors are authorized to continue to operate as an ongoing business, but may not engage in transactions outside the ordinary course of business without the approval of the Bankruptcy Court. The Company's operations outside of the U.S. are not included in the Chapter 11 proceedings.

This Disclosure Statement is being furnished by Debtors as proponents of the Joint Plan of Reorganization of the Official Committee of Unsecured Creditors and the Debtors (the "Joint Plan," a copy of which is attached hereto as *Exhibit A*), pursuant to section 1125 of the United States Bankruptcy Code (the "Bankruptcy Code") and in connection with the solicitation of votes (the "Solicitation") for the acceptance or rejection of the Joint Plan, as it may be amended or supplemented from time to time in accordance with the Bankruptcy Code and the Bankruptcy Rules. **Capitalized terms used herein but not otherwise defined herein shall have the meanings given to such terms in the Joint Plan.**

This Disclosure Statement describes certain aspects of the Joint Plan, the Company's operations, the Company's projections and other related matters, including the treatment of holders (each, a "Holder" and collectively, the "Holders") of existing Claims and Equity Interests.

### Events Leading to the Chapter 11 Cases

The Company and certain of its subsidiaries decided to file for reorganization under Chapter 11 as it offered the most efficient alternative to restructure its balance sheet and access new working capital while continuing to operate in the ordinary course of business. The Company has a heavy debt burden, caused largely by a debt-financed acquisition strategy and the significant costs of integrating those acquisitions. Other factors leading to the reorganization included the impact of adverse economic conditions on the Company's markets, particularly telecommunications, ongoing competitive pressures and capital market volatility. These factors contributed to a loss of revenues and resulted in significant operating losses and negative cash flows, severely impacting the Company's financial condition and its ability to maintain compliance with debt covenants.

The Company's operations outside of the U.S. are not included in the Chapter 11 proceedings. However, in connection with the Chapter 11 filing, the Company entered into the Standstill Agreement and Fifth Amendment to the Credit Agreement, as amended on December 5, 2003 and amended and restated on February 13, 2004 (the "Standstill Agreement"), with its Prepetition Credit Facility (as defined in Section I.B.2 below) lenders, whereby those lenders have agreed to forbear collection of principal payments on foreign borrowings under the Prepetition Credit Facility from non-Debtor subsidiaries until June 18, 2004, subject to earlier termination upon the occurrence of certain events. The principal events which could result in an early termination of the Standstill Agreement are: (1) non-payment of interest on the European tranche of the Company's Prepetition Credit Facility as and when due; (2) if any significant foreign subsidiaries commence any winding up or liquidation proceeding; (3) an event of default shall occur under the Replacement DIP Credit Facility that has not been waived or cured in accordance with the terms thereof, other than certain specified events of default thereunder; (4) termination of the Replacement DIP Credit Facility; and (5) non-payment of principal of the 9.125% Senior Notes (Deutsche mark denominated) agreement at the final maturity thereof.

On May 10, 2002, the Debtors received final Bankruptcy Court approval of its prior $250 million debtor-in-possession credit facility (the "Original DIP Credit Facility"). The Original DIP Credit Facility was being used to supplement cash flows from operations during the reorganization process, including the payment of post-petition ordinary course trade and other payables, the payment of certain permitted pre-petition claims, working capital needs, letter of credit requirements and for other

credit and term loan facility under which Exide Technologies is the borrower with certain U.S. subsidiaries acting as guarantors. The Replacement DIP Credit Facility received interim Bankruptcy Court approval on February 12, 2004, and is afforded super priority claim status in the Chapter 11 Cases and is collateralized by first liens on certain eligible U.S. assets of the Company, principally accounts receivable, inventory and property.

The revolving credit tranche of the Replacement DIP Credit Facility provides for borrowing up to $100 million, of which up to $65 million is available to Exide Technologies for on-lending to its foreign subsidiaries. An additional $50 million sub-facility (subject to the aggregate $100 million limit for revolving loans) is also available to the foreign subsidiaries based on certain collateral asset values in the United Kingdom and Canada. To the extent funds are borrowed under the Replacement DIP Credit Facility and on-lent to foreign subsidiaries, additional liens on certain assets of the borrowing foreign subsidiary and related guarantees are required. The secured senior term loan facility of the Replacement DIP Credit Facility provides for borrowing up to $165 million.

