lenders under the European securitization facility, (3) to provide the Company with an additional $40 million in working capital financing and (4) to provide the Company with a $125 million stand-by commitment to pay the 9.125% Senior Notes (Deutsche mark denominated) at their April 15, 2004 maturity.

**B.     APPOINTMENT OF THE OFFICIAL COMMITTEES**

On April 30, 2002, the office of the United States Trustee appointed the Creditors Committee.

The current members of the Creditors Committee are Pension Benefit Guarantee Corporation, HSBC Bank USA, as Trustee, The Bank of New York, as Trustee, Smith Management LLC, Turnberry Capital Management, L.P., Tulip Corporation, Transervice Logistics Inc., Carroll Todd Lollis, as Guardian ad Litem for Logan T. Lollis, and Aaron Wann.

After being ordered to appoint a committee of equity holders by an order of the Bankruptcy Court, on September 24, 2002, the office of the United States Trustee appointed the Equity Committee.

The members of the Equity Committee are State of Wisconsin Investment Board, Thomas V. Kandathil and Amand P. Rendell.

**C.     SUMMARY OF KEY MOTIONS**

1.     Motion to Obtain Postpetition Financing and Authorizing Debtors to Utilize Cash
       Collateral; Granting Adequate Protection to Prepetition Secured Lenders

On April 17, 2002 the Bankruptcy Court entered an interim order granting authority for the Debtors to enter into a Postpetition Credit Agreement to obtain revolving credit and term loans in an interim aggregate principal amount of up to $200 million, of which no more than $125 million in aggregate principal amount may consist of revolving loans. The Debtors were also granted authority to use cash collateral of the Prepetition Lenders and authority for the Debtors who are parties to the Prepetition Credit Agreement (namely, Exide, Exide Delaware, L.L.C. and RBD Liquidation, L.L.C. (collectively, the "Adequate Protection Debtors") to provide adequate protection to the Agent and the Prepetition Lenders, including making certain adequate protection payments to the Prepetition Lenders subject to liquidity calculations prescribed in the Original DIP Credit Facility. On May 10, 2002, the Bankruptcy Court gave final approval of the Debtors' Original DIP Credit Facility, in an aggregate principal amount of up to $250 million.

On February 12, 2004, the Bankruptcy Court entered an interim order granting authority for Debtors to amend and restate the Original DIP Credit Facility. The Replacement DIP Credit Facility provides up to $500 million in financing, is afforded super priority claim status in the Chapter 11 Cases and is collateralized by first liens on certain eligible U.S. assets of the Company, principally accounts receivable, inventory and property.

2.     Motions for the Authority to Pay Prepetition Shipping Charges and Claims of Essential
       Trade Creditors

On April 18, 2002, the Bankruptcy Court granted the Debtors' requests for limited discretionary authority to pay certain prepetition trade claims of critical vendors, not to exceed $30 million. The Bankruptcy Court also granted the Debtors' request to pay certain prepetition shipping, warehouse, and customs fees and costs for goods in transit, not to exceed approximately $10 million. The relief granted in these motions allowed the Debtors to stabilize key vendor and supply relationships, helping to ensure a smooth transition into Chapter 11.

3.     Applications for Retention of Debtors' Professionals

The Debtors have received Bankruptcy Court authority to retain legal, financial, turnaround and public relations professionals, among others, to assist the Debtors in connection with these Chapter 11 Cases. These professionals were intimately involved with the negotiation and development of the Debtors' restructuring. These professionals include, among others, (a) Kirkland & Ellis LLP, as counsel for the Debtors; (b) Pachulski, Stang, Ziehl, Young, Jones & Weintraub, as co-counsel for the Debtors; (c) The Blackstone Group, L.P., as financial advisors; (d) AlixPartners, as turnaround advisors; and (e) Gavin Anderson, as public relations consultants.

A-0473

4.    **Motion for Expedited Procedures for the Rejection of Executory Contracts and Unexpired Leases**

The Bankruptcy Court has authorized the use of expedited procedures in which the Debtors may reject an agreement for an executory contract or an unexpired lease where the remaining benefits under the agreement, if any, are of no or negligible further value to the Debtors' reorganization efforts.

5.    **Motion for Continued Use of Cash Management System**

On June 14, 2002, the Bankruptcy Court entered a final order authorizing the Debtors to continue to operate their existing bank accounts, to continue to use their existing business forms, to continue to use their centralized cash management system and to grant superiority status to postpetition intercompany claims.

6.    **Motions to Pay Prepetition Wages, Salaries and other Compensation and Employee Medical, Pension and Similar Benefits**

On August 12, 2002, the Bankruptcy Court granted the Debtors' request to pay all compensation and benefits owed to employees. The authority granted allows the Debtors to compensate their employees for obligations payable as of the Petition Date, as well as obligations that come due after the Petition Date.

7.    **Motion for Expedited Procedures in the Sale or Abandonment of De Minimis Assets**

On May 10, 2002, the Bankruptcy Court authorized the use of expedited procedures in which the Debtors may (a) effectuate sales of certain obsolete, excess, or burdensome assets free and clear of all liens, claims, interests and encumbrances with any such liens attaching to the sale proceeds in the same validity, extent and priority as immediately prior to the sale, and (b) abandon de minimis assets to the extent a sale thereof cannot be consummated at value greater than the liquidation expense of such assets. The maximum aggregate value of de minimis asset sales authorized under this order cannot exceed $60 million without further approval from the Bankruptcy Court.

8.    **Motion to Implement a Key Employee Restructuring Milestone Incentive and Income Protection Program**

On August 12, 2002, the Bankruptcy granted final approval of the Debtors' Key Employee Restructuring Milestone Incentive and Income Protection Program. The program addresses the Debtors' employment relationships with approximately 80 employees and provides a discretionary reserve fund for use in retaining the services of other employees deemed critical to the performance of the Debtors' businesses during the Chapter 11 Cases.

9.    **Motion to Extend the Time to Assume or Reject Unexpired Leases of Nonresidential Real Property**

The Debtors, requiring more than the statutory 60 day period to decide whether to assume or reject unexpired leases of non-residential real property, have been granted several extensions of time within which to assume or reject such leases. The current deadline is set to expire on March 31, 2004.

10.    **Motion to Extend Time to File a Joint Plan and Solicit Acceptances**

The Bankruptcy Court has granted several extensions of the time period in which the Debtors have the exclusive right to file a plan of reorganization and solicit acceptances of a plan. The Debtors' exclusive period to file a plan of reorganization and obtain acceptances to any such plan has expired with respect to the Agent and the Creditors Committee, but such period was extended to February 15, 2004 for all other parties. The Debtors have filed a motion to further extend their exclusive period to solicit acceptances of a plan of reorganization with respect to all parties except the Agent and the Creditors Committee to May 15, 2004.

11.    **Motion to Appoint an Equity Security Holders Committee**

On September 23, 2002 the Bankruptcy Court granted the State of Wisconsin Investment Board authority to direct the United States Trustee to appoint an Equity Security Holders' Committee for the Debtors' Chapter 11 Cases.

-24-

A-0474

12.    **Motion Directing that Certain Orders in the Chapter 11 Cases of Exide Technologies, et al be Made Applicable to Dixie Metals Company and Refined Metals Corporation**

On November 21, 2002, the Debtors Dixie Metals Company and Refined Metals Corporation filed voluntary petitions for relief under Chapter 11. By order of the Bankruptcy Court dated December 18, 2002, certain orders previously entered in the Chapter 11 Cases were made applicable to Dixie Metals and Refined Metals, as if Dixie Metals and Refined Metals were actually referred to in the particular orders.

13.    **Claim of Bernd Schulte-Ladbeck**

Bernd H. Schulte-Ladbeck ("Schulte") and Performance Plastics Products, Inc. ("3PI") have filed proofs of claim in which they assert ownership or co-ownership rights in certain patents. Specifically, Schulte and 3PI assert that (i) Exide Technologies is the owner by assignment of United States Patent Nos. 6,045,940 ("the '940 patent") and 6,110,617 ("the '617 patent") (collectively, the "Patents"), (ii) the '940 patent entitled Flooded Lead Acid Battery with Tilt-Over Capability issued to Exide Technologies on April 4, 2000, (iii) the '617 patent entitled Flooded Lead Acid Battery with Roll-Over Capability issued to Exide Technologies on August 29, 2000, (iv) both Patents name Fred F. Feres ("Feres") as the inventor, (vi) the Patents described and claimed batteries employing polytetrafluoroethylene (PTFE) frits as flame arresters to provide improved safety in tilt over and roll over circumstances, (vii) in the '617 patent, the frits are employed alone, while in the '940 patent they are used with a labyrinth on the top of the battery to prevent fluid loss, and (viii) these inventions are particularly suitable for use in automotive batteries. Schulte asserts that he is an engineer employed by 3PI. Schulte and 3PI assert that Schulte is the inventor of the invention disclosed and claimed in the '617 patent and is a co-inventor of the invention disclosed and claimed in the '940 patent. Schulte and 3PI assert in their proofs of claim that they intend to seek a correction of the inventors named in the Patents which would result in their acquisition of an ownership interest in the Patents. Further, they claim damages as a result of (1) Exide Technology's alleged unauthorized disclosure of Schulte's invention and 3PI's confidential and proprietary information by application for and acquisition of those United States patents and (2) the alleged loss of patent rights in foreign countries, notably Europe, Japan, Brazil, Russia and other countries where automobiles are manufactured and used, which Schulte and 3PI allege, over the twenty (20) year life of the average patent, could exceed One Hundred Million Dollars ($100,000,000.00). The Debtors dispute the factual and legal assertions of Schulte and 3PI and reserve all of their rights with respect thereto. The Debtors agree that Schulte or 3PI may file an action in the Bankruptcy Court (or seek relief from the automatic stay to file an action in another court) seeking a change of the inventors named in the Patents which would result in their acquisition of an ownership interest in the Patents, and that such action would not be barred by any injunction provisions or any other provisions contained in any confirmed plan of reorganization in these Chapter 11 Cases.

14.    **Motion to Approve Stipulation and Agreed Order Authorizing Entry Into a Bonding Facility Agreement**

On August 19, 2003, the Bankruptcy Court approved a Stipulation and Agreed Order ("Stipulation and Agreed Order") Authorizing Entry Into a Bonding Facility Agreement by and between the Debtors and The St. Paul Companies, Inc., St. Paul Fire and Marine Insurance Company, St. Paul Guardian Insurance Company, St. Paul Mercury Insurance Company and Seaboard Surety Company (collectively, "St. Paul"). Pursuant to the Stipulation and Agreed Order, St. Paul has agreed to provide Exide with certain bonding availability during the remainder of the Debtors' bankruptcy proceedings and for a substantial period following emergence from bankruptcy, and Exide has agreed, inter alia, to collateralize outstanding bonds, all pursuant to the terms and conditions of the Stipulation and Agreed Order, which terms and conditions are more fully set forth therein.

**D.    ASSUMPTION/REJECTION OF CONTRACTS AND LEASES**

Pursuant to section 365 of the Bankruptcy Code, and pursuant to the rejection procedures order described above, the Debtors may either assume, assume and assign, or reject executory contracts and unexpired leases of real and personal property, subject to the approval of the Bankruptcy Court. As a condition to assumption, or assumption and assignment, the Debtors must cure all existing defaults under the contract or lease. If the contract or lease is rejected, any resulting rejection damages are treated as prepetition unsecured claims. Generally, and with certain exceptions, postpetition obligations arising under a contract or lease must be paid in full in the ordinary course of business.

A-0475

Throughout these Chapter 11 Cases, the Debtors have filed several motions to reject contracts, and have sought several extensions of time within which to assume or reject contracts. The current deadline for assuming or rejecting unexpired leases of non-residential real property is March 31, 2004. The Debtors are continuing to review their executory contracts and unexpired leases and will continue to make determinations with respect to such contracts on a rolling basis.

On March 24, 2003, the Debtors initiated adversary proceeding number 03-51952 (KJC) against certain of its purported equipment lessors (the "Purported Lessors") seeking a declaration that certain purported leases (the "Purported Leases") are actually financing agreements that create a security interest and are not "true leases" (the "Recharacterization Adversary Proceeding"). The Purported Lessors deny that the agreements are secured transactions. At this time, no trial date has been scheduled; however, under the current scheduling and discovery order, the Recharacterization Adversary Proceeding will not be resolved or completed prior to confirmation of the Joint Plan. As a result, the Purported Leases and Purported Lessors shall be subject to the following treatment under the Joint Plan. Immediately prior to the Effective Date, except as otherwise provided in this section, all Purported Leases shall be deemed assumed on a conditional basis pending the entry of a final, non-appealable order resolving the Recharacterization Adversary Proceeding in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code except those Purported Leases that (1) have been rejected on a conditional basis pending the entry of a final, non-appealable order resolving the Recharacterization Adversary Proceeding by order of the Bankruptcy Court, (2) are the subject of a motion to reject on a conditional basis pending the entry of a final, non-appealable order resolving the Recharacterization Adversary Proceeding pending on the Effective Date, or (3) are identified on a list to be included in the Plan Supplement. To the extent that a final, non-appealable order is entered in the Recharacterization Adversary Proceeding providing that a Purported Lease is a "true lease," the conditional assumption or rejection of such Purported Lease, whichever is applicable, shall become final and such Purported Lessor shall be entitled to the treatment provided for other lessors and non-debtor parties to executory contracts. To the extent that a final, non-appealable order is entered in the Recharacterization Adversary Proceeding providing that a Purported Lease is a secured financing transaction, such Purported Lessor shall be entitled to a Class P2-Other Secured Claim to the extent of the value of the equipment subject to the Purported Lease under section 506 of the Bankruptcy Code if such Purported Lessor qualifies as a secured creditor under applicable non-bankruptcy law and a P4-General Unsecured Claim for any amounts owed by the Debtors greater than the value of the equipment or for the entire amount of such allowed claim if the Purported Lessor does not qualify as a secured creditor under applicable non-bankruptcy law. With respect to any Purported Lease as to which the Debtors retain possession of the underlying equipment or to which the Debtors have not returned the underlying equipment, from the Confirmation Date through the date of entry of a dispositive final, non-appealable order in the Recharacterization Adversary Proceeding with respect to such Purported Lease or by other agreement between the parties, the Debtors and the Purported Lessors shall continue to perform their obligations under the Purported Leases in accordance with each such Purported Lease's terms; provided however, that with respect to any Purported Lease that is conditionally assumed as of the Confirmation Date, the Debtors shall not be required to make any cure payment within the meaning of section 365 of the Bankruptcy Code until the entry of a final, non-appealable order in the Recharacterization Adversary Proceeding determining that such Purported Lease is a "true lease." Unless otherwise agreed to by the parties, the Debtors shall continue to perform their obligations under the holdover terms of any Purported Lease for which the Debtors retain possession of the underlying equipment but which expires by its own terms prior to the entry of a dispositive final, non-appealable order in the Recharacterization Adversary Proceeding. In the event that the Debtors conditionally assume a Purported Lease and a final, non-appealable order is entered in the Recharacterization Adversary Proceeding determining that such Purported Lease is a "true lease," the Debtors shall provide such Purported Lessor with a notice setting forth the proposed cure amount within 30 days of the entry of such order. If the Purported Lessor does not agree with the Debtors' proposed cure amount, such Purported Lessor may submit an alternative cure amount within 30 days of receipt of the Debtors' notice. If the parties are unable to agree on a cure amount, a hearing shall be set before the Bankruptcy Court to determine the cure amount. Any bar date relating to Administrative Claims established in the Joint Plan or otherwise shall not apply to Administrative Claims alleged by the Purported Lessors relating to the Purported Leases. Rather, upon the motion of the Debtors or the Purported Lessors, the Bankruptcy Court shall establish a bar date and related notice and filing procedures, in the Recharacterization Adversary Proceeding, for Administrative Claims alleged by the Purported Lessors relating to the Purported Leases.

