- resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Joint Plan or any Person's or Entity's obligations incurred in connection with the Joint Plan;

- issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with Consummation or enforcement of the Joint Plan, except as otherwise provided in the Joint Plan;

- resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article X of the Joint Plan and enter such orders as may be necessary or appropriate to implement such releases, injunction and other provisions;

- enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

- determine any other matters that may arise in connection with or relate to the Joint Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Joint Plan or the Disclosure Statement; and

- enter an order and/or final decree concluding the Chapter 11 Cases.

**P.    MISCELLANEOUS PROVISIONS**

**1.    Effectuating Documents, Further Transactions and Corporation Action**

The Debtors and Reorganized Debtors are authorized to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Joint Plan and the securities issued pursuant to the Joint Plan.

Prior to, on or after the Effective Date (as appropriate), all matters expressly provided for hereunder that would otherwise require approval of the shareholders or directors of the Debtors or Reorganized Debtors shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable state general corporation law without any requirement of further action by the shareholders or directors of the Debtors or Reorganized Debtors.

**2.    Dissolution of Committees**

On (1) the later of (a) the Effective Date, and (b) 11 days after the Confirmation Date, or (2) in the case of the Creditors Committee only, the formation of the Postconfirmation Creditors Committee, if no appeal is pending, the Creditors Committee and the Equity Committee shall dissolve and their members shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases, provided, however, that the members of the Creditors Committee shall have the option of serving on the Postconfirmation Creditors Committee. Any duties to be performed by the Postconfirmation Creditors Committee shall be performed by the Creditors Committee if the Postconfirmation Creditors Committee has not yet been formed.

**3.    Payment of Statutory Fees**

All fees payable pursuant to section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid on the earlier of when due or the Effective Date, or as soon thereafter as practicable, but prior to the closing of the Chapter 11 Cases, with respect to any such fees payable after the Effective Date.

**4.    Letters of Credit**

The Debtors will cause each letter of credit issued pursuant to the Prepetition Credit Facility that has not expired, been terminated, been replaced and terminated, or fully drawn on or before the Effective Date, to be

A-0509

replaced and terminated on the Effective Date, provided, however, that in the event any such letter of credit shall not have been so replaced and terminated on the Effective Date, the Debtors may at their option provide to the Agent cash collateral for each such letter of credit in an amount equal to 105% of the undrawn balance of such letter of credit as of the Effective Date.

5.     Modification of Joint Plan

    Subject to the limitations contained in the Joint Plan, (1) the Creditors Committee, the Agent and the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Joint Plan prior to the entry of the Confirmation Order and (2) after the entry of the Confirmation Order, the Creditors Committee or Postconfirmation Creditors Committee and the Debtors or Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Joint Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Joint Plan in such manner as may be necessary to carry out the purpose and intent of the Joint Plan.

6.     Revocation of Joint Plan

    The Creditors Committee, the Agent and the Debtors reserve the right to revoke or withdraw the Joint Plan prior to the Confirmation Date and to File subsequent plans of reorganization. If the Creditors Committee, the Agent and the Debtors revoke or withdraw the Joint Plan, or if Confirmation or Consummation does not occur, then (a) the Joint Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Joint Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of executory contracts or leases affected by the Joint Plan, and any document or agreement executed pursuant to the Joint Plan, shall be deemed null and void, and (c) nothing contained in the Joint Plan shall (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, such Debtor or any other Person, (ii) prejudice in any manner the rights of such Debtor or any other Person, or (iii) constitute an admission of any sort by the Creditors Committee, the Agent, the Debtor or any other Person.

7.     Successors and Assigns

    The rights, benefits and obligations of any Person or Entity named or referred to in the Joint Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Person or Entity.

8.     Reservation of Rights

    Except as expressly set forth in the Joint Plan, the Joint Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Joint Plan, any statement or provision contained in the Joint Plan, or the taking of any action by the Creditors Committee or a Debtor with respect to the Joint Plan shall be or shall be deemed to be an admission or waiver of any rights of the Creditors Committee or a Debtor with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

9.     Section 1145 Exemption

    Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold claims against or interests in the debtor; and (iii) the securities must be issued in exchange (or principally in exchange) for the recipient's claims against or interests in the debtor. The Debtors believe that the offer and sale of the New Exide Common Stock and New Exide Warrants under the Joint Plan, including the shares of New Exide Common Stock issuable upon exercise of the New Exide Warrants, satisfy the requirements of section 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws.

    To the extent that the New Exide Common Stock and New Exide Warrants are issued under the Joint Plan and are covered by section 1145(a)(1) of the Bankruptcy Code, they may be resold by the holders thereof without registration unless, as more fully described below, the holder is an "underwriter" with respect to such

-60-

securities. Generally, section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who: (i) purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest; (ii) offers to sell securities offered under a plan for the holders of such securities; (iii) offers to buy such securities from the holders of such securities, if the offer to buy is: (A) with a view to distributing such securities; and (B) under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or (iv) is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

Under section 2(a)(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer. To the extent that Persons who receive New Exide Common Stock and New Exide Warrants pursuant to the Joint Plan are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code, resales by such Persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such Persons would, however, be permitted to sell such New Exide Common Stock and New Exide Warrants or other securities without registration if they are able to comply with the provisions of Rule 144 under the Securities Act. These rules permit the public sale of securities received by such Person if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met. Any person who is an "underwriter" but not an "issuer" with respect to an issue of securities is, however, entitled to engage in exempt "ordinary trading transactions" within the meaning of section 1145(b) of the Bankruptcy Code.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Exide Common Stock or New Exide Warrants to be issued pursuant to the Joint Plan would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular Person receiving New Exide Common Stock or New Exide Warrants under the Joint Plan would be an "underwriter" with respect to such New Exide Common Stock or New Exide Warrants.

Given the complex and subjective nature of the question of whether a particular holder may be an underwriter, the Debtors make no representation concerning the right of any Person to trade in the New Exide Common Stock or New Exide Warrants. The Debtors recommend that potential recipients of the New Exide Common Stock or New Exide Warrants consult their own counsel concerning whether they may freely trade Exide Common Stock or New Exide Warrants without compliance with the Securities Act, the Securities Exchange Act or similar state and federal laws.

10.    Section 1146 Exemption

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers of property pursuant to the Joint Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

11.    Further Assurances

The Debtors, Reorganized Debtors, Releasees and all Holders of Claims receiving distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Joint Plan.

12.    Service of Documents

Any pleading, notice or other document required by the Joint Plan to be served on or delivered to the Debtors or Reorganized Debtors shall be sent by first class U.S. mail, postage prepaid to:

-61-

A-0511

Exide Technologies
13000 Deerfield Parkway Building 200
Alpharetta, GA 30004
Attn:    Stuart H. Kupinsky, Executive Vice President,
         General Counsel and Secretary

         And

Exide Technologies
Attn:    Plan Service, Suite 230
Crossroads Corporate Center
3150 Brunswick Pike
Lawrenceville, NJ 08648

with copies to:
Kirkland & Ellis LLP
200 E. Randolph Drive
Chicago, Illinois  60601
Attn:    Matthew N. Kleiman
         Ross M. Kwasteniet

         And

Pachulski, Stang, Ziehl, Young, Jones & Weintraub
919 North Market Street
P.O. Box 8705
Wilmington, Delaware 19899-8705
Attn:    Laura Davis Jones
         James E. O'Neill

        Any pleading, notice or other document required by the Joint Plan to be served on or delivered to the
Creditors Committee or Postconfirmation Creditors Committee shall be sent by first class U.S. mail, postage
prepaid to:

Akin Gump Strauss Hauer & Feld LLP
590 Madison Avenue
New York, New York  10022
Attn:    Fred S. Hodara
         Mary Reidy Masella

Pepper Hamilton LLP
Hercules Plaza
Suite 5100
1313 Market Street
Wilmington, DE  19801
Attn:    David B. Stratton
         David M. Fournier

        Any pleading, notice or other document required by the Joint Plan to be served on or delivered to the
Agent shall be sent by first class U.S. mail, postage prepaid to:

Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
Attn:    Douglas P. Bartner
         Marc B. Hankin

-62-

Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, DE 19899
Attn:    Mark D. Collins
         Etta R. Wolfe

### 13.    Filing of Additional Documents

On or before the Effective Date, the Creditors Committee and the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

### IV.
### VOTING AND CONFIRMATION PROCEDURE

The following is a brief summary regarding the acceptance and confirmation of the Joint Plan. Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys. Additional information regarding voting procedures is set forth in the Notices accompanying this Disclosure Statement.

### A.    VOTING INSTRUCTIONS

This Disclosure Statement, accompanied by a Ballot to be used for voting on the Joint Plan, is being distributed to Holders of Claims in Classes P3, P4 and S3. Ballots and Master Ballots are being distributed to Holders of Class P4-B and P4-C Claims. Only Holders in these Classes are entitled to vote to accept or reject the Joint Plan and may do so by completing the Ballot and returning it in the envelope provided. Beneficial owners who receive a return envelope addressed to their Nominee should allow enough time for their vote to be received by the Nominee and processed on a Master Ballot. *In light of the benefits of the Joint Plan for each Class of Claims, the Creditors Committee, the Debtors and the ad hoc steering committee of Prepetition Lenders recommend that Holders of Claims in each of the Impaired Classes vote to accept the Joint Plan and return the Ballot.*

BALLOTS AND MASTER BALLOTS CAST BY HOLDERS IN CLASSES ENTITLED TO VOTE MUST BE RECEIVED BY THE SOLICITATION AGENT BY THE VOTING DEADLINE AT THE FOLLOWING ADDRESSES:

| If by U.S. Mail: | If by courier/hand delivery: |
|---|---|
| Bankruptcy Management Corporation | Bankruptcy Management Corporation |
| Attention:  Exide Solicitation Agent | Attention:  Exide Solicitation Agent |
| PO Box 1063 | 1330 E. Franklin Avenue |
| El Segundo, CA 90245-1063 | El Segundo, CA 90245 |

IF YOU HAVE ANY QUESTIONS ON VOTING PROCEDURES, PLEASE CALL BANKRUPTCY MANAGEMENT CORPORATION TOLL FREE AT (888) 909-0100.

