# TAB 15

## COORDINATING AGREEMENT

This COORDINATING AGREEMENT dated May 9, 2000 (the "Agreement") is executed by and between Exide Corporation, a Delaware corporation ("Buyer") and Pacific Dunlop Holdings (USA) Inc., a Delaware corporation ("Seller").

### RECITALS

A.    The parties hereto have agreed that Buyer and certain subsidiaries of Buyer (the "International Buyers") will purchase from the Seller and certain Affiliates of Seller (the "International Sellers") the businesses more particularly described in and conveyed under the Sale Agreements as defined below (collectively, the "Business").

B.    To effect the foregoing, following the execution of this Agreement, Buyer and the International Buyers, on the one hand, and, Seller or the International Sellers, on the other hand, will execute individual asset or share purchase agreements, which are described on Exhibit A hereto, including the U.S. Agreement (as defined herein) which is being executed by Buyer and Seller simultaneously herewith (collectively, the "Sale Agreements"), pursuant to which the Seller or one or more of the International Sellers will agree to sell, and the Buyer or one or more of the International Buyers will agree to purchase, the assets or capital shares owned by the Seller or the International Sellers (the "Purchased Assets"), that, together with certain liabilities that Buyer or the International Buyers will agree to assume (the "Assumed Liabilities"), in the aggregate constitute the Business, on the terms and conditions set forth in the Sale Agreements.

C.    Pursuant to this Agreement and in connection with the Buyer's acquisition of the Business, the Seller is delivering to Buyer certain financial statements of the Business.

D.    In order effectively and efficiently to coordinate the acquisition of the Business by means of the multiple Sale Agreements, the parties hereto desire to provide in a single document certain provisions that have overarching effect on the transactions contemplated by the Sale Agreements, such as (i) the adjustment of the purchase price paid pursuant to the Sale Agreements under the circumstances described in this Agreement, (ii) the Seller's representation and warranty regarding the financial statements referred to in Recital C, and (iii) the resolution of any unintended inconsistencies or conflicts between or among the terms of the Sale Agreements.

E.    The parties hereto further desire to provide for a single avenue of recourse for indemnification claims arising under the Sale Agreements and have therefore agreed that all claims for indemnity against losses or claims resulting from breaches of obligations, representations or warranties under the Sale Agreements or this Agreement will be addressed exclusively under this Agreement.

NOW THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, and in exchange for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1.

## DEFINITIONS

Section 1.1    Definitions.  In this Agreement, the terms set forth below have the meanings specified or referred to in this Section 1.1 and shall be equally applicable to both the singular and plural forms.  Unless otherwise defined herein, all capitalized terms used in this Agreement shall have the meanings ascribed to them in the U.S. Agreement.

"Accounting Report" has the meaning specified in Section 2.1(b)(ii) of this Agreement.

"Action" means any lawsuit, arbitration, regulatory, governmental or other proceeding or investigation, whether at law or in equity.

"Additional Accounting Firm" has the meaning specified in Section 2.1(d) of this Agreement.

"Additional Accounting Firm Adjustments" has the meaning specified in Section 2.1(d)(ii) of this Agreement.

"Affiliate" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person, including, but not limited to, those affiliates that have executed this Agreement.

"Agreed Accounting Principles" has the meaning specified in Section 2.1(a) of this Agreement.

"Agreed Adjustments" has the meaning specified in Section 2.1(d) of this Agreement.

"Agreed Rate" means the prime rate published by The Wall Street Journal, as that rate may vary from time to time, or if that rate is no longer published, a comparable rate.

"Agreement" has the meaning specified on the first page of this Agreement.

"Assumed Liabilities" has the meaning specified on the first page of this Agreement.

-2-

A-0606

"Purchase Price" means the aggregate of the cash purchase prices paid pursuant to the Sale Agreements, being Three Hundred and Thirty-Three Million United States Dollars (US $333,000,000).

"Purchase Price Adjustment Due Date" has the meaning specified in Section 2.2(b) of this Agreement.

"Purchased Assets" has the meaning specified on the first page of this Agreement.

"Qualifying Claim" has the meaning specified in Section 4.1(b)(i) of this Agreement.

"Real Property" has the meaning specified in each of the Sale Agreements.

"Requirements of Law" means any foreign, federal, state or local law, statute, regulation, code or ordinance of any Governmental Body currently in effect.

"Resolution Period" has the meaning specified in Section 2.1(d) of this Agreement.

"Review Commencement Date" has the meaning specified in Section 2.1(e)(i) of this Agreement.

"Sale Agreements" has the meaning specified on the first page of this Agreement.

"Seller Entities" has the meaning specified in Section 5.5 of this Agreement.

"Tax" (and, with correlative meaning, "Taxes" and "Taxable") means any federal, state, county, local or foreign income, alternative or add-on minimum, gross income, gross receipts, capital gains, capital, property, sales, use, transfer, license, excise, premium, lease, estimated, environmental, registration, value added, stamp, real property, franchise, employment, payroll, wage, withholding or minimum tax, ad valorem, stamp duty, customs duty, any other similar taxes or governmental charges, fees, levies, assessments or liabilities of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, and includes any interest, penalty or fine, or addition to tax imposed by any Governmental Body.

"Transferring Employees" means all employees of the Business who accept employment with the Buyer or one of its Affiliates, or who are employed by one of the GNB Companies purchased by the Buyer or one of its Affiliates.

"U.S. Agreement" means the Stock Purchase Agreement by and between Buyer and Seller concerning the purchase and sale of Seller's United States business and operations.

-5-

## ARTICLE 2.

## PURCHASE PRICE ADJUSTMENT

Section 2.1    Determination of Final Closing Date Balance Sheet.

(a)    As soon as possible following the Closing Date (but not later than sixty (60) days after the Closing Date), Buyer shall cause to be prepared a balance sheet as of the Closing Date setting forth in reasonable detail the total assets and total liabilities of the Business (the "Preliminary Closing Date Balance Sheet") and deliver same to Seller and to KPMG Peat Marwick LLP or its successor ("KPMG"). The Preliminary Closing Date Balance Sheet shall be prepared in accordance with generally accepted accounting principles consistent with those employed in the preparation of the June 30, 1999 Balance Sheet and the March 31, 2000 Balance Sheet ("Agreed Accounting Principles"). Notwithstanding the foregoing, the parties agree that:

(i)    the Preliminary Closing Date Balance Sheet and the March 31, 2000 Balance Sheet shall not reflect (and/or no consideration will be given to) an accrual or provision for "Closure, restructuring and other reserves" which was presented as $9,571,000 on the March 31, 2000 Balance Sheet;

(ii)    the fixed assets of the Business will be valued on the Preliminary Closing Balance Sheet in the amounts set forth in the March 31, 2000 Balance Sheet subject only to ordinary depreciation. plus any capital expenditures (less disposals) after March 31, 2000; and

(iii)    the inventory of the Business shall be determined using the results of a physical inventory of the Business near the Closing Date as agreed to by the parties.

KPMG and Seller and Buyer and its auditors shall have the opportunity to observe the taking of physical inventories.

(b)    Promptly following delivery of the Preliminary Closing Date Balance Sheet to Seller, Seller shall cause KPMG to conduct a special audit of the Preliminary Closing Date Balance Sheet, which special audit shall be completed not later than sixty (60) days after delivery of the Preliminary Closing Date Balance Sheet to Seller. Upon completion of the special audit, Seller shall cause KPMG to deliver to each of Seller and Buyer:

(i)    a "Price Adjustment Statement" of the Business which will reflect changes in inventories, prepaid expenses, trade receivables net of allowance, trade accounts payable, accrued salaries, wages and other compensation, warranty reserves and other accrued expenses (as such

-6-

A-0610

accounts are defined in the June 30, 1999 Balance Sheet and the March 31, 2000 Balance Sheet), in each case since March 31, 2000, plus an amount equal to any capital expenditures: (A) made after March 31, 2000 that are permitted by Section 5.7 and Section 7.3(b) and that are described in Schedule 7.3(B) to the U.S. Agreement, (or the corresponding schedules of the other Sale Agreements) plus (B) any other capital expenditures made in the ordinary course of business since March 31, 2000, minus ordinary depreciation and disposals of such capital assets and casualty losses (net of expected insurance proceeds) of such capital assets plus an amount equal to the amount of tax benefit, but in no event more than One Million United States Dollars (US $1,000,000), on the Employee Leave Benefits and future retiree medical benefits accrued (on a country-by-country basis) with respect to all Transferring Employees as at the Closing Date (collectively, the "Adjustable Accounts"); and

(ii)    an audit report stating (without qualification) that, in KPMG's opinion, the Preliminary Closing Date Balance Sheet, including the financial information in the Price Adjustment Statement referred to in Section 2.1 (b)(i), as audited by such firm, has been prepared in accordance with the Agreed Accounting Principles except as provided in Section 2.1 (a)(i) and (ii) (such summary, Price Adjustment Statement and audit report are herein referred to as the "Accounting Report").

The Preliminary Closing Date Balance Sheet, as so determined, is herein referred to as the "Audited Closing Date Balance Sheet." The parties shall make available to KPMG all books, records and other information that KPMG may request to issue its Accounting Report. The fees and expenses of KPMG related to the special audit of the Preliminary Closing Date Balance Sheet hereunder shall be paid by Seller.

(c)    Promptly following the delivery of the Accounting Report to Buyer, Buyer and its auditors and advisors may review the same and, within thirty (30) days after such delivery (the "Objection Period"), Buyer may deliver to Seller a certificate (signed by an officer of Buyer) setting forth its objections, if any, only to the values shown for the Adjustable Accounts on the Audited Closing Date Balance Sheet, together with a summary of the reasons therefor and calculations which, in Buyer's view, are necessary to eliminate such objections. In the event Buyer does not so object within the Objection Period, the Audited Closing Date Balance Sheet shall be final and binding as the "Final Closing Date Balance Sheet".

