## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Bk. Case No. 02-11125 (KJC) |
| EXIDE TECHNOLOGIES, INC., *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | |
| ——————————————— | ) | |
| | ) | C.A. No.  05-561- SLR |
| PACIFIC DUNLOP HOLDINGS | ) | |
| (EUROPE) LTD, *et al.*, | ) | |
| Appellants, | ) | Bankr. Adv. Pro. No. 04-51299-KJC; |
| v. | ) | |
| | ) | Removed From Circuit Court of Cook |
| EXIDE HOLDING EUROPE, *et al.* | ) | County, Ill. Civ. Action No.: 01L |
| 008460 | ) | |

## APPENDIX TO APPELLANTS' BRIEF
## VOLUME III

MORRIS, JAMES, HITCHENS & WILLIAMS LLP
Brett D. Fallon (ID No. 2480)
Douglas N. Candeub (ID No. 4211)
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, Delaware 19899
Telephone: (302) 888-6800
Facsimile: (302) 571-1750

-and-

GOODELL, DEVRIES, LEECH & DANN, LLP
Linda Woolf, Esquire
Paula Krahn Merkle, Esquire
One South Street, 20th Floor
Baltimore, Maryland 21202
Telephone: (410) 783-4000
Facsimile: (410) 783-4040

Dated: February 13, 2006

Attorneys for the Appellants, Pacific Dunlop Holdings
(USA), Inc., Pacific Dunlop Holdings (Europe)
Limited, P.D. International Pty Limited, Pacific
Dunlop Holdings (Hong Kong) Limited, and Pacific
Dunlop Holdings (Singapore) PTE. Ltd.

---

[1]  Apart from the lead debtor, Exide Technologies, Inc., f/k/a Exide Corporation, the
debtors in these proceedings were Exide Delaware, L.L.C.; Exide Illinois, Inc.; RBD Liquidation,
L.L.C.; Dixie Metals Company; and Refined Metals Corporation.  The cases of these subsidiary
debtors were closed by order entered June 18, 2004 (Bankr. docket No. 4599).

# APPENDIX
## Table of Contents

Tab 1.     Order Denying Motion of Pacific Dunlop Holdings (USA), Inc., Pacific Dunlop
           Holdings (Europe) Limited, P.D. International Pty Limited, Pacific Dunlop Holdings
           (Hong Kong) Limited and Pacific Dunlop Holdings (Singapore) PTE. Ltd. for Remand
           of State Law Action or, in the Alternative, for Abstention and for an Order Granting
           Relief from the Automatic Stay to Proceed to Liquidate Claim in State Court (D.I.
           3325) (the "2003 Order")

Tab 2.     The Bankruptcy Court's Order Denying the Motion of Pacific Dunlop Holdings
           Entities for Reconsideration of Order Denying Their Motion to Remand or for
           Abstention and Stay Relief, and Dismissing Their Causes of Action Against the Non-
           Debtor, Foreign Exide Entities (D.I. 5104) (the "2005 Order")

Tab 3.     Memorandum Denying the Motion of Pacific Dunlop Holdings Entities for
           Reconsideration of Order Denying Their Motion to Remand or for Abstention and Stay
           Relief, and Dismissing Their Causes of Action Against the Non-Debtor, Foreign Exide
           Entities (D.I. 5103) (the "2005 Memorandum")

Tab 4.     Motion of the Pacific Dunlop Holdings Entities for Reconsideration of Order Denying
           Their Motion to Remand or for Abstention and Stay Relief, and Dismissing Their
           Causes of Action Against the Non-Debtor, Foreign Exide Entities (D.I. 3385) (the
           "Motion for Reconsideration")

           Exhibit A.   Order Denying Motion of Pacific Dunlop Holdings (USA), Inc., Pacific
                        Dunlop Holdings (Europe) Limited, P.D. International Pty Limited, Pacific
                        Dunlop Holdings (Hong Kong) Limited and Pacific Dunlop Holdings
                        (Singapore) PTE. Ltd. for Remand of State Law Action or, in the Alternative,
                        for Abstention and for an Order Granting Relief from the Automatic Stay to
                        Proceed to Liquidate Claim in State Court

           Exhibit B.   Coordinating Agreement

           Exhibit C.   Affidavit of James D. McDonough

           Exhibit D.   Declaration of Martin Hudson

Tab 5.     Substituted Declaration of Martin Hudson Re: D.I. 3385 (D.I. 3417)

Tab 6.     Motion of Pacific Dunlop Holdings (USA), Inc., Pacific Dunlop Holdings (Europe)
           Limited, P.D. International Pty Limited, Pacific Dunlop Holdings (Hong Kong)
           Limited and Pacific Dunlop Holdings (Singapore) PTE. Ltd. for Remand of State Law
           Action or, in the Alternative, for Abstention and for an Order Granting Relief from the
           Automatic Stay to Proceed to Liquidate Claim in State Court (D.I. 2507) (the "Remand
           Motion")

           Exhibit A.   First Complaint (PDH Entities v. Exide Entities)

           Exhibit B.   Second Complaint (PDH USA v. Exide)

Exhibit C.   Order, Cook County (Ill.) Circuit Court, lifting stay of discovery against
defendants other than debtor (July 19, 2002)

Exhibit D.   Memorandum in Opposition to Defendants' Motion to Transfer, in
Bankruptcy Court, Northern District of Illinois

Exhibit E.   Motion to Remand or, in the Alternative, to Abstain, in Bankruptcy Court,
Northern District of Illinois

Exhibit F.   Memorandum Opinion Transferring Adversary from Another District

Exhibit G.   *RCG Int'l Investors, LDC v. ARI Network Servs., Inc.*, 2003 WL 21843637
(D. Del.).

Exhibit H.   *OMNA Med. Partners, Inc. v. Carus Healthcare, P.A.*, 2000 WL 33712302
(Bankr. D. Del.).

Exhibit I.   *Carol L. Lux v. D'Angeli Bldg. & Constr. Co.*, 1994 Bankr. LEXIS 341
(Bankr. E.D. Pa.).

Exhibit J.   *Nemsa Establishment, S.A. v. Viral Testing Sys.*, 1995 U.S. Dist. 11650
(S.D.N.Y.).

Exhibit K.   *Port Auth. of N.Y. & N.J. v. CCI-Bowers Co.*, 1992 U.S. Dist. LEXIS 6206
(D.N.J.).

Exhibit L.   *In re Federated Dep't Stores, Inc.*, 1990 Bankr. LEXIS 1118 (Bankr. S.D.
Ohio).

Tab 7.    Court Docket for Adv. Pro. No. 04-51299 (KJC)

Tab 8.    Transcript of Hearing before Cook County Circuit Court Judge Sheldon Gardner, Cook
County Circuit Court, July 8, 2002

Tab 9.    Order and Memorandum Transferring Adversary from another District (Bankr. N.D. Ill.
Feb. 4, 2003) (Sonderby, B.J.)

Tab 10.   Amended Joint Plan of Reorganization of the Official Committee of Unsecured
Creditors and the Debtors (D.I. 3918)

Exhibit A.   Amended Prepetition Foreign Credit Agreement Term Sheet

Exhibit B.   New Exide Warrant Term Sheet

Exhibit C.   Personal Injury Tort and Wrongful Death Claims Resolution and Distribution
Procedures

Tab 11.   Disclosure Statement for Joint Plan of Reorganization of the Official Committee of
Unsecured Creditors and the Debtors (D.I. 3919) (exhibits not included in this
appendix)

Tab 12.    Order Confirming Joint Plan of Reorganization of the Official Committee of Unsecured Creditors and the Debtors (D.I. 4341)

Tab 13.    Findings of Fact, Conclusions of Law and Memorandum Order Relating to Confirmation of the Joint Plan of Reorganization of the Official Committee of Unsecured Creditors and the Debtors (D.I. 4340)

Tab 14.    Amended Notice of Appeal (D.I. 5125)

Tab 15.    Coordinating Agreement

Tab 16.    Stock Purchase Agreement with Respect to Pacific Dunlop GNB Corporation, Between Pacific Dunlop Holdings (USA) Inc., as Seller, and Exide Corporation, as Buyer (the "US Agreement")

Tab 17.    Stock Purchase Agreement with Respect to Pacific Dunlop GNB Technologies Limited, Between Pacific Dunlop Holdings (Europe) Ltd, as Seller, and Exide Holdings Europe, as Buyer (the "UK Agreement")

Tab 18.    Stock Purchase Agreement with Respect to Pacific Dunlop GNB Technologies NV, Between P D International Pty Limited and Pacific Dunlop Holdings (Europe) Ltd., as Sellers, and Exide Holding Europe, as Buyer (the "European Agreement")

Tab 19.    Stock Purchase Agreement with Respect to Pacific Dunlop GNB Technologies (China) Limited, Among Pacific Dunlop Holdings (Hong Kong) Limited, as Seller, and Exide Holding Asia Pte Limited, as Buyer (the "Hong Kong/PRC Agreement")

Tab 20.    Stock Purchase Agreement with Respect to Pacific Dunlop GNB Technologies (India) Private Limited, Among Pacific Dunlop Holdings (Singapore) Pte Ltd, as Seller, and Exide Holding Asia Pte Limited, as Buyer (the "India Agreement")

Tab 21.    Asset Purchase Agreement, Between Pacific Dunlop Holdings (Singapore) Pte Ltd., as Seller, and Bluewall Pte Ltd to be renamed Exide Singapore Pte Limited, as Buyer (the "Singapore Agreement")

Tab 22.    Proofs of Claim for: Pacific Dunlop Holdings (Europe) Limited; Pacific Dunlop Holdings (Hong Kong) Limited; and Pacific Dunlop Holdings (Singapore) Pte Ltd. (without their accompanying attachments)

Tab 23.    Order consolidating Case Nos. 01-L-15589 and 01-L-08460.

Tab 24.    Excerpt from Transcript of Hearing before Bankruptcy Judge Kevin J. Carey, January 22, 2004 at 2:15 p.m.

