# TAB 19

Hongkong! PLC
(2)

STOCK PURCHASE AGREEMENT
WITH RESPECT TO GNB TECHNOLOGIES (CHINA) LIMITED

Dated 23 June 2000

among

Pacific Dunlop Holdings (Hong Kong) Limited, as Seller

and

Exide Holding Asia Pte Limited, as Buyer

A-0812

if the date upon which the last of the conditions specified in Article 8 is satisfied or waived is five (5) or fewer Business Days before the last day of the month, then the Closing shall be consummated on the fifth (5th) Business Day following the date upon which the last of such conditions was satisfied or waived, or such other date as may be agreed upon by Buyer and Seller  The time and date on which the Closing is actually held is referred to herein as the "Closing Date"  The Closing shall be effective as of the close of business on the Closing Date

Section 3 2    Documents to be Delivered to Buyer  At the Closing, Seller shall deliver to Buyer

(a)    certificates representing the Shares, free and clear of all Encumbrances together with duly executed instruments of transfer, bought and sold notes and any other relevant documents in favor of Buyer (or such other Person as Buyer may direct) in form satisfactory to Buyer,

(b)    a certificate of Seller in a form reasonably satisfactory to Buyer certifying as to the accuracy of the Seller's representations and warranties at and as of the Closing and that Seller has performed and complied with all of the terms, provisions and conditions to be performed and complied with by Seller at or before the Closing,

(c)    a certificate of the company secretary or an assistant secretary of Seller in a form reasonably satisfactory to Buyer, dated the Closing Date, certifying as to  (i) Seller's Memorandum and Articles of Association, (ii) the resolutions of Seller's board of directors, authorizing the execution and performance of this Agreement, the Seller Ancillary Agreements, and the transactions contemplated hereby, (iii) incumbency and signatures of its officers executing this Agreement and any Seller Ancillary Agreement and (iv) the appointment of Buyer's nominees to the board of directors of GNB,

(d)    resignations of each of the directors and officers of GNB effective as of the Closing Date, and

(e)    such other certificates and documents as Buyer or its counsel may reasonably request

Section 3 3    Documents to be Delivered to Seller  At the Closing, Buyer shall, in addition to the payment under Section 2 2, deliver to Seller

(a)    a certificate of Buyer in a form reasonably satisfactory to Seller certifying as to the accuracy of the Buyer's representations and warranties at and as of the Closing and that Buyer has performed and complied with all of the terms, provisions and conditions to be performed and complied with by Buyer at or before the Closing,

(b)    a certificate of the secretary or an assistant secretary of Buyer in a form reasonably satisfactory to Seller, dated the Closing Date, certifying as to  (i) Buyer's Memorandum and Articles of Association, (ii) the resolutions of Buyer's board of directors, authorizing the execution and performance of this Agreement, the Buyer Ancillary Agreements,

-7-

A-0823

## ARTICLE 4

### REPRESENTATIONS AND WARRANTIES REGARDING SELLER

Seller represents and warrants to Buyer as follows

Section 4 1  **Organization**  Seller is a company incorporated and validly existing under the laws of Hong Kong  Seller is not in violation of any provision of its Memorandum and Articles of Association  Seller is duly qualified or licensed to do business and is in good standing as a foreign corporation in each of the jurisdictions specified in Schedule 4 1  Seller is not required in relation to the Business to be qualified or licensed to do business as a foreign corporation in any jurisdiction other than those specified in Schedule 4 1, except for those jurisdictions where the failure to so qualify is not likely to have a Material Adverse Effect

Section 4 2  **Power and Authority, Agreement Binding**  Seller has all requisite corporate power and authority to execute and deliver this Agreement and the Seller Ancillary Agreements and to perform its obligations hereunder and thereunder  Seller's execution, delivery and performance of this Agreement and the Seller Ancillary Agreements has been duly authorized and approved by all necessary corporate action  This Agreement has been, and the Seller Ancillary Agreements will be, duly executed and delivered by Seller and, assuming due authorization, execution, and delivery by Buyer, is and will be the legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms, subject to general principles of equity and except as enforceability may be limited by applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or other similar laws of general application relating to creditors' rights generally

Section 4 3  **Absence of Conflicts**  The execution, delivery and performance of this Agreement and the Seller Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby, will not

(a)  conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation, or result in the termination of or result in the creation or imposition or crystallisation of any Encumbrance upon the Shares or any assets of GNB under, (i) any note, instrument, contract, agreement, mortgage, indenture, lease, license, or franchise to which Seller or any Affiliate of Seller is a party or by which it or any of its assets is bound, (ii) any Court Order, or (iii) any Requirements of Law, except for any of the foregoing which, individually or in the aggregate is or are not likely to have a Material Adverse Effect or hinder or impair the consummation of the transactions contemplated hereby, or

(b)  require the approval, consent, authorization or act of, or the making by Seller or any Affiliate of Seller of any declaration, notification, filing or registration with any Person, except for any of the foregoing which, individually or in the aggregate, if not taken, is or are not likely to have a Material Adverse Effect

-2-

A-0824

Section 4 4    No Litigation  There is no Action pending or, to the Knowledge of the Seller, threatened which questions the legality or propriety of the transactions contemplated by this Agreement or the Seller Ancillary Agreements or which would impair the consummation of the transactions contemplated hereby or thereby

Section 4 5    Title to Shares  Except as set forth in Schedule 4 5, Seller has good, valid and marketable title to and beneficial ownership of the Shares, free and clear of all Encumbrances, and has full right and power to vote and dispose of such Shares as contemplated herein  The Seller is not a party to any option, warrant, purchase right, or other contract or commitment that could require the Seller to sell, transfer, or otherwise dispose of any of the Shares (other than this Agreement)  The Seller is not a party to any voting trust, proxy, or other agreement or understanding with respect to the voting of any of the Shares

Section 4 6    No Advisor  Neither Seller nor any of its Affiliates nor any Person acting on its or their behalf, has retained any advisor, broker, investment banker or financial advisor in connection with this Agreement or any transaction contemplated hereby for which the Buyer or GNB may be liable

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES REGARDING GNB

Seller represents and warrants to Buyer as follows

Section 5 1    Organization  GNB is a company duly incorporated, validly existing and is duly authorised under the laws of Hong Kong  Seller has delivered to Buyer complete and correct copies of GNB's Memorandum and Articles of Association as in effect on the date hereof, and has furnished or made available copies of the minute books of GNB  Such Memorandum and Articles of Association are in full force and effect  GNB is not in violation of any provision of its Memorandum and Articles of Association  GNB is duly qualified or licensed to do business and is in good standing as a foreign corporation in each of the jurisdictions specified in Schedule 5 1  GNB is not required to be qualified or licensed to do business as a foreign corporation in any jurisdiction other than those specified in Schedule 5 1, except for those jurisdictions where the failure to so qualify is not likely to have a Material Adverse Effect or hinder or impair the ability of Seller to consummate the transactions contemplated by this Agreement or the Seller Ancillary Agreements

Section 5 2    Capitalization  The authorized capital of GNB consists of One Hundred Million (100,000,000) ordinary shares of par value HK $10 each  There are two ordinary (2) shares in the capital of GNB issued and outstanding, all of which constitute the Shares  All of the Shares are beneficially owned by Seller  The Shares have been duly authorized and validly issued, are fully paid and non-assessable, and have not been issued in violation of any preemptive or other rights under applicable law, GNB's Memorandum and Articles of Association, or the terms of any subscription, option, warrant, right, agreement, commitment or Court Order to which GNB is a party, or by which it is bound  GNB does not have any outstanding subscriptions, options, warrants, rights, agreements or other commitments granting

-10-

A-0825

to any Person any interest in or right to acquire any of their securities, including , without limitation, the Shares, or any interest therein  GNB has not issued any security convertible into, or exchangeable for, the Shares or other capital shares, and there is no voting trust or other agreement or understanding to which GNB or Seller is a party or by which either of them is bound with respect to the voting of the Shares  GNB is not under any obligation, whether contingent or otherwise, to issue or repurchase any of its capital shares or to share or make any dividend or distribution payments based on its revenues, profits or net income

Section 5 3    Subsidiaries and Investments    Save that, if formed by Closing, at Closing GNB will own all of the registered capital of the Subsidiary, GNB does not own, directly or indirectly, any stocks, bonds or securities or any equity or other proprietary interest in any Person

Section 5 4    Absence of Conflicts    Except as set forth in Schedule 5 4, the execution, delivery, and performance of this Agreement and the Seller Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby, will not

(a)    conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation, or result in the termination of, or result in the creation or imposition or crystallisation of any Encumbrance upon the Shares or any assets of GNB under  (i) any note, instrument, contract, agreement, mortgage, indenture, lease, license, or franchise to which GNB is a party or by which it or its assets, are bound, (ii) any Court Order, or (iii) any Requirements of Law, except for any of the foregoing which, individually or in the aggregate, is or are not likely to have a Material Adverse Effect or hinder or impair the consummation of the transactions contemplated hereby or thereby, or

(b)    require the approval, consent, authorization or act of, or the making by GNB of any declaration, notification, filing or registration with any Person, except for any of the foregoing which, individually or in the aggregate, is not likely to have a Material Adverse Effect or materially hinder or impair the consummation of the transactions contemplated hereby and thereby

Section 5 5    No Litigation    Except as set forth in Schedule 5 5  (a) there is no Action pending or, to the Knowledge of the Seller, threatened against GNB or any of its assets and there has not been, to the Knowledge of the Seller, any claim asserted by any Person that could lead to an Action, and (b) neither GNB nor any of its assets is subject to any currently pending Court Order  Except as set forth in Schedule 5 5, to the Knowledge of the Seller, there is no Action pending or threatened against any officer or director of GNB arising out of his or her service as an officer or director of GNB

Section 5 6    No Violation    Except as set forth in Schedule 5 6, GNB has complied and is in compliance with all Court Orders and Requirements of Law which are applicable to GNB or the Business, except for such Requirements of Law as to which noncompliance is not likely to have a Material Adverse Effect

