# TAB 20

STOCK PURCHASE AGREEMENT
WITH RESPECT TO GNB TECHNOLOGIES (INDIA) PRIVATE LIMITED

Dated as of 28 June 2000

among

Pacific Dunlop Holdings (Singapore) Pte Ltd , as Seller

and

Exide Holding Asia Pte Limited, as Buyer

TABLE OF CONTENTS

| | | |
|---|---|---|
| ARTICLE 1 | DEFINITIONS | 1 |
| Section 1 1 | Definitions | 1 |
| ARTICLE 2 | PURCHASE AND SALE | 5 |
| Section 2 1 | Purchase and Sale of Shares | 5 |
| Section 2 2 | Purchase Price | 5 |
| ARTICLE 3 | CLOSING | 6 |
| Section 3 1 | Closing | 6 |
| Section 3 2 | Documents to be Delivered to Buyer | 6 |
| Section 3 3 | Documents to be Delivered to Seller | 7 |
| Section 3 4 | Form of Documents | 7 |
| Section 3 5 | Post Closing Matters | 7 |
| ARTICLE 4 | REPRESENTATIONS AND WARRANTIES REGARDING SELLER | 8 |
| Section 4 1 | Organization | 8 |
| Section 4 2 | Power and Authority | 8 |
| Section 4 3 | Agreement Binding | 8 |
| Section 4 4 | Absence of Conflicts | 8 |
| Section 4 5 | No Litigation | 9 |
| Section 4 6 | Title to Shares | 9 |
| Section 4 7 | No Advisor | 9 |
| ARTICLE 5 | REPRESENTATIONS AND WARRANTIES REGARDING GNB | 9 |
| Section 5 1 | Organization | 9 |
| Section 5 2 | Capitalization | 10 |
| Section 5 3 | Subsidiaries and Investments | 10 |
| Section 5 4 | Absence of Conflicts | 10 |
| Section 5 5 | No Litigation | 11 |
| Section 5 6 | No Violation | 11 |
| Section 5 7 | Operations Since June 30, 1999 | 11 |
| Section 5 8 | Taxes | 13 |
| Section 5 9 | Title to Assets | 14 |
| Section 5 10 | Real Property | 14 |
| Section 5 11 | Personal Property | 14 |
| Section 5 12 | Personal Property Leases | 14 |
| Section 5 13 | Governmental Permits | 15 |
| Section 5 14 | Intellectual Property | 15 |
| Section 5 15 | Employees | 15 |
| Section 5 16 | Employee Relations | 16 |
| Section 5 17 | Commercial Contracts | 16 |
| Section 5 18 | Status of Contracts | 17 |
| Section 5 19 | Environmental Matters | 17 |
| Section 5 20 | Insurance | 18 |
| Section 5 21 | Product Warranties | 19 |
| Section 5 22 | Bank Accounts, Guarantees and Powers | 19 |
| Section 5 23 | Accounts and Records | 19 |

-1-

A-0872

| | | |
|---|---|---|
| Section 5.24 | No Misrepresentation | 19 |
| Section 5.25 | Sufficiency of Assets | 19 |
| Section 5.26 | Powers of Attorney | 19 |
| ARTICLE 6 | REPRESENTATIONS AND WARRANTIES OF BUYER | 20 |
| Section 6.1 | Organization | 20 |
| Section 6.2 | Power and Authority | 20 |
| Section 6.3 | Agreement Binding | 20 |
| Section 6.4 | Absence of Conflicts | 20 |
| Section 6.5 | No Litigation | 20 |
| Section 6.6 | Investment Representation | 21 |
| Section 6.7 | No Advisor | 21 |
| Section 6.8 | No Misrepresentation | 21 |
| ARTICLE 7 | ACTION PRIOR TO THE CLOSING DATE | 21 |
| Section 7.1 | Preserve Accuracy of Representations and Warranties | 21 |
| Section 7.2 | Governmental Approvals | 21 |
| Section 7.3 | Operations Prior to the Closing Date | 22 |
| Section 7.4 | Notification of Changes | 22 |
| Section 7.5 | Satisfaction of Condition | 22 |
| Section 7.6 | Intercompany Agreements | 22 |
| Section 7.7 | Preemptive Rights | 22 |
| Section 7.8 | Insurance Matters | 22 |
| Section 7.9 | General | 23 |
| Section 7.10 | Preservation of Business | 23 |
| ARTICLE 8 | CONDITIONS TO CLOSING | 23 |
| Section 8.1 | Conditions to the Obligations of the Buyer | 23 |
| Section 8.2 | Conditions to the Obligations of Seller | 24 |
| ARTICLE 9 | TERMINATION | 25 |
| Section 9.1 | Termination | 25 |
| Section 9.2 | Notice of Termination | 26 |
| Section 9.3 | Effect of Termination | 26 |
| ARTICLE 10 | EXCLUSIVITY OF REMEDY | 26 |
| Section 10.1 | Indemnification by Seller | 26 |
| Section 10.2 | Indemnification by Buyer | 26 |
| Section 10.3 | Exclusivity of Remedy | 26 |
| ARTICLE 11 | ADDITIONAL AGREEMENTS OF THE PARTIES | 27 |
| Section 11.1 | Taxes | 27 |
| ARTICLE 12 | GENERAL PROVISIONS | 29 |
| Section 12.1 | Notices | 29 |
| Section 12.2 | Confidential Information | 30 |
| Section 12.3 | No Public Announcement | 30 |
| Section 12.4 | Entire Agreement, Amendments | 31 |
| Section 12.5 | Successors and Assigns | 31 |
| Section 12.6 | Interpretation | 31 |
| Section 12.7 | Waivers | 31 |
| Section 12.8 | Expenses | 32 |
| Section 12.9 | Partial Invalidity | 32 |

-ii-

A-0873

| Section 12.9 | Execution in Counterparts | 32 |
| Section 12.11 | Governing Law | 32 |
| Section 12.12 | Further Assurances and Cooperation | 32 |
| Section 12.13 | No Reliance | 33 |
| Section 12.14 | Disclosure Schedules | 33 |

-iii-

A-0874

SCHEDULES

| | |
|---|---|
| Schedule 5 2 | Capitalization |
| Schedule 5 4 | Absence of Conflicts |
| Schedule 5 5 | No Litigation |
| Schedule 5 6 | No Violation |
| Schedule 5 7 | Operations since April 30, 1998 |
| Schedule 5 8 | Taxes |
| Schedule 5 9 | Title to Assets |
| Schedule 5 10 | Real Property |
| Schedule 5 11 | Personal Property |
| Schedule 5 12 | Personal Property Leads |
| Schedule 5 13 | Governmental Permits |
| Schedule 5 14 | Intellectual Property |
| Schedule 5 15 | Employees |
| Schedule 5 16 | Employee Relations |
| Schedule 5 17 | Commercial Contracts |
| Schedule 5 18 | Status of Contracts |
| Schedule 5 19 | Environmental Matters |
| Schedule 5 20 | Insurance |
| Schedule 5 21 | Product Warranties |
| Schedule 5 22 | Bank Accounts, Guarantees and Powers |
| Schedule 7 6 | Intercompany Agreements |

A-0875

## STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT, dated as of 28 June 2000 (the "Agreement") is executed by and among Pacific Dunlop Holdings (Singapore) Pte Ltd, a corporation incorporated under the laws of Singapore ("Seller") and Exide Holding Asia Pte Limited, a corporation incorporated under the laws of Singapore and whose registered number is 200005013E ("Buyer")

WHEREAS, Seller owns the Shares (as defined herein) comprised in the capital stock of GNB Technologies (India) Private Limited, a corporation incorporated under the laws of India ("GNB"),

WHEREAS, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, the Shares all on the terms and subject to the conditions set forth herein,

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth Seller and Buyer agree as follows

### ARTICLE 1
### DEFINITIONS

Section 1 1    Definitions  In this Agreement, the following terms have the meanings specified or referred to in this Section 1 1 and shall be equally applicable to both the singular and plural forms  Any agreement referred to below shall mean such agreement as amended, supplemented and modified from time to time to the extent permitted by the applicable provisions thereof and by this Agreement

"Action" means any lawsuit, arbitration, or regulatory, governmental or other proceeding or investigation whether at law or in equity

"Adjoining Properties" shall mean all sites or locations other than the Real Property or the PRP Sites to which Contaminants have migrated from the Real Property through air, soil, surface water or groundwater

"Affiliate" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person

"Agreement" has the meaning specified in the first paragraph of this Agreement

"Business" means the marketing and distribution of batteries and allied products, parts and service for industrial applications as conducted by GNB immediately prior to the Closing Date

"**Expenses**" means any and all reasonable expenses incurred in connection with investigating, defending or asserting any Action or overtly threatened Action (including court filing fees, court costs, arbitration fees or costs, witness fees, and reasonable fees and disbursements of legal counsel, investigators, expert witnesses, accountants and other professionals)

"**Final Closing Date Balance Sheet**" has the meaning specified in Section 2 1(c) of the Coordinating Agreement

"**Financial Statements**" has the meaning specified in the Coordinating Agreement

"**GNB**" has the meaning specified in the second paragraph of this Agreement

"**Governmental Body**" means any foreign, federal, state, or local governmental authority agency, or regulatory body

"**Governmental Permits**" has the meaning specified in Section 5 13

"**Hebbar Shares**" has the meaning specified in Section 5 2

"**Insurance Policies**" has the meaning specified in Section 7 8(a)

"**Insured Claims**" has the meaning specified in Section 7 8(a)