As with the Original DIP Credit Facility, Borrowings under the Replacement DIP Credit Facility bear interest at LIBOR plus 3.75% per annum and are limited to eligible collateral under the Replacement DIP Credit Facility. Eligible collateral under the Replacement DIP Credit Facility includes certain accounts receivable and inventory in the U.S. and certain property in the U.S. and Europe. Availability to the Company is impacted by changes in both the amounts of the collateral and qualitative factors (such as aging of accounts receivable and inventory reserves) as well as cash requirements of the business such as trade credit terms. The Replacement DIP Credit Facility contains certain financial covenants requiring the Company to maintain monthly specified levels of earnings before interest, taxes, depreciation, amortization, restructuring and certain other defined charges, as well as limits on capital expenditures and cash restructuring expenditures. The Replacement DIP Credit Facility also contains other customary covenants, including certain reporting requirements and covenants that restricts the Company's ability to incur indebtedness, create or incur liens or guarantees, enter into leases, sell or dispose of assets, change the nature of the Company's business or enter into related party transactions.

The Replacement DIP Credit Facility matures on the earlier of (1) May 15, 2004, (2) the date of termination of the commitments under the Replacement DIP Credit Facility, (3) the date on which the obligations become due and payable under the Replacement DIP Credit Facility, (4) four business days before the final maturity of any principal obligations under the Prepetition Credit Facility, which is currently scheduled to mature on June 18, 2004, or (5) the date the Company emerges from bankruptcy.

Total availability under the Replacement DIP Credit Facility as of February 13, 2004, was $34.7 million.

2.  **Prepetition Credit Facility**

The Company is also party to an Amended and Restated Credit and Guarantee Agreement dated as of September 29, 2000 (the "Prepetition Credit Facility"). The borrowers under the Prepetition Credit Facility include the Company and various of its foreign subsidiaries. The guarantors include, in addition to the borrowers, GNB Battery Technologies Japan, Inc. and various other of its foreign subsidiaries. The foreign subsidiaries, who are borrowers and guarantors, and GNB Battery Technologies Japan, Inc. are not debtors in the bankruptcy proceeding. The Prepetition Credit Facility is a secured revolving credit and term loan facility.

The Company's Prepetition Credit Facility has three borrowing tranches: a $150 million six year multi-currency term A loan, a $500 million seven and one-quarter year U.S. dollar term B loan and a $250 million six year multi-currency revolving credit line. This facility contains a number of financial and other covenants customary for such agreements including restrictions on new indebtedness, liens, leverage ratios, acquisitions and capital expenditures. Under the original terms of the agreement, principal payments on the revolving credit line and the term A loans were due and payable in December 2003 while principal payments on the term B loans continue through March 2005.

In connection with the Chapter 11 proceedings, the Company entered into the Standstill Agreement with its Prepetition Credit Facility lenders, whereby those lenders have agreed to forbear collection of principal payments on foreign borrowings under the Prepetition Credit Facility from non-Debtor subsidiaries until June 18, 2004, subject to earlier termination upon the occurrence of certain events. The principal events which could result in an early termination of the Standstill Agreement are: (1) non-payment of interest on the European tranche of the Company's Prepetition Credit Facility as and when due; (2) if any significant foreign subsidiaries

A-0464

commence any winding up or liquidation proceeding; (3) an event of default shall occur under the Replacement DIP Credit Facility that has not been waived or cured in accordance with the terms thereof, other than certain specified events of default thereunder; (4) termination of the Replacement DIP Credit Facility; and (5) non-payment of principal of the 9.125% Senior Notes (Deutsche mark denominated) agreement at the final maturity thereof. The Company continues to accrue interest under the Prepetition Credit Facility. Borrowings under the Prepetition Credit Facility by Exide Technologies are subject to compromise within the Chapter 11 Cases.

### 3.     10% Senior Notes

In 1995, Exide Technologies issued $300 million original principal amount 10% senior notes due April 15, 2005 (the "10% Senior Notes") pursuant to an indenture dated April 28, 1995, as amended from time to time, between Exide Technologies and The Bank of New York, as Trustee.

The 10% Senior Notes are unsecured obligations of Exide Technologies and are redeemable at the option of Exide Technologies, in whole or in part, at any time at 100% of the principal amount, plus accrued interest. The 10% Senior Notes are not guaranteed by any subsidiary of Exide Technologies.

Amounts owing to holders of the 10% Senior Notes are subject to compromise within the Chapter 11 Cases.

As of March 31, 2003, there were $300 million of 10% Senior Notes outstanding.