E.     BANKRUPTCY LITIGATION

The following are substantial litigation issues currently pending by or against or seriously impacting upon the Debtors:

-26-

**A-0476**

1.    Exide v. Keystone Leasing Service, et al.

On March 24, 2004, Exide Technologies filed adversary complaint number 03-51952 in the United States Bankruptcy Court for the District of Delaware against Keystone Leasing Service, JDR Capital Corporation, Citicorp Vendor Finance, Inc., f/k/a Copelco Capital, Inc., Finova Capital Corporation, Trimarc Financial, New England Capital Corporation, Diamond Lease (U.S.A.), Inc., Sovereign Bank Network Capital Alliance Division, Fleet Credit Corporation, n/k/a Fleet Capital Corporation, Transamerica Business Credit Corporation, n/k/a M Credit, Inc., USL Capital Corporation, n/k/a Mellon US Leasing, General Electric Capital Corporation, Associates Leasing, Inc., n/k/a CitiCapital Commercial Leasing Corporation, Sanwa Business Credit Corporation n/k/a Fleet Business Credit Corporation, Fleet Business Credit Funding Corporation, FleetBoston Financial Corporation, Senstar Finance Company, n/k/a Deere Credit, Inc., Fifth Third Leasing Company and National City Leasing Company. The complaint relates to agreements pertaining to certain of Exide's industrial and manufacturing machinery, and seeks a determination that such agreements are secured financing transactions and not true leases. Currently, the parties are in the discovery phase of the litigation.

2.    Exide v. Arthur M. Hawkins, Douglas N. Pearson and Alan E. Gauthier

On May 8, 2002, Exide filed an adversary proceeding against former officers Arthur Hawkins and Douglas Pearson, seeking the recovery of preferential transfers made within 90 days prior to the Petition Date. On or about April 24, 2003, Exide filed an additional adversary proceeding, naming Arthur Hawkins, Douglas Pearson and Alan Gauthier as defendants, seeking recovery of certain preferential transfers, fraudulent conveyances, and seeking the turnover of certain property of Exide's estate. These adversary proceedings have been consolidated under case number 02-03274, and all told Exide is seeking the recovery of approximately $3.2 million dollars, including approximately $735,000 from Arthur Hawkins, $1.787 million from Douglas Pearson and $661,298 from Alan Gauthier. This adversary proceeding is currently in the discovery phase.

3.    Creditors Committee and $R^2$ Investments v. Credit Suisse First Boston and Salomon Smith Barney, Inc.

On January 16, 2003 the Committee and $R^2$ Investments, LDC filed an adversary proceeding against Credit Suisse First Boston, individually as lender and as administrative agent, joint lead arranger, sole book manager and class representative for a syndicate of banks and other institutions, and Salomon Smith Barney, Inc., as syndication agent, joint lead arranger and class representative for Prepetition Lenders, alleging impropriety with respect to the Prepetition Credit Facility. This adversary proceeding seeks, among other things, to avoid as fraudulent and preferential transfers certain of the Prepetition Credit Facility Claims and to subordinate all of the Prepetition Credit Facility Claims to the payment of General Unsecured Claims. Pursuant to section 1123(b) of the Bankruptcy Code, the plaintiffs, the defendants and the Debtors are settling this litigation in consideration for the classification, distribution, treatment, releases and other benefits provided under the Joint Plan, including without limitation the distributions to be made to Holders of General Unsecured Claims pursuant to Article III.B.4 of the Joint Plan and the undertakings of the parties in furtherance of the settlements provided in the Joint Plan. See Section III.I.7 below for a more detailed description of the litigation and proposed settlement.

As a condition to Confirmation of the Joint Plan, the Confirmation Order must approve the dismissal, with prejudice, of this adversary proceeding in its entirety, which dismissal shall be effective as of the Effective Date.

4.    Smith Management LLC vs. Credit Suisse First Boston, et al.

On October 14, 2003, Smith Management LLC filed an adversary proceeding against Credit Suisse First Boston, Salomon Smith Barney, Inc., n/k/a Citigroup Global Markets, Inc., AG Capital Funding Partners L.P., $R^2$ Top Hat LTD., Black Diamond 1998-1 LTD., Black Diamond CLO 2000-1 LTD., Black Diamond International Funding, LTD., Citadel Trading LTD., and Citadel Equity Fund, LTD., designated as adversary proceeding 03-56894(KJC). The Smith Management LLC adversary proceeding makes allegations substantially identical to the allegations raised in the Creditors' Committee adversary proceeding, described immediately above. Pursuant to section 1123(b) of the Bankruptcy Code, the plaintiff, the defendants, the Debtors and the Creditors Committee are settling this litigation in consideration of the classification, distribution, treatment, releases and other benefits provided under the Joint Plan, including without limitation the distributions to be made to Holders of General Unsecured Claims pursuant to Article III.B.4 of the Joint Plan and the undertakings

A-0477

of the parties to the settlements provided in the Joint Plan.  See Section III.I.7 below for a more detailed description of the litigation and proposed settlement.

As a condition to Confirmation of the Joint Plan, the Confirmation Order must approve the dismissal, with prejudice, of this adversary proceeding in its entirety, which dismissal shall be effective as of the Effective Date.

### 5.    EnerSys Litigation

On or about March 14, 2003, the Debtors gave notice of their intention to reject certain contracts (the "EnerSys Contracts") with predecessors in interest to EnerSys Inc. ("EnerSys"), including but not limited to a trademark licensing agreement regarding the use of the "Exide" name on industrial battery products.  EnerSys objected to the Debtors' rejection of certain of the EnerSys Contracts, arguing, among other things, that the contracts at issue are not executory, that any benefit to the Debtors' estates from such rejections would be exceeded by the costs to the estates arising out of the rejection, and that it would be inequitable under the circumstances to permit rejection of certain of the contracts.  A hearing on rejection of the EnerSys Contracts that EnerSys opposes will be heard by the Court beginning March 3, 2004.

The financial projections contained in this Disclosure Statement do not assume that the Debtors will obtain an order authorizing the rejection of the EnerSys Contracts.  If the Debtors are authorized to reject the EnerSys Contracts, including the trademark licensing agreement, the Debtors assert that they will be able to use the "Exide" trademark in marketing industrial batteries, and believe that they would enjoy significant economic benefits from being able to market all of their products under a single brand.  However, the Debtors have not quantified the amount of such benefits.  In addition, the Debtors assert that EnerSys will be unable to use the "Exide" trademark in any market in connection with any products.  In the event the Debtors prevail in their efforts to reject the EnerSys Contracts, no additional consideration would flow to unsecured creditors under the Joint Plan.  Rather, any benefit from the rejection would inure to the benefit of Reorganized Exide.  Further, in the event the Debtors are able to reject the EnerSys Contracts, EnerSys has asserted that it will have a rejection damage claim which will exceed $50.0 million.  The Debtors and the Creditors Committee or the Postconfirmation Creditors Committee may contest the EnerSys rejection damage claim.  To the extent the EnerSys rejection claim is allowed, it will be a Class P4-A Claim and the existence of such Claim will cause a reduction in the distributions to other Holders of Class P4 Claims.

### 6.    Pacific Dunlop Litigation

In July 2001, Pacific Dunlop Holdings (US), Inc. ("PDH") and several of its foreign affiliates under the various agreements through which Exide and its affiliates acquired GNB, filed a complaint in the Circuit Court for Cook County, Illinois alleging breach of contract, unjust enrichment and conversion against Exide and three of its foreign affiliates.  The plaintiffs maintain they are entitled to approximately $17.0 million in cash assets acquired by the defendants through their acquisition of GNB.  In December 2001, the Court denied the defendants' motion to dismiss the complaint, without prejudice to re-filing the same motion after discovery proceeds.  The defendants have filed an answer and counterclaim.  On July 8, 2002, the Court authorized discovery to proceed as to all parties except Exide.  In August 2002, the case was removed to the U.S. Bankruptcy Court for the Northern District of Illinois and in October 2002, the parties presented oral arguments, in the case of PDH, to remand the case to Illinois state court and, in the case of Exide, to transfer the case to the U.S. Bankruptcy Court for the District of Delaware.  On February 4, 2003, the U.S. Bankruptcy Court for the Northern District of Illinois transferred the case to the U.S. Bankruptcy Court in Delaware.

In December 2001, PDH filed a separate action in the Circuit Court for Cook County, Illinois seeking recovery of approximately $3.1 million for amounts allegedly owed by Exide under various agreements between the parties.  The claim arises from letters of credit and other security allegedly provided by PDH for GNB's performance of certain of GNB's obligations to third parties that PDH claims Exide was obligated to replace.  Exide's answer contested the amounts claimed by PDH and Exide filed a counterclaim.  Although this action has been consolidated with the Cook County suit concerning GNB's cash assets, the claims relating to this action are currently subject to the automatic bankruptcy stay, and have been transferred to the U.S. Bankruptcy Court for the District of Delaware.

On November 19, 2003, the Bankruptcy Court, denying PDH's Motion to Remand to the Circuit Court in Cook County, Illinois, issued an opinion holding that the Bankruptcy Court had jurisdiction over PDH's

A-0478

claims and, moreover, holding that liability, if any, would lie solely against Exide and not against any of Exide's foreign affiliates. While Exide intends to vigorously defend the action and dispute any liability, Exide is confident, based on the Court's ruling, that any finding of liability would give rise to a prepetition claim that would be subject to discharge under the pending Joint Plan.

7.     <u>Confirmation Appeals</u>

Smith Management LLC and HSBC Bank USA have each filed appeals with respect to the Bankruptcy Court's Opinion and Order, dated December 30, 2003, regarding confirmation of the Debtors' Fourth Amended Joint Plan of Reorganization. The parties have agreed that both such appeals shall be stayed during the pendency of the confirmation process for the Joint Plan.

F.     **CLAIMS PROCESS AND CLAIMS BAR DATES**

In Chapter 11, claims against a debtor are established either as a result of being listed in a debtor's schedules of liabilities (the "Schedules") or through assertion by the creditor in a timely filed proof of claim (each, a "Claim"). Claims asserted by creditors are either allowed or disallowed. If allowed, the Claim will be recognized and treated pursuant to the plan of reorganization. If disallowed, the creditor will have no right to obtain any recovery on or otherwise enforce the Claim against the debtor.

1.     <u>Filing of Schedules of Liabilities</u>

On June 13, 2002, the Initial Debtors filed their Schedules with the Bankruptcy Court. Schedules for the Subsequent Debtors were filed on November 27, 2002. The Debtors have, from time to time, amended their Schedules and reserve the right to continue to amend them during the pendency of the Chapter 11 Cases.

2.     <u>Bar Dates</u>

By motion of the Debtors, the Bankruptcy Court set April 23, 2003, as the bar date for all entities to file Claims against the Debtors, subject to certain exceptions. Those creditors who were required to, but failed to, file Claims by April 23 are barred from asserting any claims against the Debtors or receiving any distributions under the Joint Plan. By further motion of the Debtors, the Bankruptcy Court set August 15, 2003 as the date by which all "contaminant" Claims, including personal injury and property damage claims based on contamination theories, must have been filed. Those creditors whose Claims were subject to the August 15 deadline must have filed Claims before that date, or they are now barred from asserting any claims against the Debtors or receiving any distributions under the Joint Plan on account of such claims.

3.     <u>Claims Objection Process</u>

The Debtors anticipate that, when the various bar dates expire, the Debtors will begin evaluating the proofs of claim to determine whether to file objections seeking to disallow asserted Claims. The Debtors anticipate that they will also reconcile the Claims listed in our Schedules with the Claims asserted in proofs of claim and will eliminate duplicative or erroneous Claims to ensure that the Bankruptcy Court allows only valid Claims. If the Debtors object to a proof of claim, the Bankruptcy Court will determine whether to allow any such Claim. To the extent that the Debtors are successful in claims objections, the total amount of our liabilities to be treated under the Joint Plan will decrease. If the Debtors do not object to a proof of claim, the Claim will be deemed allowed and will be treated pursuant to the Joint Plan. As appropriate, the Debtors may seek to negotiate and settle proofs of claim disputes as an alternative to filing objections thereto.

G.     **EXCLUSIVE JOINT PLAN PROPOSAL AND ACCEPTANCE RIGHTS**

Section 1121(b) of the Bankruptcy Code provides a debtor with an initial period of 120 days after the commencement of a Chapter 11 case during which it has the exclusive right to file a plan of reorganization and an initial period of 180 days to obtain acceptances of any such plan (the "Exclusive Periods"). In addition, pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend or increase a debtor's Exclusive Periods. The Debtor's Exclusive Period has expired with respect to the Agent and the Creditors Committee, but was extended to February 15, 2004 for all other parties. The Debtors have filed a motion to further extend their exclusive period to solicit acceptances of a plan of reorganization with respect to all parties except the Agent and the Creditors Committee to May 15, 2004.

-29-

**H.    EVENTS SINCE THE SECOND AMENDED DISCLOSURE STATEMENT**

On October 25, 2003, and within the Debtors' exclusive period to file a plan of reorganization, the Debtors filed the Fourth Amended Plan. Under the Fourth Amended Plan, Classes P3, S3 and P4 were impaired and entitled to vote. Classes P3 and S3 voted overwhelmingly to accept the Fourth Amended Plan. Class P4 voted to reject the Fourth Amended Plan.

The Debtors received 27 formal, and several informal, objections to confirmation of the Fourth Amended Plan. Each of the informal objections were resolved without the necessity of filing a written objection. Approximately half of the formal objections were consensually resolved by the parties and withdrawn prior to the hearing to confirm the Fourth Amended Plan (the "Fourth Amended Plan Confirmation Hearing"). Several other formal objections were overruled by the Bankruptcy Court, and at the close of the Fourth Amended Plan Confirmation Hearing, only seven objections remained.

Following the Fourth Amended Plan Confirmation Hearing, on December 30, 2003, the Bankruptcy Court issued an order denying confirmation of the Fourth Amended Plan. The Bankruptcy Court found the Debtors' enterprise value to be in the range of $1.4 billion to $1.6 billion. Given, in large part, its opinion on the value of the Debtors' estates, the Bankruptcy Court held that (1) although the Debtors are authorized to propose a settlement of the Creditors Committee Adversary Proceeding under section 1123(b)(3)(A) of the Bankruptcy Code, the proposed settlement in the Fourth Amended Plan was not fair and equitable because the $8.5 million settlement amount was below the lowest range of reasonableness; (2) the Fourth Amended Plan's release and injunction provisions were not approved because general unsecured creditors did not receive fair consideration from the parties proposed to be released in return for such releases; and (3) the Debtors' proposed distribution to certain general unsecured creditors is not a reallocation of the Prepetition Lenders' recovery because there may be sufficient value to pay the Prepetition Lenders in full. The Bankruptcy Court's order further urged the parties to continue discussing a consensual exit strategy in light of the above findings.