BALLOTS ARE ACCOMPANIED BY RETURN ENVELOPES WHENEVER POSSIBLE. IF YOUR RETURN ENVELOPE IS ADDRESSED TO YOUR NOMINEE (I.E., AN INTERMEDIARY), PLEASE ALLOW ADDITIONAL TIME FOR YOUR VOTE TO BE PROCESSED BY THE NOMINEE AND VOTED ON A MASTER BALLOT. IF YOU HAVE A QUESTION CONCERNING THE VOTING PROCEDURES, CONTACT THE APPLICABLE INTERMEDIARY OR THE SOLICITATION AGENT. ANY BALLOT, OR MASTER BALLOT VOTED BY YOUR NOMINEE ON YOUR BEHALF, RECEIVED AFTER THE VOTING DEADLINE MAY NOT BE COUNTED.

ANY BALLOT WHICH IS EXECUTED BY THE HOLDER OF AN ALLOWED CLAIM WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE JOINT PLAN OR WHICH INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE JOINT PLAN SHALL NOT BE COUNTED ONLY FOR PURPOSES OF VOTING FOR OR AGAINST THE JOINT PLAN.

A-0513

The Debtors will publish the Confirmation Hearing Notice in the national edition of <u>The Wall Street Journal</u>, which will contain the Joint Plan objection deadline and the date and time of the Confirmation Hearing, in order to provide notification to persons who may not otherwise receive notice by mail.

*For all Holders:*

By signing and returning a Ballot, each Holder of Claims in Classes P3, P4 and S3 will also be certifying to the Bankruptcy Court, the Debtors and the Creditors Committee that, among other things:

- such Holder has received and reviewed a copy of the Joint Plan, the Disclosure Statement and related Ballot and/or Master Ballot and other solicitation materials and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth in the Joint Plan;

- such Holder has cast the same vote on every Ballot completed by such Holder with respect to holdings of such Class of Claims;

- no other Ballots with respect to such Class of Claims have been cast or, if any other Ballots have been cast with respect to such Class of Claims, such earlier Ballots are thereby revoked;

- the Debtors and the Creditors Committee have made available to such Holder or its agents all documents and information relating to the Joint Plan and related matters reasonably requested by or on behalf of such Holder; and

- except for information provided by the Debtors and the Creditors Committee in writing, and by its own agents, such Holder has not relied on any statements made or other information received from any person with respect to the Joint Plan.

By signing and returning a Ballot, each Holder of Claims also acknowledges that the securities being distributed pursuant to the Joint Plan are not being distributed pursuant to a registration statement filed with the United States Securities and Exchange Commission or with any securities authority outside of the United States and represents that any such securities will be acquired for its own account and not with a view to any distribution of such securities in violation of the United States Securities Act of 1933. *It is expected that when issued pursuant to the Joint Plan, except with respect to entities deemed to be underwriters, the New Exide Common Stock, including the shares of New Exide Common Stock issuable upon exercise of the New Exide Warrants, and the New Exide Warrants will be exempt from the registration requirements of the Securities Act by virtue of section 1145 of the Bankruptcy Code and may be resold by the Holders thereof subject to the provisions of section 1145.*

**B.    VOTING TABULATION**

The Voting Record Date for purposes of determining which Holders of Claims are entitled to vote on the Joint Plan is March 11, 2004.

In tabulating votes, the following rules shall be used to determine the claim amount associated with a Creditor's vote:

(i)    If neither the Debtors nor the Creditors Committee have filed a written objection to the Claim, the Claim amount for voting purposes shall be the Claim amount contained on a timely filed proof of claim or, if no proof of claim was filed, the non-contingent, liquidated and undisputed Claim amount listed in the Debtors' schedules of liabilities.

(ii)    If the Debtors or the Creditors Committee have filed a written objection to the Claim, such Creditor's Ballot shall not be counted in accordance with Fed. R. Bankr. P. 3018(a), unless temporarily allowed by the Bankruptcy Court for voting purposes, after notice and a hearing, pursuant to instruction (iv) below.

(iii)    If a Creditor casts a Ballot and is listed on the Debtors' schedules of liabilities as holding a Claim that is contingent, unliquidated or disputed, and such Creditor has not filed a proof of claim as to which the Debtors or the Creditors Committee have not filed a written objection,

-64-

such Creditor's Ballot shall not be counted in accordance with Fed. R. Bankr. P. 3018(a), unless temporarily allowed by the Bankruptcy Court for voting purposes, after notice and a hearing pursuant to instruction (iv) below.

(iv)     If a Creditor is not entitled to vote pursuant to instructions (ii) or (iii) above and believes that it should be entitled to vote on the Joint Plan, then such Creditor must serve on the Debtors and the Creditors Committee and file with the Bankruptcy Court a motion for an order pursuant to Fed. R. Bankr. P. 3018(a) (a "Rule 3018(a) Motion") seeking temporary allowance of their Claim for voting purposes. Such Rule 3018(a) Motion, with evidence in support thereof, must be filed by 5:00 p.m. Prevailing Eastern Time on April 9, 2004. With regard to any timely filed Rule 3018(a) Motions, the Debtors and the Creditors Committee may file a response no later than the commencement of the Confirmation Hearing. The Bankruptcy Court shall consider timely filed Rule 3018(a) Motions, if any, at the Confirmation Hearing;

(v)      Ballots cast by Creditors whose Claims are not listed on the Debtors' schedules of liabilities, but who timely filed proofs of Claim in unliquidated or unknown amounts that are not the subject of a written objection, will count for satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count as Ballots for Claims in the amount of $1.00 solely for the purpose of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code.

(vi)     In the case of publicly traded securities, the principal amount or number of shares according to the records of the transfer agent for the particular series of securities, including a further breakdown, in the case of The Depository Trust Company ("DTC"), of the individual Nominee Holders which are DTC participants, as of the Voting Record Date, shall be the Claim or interest amount, except that in no event shall a Nominee Holder be permitted to vote in excess of its position in DTC as of the Voting Record Date.

The Claim amount established through the above process controls for voting purposes only and does not constitute the Allowed amount of any Claim or Equity Interest for distribution purposes.

To ensure that its vote is counted, each Holder of a Claim must (a) complete a Ballot; (b) indicate the Holder's decision either to accept or reject the Joint Plan in the boxes provided in the respective Ballot; and (c) sign and return the Ballot, by the Voting Deadline, to the address set forth on the envelope enclosed therewith.

The Ballot or Master Ballot does not constitute, and shall not be deemed to be, a proof of claim or an assertion or admission of a Claim.

The following general voting procedures and standard assumptions will be used to tabulate ballots:

• Except to the extent determined by the Debtors and the Creditors Committee in their reasonable discretion, or otherwise permitted by the Bankruptcy Court, the Debtors and the Creditors Committee will not accept or count any Ballots and Master Ballots received after the Voting Deadline.

• Creditors shall not split their vote within a Claim; thus, each Creditor shall be deemed to have voted the full amount of its Claims either to accept or reject the Joint Plan.

• The method of delivery of Ballots and Master Ballots to be sent to the Solicitation Agent is at the election and risk of each Holder, *provided that*, except as otherwise provided in the Joint Plan, such delivery will be deemed made only when the *original* executed Ballot or Master Ballot is *actually received* by the Solicitation Agent.

• The Solicitation Agent must receive an original executed Ballot or Master Ballot; delivery of a Ballot or Master Ballot by facsimile, email or any other electronic means will not be accepted.

A-0515

- No Ballot or Master Ballot sent to (i) the Debtors or the Creditors Committee, (ii) any indenture trustee or agent, or (iii) the Debtors' or the Creditors Committee's financial or legal advisors shall be accepted or counted.

- If multiple Ballots or Master Ballots are received from, or on behalf of, an individual Holder of Claims with respect to the same Claims prior to the Voting Deadline, the last Ballot or Master Ballot timely received or otherwise accepted will be deemed to reflect the voter's intent and to supersede and revoke any prior Ballot or Master Ballot.

- Any trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other person acting in a fiduciary or representative capacity, who signs a Ballot or Master Ballot must (i) indicate his or her capacity as such when signing and, (ii) unless otherwise determined by the Debtors and the Creditors Committee, submit proper evidence of such authority to act on behalf of a beneficial interest Holder in form and content satisfactory to the Debtors and the Creditors Committee.

- The Debtors and the Creditors Committee, in their joint sole discretion, and without notice, subject to contrary order of the Bankruptcy Court, may waive any defect in any Ballot or Master Ballot at any time, either before or after the close of voting, and without notice.  Except as otherwise provided herein, the Debtors or the Creditors Committee may, in their joint sole discretion, reject any Ballot or Master Ballot not timely submitted on or prior to the Voting Deadline as invalid and, therefore, not count such Ballot or Master Ballot in connection with confirmation of the Joint Plan.

- Any Holder of Impaired Claims who has delivered a valid Ballot voting on the Joint Plan may withdraw such vote solely in accordance with Fed. R. Bankr. P. 3018(a).

- Neither the Debtors, the Creditors Committee nor any other person or entity, will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots or Master Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots or Master Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots and Master Ballots previously furnished (as to which any irregularities have not theretofore been cured or waived) will not be counted.

The following procedures, as well as the procedures set forth above, apply to Holders of Claims derived from or based on publicly traded securities (collectively, the "Beneficial Holder Claims"):

- The Debtors and the Creditors Committee shall distribute a Ballot to each record Holder of the Beneficial Holder Claims as of the Voting Record Date.

- The Debtors and the Creditors Committee shall also distribute an appropriate number of copies of Ballots to each bank or brokerage firm (or the agent or other Nominee therefor) identified by the Solicitation Agent as an entity through which beneficial owners hold the Beneficial Holder Claims. Each Nominee will be requested to immediately distribute the Ballots to all beneficial Holders for which it holds the Beneficial Holder Claims.