(d)    In the event Buyer objects within the Objection Period, then within thirty (30) days following Buyer's delivery to Seller of the certificate referenced in Section 2.1(c), (the "Resolution Period"), the Buyer and Seller shall use their reasonable efforts to resolve by written

-7-

agreement (the "Agreed Adjustments") Buyer's objections to the Audited Closing Date Balance Sheet. In the event that Seller and Buyer so resolve any such objections, the Audited Closing Date Balance Sheet shall be adjusted by the Agreed Adjustments and, if all such objections have been resolved by Agreed Adjustments, the Audited Closing Date Balance Sheet, as adjusted by the Agreed Adjustments, shall be final and binding as the Final Closing Date Balance Sheet. In the event any objections raised by Buyer are not resolved by Agreed Adjustments during the Resolution Period, then within ten (10) days following the end of the Resolution Period, the Seller and Buyer shall jointly select a national accounting firm acceptable to both Seller and Buyer (or if they cannot agree on such selection, a national accounting firm will be selected by lot after eliminating any accounting firm or firms that has or have acted as auditors, tax advisors, or consultants to Seller or Buyer or their respective Affiliates) (the "Additional Accounting Firm"). For purposes of the preceding sentence, only the following accounting firms shall be considered national accounting firms: Ernst & Young LLP and Deloitte & Touche LLP. The terms of the engagement of the Additional Accounting Firm shall be the terms set forth in Section 2.1(e). The Additional Accounting Firm shall review and resolve any remaining objections as to which Buyer and Seller have not reached Agreed Adjustments and deliver, in no event later than sixty-five (65) days following the Review Commencement Date (as defined in Section 2.1(e)(i)) (time being of the essence), written notice to each of Buyer and Seller setting forth:

    (i)    its determination of such remaining objections; and

    (ii)    the adjustments to the Audited Closing Date Balance Sheet (the "Additional Accounting Firm Adjustments").

The Audited Closing Date Balance Sheet as so determined but after giving effect to the Agreed Adjustments and to the Additional Accounting Firm Adjustments shall constitute the Final Closing Date Balance Sheet.

    (e)    The parties agree that the firm chosen as the Additional Accounting Firm will agree expressly in the instrument of their engagement that the following procedures will be used by the Additional Accounting Firm in determining the Additional Accounting Firm Adjustments:

    (i)    Seller will provide to the Additional Accounting Firm copies of this Agreement, the Agreements set forth on Exhibit A, the Accounting Report and the Audited Closing Date Balance Sheet. The date upon which the Additional Accounting Firm receives such documents is referred to as the "Review Commencement Date."

    (ii)    Each of Buyer and Seller may make a single additional submission to the Additional Accounting Firm, which will not exceed twenty five (25) pages in length (including all exhibits and attachments), within thirty (30) days of the Review Commencement Date.

-8-

A-0612

(iii)    Each party shall be permitted to deliver to the Additional Accounting Firm a response to the submission of the other party described in Section 2.1 (e)(ii), which response, with all exhibits and attachments, shall not exceed five (5) pages. The responses contemplated by this Section 2. 1(e)(iii) will be delivered, if at all, within twenty (20) days of the respondent's receipt of the submission described in Section 2. 1(e)(ii).

(iv)    The Additional Accounting Firm shall review the documents submitted by the parties, and shall have the opportunity to ask specific written questions or request specific historical documents from either party to clarify its understanding of the submissions, including, if reasonably available, the work papers of KPMG relating hereto. The non-responding party may submit to the Additional Accounting Firm a written dissent of not more than five (5) pages to any response submitted by the other party to the Additional Accounting Firm.

(v)    Copies of any submission, response, or document submitted to or by the Additional Accounting Firm by or to a party as contemplated hereby will be submitted by the Additional Accounting Firm to the other party simultaneously or as soon as received, as the case may be.

(vi)    The Additional Accounting Firm will deliver its determination of remaining objections between Buyer and Seller and the Additional Accounting Firm Adjustments within sixty-five (65) days following the Review Commencement Date.

(f)    The fees and expenses of the Additional Accounting Firm shall be paid by Seller and Buyer in inverse proportion to their success. For example, if Buyer's objections were $1 million and the Additional Accounting Firm determined that $600,000 of such objections were valid, Buyer would be responsible for 40% of such fees and expenses.

Section 2.2    Calculation and Payment of Adjustment.

(a)    If the Price Adjustment Statement discloses a positive net change to the specific items included therein, then the amount of such positive net change (the "Positive Purchase Price Adjustment") shall be added to the Purchase Price. If the Price Adjustment Statement discloses a negative net change to the specific items included therein then the Purchase Price shall be reduced by the amount of such negative net change (the "Negative Purchase Price Adjustment").

(b)    Not later than three (3) Business Days after the determination of the Final Closing Date Balance Sheet (such third Business Day being the "Purchase Price Adjustment Due

-9-

A-0613

Date"), Buyer shall pay to Seller by wire transfer of immediately available funds to such bank account as Seller shall designate in writing to Buyer, the Positive Purchase Price Adjustment, if any, plus interest thereon from the Closing Date through the date of payment at the Agreed Rate.  In the event that Buyer does not pay the Positive Purchase Price Adjustment on or before the Purchase Price Adjustment Due Date, then Buyer shall pay Seller the sum of:

    (i)    the Positive Purchase Price Adjustment; plus

    (ii)    interest on the Positive Purchase Price Adjustment from the Closing Date through the Purchase Price Adjustment Due Date at the Agreed Rate; plus

    (iii)    interest on the sum of the amounts specified in clauses (i) and (ii) of this Section 2.2(b) from the Purchase Price Adjustment Due Date through the date of payment at a rate equal to the Agreed Rate plus five percent (5%).

    (c)    On or before the Purchase Price Adjustment Due Date, Seller shall pay to Buyer, by wire transfer of immediately available funds to such bank account as Buyer shall designate in writing to Seller, the Negative Purchase Price Adjustment, if any, plus interest thereon from the Closing Date through the date of payment at the Agreed Rate.  In the event that Seller does not pay the Negative Purchase Price Adjustment on or before the Purchase Price Adjustment Due Date, then Seller shall pay Buyer the sum of:

    (i)    the Negative Purchase Price Adjustment; plus

    (ii)    interest on the Negative Purchase Price Adjustment from the Closing Date through the Purchase Price Adjustment Due Date at the Agreed Rate; plus

    (iii)    interest on the sum of the amounts specified in clauses (i) and (ii) of this Section 2.2(c) from the Purchase Price Adjustment Due Date through the date of payment at a rate equal to the Agreed Rate plus five percent (5%).

    (d)    In no event shall the Purchase Price Adjustment Due Date be less than 90 days after the Closing Date.

    Section 2.3    Adjustment of Purchase Price Allocation.  The amount of any adjustment to the Purchase Price payable pursuant to Section 2.2 hereof and due to an increase or decrease in value of one of the categories of Purchased Assets or Assumed Liabilities as to which the Purchase Price, as provided in any Sale Agreements, has been allocated (other than intangible assets) shall be allocated to or deducted from each such category of Purchased Assets or Assumed Liabilities in an

A-0614

amount equal to the actual increase or decrease occurring with respect to that particular category of Purchased Asset or Assumed Liability. Any difference between the total amount of the adjustment to the Purchase Price and the amount of such adjustment due to changes in value of the tangible Purchased Assets or Assumed Liabilities as to which the Purchase Price has been otherwise allocated, shall be allocated to or deducted from intangible assets.

## ARTICLE 3.

## FINANCIAL STATEMENTS

Section 3.1    Financial Statements.    Attached to this Agreement as Exhibit B is a copy of the audited combined statements of assets, liabilities and shareholders' equity and audited combined statements of operations of the Business at and for the years ended June 30, 1998 and 1999, together with the notes thereto and the independent auditors' reports thereon, including the audited balance sheet of the Business as at June 30, 1999 together with the notes thereto (the "June 30, 1999 Balance Sheet"). Seller will deliver by May 19, 2000, a copy of the unaudited combined statements of assets, liabilities and shareholders' equity and combined statements of operations of the Business at and for the nine months ended March 31, 2000, including the unaudited balance sheet of the Business as at March 31, 2000 together with the notes thereto (the "March 31, 2000 Balance Sheet"). The financial statements attached hereto as Exhibit B and to be delivered by Seller pursuant to this Section 3.1 are referred to collectively as the "Financial Statements".

Section 3.2    Representation and Warranty.    Seller hereby represents and warrants to Buyer that the Financial Statements have been prepared from the books and records of the Business and have been restated as described in the notes thereto. Subject to the matters described in the last sentence of this Section 3.2 and the qualifications set forth in the applicable auditors' reports and notes to the Financial Statements, the Financial Statements fairly present, in all material respects, and on a consistent basis (except as described in the applicable notes) the financial position and results of operations of the Business at the dates and for the periods covered (in conformity with U.S. generally accepted accounting principles).

-11-

A-0615

# ARTICLE 4.

## INDEMNIFICATION

Section 4.1    Indemnification by Seller.