# TAB 17

VK  ④

STOCK PURCHASE AGREEMENT

WITH RESPECT TO GNB TECHNOLOGIES LIMITED

Dated as of 28 June 2000

between

Pacific Dunlop Holdings (Europe) Ltd , as Seller,

and

Exide Holding Europe, as Buyer

# TABLE OF CONTENTS

| | | |
|---|---|---|
| ARTICLE 1 | DEFINITIONS | 1 |
| Section 1 1 | Definitions | 1 |
| ARTICLE 2 | SALE AND PURCHASE | 6 |
| Section 2 1 | Sale and Purchase of the Shares | 6 |
| Section 2 2 | Purchase Price | 6 |
| ARTICLE 3 | CLOSING | 6 |
| Section 3 1 | Closing  time and location | 6 |
| Section 3 2 | Documents to be Delivered to the Buyer at Closing | 7 |
| Section 3 3 | Seller Obligations Closing | 7 |
| Section 3 4 | Buyer's Obligations at Closing | 8 |
| Section 3 5 | Form of Documents | 8 |
| Section 3 6 | Post-Closing Matters | 8 |
| ARTICLE 4 | REPRESENTATIONS AND WARRANTIES REGARDING THE SELLER | 9 |
| Section 4 1 | Organisation | 9 |
| Section 4 2 | Power and Authority | 9 |
| Section 4 3 | Agreement Binding | 9 |
| Section 4 4 | Absence of Conflicts | 10 |
| Section 4 5 | No Litigation | 10 |
| Section 4 6 | Title to Shares | 10 |
| Section 4 7 | No Advisor | 11 |
| ARTICLE 5 | REPRESENTATIONS AND WARRANTIES REGARDING GNB | 11 |
| Section 5 1 | Organisation | 11 |
| Section 5 2 | Share Capital | 11 |
| Section 5 3 | Subsidiaries and Investments | 12 |
| Section 5 4 | Absence of Conflicts | 12 |
| Section 5 5 | No Violation or Litigation | 12 |
| Section 5 6 | Operations Since June 30, 1999 | 13 |
| Section 5 7 | Returns, Elections and Appeals | 14 |
| Section 5 8 | Title to Assets | 16 |
| Section 5 9 | Real Property | 16 |
| Section 5 10 | Assets | 16 |
| Section 5 11 | Asset Leases | 16 |
| Section 5 12 | Licences | 17 |
| Section 5 13 | Intellectual Property | 17 |
| Section 5 14 | Employees, etc | 17 |
| Section 5 15 | Trade Disputes | 18 |
| Section 5 16 | Payments on Termination | 18 |
| Section 5 17 | Clients | 19 |
| Section 5 18 | Pensions | 19 |
| Section 5 19 | Commercial Contracts | 19 |
| Section 5 20 | Status of Contracts | 20 |

1

| | | |
|---|---|---|
| Section 5 21 | Environmental Matters | 20 |
| Section 5 22 | Bank Accounts, Guarantees and Powers | 21 |
| Section 5 23 | Accounts and Records | 22 |
| Section 5 24 | Insurance | 22 |
| Section 5 25 | Product Warranties | 22 |
| Section 5 26 | No Misrepresentation | 23 |
| Section 5 27 | Sufficiency of Assets | 23 |
| Section 5 28 | Powers of Attorney | 23 |
| ARTICLE 6 | REPRESENTATIONS AND WARRANTIES REGARDING THE BUYER | 23 |
| Section 6 1 | Organisation | 23 |
| Section 6 2 | Power and Authority | 23 |
| Section 6 3 | Agreement Binding | 23 |
| Section 6 4 | Absence of Conflicts | 23 |
| Section 6 5 | No Litigation | 24 |
| Section 6 6 | Investment Representation | 24 |
| Section 6 7 | No Advisor | 24 |
| Section 6 8 | No Misrepresentation | 24 |
| ARTICLE 7 | ACTION PRIOR TO THE CLOSING DATE | 25 |
| Section 7 1 | Preserve Accuracy of Representations and Warranties | 25 |
| Section 7 2 | Notification of Changes | 25 |
| Section 7 3 | Governmental Approvals | 25 |
| Section 7 4 | Operations Prior to the Closing Date | 25 |
| Section 7 5 | Intercompany Agreements | 26 |
| Section 7 6 | General | 26 |
| Section 7 7 | Preservation of Business | 26 |
| ARTICLE 8 | CONDITIONS TO CLOSING | 26 |
| Section 8 1 | Buyer | 26 |
| Section 8 2 | Seller | 27 |
| ARTICLE 9 | TERMINATION | 29 |
| Section 9 1 | Termination | 29 |
| Section 9 2 | Effect of Termination | 29 |
| Section 9 3 | Notice of Termination | 29 |
| ARTICLE 10 | EXCLUSIVITY OF REMEDY | 30 |
| Section 10 1 | Indemnification by the Seller | 30 |
| Section 10 2 | Indemnification by the Buyer | 30 |
| Section 10 3 | Exclusivity of Remedy | 30 |
| ARTICLE 11 | GENERAL PROVISIONS | 30 |
| Section 11 1 | Notices | 30 |
| Section 11 2 | Confidential Information | 32 |
| Section 11 3 | No Public Announcement | 33 |
| Section 11 4 | Entire Agreement, Amendments | 33 |
| Section 11 5 | Successors and Assigns | 33 |
| Section 11 6 | Interpretation | 33 |
| Section 11 7 | Waivers | 34 |

ii

| Section 11 8 | Expenses | 34 |
| Section 11 9 | Partial Invalidity | 34 |
| Section 11 10 | Execution in Counterparts | 34 |
| Section 11 11 | Governing Law | 35 |
| Section 11 12 | Further Assurances and Cooperation | 35 |
| Section 11 13 | No Reliance | 35 |
| Section 11 14 | Insurance Matters | 35 |
| Section 11 15 | Disclosure Letter | 36 |

iii

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT dated as of 28 June 2000 (the "Agreement") is executed by and among PACIFIC DUNLOP HOLDINGS (EUROPE) LIMITED, a company incorporated in England and Wales under company number 1458684 (the "Seller"), whose registered office is at Ansell House, 119 Ewell Road, Surbiton, Surrey, KT6 6AL, and Exide Holding Europe, a company incorporated in France (the "Buyer")

### WHEREAS

A     The Seller owns the entire issued share capital of GNB (as defined in this Agreement)

B     The Buyer desires to purchase from the Seller, and the Seller desires to sell to the Buyer, the entire issued share capital of GNB on the terms and subject to the conditions in this Agreement

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the Seller and the Buyer agree as follows

### ARTICLE 1

### DEFINITIONS

Section 1 1     **Definitions**   In this Agreement, unless the context otherwise requires, the following terms have the meanings specified or referred to in this Section 1 1 and shall be equally applicable to both the singular and plural forms   Any agreement referred to below shall mean such agreement as amended, supplemented and modified from time to time to the extent permitted by the applicable provisions thereof and by this Agreement

"**Action**" means any lawsuit, arbitration, or regulatory, governmental or other proceeding or investigation whether at law or in equity

"**Adjoining Properties**" shall mean all sites or locations other than the Real Property or the PRP Sites to which Contaminants have migrated from the Real Property through air, soil, surface water or groundwater

"**Affiliate**" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person

"**Agreement**" has the meaning specified in the first paragraph of this Agreement

1

A-0711

"Business" means  (i) the marketing of starting-lighting-ignition automotive and specialty batteries and supplying original equipment manufacturers and replacement market customers with batteries for passenger cars, light and heavy-duty trucks, golf carts, motorcycles, garden tractors and marine use and related activities, and (ii) the marketing of batteries and allied products, parts and service for industrial applications, in each case, as conducted by GNB at the Real Property immediately prior to the Closing Date

"Business Day" means a day other than Saturday, Sunday or a day on which United States national banks are closed

"the Buyer" has the meaning specified in the first paragraph of this Agreement

"the Buyer Ancillary Agreements" means all agreements, instruments and documents being or to be executed and delivered by the Buyer under this Agreement

"Closing" has the meaning specified in Section 3 1

"Closing Date" has the meaning specified in Section 3 1

"Companies Act" means the Companies Act 1985 of the United Kingdom, as amended as of the Closing Date

"Confidential Information" has the meaning specified in Section 11 2

"Coordinating Agreement" means that certain coordinating agreement dated 9 May 2000 between Exide Corporation, a Delaware corporation, and Pacific Dunlop Holdings (USA) Inc , a Delaware corporation, as amended and supplemented from time to time

"Court Order" means any judgement, order, award or decree of any foreign, federal, state, or local court or tribunal or governmental agency and any award in any arbitration proceeding in any jurisdiction

"Disclosure Letter" means the letter dated 12 June 2000 the Buyer, as modified pursuant to Section 5 7 of the Coordinating Agreement

"Employees" has the meaning specified in Section 5 18(a)

"Employee Plan" has the meaning specified in the Principal US Agreement

"Encumbrance" means any lien, charge, security interest, mortgage, pledge, power of sale, easement, encroachment, covenant, restriction on transfer or other restriction on or defect in title or other encumbrances

"Environmental Laws" means all applicable statutory, international, treaty, conventions and local laws, regulations, codes of practice, circulars and guidance notes relating to pollution or human health or the environment (as defined in Section 1(2) of the Environmental Protection Act 1990 of the United Kingdom) (including ambient air, surface water, ground water, tidal water and the foreshore between high and low tide, land surface or sub-surface strata), including,

2

A-0712

without limitation, those relating to Environmental Matters or otherwise relating to the manufacture, possessing, distribution, use, processing, treatment, storage, disposal, transport or handling of Hazardous Materials currently in effect applicable to the operations of the Business

"Environmental Matters" means waste, land including contaminated land, aquatic environment, discharges, emissions, noise and vibration, heat, light and radiation, dangerous, hazardous or toxic substances and materials, nuisance and health and safety

"Expenses" means any and all reasonable expenses incurred in connection with investigating, defending or asserting any Action or overtly threatened Action (including court filing fees, court costs, arbitration fees or costs, witness fees, and reasonable fees and disbursements of legal counsel, investigators, expert witnesses, accountants and other professionals)

"Financial Statements" has the meaning specified in the Coordinating Agreement

"FRS" means Financial reporting standards issued by the Accounting Standards Board

"GNB" means GNB Technologies Limited a company incorporated in England and Wales under company number 3396707 whose registered office is at 51 Eastcheap, London EC3M 1JP

"GNB Agreements" has the meaning specified in Section 5 20

"GPP" has the meaning specified in Section 5 18(d)

"Governmental Body" means any foreign, United Kingdom, European Community, European Union, United States, state, or local governmental authority, agency or regulatory body

"Governmental Permit" has the meaning specified in the Principal US Agreement

"Harm" means harm defined in section 1(4) of the Environmental Protection Act 1990 of the United Kingdom

"Hazardous Materials" means chemicals, pollutants, contaminants, waste, petroleum, petroleum hydro-carbon products, explosives, radioactive substances, dangerous, hazardous or toxic substances and materials including the substances prescribed in schedules 4, 5 and 6 of the Environmental Protection (Prescribed Processes and Substances) Regulations 1991 of the United Kingdom or any statutory modification thereof and other substances possessing any of the hazardous properties listed in part II of Schedule 2 of the Special Waste Regulations 1996 of the United Kingdom capable of polluting land, water of air or which causes Harm