-11-

A-0826

Section 5 7    Operations Since June 30, 1999

(a)    Except as set forth in Schedule 5 7(A), or except as reflected in the March 31, 2000 Balance Sheet, since June 30, 1999, there has been no material adverse change in the business, operations, assets, or financial condition of the Business, GNB or the Subsidiary in each case taken as a whole  The termination of any Intercompany Agreement not listed on Schedule 7 4 will not have a Material Adverse Effect

(b)    Except as set forth in Schedule 5 7(B), or except as reflected in the March 31, 2000 Balance Sheet, since June 30, 1999, the Business has been conducted only in the ordinary course  Specifically, since June 30, 1999, except as set forth in Schedule 5 7(B), none of the seller or assignor under the Acquisition Contracts, GNB or the Subsidiary have

(i)    made any material change in operations,

(ii)    made any capital expenditure or entered into any contract or commitment therefor in excess of the capital expenditures disclosed in the "Fiscal Year 2000 Open Sanction Summary" attached to Schedule 5 7(B) to the US Agreement,

(iii)    sold, leased (as lessor), assigned, transferred or otherwise disposed of, or imposed or suffered to be imposed any Encumbrance on, any of the assets, except for inventory and other personal or real property sold, leased or otherwise disposed of for fair value in the ordinary course of business consistent with past practice and except for Permitted Encumbrances,

(iv)    cancelled any debts owed to or claims held by it (including the settlement of any Action) other than in the ordinary course of business consistent with past practice,

(v)    created, incurred or assumed, or agreed to create, incur or assume, any indebtedness for borrowed money or entered into, as lessee, any finance lease obligations as defined in AASB 1008 or guaranteed any such indebtedness or leases of others or made any loans other than in the ordinary course of business consistent with past practice,

(vi)    written off as uncollectible or accelerated or delayed collection of notes or accounts receivable generated by GNB in advance of or beyond their regular due dates or the dates when the same would have been collected other than in the ordinary course of business consistent with past practice,

(vii)    delayed or accelerated payment of any accounts payable or other liabilities of GNB beyond or in advance of their due date or the date when such liabilities would have been paid other than in the ordinary course of business consistent with past practice,

-12-

A-0827

(viii)   made any distribution of assets (including payments of cash) to any of its Affiliates other than pursuant to agreements entered into in the ordinary course of business consistent with past practice or declared or paid any dividends (provided that Seller shall have the right to remove and retain all cash held by GNB or its Subsidiary), or redeemed, reclassified or purchased or otherwise acquired any shares of its capital stock or authorized or issued any shares of its capital stock or any option, warrant or other right to purchase or acquire any such shares,

(ix)   entered into or, except as set forth in Schedule 5.15(A), amended any employment, severance or similar agreement or arrangement or made any increases in the wages, bonuses, and benefits of its employees (other than any increases made in the ordinary course of business consistent with past practice),

(x)   waived any rights or settled any claims, except for such waivers or settlements granted or entered into in the ordinary course of business,

(xi)   made any change in any method of accounting,

(xii)   suffered or incurred any damage, destruction, fire, explosion, accident, flood or other casualty loss or act of God (whether or not covered by insurance) to any material operating asset or group of operating assets,

(xiii)   entered into or amended any purchase or sale contract outside the ordinary course of business,

(xiv)   suffered any amendment, termination, suspension or revocation of, any Governmental Permit,

(xv)   joined any new or amended or modified any already existing superannuation fund applicable to its employees other than the Provident Fund,

(xvi)   amended its Memorandum and Articles of Association,

(xvii)   manufactured inventory in excess of its expected needs, or

(xviii)   where applicable, agreed to do any of the foregoing.

Section 5.8    **Taxes.** Except as set forth in Schedule 5.8.

(a)   Seller has accurately prepared and timely filed (including all extensions) all Tax Returns

-13-

(b)    All such Tax Returns have been prepared in compliance with applicable Requirements of Law and filed by Seller and are true and correct and properly reflect the Taxes due for the periods covered thereby

(c)    All Taxes due and payable by Seller have been properly paid

(d)    Seller has not waived any law or regulation fixing, or consented to the extension of, any period of time for assessment of any Taxes which waiver or consent is currently in effect nor been requested or been granted an extension of time for filing any Tax Return which has not yet been filed

(e)    There are no material elections, consents or agreements with tax authorities other than those reflected on tax forms filed with tax authorities

(f)    Except as set forth on Schedule 5 8, no deficiency or proposed adjustment (which has not settled or otherwise resolved) for any amount of Tax has been proposed, asserted or assessed by any taxing authority against GNE or its Subsidiary

(g)    Except as set forth on Schedule 5 8, there is no action, suit, taxing authority proceeding or audit now in progress, pending or, to the Knowledge of Seller, threatened against or with respect to GNB or its Subsidiary

(h)    Except as set forth on Schedule 5 8, no claim has ever been made by a taxing authority in a jurisdiction where GNB or its Subsidiary, respectively, do not file Tax Returns that such entity is or may be subject to Taxes assessed by such jurisdiction

(i)    Except as set forth on Schedule 5 8, GNB and its Subsidiary will not be required (A) as a result of a change in method of accounting for a taxable period ending on or prior to the Closing Date, to include any adjustment in taxable income for any taxable period (or portion thereof) ending after the Closing Date, (B) as a result of any Requirement of Law relating to taxation matters to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date, (C) as a result of any Requirement Law relating to taxation matters, to include any item of income in taxable income for any taxable period (or portion thereof) ending after the Closing Date or (D) any installment sale made, or prepaid income attributable to, a taxable period ending on or prior to the Closing Date

(j)    Except as set forth on Schedule 5 8, GNB and its Subsidiary have no obligation or liability for the payment of Taxes of any other Person, including, but not limited to the following, a liability of GNB or its Subsidiary for the payment of any Tax arising (A) as a result of being (or ceasing to be) a member of any Affiliated Group (or being included (or required to be included) in any Tax Return relating thereto), (B) as a result from any expressed or implied obligation to indemnify another person, and (C) as a result from GNB or its Subsidiary succeeding to the Tax liability of any other person as a successor, transferee or otherwise

-14-

Section 5.9    Title to Assets.  GNB is the exclusive and absolute owner of and has good title to, or a valid leasehold interest to, all of its personal property reflected in the June 30, 1999 Balance Sheet (other than property disposed of since the date of the June 30, 1999 Balance Sheet in the ordinary course of business consistent with past practice for fair value) in the amounts and categories reflected therein, and all personal property acquired after the date of the June 30, 1999 Balance Sheet, free and clear of all Encumbrances, except for (a) Permitted Encumbrances, (b) the lien of current taxes not yet due and payable, and (c) other exceptions disclosed in Schedule 5.9  Except as disclosed in Schedule 5.9, the personal property of GNB is usable in the ordinary course of GNB's business and conforms to all Requirements of Law relating to its construction, use and operation, except where such nonconformity is not likely to have a Material Adverse Effect

Section 5.10    Real Property.

(a)    Schedule 5.10(A) sets forth a complete and accurate list, including a brief description of the material terms of each material lease, sublease or similar agreement under which GNB is lessee or sublessee of, or holds or operates, any real property owned by any third Person (the "Leased Real Property")

(b)    GNB has a good and valid leasehold interest in all of the Leased Real Property leased by it, free and clear of all Encumbrances except for Permitted Encumbrances  The occupation, possession and use of the Leased Real Property by GNB has not been disturbed and, to the Knowledge of the Seller, no claim has been asserted or threatened which is adverse to the rights of GNB to the continued occupation, possession and use of the Leased Real Property, as currently utilized

Section 5.11    Personal Property.  Schedule 5.11 contains a list of all machinery, equipment, and vehicles owned by GNB having an original cost of Seven Hundred Eighty Thousand Hong Kong dollars (HK$780,000) or more

Section 5.12    Personal Property Leases.  Schedule 5.12 contains a brief description of each lease or other agreement or right under which GNB is lessee of, or holds or operates, any machinery, equipment, or vehicle owned by a third Person, except those which are terminable by GNB without cost or penalty on 30 days' or less notice or which provide for annual rentals of less than Seven Hundred Eighty Thousand Hong Kong dollars (HK$780,000)

Section 5.13    Governmental Permits.

(a)    Except as disclosed in Schedule 5.13(A), GNB owns, holds or possesses all material licenses, franchises, permits, privileges, immunities, approvals and other authorizations from a Governmental Body which are necessary to entitle it to own or lease, operate and use its assets and conduct its operations substantially as currently operated (herein collectively called "Governmental Permits")  Notwithstanding the foregoing, Governmental Permits required under Environmental Laws are addressed solely in Section 5.19(b)

-15-

(b)    Except as set forth in <u>Schedule 5 13(B)</u>  ( ) GNB has fulfilled and performed its obligations under each of the Governmental Permits, except for such nonfulfillment or nonperformance which is not likely to have a Material Adverse Effect, and (ii) no written notice of cancellation, revocation, suspension, or default or of any dispute concerning any Governmental Permit has been received by GNB and, to the Knowledge of the Seller, there is no basis for the issuance of such notice except as a result of the consummation of the transactions contemplated hereby or except as is not likely to have a Material Adverse Effect

Section 5 14   <u>Intellectual Property</u>

(a)    Except as set forth on <u>Schedule 5 14(A)</u>, there are no material patents, patent applications, trademarks or trademark registrations, service marks or service mark registrations, trade names, Internet domain names, business names, or any applications to register any of the foregoing, copyrights, or any licenses to or from any Person with respect to any of the foregoing, used by GNB or otherwise relating to the business substantially as currently conducted by GNB (collectively, the "**Intellectual Property**")

(b)    Each item constituting part of the Intellectual Property has been, to the extent indicated in <u>Schedule 5 14(B)</u>, duly registered, filed or issued, as the case may be, as is indicated in <u>Schedule 5 14(B)</u>, and such registrations, filings and issuances remain in full force and effect

(c)    Except as set forth on <u>Schedule 5 14(C)</u>, GNB owns and possesses all right, title and interest in and to the Intellectual Property, and GNB has not received written notice of any claim by any Person contesting the validity, enforceability, use, or ownership of any Intellectual Property, patent disclosures or inventions or asserting that GNB is infringing the intellectual property of others   <u>Schedule 5 14(C)</u> sets forth all technology (including Intellectual Property) owned by third parties and used by GNB   To the Knowledge of the Seller, except as set forth in <u>Schedule 5 14(C)</u>, no Person is infringing the rights of GNB with respect to any Intellectual Property   GNB uses all reasonable efforts to protect its trade secrets

Section 5 15   <u>Employee Agreements and Plans</u>

(a)    Except as described in <u>Schedule 5 15(A)</u>, GNB is not a party to or bound by any collective bargaining agreement, employment agreement, severance agreement, consulting, independent contractor or service agreement, deferred compensation agreement, confidentiality agreement or covenant not to compete which is material to its business

(b)    Except as set forth in <u>Schedule 5 15(B)</u>  (i) GNB is in compliance with all applicable Requirements of Law with respect to labor and employment, including employment practices, terms and conditions of employment and wages, overtime pay, and hours, except for such noncompliance as is not likely to have a Material Adverse Effect, (ii) GNB has not engaged in any unfair labor practice or illegally discriminated with regard to any aspect of employment on the basis of any legally prohibited category or classification, and (iii) with respect to employees and former employees who rendered services to, or participated in conduct or activities in connection with GNB , GNB is not liable for any arrears of wages, salaries or other payments

A-0831

Section 5.16   **Superannuation**

(a)    The superannuation schemes listed in paragraph (a) of part (1) of Schedule 5.17 are the only employer sponsored superannuation schemes or pension arrangements to which GNB pays contributions in respect of its employees.