"**Intellectual Property**" has the meaning specified in Section 5 14(a)

"**Intercompany Agreements**" means agreements between GNB and an Affiliate of GNB

"**Interim Period**" has the meaning specified in Section 11 1(b)

"**June 30, 1999 Balance Sheet**" has the meaning specified in the Coordinating Agreement, including the notes to such balance sheet

"**Knowledge of the Seller**" or similar phrases means matters actually known to Thomas Mitner, Thomas Smith, Thomas O'Hare, Mitchell Bregman, Barbara Hatcher, Sanjay Deshpande or Ranna Hebbar

"**Knowledge of the Seller Regarding Environmental Matters**" or similar phrases means matters actually known to Barbara Hatcher, Steve Emmons, or Ranna Hebbar

"**Leased Real Property**" has the meaning specified in Section 5 10

-3-

A-0878

"Losses" means losses, obligations, liabilities, settlement payments, awards, judgments, fines, assessments, penalties, and damages

"March 31, 2000 Balance Sheet" has the meaning specified in the Coordinating Agreement, including the notes to such balance sheet

"Material Adverse Effect" means any event, occurrence or condition (other than as a result of general economic conditions or events or conditions affecting the automotive and industrial battery industry as a whole) which has, or could reasonably be expected to have, a material adverse effect on the financial condition, assets, results of operations, Business, or operations of GNB, taken as a whole

"Person" means any individual, corporation, partnership, limited liability company or corporation, joint venture, association, joint-stock company, trust, unincorporated organization or Governmental Body

"Pre-Closing Period" has the meaning specified in Section 11 1(b)

"Principal US Agreement" means the Stock Purchase Agreement with respect to Pacific Dunlop GNB Corporation dated May 9, 2000 between Pacific Dunlop Holdings (USA) Inc , as Seller, and Exide Corporation, as Buyer, as amended and supplemented from time to time

"PRP Sites" shall mean all (other than the Real Property and the Adjoining Properties) with respect to which GNB or any of their successors or assignees have or may have liability under any Environmental Law

"Purchase Price" has the meaning specified in Section 2 2

"Release" includes any and all spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, and any other means by which a substance may be introduced into or travel through the environment

"Remedial Action" shall include all actions required by a Court Order or otherwise by a Governmental Body to (i) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any other way address Contaminants, or (ii) prevent or minimize a Release or threatened Release of Contaminants

"Requirements of Law" means any foreign, federal, state or local law, statute, regulation, code or ordinance of any Governmental Body currently in effect

"ROW Agreements" has the meaning specified in the Coordinating Agreement

"Schedule" refers to a schedule in the Disclosure Schedules

A-0879

"Seller" has the meaning specified in the first paragraph of this Agreement

"Seller Ancillary Agreements" means all agreements, instruments and documents being or required to be executed and delivered by the Seller under this Agreement

"Shares" has the meaning specified in Section 2.1

"Short Period" has the meaning specified in Section 11.1(b)

"Tax" (and, with correlative meaning, "Taxes" and "Taxable") means any federal, state, county, local or foreign income, alternative or add-on minimum, gross income, gross receipts, capital gains, capital, property, sales, use, transfer, license, excise, premium, lease, estimated, environmental, registration, value added, stamp, real property, franchise, employment, payroll, wage, withholding or minimum tax, ad valorem, or customs duty and any other similar taxes or governmental charges, fees, levies, assessments or liabilities of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, and includes any interest, penalty or fine, or addition to tax imposed by any Governmental Body

"Tax Return" means any return, report or similar statement required to be filed with respect to any Taxes (including any attached schedules), including, without limitation, any information return, claim for refund, amended return and declaration of estimated Tax

## ARTICLE 2
## PURCHASE AND SALE

### Section 2.1    Purchase and Sale of Shares

(a) On the terms and subject to the conditions of this Agreement, on the Closing Date, Seller shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall purchase from Seller, all of the issued and outstanding equity shares of capital stock of GNB owned beneficially and of record by Seller (the "Shares") free from Encumbrances together with all rights attaching to such Shares at Closing

(b) Buyer shall, from the Closing Date, be entitled to exercise all rights attached to or accrued to the Shares including, without limitation, the right to receive all dividends made or paid on or after the Closing Date

### Section 2.2    Purchase Price.  The purchase price (the "Purchase Price") shall be equal to One Thousand Six United States Dollars (US$1,006)  At the Closing, Buyer shall pay the Purchase Price to Seller by wire transfer of immediately available funds to such bank account as Seller shall direct in writing  After Closing, the Purchase Price shall be adjusted pursuant to the Coordinating Agreement

-5-

A-0880

## ARTICLE 3
## CLOSING

Section 3 1    Closing    The closing of the purchase and sale of the Shares (the "Closing") shall be consummated at 10 00 a m  Chicago time on the last Business Day of the month in which the last of the conditions specified in Article 8 is satisfied or waived, at the offices of Gardner, Carton & Douglas at 321 North Clark Street, in Chicago, Illinois, U S A , or at such other time or place as shall be agreed upon by Seller and Buyer  Notwithstanding the foregoing, if the date upon which the last of the conditions specified in Article 8 is satisfied or waived is five (5) or fewer Business Days before the last day of the month, then the Closing shall be consummated on the fifth (5th) Business Day following the date upon which the last of such conditions was satisfied or waived, or such other date as may be agreed upon by Buyer and Seller  The time and date on which the Closing is actually held is referred to herein as the "Closing Date "  The Closing shall be effective as of the close of business on the Closing Date

Section 3 2    Documents to be Delivered to Buyer    At the Closing, Seller shall deliver to Buyer or as Buyer may direct

(a) a duly executed and completed transfer of the Shares in favour of the Buyer or as the Buyer may direct together with the relative share certificates (or an indemnity in agreed a form reasonably satisfactory to the Buyer in respect of any share certificates which are missing) and any power of attorney under which such transfer has been executed,

(b) duly executed transfers of any of the shares held by nominees in favor of Buyer or as Buyer may direct,

(c) duly executed counterparts of the Seller Ancillary Agreements,

(d) a closing certificate of the Seller in a form reasonably satisfactory to the Buyer certifying as to the accuracy of the Seller's representations and warranties at and as of the Closing and that the Seller has performed and complied with all of the terms, provisions and conditions to be performed and complied with by the Seller at or before the Closing,

(e) the written resignations of their respective offices executed as a deed by each of the directors and officers (including the company secretary of GNB) as may be required to resign by the Buyer of GNB effective as of the Closing Date,

(f) documentation sufficient to convey by transfer or license certain intellectual property to GNB from certain GNB Affiliates (the "Intellectual Property Transfer/License Documents"),

(g) a certificate of the secretary or an assistant secretary of Seller in a form reasonably satisfactory to Buyer, dated the Closing Date, certifying as to (i) Seller's constituent document, (ii) the resolutions of Seller's board of directors, authorizing the execution and performance of this Agreement, the Seller Ancillary Agreements, and the transactions contemplated hereby, and

-6-

A-0881

(iii) incumbency and signatures of its officers or representatives executing 'us Agreement and any Seller Ancillary Agreement,

(h) a direction duly executed by Seller to Rama Hebbar directing him to hold on and from Closing the twenty-one shares in the capital of GNB held by him, on behalf of and at the sole direction of Buyer, and

(i) such other certificates and documents as Buyer or its counsel may reasonably request

Section 3.3    Documents to be Delivered to Seller    Upon completion of all the matters referred to in Section 3 2 (and only upon such completion), Buyer shall be obliged to deliver to Seller

(a) a closing certificate of Buyer in a form reasonably satisfactory to Seller,

(b) duly executed counterparts of the Buyer Ancillary Agreements,

(c) a certificate of the secretary or an assistant secretary of Buyer in a form reasonably satisfactory to Seller, dated the Closing Date, certifying as to (i) the resolutions of Buyer's board of directors, authorizing the execution and performance of this Agreement, the Buyer Ancillary Agreements, and the transactions contemplated hereby, and (ii) incumbency and signatures of its officers or representatives executing this Agreement and any Buyer Ancillary Agreement, and

(d) such other certificates and documents as Seller or its counsel may reasonably request

Section 3 4    Form of Documents    The documents and instruments referred to in Sections 3 2 and 3 3 shall be satisfactory as to form to counsel for the party to whom they are delivered

Section 3 5    Post Closing Matters

(a) The Seller hereby declares that for so long as it remains the registered holder of any of the Shares after Closing it will

(i)    hold the Shares and the dividends and other distributions of profits or surplus or other assets declared, paid or made in respect of them after Closing and all rights arising out of or in connection with them in trust for the Buyer and its successors in title, and

(ii)    deal with and dispose of the Shares and all such dividends, distributions and rights as are described in Section 3 6(a)(i) as the Buyer or any such successor may direct

(b)

-7-

(i,     The Seller hereby appoints the Buyer as its lawful attorney for the
purpose of receiving notices of an attending and voting all meetings of the
members of GNB from Closing to the date on which the Buyer or its
nominee is entered in the register of members of GNB as the holder of the
Shares

(ii)    For such purpose the Seller hereby authorises

(A)    GNB to send any notices in respect of its holding of Shares to the
Buyer, and

(B)    the Buyer to complete in such manner as it thinks fit and to return
proxy cards, consents to short notice and any other document
required to be signed by it in its capacity as a member

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES REGARDING SELLER

Seller represents and warrants to Buyer as follows

Section 4 1    **Organization**  Seller is a corporation duly organized, validly existing and
in good standing under the laws of Singapore