### 4.     Convertible Notes

In 1995, Exide Technologies issued convertible senior subordinated notes due December 15, 2005 with a face amount of $397 million discounted to $287.8 million (the "Convertible Notes") pursuant to an indenture dated December 15, 1995, as amended from time to time, between Exide Technologies and The Bank of New York, as Trustee. The Convertible Notes are subordinated to all senior debt of Exide Technologies, including the Prepetition Credit Facility and the 10% Senior Notes.

The Convertible Notes are unsecured obligations of Exide Technologies and have a coupon rate of 2.9% with a yield to maturity of 6.75%. The Convertible Notes are convertible into Exide Technologies' common stock at a conversion rate of .0125473 shares per $1 principal amount at maturity, subject to adjustments in certain events. The Convertible Notes are not guaranteed by any subsidiary of Exide Technologies.

Amounts owing to holders of the Convertible Notes are subject to compromise within the Chapter 11 Cases.

As of March 31, 2003, there were $320.7 million of Convertible Notes outstanding.

### 5.     Common Stock

As of March 31, 2003 the Company had 27,383,000 shares of its common stock, par value $.01 per share (the "Old Common Stock"), outstanding. The Old Common Stock is currently traded on the over-the-counter market and quoted on the OTC Bulletin Board under the symbol "EXDTQ" Prior to delisting on February 15, 2002, the Old Common Stock had been traded on the New York Stock Exchange. The Company's Board of Directors suspended payment of dividends on the Old Common Stock on November 8, 2001.

The Old Common Stock will be cancelled on the Effective Date, and the obligations of the Company thereunder or in any way related thereto shall be discharged.

## C.     EVENTS LEADING TO THE CHAPTER 11 CASES

The Company and certain of its subsidiaries decided to file for reorganization under Chapter 11 as it offered the most efficient alternative to restructure the Company's balance sheet and access new working capital while continuing to operate in the ordinary course of business. The Company has a heavy debt burden, caused largely by a debt-financed acquisition strategy and the significant costs of integrating those acquisitions. Other factors leading to the reorganization included the impact of adverse economic conditions on the Company's markets, particularly telecommunications and ongoing competitive pressures. These factors contributed to a loss

-15-

of revenues and resulted in significant operating losses and negative cash flows, severely impacting the Company's financial condition and its ability to maintain compliance with debt covenants.

The Company's operations outside of the U.S. are not included in the Chapter 11 proceedings. However, in connection with the Chapter 11 proceedings, the Company entered into the Standstill Agreement with its Prepetition Credit Facility lenders, whereby those lenders have agreed to forbear collection of principal payments on foreign borrowings under the Prepetition Credit Facility from non-Debtor subsidiaries until June 18, 2004, subject to earlier termination upon the occurrence of certain events. The principal events which could result in an early termination of the Standstill Agreement are: (1) non-payment of interest on the European tranche of the Company's Prepetition Credit Facility as and when due; (2) if any significant foreign subsidiaries commence any winding up or liquidation proceeding; (3) an event of default shall occur under the Replacement DIP Credit Facility that has not been waived or cured in accordance with the terms thereof, other than certain specified events of default thereunder; (4) termination of the Replacement DIP Credit Facility; and (5) non-payment of principal of the 9.125% Senior Notes (Deutsche mark denominated) agreement at the final maturity thereof.

On May 10, 2002, the Debtors received final Bankruptcy Court approval of its prior $250 million Original DIP Credit Facility. The Original DIP Credit Facility was being used to supplement cash flows from operations during the reorganization process, including the payment of post-petition ordinary course trade and other payables, the payment of certain permitted prepetition claims, working capital needs, letter of credit requirements and for other general corporate purposes. On February 13, 2004, the Company amended and restated the Original DIP Credit Facility to provide up to $500 million in financing (1) to supplement cash flows from operations during the reorganization process, including the payment of post-petition ordinary course trade and other payables, the payment of certain permitted prepetition claims, working capital needs, letter of credit requirements and other general corporate purposes, (2) purchase the outstanding loans and commitments of the lenders under the European securitization facility, (3) to provide the Company with an additional $40 million in working capital financing and (4) to provide the Company with a $125 million stand-by commitment to pay the 9.125% Senior Notes (Deutsche mark denominated) at their April 15, 2004 maturity.

For further information about the matters discussed above, see the Company's Annual Report on Form 10-K for the fiscal year ended March 31, 2003 attached as *Exhibit D* hereto. The exhibits to this report are available on the Securities and Exchange Commission's internet website at http://www.sec.gov.