In consideration of the Bankruptcy Court's order and its determination that the Debtors' enterprise value is in the range of $1.4 billion to $1.6 billion, the Creditors Committee, the Debtors, the Agent and their respective advisors negotiated for several weeks in an effort to reach a consensual plan of reorganization. On January 22, 2004, the parties reached an agreement in principle, which is the basis for this Disclosure Statement and the Joint Plan.

## III.
## SUMMARY OF THE JOINT PLAN OF REORGANIZATION

**A.    OVERVIEW OF CHAPTER 11**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. It authorizes a debtor to reorganize its business for the benefit of itself, its creditors and its interest holders. Another Chapter 11 goal is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a Chapter 11 case creates an estate that comprises all of a debtor's legal and equitable interests as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The principal objective of a Chapter 11 case is to consummate a plan of reorganization. The Chapter 11 plan of reorganization sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any creditor of or equity holder in the debtor, whether or not such creditor or equity holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan.

A Chapter 11 plan may specify that the legal, contractual and equitable right of the holders of claims or interests in classes are to remain unaltered by the reorganization effectuated by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan.

-30-

Accordingly, it is not necessary to solicit votes from the holders of claims or equity interests in such classes. A Chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any classes that are receiving a distribution of property under the plan but are not "unimpaired" will be solicited to vote to accept or reject the plan.

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims of a debtor's creditors and equity interest holders. .In compliance therewith, the Joint Plan divides Claims and Equity Interests into various Classes and sets forth the treatment for each Class. The Debtors also are required, as discussed above, under section 1122 of the Bankruptcy Code, to classify Claims and Equity Interests into Classes that contain Claims and Equity Interests that are substantially similar to the other Claims and Equity Interests in such Classes. The Debtors believe that the Joint Plan has classified all Claims and Equity Interests in compliance with the provisions of section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Equity Interest may challenge the classification of Claims and Equity Interests and that the Bankruptcy Court may find that a different classification is required for the Joint Plan to be confirmed. In such event, the Debtors intend, to the extent permitted by the Bankruptcy Court and the Joint Plan, to make such reasonable modifications of the classifications under the Joint Plan to permit confirmation and to use the Joint Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class under the Joint Plan, by changing the composition of such Class and the vote required of that Class for approval of the Joint Plan.

The Debtors and their Affiliates, the Reorganized Debtors and each of their Affiliates, the Creditors Committee, the Equity Committee, the Agent, the Option A Electors and all officers, directors, members, employees, attorneys, financial advisors, accountants, investment bankers, agents and representatives of each of the foregoing whether current or former, in each case in their capacity as such, and only if serving in such capacity on the Initial Petition Date or thereafter, have, and upon confirmation of the Joint Plan will be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the securities under the Joint Plan, and therefore are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Joint Plan or such distributions made pursuant to the Joint Plan.

THE REMAINDER OF THIS SECTION SUMMARIZES THE STRUCTURE AND MEANS FOR IMPLEMENTING THE JOINT PLAN AND HOW THE JOINT PLAN CLASSIFIES AND TREATS CLAIMS AND EQUITY INTERESTS, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE JOINT PLAN (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN).

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE JOINT PLAN AND IN THE DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE JOINT PLAN OR DOCUMENTS REFERRED THEREIN, AND REFERENCE IS MADE TO THE JOINT PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF THE TERMS AND PROVISIONS OF THE JOINT PLAN AND DOCUMENTS REFERRED TO THEREIN.

THE JOINT PLAN ITSELF AND THE DOCUMENTS THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS UNDER THE JOINT PLAN AND WILL, UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, THE DEBTORS' ESTATES, ALL PARTIES RECEIVING PROPERTY UNDER THE JOINT PLAN, AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE JOINT PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE JOINT PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

THE DISCUSSION OF THE JOINT PLAN SET FORTH BELOW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE JOINT PLAN

-31-

A-0481

AND ITS EXHIBITS, THE TERMS OF WHICH ARE CONTROLLING. HOLDERS OF CLAIMS OR INTERESTS AND OTHER INTERESTED PARTIES ARE URGED TO READ THE JOINT PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE JOINT PLAN.

**B.    SUBSTANTIVE CONSOLIDATION**

THE ESTATES OF THE DEBTORS HAVE NOT BEEN CONSOLIDATED, SUBSTANTIVELY OR OTHERWISE. ANY CLAIMS HELD AGAINST ONE OF THE DEBTORS WILL BE SATISFIED SOLELY FROM THE CASH AND ASSETS OF SUCH DEBTOR. EXCEPT AS SPECIFICALLY SET FORTH IN THE JOINT PLAN, NOTHING IN THE JOINT PLAN OR THIS DISCLOSURE STATEMENT SHALL CONSTITUTE OR BE DEEMED TO CONSTITUTE AN ADMISSION THAT ONE OF THE DEBTORS IS SUBJECT TO OR LIABLE FOR ANY CLAIM AGAINST THE OTHER DEBTORS  THE CLAIMS OF CREDITORS THAT HOLD CLAIMS AGAINST MULTIPLE DEBTORS WILL BE TREATED AS SEPARATE CLAIMS WITH RESPECT TO EACH DEBTOR'S ESTATE FOR ALL PURPOSES (INCLUDING, BUT NOT LIMITED TO, DISTRIBUTIONS AND VOTING), AND SUCH CLAIMS WILL BE ADMINISTERED AS PROVIDED IN THE JOINT PLAN.

**C.    ADMINISTRATIVE AND PRIORITY TAX CLAIMS**

**1.    Administrative Claims**

Subject to the provisions of section 330(a) and 331 of the Bankruptcy Code, each Holder of an Allowed Administrative Claim will be paid the full unpaid amount of such Allowed Administrative Claim in Cash (i) on the Effective Date, (ii) or if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed, or (iii) upon such other terms as may be agreed upon by such Holder and Reorganized Debtor or otherwise upon an order of the Bankruptcy Court; *provided that* Allowed Administrative Claims representing obligations incurred in the ordinary course of business or otherwise assumed by a Debtor pursuant hereto will be assumed on the Effective Date and paid or performed by such Reorganized Debtor when due in accordance with the terms and conditions of the particular agreements governing such obligations. The Holders of Allowed Adequate Protection Superpriority Claims, if any, will receive on account of such Claims the treatment set forth for Class P3 in Article III.B.3 of the Joint Plan.

**2.    DIP Facility Claims**

Subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, Allowed DIP Facility Claims will be paid in full in Cash on the earlier of (i) the Effective Date or (ii) the termination of the DIP Facility according to its terms.

**3.    Priority Tax Claims**

On the Effective Date or as soon as practicable thereafter, each Holder of a Priority Tax Claim due and payable on or prior to the Effective Date shall be paid, at the option of the respective Reorganized Debtor, (a) Cash in an amount equal to the amount of such Allowed Claim, or (b) Cash over a six-year period from the date of assessment as provided in section 1129(a)(9)(C) of the Bankruptcy Code, with interest payable at a fixed rate determined as of the Confirmation Date by the formula provided in section 6621(a)(2) of the Internal Revenue Code and compounded daily (as provided in section 6622 of the Internal Revenue Code), provided, however, that tax obligations owed to the Missouri Department of Revenue shall be paid at a rate of 5% annual interest. Any deferred payments made pursuant to section 1129(a)(9)(C) of the Bankruptcy Code shall be by equal quarterly Cash payments beginning on the first day of the calendar month following the Effective Date, and following on the first day of each third calendar month thereafter, as necessary. The amount of any Priority Tax Claim that is not an Allowed Claim or that is not otherwise due and payable on or prior to the Effective Date, and the rights of the Holder of such Claim, if any, to payment in respect thereof shall (x) be determined in the manner in which the amount of such Claim and the rights of the Holder of such Claim would have been resolved or adjudicated if the Chapter 11 Cases had not been commenced, (y) survive the Effective Date and Consummation of the Joint Plan as if the Chapter 11 Cases had not been commenced, and (z) not be discharged pursuant to section 1141 of the Bankruptcy Code. In accordance with section 1124 of the Bankruptcy Code, and notwithstanding any other provision of the Joint Plan to the contrary, the Joint Plan shall leave unaltered the legal, equitable, and contractual rights of each Holder of a Priority Tax Claim. If the Reorganized Debtors substantially default on the

-32-

A-0482

payments of a tax due to a local, state or federal taxing authority under the Joint Plan, then the total amount still owed to such local, state or federal taxing authority under the Joint Plan shall become due and payable, and such local, state or federal taxing authority may collect such amount as otherwise permitted under nonbankruptcy law. In this context, "substantial default" shall mean that the Reorganized Debtors have defaulted on two consecutive Joint Plan payments owing to a given local, state or federal taxing authority, and, after receiving written notice of such default from the local, state or federal taxing authority, have not, within sixty days, cured the default.

**D.      CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS**

        **1.      Summary**

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, confirmation and distribution pursuant to the Joint Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

        **2.      Summary of Classification and Treatment of Claims and Equity Interests: Exide**

| Class | Claim | Status | Voting Right |
|---|---|---|---|
| P1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| P2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| P3 | Prepetition Credit Facility Claims | Impaired | Entitled to vote |
| P4 | General Unsecured Claims<br>P4-A: Non-Noteholder General Unsecured Claims<br>P4-B: 10% Senior Note Claims<br>P4-C: 2.9% Convertible Note Claims | Impaired | Entitled to vote |
| P5 | Equity Interests | Impaired | Deemed to reject |

        **3.      Summary of Classification and Treatment of Claims and Equity Interests: Subsidiary Debtors**

| Class | Claim | Status | Voting Right |
|---|---|---|---|
| S1 | Other Priority Claims | Unimpaired | Deemed to accept |
| S2 | Other Secured Claims | Unimpaired | Deemed to accept |
| S3 | Prepetition Credit Facility Claims | Impaired | Entitled to vote |
| S4 | General Unsecured Claims | Impaired | Deemed to Reject |
| S5 | Equity Interests | Impaired | Deemed to Reject |

**E.      CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS: EXIDE**

        **1.      Class P1—Other Priority Claims**

        (a)      *Classification.*  Class P1 consists of all Other Priority Claims against Exide.

        (b)      *Treatment.*  The legal, equitable and contractual rights of the Holders of Allowed Class P1 Claims are unaltered by the Joint Plan. Unless otherwise agreed to by the Holders of the Allowed Other Priority Claim and Exide, each Holder of an Allowed Class P1 Claim shall receive, in full and final satisfaction of such Allowed Class P1 Claim, one of the following treatments, in the sole discretion of Exide:

            (i)      Reorganized Exide will pay the Allowed Class P1 Claim in full in Cash on the Effective Date or as soon thereafter as is practicable; *provided that,* Class P1 Claims

-33-

representing obligations incurred in the ordinary course of business will be paid in full in Cash when such Class P1 Claims become due and owing in the ordinary course of business; or

      (ii)    such Claim will be treated in any other manner so that such Claim shall otherwise be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

    (c)    *Voting.* Class P1 is Unimpaired and the Holders of Class P1 Claims are conclusively deemed to have accepted the Joint Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Claims in Class P1 are not entitled to vote to accept or reject the Joint Plan.

    2.    <u>Class P2—Other Secured Claims</u>

    (a)    *Classification.* Class P2 consists of all Other Secured Claims against Exide.

    (b)    *Treatment.* The legal, equitable and contractual rights of the Holders of Class P2 Claims are unaltered by the Joint Plan. Unless otherwise agreed to by the Holder of the Allowed Class P2 Claim and Exide, each Holder of an Allowed Class P2 Claim shall receive, in full and final satisfaction of such Allowed Class P2 Claim, one of the following treatments, in the sole discretion of Exide:

      (i)    the legal, equitable and contractual rights to which such Claim entitles the Holder thereof shall be unaltered by the Joint Plan;

      (ii)    Reorganized Exide shall surrender all collateral securing such Claim to the Holder thereof, without representation or warranty by or further recourse against Exide or Reorganized Exide; or

      (iii)    such Claim will be treated in any other manner so that such Claim shall otherwise be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

On the Effective Date or as soon as practicable thereafter, the Allowed Class P2 Claims of local, state and federal taxing authorities, if any, shall be paid, at the option of the respective Reorganized Debtor, (a) Cash in an amount equal to the amount of such Allowed Class P2 Claim, or (b) Cash over a six-year period from the date of assessment of the tax to which the claim relates, with interest payable at a fixed rate determined as of the Confirmation Date by the formula provided in section 6621(a)(2) of the Internal Revenue Code and compounded daily (as provided in section 6622 of the Internal Revenue Code), provided, however, that tax obligations owed to the Missouri Department of Revenue shall be paid at a rate of 5% annual interest. Any deferred payments made pursuant to this provision of the Joint Plan shall be by equal quarterly Cash payments beginning on the first day of the calendar month following the Effective Date, and following on the first day of each third calendar month thereafter, as necessary. Notwithstanding any other provision of the Joint Plan, all local, state and federal taxing authorities shall retain their applicable legal and equitable rights, if any, against non-Debtor obligors with respect to local, state and federal tax obligations owed by the Debtors.

Notwithstanding any other provision of the Joint Plan, any oversecured Allowed Class 2A Claim of a state or federal taxing authority shall be entitled to postpetition interest at the rate provided for in section 6621(a)(2) of the Internal Revenue Code up to the amount by which the value of the property securing the oversecured Allowed Class P2 Claim exceeds the value of such claim.

All local, state and federal taxing authorities shall retain the tax liens and rights to setoff securing their Allowed Class P2 Claims and, in the event the Reorganized Debtors substantially default on the payment of such claims (as provided for in the Joint Plan), then the total amount still owed to the applicable state or federal taxing authority under the Joint Plan shall become due and payable, and the local, state or federal taxing authority may collect such amount as otherwise permitted under nonbankruptcy law. In this context, "substantial default" shall mean that the Reorganized Debtors have defaulted on two consecutive Joint Plan payments owing to a given local, state or federal taxing authority and, after receiving written notice of such default from the local, state or federal taxing authority, have not, within sixty days, cured the default.

A-0484

(c)    *Voting.* Class P2 is Unimpaired and the Holders of Class P2 Claims are conclusively deemed to have accepted the Joint Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Claims in Class P2 are not entitled to vote to accept or reject the Joint Plan.

3.    Class P3—Prepetition Credit Facility Claims

(a)    *Classification.* Class P3 consists of the Prepetition Credit Facility Claims against Exide.

(b)    *Treatment.* Class P3 Claims shall be Allowed Claims in the aggregate amount of $802.7 million. Holders of Allowed Class P3 and S3 Prepetition Credit Facility Claims may elect on their respective Ballots either (i) Class P3 Option A or (ii) Class P3 Option B, provided that Holders must elect the same treatment for both their Class P3 and S3 Claims. Any Class P3 Holder that does not make an election on its Ballot is deemed to be an Option B Elector. Any Class P3 Holder that does not make an election on its Ballot or chooses the Class P3 Option B, may, at any time prior to the Effective Date, choose the Class P3 Option A with respect to such Claim by providing notice of such choice to the Debtors in writing. The Holder of the Prepetition Credit Facility Swap Claim is deemed to be an Option A Elector with respect to such Claim.