- Each Nominee must summarize the individual votes of its respective individual beneficial Holders from their individual beneficial Holders' Ballots on a Master Ballot and return such Master Ballot to the Solicitation Agent.

- Any beneficial Holder of the Beneficial Holder Claims holding as a record Holder in its own name, shall vote on the Joint Plan by completing and signing the Ballot and returning it to the Solicitation Agent.

- Any beneficial Holder of the Beneficial Holder Claims who holds in "street name" through a Nominee shall vote on the Joint Plan by promptly completing and signing the Ballot and returning

A-0516

it to the Nominee in sufficient time to allow the Nominee to process the Ballot and return a Master Ballot to the Solicitation Agent by the Voting Deadline.

- Any Ballot returned to a Nominee by a beneficial Holder will not be counted for purposes of accepting or rejecting the Joint Plan until such Nominee properly completes and timely delivers to the Solicitation Agent a Master Ballot that reflects the vote of such beneficial Holder.

- If a beneficial Holder holds the Beneficial Holder Claims or any combination thereof through more than one Nominee, such beneficial Holder should execute a separate Ballot for each block of the Beneficial Holder Claims that it holds through any Nominee and return the Ballot to the respective Nominee that holds the Beneficial Holder Claims.

- If a beneficial Holder holds a portion of its Beneficial Holder Claims through a Nominee and another portion directly or in its own name as a record Holder, such beneficial Holder should follow the procedures described herein with respect to voting each such portion separately.

## C.    THE CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Joint Plan (the "Confirmation Hearing"). Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Joint Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for April 16, 2004, before the Honorable Kevin J. Carey, United States Bankruptcy Judge, at the Robert N.C. Nix Federal Courthouse, 900 Market Street, Philadelphia, PA 19107. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to confirmation of the Joint Plan must be filed and served on or before 5:00 p.m. Prevailing Eastern Time on April 9, 2004 in accordance with the Confirmation Hearing Notice accompanying this Disclosure Statement. **UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION ORDER, THEY WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## D.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE JOINT PLAN

At the Confirmation Hearing, the Bankruptcy Court will confirm the Joint Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that the Joint Plan (i) is accepted by all impaired Classes of Claims and Interests or, if rejected by an impaired Class, that the Joint Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) is feasible, and (iii) is in the "best interests" of holders of Claims and Interests impaired under the Joint Plan. A Class is impaired if the Claims in that Class will not be paid in full under the Joint Plan.

### 1.    Acceptance

The Claims and Equity Interests in Classes P1, P2, S1 and S2 are not impaired under the Joint Plan, and as a result the Holders of such Claims are deemed to have accepted the Joint Plan.

Claims in Classes P3, P4, and S3 are impaired under the Joint Plan, and as a result, the holders of such Claims are entitled to vote thereon. Pursuant to section 1129 of the Bankruptcy code, the Claims in Classes P3, P4 and S3 must accept the Joint Plan in order for it to be confirmed without application of the "fair and equitable test," described below, to such Classes. As stated above, Classes of Claims will have accepted the Joint Plan if the Joint Plan is accepted by at least two-thirds in dollar amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Joint Plan.

-67-

A-0517

### 2.    Fair and Equitable Test

The Debtors will seek to confirm the Joint Plan notwithstanding the nonacceptance or deemed nonacceptance of the Joint Plan by any impaired Class of Claims or Equity Interests. To obtain such confirmation, it must be demonstrated to the Bankruptcy Court that the Joint Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such dissenting impaired Class. A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class receives more than it is entitled to for its claims or interests. The Debtors believe that the Joint Plan satisfies this requirement.

The Bankruptcy Code establishes different "fair and equitable" tests for secured claims, unsecured claims and interests, as follows:

(a)    *Secured Claims*. Either the plan must provide (i) that the Holders of such Claims retain the liens securing such Claims, whether the property subject to such liens is retained by the Debtors or transferred to another entity, to the extent of the allowed amount of such Claims, and each Holder of a Claim receives deferred cash payments totaling at least the allowed amount of such Claim, of a value, as of the effective date of the plan, of at least the value of such Holder's interest in the estate's interest in such property; (ii) for the sale of any property that is subject to the liens securing such Claims, free and clear of such liens, with such liens to attach to the proceeds of such sale; or (iii) for the realization by such Holders of the indubitable equivalent of such Claims.

(b)    *Unsecured Claims*. Either (i) each Holder of an Impaired unsecured Claim receives or retains under the plan property of a value equal to the amount of its Allowed Claim or (ii) the Holders of Claims and Equity Interests that are junior to the Claims of the dissenting class will not receive any property under the plan.

(c)    *Equity Interests*. No Equity Interest Holder will receive any distributions under the Joint Plan.

THE DEBTORS BELIEVE THAT THE JOINT PLAN MAY BE CONFIRMED ON A NONCONSENSUAL BASIS (PROVIDED AT LEAST ONE IMPAIRED CLASS OF CLAIMS VOTES TO ACCEPT THE JOINT PLAN). ACCORDINGLY, THE DEBTORS WILL DEMONSTRATE AT THE CONFIRMATION HEARING THAT THE JOINT PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AS TO ANY NON-ACCEPTING CLASS.

### 3.    Feasibility

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by the liquidation or the need for further financial reorganization, unless such liquidation is contemplated by the Joint Plan. For purposes of showing that the Joint Plan meets this feasibility standard, the Debtors, together with Blackstone and AlixPartners, have analyzed the ability of the Reorganized Debtors to meet their obligations under the Joint Plan and to retain sufficient liquidity and capital resources to conduct their businesses.

The Debtors believe that with a significantly deleveraged capital structure, the Company's businesses will be able to return to viability. The decrease in the amount of debt on the Company's balance sheet will substantially reduce its interest expense, improving cash flow. Based on the terms of the Joint Plan, at emergence the Company will have approximately $1.4 billion less in debt and accrued interest on its balance sheet than it had prior to the restructuring.

The Projections indicate that the Reorganized Debtors should have sufficient cash flow to pay and service their obligations and to fund their operations. Accordingly, the Debtors believe that the Joint Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

### 4.    "Best Interests" Test

With respect to each impaired Class of Claims and Equity Interests, confirmation of the Joint Plan requires that each such holder either (x) accepts the Joint Plan or (y) receives or retains under the Joint Plan property of a value, as of the Effective Date of the Joint Plan, that is not less than the value such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

A-0518

This analysis requires the Bankruptcy Court to determine what the Holders of Allowed Claims and Allowed Equity Interests in each impaired class would receive from the liquidation of the Debtors' assets and properties in the context of Chapter 7 liquidation cases. The cash amount which would be available for the satisfaction of Unsecured Claims and Equity Interests of the Debtors would consist of the proceeds resulting from the disposition of the unencumbered assets of the Debtors, augmented by the unencumbered Cash held by the Debtors at the time of the commencement of the liquidation cases. Such cash amount would be reduced by the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from the termination of the Debtors' businesses and the use of Chapter 7 for the purposes of liquidation.

The Debtors' costs of liquidation under Chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those payable to attorneys, investment bankers and other professionals that such trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases, such as compensation for attorneys, Advisors, accountants and costs and expenses of members of any official committees that are allowed in the Chapter 7 cases. In addition, claims could arise by reason of the breach or rejection of obligations incurred and executory contracts entered into or assumed by the Debtors during the pendency of the Chapter 11 Cases.

The foregoing types of Claims and such other claims which may arise in the liquidation cases or result from the pending Chapter 11 Cases would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition Claims.

To determine if the Joint Plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the Debtors' assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of Claims and Equity Interests under the Joint Plan.

In applying the "best interests" test, it is possible that Claims and Equity Interests in the Chapter 7 cases may not be classified according to the seniority of such Claims and Equity Interests. In the absence of a contrary determination by the Bankruptcy Court, all pre-Chapter 11 Unsecured Claims which have the same rights upon liquidation would be treated as one class for the purposes of determining the potential distribution of the liquidation proceeds resulting from the Chapter 7 cases of the Debtors. The distributions from the liquidation proceeds would be calculated on a Pro Rata basis according to the amount of the Claim held by each Creditor. Therefore, Creditors who claim to be third-party beneficiaries of any contractual subordination provisions might have to seek to enforce such contractual subordination provisions in the Bankruptcy Court or otherwise. The Debtors believe that the most likely outcome of liquidation proceedings under Chapter 7 would be the application of the rule of absolute priority of distributions. Under that rule, no junior creditor receives any distribution until all senior creditors are paid in full with interest and no stockholder receives any distribution until all Creditors are paid in full with postpetition interest.

In addition, under a Chapter 7 liquidation, the Debtors would face significant challenges in retaining its key management to execute the wind down plan. The Debtors further believe that a Chapter 7 liquidation is not the optimal environment for disposing of assets and businesses, and projects that a forced liquidation or an orderly liquidation of their assets in Chapter 7 would allow them to recover less than the "going concern" value of the Company — the value on which the Joint Plan is premised. Finally, the Debtors would likely require working capital to finance the liquidation of its assets; raising such financing would be difficult in a Chapter 7 environment.

After consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Cases, including: (a) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee; (b) the substantial increases in claims which would be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases; and (c) the significantly lower proceeds likely to be realized from a liquidation of the Debtors' assets under a Chapter 7 liquidation, the Debtors believe that Confirmation of the Joint Plan will provide each holder of an Allowed Claim or Equity Interest with no less than, and in many cases more than, the amount it would receive pursuant to liquidation of the Debtors under Chapter 7 of the Bankruptcy Code. See *Exhibit B* and *Exhibit C* hereto.

The Debtors also believe that the value of any distributions from the liquidation proceeds to each class of Allowed Claims in a Chapter 7 case would be less than the value of distributions under the Joint Plan because

A-0519

such distributions in a Chapter 7 case would not occur for a substantial period of time. It is likely that distribution of the proceeds of the liquidation could be delayed for at least a year or more after the completion of such liquidation in order to resolve claims and prepare for distributions. In the likely event litigation were necessary to resolve claims asserted in the Chapter 7 cases, the delay could be prolonged.

Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and management. The Liquidation Analysis is also based upon assumptions with regard to liquidation decisions that are subject to change. Accordingly, the values reflected may not be realized if the Debtors were, in fact, to undergo such a liquidation.

## V.
## RISK FACTORS

ALL IMPAIRED HOLDERS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE JOINT PLAN.

### A.    CERTAIN BANKRUPTCY CONSIDERATIONS

*Parties in interest may object to Debtors' classification of Claims.* Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a class or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. Debtors believe that the classification of claims and interests under the Joint Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

*The bankruptcy filing may disrupt the Company's operations.* The impact, if any, that the Chapter 11 Cases may have on the operations of Reorganized Debtors cannot be accurately predicted or quantified. Since Debtors' announcement of their intention to seek a restructuring of its capital structure in April, 2002 and their filing of the Chapter 11 Cases, the Company has not suffered significant disruptions in or an adverse impact on its operations. Nonetheless, the continuation of the Chapter 11 Cases, particularly if the Joint Plan is not approved or confirmed in the time frame currently contemplated, could adversely affect the Company's relationship with its customers, suppliers and employees.

If confirmation and consummation of the Joint Plan do not occur expeditiously, the Chapter 11 Cases could adversely affect the Company's relationships with its customers, employees and suppliers and could result in, among other things, increased costs for professional fees and similar expenses. In addition, prolonged Chapter 11 Cases may make it more difficult for the Company to retain and attract management and other key personnel and would require senior management to spend an excessive amount of time and effort dealing with Debtors' financial problems instead of focusing on the operation of their businesses.

*Debtors may not be able to secure confirmation of the Joint Plan.* There can be no assurance that the requisite acceptances to confirm the Joint Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Joint Plan. A non-accepting creditor or equity holder of Debtors might challenge the adequacy of this Disclosure Statement or the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Joint Plan if it found that any of the statutory requirements for confirmation had not been met, including that the terms of the Joint Plan are fair and equitable to non-accepting Classes. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the Joint Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes, confirmation of the Joint Plan is not likely to be followed by a liquidation or a need for further financial reorganization and the value of distributions to non-accepting Holders of claims and interests within a particular class under the Joint Plan will not be less than the value of distributions such Holders would receive if Debtors were liquidated under Chapter 7 of the Bankruptcy Code. While there can be no assurance that these requirements will be met, Debtors believe

A-0520

that the Joint Plan will not be followed by a need for further financial reorganization and that non-accepting Holders within each Class under the Joint Plan will receive distributions at least as great as would be received following a liquidation under Chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and costs associated with any such Chapter 7 case. Debtors believe that Holders of Equity Interests in Debtors would receive no distribution under either a liquidation pursuant to Chapter 7 or Chapter 11.

The confirmation of the Joint Plan is also subject to certain conditions as described in Section III.M hereof. If the Joint Plan is not confirmed, it is unclear whether a restructuring of Debtors could be implemented and what distributions Holders of Claims or Equity Interests ultimately would receive with respect to their Claims or Equity Interests. If an alternative reorganization could not be agreed to, it is possible that Debtors would have to liquidate their assets, in which case it is likely that Holders of Claims and Equity Interests would receive substantially less favorable treatment than they would receive under the Joint Plan.

*Debtors may not be able to consummate the Joint Plan.* Consummation of the Joint Plan is conditioned upon, among other things, entry of the Confirmation Order and the negotiation and execution of certain definitive agreements, documents and plans. As of the date of this Disclosure Statement, there can be no assurance that any or all of the foregoing conditions will be met (or waived) or that the other conditions to consummation, if any, will be satisfied. Accordingly, even if the Bankruptcy Court confirms the Joint Plan, there can be no assurance that the Joint Plan will be consummated. If a liquidation or protracted reorganization were to occur, there is a risk that the value of the Debtors' enterprise would be eroded to the detriment of all stakeholders.

*Debtors may object to the amount or classification of a Claim.* Debtors reserve the right to object to the amount or classification of any Claim or Equity Interest. The estimates set forth in this Disclosure Statement cannot be relied on by any creditor or equity holder whose Claim or Equity Interest is subject to an objection. Any such Holder of a Claim or Equity Interest may not receive its specified share of the estimated distributions described in this Disclosure Statement.

*Bankruptcy Court may not approve the settlement of Creditors Committee Adversary Proceeding.* If the Bankruptcy Court does not approve the settlement of the Creditors Committee Adversary Proceeding, as contemplated by Article V.G of the Joint Plan, there is a substantial and material risk that distributions called for under the Joint Plan will be significantly delayed. There is the additional possibility that the full litigation of the Creditors Committee Adversary Proceeding would result in allocations to Creditors that are materially different from the allocations called for under the Joint Plan.

*Conditions precedent to the Effective Date may not be satisfied on time.* If the conditions precedent to the Effective Date have not been satisfied or waived by June 18, 2004, the lenders party to the Standstill Agreement will be able to exercise their rights and remedies against the non-Debtor subsidiaries of the Company under the Prepetition Credit Facility. In addition, the lenders under the Replacement DIP Credit Facility will be able to exercise their rights and remedies against the Debtors and non-Debtor subsidiaries. As of March 31, 2003, the assets of the non-Debtor subsidiaries represented 59% of the Company's consolidated assets. The Debtors cannot assure you as to the timing of the satisfaction or waiver of the conditions precedent to the Effective Date.

**B.     FACTORS AFFECTING THE VALUE OF THE SECURITIES TO BE ISSUED UNDER THE JOINT PLAN**

*Reorganized Debtors may not be able to achieve their projected financial results.* Reorganized Debtors may not be able to meet their projected financial results or achieve the revenue or cash flow that they have assumed in projecting their future business prospects. If Reorganized Debtors do not achieve these projected revenue or cash flow levels, they may lack sufficient liquidity to continue operating as planned after the Effective Date. Debtors' financial projections represent management's view based on current known facts and hypothetical assumptions about Reorganized Debtors' future operations. However, the Projections set forth on *Exhibit C* attached hereto do not guarantee Reorganized Debtors' future financial performance.

*Reorganized Debtors may not be able to meet their post-reorganization debt obligations and finance all of their operating expenses, working capital needs and capital expenditures.* Debtors are currently highly leveraged. Even after the reorganization, the Reorganized Debtors and the non-Debtor subsidiaries will have a significant amount of debt which will continue to require significant interest and principal payments. The Company may not generate sufficient positive cash flow to support the debt. The Company's level of debt and

A-0521

the limitations imposed on it by the Company's debt agreements could adversely affect the Company's operating flexibility and put the Company at a competitive disadvantage. The Company's significant level of debt may adversely affect the Company's future performance, because, among other things:

- the Company may not be able to obtain further debt financing and may have to pay more for the financing or sell equity securities which could dilute the ownership interest of a holder of New Exide Warrants or New Exide Common Stock;

- the Company may not be able to take advantage of business opportunities;

- the Company may be disadvantaged compared to competitors with less leverage; and

- the Company will be more vulnerable to adverse economic conditions.

The Company's debt agreements will likely contain a number of significant financial and other restrictive covenants. These covenants could adversely affect the Company by limiting the Company's financial and operating flexibility as well as its ability to plan for and react to market conditions and to meet its capital needs. The Company's failure to comply with these covenants could result in events of default which, if not cured or waived, could result in the Company's being required to repay that indebtedness before its due date, and the Company cannot assure that it would have the financial resources or be able to arrange alternative financing to do so.

*A liquid trading market for the New Exide Common Stock and New Exide Warrants may not develop.* Although the Company will use its best efforts to cause the New Exide Common Stock and New Exide Warrants to be listed on the New York Stock Exchange or the Nasdaq National Market as soon as practicable after the Effective Date, it cannot provide assurances that it will be able to obtain these listings or, even if it does, that liquid trading markets for the New Exide Common Stock and New Exide Warrants will develop. The liquidity of any market for the New Exide Common Stock and New Exide Warrants will depend, among other things, upon the number of Holders of New Exide Common Stock and New Exide Warrants, the Company's financial performance, and the market for similar securities, none of which can be determined or predicted. Therefore, the Company cannot provide assurances that an active trading market will develop or, if a market develops, what the liquidity or pricing characteristics of that market will be.

*The estimated valuation of Reorganized Debtors and the New Exide Common Stock and New Exide Warrants, and the estimated recoveries to Holders of Claims and Equity Interests, is not intended to represent the trading values of the New Exide Common Stock and New Exide Warrants.* The estimated valuation of Reorganized Debtors set forth in Section I.H hereof is not intended to represent the trading values of Debtors' securities in public or private markets. The estimated recoveries to each of the Impaired Classes are based on this theoretical valuation analysis. This valuation analysis is based on numerous assumptions, the realization of many of which is beyond the control of Debtors). Even if Reorganized Debtors achieve the Projections, the trading market values for the New Exide Common Stock and New Exide Warrants could be adversely impacted by the lack of trading liquidity for such securities, the lack of institutional research coverage and concentrated selling by recipients of such securities.

*Reorganized Exide does not expect to pay any dividends on the New Exide Common Stock for the foreseeable future.* It is not anticipated that any cash dividends will be paid on the New Exide Common Stock for the foreseeable future.

*Provisions of the New Exide Certificate of Incorporation could delay or prevent a change of control.* The New Exide Certificate of Incorporation will provide that the New Exide Board of Directors will be classified into three classes of directors, with each class elected at a separate election. Such provisions, among others, could delay a potential acquiror from obtaining majority control of the New Exide Board of Directors and thus deter potential acquisitions that might otherwise provide Reorganized Exide's stockholders with a premium over the then current market price for their shares.