(a)    Subject to Sections 4.1(b), 4.1(c) and 4.1(d), Seller agrees to indemnify and hold Buyer and Buyer's Affiliates harmless from and against any and all Losses and Expenses incurred by Buyer and Buyer's Affiliates in connection with or arising from:

(i)    any breach by Seller or the International Sellers of any of their respective covenants and agreements in the Sale Agreements or in this Agreement;

(ii)    any breach of any warranty or the inaccuracy of any representation of Seller or the International Sellers contained in the Sale Agreements or in this Agreement, but not including the representations and warranties contained in Section 5.19(h) of the U.S. Agreement or the corresponding sections of the other Sale Agreements, in each case without regard to "materiality" or Material Adverse Effect;

(iii)    (A) Taxes levied in relation to (or attributable to) the Business on or prior to the Closing Date or subsequent to the Closing Date but relating to periods ending on or prior to and including the Closing Date or attributable to operations through the Closing Date, but only insofar as such Taxes have not been reflected or reserved against in the Final Closing Date Balance Sheet; (B) taxes for which PDGNB or any Subsidiary is liable under § 1.1502-6 of the U.S. Treasury Regulations (or any analogous provision of state, local or foreign law); (C) liabilities of PDGNB or any Subsidiary under Section 4062(a) of ERISA; (D) any income taxes attributable to the making of a Section 338(h)(10) Election; (E) any Tax allocation or Tax sharing or similar agreement, as a transferee or successor, by contract or otherwise binding on Seller or any of its Affiliates; and (F) any Taxes attributable to any adjustment to taxable income as a result of (i) any deferred intercompany gain described in Treasury Regulation Sections 1.1502-13 or former Treasury Regulation Section 1.1502-14 (or any corresponding or similar provision or administrative rule of federal, state, local or foreign law), (ii) any excess loss account described in Treasury Regulation Sections 1.1502-19 and 1.1502-32 (or any corresponding or similar provision or administrative rule of federal, state, local or foreign law), or (iii) an adjustment under

-12-

A-0616

Section 482 of the Code (or any corresponding or similar provision or administrative rule of federal, state, local or foreign law);

(iv)    any breach by Seller or any of the International Sellers of any covenant contained in <u>Section 12.2</u> of the U.S. Agreement or the corresponding provisions in the other Sale Agreements;

(v)    any claim for injury to person or property occurring or allegedly occurring at an Adjoining Property, but only to the extent that (A) such claim arises from or is attributable to the activities or operations of the Business by PDGNB, any Subsidiary, or any International Seller prior to the Closing Date, and (B) such claim arises from any Release of Contaminants or violation of any Environmental Law on the Real Property;

(vi)    any breach or inaccuracy of the representation and warranty contained in <u>Section 5.19(h)</u> of the U.S. Agreement or the corresponding provisions of the other Sale Agreements;

(vii)    any assets or liabilities retained by Seller or its Affiliates under the ROW Agreements; or

(viii)    an amount of Taxes equal to any amount of Taxes accrued on the March 31, 2000 Balance Sheet to the extent that such Tax accrual exceeds the amount of Taxes properly accrued as of such date under U.S. generally accepted accounting principles applied consistently with past practice.

(b)    Notwithstanding anything to the contrary contained herein:

(i)    Seller shall be required to indemnify and hold Buyer and Buyer's Affiliates harmless for any claims asserted under clause (ii) of <u>Section 4.1(a)</u> of this Agreement with respect to any Losses and Expenses incurred by Buyer only with respect to individual claims that exceed One Hundred and Fifty Thousand United States Dollars (US $150,000) (provided that separate claims arising from the same occurrence shall be considered as one individual claim) ("<u>Qualifying Claim</u>") and then only to the extent that such Qualifying Claim, individually or in the aggregate with other Qualifying Claims, exceeds Five Million Five Hundred Thousand United States Dollars (US $5,500,000);

-13-

(ii)     the aggregate amount required to be paid by Seller pursuant to Sections 4.1 (a)(i), (ii) and (iv) shall not exceed the Purchase Price less any amount previously paid by Seller pursuant to Sections 4.1(a)(v) and (vi);

(iii)    the limitations in (i) and (ii) shall not apply to breaches of Sections 4.1, 4.2, 4.6, 5.1 or 5.2 of the U.S. Agreement and the corresponding provisions of the other Sale Agreements; and

(iv)     the aggregate amount required to be paid by Seller pursuant to Sections 4.1 (a)(v) or 4.1 (a)(vi) shall not exceed forty million United States Dollars (US $40,000,000), provided, however, that the amount of any claim under Section 4.1 (a)(v) (but not Section 4.1(a)(vi)) shall be calculated by multiplying the amount of the Losses and Expenses constituting such claim by 0.8. For the avoidance of doubt, it is the intention of the parties that Buyer shall be entitled to collect eighty percent (80%) of any and all Losses and Expenses constituting claims under Section 4.1 (a)(v) pursuant to the indemnification provided in this Agreement, it being the further intention of the parties that Buyer or its Affiliates must contribute twenty percent (20%) of the Losses and Expenses constituting any claim under Section 4.1 (a)(v);

(v)      no indemnity shall be provided by Seller with respect to Losses and Expenses arising from or relating to the Savanna Sites, except for the indemnity provided in Section 4.1(a)(ii) with respect to the breach of the representations and warranties contained in the following sections of the U.S. Agreement: Sections 5.10(a), (e), and (d)(i) (as applied to the Owned Real Property included in the Savanna Sites), and Section 5.19(i);

(vi)     no indemnity shall be provided by Seller with respect to Losses and Expenses arising from any discontinuation of operations or closure of facilities at any of the Real Property on or after the Closing Date;

(vii)    no claim for indemnification may be brought by Buyer or its Affiliates under Section 4.1(a)(ii) or (vi) for breach of any representation or warranty contained in the U.S. Agreement if such claim could also be asserted under Section 4.1(a)(v). In determining whether any claim could be asserted under Section 4.1(a)(v), no consideration shall be given to the limitations set forth in Section 4.1(b)(iv); and

-14-

A-0618

(viii)    no indemnity shall be provided by Seller pursuant to Section 4.1(a)(v) for Losses and Expenses arising from those matters identified in Schedule 4.1(A)(v) hereto, which are those Releases on the Real Property which are reasonably likely to have an impact on any Adjoining Property.

(c)    The indemnification provided for in this Section 4.1 shall terminate two (2) years after the Closing Date (and no claims shall be made by Buyer thereafter), except that:

(i)    the indemnification by Seller shall continue as to the representations and warranties contained in Section 5.8 of the U.S. Agreement (and the corresponding provisions of the other Sale Agreements) and the indemnity provided pursuant to clauses (iii)(A), (iii) (D), (iii)(E) and (viii) of Section 4.1(a) until the expiration of the applicable statute of limitations;

(ii)    the indemnification by Seller shall continue as to the indemnity provided pursuant to clauses (i), (iii) (B), (C) and (F), (iv) and (vii) of Section 4.1(a) indefinitely; and

(iii)    the indemnification by Seller as to any event, fact or circumstance of which Buyer has notified Seller or the International Sellers in accordance with the requirements of Section 4.3 on or prior to the date such indemnification would otherwise terminate in accordance with this Section 4.1 shall continue until the liability of Seller shall have been determined pursuant to this Article 4 and Seller shall have reimbursed Buyer for the full amount of all Losses and Expenses in accordance with this Article 4.

(d)    Notwithstanding anything to the contrary contained herein, in any Sale Agreement, or in any other document, Buyer and Buyer's Affiliates shall not be entitled to indemnification under Section 4.1(a) with respect to (i) a breach of covenant or agreement or breach or inaccuracy of any representation or warranty of Seller or an Affiliate of Seller in the Sale Agreements to the extent that Buyer or Buyer's Affiliates (which shall include Buyer's and Buyer's Affiliates' officers, employees, counsel, and authorized representatives) had knowledge of such breach as of the Closing Date (it being understood that, for purposes of this Section 4.1(d) only, Buyer shall be deemed to have knowledge of the material contained in the Data Room, a true and correct copy of which will be provided by Seller to Buyer) or (ii) any adjustment already taken into account in determining the Final Closing Date Balance Sheet.

Section 4.2    Indemnification by Buyer.

-15-

(a)     Subject to Sections 4.2(b), 4.2(c), and 4.2(d), Buyer agrees to indemnify and hold Seller and the International Sellers and their Affiliates harmless from and against any and all Losses and Expenses incurred by Seller or the International Sellers and their Affiliates in connection with or arising from:

      (i)     any breach by Buyer of any of its covenants or agreements in the Sale Agreements or in this Agreement;

      (ii)     any breach of any warranty or the inaccuracy of any representation of Buyer contained in the Sale Agreements, in each case without regard to "materiality" or Material Adverse Effect; or

      (iii)     any breach by Buyer of any covenant contained in Section 11.1 or Section 12.2 of the U.S. Agreement or the corresponding provisions in the other Sale Agreements.

(b)     Notwithstanding anything to the contrary contained herein:

      (i)     Buyer shall be required to indemnify and hold Seller and the International Sellers and their Affiliates harmless for any claims asserted under clause (ii) of Section 4.2(a) with respect to any Losses and Expenses incurred by Seller or the International Sellers only with respect to Qualifying Claims and then only to the extent that such Qualifying Claims, individually or in the aggregate with other Qualifying Claims, exceeds Five Million Five Hundred Thousand United States Dollars (US $5,500,000); and

      (ii)     the aggregate amount required to be paid by Buyer pursuant to Section 4.2(a) shall not exceed the Purchase Price;

      (iii)     the limitations in (i) and (ii) shall not apply to breaches of Sections 6.1, 6.2 or 6.7 of the U.S. Agreement and the corresponding provisions of the other Sale Agreements.

(c)     The indemnification provided for in this Section 4.2 shall terminate two (2) years after the Closing Date (and no claims shall be made by Seller or the International Sellers thereafter), except that:

      (i)     the indemnification by Buyer shall continue as to the indemnity provided pursuant to clauses (i) and (iii) of Section 4.2(a) indefinitely; and

-16-

A-0620

(ii)    the indemnification by Buyer as to any event, fact or circumstance of which Seller or the International Sellers have notified Buyer in accordance with the requirements of Section 4.3 on or prior to the date such indemnification would otherwise terminate in accordance with this Section 4.2 shall continue until the liability of Buyer shall have been determined pursuant to this Article 4 and Buyer shall have reimbursed Seller and the International Sellers for the full amount of all Losses and Expenses in accordance with this Article 4.