"ICTA 1988" means the Income and Corporation Taxes Act 1988 of the United Kingdom, as amended as of the Closing Date

"Insurance Policies" means the insurance policies of GNB referred to in Section 11 14

3

"Intellectual Property" has the meaning specified in Section 5.13(a)

"Intercompany Agreements" means agreements between GNB or a Subsidiary and an Affiliate of GNB other than GNB and any Subsidiary

"June 30, 1999 Balance Sheet" has the meaning specified in the Coordinating Agreement, including the notes to such balance sheet

"KPMG" means KPMG LLP or its successor

"Knowledge of the Seller" or similar phrases means matters actually known to Thomas Minner, Thomas Smith, Thomas O'Hare, Mitchell Brogatti, Barbara Hatcher, Rolf Fehndrich, Bart de Keyser or Jeff Kostos

"Knowledge of the Seller Regarding Environmental Matters" or similar phrases means matters actually known to Rolf Fehndrich or Barbara Hatcher

"Licences" has the meaning specified in Section 5.12

"Losses" means all losses, obligations, liabilities, settlement payments, awards, judgements, fines, assessments, penalties, and damages

"March 31, 2000 Balance Sheet" has the meaning specified in the Coordinating Agreement, including the notes to such balance sheet

"Material Adverse Effect" means any event, occurrence or condition (other than as a result of general economic conditions or events or conditions affecting the automotive and industrial battery industry as a whole) which has, or could reasonably be expected to have, a material adverse effect on the financial condition, assets, results of operations, Business, or operations of GNB, taken as a whole

"Person" means any individual, corporation, partnership, limited liability company or corporation, joint venture, association, trust, unincorporated organisation, or Governmental Body

"Principal US Agreement" means the Stock Purchase Agreement With Respect To Pacific Dunlop GNB Corporation dated May 9, 2000 between Pacific Dunlop Holdings (USA) Inc., as Seller, and Exide Corporation, as Buyer, as amended and supplemented from time to time

"PRP Sites" shall mean all sites (other than the Real Property and the Adjoining Properties) with respect to which GNB, a Subsidiary, or any of their successors or assignees have or may have liability under any Environmental Law

"Purchase Price" has the meaning specified in Section 2.2

4

A-0714

"Real Property" means leasehold property held by GNB, brief details of which are set out in Schedule 2

"Release" includes any and all spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaking, dumping, disposing, and any other means by which a substance may be introduced into or travel through the environment

"Remedial Action" shall include all actions required by a Court Order or otherwise by a Governmental Body to (i) clean up, remove, remediate, contain, treat, monitor, assess, evaluate or in any other way address Hazardous Materials, (ii) prevent the Release or threatened Release of Hazardous Materials, or (iii) investigate and determine if a remedial response is needed and to design such a response and post-remedial investigation, monitoring, operation and maintenance

"Requirements of Law" means any applicable law, regulation, bylaw, code or ordinance of any Governmental Body currently in effect

"ROW Agreements" has the meaning specified in Section 5 5(e) of the Coordinating Agreement

"Schemes" has the meaning specified in Section 5 18(a)

"The Seller" has the meaning specified in the first paragraph of this Agreement

"The Seller Ancillary Agreements" means all agreements, instruments and documents being or to be executed and delivered by the Seller under this Agreement

"Shares" means the 239,644 fully paid issued ordinary shares of £1 each in the share capital of GNB constituting its entire issued share capital

"SSAP" means a Statement of standard accounting practice adopted by the Accounting Standards Board

"Subsidiary" shall have the meaning ascribed to it in sections 736 and 736A of the Companies Act

"Tax Authority" means any governmental, federal, state, provincial, local governmental or other, fiscal, tax, revenue, customs duties or excise authority body or official whether of the United Kingdom or elsewhere in the world

"Tax" means any and all forms of taxes, levies, imposts, contributions, duties and charges and all withholdings or deductions in respect thereof, in the nature of and corresponding to Tax imposed by any Tax Authority acting as such whether directly or primarily chargeable against, recoverable from or attributable to GNB or any other person, and all fines, penalties, charges, costs and interest relating thereto and "Taxation" shall be construed accordingly

"Tax Return" means any return, report notice, computation, or similar statement required to be filed with respect to any Tax (including any attached schedules), including,

5

A-0715

without limitation, any information return, claim for refund, amended return and declaration of estimated Tax

## ARTICLE 2

## SALE AND PURCHASE

### Section 2 1    Sale and Purchase of the Shares

(a)    On the terms and subject to the conditions of this Agreement, on the Closing Date, the Seller shall sell, transfer, assign, convey and deliver to the Buyer, and the Buyer shall purchase from the Seller, the Shares free and clear from all Encumbrances together with all rights and benefits attaching or accruing to such Shares at Closing

(b)    Title to beneficial ownership of, and any risk attaching to the Shares shall pass on the Closing and the Buyer shall, from the Closing Date, be entitled to exercise all rights attached or accrued to the Shares including, without limitation, the right to receive all dividends, distributions or any return of capital made or paid by GNB on or after the Closing Date

(c)    The Buyer shall not be obliged to complete the purchase of any of the Shares unless the purchase of all the Shares is completed simultaneously

### Section 2 2    Purchase Price

The purchase price (the "Purchase Price") shall be equal to One Million Seven Hundred Seventy Nine Thousand United States Dollars (US$1,779,000)   At the Closing, the Buyer shall pay the Purchase Price to the Seller by wire transfer of immediately available funds to such bank account as the Seller shall direct in writing   After Closing, the Purchase Price shall be adjusted pursuant to Article 2 of the Coordinating Agreement

## ARTICLE 3

## CLOSING

### Section 3 1    Closing  time and location

Completion of the sale and purchase of the Shares (the "Closing") shall take place at 10 00 a m  Chicago time on the last Business Day of the month in which the last of the conditions specified in Article 8 is satisfied or waived at the offices of at Gardner, Carton & Douglas at 321 North Clark Street, Chicago, Illinois, or at such other time or place as shall be agreed upon by the Seller and the Buyer  Notwithstanding the foregoing, if the date upon which the last of the conditions specified in Article 8 is satisfied or waived is five (5) or fewer Business Days before the last day of the month, then the Closing shall be consummated on the fifth (5th) Business Day following the date upon which the last of such conditions was satisfied or waived, or such other date as may be agreed upon by Buyer and Seller  The time and date on which the

6

Closing is completed is referred to herein as the "Closing Date"   The Closing shall be effective as of close of business on the Closing Date

Section 3 2    <u>Documents to be Delivered to the Buyer at Closing</u>

At Closing, the Seller shall deliver to the Buyer or as the Buyer may direct

(a)    a duly executed and completed transfer of the Shares in favour of the Buyer or as the Buyer may direct together with the relative share certificates (or an indemnity in a form reasonably satisfactory to the Buyer in respect of any share certificates which are missing) and any power of attorney under which such transfer has been executed,

(b)    duly executed transfers of any of the Shares held by nominees in favour of the Buyer or as the Buyer may direct,

(c)    duly executed counterparts of the Seller Ancillary Agreements,

(d)    a closing certificate of the Seller in a form reasonably satisfactory to the Buyer certifying as to the accuracy of the Seller's representations and warranties at and as of the Closing and that the Seller has performed and complied with all of the terms, provisions and conditions to be performed and complied with by the Seller at or before the Closing,

(e)    a certificate of the Company Secretary or an Assistant Company Secretary of the Seller in a form reasonably satisfactory to the Buyer dated the Closing Date, certifying as to  (i) the Seller's articles of association, (ii) the passing of resolutions of the Seller's board of directors, authorising the execution and performance of this Agreement, the Seller Ancillary Agreements, and the transactions contemplated hereby, and (iii) evidence of due appointment and signatures of its officers executing this Agreement and any Seller Ancillary Agreement,

(f)    the written resignations of their respective offices executed as a deed by each of the directors and the company secretary as may be required to resign by the Buyer effective as of the Closing Date,

(g)    the certificate of incorporation and any certificates of incorporation on change of name, the share register, share certificate books (with any unissued share certificates), all minute books and other statutory books (which shall be written up to but not including the Closing Date), and the common seal of GNB,

(h)    the resignation of the auditors of GNB in accordance with section 392 of the Companies Act confirming that they have no outstanding claims of any kind against GNB and containing a statement complying with section 394(1) of the Companies Act, and

(i)    such other certificates and documents as the Buyer or its Counsel may reasonably request

7

A-0717

Section 3 3    Seller Obligations Closing

At the Closing, the Seller shall be obligated to

(a)    cause those persons nominated by the Buyer who have duly consented to act as Directors of GNB, to be validly appointed as additional directors and the person nominated by the Buyer who has duly consented to act as secretary of GNB to be validly appointed as company secretary of GNB, and

(b)    on such appointments referred to in section 3 3(a) being made, cause the persons referred to in section 3 2(f) to cease to be directors and the company secretary of GNB

Section 3 4    Buyer's Obligations at Closing

Upon completion of all the matters referred to in Section 3 2 (and only upon such completion) the Buyer shall be obliged to deliver to the Seller

(a)    duly executed counterparts of the Buyer Ancillary Agreements,

(b)    a closing certificate of the Buyer in a form reasonably satisfactory to the Seller certifying as to the accuracy of the Buyer's representations and warranties at and as of the Closing and that Buyer has performed and complied with all of the terms, provisions and conditions to be performed and complied with by the Buyer at or before the Closing,

(c)    a certificate of the Company Secretary or an Assistant Company Secretary of the Buyer in a form reasonably satisfactory to the Seller, dated the Closing Date, certifying as to (i) the Buyer's articles of association (or other like constitutional document), (ii) the passing of resolutions of the Buyer's board of directors, authorising the execution and performance of this Agreement, the Buyer Ancillary Agreements, and the transactions contemplated hereby, and (iii) evidence of due appointment and signatures of its officers executing this Agreement and any Buyer Ancillary Agreement,

(d)    the written consent of each of the persons named in Section 3 3(a) to serve as director or company secretary, as the case may be, and

(e)    such other certificates and documents as the Seller or its Counsel may reasonably request

Section 3 5    Form of Documents

The documents and instruments referred to in Sections 3 2 and 3 4 shall be satisfactory as to form to counsel for the party to whom they are delivered

Section 3 6    Post-Closing Matters

(a)    The Seller hereby declares that for so long as it remains the registered holder of any of the Shares after Closing it will

8

(i)    hold the Shares and the dividends and other distributions of profits or surplus or other assets declared, paid or made in respect of them after Closing and all rights arising out of or in connection with them in trust for the Buyer and its successors in title, and