(b)    GNB has paid all contributions due by GNB to the Provident Fund in respect of its employees.

(c)    Except for its commitment to contribute to the Provident Fund, GNB has no obligation, liability or duty to make any payment to any person in respect of any superannuation, retirement benefits, pensions, annuities, life assurance schemes or arrangements for the benefit of any of its employees.

Section 5.17   **Contracts**   Except as set forth in Schedule 5.17, GNB is not a party to or bound by

(a)    any consignment, distributor, dealer, manufacturer's representative, sales agency, advertising representative or advertising or public relations contract or agreement which is reasonably anticipated by GNB to involve the payment of more than Seven Hundred Eighty Thousand Hong Kong Dollars (HK$780,000) per year,

(b)    any contract, agreement or commitment regarding the sale or other disposition of products or services by GNB, or for the purchase of raw materials, products or services by GNB, which is reasonably anticipated by GNB to involve the receipt or payment of more than Seven Hundred Eighty Thousand Hong Kong Dollars (HK$780,000) per year,

(c)    any guarantee or indemnification agreement for the benefit of any Person made or given outside of the ordinary course of business,

(d)    any contract, agreement or commitment which provides for the recurrence by GNB of indebtedness for borrowed money or capitalized lease obligations,

(e)    any partnership or joint venture agreement,

(f)    any agreement, contract or commitment relating to capital expenditures of an amount or value in excess of Seven Hundred Eighty Thousand Hong Kong Dollars (HK$780,000),

(g)    any agreement that restricts or purports to restrict the business activity of GNB or limits GNB's ability to engage in any line of business or compete with any Person, or

(h)    any material license of software or other intellectual property, or

(i)    any agreement that was not entered into in the ordinary course of GNB's business consistent with past practice and that involves annual payments in excess of Seven Hundred Eighty Thousand Hong Kong Dollars (HK$780,000)

-17-

A-0832

order from, claim by, statutory request for information from, or continuing agreement with any Person respecting (i) any violation of Environmental Law or Governmental Permits, (ii) any Remedial Action, or (iii) any claim of Losses and Expenses, in each case arising from the Release or threatened Release of a Contaminant or the presence of any Contaminant on, in, at or beneath the Leased Real Property or the migration of any Contaminant onto or from the Leased Real Property

(d)    Except as set forth in Schedule 5.19(D), GNB is not subject to any pending or, to the Knowledge of the Seller Regarding Environmental Matters, threatened judicial or administrative investigation, proceeding, order, notice of violation, judgment, decree or settlement with any continuing obligation alleging or relating to a violation of or liability under any Environmental Law or Governmental Permits

(e)    Except as set forth in Schedule 5.19(E)

(i)    Neither GNB nor the seller or assignor under the Acquisition Contracts has reported a Release pursuant to an Environmental Law,

(ii)    Neither GNB nor the seller or assignor under the Acquisition Contracts has filed a notice with respect to the Contamination of land or the generation of hazardous wastes that is required to be filed pursuant to an Environmental Law, or

(iii)    to the Knowledge of the Seller Regarding Environmental Matters, there has not been any disposal by GNB or the seller or assignor under the Acquisition Contracts or Release of any Contaminants on, at, in, or beneath any Leased Real Property

(f)    Except as set forth in Schedule 5.19(F), GNB has not received written notice under any Environmental Law to the effect that it is or may be liable to any Person as a result of the generation, storage, transportation, Release, arrangement for disposal or disposal of any Contaminants on, at or, in any Leased Real Property

(g)    Except as set forth in Schedule 5.19(G), to the Knowledge of the Seller Regarding Environmental Matters, there are no underground storage tanks (whether active or abandoned) located at, in, or beneath the Leased Real Property

(h)    Except as disclosed in the Schedules to Section 5.19, to the Knowledge of the Seller Regarding Environmental Matters, as of the Closing Date there is no condition existing on the premises constituting the Leased Real Property that will give rise to any liability of GNB under any Environmental Law

(i)    Seller has made available to Buyer true and correct copies of all material environmental audits and consultant's reports relating to the past and current operations, properties and facilities of GNB or any of their respective predecessors, which are in its possession or under its reasonable control

-19-

A-0834

(j)    To the Knowledge of the Seller Regarding Environmental Matters    e sites identified the Disclosure Schedule constitute, and as the Disclosure Letter is updated by Seller from time to time in its sole discretion prior to the Closing Date, will constitute all PRP Sites as of the Closing Date

(k)    Notwithstanding any other provision of this Agreement, no representations and warranties are made or shall be deemed to apply to the PRP Sites

Section 5 20    Insurance    Seller has, and at all times has had, valid insurance coverage in respect of the business against all risks normally insured against by persons in the same industry, underwritten by one or more well-established and reputable insurers or adequately capitalized Affiliates    Schedule 5 20 contains a list of all insurance policies (specifying (i) the insurer, (ii) the amount of the coverage, (iii) the type of insurance, (iv) the policy number, and (v) any currently pending claims thereunder) maintained by or on behalf of GNB on its properties, assets, business or personnel    GNB has not failed to give any notice or present any claim under any insurance policy in due and timely fashion    All premiums due under the policies listed on Schedule 5 20 have been paid or accrued for on the Financial Statements and all such policies are in full force and effect and no notice of disallowance of any claim under any insurance policy, whether or not currently in effect, has been received by GNB    Other than (i) claims properly made against GNB in the ordinary course of business pursuant to insurance programs written on a retrospective rating basis, (ii) claims made as a result of premium audits relating to expired insurance policies, (iii) deductible claims relating to losses that are incurred by not reported, or losses that are known but not finally resolved, GNB has no liability for or exposure to any premium expenses for expired policies and there are no current claims by GNB under any such policy as to which coverage has been questioned, denied or disputed by the underwriters of such policies

Section 5 21    Product Warranties    All of GNB's unexpired, express product warranties with respect to product that it manufactures or sells or that it has heretofore manufactured or sold are described in Schedule 5 21    Except as set forth in Schedule 5 21, GNB has not received written notice of any claim, and to the Knowledge of the Seller there are no threatened claims against GNB, based on any product warranty (except claims outstanding as of June 30, 1999, not exceeding One Million Five Hundred Sixty Thousand Hong Kong Dollars (HK$1,560,000) in the aggregate)

Section 5 22    Bank Accounts, Guarantees and Powers    Schedule 5 22 sets forth a list of all accounts, borrowing resolutions and deposit boxes maintained by GNB at any bank or other financial institution and the names of the persons authorized to effect transactions in such accounts and pursuant to such resolutions and with access to such boxes

Section 5 23    Accounts and Records    All the accounts, books, ledgers and financial and other material records of GNB have been maintained accurately and in accordance with generally accepted accounting practices

Section 5 24    No Misrepresentation    To the Knowledge of the Seller, the representations and warranties of Seller contained in this Agreement, the Disclosure Schedules

-20-

A-0835

attached hereto, and the ce ificates and other instruments delivered by Seller pursuant hereto, do not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained herein or therein not misleading

Section 5 25  **Sufficiency of Assets**  GNB and the Subsidiary lease or have the right to use all Leased Real Property, buildings, machinery, equipment, intellectual property and other assets necessary for the conduct of the Business

Section 5 26  **Powers of Attorney**  As of Closing, there will not be any outstanding powers of attorney executed on behalf of GNB or its Subsidiary other than with respect to the filing of taxes, customs and similar matters and intellectual property registrations

Section 5 27  **Acquisition Contracts**  GNB has acquired and will at Closing be or be entitled to become the owner, directly or indirectly of all of the assets and liabilities relating to the Business in Hong Kong and the PRC formerly owned or held respectively by either Pacific Dunlop (Asia) Limited or Pacific Dunlop Holdings (China) Co  Ltd

## ARTICLE 6

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows

Section 6 1  **Organization**  Buyer is a corporation duly organized, validly existing and is duly authorized under the laws of Singapore  Buyer is not in violation of any of the provisions of its Memorandum and Articles of Association  Buyer is duly qualified to do business and is in good standing as a foreign corporation in each of the jurisdictions in which Buyer's operations require that it qualify to transact business as a foreign corporation, except for those jurisdictions where the failure to so qualify is not likely to have a material adverse effect on Buyer's business or financial condition  or the ability of Buyer to lawfully consummate the transactions contemplated by this Agreement in all material respects

Section 6 2  **Power and Authority**  Buyer has the full corporate power and authority to execute and deliver this Agreement and the Buyer Ancillary Agreements, to perform its obligations hereunder and thereunder, and to own and lease its property and conduct its operations as currently conducted  Buyer s execution, delivery and performance of this Agreement has been duly authorized and approved by all necessary corporate action