Section 4 2    **Power and Authority.**  Seller has the full corporate power and authority
to execute and deliver this Agreement and the Seller Ancillary Agreements and to perform its
obligations hereunder and thereunder  Seller's execution, delivery and performance of this
Agreement and the Seller Ancillary Agreements has been duly authorized and approved by all
necessary corporate action

Section 4 3    **Agreement Binding**  This Agreement has been, and the Seller Ancillary
Agreements will be, duly executed and delivered by Seller and, assuming due authorization,
execution, and delivery by Buyer, is and will be the legal, valid and binding obligations of Seller
enforceable against Seller in accordance with their respective terms, subject to general principles
of equity and except as enforceability may be limited by applicable bankruptcy, insolvency,
fraudulent transfer, reorganization, moratorium or other similar laws of general application
relating to creditors' rights generally

Section 4 4    **Absence of Conflicts**  The execution, delivery and performance of this
Agreement and the Seller Ancillary Agreements and the consummation of the transactions
contemplated hereby and thereby, will not

(a) conflict with, result in a breach of the terms, conditions or provisions of, or constitute
a default, an event of default or an event creating rights of acceleration, termination or
cancellation, or result in the termination of or result in the creation or imposition or

-8-

A-0883

crystallisation of any Encumbrance upon the Shares or any assets of GNB under, (i) any term or provision of the Memorandum of Association or Articles of Incorporation of Seller, (ii) any note, instrument, contract, agreement, mortgage, indenture, lease, license, or franchise to which Seller or any Affiliate of Seller is a party or by which it or any of its assets is bound, (iii) any Court Order, or (iv) any Requirements of Law, except for any of the foregoing which, individually or in the aggregate is or are not likely to have a Material Adverse Effect or hinder or impair the consummation of the transactions contemplated hereby, or

(b) require the approval, consent, authorization or act of, or the making by Seller or any Affiliate of Seller of any declaration, notification, filing or registration with any Person, except for governmental approvals and any of the foregoing which, individually or in the aggregate, if not taken, is or are not likely to have a Material Adverse Effect, or materially hinder or impair the consummation of the transactions contemplated hereby

Section 4 5     No Litigation  There is no Action pending or, to the Knowledge of Seller, threatened which questions the legality or propriety of the transactions contemplated by this Agreement or the Seller Ancillary Agreements or which would impair the consummation of the transactions contemplated hereby or thereby

Section 4 6     Title to Shares   Subject to the provisions contained in the Articles of Association of GNB regarding restriction on transfer of shares and the terms of approval dated October 17, 1997 of the Secretariat of Industrial Assistance requiring the Seller to disinvest 25% of the equity within five to seven years form the date of the approval, Seller has good, valid and marketable title to the Shares, free and clear of all Encumbrances, and has full right and power to vote and dispose of such Shares as contemplated herein  The Seller is not a party to any option, warrant, purchase right, or other contract or commitment that could require the Seller to sell, transfer, or otherwise dispose of any of the Shares (other than this Agreement)  The Seller is not a party to any voting trust, proxy, or other agreement or understanding with respect to the voting of any of the Shares

Section 4 7     No Advisor  Neither Seller nor any of its Affiliates nor any Person acting on its or their behalf, has retained any advisor, broker, investment banker or financial advisor in connection with this Agreement or any transaction contemplated hereby for which the Buyer or GNB may be liable

## ARTICLE 5.
## REPRESENTATIONS AND WARRANTIES REGARDING GNB

Seller represents and warrants to Buyer as follows

Section 5 1     Organization   GNB is a corporation duly organized, validly existing and is duly authorized under the laws of India  Seller has delivered or made available to Buyer complete and correct copies of GNB's organizational documents and amendments thereto as in effect on the date hereof and has furnished or made available copies of the minute books and other statutory registers of GNB  Such organizational documents are in full force and effect GNB is not in violation of any provision of its Memorandum of Association or Articles of

-9-

A-0884

Association  GNB has all requisite corporate power and authority to own or h ld under lease its properties and assets and to carry on its business as currently conducte... and to operate the properties and assets now being operated by it

Section 5 2    Capitalization  The authorized capital of GNB consists of Two Million (2,000,000) shares of common stock, par value INR 10 per share  On the date of the Closing, there will be One Million Five Hundred Forty Eight Thousand Four Hundred Thirty Six (1,548,436) equity shares of the stock of GNB issued and outstanding, One Million Five Hundred Forty Eight Thousand Four Hundred Fifteen (1,548,415) of which are owned by the Seller and constitute the Shares  All of the Shares are owned by Seller  As of the Closing, the Twenty One (21) shares of issued and outstanding stock that are not owned by Seller will be owned by Mr Ranna Hebbar, an employee of GNB (the "Hebbar Shares")  The Shares and the Hebbar Shares have been duly authorized and validly issued, are fully paid and non-assessable, and have not been issued in violation of any preemptive or other rights under applicable law, GNB's organizational document, or the terms of any subscription, option, warrant, right, agreement, commitment or Court Order to which GNB is a party, or by which it is bound  Except as set forth on Schedule 5 2, GNB has no outstanding subscriptions, options, warrants, rights, agreements or other commitments granting to any Person any interest in or right to acquire any of its securities, including, without limitation, the Shares and the Hebbar Shares, or any interest therein  GNB has not issued any security convertible into, or exchangeable for, the Shares or the Hebbar Shares or other capital shares, and there is no voting trust or other agreement or understanding to which GNB or Seller is a party or by which either of them is bound with respect to the voting of the Shares or the Hebbar Shares  GNB is not under any obligation, whether contingent or otherwise, to issue or repurchase any of its capital shares or to share or make any dividend or distribution payments based on its revenues, profits or net income

Section 5 3    Subsidiaries and Investments  GNB has no subsidiaries  GNB does not own, directly or indirectly, any stocks, bonds or securities or any equity or other proprietary interest in any Person

Section 5 4    Absence of Conflicts  Except as set forth in Schedule 5 4, the execution, delivery, and performance of this Agreement and the Seller Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby, will not

(a) conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation, or result in the termination of, or result in the creation or imposition of crystallisation of any Encumbrance upon the Shares or the Hebbar Shares or any assets of GNB under (i) any term or provision of the organizational documents of GNB, (ii) any note, instrument, contract, agreement, mortgage, indenture, lease, license, or franchise to which GNB is a party or by which it or any of its assets, is bound, (iii) any Court Order, or (iv) any Requirements of Law, except for any of the foregoing which, individually or in the aggregate, is or are not likely to have a Material Adverse Effect or hinder or impair the consummation of the transactions contemplated hereby and thereby, or

-10-

A-0885

(b) require the approval, consent, authorization or act of, or the making by GNB of any declaration, notification, filing or registration with any Person, except, for any of the foregoing which, individually or in the aggregate, is or are not likely to have a Material Adverse Effect or materially hinder or impair the consummation of the transactions contemplated hereby and thereby

Section 5.5    No Litigation    Except as set forth in Schedule 5.5    (a) there is no Action pending or, to the Knowledge of Seller, threatened against GNB or any of its assets and there has not been, to the Knowledge of Seller, any claim asserted by any Person that could lead to an Action, and (b) neither GNB nor any of its assets is subject to any currently pending Court Order Except as set forth in Schedule 5.5, to the Knowledge of Seller, there is no Action pending or threatened against any officer or director of GNB arising out of his or her service as an officer or director of GNB

Section 5.6    No Violation    Except as set forth in Schedule 5.6    (a) GNB has complied and is in compliance with all Court Orders and Requirements of Law which are applicable to GNB and its business, and (b) GNB has complied and is in compliance with all Court Orders and Requirements of Law which are applicable to GNB, except, in either case, for such Requirements of Law as to which noncompliance is not likely to have a Material Adverse Effect

Section 5.7    Operations Since June 30, 1999

(a) Except as set forth in Schedule 5.7(A), or as reflected in the March 31, 2000 Balance Sheet, since June 30, 1999, there has been no material adverse change in the business, operations, assets, or financial condition of GNB taken as a whole    The termination of any Intercompany Agreement not listed on Schedule 7.6 will not have a Material Adverse Effect

(b) Except as set forth in Schedule 5.7(B), or as reflected in the March 31, 2000 Balance Sheet, since June 30, 1999, GNB has conducted its business only in the ordinary course and has not

(i)    made any material change in operations,

(ii)    made any capital expenditure or entered into any contract or commitment therefor in excess of the capital expenditures in the "Fiscal Year 2000 Open Sanction Summary" attached to Schedule 5.7(B) to the Principal US Agreement,

(iii)    sold, leased (as lessor), assigned transferred or otherwise disposed of, or imposed or suffered to be imposed any Encumbrance on, any of the assets, except for inventory and other personal or real property sold, leased or otherwise disposed of for fair value in the ordinary course of business consistent with past practice and except for Permitted Encumbrances (as defined in the Principal US Agreement),

(iv)    canceled any debts owed to or claims held (including the settlement of any Action) other than in the ordinary course of business consistent with past practice,

-11-

A-0886

(v)   created, incurred or assumed or agreed to create, incur or assume, any indebtedness for borrowed money or entered into, as lessee, any capitalized lease obligations or guaranteed any such indebtedness or leases of others or made any loans other than in the ordinary course of business consistent with past practice,

(vi)   written off as uncollectible or accelerated or delayed collection of notes or accounts receivable generated by GNB in advance of or beyond their regular due dates or the dates when the same would have been collected other than in the ordinary course of business consistent with past practice,