D.      PURPOSE OF THE JOINT PLAN

The purpose of the Joint Plan is to restructure Debtors' debt to provide Debtors with a capital structure that can be supported by the cash flow of their operations. Assuming that all Holders of Allowed Class P3 and S3 Prepetition Credit Facility Claims choose the Class P3 Option A, the Joint Plan will reduce the Debtors' and the non-Debtors' subsidiary debt and accrued interest by approximately $1.4 billion and their future annual interest expense by approximately $55-60 million. Debtors believe that the reorganization contemplated by the Joint Plan is in the best interests of their creditors and other interested constituencies. If the Joint Plan is not confirmed, Debtors believe that they will be forced to either file an alternate plan of reorganization or liquidate under Chapter 7 of the Bankruptcy Code. In either event, Debtors believe that the Company's unsecured creditors and equity holders would realize a less favorable distribution of value, or, in certain cases, none at all, for their Claims or Equity Interests under an alternative plan or liquidation. See the Liquidation Analysis set forth in *Exhibit B* attached hereto.

E.      TERMS OF SECURITIES TO BE ISSUED AND CREDIT FACILITY TO BE MODIFIED PURSUANT TO THE JOINT PLAN

1.      New Exide Common Stock

New Exide will issue or authorize for issuance in accordance with the Joint Plan 25 million shares of New Exide Common Stock which, assuming the distribution of all securities in the reserve for potential payment of Disputed Claims and the exercise of all New Exide Warrants on the Effective Date, represents 80% of the outstanding New Exide Common Stock, subject to dilution pursuant to the Company Incentive Plan and any duly authorized issuance of Reorganized Exide capital stock after the Effective Date. The New Exide Common Stock will be authorized pursuant to the New Exide Certificate of Incorporation. Reorganized Exide will use its best

-16-

A-0466

efforts to cause the New Exide Common Stock to be listed on the New York Stock Exchange or the Nasdaq National Market as soon as practicable after the Effective Date.

### 2.  New Exide Warrants

On the Effective Date, Reorganized Exide will issue for distribution in accordance with the Joint Plan New Exide Warrants initially exercisable for 6.25 million shares of New Exide Common Stock, which shares will be reserved for issuance upon the exercise of the New Exide Warrants. The New Exide Warrants will expire seven years after the Effective Date. They will have customary anti-dilution protections for stock splits, stock dividends, stock combinations, stock issuances below certain prices and similar transactions but will be subject to dilution pursuant to the Company Incentive Plan. The exercise price of the New Exide Warrants will initially be set at a price per share equal to $32.11. Reorganized Exide will use its best efforts to cause the New Exide Warrants to be listed on the New York Stock Exchange or the Nasdaq National Market as soon as practicable after the Effective Date.

The terms of the New Exide Warrants are more fully described in Section III.I.4 hereof.

### 3.  Amended Prepetition Foreign Credit Agreement

Holders of Allowed Class P3 and Class S3 Prepetition Credit Facility Claims who choose the Class P3 Option B will, among other thing, have their Prepetition Foreign Secured Claims as against the respective Foreign Subsidiary Borrowers reinstated pursuant to the Amended Prepetition Foreign Credit Agreement. Modifications to the Prepetition Foreign Credit Agreement are described in Section III.I.4 hereof.

## F.  NEW EXIDE BOARD OF DIRECTORS AND OFFICERS

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the principal officers of Exide immediately prior to the Effective Date shall be the officers of Reorganized Exide. Reorganized Exide will have a seven person board of directors. Please see Section III.I.6 for more information regarding the selection of the initial New Exide Board of Directors. Prior to confirmation of the Joint Plan, Exide will disclose the identities of the initial members of the New Exide Board of Directors.

## G.  LIQUIDATION ANALYSIS

Pursuant to section 1129(a)(7) of the Bankruptcy Code (sometimes called the "Best Interests Test," which is described in greater detail in Section IV.D.4 hereof), the Bankruptcy Code requires that each Holder of an Impaired Claim or Impaired Equity Interest either (x) accept the Joint Plan or (y) receive or retain under the Joint Plan property of a value, as of the Effective Date of the Joint Plan, that is not less than the value such holder would receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

The first step in meeting this test is to determine the proceeds that would be generated from the hypothetical liquidation of Debtors' assets and properties in the context of a Chapter 7 liquidation case. The gross amount of cash and cash equivalents ("Cash") available would be the sum of the proceeds from the disposition of Debtors' assets and the Cash held by Debtors at the time of the commencement of the Chapter 7 case. Such amount is reduced by the amount of any Claims secured by such assets, the costs and expenses of the liquidation and such additional administrative expenses and priority claims that may result from the termination of Debtors' business and the use of Chapter 7 for the purposes of a hypothetical liquidation. Any remaining net Cash would be allocated to creditors and stockholders in strict priority in accordance with section 726 of the Bankruptcy Code.