(i)    Class P3 Option A:  On or as soon as practicable after the Effective Date, Holders of Allowed Class P3 and S3 Prepetition Credit Facility Claims who choose the Class P3 Option A shall receive, in full and final satisfaction of their Prepetition Domestic Secured Claims and Prepetition Foreign Secured Claims, a Pro Rata share (based on the aggregate of such Holder's Prepetition Domestic Secured Claims and Prepetition Foreign Secured Claims) of 100% of the remaining Class P3 Distribution after distributions, if any, pursuant to the Class P3 Option B. As a condition to the receipt of a Pro Rata share of the New Exide Common Stock, each Option A Elector shall execute the amendment to the Prepetition Credit Facility summarized in the Amended Prepetition Foreign Credit Agreement Term Sheet.

(ii)    Class P3 Option B:  On or as soon as practicable after the Effective Date, Holders of Allowed Class P3 and S3 Prepetition Credit Facility Claims who choose the Class P3 Option B shall receive, in full and final satisfaction of their Prepetition Domestic Secured Claims, a Pro Rata share (based on the aggregate of the Prepetition Domestic Secured Claims) of the Class P3 Option B Distribution. On the Effective Date, the Prepetition Foreign Secured Claims of Option B Electors shall be governed by the Amended Prepetition Foreign Credit Agreement.

(c)    *Voting.* Class P3 is Impaired and Holders of Class P3 Claims are entitled to vote to accept or reject the Joint Plan.

4.    Class P4—General Unsecured Claims

(a)    *Classification.* Class P4 consists of all General Unsecured Claims against Exide.

(b)    *Treatment.* Except as provided in Section III.L hereof, on or as soon as practicable after the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Allowed Class P4 Claim, the following treatment:

(i)    Class P4-A: Non-Noteholder General Unsecured Claims: Holders of Class P4-A Non-Noteholder General Unsecured Claims shall receive a Pro Rata share of the Class P4 Distribution, based on the Allowed amount of their Claims.

(ii)    Class P4-B: 10% Senior Note Claims: Pursuant to Section III.I.8 hereof, Holders of Class P4-B 10% Senior Note Claims shall receive a Pro Rata share of the Class P4-B Distribution, based on the Allowed amount of their Claims. As provided in Section III.I.3 hereof, this distribution shall be made to the 10% Senior Note Indenture Trustee, who shall in turn make the distributions to or for the benefit of the beneficial holders of the 10% Senior Note Claims in accordance with the terms of the 10% Senior Note Indenture and herewith. To the extent amounts are still owing to the 10% Senior Note Indenture Trustee under the 10%

A-0485

F.    CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS: SUBSIDIARY DEBTORS

1.    Class S1—Other Priority Claims

(a)    *Classification.*  Class S1 consists of all Other Priority Claims against the respective Subsidiary Debtors.

(b)    *Treatment.*  The legal, equitable and contractual rights of the Holders of Allowed Class S1 Claims are unaltered by the Joint Plan. Unless otherwise agreed to by the Holders of the Allowed Other Priority Claim and the respective Subsidiary Debtor, each Holder of an Allowed Class S1 Claim shall receive, in full and final satisfaction of such Allowed Class S1 Claim, one of the following treatments, in the sole discretion of the applicable Subsidiary Debtor:

(i)    The applicable Reorganized Debtor will pay the Allowed Class S1 Claim in full in Cash on the Effective Date or as soon thereafter as is practicable; *provided that,* Class S1 Claims representing obligations incurred in the ordinary course of business will be paid in full in Cash when such Class S1 Claims become due and owing in the ordinary course of business; or

(ii)    such Claim will be treated in any other manner so that such Claim shall otherwise be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(c)    *Voting.*  Class S1 is Unimpaired and the Holders of Class S1 Claims are conclusively deemed to have accepted the Joint Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Claims in Class S1 are not entitled to vote to accept or reject the Joint Plan.

2.    Class S2—Other Secured Claims

(a)    *Classification.*  Class S2 consists of all Other Secured Claims against the respective Subsidiary Debtors.

(b)    *Treatment.*  The legal, equitable and contractual rights of the Holders of Class S2 Claims are unaltered by the Joint Plan. Unless otherwise agreed to by the Holder of the Allowed Class S2 Claim and the applicable Subsidiary Debtor, each Holder of an Allowed Class 2B Claim shall receive, in full and final satisfaction of such Allowed Class 2B Claim, one of the following treatments, in the sole discretion of the applicable Subsidiary Debtor:

(i)    the legal, equitable and contractual rights to which such Claim entitles the Holder thereof shall be unaltered by the Joint Plan;

(ii)    the applicable Reorganized Debtor shall surrender all collateral securing such Claim to the Holder thereof, without representation or warranty by or further recourse against the applicable Debtor or Reorganized Debtor; or

(iii)    such Claim will be treated in any other manner so that such Claim shall otherwise be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

On the Effective Date or as soon as practicable thereafter, the Allowed Class S2 Claims of local, state and federal taxing authorities, if any, shall be paid, at the option of the respective Reorganized Debtor, (a) Cash in an amount equal to the amount of such Allowed Class S2 Claim, or (b) Cash over a six-year period from the date of assessment of the tax to which the claim relates, with interest payable at a fixed rate determined as of the Confirmation Date by the formula provided in section 6621(a)(2) of the Internal Revenue Code and compounded daily (as provided in section 6622 of the Internal Revenue Code), provided, however, that tax obligations owed to the Missouri Department of Revenue shall be paid at a rate of 5% annual interest. Any deferred payments made pursuant to this provision of the Joint Plan shall be by equal quarterly Cash payments beginning on the first day of the calendar month following the Effective Date, and following on the first day of each third calendar month thereafter, as necessary. Notwithstanding any other provision of the Joint Plan, all local, state and federal taxing authorities shall

-37-

A-0487

retain their applicable legal and equitable rights, if any, against non-Debtor obligors with respect to local, state and federal tax obligations owed by the Debtors.

Notwithstanding any other provision of the Joint Plan, any oversecured Allowed Class S2 Claim of a state or federal taxing authority shall be entitled to postpetition interest at the rate provided for in section 6621(a)(2) of the Internal Revenue Code up to the amount by which the value of the property securing the oversecured Allowed Class S2 Claim exceeds the value of such claim.

All local, state and federal taxing authorities shall retain the tax liens and rights to setoff securing their Allowed Class S2 Claims and, in the event the Reorganized Debtors substantially default on the payment of such claims (as provided for in the Joint Plan), then the total amount still owed to the applicable local, state or federal taxing authority under the Joint Plan shall become due and payable, and the local, state or federal taxing authority may collect such amount as otherwise permitted under nonbankruptcy law. In this context, "substantial default" shall mean that the Reorganized Debtors have defaulted on two consecutive Joint Plan payments owing to a given local, state or federal taxing authority, and, after receiving written notice of such default from the local, state or federal taxing authority, have not, within sixty days, cured the default.

(c)     *Voting.* Class S2 is Unimpaired and the Holders of Class S2 Claims are conclusively deemed to have accepted the Joint Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Claims in Class S2 are not entitled to vote to accept or reject the Joint Plan.

3.    <u>Class S3—Prepetition Credit Facility Claims.</u>

(a)     *Classification.* Class S3 consists of all Prepetition Credit Facility Claims against the respective Subsidiary Debtors.

(b)     *Treatment.* Class S3 Claims shall be Allowed Claims in the aggregate amount of $802.7 million. On account of their Class S3 Claims, the Holders thereof will receive the treatment set forth for Class P3 in Section III.E.3 above.

(c)     *Voting.* Class S3 is Impaired and Holders of Class S3 Claims are entitled to vote to accept or reject the Joint Plan.

4.    <u>Class S4—General Unsecured Claims</u>

(a)     *Classification.* Class S4 consists of all General Unsecured Claims against the respective Subsidiary Debtors.

(b)     *Treatment.* On or as soon as practicable after the Effective Date, each Allowed Class S4 Claim will be cancelled and Holders of Allowed Class S4 Claims will receive no distribution on account thereof.

(c)     *Voting.* Class S4 is Impaired and is conclusively deemed to reject the Joint Plan. Holders of Class S4 Claims are not entitled to vote to accept or reject the Joint Plan.

5.    <u>Class S5—Equity Interests</u>

(a)     *Classification.* Class S5 consists of all Equity Interest in the respective Subsidiary Debtors.

(b)     *Treatment.* On or as soon as practicable after the Effective Date, each Allowed Class S5 Equity Interest will be cancelled.

(c)     *Voting.* Class S5 is Impaired and is conclusively deemed to reject the Joint Plan. Holders of Class S5 Interests are not entitled to vote to accept or reject the Joint Plan.

-38-

G.    **SPECIAL PROVISION GOVERNING UNIMPAIRED CLAIMS**

Except as otherwise provided in the Joint Plan, nothing under the Joint Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claims, including, but not limited to, all rights in respect of legal and equitable defenses to or setoffs or recoupments against such Unimpaired Claims.

H.    **ACCEPTANCE OR REJECTION OF THE JOINT PLAN**

1.    **Voting Classes**

Each Holder of an Allowed Claim in Classes P3, P4 and S3 shall be entitled to vote to accept or reject the Joint Plan.

2.    **Acceptance by Impaired Classes**

An Impaired Class of Claims shall have accepted the Joint Plan if (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Joint Plan and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Joint Plan.

3.    **Presumed Acceptance of Joint Plan**

Classes P1, P2, S1 and S2 are Unimpaired under the Joint Plan, and, therefore, are presumed to have accepted the Joint Plan pursuant to section 1126(f) of the Bankruptcy Code.

4.    **Presumed Rejection of Joint Plan**

Classes P5, S4 and S5 are impaired and shall receive no distributions, and, therefore, are presumed to have rejected the Joint Plan pursuant to section 1126(g) of the Bankruptcy Code.

5.    **Non-Consensual Confirmation**

The Creditors Committee and the Debtors reserve the right to seek Confirmation of the Joint Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, in view of the deemed rejection by Classes P5, S4 and S5. In the event that Class P3, P4, and/or S3 fails to accept the Joint Plan in accordance with section 1129(a)(8) of the Bankruptcy Code, the Creditors Committee and the Debtors reserve the right (a) to request that the Bankruptcy Court confirm the Joint Plan in accordance with section 1129(b) of the Bankruptcy Code and/or (b) to modify the Joint Plan in accordance with Article XII.E of the Joint Plan.

I.    **MEANS FOR IMPLEMENTATION OF THE JOINT PLAN**

1.    **Restructuring**

Prior to the Confirmation Date, (i) Exide will form a new Dutch company ("Exide CV"), owned by Exide and a new wholly-owned domestic subsidiary of Exide, and (ii) Exide CV will form another new, wholly-owned Dutch company ("Exide BV"). After the Confirmation Date but on or before the Effective Date, (i) Exide will transfer the shares of two existing foreign subsidiaries, Exide Holding Asia PTE Limited ("Exide Holding Asia") and Exide Holding Europe S.A. ("Exide Holding Europe"), along with its interest in the Exide Holding Europe participating loan, to Exide CV in exchange for equity of Exide CV, (ii) Exide CV will transfer its newly-acquired shares of Exide Holding Asia and a portion of its newly acquired shares of Exide Holding Europe to Exide BV in exchange for equity of Exide BV, (iii) Exide Holding Europe will be converted from a French S.A. to a French S.A.S. or S.A.R.L, and (iv) Exide will enter into an assumption and indemnification agreement with Deutsche Exide regarding Deutsche Exide's obligations under the Prepetition Credit Facility.

2.    **Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors**

The Reorganized Debtors shall continue to exist after the Effective Date as separate legal entities, with all the powers of a corporation or limited liability company, as applicable, under the laws of their respective states of organization and without prejudice to any right to alter or terminate such existence (whether by merger

-39-

A-0489

or otherwise) under such applicable state law. Except as otherwise provided in the Joint Plan, on and after the Effective Date, all property of the Debtors' Estates, and any property acquired by the Debtors or Reorganized Debtors under the Joint Plan, shall vest in the respective Reorganized Debtors, free and clear of all Claims, liens, charges, or other encumbrances. On and after the Effective Date, the Reorganized Debtors may operate their business and may use, acquire or dispose of property and compromise or settle any Claims or Equity Interests, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Joint Plan and the Confirmation Order. In consideration of the undertakings of Reorganized Exide under the Joint Plan, Reorganized Exide shall continue to own 100% of the Subsidiary Debtors as of the Effective Date.

### 3.     Cancellation of Old Notes and Equity Interests

On the Effective Date, except to the extent otherwise provided in the Joint Plan, all notes, instruments, certificates, and other documents evidencing (a) the Old Notes, (b) Equity Interests, and (c) any stock options, warrants or other rights to purchase Equity Interests shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be discharged. On the Effective Date, except to the extent otherwise provided in the Joint Plan, any indenture relating to any of the foregoing shall be deemed to be cancelled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtors thereunder shall be discharged.

On the Effective Date, except as otherwise provided for herein, the 10% Senior Notes and the 2.9% Convertible Notes shall be deemed extinguished, cancelled and of no further force or effect, and the obligations of the Debtors thereunder shall be discharged, in each case without any further act or action under any applicable agreement, law, regulation, order or rule and without any further action on the part of the Bankruptcy Court or any Person; provided, however, that the 10% Senior Note Indenture and the 2.9% Convertible Note Indenture shall continue in effect for the purposes of (i) allowing the 10% Senior Note Indenture Trustee and the 2.9% Convertible Note Indenture Trustee to receive and make the Distributions to be made to the holders of 10% Senior Note Claims and the 2.9% Convertible Note Claims, respectively, in accordance with Article III.B.4 of the Joint Plan, and (ii) preserving any rights of the 10% Senior Note Indenture Trustee and the 2.9% Convertible Note Indenture Trustee, including indemnification rights, they may have with respect to the holders of the 10% Senior Notes or the 2.9% Convertible Notes under their respective indentures, and the charging liens in favor of the 10% Senior Note Indenture Trustee under the 10% Senior Note Indenture and the 2.9% Convertible Note Indenture Trustee under the 2.9% Convertible Note Indenture.

Notwithstanding any provision in the Joint Plan to the contrary, the distribution provisions contained in the 10% Senior Note Indenture and the 2.9% Convertible Note Indenture shall continue in effect to the extent necessary to authorize the 10% Senior Notes Indenture Trustee and the 2.9% Convertible Note Indenture Trustee to receive and distribute all distributions to be made pursuant to the Joint Plan to the holders of 10% Senior Note Claims and the 2.9% Convertible Note Claims, respectively. Such distribution provisions shall terminate in their entirety upon completion of all such distributions under the Joint Plan. The 10% Senior Note Indenture Trustee and the 2.9% Convertible Note Indenture Trustee shall not be required to give any bond or surety or other security for the performance of their duties.