*Certain tax implications of Debtors' bankruptcy and reorganization may increase the tax liability of Reorganized Debtors.* The U.S. federal income tax consequences of consummation of the Joint Plan to Holders of Claims or Equity Interests are complex and subject to uncertainty. Certain U.S. tax attributes of Debtors, including net operating loss carryovers, may be reduced or eliminated as a consequence of the Joint Plan. The

A-0522

elimination or reduction of net operating loss carryovers and such other tax attributes may increase the amount of tax payable by Reorganized Debtors following the consummation of the Joint Plan as compared with the amount of tax payable had no such reduction been required. See Section VI hereof, "Certain Federal Income Tax Consequences" below for discussion of the U.S. federal income tax consequences for creditors, equity holders and Debtors resulting from the consummation of the Joint Plan.

## C.     RISKS RELATING TO THE OPERATIONS OF REORGANIZED DEBTORS

*The Company operates in a competitive environment and the pricing of its products is substantially dependent on market forces.* The global transportation, motive power and network power battery markets are highly competitive. In recent years, competition has continued to intensify and the Company continues to come under increasing pressure for price reductions. This competition has been exacerbated by excess capacity and fluctuating lead prices as well as low-priced Asian imports impacting the Company's markets.

*The Company's financial results may be adversely affected by fluctuations in certain foreign currency exchange rates.* The Company is exposed to foreign currency risk in most European countries, principally from fluctuations in the Euro and British Pound. The Company is also exposed, although to a lesser extent, to foreign currency risk in Australia and the Pacific Rim. Movements of exchange rates against the U.S. dollar can result in variations in the U.S. dollar value of non-U.S. sales. In some instances, gains in one currency may be offset by losses in another. Movements in European currencies impacted the Company's results (both favorably and unfavorably) for the periods presented in the Annual Report on Form 10-K for the fiscal year ended March 31, 2003 attached as *Exhibit D* hereto.

*The Company's customers and sales are concentrated in a few geographic locations.* The Company is subject to concentrations of customers and sales in a few geographic locations and is dependent on customers in certain industries, including the automotive, telecommunications and material handling markets. Economic difficulties experienced in these markets and geographic locations have and may continue to impact the Company's financial results.

*The Company's business may be adversely affected by unfavorable weather conditions.* The automotive aftermarket battery industry is significantly affected by weather conditions. Unusually cold winters or hot summers accelerate battery failure and increase demand for automotive replacement batteries. Mild winters and cool summers have the opposite effect. As a result, if the Company's sales are reduced by an unusually warm winter or cool summer, it is not possible for the Company to recover these sales in later periods. Further, if the Company's sales are adversely affected by the weather, the Company cannot make offsetting cost reductions to protect its gross margins in the short-term because a large portion of the Company's manufacturing and distribution costs are fixed.

*Fluctuations in the cost of lead may adversely affect the Company.* Lead is the primary material by weight used in the manufacture of batteries, representing approximately one-fourth of the Company's cost of goods sold. The market price of lead fluctuates. Generally, when lead prices decrease, customers may seek disproportionate price reductions from the Company, and when lead prices increase, customers may resist price increases, thus decreasing the Company's gross margins.

*Environmental and occupational safety and health laws and regulations impose substantial costs on the Company's operations.* As a result of its multinational manufacturing, distribution and recycling operations, the Company is subject to numerous federal, state and local environmental, occupational safety and health laws and regulations, as well as similar laws and regulations in other countries in which the Company operates (collectively "EH&S laws"). The Company is exposed to liabilities under such EH&S laws arising from its past handling, release, storage and disposal of hazardous substances and hazardous wastes. The Company previously has been advised by the U.S. Environmental Protection Agency or state agencies that it is a "Potentially Responsible Party" ("PRP") under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") or similar state laws at approximately 94 federally defined Superfund or state equivalent sites.

The Company expects that its operations will continue to incur capital and operating expenses in order to maintain compliance with evolving environmental, health and safety requirements or more stringent enforcement of existing requirements. The Company has established reserves for on-site and off-site environmental remediation costs and believes that such reserves are adequate. As of March 31, 2003, the amount

A-0523

of such reserves on the Company's consolidated balance sheet was $78.3 million. For more information on environmental matters, see Section VII.A.2 below.

*The Company depends heavily on its senior management, and it may be unable to replace key executives if they leave.* The Company is dependent on the continued service of its management team. Although the Company believes it could replace key employees in an orderly fashion should the need arise, the loss of such personnel could have an adverse effect on the Company.

EXCEPT FOR HISTORICAL INFORMATION, THIS DISCLOSURE STATEMENT AND THE RISK FACTORS CONTAINED HEREIN MAY BE DEEMED TO CONTAIN "FORWARD-LOOKING" STATEMENTS WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 (THE "ACT"). THE DEBTORS DESIRE TO AVAIL THEMSELVES OF THE SAFE HARBOR PROVISIONS OF THE ACT AND ARE INCLUDING THIS CAUTIONARY STATEMENT FOR THE EXPRESS PURPOSE OF AVAILING THEMSELVES OF THE PROTECTION AFFORDED BY THE ACT.

FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THESE FORWARD LOOKING STATEMENTS INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING GENERAL FACTORS SUCH AS: (I) THE DEBTORS' ABILITY TO IMPLEMENT BUSINESS STRATEGIES AND FINANCIAL REORGANIZATION AND RESTRUCTURING PLANS, (II) UNSEASONABLE WEATHER (WARM WINTERS AND COOL SUMMERS) WHICH ADVERSELY AFFECTS DEMAND FOR AUTOMOTIVE AND SOME INDUSTRIAL BATTERIES, (III) THE DEBTORS' SUBSTANTIAL DEBT AND DEBT SERVICE REQUIREMENTS WHICH RESTRICT THE DEBTORS' OPERATIONAL AND FINANCIAL FLEXIBILITY, AS WELL AS IMPOSING SIGNIFICANT INTEREST AND FINANCING COSTS, (IV) THE DEBTORS ARE SUBJECT TO A NUMBER OF LITIGATION PROCEEDINGS, THE RESULTS OF WHICH COULD HAVE A MATERIAL ADVERSE EFFECT ON THE DEBTORS AND THEIR BUSINESS, (V) THE DEBTORS' ASSETS INCLUDE THE TAX BENEFITS OF NET OPERATING LOSS CARRY FORWARDS, REALIZATION OF WHICH ARE DEPENDENT UPON FUTURE TAXABLE INCOME, (VI) LEAD, WHICH EXPERIENCES SIGNIFICANT FLUCTUATIONS IN MARKET PRICE AND WHICH, AS A HAZARDOUS MATERIAL, MAY GIVE RISE TO COSTLY ENVIRONMENTAL AND SAFETY CLAIMS, CAN AFFECT THE DEBTORS' RESULTS BECAUSE IT IS A MAJOR CONSTITUENT IN MOST OF THE DEBTORS' PRODUCTS, (VII) THE BATTERY MARKETS IN NORTH AMERICA AND EUROPE ARE VERY COMPETITIVE AND, AS A RESULT, IT IS OFTEN DIFFICULT TO MAINTAIN MARGINS, (VIII) THE DEBTORS' CONSOLIDATION AND RATIONALIZATION OF ACQUIRED ENTITIES REQUIRES SUBSTANTIAL MANAGEMENT TIME AND FINANCIAL AND OTHER RESOURCES AND IS NOT WITHOUT RISK, (IX) FOREIGN OPERATIONS INVOLVE RISKS SUCH AS DISRUPTION OF MARKETS, CHANGES IN IMPORT AND EXPORT LAWS, CURRENCY RESTRICTIONS AND CURRENCY EXCHANGE RATE FLUCTUATIONS, (X) THE DEBTORS ARE EXPOSED TO FLUCTUATIONS IN INTEREST RATES ON THEIR VARIABLE DEBT WHICH CAN AFFECT THE DEBTORS' RESULTS, (XI) GENERAL ECONOMIC CONDITIONS, (XII) THE ABILITY TO ACQUIRE GOODS AND SERVICES AND/OR FULFILL LABOR NEEDS AT BUDGETED COSTS AND BANKRUPTCY CONSIDERATIONS SUCH AS: (A) THE DEBTORS' ABILITY TO CONTINUE AS A GOING CONCERN, (B) THE DEBTORS' ABILITY TO OPERATE IN ACCORDANCE WITH THE TERMS OF AND MAINTAIN COMPLIANCE WITH COVENANTS OF THE REPLACEMENT DIP CREDIT FACILITY AND OTHER FINANCING ARRANGEMENTS, (C) THE DEBTORS' ABILITY TO OBTAIN BANKRUPTCY COURT APPROVAL WITH RESPECT TO MOTIONS IN THE CHAPTER 11 CASES FROM TIME TO TIME, (D) THE DEBTORS' ABILITY TO DEVELOP, CONFIRM AND CONSUMMATE THE JOINT PLAN ON A TIMELY BASIS, (E) THE DEBTORS' ABILITY TO ATTRACT, MOTIVATE AND RETAIN KEY PERSONNEL, (F) THE DEBTORS' ABILITY TO OBTAIN AND MAINTAIN NORMAL TERMS WITH VENDORS AND SERVICE PROVIDERS, (G) THE DEBTORS' ABILITY TO MAINTAIN CONTRACTS THAT ARE CRITICAL TO THEIR BUSINESS, AND (H) THE DEBTORS' ABILITY TO ATTRACT AND RETAIN CUSTOMERS.

THEREFORE, THE DEBTORS CAUTION EACH READER OF THIS DISCLOSURE STATEMENT AND THE RISK FACTORS CONTAINED HEREIN TO CONSIDER CAREFULLY THOSE GENERAL FACTORS HEREINABOVE SET FORTH, BECAUSE SUCH FACTORS HAVE, IN SOME INSTANCES, AFFECTED AND IN THE FUTURE COULD AFFECT, THE ABILITY OF THE DEBTORS TO ACHIEVE THEIR PROJECTED RESULTS AND MAY CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE EXPRESSED HEREIN.

A-0524

VII.
MISCELLANEOUS PROVISIONS

Certain additional miscellaneous information regarding the Joint Plan and the Chapter 11 Cases is set forth below.