(d)    Notwithstanding anything to the contrary contained herein, in any Sale Agreement, or in any other document, Seller and the International Sellers shall not be entitled to indemnification under Section 4.2(a) with respect to a breach of covenant or agreement or breach or inaccuracy of any representation or warranty of Buyer in the Sale Agreements to the extent that Seller or the International Sellers (which shall include Seller's and the International Sellers' officers, employees, counsel, and authorized representatives) had knowledge of such breach as of the Closing Date. It is understood that for purposes of this Section 4.2(d), Seller shall be deemed to have knowledge of any information contained in written due diligence material provided by Buyer to Seller.

Section 4.3    Notice of Claims.

(a)    No party hereto shall be liable for any claim for indemnification under this Article 4 unless written notice of each claim ("Claim Notice") is delivered by the party seeking indemnification (the "Indemnified Party") to the party from whom indemnification is sought (the "Indemnitor") prior to the expiration of the applicable survival period. All Claim Notices shall describe in reasonable detail the facts (to the extent then known) giving rise to any claim for indemnification hereunder and shall include in such Claim Notice (if then known) the amount or the method of computation of the amount of such claim, and a reference to the provision of this Agreement or any other agreement, document or instrument executed hereunder or in connection herewith upon which such claim is based; provided that a Claim Notice in respect of any Action or other claim by or against a third Person as to which indemnification will be sought shall be given within twenty-one (21) days after the Indemnified Party receives summons, process, or other notice of such Action or other claim, provided, further that failure to give such notice shall not release the Indemnitor from its obligations hereunder, except to the extent such failure actually prejudices the Indemnitor.

(b)    In calculating any Losses or Expenses, there shall be deducted any insurance recovery received or entitled to be received by Buyer or Seller in respect thereof, and the Indemnitor shall be entitled to the tax benefit of with respect to such Loss or Expense, and the Indemnified Party shall pay to the Indemnitor the amount of such tax benefit at such time or times as and to the extent that the Indemnified Party or any affiliate of Indemnified Party actually realizes such benefit through a refund of tax or reduction in the amount of taxes which the Indemnified Party or any affiliate of Indemnified Party would otherwise have had to pay if such adjustment had not been made,

-17-

A-0621

calculated by computing the amount of Taxes before and after inclusion of any items of Loss or Expense for which indemnification was made; provided that, any such tax benefit shall be reduced by the amount of tax detriment that the Indemnified Party suffered as a result of any Loss or Expense.

Section 4.4    **Third Person Claims**.  The Indemnitor may elect, but shall not be required, to conduct and control, through counsel of its choosing and reasonably satisfactory to the Indemnified Party, the defense, compromise or settlement of any third Person Action or other claim against an Indemnified Party as to which indemnification will be sought by such Indemnified Party from such Indemnitor hereunder, and the Indemnified Party hereby appoints the Indemnitor as its agent and attorney-in-fact for such purpose.  In any case with respect to which the Indemnitor has elected to conduct or control the defense thereof, the Indemnified Party shall cooperate fully in connection therewith and shall furnish such personnel, records, information and testimony and attend such conferences, discovery proceedings, hearings, trials and appeals as may be reasonably requested by the Indemnitor in connection therewith; provided that the Indemnified Party may participate, through counsel chosen by it and at its own expense, in the defense of any such Action or other claim, however, the Indemnitor and its counsel shall control such defense.  The Indemnitor shall not, without the written consent of the Indemnified Party, pay, compromise or settle any such Action or other claim, except that the Indemnitor shall have the right to pay, settle or compromise any Action or other claim involving only money damages without the consent of the Indemnified Party, unless such Indemnified Party provides to the Indemnitor an opinion of counsel to the effect that the proposed settlement would adversely affect the post-Closing tax liability of the Indemnified Party, in which case the Indemnitor shall not pay, compromise, or settle such Action or other claim without the written consent of the Indemnified Party which consent shall not be unreasonably withheld.

Section 4.5    **Exclusivity of Remedy**.  Except as set forth in Section 9.3 of the U.S. Agreement and the corresponding provisions of the other Sale Agreements, with respect to any breach by any party of its representations, warranties, covenants, or agreements in this Agreement, the Sale Agreements and the agreements, instruments, and documents being or to be executed and delivered hereunder or thereunder, the sole and exclusive remedy of the other party and its Affiliates (in law, equity, contract, tort, for contribution, under Requirements of Law, or otherwise) shall be the indemnification provided in this Article 4.  In view of this exclusivity of remedy provision, Buyer and Seller covenant and agree for themselves and their respective Affiliates that they will not bring, maintain, join, or prosecute any Action or other proceeding against the other or its Affiliates for breach of the Sale Agreements or indemnity therefor except as provided in this Agreement.  The initiation or maintenance of any Action by any Affiliate of Buyer or Seller in contravention of this Section 4.5 will constitute a breach by the Buyer or the Seller, as the case may be, of their covenant hereunder.

Section 4.6    **Adjustment to Purchase Price**.  If Buyer or Seller makes any payment pursuant to this Article 4, then such amount shall be treated as an adjustment to the Purchase Price. If a payment by Buyer or Seller is not treated as an adjustment to the Purchase Price due to a Tax audit by a Tax authority, such payment shall be grossed up for the tax effect to such recipient so that

-18-

A-0622

the amount of payment is after taxes. The payor shall have the sole right to control the Tax audit referenced in this Section 4.6 with respect to such payment.

## ARTICLE 5.

## COORDINATING MATTERS

Section 5.1    Taxes. On a world-wide basis, all Taxes, recording fees, personal property taxes, title application fees, patent and trademark assignment registration fees, and such other transfer taxes and fees arising by virtue of the transfer of the Purchased Assets from Seller or the International Sellers, as the case may be, to Buyer pursuant to the Sale Agreements (other than Taxes based upon the net income or capital gain of Seller or their Affiliates arising out of the transactions contemplated thereby) shall be paid as follows: (i) Buyer shall pay the first Two Million United States Dollars (US $2,000,000) of such Taxes plus any transfer taxes resulting from the making of a Section 338(h)(10) Election and (ii) Seller shall pay the amount of such Taxes in excess of the amounts to be paid by Buyer pursuant to Section 5.1(i).

Section 5.2    Venue; Submission to Jurisdiction; Governing Law. For purposes of this Agreement, the Sale Agreements, and the transactions contemplated hereby and thereby (but not for the purposes of enforcing any guaranty of the indemnity obligations of the Seller pursuant to Article 4 of this Agreement (a "Guaranty Agreement")), each of the parties hereto (for themselves and for their Affiliates) agrees that any and all disputes, legal actions, suits, or proceedings arising out of or relating to claims arising under this Agreement, the Sale Agreements, or the transactions contemplated hereby and thereby, whether legal or equitable in nature, or arising out of contract, tort, Requirements of Law, for contribution or otherwise, shall be brought solely in a state or federal court located in the County of Cook, State of Illinois. By their signature to this Agreement, the parties, regardless of their residence, each irrevocably submits to the jurisdiction of the courts located in the County of Cook, State of Illinois, in any dispute, legal action, suit or proceeding arising out of or relating to this Agreement, the Sale Agreements, or the transactions contemplated hereby or thereby other than any Guaranty Agreement. Each of the parties acknowledges that it has freely agreed to so submit to jurisdiction and venue, and that without such agreement the courts located in the County of Cook, State of Illinois might not otherwise have jurisdiction over each of such parties. This Agreement and the Sale Agreements shall be governed by and construed in accordance with the internal laws of the State of Illinois, without giving effect to any choice of law provisions which may direct the application of the laws of another jurisdiction. The initiation or maintenance of any Action by any Affiliate of Buyer or Seller in contravention of this Section 5.2 will constitute a breach by the Buyer or the Seller, as the case may be, of their covenant hereunder.

Section 5.3    Waiver. For purposes of this Agreement, the Sale Agreements, and the transactions contemplated hereby and thereby other than any Guaranty Agreement, each of the parties hereby irrevocably waives all claims of immunity from jurisdiction, attachment and execution to which it might otherwise be entitled in any legal action or proceeding brought in any state or

-19-

A-0623

federal court located in the County of Cook, State of Illinois, and further irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to any dispute, legal action, suit or proceeding arising out of or relating to this Agreement, the Sale Agreements, or the transactions contemplated hereby and thereby being brought in any federal or state court located in the County of Cook, State of Illinois, and hereby further irrevocably waives any claim that any such dispute, legal action, suit, or proceeding brought in any such court has been brought in an inconvenient forum.

Section 5.4    Agent for Service of Process.  For purposes of this Agreement, the Sale Agreements, and the transactions contemplated hereby and thereby, other than any Guaranty Agreement, each of the parties hereby irrevocably appoints The Corporation Trust Company, whose address is 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604, as its designated agent for service of process in the State of Illinois upon whom may be served any notice, process or pleading in any dispute, legal action, suit or proceeding arising out of or relating to this Agreement, the Sale Agreements, or the transactions contemplated hereby and thereby, other than any Guaranty Agreement, and each further consents that service of process on such designated agent shall have the same effect as if it had lawfully been served personally with process in the State of Illinois; provided, that such appointment may be terminated after the tenth (10th) anniversary of the Closing Date.