(ii)    deal with and dispose of the Shares and all such dividends, distributions and rights as are described in Section 3 6(a)(i) as the Buyer or any such successor may direct

(b)

(i)    The Seller hereby appoints the Buyer as its lawful attorney for the purpose of receiving notices of and attending and voting at all meetings of the members of GNB from Closing to the date on which the Buyer or its nominee is entered in the register of members of GNB as the holder of the Shares

(ii)    For such purpose the Seller hereby authorises

(A)    GNB to send any notices in respect of its holding of Shares to the Buyer, and

(B)    the Buyer to complete in such manner as it thinks fit and to return proxy cards, consents to short notice and any other document required to be signed by it in its capacity as a member

## ARTICLE 4

### REPRESENTATIONS AND WARRANTIES REGARDING THE SELLER

The Seller represents and warrants to the Buyer as follows

Section 4 1    Organisation

The Seller has been duly incorporated and validly exists under the laws of England

Section 4 2    Power and Authority

The Seller has the full corporate power and authority to execute and deliver this Agreement and the Seller Ancillary Agreements and to perform its obligations hereunder and thereunder The Seller's execution, delivery and performance of this Agreement and each of the Seller Ancillary Agreements has been duly authorised and approved by all necessary corporate action

9

Section 4 3     Agreement Binding

This Agreement and each of the Seller Ancillary Agreements has been duly executed and delivered by the Seller and, assuming due authorisation, execution and delivery by the Buyer, is the legal, valid and binding obligation of the Seller enforceable against the Seller in accordance with their respective terms, subject to general principles of equity and except as enforceability may be limited by applicable bankruptcy, insolvency, fraudulent transfer, reorganisation, moratorium or other similar laws of general application relating to creditors' rights generally

Section 4 4     Absence of Conflicts

The execution, delivery and performance of this Agreement and the Seller Ancillary Agreements and the performance of the Seller's obligations hereunder and thereunder will not

(a)     conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation, or result in the termination or result in the creation, imposition or crystallisation of any Encumbrance upon the Shares or any assets of GNB under

(i)     any term or provision of the memorandum or articles of association of the Seller, or

(ii)     any note, instrument, contract, agreement, mortgage, indenture, lease, license or franchise to which the Seller or any Affiliate of Seller is a party or by which it or any of its assets is bound, or

(iii)     any Court Order, or

(iv)     any Requirements of Law,

except for any of the foregoing which, individually or in the aggregate is or are not likely to have a Material Adverse Effect or hinder or impair the completion of the transactions contemplated hereby, or

(b)     require the approval, consent, authorisation or act of, or the making by the Seller or any Affiliate of Seller of any declaration, notification, filing or registration with any Person, except for any of the foregoing which, individually or in the aggregate, if not taken, is or are not likely to have a Material Adverse Effect, or materially hinder or impair the consummation of the transactions contemplated hereby

Section 4 5     No Litigation

There is no Action pending or, to the Knowledge of the Seller, threatened, which challenges the legality or propriety of the transactions contemplated by this Agreement or the Seller Ancillary Agreements or which impairs the completion of the transactions contemplated hereby or thereby

10

A-0720

Section 4 6    Title to Shares

The Seller is the sole legal and beneficial owner of the Shares and such Shares are free and clear of all Encumbrances, and the Seller has full right and power to vote and dispose of such Shares as contemplated herein  The Seller is not a party to any option, warrant, purchase right, or other contract or commitment that could require the Seller to sell, transfer, or otherwise dispose of any of the Shares (other than this Agreement)  The Seller is not a party to any voting trust, proxy, or other agreement or understanding with respect to the voting of any of the Shares

Section 4 7    No Advisor

Neither the Seller nor any Affiliate of Seller nor any Person acting on its or their behalf, has retained any advisor, broker, investment banker or financial advisor in connection with this Agreement or any transaction contemplated hereby for which the Buyer or GNB may be liable

ARTICLE 5

REPRESENTATIONS AND WARRANTIES REGARDING GNB

The Seller represents and warrants to the Buyer as follows

Section 5 1    Organisation

(a)    GNB is a private company limited by shares and has been duly incorporated and validly exists under the laws of England and Wales  The Seller has delivered to the Buyer complete and correct copies of GNB's certificate of incorporation and certificate(s) of incorporation on change of name and a copy of its memorandum and articles of association as currently in force  GNB is not in violation of any provision of its memorandum or articles of association and GNB has all requisite corporate power and authority to hold its property under lease, to own or lease its assets and to carry on its business as currently conducted and to operate the property and assets now being operated by it  The particulars of GNB are set forth in Schedule 1

(b)    All filings required by law to be made by GNB have been properly made and all registers and minute books required by law to be kept by GNB have been properly written up and such registers and minute books contain an accurate and complete record of the matters which should be dealt with therein and GNB has not received any application or request for rectification of its statutory registers or any notice or allegation that any of them is incorrect

Section 5 2    Share Capital

The authorised share capital of GNB consists of 250,000 ordinary shares of £1 each of which 239,644 have been issued  All the Shares are legally and beneficially owned by the Seller  The Shares comprise the whole of the issued and allotted share capital of GNB and have been properly and validly issued, are fully paid or credited as fully paid and have not been issued in violation of any pre-emptive or other rights arising under statute, contract or otherwise  GNB has no outstanding subscriptions, options warrants, rights, agreements or other commitments

11

granting to any Person any interest in or right to acquire any of their its securities, including, without limitation, the Shares, or any interest therein. GNB has not issued any instrument or security convertible into, or exchangeable for, the Shares or other shares, and there is no agreement or understanding to which GNB or the Seller is a party or by which either of them is bound with respect to the voting of the Shares. GNB is under no obligation, whether contingent or otherwise, to issue or repurchase any of its Shares or to make any dividend or distribution payments based on its revenues, profits or net income.

Section 5.3     Subsidiaries and Investments

GNB has no Subsidiaries. GNB does not own, directly or indirectly, any stocks, shares, bonds or securities or any equity or other proprietary interest in any Person.

Section 5.4     Absence of Conflicts

The execution and completion of this Agreement and the Seller Ancillary Agreements, and the transactions contemplated or provided for in any of them, will not

(a)     conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation, or result in the termination of, or result in the creation, imposition or crystallisation of any Encumbrance upon the Shares or any assets of GNB under

(i)     any term or provision of the memorandum or articles of association of GNB, or

(ii)     any note, instrument, contract, agreement, mortgage, indenture, lease, licence or franchise to which GNB is a party or by which it or any of its assets is bound,

(iii)     any Court Order, or

(iv)     any Requirements of Law,

except for any of the foregoing which, individually or in the aggregate, is or are not likely to have a Material Adverse Effect or will not or is not likely to hinder or impair the exchange and completion of this Agreement or any of the transactions contemplated or provided for hereby and thereby, or

(b)     require the approval, consent, authorisation or act of, or the making by GNB of, any declaration, notification, filing or registration with any Person, except for any of the foregoing which, individually or in the aggregate, is or are not likely to have a Material Adverse Effect or materially hinder or impair the consummation of the transactions contemplated hereby and thereby.

12

A-0722

Section 5 5    No Violation or Litigation

(a)    GNB has complied and is in compliance with all Court Orders and Requirements of Law which are applicable to GNB and its business, except for such Requirements of Law as to which noncompliance is not likely to have a Material Adverse Effect, and

(b)    there is no Action pending or, to the Knowledge of the Seller, threatened, against GNB or any of its assets and there has not been, to the Knowledge of the Seller, any claim asserted by any Person that could lead to an Action and neither GNB nor any of its assets is subject to any currently pending Court Order  To the Knowledge of the Seller, there is no Action pending or threatened against any officer or director of GNB arising out of his or her service as an officer or director of GNB

Section 5 6    Operations Since June 30, 1999

Except as reflected in the March 31, 2000 Balance Sheet, since June 30, 1999

(a)    there has been no material adverse change in the business, operations, assets, or financial condition of GNB taken as a whole  The termination of any Intercompany Agreement not listed in Schedule 5 will not have a Material Adverse Effect,

(b)    Except as reflected in the March 31, 2000 Balance Sheet, GNB has conducted its business in the ordinary course and has not

(i)    made any material change in operations,

(ii)    made any capital expenditure or entered into any contract or commitment in excess of the capital expenditures disclosed in the "Fiscal Year 2000 Open Sanction Summary" attached to Schedule 5 7(B) of the Principal US Agreement,

(iii)    sold, leased (as lessor), assigned, transferred or otherwise disposed of, or imposed or suffered to be imposed any Encumbrance on, any of the assets, except for inventory and other personal or real property sold, leased or otherwise disposed of for fair value in the ordinary course of business consistent with past practice and except for Permitted Encumbrances (as defined in the Principal US Agreement),

(iv)    cancelled any debts owed to or claims held (including the settlement of any Action) other than in the ordinary course of business consistent with past practice,

(v)    created, incurred or assumed, or agreed to create, incur or assume, any indebtedness for borrowed money or entered into, as lessee, any lease obligations which are subject to SSAP 21 or FRS 5 or guaranteed any such indebtedness or leases of others or made any loans other than in the ordinary course of business consistent with past practice,

(vi)    written off as uncollectible or accelerated or delayed collection of notes or amounts receivable in advance of or beyond their regular due dates or the dates when the

13

same would have been collected other than in the ordinary course of business consistent with past practice,

(vii)    delayed or accelerated payment of any accounts payable or other liabilities beyond or in advance of their due date or the date when such liabilities would have been paid other than in the ordinary course of business consistent with past practice,

(viii)    made any distribution of assets (including payments of cash) to any of its Affiliates (not including the Seller or any of its Subsidiaries) other than pursuant to agreements entered into in the ordinary course of business consistent with past practice or declared or paid any distributions (provided that Seller shall have the right to remove and retain all cash held by GNB) or redeemed, reclassified or purchased or otherwise acquired any shares of its capital stock or authorised or issued any shares of its capital stock or any option, warrant or other right to purchase or acquire any such shares, or

(ix)    entered into, or amended, any employment, severance or similar agreement or arrangement or made any increases in the wages, bonuses, and benefits of its employees (other than any increases made in the ordinary course of business consistent with past practice),

(x)    waived any rights or settled any claims, except for such waivers or settlements granted or entered into in the ordinary course of business.