Section 6 3  **Agreement Binding**  This Agreement has been and the Ancillary Agreements will be duly executed and delivered by Buyer, and assuming due authorization, execution and delivery by Seller, is and will be the legal, valid and binding obligations of Buyer enforceable in accordance with their respective terms, subject to general principles of equity and except as enforceability may be limited by applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or other similar laws of general application relating to creditors' rights generally

A-0836

Section 6.4    Absence of Conflicts   The execut n, delivery and performance of this Agreement and the Buyer Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby, will not

(a)    conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation, result in termination of or result in the creation or imposition or crystallisation of any Encumbrance under   (i) any term or provision of the Memorandum and Articles of Association of Buyer, (ii) any note, instrument, contract, agreement, mortgage, indenture, lease, license, or franchise to which Buyer is a party or by which it or any of its assets are bound, (iii) any Court Order, or (iv) any Requirements of Law, except in each case, for any of the foregoing which, individually or in the aggregate, is or are not likely to have a material adverse effect on Buyer or its business taken as a whole or hinder or impair the consummation of the transactions contemplated hereby, or

(b)    require the approval, consent, authorization or act of, or the making by Buyer of any declaration, notification, filing or registration with, any Person, except in each case, for any of the foregoing which, individually or in the aggregate, if not taken, is or are not likely to have a material adverse effect on Buyer or its business taken as a whole or materially hinder or impair the consummation of the transactions contemplated hereby

Section 6.5    No Litigation   There is no Action pending or, to the knowledge of Buyer, threatened which questions the legality or propriety of the transactions contemplated by this Agreement or the Buyer Ancillary Agreements or which would impair the consummation of the transactions contemplated hereby, and there has not been, to the knowledge of Buyer, any claim asserted by any Person that could lead to such an Action

Section 6.6    Investment Representation   Buyer is acquiring the Shares for investment and not with a view to the distribution thereof or dividing all or any part of its interest therein with any other Person

Section 6.7    No Advisor   Neither Buyer nor any Person acting on its behalf has retained any advisor, broker, investment banker or financial advisor in connection with this Agreement or any transaction contemplated hereby for which Seller may be liable

Section 6.8    No Misrepresentation   To the knowledge of Buyer, the representations and warranties of Buyer contained in this Agreement and the certificates and other instruments delivered by Buyer pursuant hereto do not include any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made not misleading

## ARTICLE 7

## ACTION PRIOR TO THE CLOSING DATE

Buyer and Seller covenant and agree to take the following actions between the date hereof and the Closing Date

-22-

A-0837

Section 7.1   **Preserve Accuracy of Representations and Warranties**   Buyer and Seller shall, and Seller shall cause GNB to, refrain from taking any action that would render any representation or warranty contained in this Agreement inaccurate as of the Closing Date   Buyer and Seller shall promptly notify the other of any Action, investigation, or other proceeding, that shall be instituted or threatened against such party or in the case of Seller, against GNB, to restrain, prohibit or otherwise challenge the legality of any transaction contemplated by this Agreement

Section 7.2   **Consents and Approvals**

(a)   During the period prior to the Closing Date, Seller and Buyer shall, and Seller shall cause GNB to, act diligently and reasonably, and shall cooperate with each other, to secure any consents and approvals of any Governmental Body or any other Person required to be obtained in order to effect the consummation of the transactions contemplated by this Agreement and preserve for the benefit of GNB its rights under permits and agreements

(b)   Notwithstanding the provisions of Section 7.2(a), in the event that by March 31, 2001 GNB shall not have entered into an assignment or new lease of the Leased Real Property as contemplated by clauses 7.2, 7.3 or 7.4 of the Acquisition Contract with respect to the assets formerly owned by Pacific Dunlop (Asia) Limited (the "Current Leases") because of a failure to obtain necessary consents, registrations or approvals, and, as a result thereof GNB is required to enter into another lease ("the Substitute Lease") on terms less favourable than those contained in the particular Current Lease(s) not directly replaced, Seller shall indemnify Buyer against the difference between the economic terms of the particular Current Lease affected for the period between the date of commencement of the Substitute Lease and the balance of the term of that Current Lease, provided the Company shall have used its reasonable endeavours to secure a lease of premises of substantially similar location and condition as the Current Lease effected, and on terms no less favourable than those available under the particular Current Lease effected

Section 7.3   **Operations Prior to the Closing Date**

(a)   During the period prior to the Closing Date, Seller shall cause GNB to operate and carry on its operations only in the ordinary course and substantially as operated prior to the date hereof

(b)   Notwithstanding Section 7.3(a), except as set forth in Schedule 7.3(B), as expressly contemplated by this Agreement, or with the express prior consent of Buyer, Seller shall not take and shall cause GNB not to take any of the actions set forth in Section 5.7(b), provided, however, notwithstanding anything to the contrary herein, Seller shall not make any capital expenditure in excess of Hong Kong equivalent of US$250,000 (other than as permitted by Section 7.3(b) of the US Agreement) without the prior written approval of Buyer

Section 7.4   **Changes to Employment Conditions**   Seller covenants with Buyer to ensure that the warranty in Section 5.7(b)(viii) will not be breached in any material respect between the date of this Agreement and Closing

-23-

A-0838

(i)    Buyer must provide, and use all reasonable endeavours to ensure that the Trustee of the New Provident Fund provides to Seller and the trustees of the Provident Fund any information reasonably required by them to give effect to this Section 7.6

(j)    Buyer must secure in respect of Existing Members a benefit on his or her death or total and permanent disablement while in the employ of GNB between the Closing Date and the date he or she accepts or declines the offer referred to in Section 7.6(b) of an amount at least equal to the value of the insured portion of the death or total and permanent disablement benefit which would have been payable from the Provident Fund if the Existing Member had died or become totally and permanently disabled on the Closing Date

Section 7.7    General  Each of the parties will use its reasonable best efforts to take all action and to do all things necessary, proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the closing conditions set forth below)

Section 7.8    Preservation of Business  Seller shall cause GNB to use reasonable best efforts to keep its business and properties substantially intact, including its present operations, physical facilities, working conditions, and relationships with lessors, licensors, suppliers, customers and employees

## ARTICLE 8

## CONDITIONS TO CLOSING

Section 8.1    Conditions to the Obligations of the Buyer  The obligations of Buyer under this Agreement shall, at the option of Buyer, be subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions

(a)    No Misrepresentation or Breach of Covenants and Warranties  Seller shall have complied in all material respects with its covenants and agreements herein and in the Coordinating Agreement  Each of the representations and warranties of Seller contained in this Agreement and each of the Seller Ancillary Agreements shall be true and correct in all material respects on the Closing Date as though made on the Closing Date (except with respect to those representations and warranties that speak as to a particular date or time, which only need to be true and correct as of such date or time), except for changes therein specifically permitted by this Agreement or resulting from any transaction expressly consented to in writing by Buyer, and there shall have been delivered to Buyer a closing certificate in a form reasonably satisfactory to the Buyer to such effect, dated the Closing Date, signed by the Chairman or Managing Director of Seller

(b)    Closing Documents  Buyer shall have received from Seller the closing documents contemplated by Section 3.2

(c)    Necessary Approvals  Seller and Buyer shall have received all approvals and actions of or by all Governmental Bodies and any other Person which are necessary to

-25-

consummate the transaction contemplated hereby and by the ROW Agreements and preserve for the benefit of GNB its rights under the GNB Agreements which are material to the operation of the Business

(d) **No Suit** No Action by any Governmental Body shall be pending or threatened questioning the legality of this Agreement or the consummation of the transactions contemplated hereby in whole or in part

(e) **No Restraint** No Court Order shall have been issued and be in effect which restrains or prohibits any material transaction contemplated hereby

(f) **US Agreement** The transactions contemplated by the US Agreement shall have closed simultaneously with the Closing

(g) **No Material Adverse Change** On the Closing Date, there shall not be a Material Adverse Effect

(h) **Coordinating Agreement** All conditions to Exide Corporation's obligations set forth in Sections 5 5, 5 6 and 5 7(a) of the Coordinating Agreement shall have been satisfied

Notwithstanding the failure of any one or more of the foregoing conditions, Buyer may, at its option, proceed with the Closing without satisfaction, in whole or in part, of any one or more of such conditions and without written waiver, provided however, that in so proceeding with the Closing, and notwithstanding any other provision of this Agreement, Buyer shall be deemed to have waived any such failure and any rights or remedies it may have against Seller by reason of such failure

**Section 8 2   Conditions to the Obligations of Seller** The obligations of Seller under this Agreement shall, at the option of Seller, be subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions

(a) **No Misrepresentation or Breach of Covenants and Warranties** Buyer shall have complied in all material respects with its covenants and agreements herein and in the Coordinating Agreement Each of the representations and warranties of the Buyer contained in this Agreement and the Buyer Ancillary Agreements shall be true and correct in all material respects on the Closing Date as though made on the Closing Date (except with respect to those representations and warranties that speak as to a particular date or time, which only need to be true and correct as of such date or time), except for changes therein specifically permitted by this Agreement or resulting from any transaction expressly consented to in writing by Seller, and there shall have been delivered to Seller a closing certificate in a form reasonably satisfactory to the Seller to such effect, dated the Closing Date and signed by the President or a Vice President of the Buyer,

(b) **Closing Documents** Seller shall have received from Buyer the closing documents contemplated by Section 3 3

-27-

A-0842

the Closing has not then occurred solely because the date fc Closing specified in Section 3 1 has not yet occurred and unless such failure to close is due primarily to the breach by the party seeking termination of its agreements, representations or warranties contained herein,

(c)    by Buyer in the event of any breaches in any material respect by Seller of Seller's agreements, covenants, representations or warranties contained herein, and which Seller has failed to remedy or cure within twenty one (21) days after receipt of notice from Buyer requesting that such breaches be remedied or cured,

(d)    by Seller in the event of any breaches in any material respect by Buyer of Buyer's agreements, covenants, representations or warranties contained herein, which Buyer has failed to remedy or cure within twenty one (21) days after receipt of notice from Seller requesting that such breaches be remedied or cured, or

(e)    by Buyer or Seller if any court shall have issued a Court Order or if any Governmental Body shall have issued a decree or ruling or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby

Section 9 2    Notice of Termination    Any party desiring to terminate this Agreement pursuant to Section 9 1 shall give written notice of such termination to the other parties to this Agreement