(vii)   delayed or accelerated payment of any accounts payable or other liabilities of GNB beyond or in advance of their due date or the date when such liabilities would have been paid other than in the ordinary course of business consistent with past practice,

(viii)   made any distribution of assets (including payments of cash) to any of its Affiliates other than pursuant to agreements entered into in the ordinary course of business consistent with past practice or declared or paid any dividends, (provided that Seller shall have the right to remove and retain all cash held by GNB), or redeemed, reclassified or purchased or otherwise acquired any shares of its capital stock or authorized or issued any shares of its capital stock or any option, warrant or other right to purchase or acquire any such shares,

(ix)   entered into or except as set forth in Schedule 5.15, amended any employment, severance or similar agreement or arrangement or made any increases in the wages, bonuses, and benefits of its employees (other than any increases made in the ordinary course of business consistent with past practice),

(x)   waived any rights or settled any claims, except for such waivers or settlements granted or entered into in the ordinary course of business,

(xi)   made any change in any method of accounting,

(xii)   suffered or incurred any damage, destruction, fire, explosion, accident, flood or other casualty loss or act of God (whether or not covered by insurance) to any material operating asset or group of operating assets,

(xiii)   entered into or amended any purchase or sale contract outside the ordinary course of business,

(xiv)   suffered any amendment, termination, suspension or revocation of, any Governmental Permit,

(xv)   adopted any Employee Plan or amended or modified any already existing Employee Plan,

-12-

A-0887

(xvi)  amended its Memorandum of Association or its Articles of Association, or

(xvii)  manufactured inventory in excess of its expected needs, or

(xviii)  where applicable, agreed to do any of the foregoing

Section 5 8    Taxes

(a) GNB or its shareholders have accurately prepared and timely filed (including all extensions) all Tax Returns required to be filed by such entity  All such Tax Returns have been prepared in compliance with applicable Requirements of Law and are true and correct and properly reflect the Taxes due for the periods covered thereby

(b) All Taxes due and payable by Seller have been properly paid

(c) Except as disclosed in Schedule 5 8, neither GNB nor its shareholders have waived any law or regulation fixing, or consented to the extension of, any period of time for assessment of any Taxes which waiver or consent is currently in effect nor been requested or been granted an extension of time for filing any Tax Return which has not yet been filed

(d) Except as disclosed in Schedule 5 8, there are no material elections, consents or agreements with tax authorities other than those reflected on tax forms filed by GNB or its shareholders with tax authorities

(e) Except as disclosed in Schedule 5 8, GNB is not (and never has been) a party to any tax sharing agreement, and has not assumed the tax liability of any other Person under contract

(f) There are no Encumbrances on any of the assets of GNB with respect to Taxes, other than liens not yet due and payable or for Taxes that are being contested in good faith through appropriate proceedings and for which appropriate reserves have been established

(g) Except as set forth on Schedule 5 8  no deficiency or proposed adjustment (which has not settled or otherwise resolved) for any amount of Tax has been proposed, asserted or assessed by any taxing authority against GNB

(h) Except as set forth on Schedule 5 8, there is no action, suit, assessment, taxing authority proceeding or audit now in progress, pending or, to the Knowledge of Seller, threatened against or with respect to GNB

(i) Except as set forth on Schedule 5 8, no claim has ever been made by a taxing authority in a jurisdiction where GNB, respectively, do not file Tax Returns that such entity is or may be subject to Taxes assessed by such jurisdiction

(j) Except as set forth on Schedule 5 8, GNB will not be required (A) as a result of a change in method of accounting for a taxable period ending on or prior to the Closing Date, to include any adjustment in taxable income for any taxable period (or portion thereof) ending after the Closing Date, (B) as a result of any Requirement of Law relating to taxation matters to

-13-

A-0888

include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date, (C) as a result of any Requirement Law relating to taxation matters, to include any item of income in taxable income for any taxable period (or portion thereof) ending after the Closing Date or (D) any installment sale made or prepaid income attributable to a taxable period ending on or prior to the Closing Date

(k) Except as set forth on Schedule 5.8, GNB has no obligation or liability for the payment of Taxes of any other Person, including, but not limited to the following, a liability of GNB for the payment of any Tax arising (A) as a result of being (or ceasing to be) a member of any Affiliated Group (or being included (or required to be included) in any Tax Return relating thereto), (B) as a result from any expressed or implied obligation to indemnify another person, and (C) as a result from GNB succeeding to the Tax liability of any other person as a successor, transferee or otherwise

Section 5.9    **Title to Assets**    GNB is the exclusive and absolute owner of and has good title to, or a valid leasehold interest to, all of the personal property in India reflected in the June 30, 1999 Balance Sheet (other than the property in India disposed of since the date of the June 30, 1999 Balance Sheet in the ordinary course of business for fair value) in the amounts and categories reflected therein, and all personal property in India acquired after the date of the June 30, 1999 Balance Sheet, free and clear of all Encumbrances, except for (a) Permitted Encumbrances, (b) the lien of current taxes not yet due and payable and (c) other exceptions disclosed in Schedule 5.9 Except as disclosed in Schedule 5.9, the personal property of GNB that is utilized in the operation of GNB's business is usable in the ordinary course of GNB's business and conforms to all applicable statutes, ordinances and regulations relating to its construction, use and operation, except where such nonconformity is not likely to have a Material Adverse Effect

Section 5.10    **Real Property**    GNB does not own any real property    Schedule 5.10 sets forth a complete and accurate list, including a brief description of the material terms of each lease or similar agreement under which GNB is lessee of, or holds, or occupies, or operates, any real property owned by any third Person (the "Leased Real Property")    GNB has good and valid leasehold in all of the Leased Real Property leased by it, free and clear of all Encumbrances except for Permitted Encumbrances    The occupation, possession and use of the Leased Real Property by GNB has not been disturbed and, to the Knowledge of Seller, no claim has been asserted or threatened which is adverse to the rights of GNB to the continued occupation, possession and use of the Leased Real Property, as currently utilized

Section 5.11    **Personal Property**    Schedule 5.11 contains a list of all machinery, equipment and vehicles owned by GNB having an original cost of Four Million Four Hundred Sixty Thousand Indian Rupees (INR4,460,000) or more

Section 5.12    **Personal Property Leases**    Schedule 5.12 contains a brief description of each lease or other agreement or right under which GNB is lessee of, or holds or operates, any machinery, equipment or vehicle owned by a third Person, except those which are terminable by

-14-

A-0889

GNB without cost or penalty on 30 days' or less notice or which provide for annual rentals of less than Four Million Four Hundred Sixty Thousand Indian Rupees (INR4,460,000)

Section 5 13   Governmental Permits

(a) Except as disclosed in Schedule 5 13(A), GNB owns, holds or possesses all material licenses, franchises, permits, privileges, immunities, approvals and other authorizations from a Governmental Body which are necessary to entitle GNB to own or lease, operate and use its assets and conduct its operations substantially as currently operated (herein collectively called "Governmental Permits")   Notwithstanding the foregoing, Governmental Permits required under Environmental Laws are addressed solely in Section 5 19(B)

(b) Except as set forth in Schedule 5 13(B)   (i) GNB has fulfilled and performed its obligations under each of the Governmental Permits, except for such nonfulfillment or nonperformance which is not likely to have a Material Adverse Effect, and (ii) no written notice of cancellation, revocation, suspension or default or of any dispute concerning any Governmental Permit has been received by GNB and, to the Knowledge of Seller, there is no basis for the issuance of such notice except as a result of the consummation of the transactions contemplated hereby or except as is not likely to have a Material Adverse Effect

Section 5 14   Intellectual Property

(a) Except as set forth on Schedule 5 14(A), there are no material patents, patent applications, trademarks or trademark registrations, service marks or service mark registrations, trade names, internet domain names, corporate names, or any applications to register any of the foregoing, copyrights, or any license to or from any Person with respect to any of the foregoing, used by GNB or otherwise relating to the Business substantially as currently conducted by GNB (collectively, the "Intellectual Property")

(b) Each item constituting part of the Intellectual Property has been, to the extent indicated in Schedule 5 14(B), duly registered, filed or issued, as the case may be, as is indicated in Schedule 5 14(B), and such registration, filings and issuances remain in full force and effect

(c) Except as set forth in Schedule 5 14(C), GNB owns and possesses all right, title and interest in and to the Intellectual Property, and GNB has not received written notice of any claim by any Person contesting the validity, enforceability, use, or ownership of any Intellectual Property, patent disclosures or inventions   Schedule 5 14(C), sets forth all technology (including Intellectual Property) owned by third parties and used by GNB   To the Knowledge of Seller, except as set forth in Schedule 5 14(C), no Person is infringing on the rights of GNB with respect to any Intellectual Property   GNB uses all reasonable efforts to protect its trade secrets

Section 5 15   Employees   Except as described in Schedule 5 15, GNB is not required to contribute to any employee plan on behalf of its employees and no employees of GNB are covered under any employee plan   Except as set forth in Schedule 5 15, GNB is not a party to or bound by any collective bargaining agreement, employment agreement, severance agreement,

-15-

A-0890

deferred compensation agreement, confidentiality agreement or covenant not to compete which is material to its business

Section 5.16    Employee Relations

(a) Except as set forth in Schedule 5.16(A)  (i) GNB is in compliance with all applicable Requirements of Law with respect to labor and employment, (ii) GNB has not engaged in any unfair labor practice or illegally discriminated with regard to any aspect of employment on the basis of any legally prohibited category or classification, and (iii) with respect to employees and former employees who rendered services to, or participated in conduct or activities in connection with GNB, GNB is not liable for any arrears of wages, salaries or other payments