Debtors believe that the Joint Plan will produce a greater recovery for Holders of Claims and Equity Interests than would be achieved in a Chapter 7 liquidation. The Debtors, with the assistance of AlixPartners, prepared a liquidation analysis (the "Liquidation Analysis") with the assistance of management on behalf of Debtors, set forth in *Exhibit B* attached hereto, to assist Holders of Claims and Equity Interests to reach a determination as to whether to accept or reject the Plan. This Liquidation Analysis estimates the proceeds to be realized if Debtors were to be liquidated under Chapter 7 of the Bankruptcy Code. The Liquidation Analysis is based upon assets and liabilities of Debtors as of December 31, 2003 and incorporates estimates and assumptions developed by Debtors which are subject to potentially material changes with respect to economic and business conditions, as well as uncertainties not within Debtors' control. The Liquidation Analysis does not assume a

-17-

judgment in favor of the plaintiffs in the Creditors Committee Adversary Proceeding. Also, from time to time, the Debtors have received offers to purchase their smelter assets, which offers, if capable of being consummated, could provide value in excess of the value ascribed to such assets in the liquidation analysis. While the Debtors have considered such offers, they are not currently entertaining the sale of any such assets. For more information on the Debtors' assets, please see the Schedules.

It has been assumed that creditor recoveries would not be affected by proceeds from causes of action, if any, including fraudulent conveyance and other avoidance claims, or any litigation that Debtors are or may be capable of asserting. The Liquidation Analysis set forth in *Exhibit B* attached hereto does not, therefore, include any estimate of the necessary expenses to litigate such claims.

**H.     PROJECTIONS AND VALUATION**

    **1.     Projections**

As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtors. In connection with the development of the Joint Plan, and for purposes of determining whether the Joint Plan satisfies this feasibility standard, the Debtors' management has, through the development of financial projections (the "Projections"), analyzed the ability of Reorganized Exide to meet its obligations under the Joint Plan while maintaining sufficient liquidity and capital resources to conduct its business. The Projections were also prepared to assist each holder of an Allowed Claims in Voting Classes in determining whether to accept or reject the Joint Plan.

The Projections should be read in conjunction with the assumptions, qualifications and footnotes to tables containing the Projections set forth herein, the historical consolidated financial information (including the notes and schedules thereto) and the other information set forth in the Annual Report on Form 10-K for the fiscal year ended March 31, 2003. The Projections were prepared in good faith based upon assumptions believed to be reasonable and applied in a manner consistent with past practice. Most of the assumptions about the operations of the business after the assumed Effective Date that are utilized in the Projections were based, in part, on economic, competitive, and general business conditions prevailing at the time, as well as the assumption of a modest recovery as Exide emerges from Chapter 11 and continued gradual economic growth. While as of the date of the Disclosure Statement such conditions have not materially changed, any future changes in these conditions may materially impact the ability of Reorganized Exide to achieve the Projections.

The Projections were prepared to show the estimated consolidated financial position, results of operations, and cash flows at, and following, March 31, 2004. However, the Projections do not currently take into account all of the projected accounting effects of the Joint Plan. With the exception of valuation of the shareholders' equity of Reorganized Exide, the Projections are not in accordance with the American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities Under the Bankruptcy Code" ("SOP 90-7"). THE DEBTORS' INDEPENDENT ACCOUNTANT HAS NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS. ACCORDINGLY, REORGANIZED EXIDE DOES NOT INTEND TO, AND DISCLAIMS ANY OBLIGATION TO, (A) FURNISH UPDATED PROJECTIONS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO HOLDERS OF REORGANIZED EXIDE'S COMMON STOCK OR WARRANTS OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE, (B) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC, OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

THE PROJECTIONS PROVIDED IN THE DISCLOSURE STATEMENT HAVE BEEN PREPARED EXCLUSIVELY BY THE DEBTORS' MANAGEMENT. THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS (INCLUDING THE ASSUMPTION THAT THERE WILL BE NO NEGATIVE IMPACT

-18-

FROM THE CHAPTER 11 CASES ON REORGANIZED EXIDE'S RELATIONSHIPS WITH ITS CUSTOMERS), WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND REORGANIZED EXIDE'S CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR TO REORGANIZED EXIDE'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