### 4.     Issuance of New Securities; Execution of Related Documents

Reorganized Exide shall issue or authorize for future issuance all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Joint Plan, including, without limitation, the New Exide Common Stock (shares of which will be reserved for issuance upon the exercise of the New Exide Warrants) and New Exide Warrants, each of which shall be distributed as provided in the Joint Plan. Reorganized Exide and its subsidiaries shall execute and deliver such other agreements, documents and instruments, including the Amended Prepetition Foreign Credit Agreement, as are required to be executed pursuant to the terms of the Joint Plan. The principal terms of the New Exide Common Stock, New Exide Warrants and Amended Prepetition Foreign Credit Agreement are as follows:

**New Exide Common Stock**

New Exide will issue or authorize for issuance in accordance with the Joint Plan 25 million shares of New Exide Common Stock which, assuming the distribution of all securities in the reserve for potential payment of Disputed Claims and the exercise of all New Exide Warrants on the Effective Date, represents 80% of the

A-0490

outstanding New Exide Common Stock, subject to dilution pursuant to the Company Incentive Plan and any duly authorized issuance of Reorganized Exide capital stock after the Effective Date. The New Exide Common Stock will be authorized pursuant to the New Exide Certificate of Incorporation. Reorganized Exide will use its best efforts to cause the New Exide Common Stock to be listed on the New York Stock Exchange or the Nasdaq National Market as soon as practicable after the Effective Date.

### New Exide Warrants

*General.* On the Effective Date, Reorganized Exide will issue for distribution in accordance with the Joint Plan New Exide Warrants initially exercisable for 6.25 million shares of New Exide Common Stock, which shares will be reserved for issuance upon the exercise of the New Exide Warrants. The New Exide Warrants will expire seven years after the Effective Date.

*Exercise Price.* The exercise price of the New Exide Warrants will initially be set at a price per share equal to $32.11. In addition, the exercise price will be adjusted pursuant to the ant-dilution provisions summarized below.

*Anti-dilution; Listing.* The New Exide Warrants will have customary anti-dilution protections for stock splits, stock dividends, stock combinations, stock issuances below certain prices and similar transactions but will be subject to dilution pursuant to the Company Incentive Plan. Reorganized Exide will use its best efforts to cause the New Exide Warrants to be listed on the New York Stock Exchange or the Nasdaq National Market as soon as practicable after the Effective Date.

*Event Protection.* In addition, for a period of three years following the Effective Date and subject to certain other conditions, in the event of a sale of all or substantially all of the assets of Reorganized Exide or a merger or other business combination in which Reorganized Exide is not the surviving entity, a buyer or surviving entity will have the right to either (i) pay holders of the New Exide Warrants (in exchange for such New Exide Warrants) the cash equivalent to a Black-Scholes valuation (using a 40% volatility and the remaining life of the New Exide Warrants, such valuation subject to a 50% reduction in the third year following the Effective Date) of such New Exide Warrants as of the date such transaction is consummated, or (ii) assume the New Exide Warrants.

### Additional Considerations

To the extent that Reorganized Exide realizes any benefits, including any improvement in enterprise value or cash payments, from pending restructuring efforts, pending litigations (as described in Section II.E) or any transactions that may be contemplated but not yet consummated, such benefits will inure to the benefit of Reorganized Exide. It is possible that such benefits would have a positive impact on the value of Reorganized Exide's warrants and common stock. These benefits, if any, will not be distributed, or otherwise shared with, the Debtors' creditors who do not receive warrants or shares of Reorganized Exide's stock, nor will the costs of pursuing such benefits be borne by such creditors.

### Company Incentive Plan

As soon as practicable after the Effective Date, the Company Incentive Plan shall be proposed and approved by the compensation committee of the New Exide Board of Directors, subject to final approval by the New Exide Board of Directors; provided however, that the Company Incentive Plan will provide that covered employees will receive or have the right to receive securities representing not less than 5% and not more than 10% of the fully diluted shares of New Exide Common Stock.

### Amended Prepetition Foreign Credit Agreement

As described in Section III.E.3 hereof, Holders of Allowed Class P3 and Class S3 Prepetition Credit Facility Claims who choose the Class P3 Option B will, among other thing, have their Prepetition Foreign Secured Claims as against the respective Foreign Subsidiary Borrowers reinstated pursuant to the Amended Prepetition Foreign Credit Agreement, as more fully described in Exhibit A to the Joint Plan. All affirmative and negative covenants contained in the Prepetition Credit Facility and the Standstill Agreement will be deleted and will not be included in such Amended Prepetition Foreign Credit Agreement. Furthermore, the administrative agent under the Prepetition Credit Facility, Credit Suisse First Boston, will be authorized to release all obligations of GNB Battery Technologies Japan, Inc., a domestic non-Debtor, pursuant to the Loan Documents

-41-

(as defined in the Standstill Agreement). Credit Suisse First Boston will also be authorized to release all collateral securing the Prepetition Foreign Secured Claims, effective as of the day prior to the Effective Date.

5.     <u>Issuance of Stock or Limited Liability Company Interests of Reorganized Subsidiary Debtors to Reorganized Exide</u>

On or immediately after the Effective Date, the common stock or limited liability company interests, as applicable, of the Reorganized Subsidiary Debtors shall be issued to Reorganized Exide.

6.     <u>Corporate Governance, Directors and Officers, and Corporate Action</u>

(a)     *New Certificate of Incorporation and By-laws.* On the Effective Date, the Reorganized Debtors will file the New Organizational Documents with the Secretary of State for the relevant state of incorporation or formation. The New Organizational Documents will prohibit the issuance of non-voting securities pursuant to section 1123(a)(6) of the Bankruptcy Code. The New Exide Certificate of Incorporation will, among other things, authorize the New Exide Common Stock, including those shares of New Exide Common Stock issuable upon the exercise of the New Exide Warrants.

(b)     *Directors and Officers of Reorganized Exide.* Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the officers of Exide immediately prior to the Effective Date will be the officers of Reorganized Exide. Pursuant to section 1129(a)(5), Exide will disclose, on or prior to the Confirmation Date, the identity and affiliations of any Person proposed to serve on the New Exide Board of Directors. To the extent any such Person is an "Insider" under the Bankruptcy Code, the nature of any compensation for such Person will also be disclosed. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Exide Certificate of Incorporation, the New Exide By-laws and the Delaware General Corporation Law.

The New Exide Board of Directors will be a newly-appointed seven person board of directors. One initial board member shall be appointed by the Creditors Committee, which member shall have a three year term and shall serve on the compensation committee of the New Exide Board of Directors. A second initial board member shall be appointed jointly by the Creditors Committee and the Prepetition Lenders. Additionally, Craig H. Muhlhauser, the Chief Executive Officer of Exide, shall be initially appointed to the New Exide Board of Directors. The four other members of the New Exide Board of Directors shall be appointed by the Prepetition Lenders. The New Exide Certificate of Incorporation will provide that the New Exide Board of Directors shall be divided into three classes of directors, with the initial Class I directors serving for a term expiring at the next succeeding annual meeting of stockholders following the Effective Date, the initial Class II directors serving for a term expiring at the second succeeding annual meeting of stockholders following the Effective Date and the initial Class III directors, which will include the individual appointed solely by the Creditors Committee, serving for a term expiring at the third succeeding annual meeting of stockholders following the Effective Date.

(c)     *Corporate Action.* On the Effective Date, the adoption and filing of the New Exide Certificate of Incorporation and New Organizational Documents, the approval of the New Exide By-laws, the appointment of directors and officers for Reorganized Exide, the restructuring transactions contemplated by Article V.A of the Joint Plan, and all actions contemplated in the Joint Plan shall be authorized and approved by the Bankruptcy Court in all respects (subject to the provisions hereof). All matters provided for in the Joint Plan involving the corporate structure of the Debtors or Reorganized Debtors, and any corporate action required by the Debtors or Reorganized Debtors in connection with the Joint Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders or directors of the Debtors or Reorganized Debtors. On the Effective Date, the appropriate officers of the Debtors and the Reorganized Debtors and members of the board of directors of the Debtors and the Reorganized Debtors are authorized and directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Joint Plan in the name of and on behalf of the Debtors and the Reorganized Debtors.

A-0492

7.    Dismissal of Creditors Committee Adversary Proceeding, Smith Adversary
Proceeding and other Settlements

Pursuant to Bankruptcy Rule 9019, and in consideration of the classification, distribution, treatment, releases and other benefits provided under the Joint Plan, including without limitation the distributions to be made to Holders of General Unsecured Claims pursuant to Article III.B.4 of the Joint Plan, and the undertakings of the parties to the settlements provided in the Joint Plan, the provisions of the Joint Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Joint Plan including, without limitation, (a) the releases set forth in Articles X.B, X.C and X.D of the Joint Plan, (b) the Creditors Committee Adversary Proceeding, (c) the Smith Adversary Proceeding, (d) the Smith Management LLC and HSBC Bank USA appeals of the Opinion on Confirmation, dated December 30, 2003, and the Order, dated December 30, 2003, denying confirmation of the Debtors' Fourth Amended Joint Plan of Reorganization, and (e) the Committee/R² Adversary, all of which shall be deemed settled pursuant to section 1123(b)(3)(A) of the Bankruptcy Code. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Joint Plan, including the releases, and the Bankruptcy Court's findings shall constitute its determination that such compromises, settlements and releases are in the best interests of the Debtors, the estates, the creditors and other parties in interest, and are fair, equitable and within the range of reasonableness, all of which shall be effective as of the Effective Date.

On the Effective Date, (a) the Creditors Committee, R² Investments, LDC and each Holder of General Unsecured Claims shall dismiss or shall be deemed to have dismissed their claims under the Creditors Committee Adversary Proceeding, with prejudice and in their entirety, (b) Smith Management LLC shall dismiss or shall be deemed to have dismissed its claims under the Smith Adversary Proceeding with prejudice and in their entirety, (c) Smith Management LLC and HSBC Bank USA shall dismiss or be deemed to have dismissed with prejudice any appeals of the Opinion on Confirmation, dated December 30, 2003, and the Order, dated December 30, 2003, denying confirmation of the Debtors' Fourth Amended Joint Plan of Reorganization, and (d) the Creditors Committee shall dismiss or shall be deemed to have dismissed with prejudice, and the Creditors Committee and the individual members of the Creditors Committee shall be deemed to have released R² Investments, LDC and R² Top Hat, Ltd. from any and all claims, allegations and causes of action described in or related to the allegations set forth in the Committee/R² Motion.

In consideration of the mutual undertakings of the Releasees in connection with the Chapter 11 Cases and the Joint Plan, each Releasee releases each other Releasee from any and all Claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of Exide, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Person or Entity would have been legally entitled to assert (whether individually or collectively), based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date in any way relating or pertaining to (a) the Debtors or Reorganized Debtors; (b) the purchase or sale, or the rescission of a purchase or sale, of any security of any Debtor, (c) the Chapter 11 Cases, and (d) the negotiation, formulation and preparation of the Joint Plan or any related agreements, instruments or other documents.

**In addition to the general injunction set forth in Article X.H of the Joint Plan, from and after the Effective Date, (a) the Creditors Committee, R² Investments, LDC and each Holder of General Unsecured Claims shall be permanently enjoined from continuing in any manner the Creditors Committee Adversary Proceeding or any of the claims, allegations and causes of action described in or related to the Creditors Committee Adversary Proceeding, (b) Smith Management LLC shall be permanently enjoined from continuing in any manner the Smith Adversary Proceeding or any of the claims, allegations and causes of action described in or related to the Smith Adversary Proceeding, (c) Smith Management LLC and HSBC Bank USA shall be permanently enjoined from continuing in any manner any appeals of the Opinion on Confirmation, dated December 30, 2003, and the Order, dated December 30, 2003, denying confirmation of the Debtors' Fourth Amended Joint Plan of Reorganization, (d) the Creditors Committee and the individual members of the Creditors Committee shall be permanently enjoined from pursuing in any manner the claims, allegations and causes of action described in or related to the Committee/R² Motion, and (e) each Releasee shall be permanently enjoined from pursuing any claims against any other Releasee that are released pursuant to the terms of the Joint Plan.**

A-0493

In the event the Effective Date does not occur, the dismissals, enjoinders, releases and waivers described above shall not be effective.

The Committee has filed pleadings in this case asserting that it has various causes of action against the $R^2$ entities based on alleged improper actions while it served as an ex officio member of the Committee. After a full and fair investigation of these allegations (including depositions of $R^2$ employees as well as interviews with and depositions of Committee members and professionals and others involved in this case, review of thousands of pages of documents produced by $R^2$ and other actions), the Debtor has determined that such causes of action lack merit and the Committee has determined not to seek standing to pursue such causes of action unless the Plan is not confirmed. The Committee further wishes to acknowledge that $R^2$ made a substantial contribution towards the distribution that unsecured creditors will receive under the Plan by, among other things, serving as initial co-plaintiff with the Committee in the Prepetition Bank Adversary Proceeding, retaining its own counsel to assist in formulating and prosecuting the claims asserted in such proceeding and funding a substantial portion of the initial litigation costs related to such adversary proceeding.

8.    Noteholder Distribution Settlement

In recognition and settlement of claims relating to the contractual subordination of the 2.9% Convertible Notes to the 10% Senior Notes in the 2.9% Convertible Note Indenture, the 2.9% Convertible Note Indenture Trustee shall be deemed to have transferred the 2.9% Subordination Payment to the 10% Senior Note Indenture Trustee and the 10% Senior Note Indenture Trustee shall be deemed to have transferred the 2.9% Settlement and Reallocation Payment to the 2.9% Convertible Note Indenture Trustee, and all Creditors shall be deemed to have waived any and all contractual subordination rights that they may have with respect to the 2.9% Note Settlement and Reallocation Payment provided under the Joint Plan. In recognition of these deemed transfers, the Reorganized Debtors shall make the distributions set forth in Articles III.B.4.b.ii and iii of the Joint Plan.

9.    Sources of Cash for Distribution under Joint Plan

All Cash necessary for Reorganized Debtors to make payments pursuant to the Joint Plan shall be obtained from existing Cash balances, if any, and proceeds of the Exit Facility.

10.    Public Company Status and Listing on National Exchange

For a reasonable period of time following the Effective Date, Reorganized Exide shall use its best efforts to continue to be a reporting company under the Securities Exchange Act. Reorganized Exide shall use its best efforts to cause the New Exide Common Stock and New Exide Warrants to be listed on the New York Stock Exchange or the Nasdaq National Market as soon as practicable after the Effective Date.

11.    Payment of Fees and Expenses for the Agent, the Steering Committee and the Postconfirmation Creditors Committee

On the Effective Date or as soon as practicable thereafter, the Reorganized Debtors shall pay all reasonable and actual unpaid Agent Expenses and Steering Committee Expenses for the period up to and including the Effective Date. Thereafter, Reorganized Exide shall timely pay all reasonable and actual Agent Expenses incurred after the Effective Date related to the performance of services set forth in or contemplated by the Joint Plan.

After the Effective Date, the Reorganized Debtors shall pay all reasonable and actual fees and expenses of the professionals retained by the Postconfirmation Creditors Committee and all reasonable and actual expenses of the members of the Postconfirmation Creditors Committee.