A.    PENDING LITIGATION

As of the Petition Date, substantially all pending litigation against the Debtors was stayed. To the extent any of the Debtors are ultimately found liable with respect to such litigation, the Debtors believe the claim resulting therefrom would constitute a general unsecured claim against the Debtors, the treatment of which would be governed by any plan of reorganization confirmed by the Bankruptcy Court. Litigation against the Company's non-Debtor subsidiaries has not been stayed and will not be affected by the bankruptcy proceedings.

*Former Senior Executives and Battery Quality Matters.* On March 23, 2001, the Company reached a plea agreement with the U.S. Attorney for the Southern District of Illinois, resolving an investigation into a scheme by former officers and certain corporate entities involving fraudulent representations and promises in connection with the distribution, sale and marketing of automotive batteries between 1994 and 1997. Under the terms of that settlement, the Company agreed to pay a fine of $27.5 million over five years, to five-years' probation and to cooperate with the U.S. Attorney in her prosecution of Arthur M. Hawkins, Douglas N. Pearson and Alan E. Gauthier, former senior executives of the Company. The payment terms of the plea agreement are dependent upon the Company's compliance with the plea agreement during the five-year probation period. Generally, the terms of the probation would permit the U.S. Government to reopen the case against the Company if the Company violates the terms of the plea agreement or other provisions of law. The plea agreement was lodged with the U.S. District Court for the Southern District of Illinois, and accepted on February 27, 2002. The Company reserved $31.0 million for this matter, including expected costs and out-of-pocket expenses, in the first quarter of fiscal 2001, and an additional $1.0 million in the third quarter of fiscal 2002. At December 31, 2003, approximately $27.5 million of this reserve remains. As a result of the imposition of the automatic stay arising upon the Company's Chapter 11 Cases, the Company has not made installment payments of its $27.5 million fine. The Company is uncertain as to the effect of these non-payments and the bankruptcy filing with respect to the plea agreement. On June 10, 2002, the United States Attorney's Office for the Southern District of Illinois filed a claim as a general unsecured creditor for $27.9 million.

The Company is currently involved in litigation with the former senior executives referenced above. The former senior executives made claims to enforce separation agreements, reimbursements of legal fees and other contracts, and the Company has filed claims and counterclaims asserting fraud, breach of fiduciary duties, misappropriation of corporate assets and civil conspiracy. In addition, the Company has filed actions in the Bankruptcy Court against the former senior executives to recover certain payments of legal fees that the Company was required to advance to such individuals prior to the Petition Date.

The Company has filed two claims with its insurers for reimbursement of the amounts paid to the former executives, and believes it is entitled to obtain substantial reimbursement for those amounts.

The Company has completed an investigation and determined that due to a deviation from manufacturing procedures approximately 950,000 automotive aftermarket batteries sold during 2001 and 2002 in North America did not contain one minor feature of several advertised for the batteries. In all cases the batteries performed in accordance with their labeled specifications. The feature was reinstated and the Company has discussed the situation with certain customers. The Company cannot predict at this time the effects of this matter on its business, but the remediation that has been offered is not material to its financial condition, cash flows or results of operations.

1.    Private Party Lawsuits

*Active Lawsuits.* In June 2002, the following lawsuit was filed in Louisiana state court: *Hardy et. al. v. Ducote Wrecking, et. al.* The case was filed as a putative class action for damages brought by two employees of Ducote Wrecking & Demolition, an independent contractor performing multiple maintenance projects at the Company's Baton Rouge, Louisiana facility. The plaintiffs allege that while they were engaged in work at the Company's facility, they were intentionally exposed to and poisoned by lead, acid, and other heavy metals. Plaintiffs named the Company's insurance carriers and supervisory employee as defendants, along with Ducote.

-83-

The case was removed to the U.S. District Court for the Western District of Louisiana. Plaintiffs filed a motion to remand, which was denied by the Court in a January 2003 decision. In the same January 2003 decision, the Court dismissed the Company's supervisory employee and the independent contractor defendant from the litigation. The Court also has denied plaintiffs' motion for class certification. The Company's insurer has issued a reservation of rights as to the Company's coverage for the alleged claims.

On April 11, 2003, the following lawsuit was filed in the Delaware Court of Chancery by the official committee of equity holders and its members: Kandathil et. al. v. Exide. The complaint seeks to compel the Company to convene a meeting of stockholders. On April 21, 2003, the Debtors filed a complaint against the official committee of equity holders and its members in the Bankruptcy Court seeking to enjoin their attempts to compel the Company to convene a meeting of stockholders. Hearings on the two complaints have been postponed indefinitely.

Exide is a defendant in an arbitration proceeding initiated in October of 2001 by Margulead Limited ("Margulead"). In June of 1997, GNB, now an operating division of Exide, entered into an agreement with Margulead, which Margulead contended obligated the Company to build a facility to test and develop certain lead acid battery recycling technology allegedly developed by Margulead. GNB terminated the contract in 1998. Exide contended, in part, that the Margulead process was not ready for pilot plant implementation and also failed to meet success criteria. Margulead claimed approximately $13 million in damages. The Company denied that it was liable and defended the matter in the arbitration. An arbitration decision was rendered on May 7, 2003, determining that the contract was unenforceable and that neither party was entitled to damages or costs. Margulead asked the arbitrator to reconsider the decision. Margulead has now advised the Company that it intends to challenge the arbitrator's award in the English commercial court. On or about July 23, 2003, Margulead filed an Application Notice advising of its intent to apply for an extension of time in which to make an application under certain sections of the Arbitration Act of 1996.

Margulead filed an Arbitration Claim Form, dated August 13, 2003, pursuant to which it seeks to challenge the arbitrator's May 7, 2003 Final Arbitration Award and a June 26, 2003 Correction of the Final Award, in which the arbitrator corrected minor typographical errors. The Arbitration Claim Form was filed under Section 68 of the Arbitration Act of 1996 on the basis of alleged "serious irregularity." The Company is opposing that Application. Further, the Company made an application for an order that Margulead be required to provide security for costs pursuant to Section 70(6) of the Arbitration Act of 1996 in connection with its application to reopen the Final Award. That application was heard by an English Court on October 31, 2003, and was successful. A hearing on this matter has been set for February 16, 2004. The Company does not believe it is likely that Margulead will succeed in any challenge to the arbitrator's Final Award.

In November 2002, the following lawsuit was filed in the Ontario Court of Justice: Exide Canada, Inc., v. Lorne Hilts et. al. This lawsuit was initiated by Exide Canada, Inc. against former officers, employees and a former logistics services vendor seeking in excess of $1.5 million in damages on multiple grounds including breach of trust, breach of contract and fraud. Defendant Hilts filed a counterclaim against Exide Canada for severance and other benefits and seeks damages in an amount exceeding $0.6 million. Defendant Ryad counterclaimed against Exide Canada alleging breach of contract and against Exide Technologies alleging it induced Exide Canada to breach its contract with Ryad for certain logistics services. Ryad seeks damages against each defendant in an amount exceeding $6.3 million. The Company believes that the counterclaims are without merit and is vigorously defending itself.

The Company's preliminary review of these active claims suggest they are without merit, and, to the extent the Company is a party to these active lawsuits, it plans to vigorously defend itself. The Company does not believe any reserves are currently warranted for these claims.

*Stayed Prepetition Lawsuits.* The following lawsuits allege that Exide and its predecessors allowed hazardous materials used in the battery manufacturing process to be released from certain of its facilities, allegedly resulting in personal injury and/or property damage. On August 25, 1999 several cases were filed in the Circuit Court for Greenville County, South Carolina and are currently pending: Joshua Lollis v. Exide; Buchanan v. Exide; Agnew v. Exide; Patrick Miller v. Exide; Kelly v. Exide; Amanda Thompson v. Exide; Jonathan Talley v. Exide; Smith v. Exide; Lakeisha Talley v. Exide; Brandon Dodd v. Exide; Prince v. Exide; Andriae Dodd v. Exide; Dominic Thompson v. Exide; Snoddy v. Exide; Antoine Dodd v. Exide; Roshanda Talley v. Exide; Fielder v. Exide; Rice v. Exide; Logan Lollis v. Exide; and Dallis Miller v. Exide. In January 2002, counsel that brought the South Carolina actions filed additional claims in the Circuit Court for Greenville County, South

A-0534

Carolina. The following lawsuits of this type are currently pending in the Court of Common Pleas for Berks County, Pennsylvania: Grillo v. Exide, filed on May 24, 1995; Blume v. Exide, filed on March 4, 1996; Esterly v. Exide, filed on May 30, 1995; and Saylor v. Exide, filed on October 18, 1996. The following lawsuit of this type is currently pending in the United States District Court for the Southern District of Indiana: Strange v. Exide. Finally, the following lawsuit of this type is pending in the Circuit Court of Shelby County, Tennessee: Cawthon v. Exide, et al. All these cases have been stayed.

In July 2001, Pacific Dunlop Holdings (US), Inc. ("PDH") and several of its foreign affiliates under the various agreements through which Exide and its affiliates acquired GNB, filed a complaint in the Circuit Court for Cook County, Illinois alleging breach of contract, unjust enrichment and conversion against Exide and three of its foreign affiliates. The plaintiffs maintain they are entitled to approximately $17.0 million in cash assets acquired by the defendants through their acquisition of GNB. In December 2001, the Court denied the defendants' motion to dismiss the complaint, without prejudice to re-filing the same motion after discovery proceeds. The defendants have filed an answer and counterclaim. On July 8, 2002, the Court authorized discovery to proceed as to all parties except Exide. In August 2002, the case was removed to the U.S. Bankruptcy Court for the Northern District of Illinois and in October 2002, the parties presented oral arguments, in the case of PDH, to remand the case to Illinois state court and, in the case of Exide, to transfer the case to the U.S. Bankruptcy Court for the District of Delaware. On February 4, 2003, the U.S. Bankruptcy Court for the Northern District of Illinois transferred the case to the U.S. Bankruptcy Court in Delaware. On November 19, 2003, the Bankruptcy Court denied PDH's motion to abstain or remand the case and issued an opinion holding that the Bankruptcy Court had jurisdiction over PDH's claims and, moreover, holding that liability, if any, would lie solely against Exide Technologies and not against any of its foreign affiliates. The Company plans to vigorously defend the action and pursue the counterclaim.