Section 5.5    Actions Prior to the Closing Date.  Seller and the International Sellers covenant and agree to take, or cause their Affiliates, including, without limitation, PDGNB and the Subsidiaries, (collectively, the "Seller Entities") to take, and Buyer covenants and agrees to take, or cause its Affiliates to take, the following actions between the date hereof and the Closing Date:

(a)    Each party shall afford to the officers, employees and authorized representatives of the other party (and, in the case of Buyer, its financing sources and their representatives) reasonable access to its personnel, offices, properties, and business and financial records to the extent reasonably necessary and to furnish to the other party or its authorized representatives (and, in the case of Buyer, its financing sources and their representatives) such additional information concerning its assets, liabilities or operations as shall be reasonably requested. Such access shall be granted during normal business hours and upon reasonable advance notice.

(b)    The Seller Entities acknowledge and agree that their participation and cooperation will be required in order for Buyer to obtain the financing necessary to fund all or any portion of the Purchase Price and the Seller Entities covenant and agree to use their best efforts to participate and cooperate with Buyer to cause any reasonable conditions to Buyer's receipt of its financing to be fulfilled, including, without limitation, promptly taking any action or promptly furnishing any information requested by Buyer in connection therewith, including: (a) furnishing information, including financial statements and projections of the Business; (b) participating in the preparation of any offering circular, offering memorandum, private placement memorandum, prospectus, registration statement, proxy statement or other similar documents; (c) participating in the preparation of a road show or any similar marketing materials and making available appropriate

-20-

A-0624

officers of the Business for participation therein; and (d) making available requested due diligence materials and appropriate officers and employees for participation in discussions in connection therewith.

(c)    The Seller Entities shall not (and shall not permit any of their representatives or advisors to) (i) solicit, initiate, or encourage the submission of any proposal or offer from any Person relating to the acquisition of any stock or assets constituting part of the Business (including any acquisition structured as a merger, consolidation, or share exchange) or (ii) participate in any discussions or negotiations regarding, furnish any information with respect to, assist or participate in, or facilitate in any other manner any effort of attempt by any Person to do or seek any of the foregoing. No Seller Entity shall vote any shares of capital stock, including, but not limited to, the Shares, in favor of any such acquisition structured as a merger, consolidation, or share exchange. Seller shall immediately notify Buyer if any Person makes any proposal, offer, inquiry, or contact with respect to any of the foregoing.

(d)    Buyer shall not (and shall not permit any of its representatives or advisors to) solicit, initiate or encourage the submission of any proposal or offer from any Person relating to the acquisition of more than 40% of the voting securities of, or all or substantially all of the assets of, Buyer (including any acquisitions structured as a merger, consolidation or share exchange). Buyer shall immediately notify Seller if any Person makes any proposal, offer, inquiry or contact with respect to any of the foregoing.

(e)    Buyer and Seller covenant and agree that not later than June 19, 2000, the International Buyers and the International Sellers will enter into Sale Agreements to effect (i) the transfer of businesses affiliated with the Subsidiaries that are operated in Australia, New Zealand, U.K., Europe, the People's Republic of China, Hong Kong, Singapore, and India as further described in the chart dated April 24, 2000 and titled "Structure of GNB Worldwide" provided by Seller to Buyer and (ii) the transfer of certain trademarks. These agreements are referred to herein as the "ROW Agreements." Buyer and Seller further covenant and agree that: (i) the ROW Agreements will provide for closing of the transactions contemplated thereby simultaneously with the Closing, and (ii) the substantive provisions of the ROW Agreements will parallel the substantive provisions of this Agreement, modified only for compliance with local law. The ROW Agreement covering the sale of that portion of the business located in Australia shall contain a covenant not to compete from the sellers thereunder, which covenant not to compete shall be on generally the same terms and conditions as the covenant not to compete contained in Section 6 of this Agreement, including, without limitation, with respect to the global scope and five-year duration of such covenant not to compete. Upon execution of the ROW Agreements, Buyer shall cause the International Buyers and Seller shall cause the International Sellers to become parties to this Agreement by executing and delivering signature pages to this Agreement. Upon such execution and delivery, the International Buyers and the International Sellers will be subject to the obligations imposed on them and entitled to the benefits afforded to them by this Agreement.

(f)    Buyer and Seller covenant and agree that not later than June 12, 2000:

-21-

A-0625

(i)    Seller shall deliver final Disclosure Schedules to the U.S. Agreement and to this Agreement as contemplated by Section 5.7 hereof;

(ii)    Buyer and Seller shall agree on the ROW Business Allocation as set forth in the U.S. Agreement; and

(iii)    Buyer shall have determined whether or not it will make the 338(h)(10) Election.

Section 5.6    Buyer's Conditions to Closing.    Notwithstanding any provision to the contrary herein or in any Sale Agreement, the obligations of Buyer and the International Buyers under this Agreement and each Sale Agreement shall be subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions:

(a)    Buyer shall have obtained the financing necessary to consummate the transactions contemplated hereby and such financing shall not have been terminated or withdrawn and all of the conditions precedent to Buyer's receipt of such financing shall be satisfied or waived in writing, including, without limitation, that there shall have been a roadshow completed by Buyer and its financing sources (with the assistance of Seller) with respect to the sale by Buyer of senior subordinated notes (or other securities) to fund a portion of the Purchase Price.

(b)    Prior to the Closing Date, all of the obligations reflected in the item "Closure, restructuring and other reserves" in the March 31, 2000 Balance Sheet shall have been fully performed by Seller and the International Sellers.

Section 5.7.    Due Diligence Termination Right.

(a)    Notwithstanding any provision to the contrary herein or in any Sale Agreement, at any time on or prior to June 19, 2000, Buyer may terminate this Agreement and the Sale Agreements if Buyer and its financing sources, in their sole judgment, are not satisfied in all respects with the results of their due diligence review of all or any part of the Business, including, without limitation, their review of business, financial, legal, environmental and accounting matters relating to the Business.  It is expressly understood by the parties hereto: (i) that, as of the date of this Agreement, Buyer has not reviewed the Disclosure Schedules to the U.S. Agreement and to this Agreement provided by Seller and therefore Buyer's rights under this paragraph shall not be limited in any manner by any disclosure in such Disclosure Schedules as they existed on the date hereof or as modified pursuant to (ii) below; (ii) that at any time on or prior to June 12, 2000 , Seller shall be entitled to provide to Buyer modified Disclosure Schedules to the U.S. Agreement and to this Agreement which Disclosure Schedules, as modified, will constitute the final Disclosure Schedules to the U.S. Agreement (except for Schedule 5.19(J) to the U.S. Agreement, which may be updated through the Closing) and to this Agreement; and (iii) that Buyer's right to terminate this Agreement pursuant to this Section 5.7 shall include the right to terminate if Buyer is not satisfied, in its sole

-22-

discretion, with the Disclosure Schedules to the U.S. Agreement and to this Agreement as they exist on the date hereof or as they may be modified pursuant to (ii) of this Section 5.7.

(b)    Notwithstanding any provision to the contrary herein or in any Sale Agreement, at any time on or prior to June 19, 2000, Seller may terminate this Agreement and the Sale Agreements if Seller, in its reasonable judgment, determines during its due diligence review of all or any part of the Buyer's business, including without limitation, its review of business, financial, legal, environmental and accounting matters relating to the Buyer's business, that any of the matters disclosed during such review would have an adverse effect on the value of the Buyer Shares.

## ARTICLE 6.

## COVENANT NOT TO COMPETE

Section 6.1    Non-Competition.  Seller hereby agrees, for itself and its Affiliates that neither it nor any of its Affiliates shall, directly or indirectly during the period of time commencing on the date hereof and continuing until five (5) years from the Closing Date (the "Non-Compete Period"), whether alone or together in association with others, and whether as a principal, agent, owner, shareholder, officer, director, partner, member, manager, operator, employee, proprietor, investor, independent contractor, licensor, licensee, co-venturer, consultant, or in any other capacity whatsoever, engage in the Business or invest in, or have a financial interest in, or be in any way affiliated with, any Person engaged in the Business, anywhere in the world.  Seller agrees with Buyer that the geographic scope of this covenant not to compete is the result of arm's length bargaining and is fair and reasonable in light of the nature of the operations of the Business and the fact that some or all facets of the Business have competed with competitors throughout the world.  The parties intend that the covenant contained in this Article 6 shall be construed as a covenant not to compete that is enforceable under applicable law.  If in any judicial proceeding a court of competent jurisdiction shall refuse to enforce the foregoing covenant not to compete according to its terms, the parties shall negotiate in good faith to modify or limit the scope of this covenant in a manner they believe, after consultation with their respective counsel, will result in the covenant being enforced in the pending judicial proceeding, it being the intent of this provision that Buyer shall at all times have the benefit of the foregoing covenant not to compete, except to the extent as may be required to be limited or modified by applicable law or a judgment of a court or competent jurisdiction.

Section 6.2    Intellectual Property.  Commencing on the Closing Date and continuing in perpetuity, Seller shall not use, and shall cause its Affiliates not to use, any Intellectual Property, except to the extent that such Intellectual Property: (i) must be disclosed to comply with applicable laws and regulations, (ii) becomes known to the public, before or after disclosure to Buyer, other than by act or omission of Seller or its Affiliates, (iii) is lawfully disclosed to Seller by a Person having the right to disclose it to Seller, or (iv) is otherwise in the public domain.

Section 6.3    Customer Information.  Seller acknowledges and agrees that all customer information (including but not limited to lists or billing information) of PDGNB and the Subsidiaries

-23-

A-0627

(the "Customer Information") is confidential and proprietary to such entity. Following the Closing, Seller agrees to refrain from and to cause each of its Affiliates to refrain from, utilizing any and all Customer Information for any purpose involving competition with Buyer, including without limitation marketing or selling such information.