(xi)    made any change to its method of accounting,

(xii)    suffered or incurred any damage, destruction, fire, explosion, accident, flood or other casualty loss or act of God (whether or not covered by insurance) to any material operating asset or group of operating assets,

(xiii)    entered into or amended any purchase and sale contract outside the ordinary course of business,

(xiv)    suffered any amendments, termination, suspension or revocation of, any Governmental Permit,

(xv)    adopted an Employee Plan or amended or modified any already existing Employee Plan,

(xvi)    amended its articles of association,

(xvii)    manufactured inventory in excess of its expected needs, or

(xviii)    where applicable, agreed to do any of the foregoing

14

Section 3 7    Returns, Elections and Appeals

    (a)    GNB has properly and within the requisite periods made all proper returns which at any time it has been liable to make or provide for any purposes of Tax

    (b)    GNB has duly and within the requisite periods made or given all elections, claims, notices and which are assumed to have been made or given in computing the charge or provision for GNB (if any) for Tax in, or in preparing the Financial Statements

    (c)    GNB has duly and within the requisite periods accounted for or paid all Tax which it is liable to account for or pay

    (d)    No appeal is currently outstanding against any assessment or other demand in respect of any Tax

    (e)    PAYE and National Insurance    GNB has properly operated the PAYE and National Insurance contributions systems by making such deductions as are required by law from all payments made or deemed to be or treated as made by it or on its behalf, and by duly accounting to the United Kingdom Inland Revenue for all sums so deducted and for all other amounts for which it is required to account under the PAYE and National Insurance contributions systems

    (f)    Valued Added Tax Act of 1994 ("VATA 1994")    The Company is registered for the purposes of the VATA 1994 and has made, given, obtained and kept full, complete and up to date records, invoices and other documents appropriate or required for those purposes and is not in arrears with any payments or returns due and has not been required by the Commission of Customs & Excise to give security under Paragraph 4 of Schedule 1 VATA 1994

    (g)    All Taxes payable upon the importation of goods and all excise duties payable to HM Customs & Excise payable in respect of any assets (including trading stock) imported, owned or used by GNB have been paid in full

    (h)    Except as set forth in the Disclosure Letter, no deficiency or proposed adjustment (which has not settled or otherwise resolved) for any amount of Tax has been proposed, asserted or assessed by any taxing authority against GNB or its Subsidiaries

    (i)    Except as set forth in the Disclosure Letter, there is no action, suit, taxing authority proceeding or audit now in progress, pending or, to the Knowledge of Seller, threatened against or with respect to GNB or its Subsidiaries

    (j)    Except as set forth in the Disclosure Letter, no claim has ever been made by a taxing authority in a jurisdiction where GNB or its Subsidiaries, respectively, do not file Tax Returns that such entity is or may be subject to Taxes assessed by such jurisdiction

    (k)    Except as set forth in the Disclosure Letter, GNB and its Subsidiaries will not be required (A) as a result of a change in method of accounting for a taxable period ending on or prior to the Closing Date, to include any adjustment in taxable income for any taxable period (or

35

portion thereof) ending after the Closing Date, (B) as a result of any Requirement of Law relating to taxation matters to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date, (C) as a result of any Requirement Law relating to taxation matters, to include any item of income in taxable income for any taxable period (or portion thereof) ending after the Closing Date or (D) any installment sale made or prepaid income attributable to a taxable period ending on or prior to the Closing Date

(l)    Except as set forth in the Disclosure Letter, GNB and its Subsidiaries have no obligation or liability for the payment of Taxes of any other Person, including, but not limited to the following, a liability of GNB or its Subsidiaries for the payment of any Tax arising (A) as a result of being (or ceasing to be) a member of any Affiliated Group (or being included (or required to be included) in any Tax Return relating thereto), (B) as a result from any expressed or implied obligation to indemnify another person, and (C) as a result from GNB or its Subsidiaries succeeding to the Tax liability of any other person as a successor, transferee or otherwise

Section 5 8    Title to Assets

GNB is the exclusive and absolute owner of and has good title to, or a valid leasehold interest to, all of the personal property in the United Kingdom reflected in the June 30, 1999 Balance Sheet (other than the property in the United Kingdom disposed of since the date of the June 30, 1999 Balance Sheet in the ordinary course of business for fair value) in the amounts and categories reflected therein, and all personal property in India acquired after the date of the June 30, 1999 Balance Sheet, free and clear of all Encumbrances, except for (u) Permitted Encumbrances, (b) the lien of current taxes not yet due and payable and (c) other exceptions disclosed in Schedule 5 8  Except as disclosed in Schedule 5 8, the personal property of GNB that is utilized in the operation of GNB's business is usable in the ordinary course of GNB's business and conforms to all applicable statutes, ordinances and regulations relating to its construction, use and operation, except where such nonconformity is not likely to have a Material Adverse Effect

Section 5 9    Real Property

(a)    the Real Property shown in Schedule 2 comprise all the premises and land owned, leased, occupied or used by GNB,

(b)    Part II of Schedule 2 contains details of the material terms of each material lease, sublease or similar agreement under which GNB is lessee or sublessee of, or holds or occupies, the Real Property,

(c)    there is no other Person in possession or occupation of the Real Property without GNB's, or other proper authority,

(d)    to the Knowledge of the Seller there is no material subsisting breach nor any material non-observance on the part of GNB of any covenant, condition or agreement contained in the lease under which GNB occupies the Real Property and no landlord has refused to accept rent or made any complaint or objection concerning the covenants

16

A-0726

Section 5 10    Assets

Schedule 3 contains a list of all machinery, equipment, and vehicles owned by GNB having an original cost of £67,000 or more (the "Principal Assets")

Section 5 11    Asset Leases

The Disclosure Letter contains a brief description of each lease or other agreement or right, whether written or oral, (including in each case the annual rental, the expiration date thereof and a brief description of the property covered) under which GNB is lessee of, or holds or operates, any machinery, equipment, or vehicle owned by a third party, except those which are terminable by GNB without cost or penalty on 30 days' or less notice or which provide for annual rentals of less than £67,000

Section 5 12    Licences

All material licences, consents, authorisations, permits, orders, warrants, confirmations, permissions, certificates, approvals and authorities ("Licences") necessary for the carrying on of the Business and operations of GNB have been obtained and are being complied with except to the extent that non-compliance is not likely to have a Material Adverse Effect. No written notice of the suspension, cancellation, refusal, modification or revocation of any such Licence has been received by GNB and, to the Knowledge of Seller, there is no basis for the issuance of such notice except as a result of the consummation of the transactions contemplated hereby or except as is not likely to have a Material Adverse Effect. Notwithstanding the foregoing, Licenses required under the Environmental Laws are addressed solely in Section 5 21(b)

Section 5 13    Intellectual Property

(a)    Except as set out in Schedule 4 there are no material patents, patent applications, trade marks or trade mark registrations, service marks or service mark registrations, trade names, Internet domain names, corporate names, or any applications to register any of the foregoing, copyrights, licences to or from any Person in relation thereto (the "Intellectual Property"), used by GNB or otherwise relating to the business of GNB as presently carried on,

(b)    each item constituting part of the Intellectual Property has been, to the extent indicated in Schedule 4, duly registered, filed or issued, as the case may be and such registrations, filings and issuances remain in full force and effect,

(c)    GNB owns and possesses all right, title and interest in and to the Intellectual Property, and GNB has not received written notice of any claim by any Person contesting the validity, enforceability, use, or ownership of any Intellectual Property, patent disclosures or inventions or asserting that GNB is infringing the intellectual property rights of others Schedule 4 sets forth all technology (including Intellectual Property) owned by third parties and used by GNB To the Knowledge of the Seller, no Person is infringing the rights of GNB with respect to any Intellectual Property GNB uses all reasonable efforts to protect its trade secrets

17

A-0727

Section 5 14    Employees, etc

(a)    the Disclosure Letter contains details of

    (i)    the aggregate number of employees employed by GNB,

    (ii)    the name, date of commencement of service, temporary or permanent status, period of service, location, salary and benefits package, grade and age of each employee,

    (iii)    the terms of the contract of employment of each employee earning more than £25,000 per annum, and

    (iv)    the forms of all consultancy or similar arrangements involving payments in excess of £10,000 per annum,

(b)    there are no proposals to terminate the employment of any employees of GNB and there are no arrangements (whether contractual or otherwise) to vary or amend their terms of employment (whether to their detriment or benefit)

(c)    GNB has in relation to each of its employees (and, so far as relevant, to each of its former employees) complied with

    (i)    obligations imposed on it by all statutes regulations and codes of conduct and practice relevant to the relations between it and its employees or any trade union or employee representatives and has maintained current adequate and suitable records regarding the service and terms and conditions of employment of each of its employees,

    (ii)    all collective agreements recognition agreements and customs and practices for the time being dealing with such relations or the conditions of service of its employees, and

    (iii)    all relevant orders and awards made under any relevant statute regulation or code of conduct and practice affecting the conditions of service of its employees

Section 5 15    Trade Disputes

No trade union or other body is recognised by GNB for collective bargaining as representing any of the employees    GNB is not involved in any industrial or trade dispute or any dispute or negotiation with any trade union or other body representing any of the employees

Section 5 16    Payments on Termination

(a)    no liability has been or may be incurred by GNB for breach of any contract of employment or consultancy with any employee or consultant including, without limitation, redundancy payments, protective awards, compensation for wrongful dismissal or unfair

18

A-0728

dismissal or for failure to comply with any order for the reinstatement or re-engagement of any employee, and

    (b)    GNB has not made or agreed to make any payment or provided or agreed to provide any benefit to any employee or former employee or any dependent of any such employees or former employee in connection with the proposed termination or suspension of employment or variation of any contract of employment of any such employee or former employee

Section 5.17   Claims

    No liability has been or, to the Knowledge of the Seller may be, incurred by GNB for breach of any contract of employment or consultancy with any employee or consultant including without limitation, redundancy payments, protective awards, compensation for wrongful or unfair dismissal or failure to comply with any order for reinstatement

Section 5.18   Pensions

    (a)    The Disclosure Letter contains details of all retirement, death, accident, disability or sickness benefit schemes (the "Schemes") in operation for the benefit of any of GNB's current or former employees or directors (together for the purposes of this Section 5.18 referred to as the "Employees") or for the benefit of the dependants of any such Employees.

    (b)    Other than the Schemes referred to above, there are not nor have there ever been any other arrangements, agreements, customs or practices (whether legally enforceable or not) for providing pensions or other benefits on, or in anticipation of, the retirement, death, accident, disability or sickness of the Employees, nor has GNB agreed or announced any proposal to enter into or establish any such arrangement, agreement, custom or practice,

    (c)    To the Knowledge of the Seller, the Schemes have been administered in accordance with all relevant legislation and with the trusts powers and provisions of the Schemes, and

    (d)    In relation to the group personal pension ("GPP"), all contributions which have been requested have been paid up to date and in relation to the Schemes other than the GPP, all insurance premiums requested by the relevant insurance company in order to provide the benefits under such Schemes have been paid up to date

Section 5.19   Commercial Contracts

GNB is not a party to or bound by

    (a)    any consignment, distributor, dealer, manufacturer's representative, sales agency, advertising representative or advertising or public relations contract or agreement which is reasonably anticipated by GNB to involve the payment of more than £67,000 per year,

A-0729

(b)    any contract, agreement or commitment regarding the sale or other disposition of products or services by GNB, or for the purchase of raw materials, products or services by GNB, which is reasonably anticipated by GNB to involve the receipt or payment of more than £67,000 per year,

(c)    any guarantee or indemnification agreement for the benefit of any Person made or given outside of the ordinary course of business,

(d)    any contract, agreement or commitment which provides for the incurrence by GNB of indebtedness for borrowed money or capitalized lease obligations,

(e)    any partnership, consortium or joint venture agreement or has been a member of any unincorporated association, ·.