Section 9 3    Effect of Termination    In the event that this Agreement shall be terminated pursuant to this Article 9, all further obligations of the parties under this Agreement (other than Sections 11 2, 11 8, and 11 11 of this Agreement and Sections 5 2, 5 3 and 5 4 of the Coordinating Agreement) shall be terminated without further liability of any party to the other, provided that nothing herein shall relieve either party from liability for its willful breach of this Agreement

### ARTICLE 10

### EXCLUSIVITY OF REMEDY

Section 10 1    Indemnification by Seller    Seller's sole and exclusive indemnification obligations under this Agreement are set forth in the Coordinating Agreement

Section 10 2    Indemnification by Buyer    Buyer's sole and exclusive indemnification obligations under this Agreement are set forth in the Coordinating Agreement

Section 10 3    Exclusivity of Remedy    Except as provided in Section 9 3, with respect to any breach by either party of its representations warranties, covenants, or agreements in this Agreement, the respective Buyer or Seller Ancillary Agreements, or the ROW Agreements and the transactions contemplated hereby and thereby, the sole and exclusive remedy of the other party (in contract, tort, for contribution, under Requirements of Law, or otherwise) shall be the indemnification provided in the Coordinating Agreement    In view of this exclusivity of remedy provision, Buyer and Seller covenant and agree for themselves and their respective Affiliates that

-29-

they will not bring, maintain, join or prosecute any Action or other proceeding against the other or its Affiliates for breach of this Agreement or indemnity therefor except as provided in the Coordinating Agreement

## ARTICLE 11

### GENERAL PROVISIONS

Section 11 1  Notices  Any notice, request, instruction or other document to be given hereunder shall be in writing and   (a) delivered personally, (b) sent by reputable overnight courier, or (c) transmitted by facsimile, according to the instructions set forth below  Such notices shall be sent to the following addresses and/or facsimile numbers and shall be deemed given  (x) if delivered personally, at the time delivered, (y) if sent by reputable overnight courier, at the time sent, or (z) if transmitted by facsimile, at the time when receipt is confirmed by the sending facsimile machine

If to Seller, to

Pacific Dunlop Limited
Level 41
101 Collins Street
Melbourne, Victoria 3000
Australia
Attention  Managing Director
Facsimile  613-9270-7634

with a copy to

Gardner, Carton & Douglas
321 N  Clark Street
Suite 3400
Chicago, Illinois 60610
United States of America
Attention   Mr  Robert J  Wilczek
Facsimile   1-312-644-3381

If to Buyer, to

c/o Exide Corporation
2901 Hubbard Road
Ann Arbor, MI  48105
Attention  General Counsel
Facsimile  (734) 827-2575
United States of America

-30-

with a copy to

Kirkland & Ellis
200 East Randolph Drive
Chicago, Illinois 60601
Attention  Mr Carter W Emerson, P C
Facsimile  312-861-2200

or to such other address as such party may indicate by a notice delivered to the other parties hereto in accordance with the provisions of this Section 11 1

Section 11 2  **Confidential Information**  Each party agrees that it will treat in confidence all documents, materials and other information which it shall have obtained regarding any of the other parties during the course of the negotiations leading to the consummation of the transactions contemplated hereby (whether obtained before or after the date of this Agreement), the investigation provided for herein and the preparation of this Agreement and other related documents ("Confidential Information"), and, in the event the transactions contemplated hereby shall not be consummated, each party will return to the other party all copies of nonpublic Confidential Information which have been furnished in connection therewith  Confidential Information shall not be communicated to any third Person (other than the parties' respective counsel, accountants, financial advisors, or environmental consultants)  No party shall use any Confidential Information in any manner whatsoever except solely for the purpose of evaluating the proposed transaction  Notwithstanding the foregoing, after the Closing, Buyer may use or disclose any Confidential Information related to GNB  The Seller shall not at any time after the Closing disclose any Confidential Information relating to GNB  The obligation of each party to treat Confidential Information in confidence shall not apply to any Confidential Information which (i) is or becomes available to such party from a source other than such party, (ii) is or becomes available to the public other than as a result of disclosure by such party or its agents, (iii) is required to be disclosed under applicable law or judicial process, but only to the extent it must be disclosed, or (iv) as to which such party reasonably deems disclosure necessary to obtain any of the consents or approvals contemplated hereby

Section 11 3  **No Public Announcement**  Neither Buyer nor Seller shall, without the approval of the other party, issue any press release or other public announcement concerning the transactions contemplated by this Agreement  Notwithstanding the foregoing, either party may issue a press release or other public announcement concerning the transactions contemplated by this Agreement to the extent that such party or its Affiliates shall be so obligated by law, or to comply with accounting, U S  Securities and Exchange Commission, New York Stock Exchange or Australian Stock Exchange disclosure obligations, provided that such party shall be obligated to give the other party prior notice of such press release or other public announcement if prior notice is commercially feasible

-31-

Section 11 4     Entire Agreement, Amendments     This Agreement, the Coordinating Agreement, and the Exhibits and Schedules referred to herein and therein and the Buyer Ancillary Agreements and the Seller Ancillary Agreements contain the entire understanding of the parties hereto with regard to the subject matter contained herein or therein, and supersede all prior written or oral agreements, understandings or letters of intent between or among any of the parties hereto   This Agreement shall not be amended, modified or supplemented except by a written instrument signed by an authorized representative of each of the parties hereto

Section 11 5     Successors and Assigns

(a)     The rights of each party under this Agreement and the Coordinating Agreement shall not be assignable without the written consent of the other party, provided, however, that no such assignment shall relieve the assigning party from any of its duties or obligations under this Agreement or the Coordinating Agreement

(b)     This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns   Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any Person other than the parties and successors and assigns permitted by this Section 11 5 any right, remedy, benefit or claim under or by reason of this Agreement

Section 11 6     Interpretation

(a)     Article titles and headings to sections herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement   The Schedules and Exhibits referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth herein

(b)     This Agreement and the Schedules and Exhibits hereto have been mutually prepared, negotiated and drafted by each of the parties hereto and thereto   The parties agree that the terms of this Agreement shall be construed and interpreted against each party in the same manner and that no such provisions shall be construed or interpreted more strictly against one party on the assumption that an instrument is to be construed more strictly against the party which drafted the agreement

Section 11 7     Waivers   Any term or provision of this Agreement may be waived, or the time for its performance may be extended, pursuant to a written action by the party or parties entitled to the benefit thereof   Any such waiver shall be validly and sufficiently authorized for purposes of this Agreement if, as to any party, it is authorized in writing by an authorized representative of such party   Subject to Sections 8 1 and 8 2, the failure of any party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any party thereafter to enforce each and every such provision   No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach

-52-

A-0846

Section 11 8   <u>Expenses</u>   Subject to the provisions of the Coordinating Agreement or the ROW Agreements, regardless of whether the transactions provided for in this Agreement are consummated, each party hereto will pay its own costs and expenses incident to the negotiation, preparation and performance of this Agreement, including the fees, expenses and disbursements of its counsel, financial advisors, and accountants   Neither GNB nor the Business has borne and will not bear any such costs or expenses

Section 11 9   <u>Partial Invalidity</u>   Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable

Section 11 10   <u>Execution in Counterparts</u>   This Agreement may be executed in one or more counterparts, each of which shall be considered an original instrument, and shall become binding when one or more counterparts have been signed by each of the parties hereto and delivered to each of Seller and Buyer

Section 11 11   <u>Governing Law</u>   This Agreement shall be governed by and construed in accordance with the internal laws of the State of Illinois, USA, without giving effect to any choice of laws provisions which may direct the application of the laws of another jurisdiction

Section 11 12   <u>Further Assurances and Cooperation</u>

(a)   From and after the date of this Agreement, upon the request of either Seller or Buyer or any of their respective Affiliates, the other party and its Affiliates shall execute and deliver such instruments, documents or other writings as may be reasonably necessary or desirable to confirm and carry out and to effectuate fully the intent and purposes of this Agreement

(b)   After the Closing, on reasonable advance notice, Buyer shall cause GNB to provide Seller, Seller's Affiliates and any advisor retained by Seller or its Affiliates with reasonable access to the management and properties, and books, records, and documents (which were in existence on the Closing) of GNB, during normal business hours and in a manner which does not unreasonably interfere with the business of GNB, for any reasonable purpose including, but not limited to, the fulfilment of Seller's responsibilities under Section 4 1(a) of the Coordinating Agreement, the enforcement of Seller's and its Affiliates' rights under Article 2 of the Coordinating Agreement and clause (iii) of Section 4 2(a) of the Coordinating Agreement As reasonably necessary, the Seller, the Seller's Affiliates, and any advisor retained by Seller or its Affiliates shall be entitled to make copies of such books, records and documents at their expense   If Buyer shall desire at any time to dispose of any such books, records or documents, Buyer shall, prior to such disposition, give Seller a reasonable opportunity to segregate and remove such books, records and documents as Seller may select   The obligations of Buyer pursuant to this Section 11 12 shall survive the Closing indefinitely

-31-

A-0847

Section 11 13 **No Re<sup></sup> ance.** The provisions of this Agreement are intended for the sole benefit of Buyer and Seller and shall not inure to the benefit of any other Person, other than successors and permitted assigns of Buyer and Seller, whether as third party or otherwise

Section 11 14 **Disclosure Schedules** The Disclosure Schedules are hereby incorporated by reference into and made a part of this Agreement  The inclusion of any item in the Disclosure Schedules is intended to qualify the representations and warranties contained in this Agreement, and to set forth other information required by this Agreement  Disclosure of information in any one of the Disclosure Schedules shall be deemed to be a disclosure with respect to every Section of this Agreement notwithstanding the presence or absence of a cross-reference to the Disclosure Schedules under other Sections of this Agreement if the meaning of such disclosure in the context of such other Section is reasonably ascertainable  Disclosure of information in the Disclosure Schedules shall not be deemed to be an admission by Seller that such information is material for the purposes of this Agreement