(b) Except as set forth in Schedule 5.16(B), there are no  (i) unfair labor practice or discrimination charges or complaints pending or, to the Knowledge of Seller, threatened against GNB before any Indian federal, state or local agency or authority, (ii) complaints, charges or citations pending or, to the Knowledge of Seller, threatened against GNB under any Indian state or local occupational safety act or regulation, (iii) to the Knowledge of Seller. labor strike, stoppage, or material controversies pending or threatened between GNB and its employees or any labor union or organization representing or claiming to represent such employees' interests, or (iv) collective bargaining agreement currently being negotiated by GNB with respect to its employees:

Section 5.17    Commercial Contracts    Except as set forth in Schedule 5.17, GNB is not a party to or bound by

(a) any consignment, distributor, dealer, manufacturer's representative, sales agency, advertising representative or advertising or public relations contract or agreement which is reasonably anticipated by GNB to involve the payment of more than Four Million Four Hundred Sixty Thousand Indian Rupees (INR4,460,000) per year,

(b) any contract, agreement or commitment regarding the sale or other disposition of products or services by GNB, or for the purchase of raw materials, products or services by GNB, which is reasonably anticipated by GNB to involve the receipt or payment of more than Four Million Four Hundred Sixty Thousand Indian Rupees (INR4,460,000) per year,

(c) any guarantee or indemnification agreement for the benefit of any Person made or given outside of the ordinary course of business,

(d) any Tax sharing agreement,

(e) any contract, agreement or commitment which provides for the incurrence by GNB of indebtedness for borrowed money or capitalized lease obligations,

(f) any partnership or joint venture agreement,

-16-

A-0891

(g) any agreement, contract or commitment relating to capital expenditures of an amount or value in excess of Four Million Four Hundred Sixty Thousand Indian Rupees (INR4,460,000),

(h) any agreement that restricts or purports to restrict the business activity of GNB or limits GNB's ability to engage in any line of business or compete with any Person,

(i) any material license of software or other intellectual property, or

(j) any agreement that was not entered into in the ordinary course of GNB's business consistent with past practice and that involves annual payments in excess of Four Million Four Hundred Sixty Thousand Indian Rupees (INR4,460,000)

Section 5.18   Status of Contracts   Except as set forth in Schedule 5.18 hereto (a) each of the leases, contracts and other agreements of GNB listed in Schedules 5.10, 5.12, 5.14, 5.15 and 5.17 (collectively, the "GNB Agreements") constitutes a legal, valid and binding obligation of GNB (subject to bankruptcy, insolvency, reorganization, moratorium and similar laws of general application relating to or affecting creditors' rights and to general equity principles) and is in full force and effect, and (b) GNB is not, nor, to the Knowledge of Seller, alleged to be, in material breach of, or material default under, any of the GNB Agreements nor, to the Knowledge of Seller, is any other party thereto in such breach or default and, to the Knowledge of the Seller, no event has occurred which the notice or lapse of time would constitute such a breach or default or permit termination, modification or acceleration of any of the GNB Agreements

Section 5.19   Environmental Matters   Notwithstanding any other provision of this Agreement, this Section 5.19 contains the only representations or warranties of Seller with respect to Environmental Law or environmental matters, and no other statement in this Agreement, in any Seller Ancillary Agreement or in any other document or information delivered or given to or received by or on behalf of Buyer in connection with the transactions contemplated by this Agreement shall be deemed to be a representation or warranty relating to Environmental Law or environmental matters

(a) Except as set forth in Schedule 5.19(A), GNB is in compliance with all applicable Environmental Laws except for such noncompliance is as not likely to have a Material Adverse Effect.

(b) Except as set forth on Schedule 5.19(B), GNB owns, holds or possesses all material Governmental Permits required under Environmental Laws necessary for the occupation and use of the Leased Real Property and the operations of its business substantially as currently conducted  All Governmental Permits required under Environmental Laws that are currently owned, held, or possessed by GNB are listed in Schedule 5.19(B)  Except as disclosed on Schedule 5.19(B), GNB is in compliance and has for the past three (3) years complied, with all Governmental Permits except for such noncompliance as is not likely to have a Material Adverse Effect  Seller shall make commercially reasonable efforts to transfer or cause to be transferred to Buyer all such Governmental Permits at the Closing, including (i) giving notice to any Indian federal, state or local regulatory agencies with respect to the change in ownership or control or responsible officials at the Leased Real Property, (ii) completing and submitting notices of

-17-

A-0892

termination, and (iii) to the extent not transfer d by the Closing Date, shall cooperate fully with Buyer in obtaining the transfer of such Governmental Permits as promptly thereafter as possible

(c) Except as set forth in Schedule 5.19(C), GNB is not subject to any pending or, to the Knowledge of Seller Regarding Environmental Matters, threatened investigation by, order from, claim by, statutory request for information from or continuing agreement with any Person respecting (i) any violation of Environmental Law or Governmental Permits, (ii) any Remedial Action, or (iii) any claim of Losses and Expenses, in each case arising from the release of a Contaminant or the presence of any Contaminant onto or from the Leased Real Property

(d) Except as set forth in Schedule 5.19(D), GNB is not subject to any pending or, to the Knowledge of Seller Regarding Environmental Matters, threatened judicial or administrative investigation, proceeding, order, notice of violation, judgment, decree or settlement with any continuing obligation alleging or relating to a violation of or liability under any Environmental Law or Governmental Permits

(e) Except as set forth in Schedule 5.19(E), GNB has not received written notice under any Environmental Law to the effect that it is or may be liable to any Person as a result of the generation, storage, transportation, Release, arrangement for disposal or disposal of or Release of any Contaminants on, at or in any Leased Real Property

(f) Except as set forth in Schedule 5.19(F), GNB has not reported a Release pursuant to an Environmental Law or filed a notice with respect to the contamination of land or the generation of hazardous wastes that is required to be filed pursuant to an Environmental Law, and, to the Knowledge of the Seller Regarding Environmental Matters, there has not been any disposal by GNB or Release of any Hazardous Materials on, at, in or beneath any Leased Real Property

(g) To the Knowledge of Seller Regarding Environmental Matters, there are no underground storage tanks (whether active or abandoned) located at, in or beneath the Leased Real Properties

(h) Seller has made available to Buyer true and correct copies of all material environmental audits and consultant's reports relating to the past and current operations, properties and facilities of GNB or any of their respective predecessors, which are in its possession or under its reasonable control

(i) To the Knowledge of Seller Regarding Environmental Matters, the sites identified in the Disclosure Schedules constitute, and as the Disclosure Schedules are updated by Seller from time to time in its sole discretion prior to the Closing Date, will constitute all PRP Sites as of the Closing Date

(j) Notwithstanding any other provision of this Agreement, no representations and warranties are made or shall be deemed to apply to the PRP Sites

-18-

A-0893

Section 5.20    Insurance    Seller has, and at all times has had, valid insurance coverage in respect of the Business against all risks normally insured against by Persons in the same industry, underwritten by one or more well-established and reputable insurers or adequately capitalized Affiliates    Schedule 5.20 contains a list of all insurance policies (specifying (i) the insurer, (ii) the amount of coverage, (iii) the type of insurance, (iv) the policy number and (v) any currently pending claims thereunder) maintained by or on behalf of GNB on its properties, assets, business or personnel    GNB has not failed to give any notice or present any claim under any insurance policy in due and timely fashion    All premiums due under the policies listed on Schedule 5.20 have been paid or accrued for on the Financial Statements and all such policies are in full force and effect and no notice of disallowance of any claim under any insurance policy, whether or not currently in effect, has been received by GNB    Other than (i) claims properly made against GNB in the ordinary course of business pursuant to insurance programs written on a retrospective rating basis, (ii) claims made as a result of premium audits relating to expired insurance policies, (iii) deductible claims relating to losses that are incurred but not reported, or losses that are known but not finally resolved, GNB has no liability for or exposure to any premium expenses for expired policies and there are not current claims by GNB under any such policy as to which coverage has been questioned, denied or disputed by the underwriters of such policies

Section 5.21    Product Warranties    GNB's unexpired, express product warranties with respect to products that GNB manufactures or sells or that it has heretofore manufactured or sold are described in Schedule 5.21    Except as set forth in Schedule 5.21, GNB has not received written notice of any claim against GNB, based on any product warranty (except claims outstanding as of June 30, 1999, not exceeding Eight Million Nine Hundred Twenty Thousand Indian Rupees (INR8,920,000) in the aggregate)

Section 5.22    Bank Accounts, Guarantees and Powers    Schedule 5.22 sets forth a list of all accounts, borrowing resolutions and deposit boxes maintained by GNB at any bank or other financial institution and the names of the person authorized to effect transactions in such accounts and pursuant to such resolutions and with access to such boxes

Section 5.23.    Accounts and Records    All the accounts, books, ledgers and financial and other material records of the Business have been maintained accurately and in accordance with generally accepted accounting principles

Section 5.24.    No Misrepresentation    To the Knowledge of Seller, the representations and warranties of Seller contained in this Agreement, the Disclosure Schedules attached hereto, and the certificates and other instruments delivered by Seller pursuant hereto, do not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained herein or therein not misleading

Section 5.25    Sufficiency of Assets    GNB owns or leases or has the right to use all Leased Real Property, buildings, machinery, equipment, intellectual property and other assets necessary for the conduct of the Business