FINALLY, THE FOLLOWING PROJECTIONS INCLUDE ASSUMPTIONS AS TO THE ENTERPRISE VALUE OF REORGANIZED EXIDE, THE FAIR VALUE OF ITS ASSETS AND ITS ACTUAL LIABILITIES AS OF THE EFFECTIVE DATE. REORGANIZED EXIDE WILL BE REQUIRED TO MAKE SUCH ESTIMATIONS AS OF THE EFFECTIVE DATE. SUCH DETERMINATION WILL BE BASED UPON THE FAIR VALUES AS OF THAT DATE, WHICH COULD BE MATERIALLY GREATER OR LOWER THAN THE VALUES ASSUMED IN THE FOREGOING ESTIMATES.

    (a)    *Summary of Significant Assumptions.*  The Debtors have developed the Projections (summarized below) to assist both creditors and shareholders in their evaluation of the Plan and to analyze its feasibility. THE PROJECTIONS ARE BASED UPON A NUMBER OF SIGNIFICANT ASSUMPTIONS DESCRIBED BELOW. ACTUAL OPERATING RESULTS AND VALUES MAY AND LIKELY WILL VARY FROM THOSE PROJECTED.

    (i)    Fiscal Years.  Reorganized Exide's fiscal year ends on March 31 of each year.

    (ii)    Plan Terms and Consummation.  The Projections assume an Effective Date of March 31, 2004 with Allowed Claims and Interests treated in accordance with the treatment provided in the Joint Plan with respect to such Allowed Claims and Interests. The Projections also assume that no Holders of Allowed Class P3 and S3 Prepetition Credit Facility Claims choose the Class P3 Option B. If consummation of the Joint Plan does not occur on or around March 31, 2004, there is no assurance that, among other things, the trade creditors or customers will support Reorganized Exide as projected. A material reduction in trade credit and terms would materially impact Reorganized Exide's ability to achieve the projected results. Further, if the Effective Date does not occur by March 31, 2004, additional bankruptcy expenses will be incurred until such time as a plan of reorganization is confirmed and consummated. These expenses could significantly impact Reorganized Exide's results of operations and cash flows.

    (iii)    Assumptions Preceding the Effective Date.  As a basis for the Projections, management has estimated the operating results for the period of time leading up to the Effective Date. Specifically, it has been assumed that prior to and during the Chapter 11 Cases, trade vendors will continue to provide the Debtors with goods on customary terms and credit and there has been no meaningful change in the Debtors' customer base.

    (iv)    General Economic Conditions.  The Projections were prepared assuming that economic conditions in the markets to be served by Reorganized Exide will continually improve at a modest rate throughout the projection period. Pricing pressure is assumed to continue in certain markets, while inflation in costs is assumed to remain relatively low.

    (v)    Currency Exchange Rates and Lead Pricing.  For consistency with the Company's previous budgets, the Projections assume a US dollar-to-Euro conversion rate of $1.00 and do not reflect costs to hedge exchange rate fluctuations. The assumed cost of lead, the primary raw material required in battery manufacturing, is assumed to be based on base rates indicated on the London Metals Exchange of 575 Euros per metric ton, or $660 per short

A-0469

ton plus market premiums. If unhedged, actual lead pricing and exchange rates that materially differ from these assumptions could result in significant positive or negative variances from the Projections.

(vi)     Revenues. Total revenues are projected to decrease by 3.9% in fiscal year 2005, and then increase by 3.5%, 4.0%, 4.1% and 3.8% in fiscal years 2006, 2007, 2008 and 2009, respectively. Excluding exchange rate impacts, revenues in fiscal year 2005 are forecasted to grow by approximately 4.0% versus those expected to be achieved in fiscal year 2004. The achievement of projected revenue growth is assumed to result primarily from (i) focus on growth of larger aftermarket accounts currently served and modest penetration of the Mexican and South American markets in the Transportation business, (ii) increased focus on parts and services business worldwide, and (iii) Reorganized Exide's ability to source globally in a consolidating OE marketplace. The Projections are based upon maintaining key relationships with existing major clients. THE PROJECTIONS DO NOT PROJECT ANY NEGATIVE IMPACT FROM THE CHAPTER 11 CASES ON REORGANIZED EXIDE RELATIONSHIPS WITH ITS CUSTOMERS.

(vii)     Cost of Goods Sold. Cost of revenue consists primarily of lead and other materials costs, wages & related costs pertaining to manufacturing, procurement, and other overhead costs.