12.    Indenture Trustee and other Professional Fees and Expenses

All reasonable and actual fees and expenses of the Fee Submission Parties related to these Chapter 11 Cases shall be paid by the Debtors. Each Fee Submission Party shall submit to the Fee Notice Parties time descriptions and expense statements for all fees and expenses related to these Chapter 11 Cases. If such time descriptions and expense statements are submitted no later than 30 days prior to the commencement of the Confirmation Hearing, the Fee Notice Parties shall have until 10 days prior to the commencement of the

-44-

Confirmation Hearing to review such statements and serve objections, if any.  If none of the Fee Notice Parties objects to such statements, or if such objection is resolved before the Effective Date, the fees and expenses of each Fee Submission Party shall be approved in the Confirmation Order and paid by the Debtors on the Effective Date.  If any of the Fee Notice Parties objects to any of the statements presented by any of the Fee Submission Parties, the parties shall attempt to resolve such objection on a consensual basis.  If no consensual resolution is reached, the Debtors shall be authorized to pay all fees and expenses that are not subject to dispute on the Effective Date, and all disputed fees and expenses shall be presented to the Bankruptcy Court for final determination.  If such time descriptions and expense statements are submitted less than 30 days before the commencement of the Confirmation Hearing, the Fee Notice Parties shall have 20 days to review such statements and serve objections, if any.  If none of the Fee Notice Parties objects to the payment of such fees and expenses, or such objection is resolved, the Debtors shall pay such fees and expenses as soon as practicable after the expiration of the 20 day review period, but no later than 10 days after the later of the expiration of the 20 day review period or the resolution of the relevant objection, as appropriate.  If any of the Fee Notice Parties objects to any of the statements presented by any of the Fee Submission Parties, the parties shall attempt to resolve such objection on a consensual basis.  If no consensual resolution is reached, the Debtors shall be authorized to pay all fees and expenses that are not subject to dispute, and all disputed fees and expenses shall be presented to the Bankruptcy Court for final determination.  The Debtors or the Reorganized Debtors (as the case may be) shall pay any such fee or expense claim submitted to and resolved by the Bankruptcy Court as soon as practicable, but no later than 10 days after the entry of the Bankruptcy Court order relevant to such claim.  The entry of the Confirmation Order shall constitute a determination by the Bankruptcy Court that these procedures are fair and reasonable, in light of the compromises and settlements set forth herein, and that the Debtors are authorized to make the payments provided in this section without need for further order of the Bankruptcy Court.  It is understood that the billing and expense statements may be redacted as necessary to protect privilege and other related issues, and failure to so redact a statement shall not be deemed to be a waiver of such privileges and issues.

Notwithstanding any of the foregoing, the approval of the fees and expenses of Sonnenschein, Nath & Rosenthal LLP and The Bayard Firm, litigation counsel to the Creditors Committee, shall be governed by the orders of the Bankruptcy Court approving their retentions, by the order of the Bankruptcy Court dated June 25, 2003, approving the appointment of a fee examiner, by any other orders of the Bankruptcy Court related to their fees and/or expenses, including any order approving the stipulation among the Prepetition Lenders, the Debtors and the Creditors Committee, filed on or about February 27, 2004, and by all applicable provisions of the Bankruptcy Code.

Any objections to the billing and expense statements shall be in writing and shall specify the amount in dispute and the reasons therefore in reasonable detail.  All objections may be resolved by the relevant Fee Submission Party and the Fee Notice Party making the objection, at any time, without notice to the other Fee Notice or Fee Submission Parties and without further order of the Court regardless of whether presented to the Court.  Any disputed fees that are presented to the Court shall not be subject to any additional objection period.  All of the parties to any objection presented to the Court shall request that such objection be heard on an expedited basis unless otherwise agreed by the parties to such objection.

The Debtors, the Agent and the Creditors Committee acknowledge that the Fee Submission Parties, (a) made a substantial contribution to these Chapter 11 Cases, including towards the distribution that shall be received by Holders of General Unsecured Claims under the Plan and the successful reorganization of the Debtors; and (b) that the economic aspects of the settlement of the various issues among the parties, including the payment of the reasonable and actual fees and expenses of the Fee Submission Parties, described herein is an integral component of the settlement.  Accordingly, the Debtors, the Agent and the Creditors Committee support payment of the reasonable and actual fees and expenses of all of the Fee Submission Parties.

From and after the Effective Date, the Reorganized Debtors shall pay promptly all reasonable and actual fees and expenses of the 10% Senior Note Indenture Trustee and the 2.9% Convertible Note Indenture Trustee related to the performance of services set forth or contemplated by the Joint Plan, other than service by the 10% Senior Note Indenture Trustee or the 2.9% Convertible Note Indenture Trustee, if any, on the Postconfirmation Creditors Committee.

A-0495

13.    Adoption of Company Incentive Plan

As soon as reasonably practicable after the Effective Date, the Company Incentive Plan shall be proposed and approved by the compensation committee of the New Exide Board of Directors, subject to final approval by the New Exide Board of Directors, provided however, that the Company Incentive Plan will provide that covered employees will receive or have the right to receive securities representing not less than 5% and not more than 10% of the fully diluted shares of New Exide Common Stock.

J.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

1.    Assumption of Executory Contracts and Unexpired Leases

Immediately prior to the Effective Date, except as otherwise provided in the Joint Plan, all executory contracts or unexpired leases of the Debtors, including, without limitation, customer program agreements, vendor agreements and warranty obligations, will be deemed assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code except those executory contracts and unexpired leases that (1) have been rejected by order of the Bankruptcy Court, (2) are the subject of a motion to reject pending on the Effective Date, (3) are identified on a list to be included in the Plan Supplement, (4) that relate to the purchase or other acquisition of Equity Interests, or (5) are rejected pursuant to the terms hereof.

Immediately prior to the Effective Date, except as otherwise provided in the Joint Plan, all Purported Leases shall be deemed assumed on a conditional basis pending the entry of a final, non-appealable order resolving the Recharacterization Adversary Proceeding in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code except those Purported Leases that (1) have been rejected on a conditional basis pending the entry of a final, non-appealable order resolving the Recharacterization Adversary Proceeding by order of the Bankruptcy Court, (2) are the subject of a motion to reject on a conditional basis pending the entry of a final, non-appealable order resolving the Recharacterization Adversary Proceeding pending on the Effective Date, or (3) are identified on a list to be included in the Plan Supplement. To the extent that a final, non-appealable order is entered in the Recharacterization Adversary Proceeding providing that a Purported Lease is a "true lease," the conditional assumption or rejection of such Purported Lease, whichever is applicable, shall become final and such Purported Lessor shall be entitled to the treatment provided for other lessors and non-debtor parties to executory contracts. To the extent that a final, non-appealable order is entered in the Recharacterization Adversary Proceeding providing that a Purported Lease is a secured financing transaction, such Purported Lessor shall be entitled to a Class P2-Other Secured Claim to the extent of the value of the equipment subject to the Purported Lease under section 506 of the Bankruptcy Code if such Purported Lessor qualifies as a secured creditor under applicable non-bankruptcy law and a P4-General Unsecured Claim for any amounts owed by the Debtors greater than the value of the equipment or for the entire amount of such allowed claim if the Purported Lessor does not qualify as a secured creditor under applicable non-bankruptcy law. With respect to any Purported Lease as to which the Debtors retain possession of the underlying equipment or to which the Debtors have not returned the underlying equipment, from the Confirmation Date through the date of entry of a dispositive final, non-appealable order in the Recharacterization Adversary Proceeding with respect to such Purported Lease or by other agreement between the parties, the Debtors and the Purported Lessors shall continue to perform their obligations under the Purported Leases in accordance with each such Purported Lease's terms; provided however, that with respect to any Purported Lease that is conditionally assumed as of the Confirmation Date, the Debtors shall not be required to make any cure payment within the meaning of section 365 of the Bankruptcy Code until the entry of a final, non-appealable order in the Recharacterization Adversary Proceeding determining that such Purported Lease is a "true lease." Unless otherwise agreed to by the parties, the Debtors shall continue to perform their obligations under the holdover terms of any Purported Lease for which the Debtors retain possession of the underlying equipment but which expires by its own terms prior to the entry of a dispositive final, non-appealable order in the Recharacterization Adversary Proceeding. In the event that the Debtors conditionally assume a Purported Lease and a final, non-appealable order is entered in the Recharacterization Adversary Proceeding determining that such Purported Lease is a "true lease," the Debtors shall provide such Purported Lessor with a notice setting forth the proposed cure amount within 30 days of the entry of such order. If the Purported Lessor does not agree with the Debtors' proposed cure amount, such Purported Lessor may submit an alternative cure amount within 30 days of receipt of the Debtors' notice. If the parties are unable to agree on a cure amount, a hearing shall be set before the Bankruptcy Court to determine the cure amount. Any bar date relating to Administrative Claims established in the Joint Plan or otherwise shall not apply to Administrative Claims alleged by the Purported Lessors relating to the Purported Leases. Rather, upon the motion of the Debtors or the Purported Lessors, the Bankruptcy Court

-46-

A-0496

shall establish a bar date and related notice and filing procedures, in the Recharacterization Adversary Proceeding, for Administrative Claims alleged by the Purported Lessors relating to the Purported Leases.

The Debtors are still analyzing whether to assume or reject various executory contracts, including but not limited to a settlement agreement with William T. Martin and others similarly situated. Those contracts not rejected pursuant to the procedures described in the preceding paragraphs will be assumed under the Joint Plan.

### 2.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

All proofs of Claims with respect to Claims arising from the rejection of executory contracts or unexpired leases, if any, must be Filed with the Bankruptcy Court according to the deadlines established by the Bankruptcy Court in the Chapter 11 Cases. Any Claims arising from the rejection of an executory contract or unexpired lease not Filed within such time will be forever barred from assertion against the Debtors or Reorganized Debtors, their Estates and property unless otherwise ordered by the Bankruptcy Court or provided in the Joint Plan.

### 3.    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed

Any monetary amounts by which each executory contract and unexpired lease to be assumed pursuant to the Joint Plan is in default shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to such executory contracts or unexpired leases may otherwise agree. In the event of a dispute regarding: (1) the amount of any cure payments, (2) the ability of a Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

### 4.    Indemnification of Directors, Officers and Employees

The obligations of the Debtors to indemnify any Person serving at any time after the Initial Petition Date as one of their directors, officers or employees by reason of such Person's service in such capacity, or as a director, officer or employee of any other corporation or legal entity, to the extent provided in the Debtors' constituent documents, by a written agreement with a Debtor or under applicable state corporate law, shall be deemed and treated as executory contracts that are assumed by the Reorganized Debtors pursuant to the Joint Plan and pursuant to section 365 of the Bankruptcy Code as of the Effective Date. Accordingly, such indemnification obligations shall be treated as Administrative Claims, and shall survive unimpaired and unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date. Notwithstanding anything to the contrary contained in the Joint Plan, such assumed indemnity obligations shall not be discharged, impaired, or otherwise modified by confirmation of the Joint Plan and shall be deemed and treated as executory contracts that have been assumed by the relevant Debtors pursuant to the Joint Plan as to which no proofs of claim need be Filed.

### 5.    Compensation and Benefit Programs

Except as otherwise expressly provided in the Joint Plan, all employment and severance agreements and policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to their employees, former employees, retirees and non-employee directors and the employees, former employees and retirees of its subsidiaries, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit agreements and plans, incentive plans, deferred compensation plans and life, accidental death and dismemberment insurance plans shall be treated as executory contracts under the Joint Plan and on the Effective Date shall be deemed assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code; and the Debtors' obligations under such programs to such Persons shall survive confirmation of the Joint Plan, except for (1) executory contracts or employee benefit plans specifically rejected pursuant to the Joint Plan (to the extent such rejection does not violate sections 1114 and 1129(a)(13) of the Bankruptcy Code), (2) all employee equity or equity-based incentive plans, and (3) such executory contracts or employee benefit plans as have previously been rejected, are the subject of a motion to reject as of the Effective Date, or have been specifically waived by the beneficiaries of any employee benefit plan or contract; provided however,

A-0497

that the Debtors' obligations, if any, to pay all "retiree benefits" as defined in section 1114(a) of the Bankruptcy Code shall continue.

6.     Rejection of Rights Agreement and Registration Agreements

On the Effective Date, the Rights Agreement and Registration Agreements shall be deemed rejected by the Debtors, and the Reorganized Debtors shall have no obligations thereunder.

## K.     PROVISIONS GOVERNING DISTRIBUTIONS

1.     Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in the Joint Plan or as may be ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed as of the Effective Date and are entitled to receive distributions under the Joint Plan shall be made on the Effective Date, or as soon as practicable thereafter, subject to the reserves for Disputed Claims described in Section III.L.1(f) hereof.

The New Exide Common Stock and New Exide Warrants to be authorized or issued under the Joint Plan, other than New Exide Common Stock and New Exide Warrants issued in connection with the reserves for Disputed Claims described in Section III.L.1(f) hereof and the shares of New Exide Common Stock issuable upon the exercise of the New Exide Warrants, shall be deemed issued as of the Effective Date regardless of the date on which the certificates evidencing such shares are actually dated or distributed; *provided that* Reorganized Exide shall withhold any actual payment, dividend or proceeds related to such stock until such distribution is made and no interest shall accrue or otherwise be payable on any such withheld amounts.

2.     Delivery and Distributions and Undeliverable or Unclaimed Distributions

(a)     *Delivery of Distributions in General.*  Distributions to Holders of Allowed Claims shall be made to the Holders of such allowed Claims as of the Distribution Record Date. Except as otherwise provided in the Joint Plan, distributions to Holders of Allowed Claims shall be made at the address of the Holder of such Claim as indicated on the records of the Reorganized Debtors as of the date that such distribution is made. Distributions shall be subject to the reserve for Disputed Claims set forth in Article VIII.A.6 of the Joint Plan.

(b)     *Undeliverable Distributions:*

(i)     Holding of Undeliverable Distributions.  If any distribution to a Holder of an Allowed Claim is returned to a Reorganized Debtor as undeliverable, no further distributions shall be made to such Holder unless and until such Reorganized Debtor is notified in writing of such Holder's then-current address. Undeliverable distributions shall remain in the disputed claim reserve subject to section (ii) below until such time as a distribution becomes deliverable. Undeliverable Cash shall not be entitled to any interest, dividends or other accruals of any kind. As soon as reasonably practicable, the Reorganized Debtors shall make all distributions that become deliverable.

(ii)     Failure to Claim Undeliverable Distributions.  In an effort to ensure that all Holders of valid Allowed Claims receive their allocated distributions, sixty (60) days after the Effective Date, the Reorganized Debtors will File with the Bankruptcy Court a listing of unclaimed distribution holders. This list will be maintained, and periodically updated, for as long as the Chapter 11 Cases are pending. Any Holder of an Allowed Claim that does not assert a Claim pursuant to the Joint Plan for an undeliverable distribution (regardless of when not deliverable) within the later of one year after the Effective Date or 6 months after such Claim becomes an Allowed Claim shall have its Claim for such undeliverable distribution discharged and shall be forever barred from asserting any such Claim against any Reorganized Debtor or its property. In such cases: (i) any Cash held for distribution on account of such Claims shall be property of the relevant Reorganized Debtor, free of any restrictions thereon; and (ii) any New Exide Warrants or New Exide Common Stock (or any proceeds thereof) held for distribution on account of such Claims shall be placed in the disputed claim reserve.