In December 2001, PDH filed a separate action in the Circuit Court for Cook County, Illinois seeking recovery of approximately $3.1 million for amounts allegedly owed by Exide under various agreements between the parties. The claim arises from letters of credit and other security allegedly provided by PDH for GNB's performance of certain of GNB's obligations to third parties that PDH claims Exide was obligated to replace. Exide's answer contested the amounts claimed by PDH and Exide filed a counterclaim. Although this action has been consolidated with the Cook County suit concerning GNB's cash assets, the claims relating to this action are currently subject to the automatic bankruptcy stay, and have been transferred to the U.S. Bankruptcy Court for the District of Delaware.

Between March and September 2002, the following cases were filed in the U.S. District Court for the Middle District of Louisiana: Joseph et. al. v. Exide; Andrews et. al. v. Exide; and Armstead v. Exide. These actions seek monetary damages and injunctive relief for alleged racial discrimination in the Company's Shreveport and Baton Rouge, Louisiana plants. The Joseph and Andrews cases have been consolidated and all three lawsuits have been stayed.

In February 2001, the following lawsuit was filed in the U.S. District Court for the Northern District of California: Flaherty v. Exide, et. al. Plaintiff contends the Company is responsible, in part, for contamination resulting from alleged disposal of hazardous substances at plaintiff's property. The suit contains claims predicated on CERCLA, private nuisance, public nuisance, trespass, negligence, equitable indemnity, contribution, injunctive relief under RCRA and declaratory relief under state law. The Company has filed counterclaims against plaintiff and other potentially responsible parties.

The Company's preliminary review of these claims suggests they are without merit and the Company plans to vigorously defend itself with regard to the stayed prepetition lawsuits. The Company expects that all of these lawsuits will be compromised upon confirmation of the Joint Plan by the Bankruptcy Court.

2.     **Environmental Matters.**

As a result of its multinational manufacturing, distribution and recycling operations, the Company is subject to numerous federal, state and local EH&S laws. The Company is exposed to liabilities under such EH&S laws arising from its past handling, release, storage and disposal of hazardous substances and hazardous wastes. The Company previously has been advised by the U.S. Environmental Protection Agency or state agencies that it is a PRP under the CERCLA or similar state laws at approximately 94 federally defined Superfund or state equivalent sites. At approximately 44 of these sites, the Company has paid its share of liability. The Company is currently making payments at one site. The Company expects that its liability at

A-0535

certain Superfund and other sites, including all or some of the sites discussed in the following paragraph, will be treated as prepetition Claims under the Joint Plan. In most instances, the Company's remaining obligations are not expected to be significant because its portion of any potential liability appears to be minor or insignificant in relation to the total liability of all identified PRPs that are financially viable. The Company's share of the anticipated remediation costs associated with all of the superfund sites where it has been named a PRP, based on the Company's estimated volumetric contribution of waste to each site, is included in the environmental remediation reserves discussed below.

Of those sites for which the Company has not completed payment of its share of liability, it currently has greater than 50% liability at three Superfund sites, and allocated liability that exceeds five percent at an additional seven sites that averages approximately 22%. Because the Company's liability under such statutes may be imposed on a joint and several basis, the Company's liability may not necessarily be based on volumetric allocations and could be greater than the Company's estimates. The Company believes, however, that its PRP status at these Superfund sites will not have a material adverse effect on the Company's business or financial condition because, based on the Company's experience, it is reasonable to expect that the liability will be roughly proportionate to its volumetric contribution of waste to the sites, although waste toxicity may also be a factor.

The Company is also involved in the assessment and remediation of various other properties, including certain Company owned or operated facilities. Such assessment and remedial work is being conducted pursuant to applicable EH&S laws with varying degrees of involvement by appropriate legal authorities. In addition, certain environmental matters concerning the Company are pending in various courts or with certain environmental regulatory agencies.

While the ultimate outcome of the foregoing environmental matters is uncertain, after consultation with legal counsel, the Company does not believe the resolution of these matters, individually or in the aggregate, will have a material adverse effect on the Company's financial condition, cash flows or results of operations.

The Company has established reserves for on-site and off-site environmental remediation costs and believes that such reserves are adequate. As of March 31, 2003, the amount of such reserves on the Company's consolidated balance sheet was $78.3 million. These reserves were not intended to cover future environmental remediation costs at the Debtors' operating facilities, such as the Vernon, California facility. The California Department of Toxic Substances Control (the "DTSC") and other state and local environmental agencies are expected to contend that remediation of such operating facilities is an ongoing obligation of the Debtors and cannot be discharged. The Debtors reserve the right to dispute those contentions. The Company expects a significant, but as yet undetermined, portion of this liability will be treated as prepetition Claims under the Joint Plan. Because environmental liabilities are not accrued until a liability is determined to be probable and reasonably estimable, not all potential future environmental liabilities have been included in the Company's environmental reserves and, therefore, additional earnings charges are possible. Also, future findings or changes in estimates could have a material effect on the recorded reserves and cash flows.

Prior to 2000, the Debtors comprehensively reviewed potential insurance coverage for environmental liabilities and pursued claims against insurers. These efforts resulted in settlements with key insurers and others in which the Debtors received payments in return for releases from further claims under the policies. The Debtors are not aware of any other insurance coverage for environmental liabilities and believe that further pursuit to identify insurance coverage for environmental claims would be prohibitively expensive and is not in the best interests of the estates. The amount received in the settlements with insurers was less than the amount the Debtors have expended on the environmental liabilities for which coverage was pursued.

In the U.S., the Company has advised each state and federal authority with whom it has negotiated plans for environmental investigations or remediation of the Debtors' Chapter 11 Cases as required by those agreements or applicable rules. In some cases these authorities may require the Company to undertake certain agreed remedial activities under a modified schedule, or may seek to negotiate or require modified remedial activities. Such requests have been received at several sites and are the subject of ongoing discussions. Among the sites at which there are alleged remediation issues are the following:

*Tampa, Florida.* The Tampa site is a former secondary lead smelter, lead oxide production facility, and sheet lead-rolling mill that operated from 1943 to 1989. Under a RCRA Part B Closure Permit and a Consent Decree with the State of Florida, Exide is required to investigate and remediate certain historic environmental impacts to the site. Cost estimates for remediation (closure and post-closure) range from $12.5 million to $20.5

A-0536

million depending on final State of Florida requirements. The remediation activities are expected to occur over the course of several years.

*Columbus, Georgia.* The Columbus site is a former secondary lead smelter that was decommissioned in 1999, which is part of a larger facility that includes an operating lead acid battery manufacturing facility. Groundwater remediation activities began in 1988. Costs for supplemental investigations, remediation and site closure are currently estimated at $13.5 million.

*Sonalur, Portugal.* The Sonalur facility is an active secondary lead smelter. Materials from past operations present at the site are stored in aboveground concrete containment vessels and in underground storage deposits. The Company is in the process of obtaining additional site characterization data to evaluate remediation alternatives agreeable to local authorities. Costs for remediation are currently estimated at $3.5 to $7.0 million.

*Trenton, New Jersey.* The State of New Jersey, Department of Environmental Protection ("NJDEP"), has designated Exide a responsible party and has initiated an enforcement action against Exide for the seven acre site located at 467 Calhoun Street, Trenton, Mercer County, New Jersey. The NJDEP has directed Exide to perform both investigatory and remedial activities as described in "Directives" issued to Exide on June 5, 2003, and November 18, 2003, pursuant to the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -23.14. Exide had been performing such remedial activities under a memorandum of agreement with the NJDEP but did not submit a required revised remedial investigative report to the NJDEP that was due on or before July 23, 2002. The estimate for the cost of the remediation is not exact because the investigation is not complete, but the NJDEP asserts that it will probably be in the vicinity of $2,000,000. The NJDEP contends that this environmental obligation is not a "claim" but an ongoing environmental obligation of the Debtors that is not subject to discharge. On December 18, 2003, Exide declined to perform the actions requested by NJDEP's Directives on ground's related to Exide's Chapter 11 case. The Debtors reserve their rights to dispute liability with respect thereto.

*Vernon, California.* Exide operates a battery recycling facility in Vernon, California. The DTSC contends that there is a release of hazardous waste or hazardous waste constituents into the environment at that site. On February 25, 2002, the DTSC and Exide entered into a consent order to implement a corrective action program at the Vernon site. DTSC asserts that it is entitled to recover its costs of complying with the California Environmental Quality Act (the "CEQA"). In addition, the DTSC asserts that its law and regulations require the owner and operator of a hazardous waste facility to provide financial assurances to cover responses to damage and injury claims arising out of the operation of the facility and to provide for the closure and post-closure maintenance of the site. The DTSC asserts that it is entitled to reimbursement for past and future oversight costs, for hazardous waste fees, and for the CEQA and financial assurances as described above. As set forth in the claims filed by DTSC in this proceeding, the DTSC asserts that the estimated costs for the Vernon site are $11,632,088.52. The DTSC contends that this remediation obligation is not a "claim" but is an ongoing environmental obligation of the Company that is not subject to discharge. The Debtors reserve the right to dispute all such alleged liability.

*Visalia, California.* Exide operated a battery manufacturing plant and hazardous waste management facility in Visalia, California. In October of 1998, Exide and DTSC entered into a consent agreement, which superceded a previous agreement dated June 1995, requiring Exide to undertake corrective action to address releases of hazardous waste at this site as required by law. The DTSC asserts that it has unpaid prepetition and postpetition oversight costs of approximately $8,000, but estimates that future costs for site investigation, cleanup, and its oversight costs will amount to approximately $2,160,000. The DTSC contends that this remediation obligation is not a "claim" but is an ongoing environmental obligation of the Company that is not subject to discharge. The Debtors reserve the right to dispute all such alleged liability.