Section 6.4    Remedy. The parties hereto acknowledge and agree that the covenants contained in this Article 6 are reasonable and necessary for the protection and continued viability of the Business and that a breach of such covenants would cause Buyer serious loss and damage. The parties agree that in the event of an actual or threatened breach of such covenants, Buyer shall be entitled to obtain an injunction restraining Seller or any of its Affiliates from violating or continuing to violate such covenants. Nothing herein shall be construed from prohibiting Buyer from pursuing such other remedies as may be available to it for such breach, including the recovery of damages.

## ARTICLE 7.

## MISCELLANEOUS

Section 7.1    Notice. Any notice, request, instruction or other document to be given hereunder shall be in writing and: (a) delivered personally; (b) sent by Federal Express or other similarly reputable overnight courier; or (c) transmitted by facsimile, according to the instructions set forth below. Such notices shall be sent to the following addresses and/or facsimile numbers and shall be deemed given: (x) if delivered personally, at the time delivered; (y) if sent by Federal Express or other similarly reputable overnight courier, at the time delivered to such courier, or (z) if transmitted by facsimile, at the time when receipt is confirmed by the sending facsimile machine.

If to Seller or any of the International Sellers, to:

Pacific Dunlop Holdings (USA) Inc.
6121 Lakeside Drive, Suite 200
Reno, Nevada 89511
United States of America
Attention:    President
Facsimile:    702-824-4626

with a copy to:

Gardner, Carton & Douglas
321 N. Clark Street
Suite 3400
Chicago, Illinois 60610
United States of America
Attention:    Mr. Robert J. Wilczek

-24-

Facsimile:    312-644-3381
If to Buyer, to:

Exide Corporation
2901 Hubbard Road
Ann Arbor, MI 48105
United States of America
Attention:    General Counsel
Facsimile:    734-877-2575

with a copy to:

Kirkland & Ellis
200 E. Randolph Drive
Chicago, Illinois 60601
Attention:    Mr. Carter W. Emerson, P.C.
Facsimile:    312-861-2200

or to such other address as such party may indicate by a notice delivered to the other parties hereto in accordance with the provisions of this Section 7.1.

Section 7.2    Successors and Assigns.

(a)    Except as permitted by this Section 7.2, the rights of Buyer, Seller and the International Sellers pursuant to this Agreement or any of the Sale Agreements shall not be assignable by such party without the prior written consent of the other parties; provided, however, that no such assignment shall relieve the assigning party from any of its duties or obligations under this Agreement or any of the Sale Agreements.

(b)    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns. Nothing in this Agreement, express or implied, is intended or shall be construed to confer upon any Person other than the parties and successors and assigns permitted by this Section 7.2 any right, remedy, benefit or claim under or by reason of this Agreement.

Section 7.3    Entire Agreement; Amendments. This Agreement, the Sale Agreements and the other agreements and documents to be delivered pursuant to the Sale Agreements contain the entire understanding of the parties hereto with regard to the subject matter contained herein, and supersede all prior written or oral agreements, understandings or letters of intent between the parties hereto, with respect to the subject matter hereof. The Sale Agreements and all Schedules and Exhibits thereto are incorporated herein by this reference. This Agreement shall not be amended, modified or supplemented except by a written instrument signed by an authorized representative of

-25-

A-0629

each of the parties hereto.  In the event of a dispute or inconsistency between any of the Sale Agreements and this Agreement, the terms of this Agreement shall prevail.

Section 7.4    Interpretation.  Section headings are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

Section 7.5    Waivers.  Any term or provision of this Agreement may be waived, or the time for its performance may be extended, pursuant to a written action by the party entitled to the benefit thereof.  The failure of either party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of such party thereafter to enforce each and every such provision.  No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

Section 7.6    Partial Invalidity.  Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

Section 7.7    Execution in Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement, and shall become binding when one or more counterparts have been signed by each of the parties hereto and delivered to each of Seller and Buyer.

* * * * * *

-26-

# AMENDMENT NO. 1 TO
## COORDINATING AGREEMENT

This AMENDMENT NO. 1, dated June 19, 2000, is to that certain Coordinating Agreement dated as of May 9, 2000 (the "Agreement"), which was executed by and between Exide Corporation, a Delaware corporation ("Buyer"), and Pacific Dunlop Holdings (USA) Inc., a Delaware corporation ("Seller").

The parties have now determined that they desire to amend the Agreement as set forth herein. Therefore, the parties hereby agree as follows:

1.    Except as expressly amended hereby, the Agreement remains in full force and effect. Unless otherwise defined herein, capitalized terms used in this Amendment No. 1 shall have the meanings assigned to them in the Agreement.

2.    Exhibit A to the Agreement is hereby deleted and replaced in its entirety with Exhibit A attached to this Amendment.

3.    Section 4.2(a)(i) is hereby amended to insert the words "or, for sake of clarification, any International Buyer" after the word "Buyer" in the first line of such section.

4.    The following provision is added to the Agreement:

Section 5.8.    Representation regarding Trademarks.

Seller hereby represents and warrants that the Sale Agreements will convey to the Buyer or International Buyers all of the trademarks employed by Seller or its Affiliates in the Business immediately prior to the Closing.

5.    Sections 5.7(a) and (b) are hereby amended to replace the references to "June 19, 2000" therein to "June 28, 2000."

[THE REMAINDER OF THIS PAGE IS BLANK;
SIGNATURES APPEAR ON THE FOLLOWING PAGE]

HD1/12081776.4

IN WITNESS WHEREOF, the parties have duly executed this Amendment No. 1 on the date first above written.

EXIDE CORPORATION

By: _____
Name: _____
Title: _____

PACIFIC DUNLOP HOLDINGS (USA) INC.

By: _____
Name: _____
Title: _____

## Exhibit A

### Sale Agreements

Stock Purchase Agreement With Respect To Pacific Dunlop GNB Corporation dated as May 9, 2000 between Buyer and Seller.

Asset Purchase Agreement between Pacific Dunlop Holdings (N.Z.) Limited, as seller, and Exide New Zealand Limited, as buyer.

Asset Purchase Agreement between GNB Battery Technologies Limited, Australian Battery Company (Aust.) Pty Ltd, Pacific Dunlop Limited, as sellers, and Exide Australia Pty Limited, as buyer.

Stock Purchase Agreement with respect to GNB Technologies NV between P.D. International Pty Limited and Pacific Dunlop Holdings (Europe) Ltd, as sellers, and Exide Holding Europe, as buyer.

Stock Purchase Agreement with respect to GNB Technologies Limited between Pacific Dunlop Holdings (Europe) Ltd, as seller, and Exide Holding Europe, as buyer.

Stock Purchase Agreement with respect to GNB Technologies (China) Limited between Pacific Dunlop Holdings (Hong Kong) Limited, as seller, and Traeson Pte Ltd (to be renamed Exide Holding Asia Pte Limited), as buyer.

Asset Purchase Agreement between Pacific Dunlop Holdings (Singapore) Pte Ltd, as seller, and Bluewall Pte Ltd (to be renamed Exide Singapore Pte Limited), as buyer.

Stock Purchase Agreement with respect to GNB Technologies (India) Private Limited between Pacific Dunlop Holdings (Singapore) Pte Ltd, as seller, and Traeson Pte Ltd (to be renamed Exide Holding Asia Pte Limited) as buyer.

Trademark Purchase Agreement between PD Licencing Pty Ltd, as seller, and Exide Australia Pty Limited, as buyer.

A-0636

## AMENDMENT NO. 2 TO
## COORDINATING AGREEMENT

This AMENDMENT NO. 2, dated June 28, 2000, is to that certain Coordinating Agreement dated as of May 9, 2000, as amended by Amendment No. 1 thereto dated June 19, 2000 (the "Agreement"), which was executed by and between Exide Corporation, a Delaware corporation ("Buyer"), and Pacific Dunlop Holdings (USA) Inc., a Delaware corporation ("Seller").

The parties have now determined that they desire to amend the Agreement as set forth herein. Therefore, the parties hereby agree as follows:

1.     Except as expressly amended hereby, the Agreement, as amended, remains in full force and effect. Unless otherwise defined herein, capitalized terms used in this Amendment No. 2 shall have the meanings assigned to them in the Agreement.

2.     The following provisions are added to Section 4.1(a) of the Agreement:

(ix)     actions, arbitration proceedings, controversies or disputes arising out of or relating to that certain contract dated June 13, 1997 by and between GNB Technologies Inc. and Margulead Ltd., including, but not limited to, such actions, arbitration proceedings, controversies or disputes arising out of the termination, breach or alleged breach of such contract by GNB Technologies Inc. or its Affiliates; or

(x)     the failure of Seller's or its Affiliates' recordkeeping system regarding software licenses and maintenance services for such software to reflect accurately such software that is in use by Seller and its Affiliates and/or all maintenance agreements for maintaining such software.

3.     Section 4.1(b)(i) is hereby amended to pluralize the word "clause" in the second line thereof, and to add the words ", (ix) and (x)" after the word "(ii)" in the second line thereof.

4.     Section 4.1(b)(ii) is hereby amended to replace the word "and" in the second line with a comma and to insert the words ", (ix) and (x)" after the word "(iv)" in the second line thereof.

[THE REMAINDER OF THIS PAGE IS BLANK;
SIGNATURES APPEAR ON THE FOLLOWING PAGE]

A-0637

IN WITNESS WHEREOF, the parties have duly executed this Amendment No. 2 on the date first above written.

**EXIDE CORPORATION**

By: _____

Name: _____

Title: _____UP + General Counsel_____


**PACIFIC DUNLOP HOLDINGS (USA) INC.**

By: _____

Name:          Martin M. Hudson

Title:          Attorney-in-Fact


2

A-0638

IN WITNESS WHEREOF, the parties have duly executed this Amendment No. 2 on the date first above written.