(f)    any Tax sharing or Tax allocation agreement,

(g)    any agreement, contract or commitment relating to capital expenditures of an amount or value in excess of £67,000,

(h)    any agreement that restricts or purports to restrict the business activity of GNB or limits GNB's ability to engage in any line of business or compete with any Person,

(i)    any material license of software or other intellectual property, or

(j)    any agreement that was not entered into in the ordinary course of GNB's business consistent with past practice and that involves annual payments in excess of £67,000

Section 5 20    Status of Contracts

Each of the leases, contracts and other agreements of GNB disclosed in the Disclosure Letter (collectively, the "GNB Agreements") constitutes a legal, valid and binding obligation of GNB (subject to bankruptcy, insolvency, reorganisation, moratorium and similar laws of general application relating to or affecting creditors' rights and to general equity principles) and is in full force and effect and GNB is not, nor to the Knowledge of the Seller, alleged to be, in material breach of or material default under, any of the GNB Agreements nor, to the Knowledge of Seller, is any other party thereto in such breach or default and, to the Knowledge of the Seller, no event has occurred which the notice or lapse of time would constitute such a breach or default or permit termination, modification or acceleration of any of the GNB Agreements

Section 5 21    Environmental Matters

Notwithstanding any other provision of this Agreement, this Section 5 21 contains the only representations or warranties of the Seller with respect to Environmental Law or Environmental Matters in relation to GNB, and no other statement in this Agreement, in any of the Seller Ancillary Agreements or in any other document or information delivered or given to or received by or on behalf of the Buyer in connection with the transactions contemplated by this

20

Agreement shall be deemed to be a representation or warranty relating to Environmental Law or Environmental Matters in relation to GNB.

(a)    GNB is in compliance with all applicable Environmental Laws except for such noncompliance as is not likely to have a Material Adverse Effect.

(b)    GNB owns, holds or possesses all material Governmental Permits required under Environmental Laws necessary for the occupation and use of the Properties and the operation of its business substantially as currently conducted. GNB is in compliance, and has for the past three (3) years complied, with all Governmental Permits except for such noncompliance as is not likely to have a Material Adverse Effect. The Seller shall make commercially reasonable efforts to transfer or cause to be transferred to the Buyer all such Governmental Permits at the Closing, including (i) giving notice to federal, state or local regulatory agencies with respect to the change in ownership or control or responsible officials at the Properties, (ii) completing and submitting notices of termination, and (iii) to the extent not transferred by the Closing Date, shall cooperate fully with the Buyer in obtaining the transfer of such Government Permits as promptly thereafter as possible.

(c)    GNB is not subject to any pending or, to the Knowledge of the Seller Regarding Environmental Matters, threatened with investigation by, order from, claim by, statutory request for information from, or continuing agreement with any Person respecting (i) any violation of Environmental Law or Governmental Permits, (ii) any Remedial Action, or (iii) any claim of Losses and Expenses, in each case arising from the release of Hazardous Materials or the presence of any Hazardous Material on, in, at or beneath any of the Real Property or the migration of any Hazardous Material onto or from the Real Property.

(d)    GNB is not subject to any pending or, to the Knowledge of the Seller Regarding Environmental Matters, threatened judicial or administrative investigation, proceeding, order, notice of violation, judgment, decree or settlement with any continuing obligation alleging or relating to a violation of or liability under any Environmental Law or Governmental Permit.

(e)    GNB has not received any notice under any Environmental Law to the effect that it is or may be liable to any Person as a result of the generation, storage, transportation, Release, arrangement for disposal or disposal of any Hazardous Material on, at, or in any Real Property.

(f)    GNB has not reported a Release pursuant to an Environmental Law or filed a notice with respect to the contamination of land or the generation of hazardous wastes that is required to be filed pursuant to an Environmental Law, and, to the Knowledge of the Seller Regarding Environmental Matters, there has not been any disposal by GNB or Release of any Hazardous Materials on, at, in or beneath any Leased Real Property.

(g)    To the Knowledge of the Seller Regarding Environmental Matters, there are no underground storage tanks (whether active or abandoned) located at, in or beneath the Properties

21

(h)     To the Knowledge of the Seller Regarding Environmental Matters, as of the Closing Date there is no condition existing on the premises constituting the Properties that will give rise to any liability of GNB under any Environmental Law

(i)     Seller has made available to Buyer true and correct copies of all material environmental audits and consultant's reports relating to the past and current operations, properties and facilities of GNB or any of their respective predecessors, which are in its possession or under its reasonable control

(j)     To the Knowledge of the Seller Regarding Environmental Matters, the sites identified in the Disclosure Letter constitute, and as the Disclosure Letter is updated by Seller from time to time in its sole discretion prior to the Closing Date, will constitute all PRP Sites as of the Closing Date

(k)     Notwithstanding any other provision of this Agreement, no representations and warranties are made or shall be deemed to apply to the PRP Sites

Section 5 22    Bank Accounts, Guarantees and Powers

The Disclosure Letter lists all accounts, directors' resolutions authorising borrowing or deposit boxes maintained by GNB at any bank or other financial institution and the names of the persons authorised to effect transactions in such accounts and pursuant to such resolutions and with access to such boxes

Section 5 23    Accounts and Records

All the accounts, books, ledgers and financial and other material records of the Business have been maintained accurately and in accordance with generally accepted accounting practices

Section 5 24    Insurance

The Seller has, and at all times has had, valid insurance coverage in respect of the Business against all risk normally insured against by persons in the same industry, underwritten by one or more well-established and reputable insurers or adequately capitalised Affiliates  The Disclosure Letter contains a list of all insurance policies maintained by or on behalf of GNB on the Properties, assets, business or personnel specifying

(i)     the insurer,

(ii)     the amount of the coverage,

(iii)     the type of insurance,

(iv)     the policy number, and

(v)     any currently pending claims thereunder

22

any of the foregoing which, individually or in the aggregate, if not taken, is or are not likely to have a material adverse effect on the Buyer or its business taken as a whole or materially hinder or impair the consummation of the transactions contemplated hereby

Section 6 5     No Litigation

There is no Action pending or, to the knowledge of the Buyer, threatened, which questions the legality or propriety of the transactions contemplated by this Agreement the Buyer Ancillary Agreements or which would impair the contemplation of the transactions contemplated hereby, and there has not been, to the knowledge of the Buyer, any claim asserted by any Person that could lead to such an Action

Section 6 6     Investment Representation

The Buyer is acquiring the Shares for investment and not with a view to the distribution thereof or dividing all or any part of its interest therein with any other person

Section 6 7     No Advisor

Neither the Buyer nor any Person acting on its behalf has retained any advisor, broker, investment banker or financial advisor in connection with this Agreement or any transaction contemplated hereby for which the Seller may be liable

Section 6 8     No Misrepresentation   To the knowledge of Buyer, the representations and warranties of Buyer contained in this Agreement and the certificates and other instruments delivered by Buyer pursuant hereto do not include any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made not misleading

## ARTICLE 7

### ACTION PRIOR TO THE CLOSING DATE

The Buyer and the Seller covenant and agree to take the following actions between the date hereof and the Closing Date

Section 7 1     Preserve Accuracy of Representations and Warranties

The Buyer and the Seller shall, and the Seller shall procure that GNB shall, refrain from taking any action that would render any representation or warranty contained in this Agreement inaccurate as of the Closing Date   The Buyer and the Seller shall promptly notify the other of any Action, investigation, or other proceeding, that shall be instituted or threatened against such party or in the case of Seller, against GNB, to restrain, prohibit or otherwise challenge the legality of any transaction contemplated by this Agreement

25

Section 7 2    Notification of Changes

Each of the Seller and the Buyer shall promptly notify the other of any event that causes any representation or warranty given by such party in Article 4, 5, or 6 to become untrue

Section 7 3    Governmental Approvals

During the period prior to the Closing Date, the Seller and the Buyer shall, and the Seller shall cause GNB, to act diligently and reasonably, and shall cooperate with each other, to secure any consents and approvals of any Governmental Body required to be obtained in order to effect the completion of the transactions contemplated by this Agreement and preserve for the benefit of GNB its rights under permits and agreements

Section 7 4    Operations Prior to the Closing Date

(a)    During the period prior to the Closing Date, the Seller shall cause GNB to operate and carry on its operations only in the ordinary course and substantially as operated prior to the date hereof

(b)    Notwithstanding Section 7 4(a), except as expressly provided for in this Agreement, or with the prior written consent of the Buyer, the Seller shall not during the Period ending on the Closing Date take and shall not cause GNB to take any of the actions set out in Section 5 6(b), provided however, notwithstanding anything to the contrary herein, Seller will not make, and since 9 May 2000 has not made, any capital expenditure in excess of the local currency equivalent of US$250,000 (other than as permitted by Section 7 3(b) of the Principal US Agreement) without the prior written approval of Buyer

Section 7 5    Intercompany Agreements

All the Intercompany Agreements and intercompany accounts payable and receivable, except for those set out in Schedule 5, shall be terminated or canceled at Closing

Section 7 6    General    Each of the parties will use its reasonable best efforts to take all action and to do all things necessary, proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the closing conditions set forth below)

Section 7 7    Preservation of Business    Each of the parties shall, and Seller shall cause GNB to, use reasonable best efforts to keep their businesses and properties substantially intact, including their present operations, physical facilities, working conditions and relationships with lessors, licensors, suppliers, customers and employees

26

# ARTICLE 8

## CONDITIONS TO CLOSING

### Section 8 1    Buyer

The obligations of Buyer under this Agreement shall, at the election of the Buyer, be subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions

(a)    No Misrepresentation or Breach of Obligations or Agreements

Seller shall have complied in all material respects with its covenants and agreements herein and in the Coordinating Agreement