A-0848

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written

**SELLER**

PACIFIC DUNLOP HOLDINGS (HONG KONG)
LIMITED
By its duly appointed attorney

Name    Martin M. Hudson
Title    Attorney in Fact

**BUYER**

EXIDE HOLDING ASIA PTE LIMITED

By its Director duly authorized

Signature: _____

Name _____

Title _____

A-0849

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be exe uted the day and year first above written

SELLER

PACIFIC DUNLOP HOLDINGS (HONG KONG) LIMITED
By its duly appointed attorney

Name  Martin M Hudson
Title    Attorney in Fact

BUYER

TRAPSON PTE LTD

By its Director duly authorized,

Signature

Name    John Van Zile

Title    Director

6 JUN 2000  7 13     MARTIN N HUDSON 513 36544154          NO 1537  P 13

# BUSINESS SALE AGREEMENT

### Pacific Dunlop (Asia) Ltd

### and

### GNB Technologies (China) Limited

A-0851

6 JUN 2000  7 16    MARTIN M - 2306 613 96544184    NO 1537  P 12

## This business sale agreement

is made with effect on and from the Effective Date between the following parties

1    Pacific Dunlop (Asia) Ltd of Level 16, Tower II, Suites 1607-1611, The Gateway, Harbour City, 25-27 Canton Road, Kowloon, Hong Kong (Seller)

2    GNB Technologies (China) Limited of Level 16, Tower II, Suites 1607-1611, The Gateway, Harbour City, 25-27 Canton Road, Kowloon, Hong Kong (Buyer)

**Recitals**

A    The Seller is the owner of the Business Assets

B    The Seller has agreed to sell and the Buyer has agreed to buy the Business Assets on the terms and conditions set out in this agreement

**The parties agree**

in consideration of, among other things, the mutual promises contained in this agreement

## 1    Definitions and interpretation

### 1 1    Definitions

In this agreement

**Assets Leases** means the leases, hire purchase agreements, conditional purchase agreements and other hiring arrangements for assets used in the Business listed in schedule 1, but excludes the Property Leases.

**Business** means the business of distributing and selling automotive and industrial batteries carried on by the Seller in Hong Kong.

**Business Assets** means all the assets exclusively used in or forming part of the Business and includes, but is not limited to

(a)    the Assets Leases,

(b)    the Business Records,

(c)    the Contracts,

(d)    the Goodwill,

(e)    the Plant and Equipment,

(f)    the Property Leases,

(g)    the Stock,

(i)    the Receivables, and

(k)    all other tangible or intangible assets owned by the Seller and used exclusively in the Business,

**Business Day** means a day on which trading banks are open for business in Hong Kong and Melbourne, Australia,

A-0852

5 JUN 2000  7 19    MARTIN M -3303A 513 96544184              NG 1533  P 13

Business Records means the following Seller's records to the extent they relate to the Business,

(a)    customer lists,

(b)    supplier lists,

(c)    records of Assets Leases, Contracts and Property Leases,

(d)    books of account, ledgers and records of Receivables and Liabilities, and

(e)    records relating to the Transferring Employees,

Completion means the completion of the sale and purchase of the Business Assets pursuant to clause 4,

Completion Date means the date of signing this agreement,

Contracts means the agreements in respect of the Business to which the Seller is a party, and which are, wholly or partly, executory as at Completion, including the Assets Leases and the material contracts listed in schedule 2, but excluding the Property Leases,

Dollars, US$ and $ means the lawful currency of United States,

Duty means any stamp, transaction or registration duty or similar charge imposed by any governmental agency and includes, but is not limited to, any interest, fine, penalty, charge or other amount imposed in respect of the above,

Effective Date means 1 May 2000,

Employees means the employees of the Business as at Completion and includes, but is not limited to, those persons listed in schedule 3,

Encumbrance means an interest or power reserved in an asset, created or otherwise arising in or over any interest in any asset under a bill of sale, mortgage, charge, lien, pledge trust or power by way of security for the payment of a debt, any monetary obligation or the performance of any other obligation and includes any agreement to grant or create any of the above,

Goodwill means the goodwill of the Seller relating to the Business and includes the exclusive right for the Buyer to represent itself as carrying on the Business as the successor of the Seller,

Immediately Available Funds means cash or bank cheque,

Liabilities means all liabilities of the Seller of whatever nature relating to the ownership of the Business Assets, occupation of any property under the Property Leases or operation of the Business at any time before Completion and includes, but is not limited to, any actual, prospective, future or contingent liability owing or incurred by or on account of the Seller alone or severally or jointly with any other person,

Officer means a director, secretary or employee of the Seller or a Related Corporation of the Seller,

Office Lease means that part of the office premises described in Part A of schedule 4 leased by the Seller and occupied by the Business,

A-0853

**Plant and Equipment** means the furniture, fittings and motor vehicles used exclusively in or forming part of the Business and includes, but is not limited to, those listed in schedule 5 but excludes any assets leased or hired under the Assets Leases,

**Property Leases** means the Office Lease and the Warehouse Lease,

**Purchase Price** means the purchase price payable for the Business Assets calculated under clause 4,

**Receivables** means all debts acquired in the ordinary course of ordinary business of the Business and owed to the Seller at Completion,

**Seller's Funds** means the National Mutual Central Provident Fund as participated in by the Seller and certain of the Transferring Employees,

**Stock** means the stock of the Business as at Completion and includes, but is not limited to, raw materials, components, finished goods, packaging materials, spare parts and work-in-progress,

**Transferring Employee** means an Employee who accepts the Buyer's offer of employment made under clause 8.1, and

**Warehouse Lease** means the leased warehouse premises described in Part B of schedule 4

### 1.2 Interpretation

In this agreement, unless the context requires otherwise

(a) headings are for convenience only and do not affect the interpretation of this agreement,

(b) words importing the singular include the plural and vice versa,

(c) words importing a gender include any gender,

(d) a reference to any thing (including, but not limited to, any right) includes a part of that thing,

(e) a reference to a clause, party or schedule is a reference to a clause of, and a party and schedule to, this agreement, and

(f) where the day on or by which any thing is to be done is not a Business Day, that thing must be done on or by the preceding Business Day

## 2    Sale and purchase of Business Assets

The Seller shall sell and the Buyer shall buy the Business Assets for the Purchase Price with effect from Completion

## 3    Purchase Price

The Purchase Price is the aggregate of

(1) $10 for Goodwill, plus

A-0854

(2)    the total value of the Business Assets (excluding Goodwill) as recorded in the books of account of the Seller as at the Completion Date, less

(3)    the total value of the Liabilities as recorded in the books of account of the Seller as at the Completion Date

# 4    Completion

### 4.1    Date for Completion

Completion will take place on the Completion Date

### 4.2    At Completion

At Completion the Buyer must pay the Purchase Price to the Seller in Immediately Available Funds

### 4.3    Delivery of documents

Subject to the Buyer complying with its obligations under clause 4.2, at Completion the Seller must give to the Buyer the following documents

(a)    transfers of ownership and registration forms for all motor vehicles included in the Plant and Equipment executed by the Seller;

(b)    the Business Records,

(c)    assignments or novations of those Contracts which are capable of assignment or novation and which have been assigned or novated at Completion, and

(d)    any other document reasonably required by the Buyer to transfer the Business Assets to the Buyer and to complete the sale under this agreement.

### 4.4    Buyer's obligations at Completion

Subject to the Seller complying with its obligations under this clause, at Completion the Buyer must

(a)    deliver to the Seller counterparts, executed by the Buyer, of those documents listed in clause 4.3 that are to be executed by the Buyer; and

(b)    comply with its obligations under clause 4.2

# 5    Liabilities, indemnities and litigation

### 5.1    Assumption of Liabilities by the Buyer

(a)    On and subject to Completion, the Buyer becomes liable for all Liabilities and must pay all Liabilities on or before their due date

## 6      Assignment or novation of Contracts

### 6 1    Assignment

As soon as possible after Completion, the Seller must use reasonable endeavours to transfer the Contracts to the Buyer, either by assignment or by novation, with effect from the Completion Date

### 6 2    Consent of third party

If any consent or agreement of any third party is required for the transfer of Contract and has not been obtained at or prior to Completion, the Seller and the Buyer shall use their respective reasonable endeavours to obtain that consent or agreement as soon as possible following Completion.

### 6.3    Obligations pending transfer

If Contract has not been transferred to the Buyer by Completion, then after Completion

(a)    The Buyer must

(1)    perform all the obligations of the Seller under the Contract at the Buyer's expense, and

(2)    indemnify the Seller against any claim, action, damage, loss, liability, cost, charge, expense, outgoing or payment suffered, paid or incurred by the Seller after Completion under or in relation to the Contract.

(b)    The Seller must hold the benefit of all such Contracts for the Buyer and, subject to the Buyer performing its obligations under clause 6 3(a), the Buyer shall be entitled to the benefits and income therefrom (if any)

### 6 4    Use or occupation pending transfer

If an Assets Lease has not been transferred to the Buyer by Completion the Seller must, to the extent it lawfully can, allow the Buyer to use the property the subject of that Assets Lease as licensee from Completion until the transfer is completed

### 6 5    Failure to transfer

The Seller shall have no liability to the Buyer for failure to transfer any Contract and the Buyer shall have no claim or action against the Seller for any loss, liability, cost, expense, outgoing, damage or payment in relation to such failure

## 7      Transfer of Property Leases

### 7 1    Property Leases not Transferable

The Buyer acknowledges that the Warehouse Lease and the Office Lease are not transferable to the Buyer under the terms of the respective leases

### 7 2    Sublease of Office lease

A-0856

6 OCT 2003  / 20      MARTIN M HUDSON 613 96544 34              35 1531  > 12

The Seller shall use reasonable endeavours to procure, as soon as practical after the Completion Date the landlord of the Office Lease, consents to the sub-letting of the Office Lease by the Seller to the Buyer

### 7.3 Assignment of Warehouse Lease

The Seller shall use reasonable endeavours to procure, as soon as practical after the Completion Date, the landlord of the Warehouse Lease to consent to the assignment of the Warehouse Lease from the Seller to the Buyer

### 7.4 New Leases

In the event that the relevant consent from the landlord of either Property Lease cannot be obtained, the Buyer and the Seller will co-operate in seeking to obtain the agreement of the relevant landlord, in order for the Buyer to enter into a new lease of the Property the subject of the relevant Property Lease, to come into effect on the Completion Date

## 8 Employees

### 8.1 Offer of employment by Buyer

The Buyer shall offer to employ the Employees with effect from Completion on the same terms and conditions of employment as the Employees' current terms and conditions

### 8.2 Termination by Seller

Not less than seven (7) days before Completion (or such longer period as may be required under law or under other contracts of employment), the Seller and the Buyer will jointly inform each of the Employees in writing of the sale of the Business hereby agreed and will issue a joint letter in to each Employee giving notice of termination of each Transferring Employee's employment with the Seller and confirming an offer by the Buyer of re-engagement of such employee on terms no less favourable than his then existing terms of employment

### 8.3 Liability of Buyer

To the extent that the Seller has not paid the Transferring Employees any entitlement to wages, salaries, remuneration, compensation or benefits (but excluding any adjustments for annual leave, leave loading, long service leave or sick leave) arising out of their employment, due to or accrued by them at Completion, the parties agree that the value of such unpaid entitlements shall be paid by the Buyer and that the Purchase Price shall be adjusted by including such amounts in the value of Liabilities

## 9 Provident Fund

### 9.1 Buyer to become participating employer in Seller's Funds

Before or as soon as reasonably practicable after Completion, the Buyer and Seller will do all things required to ensure that the Buyer becomes a participating

A-0857

6 JUN 2000  F 21.    MARTIN M HUDSON 513 9004618+              NO 1551  P 10

employer in each of the Seller's Funds with effect immediately prior to Completion.