-19-

A-0894

Section 5 26   Powers of Attorney   Except as set forth in Schedule 5.26, as of Closing, there will not be any outstanding powers of attorney executed on behalf of GNB other than with respect to the filing of taxes, customs and similar matters and intellectual property registrations and carrying on the business in ordinary course

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows

Section 6 1   Organization   Buyer is a corporation duly organized, validly existing and is duly authorized under the laws of Singapore

Section 6 2   Power and Authority   Buyer has the full corporate power and authority to execute and deliver this Agreement and the Buyer Ancillary Agreements, to perform its obligations hereunder and thereunder   Buyer's execution, delivery and performance of this Agreement has been duly authorized and approved by all necessary corporate action

Section 6 3   Agreement Binding.   This Agreement has been and the Ancillary Agreements will be duly executed and delivered by Buyer, and assuming due authorization, execution and delivery by Seller, is and will be the legal, valid and binding obligations of Buyer enforceable in accordance with their respective terms, subject to general principles of equity and except as enforceability may be limited by applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or other similar laws of general application relating to creditors' rights generally

Section 6 4   Absence of Conflicts   The execution, delivery and performance of this Agreement and the Buyer Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby, will not

(a) conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation, result in termination of or result in the creation or imposition or crystallisation of any Encumbrance under  (i) any term or provision of the organizational documents of Buyer, (ii) any note, instrument, contract, agreement, mortgage, indenture, lease, license, franchise, permit or other commitment to which Buyer is a party or by which it or any of its assets are bound, (iii) any Court Order, or (iv) any Requirements of Law, except in each case, for any of the foregoing which, individually or in the aggregate, is or are not likely to have a material adverse effect on Buyer or its business taken as a whole or hinder or impair the consummation of the transactions contemplated hereby, or

(b) require the approval, consent, authorization or act of, or the making by Buyer of any declaration, notification, filing or registration with, any Person, except in each case, for any of the foregoing which, individually or in the aggregate, if not taken, is or are not likely to have a

-20-

material adverse effect on the financial condition of Buyer or materially hinder or impair the consummation of the transactions contemplated hereby

Section 6 5    No Litigation    There is no Action pending or, to the knowledge of Buyer, threatened which questions the legality or propriety of the transactions contemplated by this Agreement or the Buyer Ancillary Agreements or which would impair the consummation of the transactions contemplated hereby, and there has not been, to the knowledge of Buyer, any claim asserted by any Person that could lead to such an Action

Section 6 6    Investment Representation    Buyer is acquiring the Shares for investment and not with a view to the distribution thereof or dividing all or any part of its interest therein with any other Person

Section 6 7    No Advisor    Neither Buyer nor any Person acting on its behalf has retained any advisor, broker, investment banker or financial advisor in connection with this Agreement or any transaction contemplated hereby for which Seller may be liable

Section 6 8    No Misrepresentation    To the knowledge of Buyer, the representations and warranties of Buyer contained in this Agreement, and the certificates and other instruments delivered by Buyer pursuant hereto do not include any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made not misleading

## ARTICLE 7
## ACTION PRIOR TO THE CLOSING DATE

Buyer and Seller covenant and agree to take the following actions between the date hereof and the Closing Date

Section 7 1    Preserve Accuracy of Representations and Warranties    Buyer and Seller shall, and Seller shall cause GNB to, refrain from taking any action that would render any representation or warranty contained in this Agreement inaccurate as of the Closing Date  Buyer and Seller shall promptly notify the other of any Action, investigation, or other proceeding, that shall be instituted or threatened against such party or in the case of Seller, against GNB to restrain, prohibit or otherwise challenge the legality of any transaction contemplated by this Agreement

Section 7 2    Governmental Approvals    During the period prior to the Closing Date, Seller and Buyer shall, and Seller shall cause GNB to, act diligently and reasonably, and shall cooperate with each other, to secure any consents and approvals of any Governmental Body required to be obtained in order to effect the consummation of the transactions contemplated by this Agreement and preserve for the benefit of GNB its rights under permits and agreements

-21-

A-0896

Section 7.3    Operations Prior to the Closing Date

(a) During the period prior to the Closing Date, Seller shall cause GNB to operate and carry on its operations only in the ordinary course and substantially as operated prior to the date hereof

(b) Notwithstanding Section 7.3(a), except as set forth in Schedule 7.3(B) and expressly contemplated by this Agreement, or with the express prior consent of Buyer, Seller shall not take and shall cause GNB not to take any of the actions set out in Section 5.7(b), provided however, notwithstanding anything to the contrary herein, Seller shall not make, and since May 9, 2000 has not made, any capital expenditure in excess of the local currency equivalent of US$250,000 (other than those permitted by Section 7.3(b) of the Principal US Agreement) without the prior written approval of Buyer

Section 7.4    Notification of Changes    Each of Seller and Buyer shall promptly notify the other of any event that causes any representation or warranty given by such party in Articles 4, 5 and 6 to become untrue

Section 7.5    Satisfaction of Condition    Buyer and Seller shall use their respective reasonable endeavors to secure the satisfaction of the conditions to Closing contained in Section 8.2(g), provided that nothing in this Section 7.5 shall oblige Seller to agree to any variation in the terms of this Agreement or the transactions contemplated thereby

Section 7.6    Intercompany Agreements    All Intercompany Agreements and intercompany accounts payable and receivable, except for those set out in Schedule 7.6, shall be terminated or canceled at Closing

Section 7.7    Preemptive Rights    All Preemptive Rights existing under any of GNB's organizational documents shall be waived at Closing

Section 7.8    Insurance Matters

(a) Seller agrees that with respect to any occurrence-based policies as to which GNB is named insured or named as additional insured parties (the "Insurance Policies"), it shall fully cooperate with Buyer (at Buyer's expense) in taking all steps necessary to file and process any insurance claims for any claims made after the Closing Date that relate to any acts, events or occurrences prior to the Closing Date relating to the Business (the "Insured Claims") that are insured under such policies    To the extent that any proceeds relating to the Insured Claims are received by Seller or any of Seller's Affiliates, Seller agrees to pay over such proceeds promptly to Buyer

(b) Buyer agrees that it shall pay any retrospective premium charge or liability owed by Seller under the terms of such Insurance Policies (including amounts owed under premium audits), subject to the following conditions (i) Buyer shall only be obligated to pay such portion of a retrospective premium charge or liability to the extent it exclusively relates to the Business, (ii) Buyer shall have the right, upon reasonable request made to Seller, to audit any retrospective

-22-

premium policies and charges thereunder, and to object to any proposed charge on the basis of such audit (in which case any dispute between Seller and Buyer (not including any dispute between Buyer and any insurer) shall be resolved by binding arbitration) and (iii) Buyer shall not be required to pay any retrospective charge or liability with respect to any Insurance Policies to the extent the overall maximum premium owed by all of the insured parties thereon has previously been paid

(o) Buyer acknowledges and agrees that neither Buyer nor GNB will have, after the Closing Date, any rights under, and will not assert claims against, any insurance policies insuring or naming Pacific Chloride, Inc., or any of its predecessors or successors, as an insured or additional insured, nor will Buyer or GNB assert rights to any settlements of claims under such policies

Section 7 9  General  Each of the parties will use its reasonable best efforts to take all action and to do all things necessary, proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the closing conditions set forth below)

Section 7 10  Preservation of Business  Each of the parties shall, and Seller shall cause GNB to, use reasonable best efforts to keep their businesses and properties substantially intact, including their present operations, physical facilities, working conditions, and relationships with lessors, licensors, suppliers, customers and employees

**ARTICLE 8**
**CONDITIONS TO CLOSING**

Section 8 1  Conditions to the Obligations of the Buyer  The obligations of Buyer under this Agreement shall, at the option of Buyer, be subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions

(a) No Misrepresentation or Breach of Covenants and Warranties  Seller shall have complied in all material respects with its covenants and agreements herein and in the Coordinating Agreement  Each of the representations and warranties of Seller contained in this Agreement and each of the Seller Ancillary Agreements shall be true and correct in all material respects on the Closing Date as though made on the Closing Date (except with respect to those representations and warranties that speak as to a particular date or time, which only need to be true and correct as of such date or time), except for changes therein specifically permitted by this Agreement or resulting from any transaction expressly consented to in writing by Buyer, and there shall have been delivered to Buyer a closing certificate in a form reasonably satisfactory to the Buyer to such effect, dated the Closing Date, signed by the President or Vice President of Seller,

(b) Closing Documents  Buyer shall have received from Seller the agreements and closing documents contemplated by Section 3 2

-23-

A-0898

(c) <u>Necessary Approvals</u>  The Seller and the Buyer shall have received all approvals and actions of or by all Governmental Bodies and any other Person which are necessary to complete the transactions contemplated hereby and by the ROW Agreements and preserve for the benefit of GNB its rights under the GNB Agreements which are material to the operation of the Business

(d) <u>No Suit</u>  No Action by any Governmental Body shall be pending or threatened questioning the legality of this Agreement or the consummation of the transactions contemplated hereby in whole or in part

(e) <u>No Restraint</u>  No Court Order shall have been issued and be in effect which restrains or prohibits any material transaction contemplated hereby

(f) <u>Principal US Agreement</u>    The transactions contemplated by the Principal US Agreement shall have closed simultaneously with the Closing

(g) <u>No Material Adverse Change</u>  On the Closing Date, there shall not be a Material Adverse Effect

(h) <u>Coordinating Agreement</u>  All conditions to Exide Corporation's obligations set forth in Sections 5 5, 5 6 and 5 7(a) of the Coordinating Agreement shall have been satisfied