(viii)     Gross Margins (revenues less cost of goods sold, excluding depreciation). Gross margins are projected to increase as a percentage of revenues (from 24.0% to 25.0%) from fiscal 2004 to fiscal 2006 due to continued rationalization in the Debtors' cost base through a reduced manufacturing footprint. Combined with projected operating efficiencies, this rationalization is projected to result in improved absorption of fixed costs. Gross margins are then forecasted to decrease as a percentage of revenues (from 25.0% to 24.7%) from fiscal 2006 to fiscal 2009 due to inflationary cost increases for labor, utilities, and other operating expenses at the Debtors' manufacturing facilities.

(ix)     Selling & Marketing and General & Administrative Expenses. Selling & marketing and general & administrative expenses as a percent of total revenues are expected to be 16.2%, 15.8%, 15.4%, 15.1% and 14.8% for fiscal years 2005, 2006, 2007, 2008 and 2009, respectively. The decline in selling, general and administrative expenses as a percentage of revenue results primarily from initiatives designed to achieve cost savings.

(x)     EBITDAR. EBITDAR is defined for purposes of the Projections as earnings before interest expense, income tax provision, depreciation and amortization, restructuring expenses, and other unusual and non-recurring items.

(xi)     Interest Expense. Interest expense reflects interest on the Exit Facility at a rate of LIBOR plus 350 basis points ("bps") on the North American and European Term Loans and on the Revolving Credit Facility. While the three-month LIBOR is currently approximately 110 bps, the Projections assume LIBOR will increase gradually to 400 bps by the end of fiscal year 2006, as the Debtors believe that LIBOR will likely increase over the next five years.

(xii)     Income Taxes. The Projections assume that, upon consummation, Reorganized Exide will have the benefit of approximately $600 million of net operating loss carryforwards ("NOLs"), net of NOLs used to shield cancellation of indebtedness income ("COD Income") resulting from the restructuring transaction. It is anticipated that approximately $500 million of those NOLs will reside with Foreign Subsidiary Borrowers, with approximately $100 million in domestic NOLs surviving after reductions for COD Income. The domestic combined federal, state and local income tax rate is estimated at 38% before NOL usage. Taking into account the continued benefit of NOLs, the foreign combined federal, state and local income tax rate is estimated at 25%.

(xiii)     Capital Expenditures. Capital expenditures consist of maintenance costs, fixed asset purchases, environmental, health and safety costs, initiative-related capital

-20-

A-0470

expenditures, and other capital expenditures. The Projections assume a level of capital expenditures that can be supported by the capital structure and forecasted operating results of Reorganized Exide.

(xiv)    "Fresh Start Accounting". Although the Projections reflect certain adjustments as of the Effective Date, including the impact of the valuation of Reorganized Exide's equity, they do not fully reflect "fresh start" accounting. The Debtors are in the process of evaluating further how the reorganization value will be allocated to Reorganized Exide's various assets. It is likely that the final allocation will differ from current estimates, and therefore the amount of reorganization value in excess of book, as well as depreciation, will differ from the amounts presented herein. For purposes of the Projections, the fair market value of Debtors' assets and liabilities is assumed to be equivalent to their respective net book values.

(xv)    Reorganization Value. For purposes of this Disclosure Statement and in order to prepare the Projections, management has estimated the reorganization value of Reorganized Exide as of March 31, 2004 to be approximately $1.5 billion. For purposes of computing reorganization adjustments, the reorganization value is assumed to be allocated between North America and Europe/ROW based on a $600 million valuation of North America and a $900 million valuation of Europe/ROW. See Valuation disclosure in Section I.H.2 hereof.

(xvi)    Working Capital. Components of working capital are projected primarily on the basis of historic patterns, adjusted to reflect the benefit of management initiatives in areas such as inventory reduction.

(xvii)    New Loan Facilities. The Projections include an Exit Facility consisting of a $250 million North American Term Loan, a $250 million European Term Loan, and a $100 million North American Revolving Credit Facility with on-lending capabilities. The New Loan Facilities include interest at LIBOR plus 350 bps. LIBOR is forecast to increase over the projection period from 150 bps to 400 bps.