-48-

Nothing contained in the Joint Plan shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

(c)    *Compliance with Tax Requirements/Allocations.* In connection with the Joint Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant to the Joint Plan shall be subject to such withholding and reporting requirements. For tax purposes, distributions received in respect of Allowed Claims will be allocated first to any unpaid principal amount of Allowed Claims with any excess allocated to the interest that accrued on such Claims.

### 3.    Timing and Calculation of Amounts to be Distributed

On the Effective Date or as soon as practicable thereafter, each Holder of an Allowed Claim against a Reorganized Debtor shall receive the full amount of the distributions that the Joint Plan provides for Allowed Claims in the applicable Class, subject to the reserve for Disputed Claims described in Section III.L.1(f) hereof. If and to the extent that there are Disputed Claims, beginning on the date that is 20 calendar days after the end of the calendar quarter following the Effective Date and 20 calendar days after the end of each calendar quarter thereafter, distributions shall also be made, pursuant to the Joint Plan, to Holders of Disputed Claims in any Class whose Claims were allowed during the previous calendar quarter. Such quarterly distributions shall also be in the full amount that the Joint Plan provides for Allowed Claims in the applicable Class, subject to the reserve for Disputed Claims described in Section III.L.1(f) hereof.

### 4.    Minimum Distribution

Any other provision of the Joint Plan notwithstanding, payments of fractions of shares of New Exide Common Stock or fractions of New Exide Warrants will not be made. At such a time as there are no remaining Disputed Claims, the Reorganized Debtors shall aggregate all fractional shares of New Exide Common Stock or fractions of New Exide Warrants that would have been distributed to each Class or sub-Class entitled to receive distributions of New Exide Common Stock or New Exide Warrants under Article III of the Joint Plan, and shall distribute whole shares of New Exide Common Stock (and New Exide Warrants, as applicable) to those Creditors within each Class or sub-Class who would have been entitled to a fractional share of New Exide Common Stock (and fractional New Exide Warrant, as applicable), with such distributions beginning with those Creditors who were owed the largest fractional interest in a share of New Exide Common Stock (and a New Exide Warrant, as applicable), and continuing in descending order until such time as there are no remaining shares of New Exide Common Stock (and/or New Exide Warrants, as applicable) otherwise allocable to Holders in such Class or Sub-Class; *provided, however,* that distributions made by indenture trustees shall be made in accordance with Section III.I.3 hereof. Any other provision of the Joint Plan notwithstanding, the Reorganized Debtors will not be required to make distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under the Joint Plan would otherwise be called for, the actual payment will reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

### 5.    Setoffs

The Reorganized Debtors may, in consultation with the Postconfirmation Creditors Committee, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Joint Plan on account of such Claim (before any distribution is made on account of such Claim), the Claims, Equity Interests, rights and causes of action of any nature that Exide or Reorganized Exide may hold against the Holder of such Allowed Claim; *provided that* neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Reorganized Debtors of any such Claims, Equity Interests, rights and causes of action that the Debtors or Reorganized Debtors may possess against such Holder, except as specifically provided in the Joint Plan.

### 6.    Surrender of Cancelled Instruments or Securities

Each record Holder of a Claim based on or derived from the Old Notes, as a condition precedent to receiving any distribution on account of such Claims, shall be deemed to have surrendered the certificates or other documentation underlying such Claim, and all such certificates and other documentations shall be deemed to be cancelled as of the Effective Date.

-49-

A-0499

7.    <u>Restriction on Distribution of New Exide Common Stock and New Exide Warrants</u>

Distribution of any New Exide Common Stock or New Exide Warrants to any Claim Holder in a jurisdiction outside of the United States is conditioned on receipt by Exide from such Holder of satisfactory evidence that the distribution is legally permitted to be made in such foreign jurisdiction. Exide will reasonably cooperate with any such Holder, at the Holder's expense and without imposing any incremental liability on Exide, in making any filings or taking any other actions in order to make the distribution in such foreign jurisdiction legally permissible. In any event, any Claim Holder in a jurisdiction outside of the United States who has not received a distribution within one year of such Claim becoming an Allowed Claim shall have its Claim for such distribution discharged and shall be forever barred from asserting any such Claim against any Reorganized Debtor or its property. In such cases, any New Exide Common Stock or New Exide Warrants held for distribution on account of such Claims shall be placed in the disputed claims reserve.

L.    **PROCEDURES FOR RESOLUTION OF DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS OR EQUITY INTERESTS**

1.    <u>Resolution of Disputed Claims</u>

(a)    *Prosecution of Objections to Claims.* After the Effective Date, the Reorganized Debtors, in consultation with the Postconfirmation Creditors Committee, shall have the authority on or before the Claims Objection Bar Date to File objections, settle, compromise, withdraw or litigate to judgment objections to Claims. The Debtors, in consultation with the Postconfirmation Creditors Committee, also reserve the right to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law and to seek an extension of the Claims Objection Bar Date.

(b)    *Settlement of Claims.* After the Effective Date, the Debtors, after consultation with the Postconfirmation Creditors Committee, shall have the authority to settle Disputed Claims according to the following procedures:

(i)    no settlement will be agreed by the Reorganized Debtors unless it is reasonable in the judgment of the Reorganized Debtors and after consultation with the Postconfirmation Creditors Committee, upon consideration of the probability of success if the claim is litigated or arbitrated, the complexity, expense and likely duration of any litigation or arbitration with respect to such claim, other factors relevant to assessing the wisdom of settlement, and the fairness of the settlement vis-à-vis the Reorganized Debtors' estates and creditors;

(ii)    with regard to the settlement of any Disputed Claim which would result in the payment of $50,000 or less, the Reorganized Debtors may enter into and effectuate such settlement and are required to give notice to the Claim Settlement Notice Parties within 30 days following the effectuation of such settlement;

(iii)    with regard to the settlement of any Disputed Claim which would result in the payment of more than $50,000 and up to $500,000, the Reorganized Debtors may enter into, execute and consummate a written agreement of settlement that will be binding on its estate, subject to: (i) sending advance written notice to the Claim Settlement Notice Parties, (ii) if no written objections are filed by the Claim Settlement Notice Parties within ten days of receipt of such notice, the Reorganized Debtors are authorized to immediately consummate such settlement; and (iii) if a written objection is received from a notice party within such ten-day period that cannot be resolved, the relevant settlement(s) shall only be consummated upon further order of the Bankruptcy Court;

(iv)    with regard to the settlement of any Disputed Claim which would result in the payment of more than $500,000, the Reorganized Debtors may enter into, execute and consummate a written agreement of settlement that will be binding on its estate upon further order of the Bankruptcy Court; and

(v)    The Reorganized Debtors shall provide the Postconfirmation Creditors Committee, as requested but not less than quarterly, with a summary report, on a claim-by-

-50-

A-0500

claim basis, regarding the status and settlement of Disputed Claims. As requested, but not less than quarterly, the Debtors shall periodically confer with the Postconfirmation Creditors Committee to discuss pending claims and settlements; and

(vi)       the Debtors and the Postconfirmation Creditors Committee may agree to alter the foregoing procedures at any time.

(c)       *Estimation of Claims.* The Debtors or Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether a Debtor or Reorganized Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

(d)       *PITWD Claims.* Notwithstanding anything in the Joint Plan to the contrary, all objections, settlements and litigation with respect to PITWD Claims, and the allowance and payment of PITWD Claims shall be governed by the PITWD Claims Procedures, to be attached as *Exhibit C* to the Joint Plan.

(e)       *Payments and Distributions on Disputed Claims.* Notwithstanding any provision herein or in the Joint Plan to the contrary, except as otherwise agreed by Reorganized Exide after consultation with the Postconfirmation Creditors Committee, no partial payments and no partial distributions will be made with respect to a Disputed Claim until the resolution of such disputes by settlement or Final Order. On the date or, if such date is not a business day, on the next successive business day that is 20 calendar days after the calendar quarter in which a Disputed Claim becomes an Allowed Claim, the Holder of such Allowed Claim will receive all payments and distributions to which such Holder is then entitled under the Joint Plan, subject to the following adjustments:

(i)       Subdivision or Combination of New Exide Common Stock. After the Effective Date, if Reorganized Exide subdivides (by any stock split, stock dividend, recapitalization or otherwise) shares of New Exide Common Stock into a greater number of shares, the remaining number of shares of New Exide Common Stock reserved for Disputed Claims shall be proportionately increased. After the Effective Date, if Reorganized Exide at any time combines (by reverse stock split or otherwise) shares of New Exide Common Stock into a smaller number of shares, then the remaining number of shares of New Exide Common Stock reserved for Disputed Claims shall be proportionately decreased. For purposes of the anti-dilution provisions of the New Exide Warrant Agreement, the New Exide Common Stock and New Exide Warrants reserved for Disputed Claims shall be deemed to be issued as of the Effective Date.

(ii)       Dividends. After the Effective Date, if Reorganized Exide declares or pays a dividend upon the New Exide Common Stock except for a stock dividend payable in shares of New Exide Common Stock (a "Dividend"), then Reorganized Exide shall add to the reserve and payout for potential payment of Disputed Claims the amount and type of Dividends that would have been paid with respect to the remaining New Exide Common Stock reserved for Disputed Claims had such New Exide Common Stock been outstanding on the record date of such Dividend.

(iii)       Organic Change. After the Effective Date, if Reorganized Exide consummates an Organic Change (as defined in the New Exide Warrant Agreement), then the successor or acquiring entity shall assume Reorganized Exide's obligations regarding payment

A-0501

of Disputed Claims and shall adjust the reserve and payout for potential payment of Disputed Claims such that the reserve and payout consists of the consideration, if any, that would have been paid with respect to the remaining New Exide Common Stock and New Exide Warrants reserved for Disputed Claims had such New Exide Common Stock and New Exide Warrants been outstanding immediately prior to the consummation of the Organic Change.

(f)     *Reserve for Disputed Claims.* Prior to the Effective Date, the Creditors Committee shall establish, and the Debtors shall implement, an appropriate and reasonable reserve for potential payment of Disputed Claims in Class P4 comprised of authorized but not issued New Exide Common Stock and New Exide Warrants and in each case the proceeds thereof, if any. At such time as either (a) the Creditors Committee or the Postconfirmation Creditors Committee or its successor, as appropriate, reasonably determines to lower the reserve amount, or (b) there are no remaining Disputed Claims, the Reorganized Debtors shall distribute any unapplied reserve amounts or properties, including any proceeds thereof, Pro Rata to the Holders of Allowed Claims in Class P4 (it being understood that the right to receive such residual distributions of New Exide Common Stock and New Exide Warrants and any proceeds thereof shall remain with the Holders of Allowed Claims in Class P4 and shall not extend to any Persons who purchase New Exide Common Stock or New Exide Warrants from such Holders on or after the Effective Date), according to the distribution protocol described in Article III.B.4 of the Joint Plan.

After the Effective Date, Reorganized Exide will at all times, reserve and keep available, out of its aggregate authorized but unissued or treasury shares of New Exide Common Stock, the remaining number of shares of New Exide Common Stock reserved for Disputed Claims and the number of such shares deliverable upon the exercise of all remaining New Exide Warrants reserved for Disputed Claims.

(g)     *Postconfirmation Creditors Committee.* For the avoidance of doubt, while the Reorganized Debtors will have primary responsibility for administering the process of disputed claims resolution, the Postconfirmation Creditors Committee is intended to have an active role in all aspects of the disputed claims resolution process and related matters. In each instance as expeditiously as possible, the Reorganized Debtors shall provide the Postconfirmation Creditors Committee with all information and access to any and all materials and persons in the Reorganized Debtors' control reasonably requested by such committee.

2.     Allowance of Claims

Except as expressly provided in the Joint Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed, unless and until such Claim is deemed Allowed under the Bankruptcy Code or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim. Except as expressly provided in the Joint Plan or any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), Reorganized Exide after Confirmation will have and retain any and all rights and defenses Exide had with respect to any Claim as of the Initial Petition Date. All Claims of any Person or Entity that owes an obligation to the Debtors under section 502(d) of the Bankruptcy Code shall be disallowed unless or until such Person or Entity has paid the amount or turned over the property for which such person or entity is liable under section 522(i), 542, 543, 550 or 553 of the Bankruptcy Code.

3.     Controversy Concerning Impairment

If a controversy arises as to whether any Claims or any Class of Claims are Impaired under the Joint Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy before the Confirmation Date.

4.     Personal Injury Tort and Wrongful Death Claims

Pursuant to 28 U.S.C. § 157(b)(5), personal injury tort and wrongful death claims are entitled to a trial in a district court and, therefore, cannot be judicially resolved within the context of the Debtors' ordinary claims resolution process. As a result, the Debtors have established the Personal Injury Tort and Wrongful Death Claims Resolution and Distribution Procedures (the "PITWD Claims Procedures") as a means to efficiently and

A-0502

economically adjudicate and/or resolve all timely-filed personal injury tort and wrongful death claims caused by the alleged conduct of, omissions by and/or exposure to products and/or substances for which the Debtors and/or their predecessors, successors and assigns allegedly have legal responsibility (collectively, the "PITWD Claims"). The PITWD Claims Procedures are fully described in Article VIII.A.4 of the Joint Plan and Exhibit C attached thereto. Generally, under the PITWD Claims Procedures, claimants alleging PITWD Claims (the "PITWD Claimants") may initially select one of two options: either Quick Payment or Individual Review (each as defined in the PITWD Claims Procedures). If a PITWD Claimant selects the Quick Payment option, such claimant will receive a lump sum award without being required to provide any additional documentation supporting the PITWD Claim. If a PITWD Claimant believes that he, she or it is entitled to more than the amounts provided under the Quick Payment and such claimant can support such entitlement to additional compensation, the PITWD Claimant may decline the Quick Payment and select Individual Review. Under Individual Review, the Debtors may provide the PITWD Claimant with an individualized settlement offer, which such claimant may accept or reject or make a counter-offer. If the parties in good faith cannot agree on a settlement amount and have reached an impasse in their settlement negotiations, the PITWD Claimant may then select to proceed to either binding alternative dispute resolution or a trial on the merits. In either case, the amount of discovery required by the PITWD Claimant may increase and if the Debtors win the alternative dispute resolution or at trial, the PITWD Claimant will not be entitled to any claim or distribution in the chapter 11 cases. Further, notwithstanding their availability under applicable non-bankruptcy law, punitive damages will not be allowed for any PITWD Claimant.

## M.    CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE JOINT PLAN

### 1.    Condition Precedent to Confirmation

It shall be a condition to Confirmation of the Joint Plan that the following conditions have been satisfied or waived pursuant to the provisions of Article IX.C of the Joint Plan:

(a)    All provisions, terms and conditions of the Joint Plan shall have been approved in the Confirmation Order.

(b)    The Confirmation Order shall approve (a) the dismissal of the Creditors Committee Adversary Proceeding, (b) the dismissal of the Smith Adversary Proceeding, (c) the dismissal of the Smith Management LLC and HSBC Bank USA appeals of the Opinion on Confirmation, dated December 30, 2003, and the Order, dated December 30, 2003, denying confirmation of the Debtors' Fourth Amended Joint Plan of Reorganization, and (d) all other plan settlements, including releases, as described in Article V.G and Article X of the Joint Plan.