*Carson, California.* The DTSC asserts that Exide is a responsible party as the successor to GNB Technologies and GNB Industrial Battery, which the DTSC asserts arranged for the treatment or disposal of hazardous substances at the Alco Pacific site, including lead dross and slag. There is pending litigation, State of California, Department of Toxic Substances Control v. Alco Pacific Inc., et al. United States District Court, Central District of California, Civ. No. 01-09294 SJO (FMOx). The DTSC asserts that its unpaid prepetition costs include $976,761.13. The DTSC also asserts that its unpaid postpetition costs include $457,542.21. The DTSC has not estimated any future site investigation costs at this time. The DTSC estimates its future oversight costs to be $200,000 and its future cleanup costs to be $1,300,000. The DTSC estimates its total future costs to

-87-

A-0537

be $1,957,542.21]. Accordingly, the DTSC asserts that its total claim for the Alco Site is $2,934,303.34. The DTSC asserts that the alleged responsible parties at the site are jointly and severally liable with each other, some of whom are named in the existing litigation, so the amount of liability to which the DTSC asserts that Exide is likely to be exposed is currently unknown. The DTSC contends that this remediation obligation is not a "claim" but is an ongoing environmental obligation of the Company that is not subject to discharge. The Debtors reserve the right to dispute all such alleged liability.

*San Gabriel Basin Groundwater Site, Puente Valley Operable Unit, San Gabriel, California.* The DTSC asserts that San Gabriel Basin Groundwater Superfund Site includes four (4) areas of contamination in the San Gabriel Valley, Los Angeles County, including the Puente Valley Operable Unit. Exide (formerly GNB Batteries, Inc.) has been notified by the U.S. Environmental Protection Agency (the "USEPA") that it is one of 74 responsible parties for this site. The DTSC asserts that the required remedy includes extraction and treatment of contaminated groundwater and design is expected to be completed by mid to late 2003. The USEPA estimated the total clean up costs will cost roughly $47,200,000. The DTSC asserts that it has incurred prepetition oversight costs associated with this site in the amount of $61,687. The DTSC asserts that the alleged responsible parties at the site are jointly and severally liable for this site so the amount of liability to which the DTSC alleges that Exide is likely to be exposed is currently unknown. DTSC contends that this remediation obligation is not a "claim" but is an ongoing environmental obligation of the Company that is not subject to discharge. The Debtors reserve the right to dispute all such alleged liability.

### 3.     Other

In February 2002, the Company's principal French subsidiary was notified by local competition authorities that in connection with certain sales of batteries by several French manufacturers in 1996 and 1997, the subsidiary is alleged to have violated local competition laws. The civil investigative agency in the case has recommended a fine be imposed on the Company for 5.9 million Euros, but the Company does not believe that the subsidiary acted improperly and intends to defend this matter vigorously. A judicial decision with respect to this matter is expected within the next 90 days.

From 1957 to 1982, the Company's French subsidiary, CEAC, operated a plant using crocidolite asbestos fibers in the formation of battery cases, which, once formed, encapsulated the fibers. Approximately 1,500 employees worked in the plant over the period. Since 1982, the French governmental agency responsible for worker illness claims has received 34 employee claims alleging asbestos-related illnesses, and no such claims have been filed since August 2001. For some of those claims, CEAC is obligated to and has indemnified the agency in accordance with French law for approximately $132 thousand, $169 thousand and $260 thousand in calendar years 2001, 2002 and 2003, respectively. In addition, CEAC has been adjudged liable to indemnify the agency for approximately $45 thousand, $78 thousand, and $200 thousand during the same periods to date for the dependents of four such claimants. Although the Company cannot predict the number or size of any future claims, after consultation with legal counsel the Company does not believe resolution of the current or any future claims, individually or in the aggregate, will have a material adverse effect on the Company's financial condition, cash flows or results of operations.

The Company is involved in various other claims and litigation incidental to the conduct of its business. Based on consultation with legal counsel, the Company does not believe that any such claims or litigation to which the Company is a party, either individually or in the aggregate, will have a material adverse effect on the Company's financial condition, cash flows or results of operations.

### B.     PENSION PLANS

Exide Technologies has established and maintained the following pension plans for certain of its employees: The Exide Technologies Retirement Plan; The Exide Corporation (GBC) Pension Plan; The Exide Hourly Employees Pension Plan; The Exide Hourly Employees Pension Plan (UAW); The Exide Indiana Employees Pension Plan; The Exide Hamburg Pennsylvania Employees Pension Plan; The Exide Retirement Plan for the Benefit of Employees of Schuylkill Metals, Corp.; The Exide Hourly Employees Retirement Income Security Plan; and The Exide IBT-Salina Employees Pension Plan (collectively, the "Pension Plans"). The Pension Plans are covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") (29 U.S.C. Section 1301 *et seq*).

-88-

A-0538

The Debtors and all members of their controlled group, within the meaning of 29 U.S.C. § 1301(a)(14), are obligated to contribute to the Pension Plans at lease the amounts necessary to satisfy ERISA's minimum funding standards, found in ERISA Section 302 and Internal Revenue Code Section 412. The Debtors have made all of their required contributions to the Pension Plans to date. In the event of a termination of the Pension Plans, the Debtors may be jointly and severally liable for the unfunded benefit liabilities of the Pension Plans. See ERISA Section 4062, 29 U.S.C. § 1362. The Pension Plans may be terminated only if the statutory requirements of either ERISA Section 4041 or 4042 are met.

Exide Technologies has no present intention to terminate any of its Pension Plans.

Unless the Pension Plans have been terminated prior to the Effective Date, the liability of the Debtors and their controlled group under ERISA to the Pension Plans, or to The Pension Benefit Guaranty Corporation ("PBGC"), a United States Government corporation which guarantees the payment of certain pension benefits upon termination of a pension plan, shall not be affected in any way by this reorganization proceeding, including discharge or release.

**C.      SUCCESSORS AND ASSIGNS**

The rights, benefits and obligations of any Person or Entity named or referred to in the Joint Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Person or Entity.

**D.      RESERVATION OF RIGHTS**

Except as expressly set forth in the Joint Plan, the Joint Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Joint Plan, any statement or provision contained herein, or the taking of any action by Debtors with respect to the Joint Plan shall be or shall be deemed to be an admission or waiver of any rights of Debtors with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

**E.      SERVICE OF DOCUMENTS**

Except as otherwise provided by order of the Bankruptcy Court, any pleading, notice or other document required by the Joint Plan to be served on or delivered to Reorganized Debtors shall be sent by first class U.S. mail, postage prepaid to:

> Exide Technologies
> 13000 Deerfield Parkway Building 200
> Alpharetta, GA 30004
> Attn: Stuart H. Kupinsky, Executive Vice President, General Counsel and Secretary

> And

> Exide Technologies
> Attn: Plan Service, Suite 230
> Crossroads Corporate Center
> 3150 Brunswick Pike
> Lawrenceville, NJ 08648

> with copies to:

> Kirkland & Ellis LLP
> 200 E. Randolph Drive
> Chicago, Illinois 60601
> Attn: Matthew N. Kleiman

> And

A-0539

Pachulski, Stang, Ziehl, Young, Jones & Weintraub
919 North Market Street
P.O. Box 8705
Wilmington, Delaware 19899-8705
Attn: Laura Davis Jones
     James E. O'Neill

A-0540

## VIII.
## RECOMMENDATION

In the opinion of the Creditors Committee and the Debtors, the Joint Plan is preferable to the alternatives described herein because it provides for a larger distribution to the Holders than would otherwise result in a liquidation under Chapter 7 of the Bankruptcy Code. In addition, any alternative other than confirmation of the Joint Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to the Holders of Claims. *Accordingly, the Creditors Committee and the Debtors recommend that Holders of Claims entitled to vote on the Joint Plan support confirmation of the Joint Plan and vote to accept the Joint Plan.*

A-0541

Prepared by:

Matthew N. Kleiman
Jason D. Horwitz
Ross M. Kwasteniet
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

COUNSEL FOR THE DEBTORS AND DEBTORS IN POSSESSION

Fred S. Hodara
Mary Reidy Masella
AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, New York 10022
(212) 872-1000

COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

Laura Davis Jones
James E. O'Neill
Kathleen Marshall DePhillips
PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB
919 North Market Street
P.O. Box 8705
Wilmington, Delaware 19899-8705

COUNSEL FOR THE DEBTORS AND DEBTORS IN POSSESSION

and

David B. Stratton
David M. Fournier
PEPPER HAMILTON LLP
Hercules Plaza
Suite 5100
1313 Market Street
Wilmington, Delaware 19801
(302) 777-1709

COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

A-0542

Dated: March 11, 2004

Respectfully Submitted,

EXIDE TECHNOLOGIES

By:  Stuart H. Kupinsky

EXIDE DELAWARE, L.L.C.

By:  Stuart H. Kupinsky

EXIDE ILLINOIS, INC.

By:  Stuart H. Kupinsky

RBD LIQUIDATION, L.L.C.

By:  Stuart H. Kupinsky

DIXIE METALS COMPANY

By:  Stuart H. Kupinsky

REFINED METALS CORPORATION

By:  Stuart H. Kupinsky

and

OFFICIAL COMMITTEE OF UNSECURED CREDITORS

By:  Jeffrey B. Dobbs
Its: Chairman

A-0543



Dated: March 11, 2004

RESPECTFULLY SUBMITTED,

EMPIRE TECHNOLOGIES

By: Stuart L. Kaplan

EMPIRE DELAWARE, LLC

By: Stuart L. Kaplan

EMPIRE FINANCING

By: Stuart L. Kaplan

EMPIRE LIQUIDATION

By: Stuart L. Kaplan

DIXIE METALS COMPANY

By: Stuart L. Kaplan

REFINED METALS CORPORATION

By: Stuart L. Kaplan

OFFICIAL COMMITTEE OF UNSECURED

By: Jeff Waxman