EXIDE CORPORATION

By: _____
Name: _____
Title: _____

PACIFIC DUNLOP HOLDINGS (USA) INC.

By: _____
Name:        Martin M. Hudson
Title:        Attorney-in-Fact

2

A-0639

# AMENDMENT NO. 3 TO
# COORDINATING AGREEMENT

This AMENDMENT NO. 3, dated September 29, 2000, is to that certain Coordinating Agreement dated as of May 9, 2000 (the "Coordinating Agreement"), which was executed by and between Exide Corporation, a Delaware corporation ("Buyer"), and Pacific Dunlop Holdings (USA) Inc., a Delaware corporation ("Seller"), as amended by Amendment No. 1 dated June 19, 2000 and Amendment No. 2 dated June 28, 2000, is executed by and between Buyer and Seller.

The parties desire to supplement and amend the Coordinating Agreement to provide for a procedure intended to permit an efficient and expeditious closing of the transactions contemplated by the Stock Purchase Agreement upon the satisfaction of the conditions thereto.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    Except as expressly amended hereby, the Agreement, as previously amended on June 19, 2000 and June 28, 2000, remains in full force and effect.  Unless otherwise defined herein, capitalized terms used in this Amendment No. 3 shall have the meanings assigned to them in the Agreement.

2.    Section 1.1 is hereby amended to delete the existing definition of "Price Adjustment Statement" and to add the following definitions:

"Preliminary Price Adjustment Statement" has the meaning specified in Section 2.1(b)(i) of this Agreement.

"Price Adjustment Statement" means the Preliminary Price Adjustment Statement after giving effect to the Agreed Adjustments and the Additional Accounting Firm Adjustments, if any.

3.    Section 2.1(a) is hereby amended to delete the words "the Closing Date" where appearing as the last three words of the second line thereof, and replacing them with "September 30, 2000". It is the intention of the parties that no adjustment of the purchase price will result from events that occur after the close of business on the Closing Date, except for events occurring in the ordinary course of business.  Section 2.1(a) is further hereby amended to add the following language thereto as a new subsection (iv):

(iv)    reserves, in the following amounts, shall be created by Seller prior to Closing:

| | |
|---|---|
| Environmental | US$19,000,000 |
| Warranty reserves | 5,600,000 |
| Quicksmart (A/P and Accruals) | 800,000 |
| Medical Benefits (Accrued Exp) | 900,000 |

A-0640

| | |
|---|---|
| Inventory Obsolescence | 1,000,000 |
| FIFO Variances (Inventory) | 3,800,000 |
| **TOTAL** | **US$31,100,000** |

4.    Section 2.1(b) is hereby amended to change each reference to the "Price Adjustment Statement" to "Preliminary Price Adjustment Statement." Section 2.1(b) is further amended to add the following sentence to the end of such section: "The Parties expressly agree that the calculations set forth in the Preliminary Price Adjustment Statement will not give effect to any change in the price resulting from or relating to the reserves contemplated by Section 2.1(a)(iv) hereof."

5.    Section 2.1(c) is hereby amended to add the following language at the end of the last sentence thereof: ", and the Preliminary Price Adjustment Statement shall be final and binding as the Price Adjustment Statement."

6.    Section 2.1(d) is hereby deleted in its entirety and replaced with the following:

(d)    In the event Buyer objects within the Objection Period, then within thirty (30) days following Buyer's delivery to Seller of the certificate referenced in Section 2.1(c), (the "Resolution Period"), the Buyer and Seller shall use their reasonable efforts to resolve by written agreement (the "Agreed Adjustments") Buyer's objections to the Audited Closing Date Balance Sheet or the Preliminary Price Adjustment Statement. In the event that Seller and Buyer so resolve any such objections, the Audited Closing Date Balance Sheet and/or the Preliminary Price Adjustment Statement shall be adjusted by the Agreed Adjustments and, if all such objections have been resolved by Agreed Adjustments, the Audited Closing Date Balance Sheet and the Preliminary Price Adjustment Statement, as adjusted by the Agreed Adjustments, shall be final and binding as the Final Closing Date Balance Sheet and the Price Adjustment Statement. In the event any objections raised by Buyer are not resolved by Agreed Adjustments during the Resolution Period, then within ten (10) days following the end of the Resolution Period, the Seller and Buyer shall jointly select a national accounting firm acceptable to both Seller and Buyer (or if they cannot agree on such selection, a national accounting firm will be selected by lot after eliminating any accounting firm or firms that has or have acted as auditors, tax advisors, or consultants to Seller or Buyer or their respective Affiliates) (the "Additional Accounting Firm"). For purposes of the preceding sentence, only the following accounting firms shall be considered national accounting firms: Ernst & Young LLP and Deloitte & Touche LLP. The terms of the engagement of the Additional Accounting Firm shall be the terms set forth in Section 2.1(e). The Additional Accounting Firm shall review and resolve any remaining objections as to which Buyer and Seller have not reached Agreed Adjustments and deliver, in no event later than sixty-five (65) days following the Review Commencement Date (as defined in Section 2.1(e)(i)) (time being of the essence), written notice to each of Buyer and Seller setting forth:

(i)     its determination of such remaining objections; and

(ii)     the adjustments, if any, to the Audited Closing Date Balance Sheet and/or the Preliminary Price Adjustment Statement (the "Additional Accounting Firm Adjustments").

The Audited Closing Date Balance Sheet as so determined but after giving effect to the Agreed Adjustments and to the Additional Accounting Firm Adjustments shall constitute the Final Closing Date Balance Sheet. The Preliminary Price Adjustment Statement as so determined but after giving effect to the Agreed Adjustments and to the Additional Accounting Firm Adjustments shall constitute the Price Adjustment Statement.

7.     Section 5.1 is hereby amended to insert the following sentence to the end thereof: "Notwithstanding the foregoing, Seller shall not be responsible for paying Taxes in an amount equal to the excess (if any) of (i) the Taxes actually incurred in respect of the purchase in Australia by Buyer or one of Buyer's Affiliates of the Receivables, as defined in the agreement listed third on Exhibit A attached to this Agreement, pursuant to such agreement as amended by Amendment No. 1 thereto over (ii) the amount of Taxes that would have been incurred with respect to such Receivables had Section 2.9 of such agreement prior to Amendment No. 1 thereto been performed, and any such excess shall not be included in the calculation of the first (I$$2,000,000 of such Taxes for purposes of the immediately preceding sentence.

8.     Section 5.6(b) is hereby deleted in its entirety.

9.     The following provisions are hereby added to the Agreement:

Section 7.8.     Replacement of Financial Assurances and Maintenance of Related Insurance and Letters of Credit.     The Parties acknowledge and agree that, prior to the Closing Date, Seller or one of its Affiliates has arranged for the issuance by a third party of certain letters of credit securing obligations of GNB, which letters of credit are listed on Schedule 7.8 attached hereto (the "Letters of Credit"). Seller hereby agrees that the Letters of Credit will remain in place for a transitional period after the Closing, provided that: (i) from and after the Closing Date, the Buyer agrees to use commercially reasonable efforts to obtain the consent of the beneficiaries of each of the Letters of Credit to surrender such Letter of Credit and to accept replacement financial assurances from the Buyer as soon as possible after the Closing and in any event prior to the date falling one hundred eighty (180) days after the Closing Date; and (ii) until such time as the last of the Letters of Credit has been surrendered to Seller by the beneficiary thereof or canceled according to its terms, Buyer shall maintain one or more Replacement Insurance Policy(ies) (as defined below) or a Replacement LC (as defined below) with respect to each of the Letters of Credit. As used herein, the term "Replacement Insurance Policy(ies)" means one or more policies of insurance with one or more insurance companies reasonably acceptable to Seller

Amendment No. 3 to Coordinating Agr. DOC

(it being understood that Indian Harbor Insurance Company, an affiliate of XL, is an insurance company that is acceptable to Seller), which policies provide for, among other things, indemnification of the Seller or any of its Affiliates against any and all loss, cost or expense incurred or suffered by Seller or its Affiliate as a result of or associated with any draws on or payments under the Letters of Credit from and after the Closing Date, and which policies are otherwise reasonably acceptable in form and substance to the Seller (it being understood that Policy No. PEC 0006165 issued by Indian Harbor Insurance Company is acceptable to Seller).  As used herein, the term "Replacement LC" means an irrevocable standby letter of credit issued by Fleet Boston Financial or an affiliate thereof for the benefit of Seller or its designated Affiliate, which letter of credit shall permit the beneficiary to draw thereon in the amount of any and all loss, cost or expense incurred or suffered by Seller or its Affiliate as a result of or associated with any draws on or payments under the Letters of Credit from and after the Closing Date.  Buyer agrees that it will not cancel the Replacement Insurance Policy or Replacement LC or allow any such policy or letter of credit to lapse while any of the Letters of Credit remain outstanding and that, in the event the Replacement Insurance Policy or Replacement LC lapses or is otherwise rendered ineffective during such period, Buyer will promptly deliver to Seller a replacement insurance policy, letter of credit or similar instrument reasonably acceptable to Seller, which policy, letter of credit or other instrument will provide indemnification or draw rights to Seller on substantially the same terms as the canceled or lapsed policy or letter of credit (as the case may be).  It is the intention of the parties that each Letter of Credit will be the subject of Seller's or its Affiliate's rights under one, but not both, of the Replacement Insurance Policy or the Replacement LC.  Seller shall have no obligation to renew or extend the term of any Letter of Credit, it being the intention of the parties that the Letters of Credit will expire pursuant to their terms if not previously surrendered by the beneficiary thereof. The Seller covenants and agrees that it shall not and shall cause the beneficiary under the Replacement LC to not draw on the Replacement LC (or any replacement thereof) except with respect to a Letter of Credit listed on Schedule 7.8 attached hereto.