(b)    No Breach of Representation or Warranty

Each of the representations and warranties of the Seller contained in this Agreement and each of the Seller Ancillary Agreements shall be true and correct in all material respects on the Closing Date as though made on the Closing Date (except with respect to those representations and warranties that speak as to a particular date or time, which only need to be true and correct as of such date or time), except for changes therein specifically permitted by this Agreement or resulting from any transaction expressly consented to in writing by the Buyer, and there shall have been delivered to the Buyer a closing certificate in a form reasonably satisfactory to the Buyer to such effect, dated the Closing Date, signed by the Chairman or Managing Director of the Seller,

(c)    Closing Documents

The Buyer shall have received from the Seller the agreements and closing documents provided for in Section 3 2,

(d)    Necessary Approvals

The Seller and the Buyer shall have received all approvals and actions of or by all Governmental Bodies and any other Person which are necessary to complete the transactions contemplated hereby and by the ROW Agreements and preserve for the benefit of GNB its rights under the GNB Agreements which are material to the operation of the Business,

(e)    No Suit

No Action by any Governmental Body shall be pending or threatened questioning the legality of this Agreement or the consummation of the transactions contemplated hereby in whole or in part,

27

(f)    Principal US Agreement

The transactions contemplated by the Principal US Agreement shall have been completed simultaneously with the Closing

(g)    No Material Adverse Change   On the Closing Date, there shall not be a Material Adverse Effect

(h)    Coordinating Agreement   All conditions to Exide Corporation's obligations set forth in Sections 5.5, 5.6 and 5.7(a) of the Coordinating Agreement shall have been satisfied

Notwithstanding the failure of any one or more of the foregoing conditions, the Buyer may, at its option, proceed with the Closing without satisfaction, in whole or in part, of any one or more of such conditions and without written waiver, provided however, that in so proceeding with the Closing, and notwithstanding any other provision of this Agreement, the Buyer shall be deemed to have waived any such failure and any rights or remedies it may have against the Seller by reason of such failure

Section 8.2    Seller

The obligations of Seller under this Agreement shall, at the option of the Seller, be subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions

(a)    No Breach of Covenants and Agreements

Buyer shall have complied in all material respects with its covenants and agreements herein and in the Coordinating Agreement,

(b)    No Breach of Representations and Warranties

Each of the representations and warranties of the Buyer contained in this Agreement and the Buyer Ancillary Agreements shall be true and correct in all material respects on the Closing Date as though made on the Closing Date (except with respect to those representations and warranties that speak as to a particular date or time, which only need to be true and correct as of such date or time), except for changes therein specifically permitted by this Agreement or resulting from any transaction expressly consented to in writing by the Seller, and there shall have been delivered to Seller a closing certificate in a form reasonably satisfactory to Seller to such effect, dated the Closing Date and signed by the President or a Vice President of the Buyer,

(c)    Closing Documents

The Seller shall have received from Buyer the agreements and documents contemplated by Section 3.4,

(d)    Payment of Closing Date Cash Payment

The Buyer shall have tendered payment of the Purchase Price,

28

A-0738

(e)    Necessary Approvals

Seller and Buyer shall have received all approvals and actions of or by all Governmental Bodies and any other Person which are necessary to consummate the transactions contemplated hereby and by the ROW Agreements and preserve for the benefit of Buyer its rights under agreements which are material to the operation of its business.

(f)    No Suit

No Action by any Governmental Body shall be pending or threatened questioning the legality of this Agreement or the consummation of the transactions contemplated hereby in whole or in part, and

(g)    Principal US Agreement

The transactions contemplated by the Principal US Agreement shall have been completed simultaneously with the Closing

(h)    No Material Adverse Change    On the Closing Date, there shall have been no event, occurrence or condition (other than as a result of general economic conditions or events affecting the automotive and industrial battery business as a whole) which has, or could reasonably be expected to have, a material adverse effect on the financial condition, assets, results or operations, businesses, or operations of Buyer taken as a whole

(i)    Coordinating Agreement    All conditions to Pacific Dunlop Holdings (USA) Inc 's obligations set forth in Sections 5 5 and 5 7(b) of the Coordinating Agreement shall have been satisfied

Notwithstanding the failure of any one or more of the foregoing conditions, the Seller may, at its option, proceed with the Closing without satisfaction, in whole or in part, of any one or more of such conditions and without written waiver, provided however, that in so proceeding with the Closing, and notwithstanding any other provision of this Agreement, the Seller shall be deemed to have waived any such failure and any rights or remedies it may have against the Buyer by reason of such failure

### ARTICLE 9

### TERMINATION

Section 9 1    Termination

Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated at any time prior to the Closing Date

(a)    by the mutual written consent of the Buyer and the Seller;

(b)    by the Buyer or the Seller if the Closing shall not have occurred on or before December 31, 2000 unless (i) all conditions to Closing have previously been satisfied or waived,

29

and (n) the Closing has not then occurred solely because the date for Closing specified in Section 3.1 has not yet occurred and unless such failure to close is due primarily to the breach by the party seeking termination of its agreements, representations or warranties contained herein;

(c)    by the Buyer in the event of any breaches in any material respect by the Seller of the Seller's agreements, covenants, representations or warranties contained herein, and which Seller has failed to remedy or cure within twenty one (21) days after receipt of notice from the Buyer requesting that such breaches be remedied or cured;

(d)    by the Seller in the event of any breaches in any material respect by the Buyer of the Buyer's agreements, covenants, representations or warranties contained herein, which the Buyer has failed to remedy or cure within twenty one (21) days after receipt of notice from the Seller requesting that such breaches be remedied or cured; or

(e)    by the Buyer or the Seller if a Court Order shall have been made or a Governmental Body shall have issued a decree or ruling or taken any other action permanently restraining, enjoining or otherwise prohibiting the completion of the transactions contemplated hereby.

Section 9.2    Effect of Termination

In the event that this Agreement shall be terminated pursuant to this Section 9, all further obligations of the parties under this Agreement (other than Sections 11.2, 11.8 and 11.11) and under the Coordinating Agreement (other than Sections 5.2, 5.3 and 5.4) shall be terminated without further liability of any party to the other, provided that nothing herein shall relieve either party from liability for its wilful breach of this Agreement.

Section 9.3    Notice of Termination

Any party desiring to terminate this Agreement pursuant to Section 9.1 shall give written notice of such termination to the other parties to this Agreement.

ARTICLE 10

EXCLUSIVITY OF REMEDY

Section 10.1    Indemnification by the Seller

The Seller's sole and exclusive indemnification obligations under this Agreement are set forth in the Coordinating Agreement.

Section 10.2    Indemnification by the Buyer

The Buyer's sole and exclusive indemnification obligations under this Agreement are set forth in the Coordinating Agreement.

30

A-0740

Section 10 3   Exclusivity of Remedy

Except as provided in Section 9 2, with respect to any breach by either party of its representations, warranties, covenants, or agreements in this Agreement or the respective Buyer or Seller Ancillary Agreements, or the ROW Agreements and the transactions contemplated hereby and thereby, the sole and exclusive remedy of the other party (in contract, tort, for contribution, under Requirements of Law, or otherwise) shall be the indemnification provided in the Coordinating Agreement  In view of this exclusivity of remedy provision, the Buyer and the Seller covenant and agree for themselves and their respective Affiliates that they will not bring, maintain, join or prosecute any Action or other proceeding against the other or its Affiliates for breach of this Agreement or indemnity therefor except as provided in the Coordinating Agreement

## ARTICLE 11

### GENERAL PROVISIONS

Section 11 1   Notices

Any notice, request, instruction or other document to be given hereunder shall be in writing and (a) delivered personally, (b) sent by reputable overnight couriers, or (c) sent by facsimile, according to the instructions set forth below

Such notices shall be sent to the following addresses and/or facsimile numbers and shall be deemed given (x) if delivered personally, at the time delivered, (y) if sent by reputable overnight courier, at the time sent, or (z) if transmitted by facsimile, at the time when receipt is confirmed by the sending facsimile machine

If to Seller, to

    Pacific Dunlop Holdings (USA) Inc
    6121 Lakeside Drive
    Suite 200
    Reno, Nevada  89511
    U S A
    Attention  President
    Facsimile  702-824-4626

with a copy to

    Gardner, Carton & Douglas
    321 N Clark Street
    Suite 3400
    Chicago Illinois 60610
    U S A
    Attention    Mr Robert J Wilczek
    Facsimile    312-644-3381

If to Buyer, to

    c/o Exide Corporation
    2901 Hubbard Road
    Ann Arbor, Michigan 48105
    U S A
    Attention    General Counsel
    Facsimile    734-827-2575

with copies to

    Wragge & Co
    55 Colmore Row
    Birmingham
    England B3 2AS
    England
    Attention  Mr Andrew Mason
    Facsimile  011 44 121 214 1099

and

    Kirkland & Ellis
    200 East Randolph Drive
    Chicago, Illinois 60601
    U S A
    Attention  Mr Carter W Emerson, P C
    Facsimile  312-861-2200

or to such other address as such party may indicate by a notice delivered to the other party in accordance with the provisions of this Section 11 1

Section 11 2   Confidential Information

   (a)   Each party agrees that it will treat in confidence all documents, materials and other information which it shall have obtained regarding any of the other parties and/or the businesses of the other parties during the course of the negotiations leading to the completion of

32

the transactions contemplated hereby (whether obtained before or after the date of this Agreement), the investigation provided for herein and the preparation of this Agreement and other related documents ("Confidential Information"), and, in the event the transactions contemplated hereby shall not be completed, each party will destroy or return to the relevant party all copies of non-public Confidential Information which have been furnished in connection therewith, as the relevant party may specify    Confidential Information shall not be communicated to any third person (other than the parties' respective counsel, accountants, financial advisors or environmental consultants)    No party shall use any Confidential Information in any manner whatsoever except solely for the purpose of evaluating the proposed transaction  Notwithstanding the foregoing, after the Closing, the Buyer may use or disclose any Confidential Information relating to GNB    The Seller shall not at any time after the Closing disclose any Confidential Information relating to GNB

(b)    The obligation of each party to treat Confidential Information in confidence shall not apply to any Confidential Information which

(i)    is or becomes available to such party from a source other than such party,

(ii)    is or becomes available to the public other than as a result of disclosure by another party or its agents,

(iii)    is required to be disclosed under applicable law or judicial process, but only to the extent it must be disclosed, or

(iv)    as to which such party reasonably deems disclosure necessary to obtain any of the consents or approvals contemplated hereby

Section 11 3    No Public Announcement

Neither the Buyer nor the Seller shall, without the approval of the other party, issue any press release or other public announcement concerning this Agreement or the transactions contemplated by this Agreement    Notwithstanding the foregoing, either party may issue a press release or other public announcement concerning this Agreement or the transactions contemplated by it to the extent that such party or its Affiliates shall be so obligated by law, or to comply with accounting or disclosure obligations of the U S  Securities and Exchange Commission, New York Stock Exchange or the Australian Stock Exchange provided that such party shall be obligated to give the other party prior notice of such press release or other public announcement if prior notice is commercially feasible