### 9 2  Buyer to provide information

The Buyer will provide to the Seller, and to the trustees of the Seller's Funds, any information reasonably required by them to give effect to clause 9 1

### 9 3  Carrying on Business

Before Completion, the Seller must conduct the Business in the ordinary course of ordinary business up to Completion.

## 10  Title and risk

Title to, and risk in, the Business Assets passes to the Buyer on Completion

## 11  Warranties

The Seller warrants to the Buyer that, as at Completion

(a)  it has taken all necessary action to authorise the execution, delivery and performance of this agreement in accordance with its terms,

(b)  it has full power to enter into and perform its obligations under this agreement including, but not limited to, selling the Business Assets,

(c)  as far as it is aware, it is the legal and beneficial owner of the Business Assets free of Encumbrances, and

(d)  the Business Assets are all the business assets forming part of the Business

## 12  Duty

The Buyer must pay any Duty in respect of the execution, delivery and performance of

(a)  this agreement, and

(b)  any agreement or document entered into or executed pursuant to this agreement

## 13  General

### 13 1  Notices

Any notice or other communication including, but not limited to, any request, demand, consent or approval, to or by a party to this agreement must be in legible writing and in English addressed as indicated at the commencement of this agreement

A-0858

### 13.2 Continuing indemnities and survival of indemnities

Each indemnity of the Buyer contained in this agreement is a continuing obligation of the Buyer despite

(1)    any settlement of account, or

(2)    the occurrence of any other thing,

and remains in full force and effect until all money owing, contingently or otherwise, under any indemnity has been paid in full and survives termination of this agreement.

### 13.3 Further assurances

Each party must do all things necessary to give full effect to this agreement and the transactions contemplated by this agreement.

### 13.4 Entire agreement

(a)    This agreement supersedes all previous agreements in respect of its subject matter and embodies the entire agreement between the parties

(b)    The Buyer acknowledges that no representations or warranties in connection with the sale of the Business or the Business Assets have been made by the Seller or anyone on behalf of the Seller other than the warranties set out in clause 11

### 13.5 Governing law and jurisdiction

(a)    This agreement is governed by the laws of Hong Kong

(b)    Each party irrevocably submits to the exclusive jurisdiction of the courts of Hong Kong

### 13.6 Third party rights

No person (including, but not limited to, an Employee) except the Buyer and the Seller has or is intended to have any right, power or remedy or derives or is intended to derive any benefit under this agreement

A-0859

## Schedule 1 – Assets Leases

Nil

A-0860

## Schedule 2 – Contracts

Nil

A-0861

## Schedule 3 – Employees

| Item Number | Name | Other Name |
|---|---|---|
| 1 | CHAN, Shek Chang | |
| 2 | PENG, Ivan Matthew | |
| 3 | LEE, Yak Mau | Edwin |
| 4 | WONG, Yuen Kam | Karen |
| 5 | YAU, Chung Sau | |
| 6 | LI, Chun Kwok | Jimmy |
| 7 | LEUNG, Shui Yan | Jason |
| 8 | CHAN, Chu Hoi | Ella |
| 9 | WONG, Tung Chu | |
| 10 | HUNG, Suet Pan | Nancy |
| 11 | CHUNG, Hon Sang | Kenny |
| 12 | SO, Wai Kit | |

A-0862

6 JUN 2000  / 22    MARTIN M HUDSON 613 96534413#    :50 15:: P 2:

## Schedule 4 – Leasehold Properties

### PART A – Office Lease

| Property Address | Lessee Name | Lessor Name | Monthly Rental | Expiration Date |
|---|---|---|---|---|
| Level 16, Tower II Suites 1607-1611 The Gateway Harbour City 25-27 Canton Road Kowloon Hong Kong | Pacific Dunlop (Asia) Limited | Burnman Leasing Limited | | 9 December 2002 |

### PART B – Warehouse

| Property Address | Lessee Name | Lessor Name | Monthly Rental | Expiration Date |
|---|---|---|---|---|
| 7/F, Block 3 Tai Ping Industrial Centre 53 Ting Kok Road Tai Po, New Territories Hong Kong | Pacific Dunlop (Asia) Limited | Kin Sheng Kee Rattan Wares Manufacturers Limited | US$33,000.00 | 17 January 2001 |

A-0863

| | | | |
|---|---|---|---|
| 7 | Tank office table | BJO | 01-Jun-97 |
| 8 | Palma mid-back chair | BJO | 01-Jun-97 |
| 3 | Palma mid-back chair | BJO | 01-Jun-97 |
| 4 | Palma mid-back chair (without handle) | BJO | 01-Jun-97 |
| 5 | Palma mid-back chair (without handle) | BJO | 01-Jun-97 |
| 2 | Lion filing cabinet | BJO | 01-Jun-97 |
| 1 | Lion filing cabinet | BJO | 01-Jun-97 |
| 3 | Tank hanging file cabinet | BJO | 01-Jun-97 |
| 2 | Tank hanging file cabinet | BJO | 01-Jun-97 |
| 5 | Tank low cabinet | BJO | 01-Jun-97 |
| 2 | Tank 3-file cabinet | BJO | 01-Jun-97 |
| 5 | Tank hanging file cabinet | BJO | 01-Jun-97 |
| 2 | Hanging file cabinet (RMB2,000) | BJO | 05-Feb-99 |
| 1 | Megfa partition H1200 x L1500 x W50 | BJO | 01-Jun-97 |
| 2 | Megfa partition H1200 x L700 x W50 | BJO | 01-Jun-97 |
| 4 | Megfa partition H1200 x L1500 x W50 | BJO | 01-Jun-97 |
| 5 | Megfa partition H1200 x L700 x W50 | BJO | 01-Jun-97 |
| 2 | Megfa partition H1500 x L1200 x W50 | BJO | 01-Jun-97 |
| 4 | Desk | SZO | 31-Jul-98 |
| 4 | Chair | SZO | 31-Jul-98 |
| 1 | Cabinet | SZO | 31-Jul-98 |
| 4 | Conference chair | SZO | 31-Jul-98 |
| 1 | Conference table | SZO | 31-Jul-98 |
| 1 | Air-conditioner KC-52/Y | SZO | 31-Jul-98 |
| 1 | Air-conditioner 095VV | SZO | 31-Jul-98 |
| 1 | TV & VCD | SZO | 31-Jul-98 |
| 1 | Siemens telephone | SZO | 31-Jul-98 |
| 1 | Samsung refrigerator | SZO | 31-Jul-98 |
| 1 | Panasonic fax machine | SZO | 31-Jul-98 |
| 1 | National gas | SZO | 31-Jul-98 |
| 1 | National washing machine | SZO | 01-Aug-98 |
| 1 | Manager desk + return + pedestal - T Ho | SHO | 01-Dec-99 |
| 1 | Manager desk + return + pedestal - K Chan | SHO | 01-Dec-99 |
| 2 | PERCIO Manager chair (AC3100FA) | SHO | 01-Dec-99 |
| 2 | PERCIO Guest chair (AC3600FA) | SHO | 01-Dec-99 |
| 4 | Staff desk + return + pedestal | SHO | 01-Dec-99 |
| 10 | Palma staff chair (KH5567BFA) | SHO | 01-Dec-99 |
| 4 | TANK II Cabinet | SHO | 01-Dec-99 |
| 4 | Partition 1050 x 1400 | SHO | 01-Dec-99 |

A-0865

5 JUN 2000  7 23     MARTIN M HUDSON 613 96544184          XO 1537  P 26

| | | | |
|---|---|---|---|
| 4 | Pentium 1500 x 1400 | SHO | 01-Dec-99 |
| 4 | Pentium 1050 x 700 | SHO | 01-Dec-99 |
| 1 | Soflex sofa – 2 seats | SHO | 01-Dec-99 |
| 2 | Soflex sofa – 1 seat | SHO | 01-Dec-99 |
| 1 | KO's coffee table | SHO | 01-Dec-99 |
| 1 | Tank II meeting table | SHO | 01-Dec-99 |
| 1 | Glass partman 1500 x 1000 | SHO | 01-Dec-99 |
| 2 | Glass partman 1500 x 900 | SRO | 01-Dec-99 |
| 1 | Glass partman 1500 x 700 | SHO | 01-Dec-99 |
| 1 | Tank II conference table 2400 x 1200 x 748 | SHO | 01-Dec-99 |
| 2 | Perco mid back conf chair (AC3400FA) | SHO | 01-Dec-99 |
| 6 | Perco mid back conf chair (AC3600FA) | SHO | 01-Dec-99 |
| 1 | Blind | SHO | 16-Feb-00 |