Notwithstanding the failure of any one or more of the foregoing conditions, Buyer may, at its option, proceed with the Closing without satisfaction, in whole or in part, of any one or more of such conditions and without written waiver, provided however, that in so proceeding with the Closing, and notwithstanding any other provision of this Agreement, Buyer shall be deemed to have waived any such failure and any rights or remedies it may have against Seller by reason of such failure

Section 8 2    <u>Conditions to the Obligations of Seller</u>  The obligations of Seller under this Agreement shall, at the option of Seller, be subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions

(a) <u>No Misrepresentation or Breach of Covenants and Warranties</u>  Buyer shall have complied in all material respects with its covenants and agreements herein and in the Coordinating Agreement  Each of the representations and warranties of the Buyer contained in this Agreement and the Buyer Ancillary Agreements shall be true and correct in all material respects on the Closing Date as though made on the Closing Date (except with respect to those representations and warranties that speak as to a particular date or time, which only need to be true and correct as of such date or time), except for changes therein specifically permitted by this Agreement or resulting from any transaction expressly consented to in writing by Seller, and there shall have been delivered to Seller a closing certificate in a form reasonably satisfactory to the Seller to such effect, dated the Closing Date and signed by the President or Vice President of the Buyer,

-24-

A-0899

(b) Closing Documents    Seller shall have received from Buyer the agreements and closing documents contemplated by Section 3 3

(c) Payment of Purchase Price    Buyer shall have tendered payment of the Purchase Price

(d) Necessary Approvals    Seller and Buyer shall have received all approvals and actions of or by all Governmental Bodies and any other Person which are necessary to consummate the transactions contemplated hereby and by the ROW Agreements and preserve for the benefit of Buyer its rights under agreements which are material to the operation of its business.

(e) No Suit    No Action by any Governmental Body shall be pending or threatened questioning the legality of this Agreement or the consummation of the transactions contemplated hereby in whole or in part

(f) No Restraint    No Court Order shall have been issued and be in effect which restrains or prohibits any material transaction contemplated hereby

(g) Principal US Agreement    The transactions contemplated by the Principal US Agreement shall have closed simultaneously with the Closing

(h) No Material Adverse Change    On the Closing Date, there shall have been no event, occurrence or condition (other than as a result of general economic conditions or events affecting the automotive and industrial battery business as a whole) which has, or could reasonably be expected to have, a material adverse effect on the financial condition, assets, results or operations, businesses, or operations of Buyer taken as a whole

(i) Coordinating Agreement    All conditions to Pacific Dunlop Holdings (USA) Inc's obligations set forth in Sections 5 5 and 5 7(b) of the Coordinating Agreement shall have been satisfied

Notwithstanding the failure of any one or more of the foregoing conditions, Seller may, at its option, proceed with the Closing without satisfaction, in whole or in part, of any one or more of such conditions and without written waiver, provided however, that in so proceeding with the Closing, and notwithstanding any other provision of this Agreement, Seller shall be deemed to have waived any such failure and any rights or remedies it may have against Buyer by reason of such failure

## ARTICLE 9
## TERMINATION

Section 9 1    Termination    Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing Date

(a) by the mutual written consent of Buyer and Seller,

-25-

A-0900

(b) by Buyer or Seller if the Closing shall not have occurred on or before December 31, 2000 unless (i) all conditions to Closing have previously been satisfied or waived, and (ii) the Closing has not then occurred solely because the date for Closing specified in Section 3 1 has not yet occurred and unless such failure to close is due primarily to the breach by the party seeking termination of its agreements, representations or warranties contained herein,

(c) by Buyer in the event of any breaches in any material respect by Seller of Seller's agreements, covenants, representations or warranties contained herein, which Seller has failed to remedy or cure within twenty one (21) days after receipt of notice from Buyer requesting that such breaches be remedied or cured,

(d) by Seller in the event of any material breaches by Buyer of Buyer's agreements, covenants, representations or warranties contained herein, which Buyer has failed to remedy or cure within twenty one (21) days after receipt of notice from Seller requesting that such breaches be remedied or cured, or

(e) by Buyer or Seller if any court shall have issued a Court Order or if any Governmental Body shall have issued a decree or ruling or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby

**Section 9 2    Notice of Termination**  Any party desiring to terminate this Agreement pursuant to Section 9 1 shall give written notice of such termination to the other parties to this Agreement

**Section 9 3    Effect of Termination**  In the event that this Agreement shall be terminated pursuant to this Article 9, all further obligations of the parties under this Agreement (other than Sections 12 2, 12 8, and 12 11 of this Agreement and Sections 5 2, 5 3 and 5 4 of the Coordinating Agreement) shall be terminated without further liability of any party to the other, provided that nothing herein shall relieve either party from liability for its willful breach of this Agreement

### ARTICLE 10
### EXCLUSIVITY OF REMEDY

**Section 10 1    Indemnification by Seller**  Seller's sole and exclusive indemnification obligations under this Agreement are set forth in the Coordinating Agreement

**Section 10 2    Indemnification by Buyer**  Buyer's sole and exclusive indemnification obligations under this Agreement are set forth in the Coordinating Agreement

**Section 10 3    Exclusivity of Remedy**  Except as provided in Section 9 3, with respect to any breach by either party of its representations, warranties, covenants, or agreements in this Agreement, the respective Buyer Ancillary Agreements or Seller Ancillary Agreements,  or the ROW Agreements and the transactions contemplated hereby and thereby, the sole and exclusive remedy of the other party (in contract, tort, for contribution, under Requirements of Law, or

-26-

with copies to

Linklaters
9 Raffles Place
Republic Plaza #34-00
Singapore 048619
Attention  Stephen Bull
Facsimile  011 65 438 3811

and

Kirkland & Ellis
200 East Randolph Drive
Chicago, Illinois 60601
United States of America
Attention  Mr Carter W  Emerson, P C
Facsimile  312-861-2200

or to such other address as such party may indicate by a notice delivered to the other parties
hereto in accordance with the provisions of this Section 12 1

Section 12 2  **Confidential Information**  Each party agrees that it will treat in
confidence all documents, materials and other information which it shall have obtained regarding
any of the other parties during the course of the negotiations leading to the consummation of the
transactions contemplated hereby (whether obtained before or after the date of this Agreement),
the investigation provided for herein and the preparation of this Agreement and other related
documents ("Confidential Information"), and, in the event the transactions contemplated
hereby shall not be consummated, each party will return to the other party all copies of nonpublic
Confidential Information which have been furnished in connection therewith  Confidential
Information shall not be communicated to any third Person (other than the parties' respective
counsel, accountants, financial advisors, or environmental consultants)  No party shall use any
Confidential Information in any manner whatsoever except solely for the purpose of evaluating
the proposed transaction  Notwithstanding the foregoing, after the Closing, Buyer may use or
disclose any Confidential Information related to GNB  Seller shall not at any time after the
Closing disclose any Confidential Information relating to GNB  The obligation of each party to
treat Confidential Information in confidence shall not apply to any Confidential Information
which (i) is or becomes available to such party from a source other than such party, (ii) is or
becomes available to the public other than as a result of disclosure by such party or its agents,
(iii) is required to be disclosed under applicable law or judicial process, but only to the extent it
must be disclosed, or (iv) as to which such party reasonably deems disclosure necessary to obtain
any of the consents or approvals contemplated hereby

Section 12 3  **No Public Announcement**  Neither Buyer nor Seller shall, without the
approval of the other party, issue any press release or other public announcement concerning the
transactions contemplated by this Agreement  Notwithstanding the foregoing, either party may

-30-

issue a press release or other public announcement concerning the transactions contemplated by this Agreement to the extent that such party or their Affiliates shall be so obligated by law, or to comply with accounting, U.S. Securities and Exchange Commission, New York Stock Exchange or Australian Stock Exchange disclosure obligations, provided that such party shall be obligated to give the other party prior notice of such press release or other public announcement if prior notice is commercially feasible

Section 12.4 Entire Agreement, Amendments  This Agreement, the Coordinating Agreement, the ROW Agreements and the Exhibits and Schedules referred to herein and therein and the Buyer Ancillary Agreements and the Seller Ancillary Agreements contain the entire understanding of the parties hereto with regard to the subject matter contained herein or therein, and supersede all prior written or oral agreements, understandings or letters of intent between or among any of the parties hereto  This Agreement shall not be amended, modified or supplemented except by a written instrument signed by an authorized representative of each of the parties hereto

Section 12.5. Successors and Assigns

(a) The rights of each party under this Agreement and the Coordinating Agreement shall not be assignable without the written consent of the other party, provided, however, that no such assignment shall relieve the assigning party from any of its duties or obligations under this Agreement or the Coordinating Agreement

(b) This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns  Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any Person other than the parties and successors and assigns permitted by this Section 12 5 any right, remedy, benefit or claim under or by reason of this Agreement

Section 12 6  Interpretation

(a) Article titles and headings to sections herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement  The Schedules referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth herein

(b) This Agreement and the Schedules hereto have been mutually prepared, negotiated and drafted by each of the parties hereto and thereto  The parties agree that the terms of this Agreement shall be construed and interpreted against each party in the same manner and that no such provisions shall be construed or interpreted more strictly against one party on the assumption that an instrument is to be construed more strictly against the party which drafted the agreement

Section 12 7  Waivers  Any term or provision of this Agreement may be waived, or the time for its performance may be extended, pursuant to a written action by the party or parties entitled to the benefit thereof  Any such waiver shall be validly and sufficiently authorized for