(b)    *Special Note Regarding Forward-Looking Statements.* Except for historical information, statements contained in this Disclosure Statement and incorporated by reference therein, including the Projections, may be considered "forward-looking statements" within the meaning of federal securities law. Such forward-looking statements are subject to risks, uncertainties and other factors that could cause actual results to differ materially from future results expressed or implied by such forward-looking statements. Potential risks and uncertainties include, but are not limited to, general economic and business conditions, the competitive environment in which Reorganized Exide operates and will operate, the success or failure of Reorganized Exide in implementing its current business and operational strategies, the level of vendor trade support, labor relations and labor costs, the ability of Reorganized Exide to maintain and improve its revenues and margins, and the liquidity of Reorganized Exide on a cash flow basis (including the ability to comply with the financial covenants of its credit arrangements and to fund Reorganized Exide's capital expenditures).

(c)    *Financial Projections.* The financial projections prepared by management are summarized in the following tables. Specifically, the attached tables include:

(i)    Pro-forma Reorganized Exide balance sheet at March 31, 2004.

(ii)    Projected balance sheets for fiscal years ending 2005, 2006, 2007, 2008 and 2009.

(iii)    Projected income statements for fiscal years ending in 2005, 2006, 2007, 2008 and 2009.

(iv)    Projected statements of cash flow for fiscal years ending in 2005, 2006, 2007, 2008 and 2009.

-21-

A-0471

### 2.    Valuation

In the Bankruptcy Court's Opinion and Order regarding Confirmation ("Opinion"), dated December 30, 2003, the Bankruptcy Court ruled that the enterprise value of Reorganized Exide is in the range of $1.4 billion and $1.6 billion.

The Equity Committee contends that the enterprise value of $1.4 to $1.6 billion as determined by the Bankruptcy Court at the first confirmation hearing is no longer applicable or accurate. The Equity Committee maintains that the current enterprise value of the Debtors exceeds $2.0 billion; that unsecured creditors are therefore entitled to payment in full on their claims; and that Exide's shareholders are entitled to receive a distribution under a plan of reorganization. According to the Equity Committee, the increase in enterprise value is attributable to a number of developments in the past four months, including the strengthening of euro against the dollar, improvement in the metrics of comparable companies, and changes in the price of raw materials used by the Debtors in their operations, especially lead. Based on its assessment of the Debtors' enterprise value, the Equity Committee has advised the Debtors that it intends to object to confirmation of the Joint Plan. The Debtors dispute the factual and legal assertions of the Equity Committee and reserve all of their rights with respect thereto.

### I.    REORGANIZED DEBTORS AND THE POST-CONFIRMATION ESTATE

Except as otherwise provided in the Joint Plan, the Debtors shall, as Reorganized Debtors, continue to exist after the Effective Date as separate corporate entities, with all the powers of a corporation under the laws of their respective states of incorporation and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under such applicable state law. Except as otherwise provided in the Joint Plan, on and after the Effective Date, all property of the Debtors' Estates, and any property acquired by the Debtors or Reorganized Debtors under the Joint Plan, shall vest in the respective Reorganized Debtors, free and clear of all Claims, liens, charges, or other encumbrances. On and after the Effective Date, the Reorganized Debtors may operate their business and may use, acquire or dispose of property and compromise or settle any Claims or Equity Interests, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Joint Plan and the Confirmation Order. On or before the Effective Date, Exide may contribute certain assets to several existing or newly formed, wholly-owned subsidiaries organized along functional lines to hold Exide's various businesses. Ownership of the transferred assets shall vest in such subsidiaries and shall be, after the Effective Date, free and clear of all Claims, liens, charges or other encumbrances. On and after the Effective Date, such subsidiaries may operate their businesses and may use, acquire or dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Joint Plan and the Confirmation Order.

### II.
### THE CHAPTER 11 CASES

On April 15, 2002, Exide along with the other initial Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Subsequently, on November 21, 2002, the Subsequent Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. On the relevant petition dates, all actions and proceedings against the Debtors and all acts to obtain property from them were stayed under section 362 of the Bankruptcy Code. The Debtors have continued to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### A.    DEBTOR-IN-POSSESSION FINANCING

On May 10, 2002, the Company received final approval of its prior $250 million Original DIP Credit Facility. As described in greater detail in Section I.B.1 above, the Original DIP Credit Facility was being used to supplement cash flows from operations during the reorganization process, including the payment of post-petition ordinary course trade and other payables, the payment of certain permitted prepetition claims, letter of credit requirements and other general corporate purposes. On February 13, 2004, the Company amended and restated the Original DIP Credit Facility to provide up to $500 million in financing (1) to supplement cash flows from operations during the reorganization process, including the payment of post-petition ordinary course trade and other payables, the payment of certain permitted prepetition claims, working capital needs, letter of credit requirements and other general corporate purposes, (2) purchase the outstanding loans and commitments of the

-22-