(c)    The identities of the individuals proposed to serve on the New Exide Board of Directors shall have been disclosed to the Bankruptcy Court.

### 2.    Conditions Precedent to Consummation

It shall be a condition to Consummation of the Joint Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Joint Plan:

(a)    The Confirmation Order confirming the Joint Plan, as the Joint Plan may have been modified in accordance with Article XII.E of the Joint Plan, shall have been entered and become a Final Order in form and substance reasonably satisfactory to the Creditors Committee, the Debtors and the Agent, and shall provide that:

(i)    the Debtors and Reorganized Debtors are authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with the Joint Plan;

(ii)    the provisions of the Confirmation Order are nonseverable and mutually dependent;

-53-

(iii)    Reorganized Exide is authorized to issue, pursuant to section 1145 of the Bankruptcy Code, the New Exide Common Stock, the New Exide Warrants and the shares of New Exide Common Stock issuable upon exercise of the New Exide Warrants;

(b)    The following agreements and documents, in form and substance satisfactory to the Creditors Committee, the Debtors and the Agent shall have been tendered for delivery and all conditions precedent thereto, if any, shall have been satisfied:

(i)    the New Organizational Documents and New Exide By-laws;

(ii)    the agreement for the Exit Facility and all documents provided for therein or contemplated thereby;

(iii)    the Amended Prepetition Foreign Credit Agreement; and

(iv)    the New Exide Warrant Agreement.

(c)    All actions, documents and agreements necessary to implement the Joint Plan shall have been effected or executed.

(d)    The New Exide Board of Directors shall have been appointed.

(e)    Holders of no more than $17.5 million of Prepetition Foreign Secured Claims shall have elected the Class P3 Option B, pursuant to Article III.B.3 of the Joint Plan.

3.    <u>Waiver of Conditions</u>

Any of the conditions to Confirmation of the Joint Plan and/or to Consummation of the Joint Plan set forth in Article IX of the Joint Plan may be waived at any time, without any additional notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to confirm and/or consummate the Joint Plan, by the written consent of each of the Debtors, the Creditors Committee and the Agent.

4.    <u>Effect of Non-occurrence of Conditions to Consummation</u>

If the Consummation of the Joint Plan does not occur, the Joint Plan shall be null and void in all respects and nothing contained in the Joint Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors; (2) prejudice in any manner the rights of the Creditors Committee or the Debtors; or (3) constitute an admission, acknowledgment, offer or undertaking by the Creditors Committee or the Debtors in any respect.

N.    RELEASE, INJUNCTIVE AND RELATED PROVISIONS

1.    <u>Subordination</u>

The classification and manner of satisfying all Claims and Equity Interests and the respective distributions, settlements, reallocations and treatments hereunder (including, without limitation, the 2.9% Settlement and Reallocation Payment) take into account and/or conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise, and any and all such rights are settled, compromised and released pursuant to the Joint Plan. The Confirmation Order shall permanently enjoin, effective as of the Effective Date, all Persons and Entities from enforcing or attempting to enforce any such contractual, legal and equitable subordination rights satisfied, compromised and settled in this manner.

2.    <u>Releases by the Debtors</u>

Except as otherwise specifically provided herein, for good and valuable consideration, including the service of the Releasees to facilitate the expeditious reorganization of Exide, the implementation of the restructuring contemplated by the Joint Plan, and the obligations and undertakings of the Option A Electors set

-54-

forth in the Joint Plan, the Releasees, on and after the Effective Date, shall be deemed released by the Debtors and Reorganized Debtors from any and all Claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that a Debtor or its Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Person or Entity, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, including, without limitation, claims related to or arising from (a) the Prepetition Credit Facility, including but not limited to the negotiation, formulation, preparation, administration, execution, and enforcement thereof, and any payments received by the lenders thereunder, (b) any guaranty arising under the Prepetition Credit Facility, (c) any liens, pledges, or collateral of any kind, (d) any of the other loan documents referred to in the Prepetition Credit Facility or any other documents contemplated thereby or therein or the transactions contemplated thereby or therein or any action taken or omitted to be taken by the Agent under or in connection with any of the foregoing and (e) any action or omissions by a Releasee in respect of the foregoing items or any other matter in these Chapter 11 Cases; provided, however, the foregoing shall not release any Claims or liabilities in respect of ordinary commercial relationships between a Debtor and any such Person, including as between a Debtor and one of its Affiliates, it being understood that the matters listed in clauses (a) through (d) above do not relate to an ordinary commercial relationship between the Debtors and the Releasees. The Debtors are not generally aware of any specific potential cause or causes of action, including avoidance actions, against the Releasees that would be extinguished by the releases provided in the Joint Plan. The Debtors believe that the release and exculpation provisions of the Joint Plan are permissible under the Bankruptcy Code. Parties with standing may object to such provisions at the Confirmation Hearing.

3.    Releases by Holders of Claims

Except as otherwise provided in the Joint Plan, on and after the Effective Date, each Holder of a Claim who has voted to accept the Joint Plan shall be deemed to have unconditionally released each Releasee from any and all Claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of Exide, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Person or Entity would have been legally entitled to assert (whether individually or collectively), based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date in any way relating or pertaining to (s) the Debtors or Reorganized Debtors, (t) the purchase or sale, or the rescission of a purchase or sale, of any security of any Debtor, (u) the Chapter 11 Cases, (v) the negotiation, formulation and preparation of the Joint Plan or any related agreements, instruments or other documents, (w) the Prepetition Credit Facility, including, but not limited to the negotiation, formulation, preparation, administration, execution, and enforcement thereof, and any payments received by the lenders thereunder, (x) any guaranty arising under the Prepetition Credit Facility, (y) any liens, pledges, or collateral of any kind, and (z) any of the other loan documents referred to in the Prepetition Credit Facility or any other documents contemplated thereby or therein or the transactions contemplated thereby or therein or any action taken or omitted by the Agent under or in connection with any of the foregoing. The Debtors are not generally aware of any specific potential cause or causes of action, including avoidance actions, against the Releasees that would be extinguished by the releases provided in the Joint Plan. The Debtors believe that the release and exculpation provisions of the Joint Plan are permissible under the Bankruptcy Code. Parties with standing may object to such provisions at the Confirmation Hearing.

4.    Release of Foreign Subsidiary Borrowers and the Domestic Non-Debtor

On and after the Effective Date, each Option A Elector shall be deemed to have unconditionally released the Foreign Subsidiary Borrowers and the Domestic Non-Debtor from any and all Claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of Exide, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Person or Entity would have been legally entitled to assert (whether individually or collectively), based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date in any way relating or pertaining to (1) the Debtors, Reorganized Debtors, Foreign Subsidiary Borrowers or the Domestic Non-Debtor; (2) the purchase or sale, or the rescission of a purchase or sale, of any security of any Debtor, (3) the Chapter 11 Cases, (4) the negotiation, formulation and preparation of the Joint Plan or any related agreements, instruments or other documents, (5) the Prepetition Credit Facility, (6) any guaranty arising under the Prepetition Credit Facility, (7) any liens, pledges, or collateral of any kind, and (8) any of the other loan documents referred to in the Prepetition Credit Facility or

A-0505

any other documents contemplated thereby or therein or the transactions contemplated thereby or therein, and all Prepetition Foreign Secured Claims of the Option A Electors shall be deemed transferred and assigned to Exide or Reorganized Exide. In addition, each Option A Elector shall be deemed to have submitted to the jurisdiction of the Bankruptcy Court with respect to the treatment, discharge and release of such Holder's Prepetition Credit Facility Claims.

     5.     <u>Exculpation</u>

     The Releasees shall neither have nor incur any liability to any Person or Entity for any pre or post-petition act taken or omitted to be taken in connection with, or related to the formulation, negotiation, preparation, dissemination, implementation, administration, Confirmation or Consummation of the Joint Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Joint Plan or any other pre or post-petition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, provided, however, that the provisions of Article X.E of the Joint Plan shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

     6.     <u>Injunction</u>

     <u>Except as otherwise provided herein, from and after the Effective Date, all Holders of Claims or Equity Interests shall be permanently enjoined from commencing or continuing in any manner, any suit, action or other proceeding, on account of or respecting any Claim, Equity Interest, obligation, debt, right, Cause of Action, remedy or liability or any other claim or cause of action released or to be released pursuant hereto.</u>

     7.     <u>Preservation of Rights of Action</u>

     (a)     *Maintenance of Causes of Action.*  Except as otherwise provided in the Joint Plan, the Reorganized Debtors shall retain all rights on behalf of the Debtors and the post-confirmation Estates to commence and pursue any and all Causes of Action (whether arising before or after the Petition Date, under any theory of law, including, without limitation, the Bankruptcy Code, and in any court or other tribunal including, without limitation, in an adversary proceeding filed in the Debtors' Chapter 11 Cases) to the extent the Reorganized Debtors deem appropriate. Potential Causes of Action currently being investigated by the Debtors, which may be pursued by the Debtors prior to the Effective Date and by the Reorganized Debtors after the Effective Date to the extent warranted, include without limitation, Claims and Causes of Action to be set forth in more detail in the list of retained Causes of Action, which will be contained in the Plan Supplement to be filed with the Bankruptcy Court and available from the Information Agent upon specific request in writing.

     In addition, potential Causes of Action which may be pursued by the Debtors prior to the Effective Date and by the Reorganized Debtors after the Effective Date, also include, without limitation the following:

     (i)     any other Causes of Action, whether legal, equitable or statutory in nature, arising out of, or in connection with the Debtors' businesses or operations, including, without limitation, the following: possible claims against vendors, landlords, sublessees, assignees, customers or suppliers for warranty, indemnity, back charge/set-off issues, overpayment or duplicate payment issues and collections/accounts receivables matters; deposits or other amounts owed by any creditor, lessor, utility, supplier, vendor, landlord, sublessee, assignee, or other entity; employee, management or operational matters; claims against landlords, sublessees and assignees arising from the various leases, subleases and assignment agreements relating thereto, including, without limitation, claims for overcharges relating to taxes, common area maintenance and other similar charges; financial reporting; environmental, and product liability matters; actions against insurance carriers relating to coverage, indemnity or other matters; counterclaims and defenses relating to notes or other obligations; contract or tort claims which may exist or subsequently arise; and

-56-

A-0506

(ii)    except for Debtors which have expressly waived such claims, any and all avoidance claims pursuant to any applicable section of the Bankruptcy Code, including, without limitation sections 544, 545, 547, 548, 549, 550, 551, 553(b) and/or 724(a) of the Bankruptcy Code arising from any transaction involving or concerning the Debtors.

In addition, there may be numerous other Causes of Action which currently exist or may subsequently arise that are not set forth herein or in the Plan Supplement, because the facts upon which such Causes of Action are based are not currently or fully known by the Debtors and, as a result, can not be raised during the pendency of the Chapter 11 Cases (collectively, the "Unknown Causes of Action"). The failure to list any such Unknown Cause of Action herein or in the Plan Supplement is not intended to limit the rights of the Reorganized Debtors to pursue any Unknown Cause of Action to the extent the facts underlying such Unknown Cause of Action subsequently become fully known to the Debtors.

Except as otherwise provided in the Joint Plan or in any contract, instrument, release, indenture or other agreement entered into in connection with the Joint Plan, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Claims, rights, and Causes of Action that the respective Debtors, Estates, or post-confirmation Estates may hold against any Person or Entity shall vest in the applicable Reorganized Debtor, and the Debtors and Reorganized Debtors shall retain and may exclusively enforce, as the authorized representatives of the respective Estates and post-confirmation Estates, any and all such Claims, rights, or Causes of Action. The Debtors and Reorganized Debtors may pursue any and all such Claims, rights, or Causes of Action, as appropriate, in accordance with their respective best interests. The Debtors and Reorganized Debtors shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such Claims, rights, and Causes of Action without the consent or approval of any third party and without any further order of court.

The potential net proceeds from the Causes of Action identified herein, in the Plan Supplement or which may subsequently arise or be pursued are speculative and uncertain and, therefore, no value has been assigned to such recoveries. The Debtors and the Reorganized Debtors do not intend, and it should not be assumed that because any existing or potential Causes of Action have not yet been pursued by the Debtors or are not set forth herein or in the Plan Supplement, that any such Causes of Action have been waived.

(b)    *Preservation of All Causes of Action Not Expressly Settled or Released.*  Unless a claim or Cause of Action against a Creditor or other Entity is expressly waived, relinquished, released, compromised or settled in the Joint Plan or any Final Order, the Debtors expressly reserve such claim or Cause of Action for later adjudication by the Debtors or Reorganized Debtors (including, without limitation, claims and Causes of Action not specifically identified or which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances which may change or be different from those which the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims or Causes of Action upon or after the confirmation or consummation of the Joint Plan based on the Disclosure Statement, the Joint Plan or the Confirmation Order, except where such claims or Causes of Action have been released in the Joint Plan or other Final Order. In addition, the Debtors and Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which a Debtor is a defendant or an interested party, against any person or entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Any Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that such obligation, transfer, or transaction may be reviewed by the Reorganized Debtors subsequent to the Effective Date and may, if appropriate, be the subject of an action after the Effective Date, whether or not (a) such Entity has Filed a proof of claim against the Debtors in the Chapter 11 Cases; (b) such Entity's proof of claim has been objected to; (c) such Entity's Claim was included in the Debtors' Schedules; or (d) such Entity's scheduled claim

A-0507

has been objected to by the a Debtor or has been identified by a Debtor as disputed, contingent, or unliquidated.

The Debtors have not yet analyzed potential recoveries from avoidance actions, but do not believe any such recoveries could have a material impact on recoveries available to creditors. Further, any claims and recoveries under sections 544, 545, 547 and 548 of the Bankruptcy Code are pledged to the lenders under the Replacement DIP Credit Facility and to the Prepetition Lenders pursuant to the Final DIP Order.

**8.**    **Discharge of Claims and Termination of Equity Interests**

Except as otherwise provided in the Joint Plan: (1) the rights afforded in the Joint Plan and the treatment of all Claims and Equity Interests in the Joint Plan, shall be in exchange for and in complete satisfaction, discharge and release of Claims and Equity Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against any Debtor or any of its assets or properties, (2) on the Effective Date, all such Claims against, and Equity Interests in any Debtor shall be satisfied, discharged and released in full and (3) all Persons and Entities shall be precluded from asserting against the Debtors, the Reorganized Debtors, their successors, assets or properties, any other or further Claims or Equity Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date, provided, however, that nothing in the Joint Plan shall be deemed to release or nullify any environmental liability to a governmental entity under environmental laws or regulations that any of the Debtors would be subject to as the owner or operator of property after the Confirmation Date, and provided further that nothing in the Joint Plan shall be deemed to release, discharge or preclude any claims arising after the Confirmation Date that such governmental entity may have against the Reorganized Debtors or their successors.

**O.    RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases after the Effective Date as legally permissible, including jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Joint Plan, for periods ending on or before the Effective Date;

- resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any Debtor is party or with respect to which any Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including those matters related to the amendment after the Effective Date to add any executory contracts or unexpired leases to the list of executory contracts and unexpired leases to be rejected;

- ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Joint Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving any Debtor that may be pending on the Effective Date;

- enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Joint Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Joint Plan, Plan Supplement or the Disclosure Statement;

A-0508