Section 7.9    <u>Shreveport Lease</u>.

(a)    Seller and Buyer acknowledge:

(i)    United of Omaha Life Insurance Company (the "Lessor"), the Lessor of 6901 Westport Avenue, Shreveport, Louisiana 71129 (the "Shreveport Property"), has advised GNB that it does not intend to renew GNB's current Lease of the Shreveport Property (the "Current Lease") and is actively seeking a purchaser of that property;

(ii)   Sections 27(b)(ii) and 27(c) of the Current Lease permit the then Lessee of the Shreveport Property to purchase the entire subject property for the price and in the manner there specified (the "Lease Option").

(b)     Seller intends to use its reasonable commercial efforts from Closing, at its sole cost, to locate a third party buyer acceptable to the Lessor to acquire the Shreveport Property and to lease the same to Buyer upon the terms and conditions of the Lease forming Exhibit C hereto (the "New Lease").

(c)     As a condition precedent to the obligations of Seller more particularly set out in Sections 7.9(e) and 7.9(f) hereof, Buyer agrees with Seller that:

(i)     Buyer shall on or before Closing deliver to the Lessor (with a copy to Seller) the "acknowledged instrument in recordable form" referred to in the second sentence of Section 24 of the Current Lease pursuant to the terms of Section 19 of the Current Lease;

(ii)     Buyer shall after Closing, upon reasonable request from the Seller, make the Shreveport Property available for inspection by Seller and/or any prospective third party buyer located by Seller; and

(iii)     Buyer shall, upon demand from Seller, execute a lease in the form of the New Lease with any person who acquires the Shreveport Property from Lessor (whether as a result of the efforts of the Seller pursuant to Section 7.9(b), or as a result of the operation of either Section 7.9(e) or Section 7.9(f).

(d)     If by 9 November, 2000 Buyer shall not have been notified in writing that the Lessor has sold the Shreveport Property to a third party subject to the New Lease with Buyer then, on or prior to 5 p.m. Central Time on 10 November, 2000, Buyer may, by delivery to Seller of a notice in writing and a form of the New Lease duly executed by Buyer:

(i)     if, in Buyer's good faith judgment, it is lawfully able to do so, assign to Seller all of Buyer's rights with respect to the Lease Option; or

(ii)     if, in Buyer's good faith judgment, it is not lawfully able so to do, or if Lessor asserts that Buyer may not so assign the Lease Option, notify Seller that Buyer intends to exercise the Lease Option.

(e)     In the event of an assignment in accordance with Section 7.9(d)(i), Seller hereby undertakes to Buyer that Seller will:

(i)    timely and properly exercise the Lease Option and close the acquisition of the entire Shreveport Property from the Lessor as contemplated by Sections 27(c) and (b)(ii) of the Current Lease; and

(ii)    execute and deliver a counterpart of the New Lease delivered by Buyer to Seller pursuant to Section 7.9(d).

(f)    In the event of a notice in accordance with Section 7.9(d)(ii):

(i)    upon Buyer exercising the Lease Option, Buyer shall execute and deliver to Seller a special warranty deed and other documents (which shall convey to Seller rights equivalent to but not greater than those conveyed to Buyer by Lessor) to convey the Shreveport Property from Buyer to Seller on the closing date contemplated by Section 27 of the Current Lease (the "Option Closing Date"), for a consideration equal to the amount determined to be payable by the Buyer upon exercise of the Lease Option;

(ii)    on the Option Closing Date, Seller shall pay the consideration due from it to Buyer either to Buyer (and Buyer shall thereupon pay such consideration to Lessor), or if Buyer shall so direct, to Lessor on Buyer's behalf, in either event, as contemplated by the Current Lease; and

(iii)    Seller shall execute and deliver a counterpart of the New Lease delivered by Buyer to Seller pursuant to Section 7.9(d).

(g)    For the purposes of Sections 7.9(e) and 7.9(f), Buyer and Seller further agree that:

(i)    save as provided in Section 7.9(g)(ii) all fees and expenses required to be paid under Section 27(c)(iii) and the final sentence of Section 27(c)(iv) will be borne by Seller;

(ii)    the Seller may, at any time before the date of exercise of the Lease Option, cause an Affiliate to act in its stead pursuant to either Section 7.9(e) or Section 7.9(f), provided that Seller shall cause such Affiliate to perform all of Seller's obligations set forth herein.

Amendment No 3 to Coordinating Agt.DOC

A-0645

(h)    In the event that Seller shall become the owner of the Shreveport Property pursuant to the provisions of this Section 7.9 then Buyer and Seller agree that the provisions of Section 35 of the New Lease shall in no way affect the rights and obligations of the Buyer and Seller pursuant to Section 4.

Section 7.10    Closure, restructuring and other reserves.    The parties acknowledge that certain of the obligations of GNB reflected in the item "Closure, restructuring and other reserves" in the March 31, 2000 Balance Sheet will not have been fully paid or performed on or before the Closing Date by the Seller or the International Sellers. Seller hereby agrees that from and after the Closing Date, it will promptly pay costs properly included in such reserve that are incurred by or invoiced to Buyer after the Closing Date. Buyer agrees that it will submit any such invoices to or otherwise notify Seller in a prompt manner to permit timely payment of such amounts by Seller. For the avoidance of doubt, the parties also acknowledge that the term "other accrued expenses" as used in the fourth line of Section 2.1(b)(i) does not include items properly included in the item "Closure, restructuring and other reserves" in the March 31, 2000 Balance Sheet.

Section 7.11    GNB Letters of Credit.    As of the Closing Date, none of the GNB Companies (which term is intended to include both GNB and its subsidiaries and all of the businesses being acquired by Exide by way of asset purchase) is an account party or otherwise liable with respect to any letters of credit, other than those set forth on Exhibit D attached hereto.

IN WITNESS WHEREOF, the parties have duly executed this Amendment No. 3 on the date first set forth above.

EXIDE CORPORATION

By: _____
Name: David H. Kelly
Title: Vice President and Treasurer

PACIFIC DUNLOP HOLDINGS (USA) INC.

By: _____
Name: Martin Hudson
Title: Attorney-in-Fact

Amendment No 3 to Coordinating Agt.DOC

A-0646

Schedule 7.8

ANZ

L/c No.
2977 / 8200
1438 / 8200
~~1443/8200~~
1445/8200
2373 / 8204
LM 716020
LM 716021
5014/8200
5041/8200
5074/8200
5075/8200
5099 /8200
5100 / 8200
LM 716021
See Attachment 1

GNB Pac Rim L/Cs    –    See Attachment 2

BENEFICIARY
Arabia Solar Energy
Zurich-American Insurance
    Company
SMTT Oak Creek LP
Robert N. Imercel
Korea Storage Battery
Yacht Battery Co., Taipei
Yacht Battery Co., Taipei
Yacht Battery Co., Taipei
Korea Storage Battery
Yacht Battery Co., Taipei
Korea Storage Battery
Yacht Battery Co., Taipei
Yacht Battery Co., Taipei

A-0647



| GNB Inc. | | Standby/Finance | Zurich American Insurance | $ 1,904,399.86 | 31-Oct-98 | Yes | 60 Days |
|---|---|---|---|---|---|---|---|
| GNB Inc. | 14469/200 | Standby/Financial | Lake Center Management | $ 40,000.00 | 26-Sep-01 | Yes | 30 Days |
| GNB Inc. | 22601/200 | Standby/Financial | Department of Toxic, Sacramento, CA | $ 8,000,000.00 | 12-May-01 | Yes | 120 Days |
| GNB Inc. | 30549/200 | Standby/Financial | Financial Assurance, Texas | $ 8,000,000.00 | 20-Nov-01 | Yes | 120 Days |
| GNB Inc. | 84351200 | Standby/Performance | Department of Health, Sacramento, CA | $ 8,692,615.00 | 05-Jun-01 | Yes | 120 |
| GNB Inc. | 11218/200 | Standby/Performance | Environmental Protection, Georgia | $ 9,425,781.00 | 30-Jun-01 | Yes | 120 |
| GNB Inc. | 14319/200 | Standby/Performance | Florida Dept of Environmental | $ 15,682,378.00 | 31-Aug-01 | Yes | 120 |
| GNB Inc. | 61348200 | Standby/Performance | Texas Water Commission, Austin, Texas | $ 120,690.00 | 15-Aug-01 | Yes | 120 |
| GNB Inc. | 10169/200 | Standby/Performance | Texas Water Commission, Austin, Texas | $ 995,770.00 | 05-Feb-01 | Yes | 120 |
| GNB Inc. | 21501/200 | Standby/Performance | Yellow Water Road, Atlanta | $ 903,270.62 | 09-May-02 | No | N/A |
| GNB Inc. | 23730/200 | Standby/Financial | Robert N. Quenel, Minnesota | $ 137,000.00 | 21-Sep-01 | Yes | 60 |
| GNB Inc. | 33288/200 | Standby/Performance | Mississippi Department of Environmental | $ 825,173.00 | 01-May-01 | Yes | 120 |
| GNB Inc. | 33190/200 | Standby/Performance | Rankin County, Mississippi | $ 253,182.00 | 01-Jul-01 | Yes | 180 |
| GNB Ins. | 20770/200 | Standby/Performance | National Bank, Egypt A/C Cairo Electrical | $ 3,394.16 | 15-Nov-00 | No | N/A |
| GNB Int. | 40798/200 | Standby/Performance | Georgia Department of Natural Resources | $ 50,000.00 | 18-Apr-01 | Yes | 120 |

A-0649