Section 11 4    Entire Agreement, Amendments

This Agreement, the Disclosure Letter, the Buyer Ancillary Agreements, the Seller Ancillary Agreements, the Coordinating Agreement, the Principal US Agreement, the ROW Agreements and the Exhibits and Schedules referred to herein and therein contain the entire understanding of the parties hereto with regard to the subject matter herein or therein and supersede all prior written or oral agreements, understandings or letters of intent between or among any of the parties hereto    This Agreement shall not be amended, modified or

33

A-0743

supplemented except by a written instrument signed by an authorised representative of each of the parties hereto

Section 11 5   Successors and Assigns

(a)    The rights of each party under this Agreement and the Coordinating Agreement shall not be assignable without the written consent of the other party, provided, however, that no such assignment shall relieve the assigning party from any of its duties or obligations under this Agreement or the Coordinating Agreement, and provided further, however, that upon written notice to Seller, Buyer may assign this Agreement to an Affiliate of Buyer without the consent of Seller

(b)    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns   Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any Person other than the parties and successors and assigns permitted by this Section 11 5 any right, remedy, benefit or claim under or by reason of this Agreement

Section 11 6   Interpretation

(a)    Article titles and headings to Sections herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement   The Schedules and Exhibits referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth herein

(b)    This Agreement, the Disclosure Letter and the Schedules and Exhibits hereto have been mutually prepared, negotiated and drafted by each of the parties hereto and thereto   The parties agree that the terms of this Agreement shall be construed and interpreted against each party in the same manner and that no such provisions shall be construed or interpreted more strictly against one party on the assumption that an instrument is to be construed more strictly against the party which drafted the agreement

(c)    All statutes referenced in this Agreement are statutes of the United Kingdom, unless otherwise indicated

Section 11 7   Waivers

Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the party or parties entitled to the benefit thereof   Any such waiver shall be validly and sufficiently authorised for purposes of this Agreement if, as to any party, it is authorised in writing by an authorised representative of such party   Subject to Sections 8 1 and 8 2, the failure of any party hereto to enforce at any time any term or provision of this Agreement shall not be construed to be a waiver of such term or provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any party thereafter to enforce each and every such term or provision   No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach

34

A-0744

Section 11 8    Expenses

Subject to the provisions of the Coordinating Agreement or any ROW Agreement, regardless of whether the transactions contemplated in this Agreement are consummated each party hereto will pay its own costs and expenses incident to the negotiation, preparation and performance of this Agreement, including the fees, expenses and disbursements of its counsel, financial advisors and accountants   GNB has not borne and will not bear any such costs or expenses

Section 11 9    Partial Invalidity

Wherever possible, each term or provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the terms or provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such term or provision or terms or provisions or any other terms or provisions hereof, unless such a construction would be unreasonable

Section 11 10    Execution in Counterparts

This Agreement may be executed in one or more counterparts, each of which shall be considered an original instrument and shall become binding when one or more counterparts have been signed by each of the parties hereto and delivered to each of the Seller and the Buyer

Section 11 11    Governing Law

This Agreement shall be governed by and construed in accordance with the internal laws of the State of Illinois, without giving effect to any choice of laws provisions which may direct the application of the laws of another jurisdiction

Section 11 12    Further Assurances and Cooperation

From and after the date of this Agreement, upon the request of either Seller or Buyer or any of their respective Affiliates, the other party and its Affiliates shall execute and deliver such instruments, documents or other writings as may be reasonably necessary or desirable to confirm and carry out and to effectuate fully the intent and purposes of this Agreement   After the Closing, on reasonable advance notice, Buyer shall cause GNB to provide Seller, Seller's Affiliates and any advisor retained by Seller or its affiliates with reasonable access to the management and properties, and books, records, and documents (which were in existence on the Closing) of GNB, during normal business hours and in a manner which does not unreasonably interfere with GNB, for any reasonable purpose including, but not limited to, the fulfilment of Seller's responsibilities under Section 4 1(a) of the Coordinating Agreement, the enforcement of Seller's and its Affiliates' rights under Article 2 of the Coordinating Agreement and clause (iii) of Section 4 2(a) of the Coordinating Agreement   As reasonably necessary, Seller, Seller's Affiliates, and any advisor retained by Seller or its Affiliates shall be entitled to make copies of such books, records and documents at their expense   If Buyer shall desire at any time to dispose

35

of any such books, records or documents, Buyer shall, prior to such disposition, give Seller a reasonable opportunity to segregate and remove such books, records and documents as Seller may select. The obligations of Buyer pursuant to this <u>Section 11.12</u> shall survive the Closing indefinitely.

Section 11.13 <u>No Reliance</u>

The provisions of this Agreement are intended for the sole benefit of the parties hereto and shall not inure to the benefit of any other person, other than successors and permitted assigns of the Buyer and the Seller, whether as third party or otherwise.

Section 11.14 <u>Insurance Matters</u>

(a)      The Seller agrees that with respect to any occurrence-based policies as to which GNB is name insured or named as additional insured party (the "Insurance Policies"), it shall fully cooperate with the Buyer (at the Buyer's expense) in taking all steps necessary to file and process any insurance claims for any claims made after the Closing Date that relate to any acts, events or occurrences prior to the Closing Date relating to the Business (the "Insured Claims") that are insured under such policies. To the extent that any proceeds relating to the Insured Claims are received by the Seller or any of the Seller's Affiliates, the Seller agrees to pay over such proceeds promptly to the Buyer.

(b)      The Buyer agrees that it shall pay any retrospective premium charge or liability owed by the Seller under the terms of such Insurance Policies (including amounts owed under premium audits), subject to the following conditions:

(i)      the Buyer shall only be obligated to pay such proportion of a retrospective premium charge or liability to the extent it exclusively relates to the Business;

(ii)      the Buyer shall have the right, upon reasonable request made to Seller, to audit any retrospective premium policies and charges thereunder, and to object to any proposed charge on the basis of such audit (in which case any dispute between the Seller and the Buyer (not including any dispute between the Buyer and any insurer) shall be resolved by binding arbitration); and

(iii)      the Buyer shall not be required to pay any retrospective charge or liability with respect to any Insurance Policies to the extent the overall maximum premium owed by all of the insured parties thereon has previously been paid.

(c)      The Buyer acknowledges and agrees that none of the Buyer or GNB will have, after the Closing Date, any rights under, and will not assert claims against any insurance policies insuring or naming Pacific Chloride Inc., or any of its predecessors or successors, as an insured or additional insured, nor will the Buyer or GNB assert rights to any settlements of claims under such policies.

36

Section 11 15  Disclosure Letter

The Disclosure Letter is hereby incorporated by reference into and made a part of this Agreement   The inclusion of any item in the Disclosure Letter is intended to qualify the representations and warranties contained in this Agreement, and to set forth other information required by this Agreement   Disclosure of information in any paragraph of the Disclosure Letter shall be deemed to be a disclosure with respect to every Section of this Agreement notwithstanding the presence or absence of a cross-reference in the Disclosure Letter under other Sections of this Agreement if the meaning of such disclosure in the context of such other Section is reasonably ascertainable   Disclosure of information in the Disclosure Letter shall not be deemed to be an admission by the Seller that such information is material for the purposes of this Agreement

A-0747

IN WITNESS whereof the parties hereto have executed this Agreement the day and year first above written

SELLER

PACIFIC DUNLOP HOLDINGS (EUROPE) LIMITED
by its duly appointed attorney

Name   Martin M  Hudson
Title   Attorney in Fact

BUYER

EXIDE HOLDING EUROPE
by its Director duly authorised


Name   Denis Porges
Title   Chairman

A-0748

IN WITNESS whereof the parties hereto have executed this Agreement the day and year first above written

SELLER

PACIFIC DUNLOP HOLDINGS (EUROPE) LIMITED
by its duly appointed attorney

Name   Martin M Hudson
Title     Attorney in Fact

BUYER

EXIDE HOLDING EUROPE
by its Director duly authorised

Name   Denis Porges
Title    Chairman

SCHEDULE 1

Particulars of GNB

| | |
|---|---|
| Country of Incorporation | England and Wales |
| Date of Incorporation | 27 June 1997 |
| Registered Number | 3396707 |
| Registered Office | 51 Eastcheap, London EC3M1JP |
| Directors | Rolf Fehndrich |
| | Thomas Minner |
| | Thomas Smith |
| Secretary | Barbara Ann Hatcher |
| VAT Number | |
| Accounting Reference Date. | 30 June |
| Auditors | KPMG, 2 Cornwall Street |
| | Birmingham B32DL |
| Authorised Share Capital | 250,000 ordinary shares of £1 each |
| Issued Share Capital | 239,644 |
| Shareholder | Pacific Dunlop Holdings (Europe) |
| | Limited |

1

A-0750

**HOTCHKIS AND WILEY FUNDS**
Mercury Rebranding Project – Document List

| Name of Document | GC&D Document No |
|---|---|
| Class A Shares Distribution Plan Sub-Agreement | 12083184 |
| Class A Distribution Plan of Merrill Lynch Low Duration Fund of Merrill Lynch Investment Managers Trust Pursuant to Rule 12b-1 | 12085624 |
| Class B Shares Distribution Plan Sub-Agreement | 12083189 |
| Class B Distribution Plan of Merrill Lynch Low Duration Fund of Merrill Lynch Investment Managers Trust Pursuant to Rule 12b-1 | 12085651 |
| Class C Shares Distribution Plan Sub-Agreement | 12083190 |
| Class C Distribution Plan of Merrill Lynch Low Duration Fund of Merrill Lynch Investment Managers Trust Pursuant to Rule 12b-1 | 12085645 |
| Class D Shares Distribution Plan Sub-Agreement | 12083620 |
| Class D Distribution Plan of Merrill Lynch Low Duration Fund of Merrill Lynch Investment Managers Trust Pursuant to Rule 12b-1 | 12083191 |
| Distribution Agreement | 12083187 |
| License Agreement Relating to Use of Name | 12083192 |
| Merrill Lynch Select Pricing System Plan Pursuant to Rule 18f-3 Under the Investment Company Act | 12083183 |

C:\TEMP\7103111.DOC

A-0753

## SCHEDULE 5

### Surviving Intercompany Agreements

1.  Commissionaire Agreement between GNB and GNB Technologies S A dated February 26, 1998

2.  Commissionaire Agreement between GNB and GNB Technologies NV dated February 26, 1998

CH01/1 %40115 11

5