## Office Equipment

| Qnt | Description | Location | Acquired |
|---|---|---|---|
| 1 | HP Laserjet 4P printer – K Wong | HKO | 03-Dec-93 |
| 1 | HP Designt 660C printer – T Ho | HKO | 12-Sep-95 |
| 1 | IBM PC350 desktop computer – K Wong | HKO | 13-Aug-96 |
| 1 | with printer – K Wong | HKO | 13-Aug-96 |
| 1 | HP Designt C6340A printer – C S Yau | HKO | 20-Aug-96 |
| 1 | HP Scanner C2514B 4C scanner – C S Yau | HKO | 20-Aug-96 |
| 1 | IBM P166 desktop computer – T C Wong | HKO | 09-Apr-97 |
| 1 | with Canan BJ-240 printer – T C Wong | HKO | 09-Apr-97 |
| 1 | Compaq 1540 DM notebook – K Chen | SHO | 26-Nov-97 |
| 1 | Compaq P166 desktop computer – J Chan | HKO | 27-May-98 |
| 1 | Compaq P166 desktop computer – T C Wong | HKO | 27-May-98 |
| 2 | Compaq P166 desktop computer – T Ho | HKO | 27-May-98 |
| 1 | HP jet direct for 10 base | HKO | 27-May-98 |
| 1 | Sony 505TR Notebook computer – T Ho | HKO | 25-Jun-99 |
| 1 | Mastertype-plus typewriter 319541 – K Wong | HKO | 10-Jul-86 |
| 1 | Microcassette recorder | HKO | 15-Jan-89 |
| 1 | CSL telephone system SX-200 (shared with PDA) | HKO | 28-Feb-95 |
| 1 | T.M. electronic door locksys (shared with PDA) | HKO | 28-Feb-95 |
| 1 | Kodak Ektalite 1000 slide projector | HKO | 15-Jan-95 |
| 1 | Panasonic UF-744 fax machine | HKO | 29-Jan-96 |
| 1 | Ricoh copying machine | HKO | 15-Mar-96 |
| 1 | 3M 2770AB2H projector | HKO | 15-Nov-96 |

A-0866

| | | | |
|---|---|---|---|
| 1 | Panasonic KXF1110BX fax machine - T Ho s apt | HKO | 27-Feb-09 |
| 1 | Truck lift | HKW | 16-Feb-96 |
| 1 | Toyota folk lift truck w/manual lift | HKW | 27-Jun-96 |
| 1 | Mitsubishi air conditioner (9,000 BTU) | HKW | 26-Jun-96 |
| 1 | Din 450mm indoor exhausted fan with cover | HKW | 26-Jun-96 |
| 1 | Air ducting for exhausted fan | HKW | 26-Jun-96 |
| 1 | Rank Xerox XC 520 coping machine | HKW | 25-Feb-97 |
| 1 | Adist hand pallet truck | HKW | 14-Jul-97 |
| 1 | 48V DC loader | HKW | 17-Nov-97 |
| 2 | Transformer | HKW | 22-Jan-91 |
| 1 | Susamon truck - BM30M | HKW | 09-Mar-98 |
| 1 | Compaq Deskpro 2000 desktop computer + monitor | BJO | 30-May-97 |
| 1 | HP Laserjet 6P printer | BJO | 30-May-97 |
| 1 | IBM PC300GL desktop computer + monitor | BJO | 01-Aug-98 |
| 1 | Ricoh FT4422 coping machine | BJO | 30-May-97 |
| 1 | Canon Fax-L380 fax machine | BJO | 30-May-97 |
| 1 | Water dispenser | BJO | 30-May-97 |
| 1 | Panasonic KX-TP11CN switching system | BJO | 30-May-97 |
| 1 | Mobile phone - Nokia | BJO | 30-May-97 |
| 2 | 1834 desktop computer + monitor | SHO | 03-Sep-97 |
| 1 | HP 6L printer | SHO | 03-Sep-97 |
| 2 | Mobile phone Motorola M328C - K  Chan | SHO | 14-Dec-98 |
| 1 | Canon L250 fax machine | SHO | 01-Sep-98 |
| 1 | IBM PC200 desktop computer | SZO | 01-Dec-98 |
| 1 | Compaq Deskpro BP (102330-372) computer - J  Chin | HKO | 08-Jul-99 |
| 1 | HP Laser Jet 3100 Printer for Terry Ho | HKO | 02-Aug-99 |
| 1 | Olympus C-900ZOOM Digital Camera for T Ho | HKO | 02-Aug-99 |
| 1 | Paper Shredder T-225 | BJO | 02-Aug-99 |
| 1 | Epson Photo 700 Printer | BJO | 12-Aug-99 |
| 1 | HP Laser Jet 1100 Printer for Molly | HKO | 12-Aug-99 |
| 1 | KX-TA30CN System & KX-17050CN telephone set | SHO | 06-Nov-99 |
| 1 | Water dispenser | SHO | 10-Nov-99 |
| 1 | Refrigerator | SHO | 10-Nov-99 |
| 1 | Vacuum cleaner | SHO | 12-Nov-99 |
| 2 | Siemens telephone sets | SHO | 13-Nov-99 |
| 1 | Ricoh photo copier FT4422 | SHO | 21-Nov-99 |
| 1 | Iomega Zip 1GGMB Parallel External drive w/1 disk | HKO | 31-Dec-99 |
| 1 | Acepac Accounting Program | HKO | 01-Feb-00 |
| 1 | Compaq Deskpro BP PIII500 for Acrp--- | HKO | 01-Feb-00 |

A-0867

6 JUN 2000  7 24    MARTIN M HUDSON  612 96544104         60 1517   t  25

| 1 | Mobile phone for Jenny Fan | BJO | 01-Mar-00 |
| 1 | Projector 3M2770T | SHO | 01-Mar-00 |
| 1 | HP Office Jet T65 for Ivan Peng's home use | HKO | 08-Mar-00 |
| 1 | Xerox 385 | BJO | 01-Apr-00 |
| 1 | Epson Scan 2500 3 in 1 fax machine | BJO | 01-Apr-00 |
| 1 | Desk 948-285 | SZO | 01-Apr-00 |
| 1 | Chair 888-981 | SZO | 01-Apr-00 |
| 1 | File cabinet J/G-7998 | SZO | 01-Apr-00 |
| 1 | Water dispenser | SZO | 01-Apr-00 |
| 1 | Telephone set 007L97 | SZO | 01-Apr-00 |
| 1 | Mitsubishi S20I notebook (PII 400) | SZO | 01-Apr-00 |
| 2 | Chinese input pen | SZO | 01-Apr-00 |
| 1 | Computer | BJO | 23-Apr-00 |

### Machinery

| Unit | Description | Location | Acquired |
|---|---|---|---|
| 3 | Battery chargers (AU$ 11,336) | HKW | 20-Aug-96 |

### Leasehold Improvement

| Unit | Description | Location | Acquired |
|---|---|---|---|
| - | T&T - ceiling height half glass dry wall partition | HKW | 26-Jun-96 |
| - | T&T - plywood room door | HKW | 26-Jun-96 |
| - | T&T - bursting glass wall | HKW | 26-Jun-96 |
| - | T&T - 13 A Socket | HKW | 26-Jun-96 |
| - | T&T - 15 A air conditioner socket w/control | HKW | 26-Jun-96 |
| - | T&T - relocation 20A TPN socket | HKW | 26-Jun-96 |
| - | T&T - dry cell door bell | HKW | 26-Jun-96 |
| - | T&T - single five tube | HKW | 26-Jun-96 |
| - | T&T - telephone/fax outlet | HKW | 26-Jun-96 |
| - | Electrical alteration works | HKW | 28-Oct-97 |
| - | Upgrade power supply to Elect | HKW | 28-Nov-97 |
| - | T&T - partitioning | HKO | 01-Jun-97 |
| - | T&T - doors | HKO | 01-Jun-97 |
| - | T&T - wallpapering | HKO | 01-Jun-97 |
| - | T&T - flooring | HKO | 01-Jun-97 |
| - | T&T - ceiling | HKO | 01-Jun-97 |

A-0868

6 JUN 2000  7 25    MARTIN & HUDSON 613 55544734    NC 1537  P  29

| | | | |
|---|---|---|---|
| - | T&T - re-install Furniture | HKO | 01-Jun-97 |
| - | T&T - panels | HKO | 01-Jun-97 |
| - | T&T - blinds | HKO | 01-Jun-97 |
| - | Electrical works | HKO | 01-Jun-97 |
| - | Fire prevention | HKO | 01-Jun-97 |
| - | Air conditioning | HKO | 01-Jun-97 |
| - | Plumbing | HKO | 01-Jun-97 |
| - | Floor / ceiling / wallpaper | HKO | 01-Jun-97 |
| - | Access control (via T&T) | HKO | 01-Jun-97 |
| - | Cabling (HK Tel CSL) | HKO | 01-Jun-97 |
| - | Install ceiling blind | HKO | 21-Jul-97 |
| - | Telephone installation (RMB3,100) | BJO | 30-May-97 |
| - | Fire-Proof (RMB3,489 36) | BJO | 30-May-97 |
| - | Ceiling / wall paper / electricity / sundry (RMB46,858) | BJO | 30-May-97 |
| - | Mulliken carpet | BJO | 30-May-97 |
| - | Office decoration | BJO | 15-Jan-99 |
| - | Office decoration | BJO | 01-Jun-99 |
| - | Ceiling / smoke detector / ventilation | SHO | 15-Nov-99 |
| - | Office decoration | SHO | 01-Dec-99 |
| - | Additional work for ceiling | SHO | 07-Jan-00 |

A-0869

6 JUN 2000  7 25    MARTIN & HUDSON S+S 96544194    NO 1337  P 30

Executed as an agreement:

Signed for and on behalf of
Pacific Dunlop (Asia) Ltd
by an authorised officer
in the presence of

Witness

Cecilia Tang Hau Yeung
Name (please print)

Authorised officer

Fook Sin Yu
Name (please print)

Director
Title (please print)

Signed for and on behalf of
GNB Technologies (China)
Limited
by an authorised officer
in the presence of

Witness

Edwin Lee
Name (please print)

Authorised officer

Ivan M Pong
Name (please print)

General Manager / Director
Title (please print)

A-0870