-11-

purposes of this   greement if, as to any party, it is authorized in writing by an authorized representative of such party  Subject to Sections 8 1 and 8 2, the failure of any party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any party thereafter to enforce each and every such provision  No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach

Section 12 8   Expenses   Subject to the provisions of Section 9 3 and of the Coordinating Agreement, regardless of whether the transactions provided for in this Agreement are consummated, each party hereto will pay its own costs and expenses incident to the negotiation, preparation and performance of this Agreement, including the fees, expenses and disbursements of its counsel, financial advisors, and accountants  GNB has not borne and will not bear any such costs or expenses

Section 12 9   Partial Invalidity   Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable

Section 12 10   Execution in Counterparts   This Agreement may be executed in one or more counterparts, each of which shall be considered an original instrument, and shall become binding when one or more counterparts have been signed by each of the parties hereto and delivered to each of Seller and Buyer

Section 12 11   Governing Law   This Agreement shall be governed by and construed in accordance with the internal laws of the State of Illinois, U S A  without giving effect to any choice of laws provisions which may direct the application of the laws of another jurisdiction

Section 12 12   Further Assurances and Cooperation

(a)  From and after the date of this Agreement, upon the request of either Seller or Buyer or any of their respective Affiliates, the other party and its Affiliates shall execute and deliver such instruments, documents or other writings as may be reasonably necessary or desirable to confirm and carry out and to effectuate fully the intent and purposes of this Agreement

(b)  After the Closing, on reasonable advance notice, Buyer shall cause GNB to provide Seller, Seller's Affiliates (including but not limited to the Affiliate referenced in Section 11 1), and any advisor retained by Seller or its Affiliates with reasonable access to the management and properties, and books, records, and documents (which were in existence on the Closing) of GNB, during normal business hours and in a manner which does not unreasonably interfere with GNB, for any reasonable purpose including, but not limited to, the fulfillment of Seller's responsibilities under Section 4 1(a) of the Coordinating Agreement and the enforcement of Seller's and its Affiliates' rights under Article 2 of the Coordinating Agreement and clause (m) of

-32-

A-0907

Section 4 2(a) of the Coordinating Agreement.  As reasonably necessary, Seller, Seller's Affiliates, and any advisor retained by Seller, or its Affiliates shall be entitled to make copies of such books, records, and documents at their expense.  If Buyer shall desire at any time to dispose of any such books, records, or documents, Buyer shall, prior to such disposition, give Seller a reasonable opportunity to segregate and remove such books, records, and documents as Seller may select.  The obligations of Buyer pursuant to this Section 12 12(b) shall survive the Closing indefinitely.

Section 12 13  No Reliance.  The provisions of this Agreement are intended for the sole benefit of Buyer and Seller and shall not inure to the benefit of any other Person, other than successors and permitted assigns of Buyer and Seller, whether as third party or otherwise.

Section 12 14  Disclosure Schedules.  The Disclosure Schedules is hereby incorporated by reference into and made a part of this Agreement.  The inclusion of any item in the Disclosure Schedules is intended to qualify the representations and warranties contained in this Agreement, and to set forth other information required by this Agreement.  Disclosure of information in any one of the Disclosure Schedules shall be deemed to be a disclosure with respect to every Section of this Agreement notwithstanding the presence or absence of a cross-reference to the Disclosure Schedules under other Sections of this Agreement if the meaning of such disclosure in the context of such other Section is reasonably ascertainable.  Disclosure of information in the Disclosure Schedules shall not be deemed to be an admission by the Seller that such information is material for the purposes of this Agreement.

-33-

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed
the day and year first above written

SELLER

PACIFIC DUNLOP HOLDINGS
(SINGAPORE) PTE LTD
By its duly appointed attorney

_____

Name   Martin M Hudson
Title   Attorney in Fact


BUYER

TRAFSON PTE LTD
By its Director duly authorized

Signature _____

Name _____

Title _____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

SELLER

PACIFIC DUNLOP HOLDINGS
(SINGAPORE) PTE LTD
By its duly appointed attorney

Name   Martin M  Hudson
Title   Attorney in Fact

BUYER

EXIDE HOLDING ASIA PTE  LIMITED
By its Director duly authorized

Signature _____

Name _____

Title _____

A-0910

No FC II  617(97)/182(97)
Government of India
Ministry of Industry
Department of Industrial Policy & Promotion
Secretariat for Industrial Assistance
Foreign Collaboration – II Section

New Delhi, the October 21, 1997

M/s PACIFIC DUNLOP HOLDINGS (SINGAPORE) LTD
C/o VAISH ASSOCIATES, ADVOCATES
10 HAILEY ROAD, APTS 5 & 7,
NEW DELHI  110001

SUBJECT  Application for foreign collaboration (SIA Regn  No FC 1    182 dated
11/03/97)

Dear Sir,

I am directed to refer to the above mentioned application and to convey approval of
Government of India to your proposal, subject to the following terms and conditions

| 1 | Name and address of foreign collaborator | M/s PACIFIC DUNLOP HODLINGS (SINGAPORE) PTE LTD No 6, LOYANG WAY 1, #02-02, SINGAPORE |
| 2 | Name and address of Indian subsidiary | M/s GNB TECHNOLOGIES (INDIA) PVT LTD |
| 3 | Item(s) of manufacture/activity covered by the foreign collaboration | I) TO SET UP A 100% WHOLLY OWNED SUBSIDIARY FOR MANUFACTURING AND MARKETING OF VALUE REGULATED LEAD ACID BATTERIES AND PARTS THEREOF |
| 4 | Proposal location District State | BANGALORE BANGALORE (URBAN) KARNATAKA |

5 a)   Foreign Equity Participation  100.00% (One Hundred percent) initially
amounting to Rs 20.00 Lakhs (Rupees Twenty Lakhs) which will subsequently be
increased to Rs 7000.00 Lakhs ( Seven Thousand Lakhs)

5      The approval is subject to the condition that the test marketing would be only for
those items for which the company has taken approval for manufacture



7    The approval is further subject to the condition that the company would disinvest 25% of their equity within a period of 5-7 years as volunteered by them according to the laws, regulations and guidelines then in effect with respect to making public offer

8    It is noted that you have projected an export earnings of Rs 100 94 crores over 5 year period starting from the 3rd year of operation

9    It is noted that the Non-Resident shareholding in the Indian company should exceed the amount as well as the percentage specified in the approval letter. For any proposed increase in the amount as also the percentage of the Non-Resident shareholding, prior approval of the Government shall be obtained

10   In case the proposed activity is not exempted from the provisions of Industrial (Development & Regulation) Act, 1951 and the Foreign Exchange Regulation Act, 1973 it will be your responsibility to obtain such clearances as may be required under the said Acts

11   The location of the industrial projects, will be subject to Central or State Environmental laws or regulations including local zoning and land use laws and regulations

12   Adequate steps shall be taken on the satisfaction of the Government to prevent air, water and soil pollution. Such anti-pollution measures to be installed should conform to the effluent and emission standards prescribed by the State Government in which the factory or the industrial undertaking is located

13   You shall not manufacture items reserved for the Small Scale Sector without prior approval of the Government as per the prescribed policy and procedure

14   Import of capital equipments, components and raw materials will be allowed as per the import policy prevailing from time to time

15   This approval letter is made a part of the foreign collaboration agreement to be executed between you and the foreign collaborator and only those provisions of the agreement which are covered by this letter or which are not in variance with the provisions of this letter shall be binding on the Government of India or Reserve Bank of India

16   You may now proceed to finalise the agreement

17   The agreement shall be subject to Indian Laws

18   The approval is valid for a period of two years from the date of issue. Within this period, you are required to file the collaboration agreement with the Reserve Bank of India/Authorised Foreign Exchange Dealer

19    You may approach your Regional Office of Exchange Control Department of Reserve Bank of India for necessary permission under Section 19 of FERA, 1973, for allotment of shares to Non-Residents

20    You are requested to send Foreign Investment Remittance Certificate (FIRC) to the Regional Office, Reserve Bank of India, immediately on receipt of foreign remittance

21    All remittances to the foreign collaborator shall be made as per the exchange rates prevailing on the day of remittance

22    The Administrative Ministry for this Project is the IPP(B – DESK), New Delhi

23    You are requested to acknowledge and confirm acceptance of the above terms and conditions to Secretariat for Industrial Assistance (FC II Section) and the Administrative Ministry

24    A copy of the collaboration agreement, signed by both parties may be furnished to the following authorities

      (A)    Administrative Ministry/Department as mentioned above
      (B)    Secretariat for Industrial Assistance (Foreign Collaboration II Section), Department of Industrial Policy & Promotion, Udyog Bhawan, New Delhi 110011
      (C)    Department of Scientific and Industrial Research, Technology Bhavan, New Mehrauli Road, New Delhi

25    All future correspondence for amendments/changes in terms and conditions of the approval letter or for extension of validity, if required, etc , may be addressed to the Entrepreneurial Assistance Unit of the Secretariat for Industrial Assistance, Udyog Bhavan, New Delhi 110011

26    You are requested to furnish the information as per the questionnaire at Annexure on 1ˢᵗ January & 1ˢᵗ July every year till the receipt of approved foreign equity and commencement of production to the Secretariat for Industrial Assistance (FC II Section), Udyog Bhawan, New Delhi – 110011

                                        Yours faithfully,


                                        Sd/-

SEAL OF THE MINISTRY                    (P C BHATT)
                                UNDER SECRETARY TO THE GOVT OF INDIA

PH NO    3017227
FAX No    3011770

A-0914